# EXHIBIT 1 - SUMMONS AND COMPLAINT

10/29/2021 8:54 AM

**SEI**

WRIGHT, FINLAY & ZAK, LLP
Darren T. Brenner, Esq.
Nevada Bar No. 8386
Lindsay D. Dragon, Esq.
Nevada Bar No. 13474
7785 W. Sahara Ave., Suite 200
Las Vegas, NV 89117
(702) 637-2345; Fax: (702) 946-1345
ldragon@wrightlegal.net
*Attorneys for Plaintiff, Mariners Pac Ventures, LLC*

**EIGHTH JUDICIAL DISTRICT COURT**
**CLARK COUNTY, NEVADA**

| | |
|---|---|
| MARINERS PAC VENTURES, LLC,<br><br>           Plaintiff,<br><br>vs.<br><br>STEWART TITLE GUARANTY COMPANY; STEWART TITLE OF NEVADA – LAS VEGAS DIVISION; DOE INDIVIDUALS I through X; and ROE CORPORATIONS XI through XX, inclusive,<br><br>           Defendants. | Case No.: A-21-837293-C<br>Dept. No.: 1<br><br><br>**SUMMONS** |

**NOTICE!  YOU HAVE BEEN SUED.  THE COURT MAY DECIDE AGAINST YOU WITHOUT YOUR BEING HEARD UNLESS YOU RESPOND WITHIN 21 DAYS. READ THE INFORMATION BELOW.**

**TO THE DEFENDANT:**  A Civil Complaint has been filed by the Plaintiff against you for the relief set forth in the Complaint.

### STEWART TITLE GUARANTY COMPANY

    1.    If you intend to defend this lawsuit, within 21 days after this Summons is served on you exclusive of the day of service, you must do the following:

        a.    File with the Clerk of the Court, whose address is shown below, a formal written response to the Complaint in accordance with the rules of the Court.

        b.    Serve a copy of your response upon the attorney whose name and address is shown below.

2.   Unless you respond, your default will be entered upon application of the Plaintiff, and this Court may enter a judgment against you for the relief demanded in the Complaint, which could result in the taking of money or property or other relief requested in the Complaint.

3.   If you intend to seek the advice of an attorney in this matter, you should do so promptly so that your response may be filed on time.

Issued at direction of:

WRIGHT, FINLAY & ZAK, LLP

*/s/ Lindsay D. Dragon*
Lindsay D. Dragon, Esq.
Nevada Bar No. 13474
7785 W. Sahara Ave., Suite 200
Las Vegas, NV 89117
*Attorneys for Plaintiff, Mariners*
*Pac Ventures, LLC*



CLERK OF COURT

11/1/2021

DEPUTY CLERK
DATE:
County Courthouse

Demond Palmer

Electronically Filed
7/1/2021 7:27 PM
Steven D. Grierson
CLERK OF THE COURT

**COMP**
WRIGHT, FINLAY & ZAK, LLP
Darren T. Brenner, Esq.
Nevada Bar No. 8386
Christina V. Miller, Esq.
Nevada Bar No. 12448
7785 W. Sahara Ave., Suite 200
Las Vegas, NV 89117
(702) 637-2345; Fax: (702) 946-1345
dbrenner@wrightlegal.net
cmiller@wrightlegal.net
*Attorneys for Plaintiff, Mariners Pac Ventures, LLC*

CASE NO: A-21-837293-C
Department 1

**EIGHTH JUDICIAL DISTRICT COURT**

**CLARK COUNTY, NEVADA**

| | |
|---|---|
| MARINERS PAC VENTURES, LLC,<br><br>Plaintiff,<br><br>vs.<br><br>STEWART TITLE GUARANTY COMPANY; STEWART TITLE OF NEVADA – LAS VEGAS DIVISION; DOE INDIVIDUALS I through X; and ROE CORPORATIONS XI through XX, inclusive,<br><br>Defendants. | Case No.:<br>Dept. No.:<br><br>**COMPLAINT**<br><br>**ARBITRATION EXEMPT: ACTION FOR DECLARATORY RELIEF** |

Plaintiff Mariners Pac Ventures, LLC  ("Mariners"), by and through its attorneys of record, Darren T. Brenner, Esq. and Christina V. Miller, Esq., of the law firm of Wright, Finlay & Zak, LLP, submits its Complaint against Stewart Title Guaranty Company ("Stewart"), Stewart Title of Nevada – Las Vegas Division ("Stewart Nevada"), Doe Individuals I through X ("Does") and Roe Corporations XI through XX, inclusive ("Roes") (collectively, "Defendants"), for breach of their obligations to defend and indemnify Mariners under a title insurance policy issued to insure a deed of trust on real property located in Nevada.

Title insurers, like Defendants, have known since the early 1990's that homeowners associations in some states, including Nevada, impose liens that can attain superpriority over

senior mortgages and deeds of trust. Title insurers are the experts on title, and lenders like Mariners rely upon and pay them handsomely for their expertise and protection.

Title insurers, like Defendants, have acknowledged the coverage that Mariners claims is due and owing in their manuals. These insurers themselves developed the trade usage describing the endorsements at issue in this case as providing coverage to an insured lender for losses caused by the enforcement of an association's superpriority lien.

Defendants' coverage position in this specific case is directly at odds with the trade usage they developed globally.  This factual background must be considered when interpreting the title insurance contract drafted and issued by the insurers to Mariners' predecessor-in-interest.

### *Parties, Jurisdiction and Venue*

1.      Plaintiff Mariners is a California limited liability company with its principal place of business in California and doing business in Clark County, Nevada.

2.      Defendant Stewart is a Delaware corporation with its principal place of business in Texas and doing business in Clark County, Nevada.

3.      Defendant Stewart Nevada is a Nevada corporation with its principal place of business in Nevada and doing business in Clark County, Nevada.  Upon information and belief Stewart Nevada merged with Stewart and is a wholly owned subsidiary of Stewart.

4.      Mariners does not know the true names, capacities or bases of liability of fictitious defendants sued as Does I through X and Roe Corporations XI through XX, inclusive (collectively "fictitious Defendants").  Each fictitiously named defendant is in some way liable to Mariners.  Mariners will amend this Complaint to reflect the true names of said defendants when the same have been ascertained.

5.      This matter is exempt from Arbitration as Mariners has requested a declaration that the Policy provided coverage for all losses or damages, up to the Amount of Insurance, sustained by Mariners as a result of the HOA's foreclosure sale.

6.      This Court has personal jurisdiction over Defendants because they have engaged in the business of issuing title insurance policies insuring deeds of trust on land located in the

State of Nevada and therefore have sufficient contacts with the State to have availed themselves of the State's jurisdiction.

7.  This Court has personal jurisdiction over Stewart because it has purposefully availed itself of this forum by intentionally directing its subsidiaries to tortiously deny coverage under the insurance policies described below and by making or facilitating the coverage decisions of Stewart Nevada regarding thousands of claims upon policies affecting insured interests on real property located in Nevada.

8.  Venue is appropriate in this Court because this judicial district is where a substantial part of the events giving rise to Mariners' claims took place, and it is the location of the property subject to the insured deed of trust that is at the core of this lawsuit.

### *Nature of Title Insurance*

9.  A title insurance policy is a contract through which the insurer is paid one sum in consideration for agreeing to indemnify the insured up to a specified amount against loss caused by encumbrances upon or defects in the title to real property in which the insured has an interest.

10.  Lenders such as Mariners often seek to obtain title insurance policies in connection with loans they advance that are secured by interests in real property. The title insurance policy generally protects the lender against risks associated with loss of title or practical use of the property, subject to the policy's terms, exclusions, and conditions.

11.  This lawsuit concerns the issuance of a title insurance policy in favor of the original lender, Mountain View Mortgage Company, its successors and assigns.[1]  Mariners is the insured entity under the Policy.

12.  Before 2014, Defendants issued to Mariners (or Mariners' predecessors-in-interest) a number of title insurance policies.

---

[1] A true and correct copy of the Title Insurance Policy is attached as **Exhibit 1**. *See id.* at Schedule A.

13.     The large majority of insurance policies issued by Stewart and its issuing agents use standard forms promulgated by the American Land Title Association ("ALTA") and the California Land Title Association ("CLTA").

14.     ALTA and CLTA are trade groups made up of representatives from the major title insurance underwriters and issuers, including Defendants.

15.     These standard ALTA and CLTA forms are used by multiple title insurers, which publish guides concerning the coverage (and exceptions thereto) provided by the standard policy.  The standard ALTA policy form has been revised from time to time, including changes in 1992, 2006, and 2012.

16.     There are a number of ALTA standardized endorsement forms that can be issued with the standard policy to modify the scope of coverage available.  Defendants have also used CLTA standardized endorsement forms from time to time.

17.     Non-party Chicago Title Insurance Company, who is also a subsidiary of Fidelity National Title Group ("Fidelity"), issued a 2013 Endorsement Manual which states that "endorsements will provide additional coverage for matters which would ordinarily be excluded by the Exclusions From Coverage, or excepted from coverage shown in Schedule B of" a title insurance policy.[2]

18.     This is consistent with trade usage of the term "endorsement" among title insurers and their insureds.  *See, e.g.*, Joyce D. Palomar, *Title Insurance Law* § 9:1 (2013-14 ed.) (explaining that endorsements serve two primary purposes: (1) "they may provide affirmative coverage for facts that exist in a transaction which standard title insurance policies have not traditionally addressed," or (2) they "may 'insure over' or modify the effect of preprinted policy exclusions or exceptions").

19.     Lenders commonly request that title insurers issue ALTA Endorsement Form 9 ("Form 9"), or its CLTA equivalent, CLTA Endorsement Form 100 ("Form 100").  These "comprehensive" endorsements provide a range of guarantees to the insured relating to the

---

[2] A true and correct copy of Chicago Title's 2013 Endorsement Manual is attached as **Exhibit 2**.

existence of covenants, conditions, or restrictions affecting or governing the property which could cause damage to the insured lender's interest at the time the policy is issued or in the future.

20. ALTA Form 9-06 is the equivalent of ALTA Form 9 and CLTA Form 100 is the equivalent of Form 9.[3]

21. It is commonly understood between title insurers and their insureds that Form 9/Form 100 "[p]rovides comprehensive coverage for [an] insured ALTA lender against loss by reason of present *or future* [covenants, conditions and restrictions] violations[.]"[4]

22. Stewart exerts control over its subsidiaries, including Stewart Nevada, by determining the terms and conditions upon which they will insure title to real property, dictating policies and procedures that govern how they will evaluate claims, and directing them to deny certain categories of claims.

23. Stewart's Claims Department processes claims submitted under title insurance policies underwritten by all of Stewart's wholly owned subsidiaries, including Stewart Nevada. To promote consistent coverage positions among its subsidiaries, Stewart provides its Claims Department with instructions and other claims handling guidance, including directives as to which position the subsidiaries should take as to coverage on a claim.

### Defendants Issued Policies Understood to Cover Nevada Superpriority Liens

24. In 1982, the Uniform Law Commission promulgated the Uniform Common Interest Ownership Act ("UCIOA"). UCIOA provided a number of standardized terms governing the formation of common interest associations, including condominium associations and homeowners associations.

25. As relevant here, UCIOA provided that homeowners associations' covenants, conditions, and restrictions included a "superpriority" lien for unpaid assessments, which came into existence when the association was formed (i.e., when its declaration of covenants,

---

[3] *See id.* at 3.

[4] A true and correct copy of Fidelity's Endorsement Guide is attached as **Exhibit 3** (emphasis added).

conditions, and restrictions were recorded), and would take priority over a subsequently recorded mortgage or deed of trust even if no assessments were due at the time the mortgage or deed of trust was recorded.

26.     In 1991, the Nevada Legislature adopted the 1982 version of UCIOA, codifying it in Chapter 116 of the Nevada Revised Statutes.

27.     Chapter 116 includes NRS 116.3116, which, at the time of the events relevant to this suit, stated in relevant part:

> 1.   The association has a lien on a unit for any construction penalty that is imposed against the unit's owner pursuant to NRS 116.310305, any assessment levied against that unit or any fines imposed against the unit's owner from the time the construction penalty, assessment or fine becomes due. . . .
>
> 2.   A lien under this section is prior to all other liens and encumbrances on a unit except:
> . . .
> (b) A first security interest on the unit recorded before the date on which the assessment sought to be enforced became delinquent . . . ;
> . . .
> The lien is also prior to all security interests described in paragraph (b) to the extent of any charges incurred by the association on a unit pursuant to NRS 116.310312 and to the extent of the assessments for common expenses based on the periodic budget adopted by the association pursuant to NRS 116.3115 which would have become due in the absence of acceleration during the 9 months immediately preceding institution of an action to enforce the lien . . . .
> . . .
> 4. Recording of the declaration constitutes record notice and perfection of the lien. No further recordation of any claim of lien for assessment under this section is required.

28.     Under NRS 116.3116, from the time an association's covenants, conditions, and restrictions are recorded, the properties governed by the association are encumbered by a lien that secures all assessments.  Chapter 116 does not require that an association record a separate lien before the lien is foreclosed.

29.     As part of its adoption of UCIOA, the Nevada Legislature also enacted NRS 116.1104:

> Except as expressly provided in this chapter, [NRS 116's] provisions may not be varied by agreement, and rights conferred by it may not be waived. Except as otherwise provided in paragraph (b) of subsection 2 of NRS 116.12075, a declarant may not act under a power of attorney, or use any other device, to evade the limitations or prohibitions of this chapter or the declaration.

30.     The Nevada Legislature also enacted NRS 116.1206(1):

> Any provision contained in a declaration, bylaw or other governing document of a common-interest community that violates the provisions of this chapter shall be deemed to conform with those provisions by operation of law, and any such declaration, bylaw or other governing document is not required to be amended to conform to those provisions.

31.     Defendants and other title insurers were aware of Nevada's adoption of NRS 116, including its provision of a "superpriority" lien in a homeowners association's covenants, conditions, and restrictions.

32.     Defendants and other title insurers believed they could be liable for an insured's losses caused by the enforcement of an association's superpriority lien if the policy at issue contained in Form 9-06/Form 100.

33.     On information and belief, between 1991 and 2014, Defendants provided instructions to their issuing agents to modify Form 9-06/Form 100 before issuing any policy in Nevada for a property governed by a homeowners association in recognition of the coverage provided under these forms.

34.     In 2007, non-party LandAmerica Financial Group, Inc. issued to its subsidiaries, subsidiaries which have since been acquired by Fidelity, an Underwriting Manual which quotes Paragraph 1(a) of Form 9 and provides the following underwriting guidelines for issuing a policy with Form 9:[5]

///

///

///

///

---

[5] A true and correct copy of LandAmerica's Underwriting Manual is attached as **Exhibit 4**.

1. Any incorrectness in the assurance that, at Date of Policy:

   a) There are no covenants, conditions or restrictions under which the lien of the mortgage referred to in Schedule A can be divested, subordinated or extinguished, or its validity, priority or enforceability impaired.

To give this coverage, the underwriter must review all covenants, conditions and restriction listed in the title report to determine if there is language which could result in forfeiture, reversion or other impairment. Note that other impairment is added to traditional forfeiture or reversion. This includes a provision permitting a home owners or civic association to levy an assessment, secured by a lien with priority over the insured deed of trust. Under the Property Owners Association Act, 55-508, et seq., some owners associations can levy for limited purposes, with limited super-priority.

35.     Defendants have published and/or follow similar underwriting manuals and instructions indicating that Paragraph 1(a) of Form 9-06/Form 100 provides coverage for losses due to "provision[s] [in recorded covenants, conditions and restrictions] permitting a home owners or civic association to levy an assessment, secured by a lien with priority over the insured deed of trust."

36.     From 1991 until the present, Defendants have provided endorsement manuals for their issuing agents explaining the scope of coverage provided by Form 9-06/Form 100.

37.     On information and belief, Defendants' pre-2014 endorsement manuals informed their issuing agents that Form 9-06/Form 100 would provide coverage to an insured that suffered loss or damage due to an association's lien for assessments that became delinquent after the date of policy.

38.     Even after the amendments to Form 9-06/Form 100, however, Defendants have promulgated endorsement manuals indicating that the operative language in earlier versions of the forms – including the earlier version of Form 100 at issue in this case – would provide coverage to an insured for losses or damages suffered as a result of the enforcement of an association's superpriority lien.

39.     In the 2013 Endorsement Manual that Fidelity provided for the use of all of its subsidiary underwriters and their agents, Fidelity explained that certain language from Form 9/Form 100 should not be used in policies where "a FUTURE violation might result in the loss

of priority or enforceability of the lien of the Insured Mortgage," indicating Fidelity's belief that the language created coverage for the insured.[6]

40.     Contemporary trade usage describing the terms and scope of Form 9/Form 100 indicates that those endorsements provide coverage for an insured lender in the event that covenants, conditions, and restrictions of record at the date of the policy allow an association's lien to take priority over the insured mortgage or deed of trust.  *See, e.g.*, Barlow Burke, LAW OF TITLE INSURANCE § 10.05[B] (3d ed., 2002 Supp.) (in describing Form 9: "A second type of endorsement of interest to an insured lender is one covering the loss of lien priority because of the enforcement of a private covenant applicable to the title. … The priority of these covenants, restrictions, and conditions is particularly important to mortgage lenders with loan policies because their supporting documents, also recorded, typically include the power to compel the payment of amounts for the maintenance and repair of the common facilities in a large subdivision.  Often the exercise of these maintenance and repair functions is put in the hands of a subdivision homeowner's association.  It also typically holds a lien to compel the payment of these amounts, and that lien also has priority over later recorded mortgage."); *id.* ("Future violations [of covenants, conditions, and restrictions] are also insured against, but only to the extent that the violations occur between the policy date and the acquisition of title in any foreclosure action, provided the violation causes the insured to be insecure or results in loss or damage to the title acquired by the insured in satisfaction of the secured debt, as where the insured takes a deed in lieu of foreclosure."  (citing ALTA Form 9 ¶¶ 1(a), 2)).

41.     Defendants represented to the public and to Mariners' predecessor-in-interest that Form 9-06/Form 100 provided coverage against losses caused by an association's superpriority lien.

42.     Despite having actual knowledge of the possibility that Mariners could lose its security interest in properties that were governed by homeowners associations, at no time did

_____

[6] A true and correct copy of Fidelity's 2013 Endorsement Manual is attached as **Exhibit 5**. *Id.* at 66.

Defendants inform Mariners or its predecessors-in-interest of the danger of losing its security interests in such properties.

43.     Defendants implemented patterns and practices which call for the denial of claims stemming from Nevada HOA foreclosure sales despite Defendants' actual knowledge that the claims fell under the insuring provisions and policy endorsements.

### The Nevada Supreme Court Interprets NRS 116.3116

44.     In *SFR Investments Pool 1, LLC v. U.S. Bank, N.A.*, 130 Nev. 742, 334 P.3d 408 (2014), the Nevada Supreme Court confirmed that a portion of the lien included in a Nevada homeowners association's covenants, conditions, and restrictions has superpriority over a recorded first deed of trust.

45.     The Court further held that NRS 116.1104 rendered inoperative clauses in associations' covenants, conditions, and restrictions that purported to allow senior deeds of trust to survive an association's foreclosure of the superpriority lien provided in its covenants, conditions, and restrictions.

46.     *SFR Investments* confirmed that the proper foreclosure of an association's superpriority lien extinguishes a recorded senior deed of trust on the same property.

47.     Following *SFR Investments*, non-party Stewart Title Guaranty Company ("Stewart Title") issued a bulletin to its agents in Nevada indicating that "in lieu of issuing a[] [Form 9] for a lender's policy," its agents should "issue the ALTA 9.10."[7]

48.     Other title insurance companies have issued similar bulletins as a result of the decision in *SFR Investments*.

49.     Upon information and belief, Fidelity and Fidelity National sent similar bulletins to their agents following *SFR Investments*, indicating their belief that Form 9-06/Form 100 provided coverage for losses caused by superpriority liens.

50.     In *K&P Homes v. Christiana Trust*, 133 Nev. 364, 398 P.3d 292 (2017), the Nevada Supreme Court held that *SFR Investments* "did not create new law or overrule existing

---

[7] A true and correct copy of Stewart Title Bulletin NV2014002 is attached as **Exhibit 6**.

precedent; rather, that decision declared what NRS 116.3116 has required since the statute's inception" in 1991.

51.     Under controlling Nevada law, the covenants, conditions, and restrictions at issue here have provided the association with a lien that could attain priority over a senior deed of trust since 1991.

### Facts Specific to this Case

52.     This action concerns real property located at 5733 Oasis Ridge Street, North Las Vegas, Nevada 89031, APN 124-27-412-049 ("Property").

53.     The Property is subject to Declaration of Covenants, Conditions, and Restrictions ("CC&Rs") for Santa Rosa Homeowners Association ("HOA").[8]

54.     The CC&Rs, including Article V, section 5.01, creates the HOA's lien and establishes that the owner of property governed by the HOA "covenants and agrees" to pay all assessments made pursuant to the Declaration.[9]

55.     Additionally, the Declaration recitals establish the HOA's intent that the covenants in the CC&RS are to run with the land:

> **1.05 Covenants Running With Land.** This Declaration shall run with the Property and all parts and parcels thereof and shall be binding on all parties having any right, title or interest in the Property and their heirs, successors, successors-in-title, and assigns[.][10]

56.     Moreover, Article VII, Section 1 of the CC&Rs specifically states: "The annual Assessment, special Assessment, interest, costs, and reasonable attorneys; fees shall be a charge on the Lot and shall be a continuing lien upon the Lot against which each such Assessment is made until paid."[11]

---

[8] A true and correct copy of the HOA's 2002 CC&Rs are attached as **Exhibit 7**.
[9] *Id*. at 31.
[10] *Id*. at 6.
[11] *Id*. at 31.

57.     Thus, pursuant to the CC&Rs, an owner of property governed by the HOA covenants to pay assessments, and those assessments constitute a charge on the land secured by a continuing lien that has encumbered the property since the CC&Rs were recorded.

58.     Additionally, Section 5.07 states that "[s]uch lien shall be created in accordance with NRS 116.3116 and shall be foreclosed in the manner provided for in NRS 116.31162-116.31168 as is now or hereafter may be in effect."[12]

59.     Regardless of whether the CC&Rs incorporate NRS 116.3116 by reference, the CC&Rs are deemed to "conform" and incorporate NRS 116.3116 by operation of law.  *See* NRS 116.1206(1) ("Any provision contained in a declaration, bylaw or other governing document of a common-interest community that violates the provisions of this chapter shall be deemed to conform with those provisions by operation of law, and any such declaration, bylaw or other governing document is not required to be amended to conform to those provisions.").

60.     Thus, the CC&Rs provided the HOA with a superpriority lien over the lien of the insured mortgage as of the Date of Policy.

61.     June 8, 2009, Mountain View Mortgage Company ("Lender") provided a $108,007.00 loan to Ken E. Gregory ("Borrower") to finance the purchase of the Property.

62.     By purchasing the Property, Borrower covenanted "to pay to [the HOA] annual assessments or charges[.]"

63.     On or about May 26, 2009, Borrower executed a deed of trust ("Deed of Trust"), providing a security interest in the Property in favor of Lender.[13]

64.     The Trustee under the Deed of Trust is identified as "Stewart Title of Nevada."[14]

65.     The Deed of Trust, along with the promissory note and all indebtedness due thereunder, was subsequently assigned to Mariners.[15]

---

[12] *Id*. at 34-35.
[13] A true and correct copy of the recorded Deed of Trust is attached as **Exhibit 8**.
[14] *Id*. at 1.
[15] A true and correct copy of the recorded Assignment of Deed of Trust is attached as **Exhibit 9**.

66.     As part of the loan origination, Stewart and Stewart Nevada entered into a contractual relationship with Lender as the insured on a lender's title insurance policy, numbered M-9302-1363434 ("Policy"), to insure that the Deed of Trust was superior to competing liens, including the HOA's lien.[16]

67.     While the Policy identifies Stewart on the cover page, Stewart Nevada is identified as the Title Insurance Company.[17]

68.     Defendants are responsible for providing coverage that insured the Deed of Trust in first position over all other liens, and other representations contained in the Policy.

69.     Additionally, Stewart Nevada agreed to undertake the obligation of procuring, issuing, and/or providing coverage that insured the Lender's Deed of Trust was in superior position over the HOA's lien.

70.     On information and belief, Stewart and Stewart Nevada acted in conjunction with procuring, issuing, and insuring the Policy, and are jointly and severally liable for the same.

71.     On information and belief, Lender intended that the loan would be transferred to Mariners shortly after origination and, therefore, intended that all rights, promises and protections guaranteed to it during the escrow and origination process, as reflected in the escrow and origination documents, including but not limited to the HUD-1 Settlement, Preliminary Title Report, Lender's Closing Instructions and Title Policy, would be for the benefit of Mariners and would transfer to Mariners as if Mariners had been a party to the escrow and origination of the loan.

72.     The Policy obligates Stewart and Stewart Nevada to pay the costs, attorneys' fees, and expenses incurred in defense of the title or the lien of the Deed of Trust, as insured.

73.     The Policy includes a standard endorsement ALTA Form 9-06.[18]

---

[16] *See* **Ex. 1** (Title Policy) at Schedule A.
[17] *Id.*
[18] *Id.*

74.     Pursuant to Form 9-06, Stewart and Stewart Nevada promised to insure Lender and its successors:

against loss or damages sustained by reason of:

1.      The existence, at Date of Policy, of any of the following:

(a) Covenants, conditions or restrictions under which the lien of the Insured Mortgage can be divested, subordinated, or extinguished, or its validity, priority, or enforceability impaired;

…

2.      Any future violation on the Land of any existing covenants, conditions or restrictions occurring prior to acquisition of title to the estate or interest in the Land by the Insured, provided the violation results in
a.      the invalidity, loss of priority, or unenforceability of the lien of the Insured Mortgage; or
b.      the loss of Title if the Insured shall acquire Title in satisfaction of the Indebtedness secured by the Insured Mortgage;

75.     At the time they provided the Policy to Lender, Stewart and Stewart Nevada were aware of the HOA's CC&Rs, the HOA's lien for unpaid assessments, and the fact that the lien could take priority over the Deed of Trust pursuant to NRS Chapter 116.

76.     In or around 2012, Borrower ceased making payments to the HOA for monthly assessments, in violation of his covenant under Section 5.01 of the CC&Rs.

77.     On December 18, 2012, the HOA, through its foreclosure agent, Nevada Association Services, Inc. ("NAS"), recorded a Notice of Delinquent Assessment Lien against the Property ("Notice of Delinquency").[19]  The Notice of Delinquency states that it is being given "[i]n accordance with" Nevada Revised Statutes and the CC&Rs.[20]

78.     On June 21, 2013, the HOA, through its agent, NAS, recorded a Notice of Default and Election to Sell Under Homeowners Association Lien against the Property.[21]

79.     On October 28, 2013, the HOA, through its agent, NAS, recorded a Notice of Foreclosure Sale.[22]

---

[19] A true and correct copy of the Notice of Delinquency is attached as **Exhibit 10**.
[20] *See id.*
[21] A true and correct copy of the Notice of Default is attached as **Exhibit 11**.

80.     On November 22, 2013, the HOA sold the Property at foreclosure, conveying it the Saticoy Bay LLC Series 5733 Oasis Ridge ("HOA Buyer") for the amount of $25,000.00 ("HOA Sale").[23]   The Foreclosure Deed confirms that the Property was conveyed to the HOA Buyer pursuant to NRS Chapter 116 and the CC&Rs.[24]

81.     On January 1, 2014, HOA Buyer filed a Complaint against Mariners' predecessors in interest in the Eighth Judicial District Court, State of Nevada, Case No. A-14-693884-C, seeking a declaration that the Deed of Trust was extinguished by the HOA Sale ("Litigation").[25]   Mariners' predecessor filed an answer to the Complaint, which was subsequently amended in March 2018 to add Counterclaims against HOA Buyer seeking a declaration that the Deed of Trust was not extinguished by the HOA Sale.[26]

82.     The Litigation is still pending and Mariners continues to expend attorney's fees and costs to defend itself against HOA Buyer's claims.

83.     As of the Date of Policy, there existed "[c]ovenants, conditions, or restrictions under which the [Deed of Trust] c[ould] be divested, subordinated, or extinguished, or its validity, priority, or enforceability impaired,"[27] including the payment covenant contained in Section 5.01 of the HOA's CC&Rs.

84.     The HOA Sale, conducted "pursuant to the powers conferred" by the HOA's CC&Rs, resulted in the purported extinguishment of the Deed of Trust.

85.     Mariners has suffered losses or damages as a result of the existence of the HOA's CC&Rs – including Borrower's violation of his covenant to pay assessments[28] – which

---

[22] A true and correct copy of the Notice of Foreclosure Sale is attached as **Exhibit 12**.
[23] A true and correct copy of the Trustee's Deed Upon Sale is attached as **Exhibit 13**.
[24] *Id.*
[25] A true and correct copy of the Complaint is attached as **Exhibit 14**.
[26] A true and correct copy of the Answer to Amended Complaint and Counterclaim is attached as **Exhibit 15**.
[27] *See* **Ex. 1** (Title Policy), at Paragraph 1(a) of Form 100.
[28] *See* **Ex. 7** (CC&Rs), at 18.

were recorded prior to issuance of the Policy and resulted in the "impairment or loss of the lien" of the Deed of Trust.[29]

86.     Mariners has suffered losses or damages as a result of "future" (i.e., post-Date of Policy) "violation[s] on the land of" the HOA's CC&Rs – including Borrower's violation of his covenant to pay assessments[30] – which occurred prior to Mariners' acquisition of title to the Property and resulted in the "invalidity, loss of priority, or unenforceability of the lien" of the Deed of Trust.[31]

87.     Additionally, Mariners has suffered loss or damage sustained by reason of the HOA's priority lien provided for in the HOA's CC&Rs over the Deed of Trust.

88.     A claim was submitted under the Policy to Stewart ("Claim"). In the Claim, Mariners requested that the Company fulfill its obligations to cure the title defects and indemnify Mariners against losses.

89.     On May 7, 2017, Tiki Velazquez, Claims Representative for Stewart, sent Mariners' counsel a letter denying coverage under the Policy based Exclusion 3(d) and Condition and Stipulation No. 3 only.[32]

90.     Nevada law and the CC&Rs establish that the HOA's priority lien arises upon the recording of the HOA's CC&Rs.

91.     Because the CC&Rs were recorded prior to Date of Policy, Paragraph 2(a) of Form 9 extends coverage of the Claim.

92.     The Foreclosure Deed stated the HOA's foreclosure sale was conducted "pursuant to the powers conferred" by NRS 116 and the HOA's CC&Rs.[33]

93.     Exclusion 3(d) cannot be interpreted to remove coverage provided by Form 9-06. *See Nat'l Union Fire Ins. Co. of the State of Pa., Inc. v. Reno's Exec. Air, Inc.*, 100 Nev. 360,

---

[29] *See* **Ex. 1** (Title Policy).
[30] *See* **Ex. 7** (CC&Rs), at 5.01.
[31] *See* **Ex. 1** (Title Policy), at Paragraph 2(a) of Form 9-06.
[32] A true and correct copy of Stewart's claim denial is attached as **Exhibit 16**.
[33] *See* **Ex. 13** (Trustee's Deed).

365 (1984) ("Clauses providing coverage are broadly interpreted so as to afford the greatest possible coverage to the insured, [and] clauses excluding coverage are interpreted narrowly against the insurer.").

94.     On information and belief, Defendants developed specific coverage positions and claims handling guidance for claims related to Nevada association foreclosure sales.

95.     Defendants implemented and engaged in patterns and practices which call for the denial of claims stemming from Nevada HOA foreclosure sales despite Defendants' actual knowledge that the claims fell under the insuring provisions and policy endorsements. These patterns and practices demonstrate that Defendants did not simply make a reasonable mistake but engaged in a systemic and reckless and/or intentional practice of mishandling and denying otherwise valid claims in order to avoid their obligations.

96.     On information and belief, the coverage positions as to such claims nominally taken by Defendants and its affiliates reflect the claims handling and coverage positions adopted by Stewart.

97.     Because Defendants disregard their status as distinct organizations in the handling of claims, Defendants are alter egos for the purpose of liability related to issuance of the Policy and their handling of Mariners' Claim.

98.     Defendants are responsible for the acts and omissions related to the Policy because Defendants acted or failed to act at one another's direction. Additionally, because Stewart and Stewart Nevada entered into a contractual relationship with Mariners' predecessor in interest to procure coverage of the priority of the Deed of Trust over the HOA's lien—to the extent coverage is not afforded under the Policy, Stewart Nevada is an alter ego of Stewart as a result of its failure to procure coverage as requested.

99.     Because Stewart and Stewart Nevada breached their contract with Mariners' predecessor-in-interest and made material representations to the Insured, Stewart and Stewart Nevada are alter egos of Fidelity for the purpose of liability.

100.     To the extent the Defendants are not alter-egos, Defendants were involved in a joint venture that subjects Stewart and the other Defendants to liability equal to that of Stewart

Nevada. The individuals responsible for handling Mariners' Claim were/are employed by or otherwise directed by Stewart. Stewart has a vested pecuniary interest in the outcome of its claim decisions. Stewart was further responsible for the development of Stewart Nevada's claim-handling and/or underwriting practices, and for otherwise directing which policies were sold to whom and how claims were to be handled.

**FIRST CAUSE OF ACTION**
**(Declaratory Judgment – all Defendants)**

101.   The allegations in Paragraphs 1 through 100 above are expressly incorporated by reference.

102.   This Court has the power and authority to declare Mariners and Defendants' rights and legal relations in connection with the Policy.

103.   An actual controversy has arisen between Mariners, on the one hand, and Defendants, on the other, as to whether the Policy provides coverage to Mariners for losses caused by the HOA's foreclosure of its purportedly senior lien.

104.   The Policy states that Stewart and Stewart Nevada insured Lender and its successors, including Mariners:

against loss or damages sustained by reason of:

1.   The existence, at Date of Policy, of any of the following:

(a) Covenants, conditions or restrictions under which the lien of the Insured Mortgage can be divested, subordinated, or extinguished, or its validity, priority, or enforceability impaired;
…
2.   Any future violation on the Land of any existing covenants, conditions or restrictions occurring prior to acquisition of title to the estate or interest in the Land by the Insured, provided the violation results in
a.       the invalidity, loss of priority, or unenforceability of the lien of the Insured Mortgage; or
b.       the loss of Title if the Insured shall acquire Title in satisfaction of the Indebtedness secured by the Insured Mortgage;

105.   The foreclosure of the superpriority portion of the HOA's lien imposed by the CC&Rs would "cut off" and "impair[]" the Deed of Trust.

106.   Thus, as of the Date of Policy, there existed "[c]ovenants, conditions, or restrictions under which the [Deed of Trust]…[could] be divested, subordinated, or extinguished."[34]

107.   After the Date of Policy, Borrower violated his covenant to pay HOA assessments. The CC&Rs states that a homeowner's covenant to pay assessments is an obligation that runs with the Property.[35]

108.   The Borrower's post-Policy violation of his payment covenant thus constituted a "future violation[] on the land of [the HOA's] covenants, conditions or restrictions," which occurred "prior to the acquisition of title to the" Property by Mariners.[36]

109.   The foreclosure of that lien purportedly "result[ed] in impairment and loss" of the Deed of Trust.[37]

110.   For these reasons, under Paragraphs 1(a) and 2(a) of Form 9-06, the Policy provides coverage for all losses and damages sustained by Mariners as a result of the HOA Sale.

111.   Additionally, the insured complied with all material obligations under the Policy, including Condition and Stipulation 3.

112.   Stewart nevertheless denied coverage under the Policy.[38]

113.   When the Policy was issued, it was the intent of Mariners's predecessor-in-interest, Stewart and Stewart Nevada that Form 9-06 would provide coverage for losses or damages sustained as a result of the CC&Rs.

114.   Contemporary trade usage describing the terms and scope of Form 9-06 indicates the endorsement provides coverage for an insured lender for losses and damages sustained as a result of covenants, conditions, and restrictions.

---

[34] *See* **Ex. 1** (Title Policy), at Paragraph 1(a) of Form 9-06.
[35] *See* **Ex. 7** (CC&Rs), at 5.01.
[36] *See* **Ex. 1** (Title Policy), at Paragraph 2(a) of Form 9-06.
[37] *See id.*
[38] *See* **Ex 16** (Denial Letter).

115.    Exclusions under the Policy cannot be interpreted to remove coverage provided by Form 9.  *See Nat'l Union Fire Ins. Co. of the State of Pa., Inc. v. Reno's Exec. Air, Inc.*, 100 Nev. 360, 365 (1984) ("Clauses providing coverage are broadly interpreted so as to afford the greatest possible coverage to the insured, [and] clauses excluding coverage are interpreted narrowly against the insurer.").

116.    Mariners is entitled to a declaration that the Policy provided coverage for all losses or damages, up to the Amount of Insurance, sustained by Mariners as a result of the HOA's foreclosure sale.

117.    Mariners was required to retain counsel to prosecute this action and is entitled to recover its corresponding attorneys' fees.

## SECOND CAUSE OF ACTION
### (Breach of Contract – all Defendants)

118.    The allegations in Paragraphs 1 through 117 above are expressly incorporated by reference.

119.    Mariners Trustee is the insured under the Policy by reason of an assignment of all rights and interest under the Deed of Trust and indebtedness under the promissory note secured by the Deed of Trust.

120.    Mariners complied with all material conditions under the Policy, including Condition and Stipulation 3.

121.    As described above, Stewart and Stewart Nevada issued the Policy to Mariners' predecessor-in-interest, which provides coverage for any loss or damage sustained by Mariners as a result of covenants, conditions, or restrictions under which the Deed of Trust could "be divested, subordinated or extinguished or its validity, priority or enforceability impaired," or "any future violations on the land of any covenants, conditions, or restrictions" which result in the impairment or loss of the Deed of Trust.

122.    The Policy, issued by Stewart and Stewart Nevada, also provides coverage for any loss or damage sustained by reason of the priority of the HOA's lien provided for in the CC&Rs over the lien of the insured mortgage.

123.    The Policy gave rise to a duty to defend Mariners in any litigation arising from a challenge to the validity or priority of Mariners' Deed of Trust and to either cure the defects on title or indemnify Mariners for any losses it sustained as a result of the loss of priority or extinguishment of its Deed of Trust.

124.    Defendants also owed special duties to Lender as the Trustee under the Deed of Trust.

125.    As described above, Defendants are alter egos for the purpose of liability for the handling and denial of Mariners' Claim, or are otherwise engaged in a joint venture.

126.    Additionally, because Stewart and Stewart Nevada entered into a contractual relationship with Mariners' predecessor-in-interest in order to insure the Deed of Trust in senior position over the HOA's Lien, to the extent coverage is *not afforded* under the Policy, Fidelity National and Fidelity Nevada breached their contract with Mariners' predecessor.

127.    As described above, Mariners has suffered an insured loss or damages under the Policy.

128.    Stewart and Stewart Nevada breached the Policy by refusing to indemnify Mariners for its covered losses.

129.    These breaches of the Policy at Stewart's direction have proximately resulted in general and special damages to Mariners, including attorneys' fees and litigation expenses, which Mariners has incurred and will continue to incur.  Such damages and expenses should be paid by the Insurer under the Policy's terms.

130.    As a result of these breaches of the Policy at Stewart's direction, Mariners was required to retain counsel to prosecute this action and is entitled to recover its corresponding attorneys' fees.

## **THIRD CAUSE OF ACTION**
### **(Bad Faith / Breach of the Covenant of Good Faith and Fair Dealing – all Defendants)**

131.    The allegations in Paragraphs 1 through 130 above are expressly incorporated by reference.

132.   As described above, Defendants are alter egos for the purpose of liability for the handling of Mariners' Claim, or are otherwise engaged in a joint venture.

133.   All Defendants owed Mariners a duty to act in good faith and in a manner consistent with fair dealing in their considerations of Mariners' claims under the Policy, including a duty of candor and to avoid denials of claims without reasonable basis.

134.   Additionally, as the Trustee under the Deed of Trust, Defendants owed special duties to Lender.

135.   All Defendants knew that industry materials and expert commentators routinely described the "comprehensive" Form 100/Form 9-06 endorsement as providing coverage for an insured that suffered a loss as a result of the enforcement of a superpriority lien provided for in an association's covenants, conditions, and restrictions at the time the Policy was issued.

136.   All Defendants knew that their own underwriting manuals, bulletins, and endorsement guides indicated that Form 100/Form 9-06 provided coverage to an insured that suffered a loss as a result of the enforcement of a superpriority lien provided in an association's covenants, conditions, and restrictions at the time the Policy was issued.

137.   In light of the foregoing, and on information and belief, Stewart and Stewart Nevada issued the Policy with the belief that it would provide coverage if the Deed of Trust was impaired or extinguished by the enforcement of the HOA's lien.

138.   On information and belief, Defendants knew or had reason to know that Mariners' predecessor purchased the Policy with the expectation that such coverage would be provided.

139.   On information and belief, Defendants knew or had reason to know that Mariners' predecessor's expectation was reasonable in light of the trade usage and industry standards regarding Form 100/Form 9-06.

140.   On information and belief, Defendants knew or had reason to know that the HOA's CC&Rs did not include a mortgage savings clause, yet represented to the Insured that the CC&Rs did protect the Deed of Trust from extinguishment by enforcement of the HOA's lien.

141.    All Defendants acted with malice, fraud, and/or oppression by allowing Mariners' predecessor to obtain a title insurance policy that included an endorsement known and described as providing coverage against the enforcement of an association's superpriority lien, then denying coverage for losses arising from the HOA's enforcement of its superpriority lien despite internal documents, guidelines, and bulletins indicating that coverage was due.

142.    Defendants have implemented and engaged in patterns and practices which call for the denial of claims stemming from Nevada HOA foreclosure sales despite Defendants' actual knowledge that the claims fell under the insuring provisions and policy endorsements, including Mariners' Claim. These patterns and practices demonstrate that Defendants did not simply make a reasonable mistake, but engaged in a systemic and reckless and/or intentional practice of mishandling and denying otherwise valid claims in order to avoid their obligations.

143.    Defendants intentionally breached their duties and acted in bad faith by denying Mariners' claims for coverage under the Policy.

144.    Mariners has suffered damages as a result of Defendants' bad faith and breach of their duty of good faith and fair dealing.

145.    As a result of Defendants' bad faith, Mariners was required to retain counsel to prosecute this action and is entitled to recover its corresponding attorneys' fees.

### FOURTH CAUSE OF ACTION
**(Deceptive Trade Practices (NRS 41.600 and NRS 598.0915) – all Defendants)**

146.    The allegations in Paragraphs 1 through 145 above are expressly incorporated by reference.

147.    As described above, Defendants are alter egos for the purpose of liability for the handling and denial of Mariners' Claim, or are otherwise engaged in a joint venture.

148.    All Defendants received valuable consideration in exchange for providing the Policy to Mariners' predecessor.

149.    All Defendants exchanged memoranda, bulletins, underwriting guides, and other communications indicating that Form 100/Form 9-06 would provide coverage if an insured mortgage lien was impaired or otherwise affected by the enforcement of an association's

1    superpriority lien.

2        150.    All Defendants knew that public descriptions of Form 100/Form 9-06 indicated

3    that coverage would be available if an insured mortgage lien was impaired or otherwise affected

4    by the enforcement of an association's superpriority lien.

5        151.    Defendants knew the Property was subject to the HOA's CC&Rs.

6        152.    The Policy Mariners' predecessor-in-interest obtained from Stewart and Stewart

7    Nevada contained endorsement language plainly intended to provide coverage in the event the

8    Deed of Trust lost priority or was otherwise impaired by operation of the HOA's CC&Rs.

9        153.    On information and belief, Stewart and Stewart Nevada knew or had reason to

10   know that the HOA's CC&Rs did not include a mortgage savings clause, yet represented to the

11   Insured that the CC&Rs did protect the Deed of Trust from extinguishment by enforcement of

12   the HOA's lien.

13       154.    Mariners relied to its detriment upon Defendant's representations that Form

14   100/Form 9-06 would provide such coverage by originating the mortgage loan in reliance on

15   those representations.

16       155.    Mariners relied to its detriment upon Defendant's representations that the

17   CC&Rs contained a mortgage savings clause when in fact the CC&Rs via operation of law and

18   incorporation of NRS 116 by reference, provided that the HOA lien was superior to the Deed of

19   Trust.

20       156.    By representing that Form 100/Form 9-06 provided such coverage at origination,

21   then failing to accept coverage under either Form 100/Form 9-06, Defendants engaged in

22   consumer fraud as that term is defined in NRS 598.0915(5), (15) and NRS 41.600(2)(e) by

23   misrepresenting the quality and characteristics of the Policy furnished to Mariners' predecessor

24   and making false representations in the transaction.

25       157.    By representing that Deed of Trust was protected by the mortgage savings clause

26   in the HOA's CC&Rs, then failing to accept coverage under the Policy, Defendants engaged in

27   consumer fraud as that term is defined in NRS 598.0915(5), (15) and NRS 41.600(2)(e) by

28

misrepresenting the quality and characteristics of the Policy furnished to Mariners' predecessor and making false representations in the transaction.

158.    Mariners has suffered damages as a result of Defendants' consumer fraud, including the damages described above.

159.    As a result of Defendants' deceptive practices, Mariners was required to retain counsel to prosecute this action and is entitled to recover its corresponding attorneys' fees.

### FIFTH CAUSE OF ACTION
**(Violation of NRS 686A.310 – all Defendants)**

160.    The allegations in Paragraphs 1 through 159 above are expressly incorporated by reference.

161.    On information and belief, Stewart's Claims Department handles claims made on policies underwritten by all of its subsidiaries, including Stewart and Stewart Nevada, and directs the coverage positions to be taken by its subsidiaries to promote consistency in claims handling.

162.    As described above, Defendants are alter egos for the purpose of liability for the handling and denial of Mariners' Claim.

163.    All Defendants exchanged memoranda, bulletins, underwriting guides, and other communications indicating that Form 100/Form 9-06 would provide coverage if an insured mortgage lien was impaired or otherwise affected by the enforcement of an association's superpriority lien.

164.    All Defendants knew that public descriptions of Form 100/Form 9-06 indicated that coverage would be available if an insured mortgage lien was impaired or otherwise affected by the enforcement of an association's superpriority lien.

165.    Defendants represented to the Insured that Form 100/Form 9-06 provided coverage in the event that the Deed of Trust lost priority or was otherwise impaired by operation of the HOA's CC&Rs.

166.    Defendants represented to the Insured that the Deed of Trust was protected by the mortgage savings clause in the HOA's CC&Rs when in fact the CC&Rs provide for an HOA lien that could extinguish a first deed of trust.

167.    The Insured relied to its detriment upon Defendants' knowing misrepresentations regarding the protection afforded by the CC&Rs.

168.    The Insured relied to its detriment upon Defendant's knowing misrepresentations regarding the characteristics and scope of coverage provided by the Policy with Form 9-06 by originating the mortgage loan in reliance on those misrepresentations.

169.    By representing that Form 100/Form 9-06 provided coverage in the event the Deed of Trust lost priority or was otherwise impaired by operation of the HOA's CC&Rs, and then denying coverage for losses related to the HOA's foreclosure sale, Defendants breached NRS 686A.310(1)(a).

170.    In light of Defendants' knowledge that Form 100/Form 9-06 provided coverage in the event a senior deed of trust was impaired by a Nevada association's superpriority lien, Defendants were required to adopt and implement reasonable claims handling procedures to provide such coverage.  Defendants failed to do so, and instead implemented claims handling procedures that called for the denial of claims under policies with an endorsement Form 9-06 by insured lenders whose deeds of trust were impaired by Nevada association's liens, in violation of NRS 686A.310(1)(c).

171.    The Insurer's liability under the Policy for the extinguishment of the Deed of Trust was "reasonably clear," as shown by Defendants' internal memoranda, bulletins, underwriting guides, and other communications.  By failing "to effectuate [a] prompt, fair, and equitable settlement[]" of Mariners' Claim, Defendants violated NRS 686A.310(1)(e).

172.    By compelling Mariners' "to institute litigation to recover amounts due under" the Policy, Defendants violated NRS 686A.310(1)(f).

173.    In light of Defendants' internal documents and representations that Form 100/Form 9-06 provided coverage if an insured lien was impaired or otherwise affected by the enforcement of an association's superpriority lien, Defendants' violations of NRS 686A.310

arising for their denial of coverage under the Policy for that exact scenario have been oppressive, willful, and malicious.

174.     Indeed, Defendants implemented patterns and practices which call for the denial of claims stemming from Nevada HOA foreclosure sales, including Mariners' Claim, despite Defendants' actual knowledge that the claims fell under the insuring provisions and policy endorsements.

175.     As a result of Defendants' deceptive practices, Mariners was required to retain counsel to prosecute this action and is entitled to recover its corresponding attorneys' fees.

## **PRAYER FOR RELIEF**

WHEREFORE, Mariners requests that this Court grant judgment in its favor and against the Defendants, and award Mariners:

A.     a declaration establishing (1) that the Policy provided coverage for all losses or damages, up to the Amount of Insurance, sustained by Mariners as a result of the HOA's foreclosure sale; and (2) which of Defendants is responsible for coverage under the Policy;

B.     compensatory damages;

C.     punitive damages;

D.     attorneys' fees;

E.     costs; and

F.     any other relief deemed to be just.

DATED this 1st day of July, 2021.

WRIGHT, FINLAY & ZAK, LLP

*/s/ Christina V. Miller*
Darren T. Brenner, Esq.
Nevada Bar No. 8386
Christina V. Miller, Esq.
Nevada Bar No. 12448
7785 W. Sahara Ave., Suite 200
Las Vegas, NV 89117
*Attorneys for Plaintiff, Mariners Pac Ventures, LLC*

# EXHIBIT 1

# EXHIBIT 1

Gregory
G#



**Las Vegas Division**

**title of Nevada-Las Vegas Division**

**376 E. Warm Springs Road, Suite 190**
**Las Vegas, NV  89119**
**Phone (702) 791-7000 • Fax (866) 704-**
**6329**

Mountain View Mortgage Company
7311 W. Charleston, Suite 110
Las Vegas, NV  89117
Attn:  Final Docs/Closing Dept.

ORDER NUMBER:  1017264
LOAN NUMBER:

Dear Sir/Madam:

Thank you for allowing us to service your recent escrow and title needs on the above referenced loan.  We appreciate your business.  Enclosed is your Policy of Title Insurance.

If we may be of further assistance, please do not hesitate to call and we hope you will specify our company in any future transactions.

Sincerely,


Diana Andersen/jw

enclosure

If you want information about coverage or need assistance to resolve complaints, please call our toll free number: 1-800-729-1902. If you make a claim under your policy, you must furnish written notice in accordance with Section 3 of the Conditions.                                   Visit our World Wide Web site at http://www.stewart.com

ALTA Loan Policy (6-17-06)

## LOAN POLICY OF TITLE INSURANCE
## ISSUED BY



Any notice of claim and any other notice or statement in writing required to be given the Company under this Policy must be given to the Company at the address shown in Section 17 of the Conditions.

### COVERED RISKS

SUBJECT TO THE EXCLUSIONS FROM COVERAGE, THE EXCEPTIONS FROM COVERAGE CONTAINED IN SCHEDULE B, AND THE CONDITIONS, STEWART TITLE GUARANTY COMPANY, a Texas corporation (the "Company") insures as of Date of Policy and, to the extent stated in Covered Risks 11, 13, and 14, after Date of Policy, against loss or damage, not exceeding the Amount of Insurance, sustained or incurred by the Insured by reason of:

1. Title being vested other than as stated in Schedule A.
2. Any defect in or lien or encumbrance on the Title. This Covered Risk includes but is not limited to insurance against loss from
   (a) A defect in the Title caused by
      (i)  forgery, fraud, undue influence, duress, incompetency, incapacity, or impersonation;
      (ii)  failure of any person or Entity to have authorized a transfer or conveyance;
      (iii)  a document affecting Title not properly created, executed, witnessed, sealed, acknowledged, notarized, or delivered;
      (iv)  failure to perform those acts necessary to create a document by electronic means authorized by law;
      (v)  a document executed under a falsified, expired, or otherwise invalid power of attorney;
      (vi)  a document not properly filed, recorded, or indexed in the Public Records including failure to perform those acts by electronic means authorized by law; or
      (vii)  a defective judicial or administrative proceeding.
   (b) The lien of real estate taxes or assessments imposed on the Title by a governmental authority due or payable, but unpaid.
   (c) Any encroachment, encumbrance, violation, variation, or adverse circumstance affecting the Title that would be disclosed by an accurate and complete land survey of the Land. The term "encroachment" includes encroachments of existing improvements located on the Land onto adjoining land, and encroachments onto the Land of existing improvements located on adjoining land.
3. Unmarketable Title.
4. No right of access to and from the Land.
5. The violation or enforcement of any law, ordinance, permit, or governmental regulation (including those relating to building and zoning) restricting, regulating, prohibiting, or relating to
   (a) the occupancy, use, or enjoyment of the Land;
   (b) the character, dimensions, or location of any improvement erected on the Land;
   (c) the subdivision of land; or
   (d) environmental protection

Countersigned by:

_____
Authorized Countersignature

Stewart Title of Nevada-Las Vegas Division

_____
Senior Chairman of the Board

_____
Chairman of the Board

_____
President

| Part 1 of Policy Serial No. | Serial No. M-9302-1363434 |
| --- | --- |

ALTA Loan Policy  (6/17/06)

## COVERED RISKS – Continued

if a notice, describing any part of the Land, is recorded in the Public Records setting forth the violation or intention to enforce, but only to the extent of the violation or enforcement referred to in that notice.

6. An enforcement action based on the exercise of a governmental police power not covered by Covered Risk 5 if a notice of the enforcement action, describing any part of the Land, is recorded in the Public Records, but only to the extent of the enforcement referred to in that notice.

7. The exercise of the rights of eminent domain if a notice of the exercise, describing any part of the Land, is recorded in the Public Records.

8. Any taking by a governmental body that has occurred and is binding on the rights of a purchaser for value without Knowledge.

9. The invalidity or unenforceability of the lien of the Insured Mortgage upon the Title. This Covered Risk includes but is not limited to insurance against loss from any of the following impairing the lien of the Insured Mortgage:

    (a) forgery, fraud, undue influence, duress, incompetency, incapacity, or impersonation;

    (b) failure of any person or Entity to have authorized a transfer or conveyance;

    (c) the Insured Mortgage not being properly created, executed, witnessed, sealed, acknowledged, notarized, or delivered;

    (d) failure to perform those acts necessary to create a document by electronic means authorized by law;

    (e) a document executed under a falsified, expired, or otherwise invalid power of attorney;

    (f) a document not properly filed, recorded, or indexed in the Public Records including failure to perform those acts by electronic means authorized by law; or

    (g) a defective judicial or administrative proceeding.

10. The lack of priority of the lien of the Insured Mortgage upon the Title over any other lien or encumbrance.

11. The lack of priority of the lien of the Insured Mortgage upon the Title

    (a) as security for each and every advance of proceeds of the loan secured by the Insured Mortgage over any statutory lien for services, labor, or material arising from construction of an improvement or work related to the Land when the improvement or work is either:

    (i) contracted for or commenced on or before Date of Policy; or

    (ii) contracted for, commenced, or continued after Date of Policy if the construction is financed, in whole or in part, by proceeds of the loan secured by the Insured Mortgage that the Insured has advanced or is obligated on Date of Policy to advance; and

    (b) over the lien of any assessments for street improvements under construction or completed at Date of Policy.

12. The invalidity or unenforceability of any assignment of the Insured Mortgage, provided the assignment is shown in Schedule A, or the failure of the assignment shown in Schedule A to vest title to the Insured Mortgage in the named Insured assignee free and clear of all liens.

13. The invalidity, unenforceability, lack of priority, or avoidance of the lien of the Insured Mortgage upon the Title

    (a) resulting from the avoidance in whole or in part, or from a court order providing an alternative remedy, of any transfer of all or any part of the title to or any interest in the Land occurring prior to the transaction creating the lien of the Insured Mortgage because that prior transfer constituted a fraudulent or preferential transfer under federal bankruptcy, state insolvency, or similar creditors' rights laws; or

    (b) because the Insured Mortgage constitutes a preferential transfer under federal bankruptcy, state insolvency, or similar creditors' rights laws by reason of the failure of its recording in the Public Records

    (i) to be timely, or

    (ii) to impart notice of its existence to a purchaser for value or to a judgment or lien creditor.

14. Any defect in or lien or encumbrance on the Title or other matter included in Covered Risks 1 through 13 that has been created or attached or has been filed or recorded in the Public Records subsequent to Date of Policy and prior to the recording of the Insured Mortgage in the Public Records.

The Company will also pay the costs, attorneys' fees, and expenses incurred in defense of any matter insured against by this Policy, but only to the extent provided in the Conditions.

## EXCLUSIONS FROM COVERAGE

The following matters are expressly excluded from the coverage of this policy, and the Company will not pay loss or damage, costs, attorneys' fees, or expenses that arise by reason of:

1. (a) Any law, ordinance, permit, or governmental regulation (including those relating to building and zoning) restricting, regulating, prohibiting, or relating to

    (i) the occupancy, use, or enjoyment of the Land;

    (ii) the character, dimensions, or location of any improvement erected on the Land;

    (iii) the subdivision of land; or

    (iv) environmental protection; or the effect of any violation of these laws, ordinances, or governmental regulations. This Exclusion 1(a) does not modify or limit the coverage provided under Covered Risk 5.

    (b) Any governmental police power. This Exclusion 1(b) does not modify or limit the coverage provided under Covered Risk 6.

2. Rights of eminent domain. This Exclusion does not modify or limit the coverage provided under Covered Risk 7 or 8.

3. Defects, liens, encumbrances, adverse claims, or other matters:

    (a) created, suffered, assumed, or agreed to by the Insured Claimant;

    (b) not Known to the Company, not recorded in the Public Records at Date of Policy, but Known to the Insured Claimant and not disclosed in writing to the Company by the Insured Claimant prior to the date the Insured Claimant became an Insured under this policy;

    (c) resulting in no loss or damage to the Insured Claimant;

    (d) attaching or created subsequent to Date of Policy (however, this does not modify or limit the coverage provided under Covered Risk 11, 13, or 14); or

    (e) resulting in loss or damage that would not have been sustained if the Insured Claimant had paid value for the Insured Mortgage.

4. Unenforceability of the lien of the Insured Mortgage because of the inability or failure of an Insured to comply with applicable doing-business laws of the state where the Land is situated.

5. Invalidity or unenforceability in whole or in part of the lien of the Insured Mortgage that arises out of the transaction evidenced by the Insured Mortgage and is based upon usury or any consumer credit protection or truth-in-lending law.

6. Any claim, by reason of the operation of federal bankruptcy, state insolvency, or similar creditors' rights laws, that the transaction creating the lien of the Insured Mortgage, is

    (a) a fraudulent conveyance or fraudulent transfer, or

    (b) a preferential transfer for any reason not stated in Covered Risk 13(b) of this policy.

7. Any lien on the Title for real estate taxes or assessments imposed by governmental authority and created or attaching between Date of Policy and the date of recording of the Insured Mortgage in the Public Records. This Exclusion does not modify or limit the coverage provided under Covered Risk 11(b).

**CONDITIONS**

## 1. DEFINITION OF TERMS

The following terms when used in this policy mean:

(a) "Amount of Insurance": The amount stated in Schedule A, as may be increased or decreased by endorsement to this policy, increased by Section 8(b) or decreased by Section 10 of these Conditions.

(b) "Date of Policy": The date designated as "Date of Policy" in Schedule A.

(c) "Entity": A corporation, partnership, trust, limited liability company, or other similar legal entity.

(d) "Indebtedness": The obligation secured by the Insured Mortgage including one evidenced by electronic means authorized by law, and if that obligation is the payment of a debt, the Indebtedness is the sum of

   (i) the amount of the principal disbursed as of Date of Policy;

   (ii) the amount of the principal disbursed subsequent to Date of Policy;

   (iii) the construction loan advances made subsequent to Date of Policy for the purpose of financing in whole or in part the construction of an improvement to the Land or related to the Land that the Insured was and continued to be obligated to advance at Date of Policy and at the date of the advance;

   (iv) interest on the loan;

   (v) the prepayment premiums, exit fees, and other similar fees or penalties allowed by law;

   (vi) the expenses of foreclosure and any other costs of enforcement;

   (vii) the amounts advanced to assure compliance with laws or to protect the lien or the priority of the lien of the Insured Mortgage before the acquisition of the estate or interest in the Title;

   (viii) the amounts to pay taxes and insurance; and

   (ix) the reasonable amounts expended to prevent deterioration of improvements; but the Indebtedness is reduced by the total of all payments and by any amount forgiven by an Insured.

(e) "Insured": The Insured named in Schedule A.

   (i) The term "Insured" also includes

     (A) the owner of the Indebtedness and each successor in ownership of the Indebtedness, whether the owner or successor owns the Indebtedness for its own account or as a trustee or other fiduciary, except a successor who is an obligor under the provisions of Section 12(c) of these Conditions;

     (B) the person or Entity who has "control" of the "transferable record," if the Indebtedness is evidenced by a "transferable record," as these terms are defined by applicable electronic transactions law;

     (C) successors to an Insured by dissolution, merger, consolidation, distribution, or reorganization;

     (D) successors to an Insured by its conversion to another kind of Entity;

     (E) a grantee of an Insured under a deed delivered without payment of actual valuable consideration conveying the Title

       (1) if the stock, shares, memberships, or other equity interests of the grantee are wholly-owned by the named Insured,

       (2) if the grantee wholly owns the named Insured, or

       (3) if the grantee is wholly-owned by an affiliated Entity of the named Insured, provided the affiliated Entity and the named Insured are both wholly-owned by the same person or Entity;

     (F) any government agency or instrumentality that is an insurer or guarantor under an insurance contract or guaranty insuring or guaranteeing the Indebtedness secured by the Insured Mortgage, or any part of it, whether named as an Insured or not;

   (ii) With regard to (A), (B), (C), (D), and (E) reserving, however, all rights and defenses as to any successor that the Company would have had against any predecessor Insured, unless the successor acquired the Indebtedness as a purchaser for value without Knowledge of the asserted defect, lien, encumbrance, or other matter insured against by this policy.

(f) "Insured Claimant": An Insured claiming loss or damage.

(g) "Insured Mortgage": The Mortgage described in paragraph 4 of Schedule A.

(h) "Knowledge" or "Known": Actual knowledge, not constructive knowledge or notice that may be imputed to an Insured by reason of the Public Records or any other records that impart constructive notice of matters affecting the Title.

(i) "Land": The land described in Schedule A, and affixed improvements that by law constitute real property. The term "Land" does not include any property beyond the lines of the area described in Schedule A, nor any right, title, interest, estate, or easement in abutting streets, roads, avenues, alleys, lanes, ways, or waterways, but this does not modify or limit the extent that a right of access to and from the Land is insured by this policy.

(j) "Mortgage": Mortgage, deed of trust, trust deed, or other security instrument, including one evidenced by electronic means authorized by law.

(k) "Public Records": Records established under state statutes at Date of Policy for the purpose of imparting constructive notice of matters relating to real property to purchasers for value and without Knowledge. With respect to Covered Risk 5(d), "Public Records" shall also include environmental protection liens filed in the records of the clerk of the United States District Court for the district where the Land is located.

(l) "Title": The estate or interest described in Schedule A.

(m) "Unmarketable Title": Title affected by an alleged or apparent matter that would permit a prospective purchaser or lessee of the Title or lender on the Title or a prospective purchaser of the Insured Mortgage to be released from the obligation to purchase, lease, or lend if there is a contractual condition requiring the delivery of marketable title.

## 2. CONTINUATION OF INSURANCE

The coverage of this policy shall continue in force as of Date of Policy in favor of an Insured after acquisition of the Title by an Insured or after conveyance by an Insured, but only so long as the Insured retains an estate or interest in the Land, or holds an obligation secured by a purchase money Mortgage given by a purchaser from the Insured, or only so long as the Insured shall have liability by reason of warranties in any transfer or conveyance of the Title. This policy shall not continue in force in favor of any purchaser from the Insured of either (i) an estate or interest in the Land, or (ii) an obligation secured by a purchase money Mortgage given to the Insured.

## 3. NOTICE OF CLAIM TO BE GIVEN BY INSURED CLAIMANT

The Insured shall notify the Company promptly in writing (i) in case of any litigation as set forth in Section 5(a) of these Conditions, (ii) in case Knowledge shall come to an Insured of any claim of title or interest that is adverse to the Title or the lien of the Insured Mortgage, as insured, and that might cause loss or damage for which the Company may be liable by virtue of this policy, or (iii) if the Title or the lien of the Insured Mortgage, as insured, is rejected as Unmarketable Title. If the Company is prejudiced by the failure of the Insured Claimant to provide prompt notice, the Company's liability to the Insured Claimant under the policy shall be reduced to the extent of the prejudice.

## 4. PROOF OF LOSS

In the event the Company is unable to determine the amount of loss or damage, the Company may, at its option, require as a condition of payment that the Insured Claimant furnish a signed proof of loss. The proof of loss must describe the defect, lien, encumbrance, or other matter insured against by this policy that constitutes the basis of loss or damage and shall state, to the extent possible, the basis of calculating the amount of the loss or damage.

**CONDITIONS - Continued**

5. **DEFENSE AND PROSECUTION OF ACTIONS**

   (a) Upon written request by the Insured, and subject to the options contained in Section 7 of these Conditions, the Company, at its own cost and without unreasonable delay, shall provide for the defense of an Insured in litigation in which any third party asserts a claim covered by this policy adverse to the Insured. This obligation is limited to only those stated causes of action alleging matters insured against by this policy. The Company shall have the right to select counsel of its choice (subject to the right of the Insured to object for reasonable cause) to represent the Insured as to those stated causes of action. It shall not be liable for and will not pay the fees, costs, or expenses incurred by the Insured in the defense of those causes of action that allege matters not insured against by this policy.

   (b) *The Company shall have the right, in addition to the options contained in Section 7 of these Conditions, at its own cost, to institute and prosecute any action or proceeding or to do any other act that in its opinion may be necessary or desirable to establish the Title or the lien of the Insured Mortgage, as insured, or to prevent or reduce loss or damage to the Insured. The Company may take any appropriate action under the terms of this policy, whether or not it shall be liable to the Insured. The exercise of these rights shall not be an admission of liability or waiver of any provision of this policy. If the Company exercises its rights under this subsection, it must do so diligently.*

   (c) Whenever the Company brings an action or asserts a defense as required or permitted by this policy, the Company may pursue the litigation to a final determination by a court of competent jurisdiction, and it expressly reserves the right, in its sole discretion, to appeal any adverse judgment or order.

6. **DUTY OF INSURED CLAIMANT TO COOPERATE**

   (a) In all cases where this policy permits or requires the Company to prosecute or provide for the defense of any action or proceeding and any appeals, the Insured shall secure to the Company the right to so prosecute or provide defense in the action or proceeding, including the right to use, at its option, the name of the Insured for this purpose. Whenever requested by the Company, the Insured, at the Company's expense, shall give the Company all reasonable aid (i) in securing evidence, obtaining witnesses, prosecuting or defending the action or proceeding, or effecting settlement, and (ii) in any other lawful act that in the opinion of the Company may be necessary or desirable to establish the Title, the lien of the Insured Mortgage, or any other matter as insured. If the Company is prejudiced by the failure of the Insured to furnish the required cooperation, the Company's obligations to the Insured under the policy shall terminate, including any liability or obligation to defend, prosecute, or continue any litigation, with regard to the matter or matters requiring such cooperation.

   (b) The Company may reasonably require the Insured Claimant to submit to examination under oath by any authorized representative of the Company and to produce for examination, inspection, and copying, at such reasonable times and places as may be designated by the authorized representative of the Company, all records, in whatever medium maintained, including books, ledgers, checks, memoranda, correspondence, reports, e-mails, disks, tapes, and videos whether bearing a date before or after Date of Policy, that reasonably pertain to the loss or damage. Further, if requested by any authorized representative of the Company, the Insured Claimant shall grant its permission, in writing, for any authorized representative of the Company to examine, inspect, and copy all of these records in the custody or control of a third party that reasonably pertain to the loss or damage. All information designated as confidential by the Insured Claimant provided to the Company pursuant to this Section shall not be disclosed to others unless, in the reasonable judgment of the Company, it is necessary in the administration of the claim. Failure of the Insured Claimant to submit for examination under oath, produce

any reasonably requested information, or grant permission to secure reasonably necessary information from third parties as required in this subsection, unless prohibited by law or governmental regulation, shall terminate any liability of the Company under this policy as to that claim.

7. **OPTIONS TO PAY OR OTHERWISE SETTLE CLAIMS; TERMINATION OF LIABILITY**

   In case of a claim under this policy, the Company shall have the following additional options:

   (a) *To Pay or Tender Payment of the Amount of Insurance or to Purchase the Indebtedness.*

      (i) To pay or tender payment of the Amount of Insurance under this policy together with any costs, attorneys' fees, and expenses incurred by the Insured Claimant that were authorized by the Company up to the time of payment or tender of payment and that the Company is obligated to pay; or

      (ii) To purchase the Indebtedness for the amount of the Indebtedness on the date of purchase, together with any costs, attorneys' fees, and expenses incurred by the Insured Claimant that were authorized by the Company up to the time of purchase and that the Company is obligated to pay.
         When the Company purchases the Indebtedness, the Insured shall transfer, assign, and convey to the Company the Indebtedness and the Insured Mortgage, together with any collateral security.

   Upon the exercise by the Company of either of the options provided for in subsections (a)(i) or (ii), all liability and obligations of the Company to the Insured under this policy, other than to make the payment required in those subsections, shall terminate, including any liability or obligation to defend, prosecute, or continue any litigation.

   (b) *To Pay or Otherwise Settle With Parties Other Than the Insured or With the Insured Claimant.*

      (i) to pay or otherwise settle with other parties for or in the name of an Insured Claimant any claim insured against under this policy. In addition, the Company will pay any costs, attorneys' fees, and expenses incurred by the Insured Claimant that were authorized by the Company up to the time of payment and that the Company is obligated to pay; or

      (ii) to pay or otherwise settle with the Insured Claimant the loss or damage provided for under this policy, together with any costs, attorneys' fees, and expenses incurred by the Insured Claimant that were authorized by the Company up to the time of payment and that the Company is obligated to pay.

   Upon the exercise by the Company of either of the options provided for in subsections (b)(i) or (ii), the Company's obligations to the Insured under this policy for the claimed loss or damage, other than the payments required to be made, shall terminate, including any liability or obligation to defend, prosecute, or continue any litigation.

8. **DETERMINATION AND EXTENT OF LIABILITY**

   This policy is a contract of indemnity against actual monetary loss or damage sustained or incurred by the Insured Claimant who has suffered loss or damage by reason of matters insured against by this policy.

   (a) The extent of liability of the Company for loss or damage under this policy shall not exceed the least of

      (i) the Amount of Insurance,

      (ii) the Indebtedness,

      (iii) the difference between the value of the Title as insured and the value of the Title subject to the risk insured against by this policy, or

      (iv) if a government agency or instrumentality is the Insured Claimant, the amount it paid in the acquisition of the Title or the Insured Mortgage in satisfaction of its insurance contract or guaranty.

## CONDITIONS - Continued

(b) If the Company pursues its rights under Section 5 of these Conditions and is unsuccessful in establishing the Title or the lien of the Insured Mortgage, as insured,

   (i) the Amount of Insurance shall be increased by 10%, and

   (ii) the Insured Claimant shall have the right to have the loss or damage determined either as of the date the claim was made by the Insured Claimant or as of the date it is settled and paid.

(c) In the event the Insured has acquired the Title in the manner described in Section 2 of these Conditions or has conveyed the Title, then the extent of liability of the Company shall continue as set forth in Section 8(a) of these Conditions.

(d) In addition to the extent of liability under (a), (b), and (c), the Company will also pay those costs, attorneys' fees, and expenses incurred in accordance with Sections 5 and 7 of these Conditions.

## 9. LIMITATION OF LIABILITY

(a) If the Company establishes the Title, or removes the alleged defect, lien, or encumbrance, or cures the lack of a right of access to or from the Land, or cures the claim of Unmarketable Title, or establishes the lien of the Insured Mortgage, all as insured, in a reasonably diligent manner by any method, including litigation and the completion of any appeals, it shall have fully performed its obligations with respect to that matter and shall not be liable for any loss or damage caused to the Insured.

(b) In the event of any litigation, including litigation by the Company or with the Company's consent, the Company shall have no liability for loss or damage until there has been a final determination by a court of competent jurisdiction, and disposition of all appeals, adverse to the Title or to the lien of the Insured Mortgage, as insured.

(c) The Company shall not be liable for loss or damage to the Insured for liability voluntarily assumed by the Insured in settling any claim or suit without the prior written consent of the Company.

## 10. REDUCTION OF INSURANCE; REDUCTION OR TERMINATION OF LIABILITY

(a) All payments under this policy, except payments made for costs, attorneys' fees, and expenses, shall reduce the Amount of Insurance by the amount of the payment. However, any payments made prior to the acquisition of Title as provided in Section 2 of these Conditions shall not reduce the Amount of Insurance afforded under this policy except to the extent that the payments reduce the Indebtedness.

(b) The voluntary satisfaction or release of the Insured Mortgage shall terminate all liability of the Company except as provided in Section 2 of these Conditions.

## 11. PAYMENT OF LOSS

When liability and the extent of loss or damage have been definitely fixed in accordance with these Conditions, the payment shall be made within 30 days.

## 12. RIGHTS OF RECOVERY UPON PAYMENT OR SETTLEMENT

(a) The Company's Right to Recover.

Whenever the Company shall have settled and paid a claim under this policy, it shall be subrogated and entitled to the rights of the Insured Claimant in the Title or Insured Mortgage and all other rights and remedies in respect to the claim that the Insured Claimant has against any person or property, to the extent of the amount of any loss, costs, attorneys' fees, and expenses paid by the Company. If requested by the Company, the Insured Claimant shall execute documents to evidence the transfer to the Company of these rights and remedies. The Insured Claimant shall permit the Company to sue, compromise, or settle in the name of the Insured Claimant and to use the name of the Insured Claimant in any transaction or litigation involving these rights and remedies.

If a payment on account of a claim does not fully cover the loss of the Insured Claimant, the Company shall defer the exercise of its right to recover until after the Insured Claimant shall have recovered its loss.

(b) The Insured's Rights and Limitations.

   (i) The owner of the Indebtedness may release or substitute the personal liability of any debtor or guarantor, extend or otherwise modify the terms of payment, release a portion of the Title from the lien of the Insured Mortgage, or release any collateral security for the Indebtedness, if it does not affect the enforceability or priority of the lien of the Insured Mortgage.

   (ii) If the Insured exercises a right provided in (b)(i), but has Knowledge of any claim adverse to the Title or the lien of the Insured Mortgage insured against by this policy, the Company shall be required to pay only that part of any losses insured against by this policy that shall exceed the amount, if any, lost to the Company by reason of the impairment by the Insured Claimant of the Company's right of subrogation.

(c) The Company's Rights Against Noninsured Obligors.

The Company's right of subrogation includes the Insured's rights against non-insured obligors including the rights of the Insured to indemnities, guaranties, other policies of insurance, or bonds, notwithstanding any terms or conditions contained in those instruments that address subrogation rights.

The Company's right of subrogation shall not be avoided by acquisition of the Insured Mortgage by an obligor (except an obligor described in Section 1(e)(i)(F) of these Conditions) who acquires the Insured Mortgage as a result of an indemnity, guarantee, other policy of insurance, or bond, and the obligor will not be an Insured under this policy.

## 13. ARBITRATION

Either the Company or the Insured may demand that the claim or controversy shall be submitted to arbitration pursuant to the Title Insurance Arbitration Rules of the American Land Title Association ("Rules"). Except as provided in the Rules, there shall be no joinder or consolidation with claims or controversies of other persons. Arbitrable matters may include, but are not limited to, any controversy or claim between the Company and the Insured arising out of or relating to this policy, any service in connection with its issuance or the breach of a policy provision, or to any other controversy or claim arising out of the transaction giving rise to this policy. All arbitrable matters when the Amount of Insurance is $2,000,000 or less shall be arbitrated at the option of either the Company or the Insured. All arbitrable matters when the Amount of Insurance is in excess of $2,000,000 shall be arbitrated only when agreed to by both the Company and the Insured. Arbitration pursuant to this policy and under the Rules shall be binding upon the parties. Judgment upon the award rendered by the Arbitrator(s) may be entered in any court of competent jurisdiction.

## 14. LIABILITY LIMITED TO THIS POLICY; POLICY ENTIRE CONTRACT

(a) This policy together with all endorsements, if any, attached to it by the Company is the entire policy and contract between the Insured and the Company. In interpreting any provision of this policy, this policy shall be construed as a whole.

(b) Any claim of loss or damage that arises out of the status of the Title or lien of the Insured Mortgage or by any action asserting such claim shall be restricted to this policy.

(c) Any amendment of or endorsement to this policy must be in writing and authenticated by an authorized person, or expressly incorporated by Schedule A of this policy.

(d) Each endorsement to this policy issued at any time is made a part of this policy and is subject to all of its terms and provisions. Except as the endorsement expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsement, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance.

**CONDITIONS - Continued**

15. **SEVERABILITY**

In the event any provision of this policy, in whole or in part, is held invalid or unenforceable under applicable law, the policy shall be deemed not to include that provision or such part held to be invalid, but all other provisions shall remain in full force and effect.

16. **CHOICE OF LAW; FORUM**

(a) Choice of Law: The Insured acknowledges the Company has underwritten the risks covered by this policy and determined the premium charged therefor in reliance upon the law affecting interests in real property and applicable to the interpretation, rights, remedies, or enforcement of policies of title insurance of the jurisdiction where the Land is located.

Therefore, the court or an arbitrator shall apply the law of the jurisdiction where the Land is located to determine the validity of claims against the Title or the lien of the Insured Mortgage that are adverse to the Insured and to interpret and enforce the terms of this policy. In neither case shall the court or arbitrator apply its conflicts of law principles to determine the applicable law.

(b) Choice of Forum: Any litigation or other proceeding brought by the Insured against the Company must be filed only in a state or federal court within the United States of America or its territories having appropriate jurisdiction.

17. **NOTICES, WHERE SENT**

Any notice of claim and any other notice or statement in writing required to be given to the Company under this policy must be given to the Company at Claims Department, P.O. Box 2029, Houston, Texas 77252-2029.

stewart
title guaranty company

ALTA Loan Policy (6-17-06)

## SCHEDULE A

Name and Address of Title Insurance Company: Stewart Title of Nevada-Las Vegas, Division, 8363 W. Sunset Road, Suite 100, Las Vegas, NV 89113

File No.: 1017264                            Policy No.: M-9302-1363434

Loan No.: ▮▮▮▮▮

*Address Reference:     5733 Oasis Ridge Street
                        Las Vegas, Nevada 89031

Amount of Insurance: $108,007.00              Premium: $271.25
                                              Total Endorsement Fee: $25.00

Date of Policy: 6/8/2009 3:47:47 PM
(or the date of recording of the insured mortgage, whichever is later)

1.  Name of Insured:

    Mountain View Mortgage Company

2.  The estate or interest in the Land that is encumbered by the Insured Mortgage is:

    Fee Simple

3.  Title is vested in:

    Ken Gregory

4.  The Insured Mortgage, and its assignments, if any, are described as follows:

    DEED OF TRUST:  A Deed of Trust to secure an indebtedness of the amount stated herein, and any other amounts payable under the terms thereof.
    Dated          : May 26, 2009
    Amount         : $108,007.00
    Trustor        : Ken E. Gregory, an unmarried man
    Trustee        : Stewart Title of Nevada
    Beneficiary    : Mortgage Electronic Registration Systems, Inc., solely as nominee for Mountain View Mortgage Company
    Recorded       : June 8, 2009
    Book           : 20090608
    Document No.   : 0006547, of Official Records.

5.  The Land referred to in this policy is described as follows:

    **SEE ATTACHED EXHIBIT A**

6.  This policy incorporates by reference those ALTA endorsements selected below:

    ☐  4-06       (Condominium)
    ☐  4.1-06
    ☐  5-06       (Planned Unit Development)
    ☐  5.1-06
    ☐  6-06       (Variable Rate)
    ☐  6.2-06     (Variable Rate--Negative Amortization)
    ☒  8.1-06     (Environmental Protection Lien) Paragraph b refers to the following state statute(s): none
    ☒  9-06       (Restrictions, Encroachments, Minerals)
    ☐  13.1-06    (Leasehold Loan)
    ☐  14-06      (Future Advance-Priority)
    ☐  14.1-06    (Future Advance-Knowledge)
    ☐  14.3-06    (Future Advance-Reverse Mortgage)

*FOR COMPANY REFERENCE PURPOSE ONLY, NOT AN INSURING PROVISION.

0025 W/O BLOCKS



ALTA Loan Policy (6-17-06)

## SCHEDULE A

☒   22-06     (Location), the type of improvement is a Single family residence and the street
              address is as shown above.



ALTA Loan Policy (6-17-06)

## SCHEDULE A

## EXHIBIT A

Lot Eighty-Five (85) in Block Ten (10) of Rancho Mirage Unit II, Phase 2, as shown by map thereof on file in Book 102 of Plats, Page 96 and amended by the Certificate of Amendment recorded January 18, 2002 in Book 20020118 as Document No. 00615, in the Office of the County Recorder of Clark County, Nevada.

ALTA Loan Extended Policy (6-17-06)

**SCHEDULE B**
**PART I**

File No.: 1017264                                    Policy No.: M-9302-1363434

**This policy does not insure against loss or damage (and the Company will not pay costs, attorneys' fees or expenses) which arise by reason of:**

1.  Taxes or assessments which are not now payable or which are not shown as existing liens by the records of any taxing authority that levies taxes or assessments on real property or by the public records; proceedings by a public agency which may result in taxes or assessments, or notices of such proceedings, whether or not shown by the records of such agency or by the public records.

2.  (a) Unpatented mining claims, (b) reservations or exceptions in patents or in Acts authorizing the issuance thereof; (c) water rights, claims or title to water; whether or not the matters excepted under (a), (b) or (c) are shown by the public records, (d) Indian tribal codes or regulations, Indian Treaty or Aboriginal Rights, including easements or equitable servitudes.

3.  State, County and City Taxes for the fiscal period 2008 to 2009, are paid in full in the amount of $2,063.17
    PARCEL NO.: 124-27-412-049  TAX DISTRICT: 254 LOCATION: Las Vegas
    1st installment of    $515.80 Paid
    2nd installment of   $515.79 Paid
    3rd installment of    $515.79 Paid
    4th installment of    $515.79 Paid

4.  The lien of supplemental taxes, if any, assessed pursuant to the provisions of Chapter 361.260 of the NEVADA REVISED STATUTES. (Paid current)

5.  The herein described property lies within the boundaries of the City of North Las Vegas and is subject to any and all fees that may be due said District. (Paid current)

6.  Any Special Assessments which may be due and payable that are not assessed through the Clark County Treasurers Office and are being billed by the entity where the parcel is located.

7.  PATENT: Mineral rights, reservations, easements and exclusions in the patent from the State of Nevada recorded Hybe 8m 1914, in Book 4 of Deed of Records, page 11 as Document No. 6530 of Official Records.

8.  EASEMENTS AND DEDICATIONS as indicated or delineated on the plat of said subdivision on file in Book 102 of Plats, Page 96, Official Records.  (See map for full particulars.)

9.  DECLARATION OF RESTRICTIONS: Covenants, Conditions and Restrictions (but deleting restrictions, if any, based upon race, color, religion, sex, handicap, familial status, or national origin) unless and only to the extent that said covenant (a) is exempt under Chapter 42, Section 3607 of the United States Code or (b) relates to handicap but does not discriminate against handicapped persons as contained in a Declaration of Restrictions recorded May 10, 2002, in Book 20020510, as Document No. 01313, of Official Records.

    Said instrument provides that a violation thereof shall not defeat nor render invalid the lien of any mortgage or Deed of Trust made in good faith and for value.

    RIGHT TO LEVY ASSESSMENTS: The right to levy certain charges or assessment against said land which shall become a lien if not paid as set forth in the above Declaration of Restrictions is conferred upon **SANTA ROSA HOMEOWNERS ASSOCIATION.**

**End of Exceptions**



0026                                    Page 1 of 1

ALTA Loan Extended Policy (6-17-06)

**SCHEDULE B**
PART II

File No.: 1017264                                    Policy No.: M-9302-1363434

In addition to the matters set forth in Part I of this Schedule, the Title is subject to the following matters, and the Company insures against loss or damage sustained in the event that they are not subordinate to the lien of the Insured Mortgage:



**STG Privacy Notice (Rev 01/26/09) Stewart Title Companies**

## WHAT DO THE STEWART TITLE COMPANIES DO WITH YOUR PERSONAL INFORMATION?

Federal and applicable state law and regulations give consumers the right to limit some but not all sharing. Federal and applicable state law regulations also require us to tell you how we collect, share, and protect your personal information. Please read this notice carefully to understand how we use your personal information. This privacy notice is distributed on behalf of the Stewart Title Guaranty Company and its affiliates (the Stewart Title Companies), pursuant to Title V of the Gramm-Leach-Bliley Act (GLBA).

The types of personal information we collect and share depend on the product or service that you have sought through us. This information can include social security numbers and driver's license number.

All financial companies, such as the Stewart Title Companies, need to share customers' personal information to run their everyday business--to process transactions and maintain customer accounts. In the section below, we list the reasons that we can share customers' personal information; the reasons that we choose to share; and whether you can limit this sharing.

| Reasons we can share your personal information | Do we share? | Can you limit this sharing |
|---|---|---|
| For our everyday business purposes- to process your transactions and maintain your account. This may include running the business and managing customer accounts, such as processing transactions, mailing, and auditing services, and responding to court orders and legal investigations. | Yes | No |
| For our marketing purposes- to offer our products and services to you. | Yes | No |
| For joint marketing with other financial companies | No | We don't share |
| For our affiliates' everyday business purposes- information about your transactions and experiences. Affiliates are companies related by common ownership or control. They can be financial and nonfinancial companies. *Our affiliates may include companies with the Stewart name; financial companies, such as Stewart Title Company* | Yes | No |
| For our affiliates' everyday business purposes- information about your creditworthiness | No | We don't share |
| For our affiliates to market you | Yes | No |
| For nonaffiliates to market to you- Nonaffiliates are companies not related by common ownership or control. They can be financial and nonfinancial companies. | No | We don't share |

We may disclose your personal information to our affiliates or to nonaffiliates as permitted by law. If you request a transaction with a nonaffiliate, such as a third party insurance company, we will disclose your personal information to that nonaffiliate. [We do not control their subsequent use of information, and suggest you refer to their privacy notices.]

| Sharing practices | |
|---|---|
| How often do the Stewart Title Companies notify me about their practices? | We must notify you about our sharing practices when you request a transaction. |
| How do the Stewart Title Companies protect my personal information? | To protect your personal information from unauthorized access and use, we use security measures that comply with federal and state law. These measures include computer, file, and building safeguards. |
| How do the Stewart Title Companies collect my personal information? | We collect your personal information, for example, when you<br><br>• request insurance-related services<br>• provide such information to us<br><br>We also collect your personal information from others, such as the real estate agent or lender involved in your transaction, credit reporting agencies, affiliates or other companies. |
| What sharing can I limit? | Although federal and state law give you the right to limit sharing (e.g., opt out) in certain instances, we do not share your personal information in those instances. |

| Contact Us | If you have any questions about this privacy notice, please contact us at: Stewart Title Guaranty, 1980 Post Oak Blvd., Privacy Officer, Houston, Texas 77056. |

# EXHIBIT 2

# EXHIBIT 2



# CHICAGO TITLE
## NATIONAL COMMERCIAL SERVICES



## National Commercial Services
# ENDORSEMENT GUIDE

© 2013 Chicago Title, a member of the Fidelity National Financial family of companies. | NYSE:FNF



**ENDORSEMENTS**

Generally, endorsements will provide additional coverage for matters which would ordinarily be excluded by the Exclusions From Coverage, or excepted from coverage shown in Schedule B of the policy either by the regional general exceptions, if applicable, or by specific exceptions. A majority of the endorsements are not general in nature, but are specific as to items for which the insured desires coverage. Some are specifically designed for owner's policies and others for loan policies. Some endorsements are not available in all circumstances.

The issuance of any endorsement is conditioned upon the circumstances surrounding the property involved, and upon the fulfillment of the underwriting criteria established by Chicago Title Insurance Company is subject to the terms and conditions of the policy to which they are attached. The following descriptions do not define the complete coverage of the endorsements, which can only be determined by reading the same. This list is provided as a convenience in located the endorsement which may fit a particular set of facts. This list does not include all endorsements that may be filed in California, but rather includes the standard ALTA endorsements.

**All information is provided as a courtesy and is deemed reliable but not guaranteed. Please contact your local Sales Executive to learn more. **

**ALTA/CLTA ENDORSEMENT CONVERSION CHART AS OF 04-02-13**

| ALTA | CLTA | Description | Adoption (Rev.) |
|------|------|-------------|-----------------|
| 1-06 | | Street Assessments | 6-17-06 |
| 2-06 | 125-06 | Truth in Lending | 6-17-06 |
| 3-06 | 123.1-06 | Zoning – Unimproved Land | 6-17-06 |
| 3.1-06 | 123.2-06 | Zoning – Improved Land | (10-22-09) |
| 3.2-06 | 123.3-06 | Zoning – Land Under Development (OP or LP) | 04-02-12 (Tech. Correction 12-3-12) |
| 4-06 | 115.1-06 | Condominium | (02-03-10) |
| 4.1-06 | 115.3-06 | Condominium (for NV & HI not CA) | (10-16-08) |
| 5-06 | 115.2-06 | Planned Unit Development | (02-03-10) |
| 5.1-06 | 115.4-06 | Planned Unit Development (for NV & HI not CA) | (10-16-08) |
| 6-06 | 111.5-06 | Variable rate | (10-16-08) |
| 6.2-06 | 111.8-06 | Variable Rate - Negative Amortization | (10-16-08) |
| 7-06 | 116.5-06 | Manufactured Housing Unit | 6-17-06 |
| 7.1-06 | 116.5. 1-06 | Manufactured Housing Unit-Conversion; Loan | 6-17-06 |
| 7.2-06 | 116.5. 2-06 | Manufactured Housing Unit-Conversion; Owner's | 6-17-06 |
| 8.1-06 | 110.9-06 | Environmental Protection Lien | 6-17-06 |
| 8.2-06 | 110.9.1-06 | Commercial Environmental Protection Lien | 10-16-08 |
| 9-06 | 100.2-06 | Restrictions, Encroachments & Minerals-Loan | (04-02-12) |
| 9.1-06 | 100.9-06 | Covenants, Conditions and Restrictions (Owner's Policy - Unimproved Land) | (04-02-12) |
| 9.2-06 | 100.10-06 | Covenants, Conditions and Restrictions (Owner's Policy - Improved Land) | (04-02-12) |
| 9.3-06 | 100.2.1-06 | Covenants, Conditions and Restrictions-Loan | (04-02-12) |
| 9.4-06 | 100.2.2-06 | Restrictions, Encroachments, Minerals-Future Improvements re Minerals Extraction– OP-Unimproved Land | Withdrawn 04-02-12) |
| 9.5-06 | 100.2.3-06 | Restrictions, Encroachments, Minerals –Future Improvements re Minerals Extraction- OP– Improved Land | (Withdrawn 04-02-12) |
| **9.6-06** | **(100.2.6-06)** | **Private Rights - Loan** | **04-02-13** |
| 9.7-06 | (100.2.7-06) | Restrictions, Encroachments, Minerals – Land under Development-Loan | 04-02-12 |
| 9.8-06 | (100.2.8-06) | Covenants, Conditions and Restrictions-Land under Development-Owners | 04-02-12 (Tech. Correction 12-3-12) |
| **9.9-06** | **100.2.9-06** | **Private Rights – Owner's** | **(04-02-13)** |
| **9.10-06** | **100.2.10-06** | **Restrictions, Encroachments, Minerals – Current Violations - Loan** | **(04-02-13)** |
| 10-06 | 104.12-06 | Assignment of Mortgage | (02-03-10) |
| 10.1-06 | 104.13-06 | Assignment and Date Down | (02-03-10) |
| 11-06 | 110.11-06 | Mortgage Modification | 6-17-06 |
| 11.1-06 | 110.11.1-06 | Mortgage Modification with Subordination | 10-22-09 |
| **12-06** | **117-06** | **Aggregation - Loan** | **(04-02-12)** |
| **12.1-06** | **117.1-06** | **Aggregation – State Limits – Loan** | **04-02-13** |
| 13-06 | 119.5-06 | Leasehold – Owner's | 04-02-12 |
| 13.1-06 | 119.6-06 | Leasehold – Loan | 04-02-12 |
| 14-06 | 111.14-06 | Future Advance-Priority [Note: Version A gives ML Coverage: Version B Does Not] | (02-03-11) |
| 14.1-06 | 111.14.1-06 | Future Advance-Knowledge [See Note for ALTA 14] | (02-03-11) |
| 14.2-06 | 111.14.2-06 | Future Advance-Letter of Credit [See Note for ALTA 14] | (02-03-11) |
| 14.3-06 | 111.14.3 -06 | Future Advance-Reverse Mortgage [See Note for ALTA 14] | (02-03-11) (Tech. Correction 12-3-12) |
| 15-06 | 127-06 | Non-imputation-Full Equity Transfer [Owner's Policy Only] | 6-17-06 |
| 15.1-06 | 127.1-06 | Non-imputation-Additional Insured [Owner's Policy Only] | 6-17-06 |
| 15.2-06 | 127.2-06 | Non-imputation-Partial Equity Transfer [Owner's Policy Only] | 6-17-06 |
| 16-06 | 128-06 | Mezzanine Financing [Owner's Policy Only] | 6-17-06 |
| 17-06 | 103.11-06 | Access and Entry | 6-17-06 |
| 17.1-06 | 103.12-06 | Indirect Access and Entry | 6-17-06 |
| 17.2-06 | 103.13-06 | Utility Access | 10-16-08 |
| 18-06 | 129-06 | Single Tax Parcel | 6-17-06 |
| 18.1-06 | 129.1-06 | Multiple Tax Parcels | 6-17-06 |
| 19-06 | 116.4.1-06 | Contiguity-Multiple Parcels | 6-17-06 |
| 19.1-06 | 116.4-06 | Contiguity-Single Parcel | 6-17-06 |
| 20-06 | 130-06 | First Loss-(Multiple Parcels) Transaction [Loan Policy Only] | 6-17-06 |
| 21-06 | 131-06 | Creditors' Rights (Decertification effective 03-08-10) | 6-17-06 |
| 22-06 | 116.01-06 | Location | 6-17-06 |

© 2013 Chicago Title, a member of the Fidelity National Financial family of companies. | NYSE:FNF

| 22.1-06 | 116.02-06 | Location & Map | 6-17-06 |
|---|---|---|---|
| 23-06 | 114.3-06 | Co-Insurance – Single Policy (01-01-08) | 10-16-08 |
| 24-06 | 133-06 | Doing Business | 10-16-08 |
| 25-06 | 116.1-06 | Same as Survey | 10-16-08 |
| 25.1-06 | 116.1.2-06 | Same as Portion of Survey | 10-16-08 |
| 26-06 | 116.8-06 | Subdivision | 10-16-08 |
| 27-06 | 132-06 | Usury | 10-16-08 |
| 28-06 | 103.1-06 | Easement – Damage or Enforced Removal | 02-03-10 |
| 28.1-06 | 103.14-06 | Encroachments-Boundaries and Easements | 04-02-12 |
| **28.2-06** | **103.15-06** | **Encroachments-Boundaries and Easements – Described Improvements** | **04-02-13** |
| 29-06 | 134-06 | Interest Rate SWAP-Direct Obligation | 02-03-10 |
| 29.1-06 | 134.1-06 | Interest Rate SWAP-Additional Interest | 02-03-10 |
| 29.2-06 | 134.2-06 | Interest Rate SWAP-Direct Obligation – Defined Amount | 08-01-11 |
| 29.3-06 | 134.3-06 | Interest Rate SWAP-Additional Interest – Defined Amount | 08-01-11 |
| 30-06 | 135-06 | Shared Appreciation Mortgage | 07-26-10 |
| 30.1-06 | 135.1-06 | Commercial Participation Interest | 08-01-12 |
| 31-06 | 136-06 | Severable Improvements | 02-03-11 |
| 32-06 | 137-06 | Construction Loan – Loss of Priority | 02-03-11 |
| **32.1-06** | **137.1-06** | **Construction Loan – Loss of Priority – Direct Payment** | **(04-02-13)** |
| **32.2-06** | **137.2-06** | **Construction Loan – Loss of Priority – Insured's Direct Payment** | **(04-02-13)** |
| 33-06 | 138-06 | Disbursement Endorsement | 02-03-11 |
| 34-06 | 139-06 | Identified Risk Coverage | 08-01-11 |
| 35-06 | 140-06 | Minerals and Other Subsurface Substances – Buildings-OP or LP | 04-02-12 |
| 35.1-06 | 140.1-06 | Minerals and Other Subsurface Substances-Described Improvements –OP or LP | 04-02-12 |
| 35.2-06 | 140.2-06 | Minerals and Other Subsurface Substances-Improvements- OP or LP_ | 04-02-12 |
| 35.3-06 | 140.3-06 | Minerals and Other Subsurface Substances-Land Under Development-OP or LP | 04-02-12 |
| 36-06 | 141-06 | Energy Project-Leasehold/Easement-OP | 04-02-12 |
| 36.1-06 | 141.1-06 | Energy Project-Leasehold/Easement-LP | 04-02-12 |
| 36.2-06 | 141.2-06 | Energy Project-Leasehold-OP | 04-02-12 |
| 36.3-06 | 141.3-06 | Energy Project-Leasehold-LP | 04-02-12 |
| 36.4-06 | 141.4-06 | Energy Project- CC and Rs- Land Under Development-OP | 04-02-12 |
| 36.5-06 | 141.5-06 | Energy Project- CC and Rs- Land Under Development-LP | 04-02-12 |
| 36.6-06 | 141.6-06 | Energy Project-Encroachments- LP or OP | 04-02-12 |
| **37-06** | **104.6-06** | **Assignment of Rents or Leases** | **12-03-12** |
| **39-06** | **142-06** | **Policy Authentication** | **04-02-13** |
| JR 1 | | ALTA Res. Limited Cov.  Jr. Loan Policy | 08-01-12 |
| JR 2 | | ALTA Res. Limited Cov.  Jr. Loan Policy | 08-01-12 |

© 2013 Chicago Title, a member of the Fidelity National Financial family of companies. | NYSE:FNF

**STREET ASSESSMENTS**
**ALTA ENDORSEMENT - FORM 1-06 (06-17-06)**

The repair and maintenance of public streets is either contracted for by a governmental body or done directly by government employees. The property owners adjoining the streets or in the generally benefited area are usually assessed the costs of the work on some basis. The governmental body is almost universally given a lien to secure the payment of this assessment.

This endorsement is concerned with the priority of that lien if the improvements are either in process or completed at the Date of Policy. If this lien is prior to the lien of the Insured Mortgage and the assessments are not paid by the borrower, the lender will have to pay them in order to stop a tax foreclosure. This endorsement covers the loss or damage which the lender may sustain by having to pay the assessments which have gained priority over the Insured Mortgage.

This endorsement is not filed in California.

© 2013 Chicago Title, a member of the Fidelity National Financial family of companies. | NYSE:FNF

**ENDORSEMENT**

Attached to Policy No._____
Issued by
Chicago Title Insurance
Company

The Company insures against loss or damage sustained by the Insured by reason of the lack of priority of the lien of the Insured Mortgage over the lien of any assessments for street improvements under construction or completed at Date of Policy.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

[Witness Clause Optional]

DATED:

Chicago Title Insurance Company

BY:_____
AUTHORIZED SIGNATORY

ALTA Endorsement Form 1-06
(Street Assessments) (6/17/06)
© American Land Title Association

**TRUTH-IN-LENDING**
**ALTA 2-06 (06-17-06)**

This endorsement is for loan policies only. It provides insurance against some losses the Insured may suffer if the borrower exercises a right of rescission under Regulation Z of the Federal Truth in Lending Act.

© 2013 Chicago Title, a member of the Fidelity National Financial family of companies. | NYSE:FNF

**ENDORSEMENT**

Attached to Policy No._____
Issued by
Chicago Title Insurance
Company

The Company insures against loss or damage sustained by the Insured by reason of:

any final judgment of a court of competent jurisdiction that either the lien of the Insured Mortgage has been terminated or the Title of an Insured, who has acquired all or any part of the Land by foreclosure, trustee's sale, conveyance in lieu of foreclosure, or other legal manner, which discharges the lien of the Insured Mortgage, has been defeated by a valid exercise of the right of rescission conferred by the Federal Truth-in-Lending Act and that the right or rights of rescission existed because neither the credit transaction evidenced by the Insured Mortgage nor the right of rescission was exempted or excepted by the provisions of Regulation Z (12 CFR 226).

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

[Witness Optional]

DATED:

Chicago Title Insurance Company

BY:_____
    AUTHORIZED SIGNATORY

ALTA Endorsement Form 2-06
(Truth in Lending) (6/17/06)
© American Land Title Association

© 2013 Chicago Title, a member of the Fidelity National Financial family of companies. | NYSE:FNF

**ZONING**
**ALTA 3-06 (06-17-06), 3.1-06 (10-22-09) and 3.2-06 (04-02-12)**

These forms are used to provide certain zoning coverage. They do not provide unlimited zoning insurance.

© 2013 Chicago Title, a member of the Fidelity National Financial family of companies. | NYSE:FNF

**ENDORSEMENT**

Attached to Policy No._____
Issued by
Chicago Title Insurance
Company

1.      The Company insures against loss or damage sustained by the Insured in the event that, at Date of Policy,

a.      According to applicable zoning ordinances and amendments, the Land is not classified Zone *[FILL IN]*;

b.      The following use or uses are not allowed under that classification:

*[FILL IN]*

2.      There shall be no liability under this endorsement based on

a.      Lack of compliance with any conditions, restrictions, or requirements contained in the zoning ordinances and amendments, including but not limited to the failure to secure necessary consents or authorizations as a prerequisite to the use or uses.  This paragraph 2.a. does not modify or limit the coverage provided in Covered Risk 5.

b.      The invalidity of the zoning ordinances and amendments until after a final decree of a court of competent jurisdiction adjudicating the invalidity, the effect of which is to prohibit the use or uses.

c.      The refusal of any person to purchase, lease or lend money on the estate or interest covered by this policy.

This endorsement is issued as part of the policy.  Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls.  Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements to it.


[Witness Optional]


DATED:

Chicago Title Insurance Company

BY:_____
          AUTHORIZED SIGNATORY



ALTA Endorsement Form 3-06
(Zoning – Unimproved Land) (6/17/06)
©American Land Title Association

© 2013 Chicago Title, a member of the Fidelity National Financial family of companies. | NYSE:FNF

**ENDORSEMENT**

Attached to Policy No._____
Issued by
Chicago Title Insurance
Company

1.    The Company insures against loss or damage sustained by the Insured in the event that, at Date of Policy,

    a.    according to applicable zoning ordinances and amendments, the Land is not classified Zone FILL IN;

    b.    the following use or uses are not allowed under that classification:
        FILL IN

    c.    There shall be no liability under paragraph 1.b. if the use or uses are not allowed as the result of any lack of compliance with any conditions, restrictions, or requirements contained in the zoning ordinances and amendments, including but not limited to the failure to secure necessary consents or authorizations as a prerequisite to the use or uses. This paragraph 1.c. does not modify or limit the coverage provided in Covered Risk 5.

2.    The Company further insures against loss or damage sustained by the Insured by reason of a final decree of a court of competent jurisdiction either prohibiting the use of the Land, with any existing structure, as specified in paragraph 1.b. or requiring the removal or alteration of the structure, because, at Date of Policy, the zoning ordinances and amendments have been violated with respect to any of the following matters:

    a.    Area, width, or depth of the Land as a building site for the structure

    b.    Floor space area of the structure

    c.    Setback of the structure from the property lines of the Land

    d.    Height of the structure, or

    e.    Number of parking spaces.

3.    There shall be no liability under this endorsement based on:

    a.    the invalidity of the zoning ordinances and amendments until after a final decree of a court of competent jurisdiction adjudicating the invalidity, the effect of which is to prohibit the use or uses;

    b.    the refusal of any person to purchase, lease or lend money on the Title covered by this policy.

This endorsement is issued as part of the policy.  Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements to it.
[Witness Optional]

DATED:
Chicago Title Insurance Company
BY:_____
    AUTHORIZED SIGNATORY

ALTA Endorsement Form 3.1-06
(Zoning-Completed Structure) (rev. 10/22/09)
©American Land Title Association

© 2013 Chicago Title, a member of the Fidelity National Financial family of companies. | NYSE:FNF

**ENDORSEMENT**

Attached to Policy No._____
Issued by
Chicago Title Insurance
Company

1. For purposes of this endorsement:
    a. "Improvement" means a building, structure, road, walkway, driveway, curb, subsurface utility or  water well existing at Date of Policy or to be built or constructed according to the Plans that is or  will be located on the Land, but excluding crops, landscaping, lawns, shrubbery, or trees.

    b. "Plans" means those site and elevation plans made by [*name of architect or engineer*] dated_____,  last revised_____, designated as [*name of project*] consisting of_____sheets.

2. The Company insures against loss or damage sustained by the Insured in the event that, at Date of  Policy
    a. according to applicable zoning ordinances and amendments, the Land is not classified Zone _____;

    b. the following use or uses are not allowed under that classification:

    c. There shall be no liability under paragraph 2.b. if the use or uses are not allowed as the result of  any lack of compliance with any condition, restriction, or requirement contained in the zoning  ordinances and amendments, including but not limited to the failure to secure necessary consents  or authorizations as a prerequisite to the use or uses.  This paragraph 2.c. does not modify or limit  the coverage provided in Covered Risk 5.

3. The Company further insures against loss or damage sustained by the Insured by reason of a final  decree of a court of competent jurisdiction either prohibiting the use of the Land, with any existing  Improvement, as specified in paragraph 2.b. or requiring the removal or alteration of the Improvement,  because of a violation of the zoning ordinances and amendments in effect at  Date of Policy with  respect to any of the following matters:
    a.        Area, width, or depth of the Land as a building site for the Improvement

    b.        Floor space area of the Improvement

    c.        Setback of the Improvement from the property lines of the Land

    d.        Height of the Improvement, or

    e.        Number of parking spaces.

4. There shall be no liability under this endorsement based on:
    a. the invalidity of the zoning ordinances and amendments until after a final decree of a court of  competent jurisdiction adjudicating the invalidity, the effect of which is to prohibit the use or uses;

    b. the refusal of any person to purchase, lease or lend money on the Title covered by this policy.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and  provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of  Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of  this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of  the policy and of any prior endorsements.
[Witness Optional]

DATED:
Chicago Title Insurance Company
BY:_____
        AUTHORIZED SIGNATORY

© 2013 Chicago Title, a member of the Fidelity National Financial family of companies. | NYSE:FNF

ALTA Endorsement Form 3.1-06
(Zoning-Completed Structure) (rev. 10/22/09)
©American Land Title Association

**CONDOMINIUM**

**ALTA 4-06 (02-03-10) and 4.1-06 (10-16-08)**

These endorsements provide affirmative insurance to mortgage lenders loaning on the security of condominium units. There are seven matters selected for insurance in these endorsements.  The ALTA 4.1-06 differs from the ALTA 4-06 only in hat there is no insurance of priority over future assessments in paragraph 4 of the endorsement.  The ALTA 4.1-06 may be used with either an Owner's or Lender's Policy.

© 2013 Chicago Title, a member of the Fidelity National Financial family of companies. | NYSE:FNF

**ENDORSEMENT**

Attached to Policy No._____
Issued by
Chicago Title Insurance
Company

The Company insures against loss or damage sustained by the Insured by reason of:

1.   The failure of the unit identified in Schedule A and its common elements to be part of a condominium within the meaning of the condominium statutes of the jurisdiction in which the unit and its common elements are located.

2.   The failure of the documents required by the condominium statutes to comply with the requirements of the statutes to the extent that such failure affects the Title to the unit and its common elements.

3.   Present violations of any restrictive covenants that restrict the use of the unit and its common elements and that are contained in the condominium documents or the forfeiture or reversion of Title by reason of any provision contained in the restrictive covenants. As used in this paragraph 3, the words "restrictive covenants" do not refer to or include any covenant, condition, or restriction (a) relating to obligations of any type to perform maintenance, repair, or remediation on the Land, or (b) pertaining to environmental protection of any kind or nature, including hazardous or toxic matters, conditions, or substances, except to the extent that a notice of a violation or alleged violation affecting the Land has been recorded in the Public Records at Date of Policy and is not excepted in Schedule B.

4.   The priority of any lien for charges and assessments provided for in the condominium statutes and condominium documents at Date of Policy over the lien of any Insured Mortgage identified in Schedule A.

5.   The failure of the unit and its common elements to be entitled by law to be assessed for real property taxes as a separate parcel.

6.   Any obligation to remove any improvements that exist at Date of Policy because of any present encroachments or because of any future unintentional encroachment of the common elements upon any unit or of any unit upon the common elements or another unit.

7.   The failure of the Title by reason of a right of first refusal to purchase the unit and its common elements that was exercised or could have been exercised at Date of Policy.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

[Witness clause optional]
DATED:
Chicago Title Insurance Company
BY:_____
        AUTHORIZED SIGNATORY

ALTA Endorsement Form 4-06
(Condominium) (Rev. 02/03/10)
©American Land Title Association

**ENDORSEMENT**

Attached to Policy No._____
Issued by
Chicago Title Insurance
Company

The Company insures against loss or damage sustained by the Insured by reason of:

1.      The failure of the unit identified in Schedule A and its common elements to be part of a condominium within the meaning of the condominium statutes of the jurisdiction in which the unit and its common elements are located.

2.      The failure of the documents required by the condominium statutes to comply with the requirements of the statutes to the extent that such failure affects the Title to the unit and its common elements.

3.      Present violations of any restrictive covenants that restrict the use of the unit and its common elements and that are contained in the condominium documents or the forfeiture or reversion of Title by reason of any provision contained in the restrictive covenants.  As used in this paragraph 3, the words "restrictive covenants" do not refer to or include any covenant, condition, or restriction (a) relating to obligations of any type to perform maintenance, repair, or remediation on the Land, or (b) pertaining to environmental protection of any kind or nature, including hazardous or toxic matters, conditions, or substances, except to the extent that a notice of a violation or alleged violation affecting the Land has been recorded in the Public Records at Date of Policy and is not excepted in Schedule B.

4.      Any charges or assessments provided for in the condominium statutes and condominium documents due and unpaid at Date of Policy.

5.      The failure of the unit and its common elements to be entitled by law to be assessed for real property taxes as a separate parcel.

6.      Any obligation to remove any improvements that exist at Date of Policy because of any present encroachments or because of any future unintentional encroachment of the common elements upon any unit or of any unit upon the common elements or another unit.

7.      The failure of the Title by reason of a right of first refusal to purchase the unit and its common elements which was exercised or could have been exercised at Date of Policy.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

[Witness clause optional]
DATED:
Chicago Title Insurance Company
BY:_____
      AUTHORIZED SIGNATORY

ALTA Endorsement Form 4.1-06
(Condominium) (Rev. 10/16/08)
©American Land Title Association

**PLANNED UNIT DEVELOPMENT**
**ALTA 5-06 (02-03-10) and 5.1-06 (10-16-08)**

These endorsements provide affirmative coverage for lenders loaning on the security of units in a Planned Unit Development, or PUD. Affirmative coverage is provided against loss caused by violation of restrictions or by the existence of certain kinds of restrictions. In addition, both cover loss from enforced removal of buildings by reason of encroachments and from failure of Title, as defined by the policies, caused by the exercise of any right of first refusal. The ALTA 5-06 insures against loss from lack of priority of the mortgage lien over the lien for homeowners' association assessments. The ALTA 5.1-06 differs in that there is no insurance of priority over future assessments in Paragraph 2 of the 5.1-06; instead it only covers unpaid assessments at date of policy.   The ALTA 5.1-06 may be used with either an Owner's or Lender's Policy.

**ENDORSEMENT**

Attached to Policy No._____
Issued by
Chicago Title Insurance
Company

The Company insures against loss or damage sustained by the Insured by reason of:

1.　　　Present violations of any restrictive covenants referred to in Schedule B that restrict the use of the Land or the forfeiture or reversion of Title by reason of any provision contained in the restrictive covenants. As used in this paragraph 1, the words "restrictive covenants" do not refer to or include any covenant, condition or restriction (a) relating to obligations of any type to perform maintenance, repair or remediation on the Land, or (b) pertaining to environmental protection of any kind or nature, including hazardous or toxic matters, conditions, or substances, except to the extent that a notice of a violation or alleged violation affecting the Land has been recorded in the Public Records at Date of Policy and is not excepted in Schedule B.

2.　　　The priority of any lien for charges and assessments in favor of any association of homeowners which are provided for in any document at Date of Policy referred to in Schedule B over the lien of any Insured Mortgage identified in Schedule A.

3.　　　The enforced removal of any existing structure on the Land (other than a boundary wall or fence) because it encroaches onto adjoining land or onto any easements.

4.　　　The failure of the Title by reason of a right of first refusal to purchase the Land which was exercised or could have been exercised at Date of Policy.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

[Witness clause optional]

Chicago Title Insurance Company

BY:_____

ALTA Endorsement Form 5-06
(Planned Unit Development) (Rev. 02/03/10)
© American Land Title Association

© 2013 Chicago Title, a member of the Fidelity National Financial family of companies. | NYSE:FNF

**ENDORSEMENT**

Attached to Policy No._____
Issued by
Chicago Title Insurance
Company

The Company insures against loss or damage sustained by the Insured by reason of:

1.      Present violations of any restrictive covenants referred to in Schedule B that restrict the use of the Land or the forfeiture or reversion of Title by reason of any provision contained in the restrictive covenants. As used in this paragraph 1, the words "restrictive covenants" do not refer to or include any covenant, condition, or restriction (a) relating to obligations of any type to perform maintenance, repair, or remediation on the Land, or (b) pertaining to environmental protection of any kind or nature, including hazardous or toxic matters, conditions, or substances, except to the extent that a notice of a violation or alleged violation affecting the Land has been recorded in the Public Records at Date of Policy and is not excepted in Schedule B.

2.      Any charges or assessments in favor of any association of homeowners, which are provided for in any document referred to in Schedule B, due and unpaid at Date of Policy.

3.      The enforced removal of any existing structure on the Land (other than a boundary wall or fence) because it encroaches onto adjoining land or onto any easements.

4.      The failure of the Title by reason of a right of first refusal to purchase the Land that was exercised or could have been exercised at Date of Policy.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

[Witness clause optional]

Chicago Title Insurance Company

BY:_____

ALTA Endorsement Form 5.1-06
(Planned Unit Development) (Rev. 10/16/08)
©American Land Title Association

**VARIABLE RATE MORTGAGE**
**ALTA 6-06 (10-16-08), and 6.2-06 (10-16-08)**

These endorsements were created to insure the validity and priority of the mortgage liens securing loans with variable interest rates. The ALTA 6-06 is the basic variable interest rate endorsement. The ALTA 6.1 is not filed in California and is designed for use where lenders face regulatory requirements which must be followed in order to make such loans. The ALTA 6.2-06 was created to insure the validity and priority of mortgage liens as security for interest at variable rates and as security for additional principal created by the negative amortization of unpaid interest.

© 2013 Chicago Title, a member of the Fidelity National Financial family of companies. | NYSE:FNF

**ENDORSEMENT**

Attached to Policy No._____
Issued by
Chicago Title Insurance
Company

The Company insures against loss or damage sustained by the Insured by reason of:

1.      The invalidity or unenforceability of the lien of the Insured Mortgage resulting from its provisions that provide for changes in the rate of interest.

2.      Loss of priority of the lien of the Insured Mortgage as security for the unpaid principal balance of the loan, together with interest as changed in accordance with the provisions of the Insured Mortgage, which loss of priority is caused by the changes in the rate of interest.

"Changes in the rate of interest", as used in this endorsement, shall mean only those changes in the rate of interest calculated pursuant to the formula provided in the documents secured by the Insured Mortgage at Date of Policy.

This endorsement does not insure against loss or damage based upon:

1.      usury, or

2.      any consumer credit protection or truth in lending law.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

[Witness clause optional]
DATED:
Chicago Title Insurance Company
BY:_____
        AUTHORIZED SIGNATORY

ALTA Endorsement Form 6-06
(Variable Rate) (Rev. 10/16/08)
©American Land Title Association

**For use with 1992 policies or older**

**ENDORSEMENT**

Attached to Policy No._____
Issued by
Chicago Title Insurance
Company

The Company insures the owner of the indebtedness secured by the insured mortgage against loss or damage sustained by reason of:

1.     The invalidity or unenforceability of the lien of the insured mortgage resulting from the provisions therein which provide for changes in the rate of interest.

2.     Loss of priority of the lien of the insured mortgage as security for the unpaid principal balance of the loan, together with interest as changed in accordance with the provisions of the insured mortgage, which loss of priority is caused by the changes in the rate of interest.

"Changes in the rate of interest", as used in this endorsement, shall mean only those changes in the rate of interest calculated pursuant to the formula provided in the insured mortgage at Date of Policy.

This endorsement does not insure against loss or damage by reason of the failure of the insured to comply with the following statutes or regulations concerning variable rate mortgages:

This endorsement does not insure against loss or damage based upon (a) usury, or (b) any consumer credit protection or truth in lending law.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy or
(iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

[Witness clause optional]
DATED:
Chicago Title Insurance Company
BY:_____
        AUTHORIZED SIGNATORY

ALTA Endorsement - Form 6.1
(Variable Rate Mortgage) (1/17/04)
©American Land Title Association

© 2013 Chicago Title, a member of the Fidelity National Financial family of companies. | NYSE:FNF

**ENDORSEMENT**

Attached to Policy No._____
Issued by
Chicago Title Insurance
Company

The Company insures against loss or damage sustained by the Insured by reason of:

1.      The invalidity or unenforceability of the lien of the Insured Mortgage resulting from its provisions that provide for (a) interest on interest, (b) changes in the rate of interest, or (c) the addition of unpaid interest to the principal balance of the loan.

2.      Loss of priority of the lien of the Insured Mortgage as security for the principal balance of the loan, including any unpaid interest which was added to principal in accordance with the provisions of the Insured Mortgage, interest on interest, or interest as changed in accordance with the provisions of the Insured Mortgage, which loss of priority is caused by (a) changes in the rate of interest, (b) interest on interest, or (c) increases in the unpaid principal balance of the loan resulting from the addition of unpaid interest.

"Changes in the rate of interest", as used in this endorsement shall mean only those changes in the rate of interest calculated pursuant to the formula provided in the loan documents secured by the Insured Mortgage at Date of Policy.

This endorsement does not insure against loss or damage based upon:

       1.      usury, or

       2.      any consumer credit protection or truth in lending law.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

[Witness clause optional]
DATED:
Chicago Title Insurance Company
BY:_____
       AUTHORIZED SIGNATORY

ALTA Endorsement Form 6.2-06
(Variable Rate, Negative Amortization) (Rev. 10/16/08)
©American Land Title Association

© 2013 Chicago Title, a member of the Fidelity National Financial family of companies. | NYSE:FNF

**MANUFACTURED HOUSING**
**ALTA 7-06 (06-17-06), 7.1-06 (06-17-06) and 7.2-06 (06-17-06)**

These endorsements clarify whether or not a manufactured housing unit ("MHU") located on the Land is covered by the insurance policy. The ALTA 7-06 adds the MHU to the definition of Land. In addition the ALTA 7.1-06 and the ALTA 7.2-06 insure against loss or damage if the MHU is not located on the subject premises, if there are UCC type liens filed against the MHU and if the MHU does not constitute real property under state law. The ALTA 7.1-06, which is the form to be used with a Loan Policy, also insures that the Insured Mortgage can be enforced in a single foreclosure action against both the MHU and the Land.

© 2013 Chicago Title, a member of the Fidelity National Financial family of companies. | NYSE:FNF

**ENDORSEMENT**

Attached to Policy No._____
Issued by
Chicago Title Insurance
Company

The term "Land" includes the manufactured housing unit located on the land described in Schedule A at Date of Policy.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

[Witness clause optional]
DATED:
Chicago Title Insurance Company
BY:_____
      AUTHORIZED SIGNATORY

ALTA Endorsement Form 7-06
(Manufactured Housing Unit) (6/17/06)
©American Land Title Association

**ENDORSEMENT**

Attached to Policy No._____
Issued by
Chicago Title Insurance
Company

1.   The term "Land" as defined in this policy includes the manufactured housing unit located on the land described in Schedule A at Date of Policy.

2.   Unless excepted in Schedule B, the Company insures against loss or damage sustained by the Insured if, at Date of Policy,

   (a)   A manufactured housing unit is not located on the land described in Schedule A.

   (b)   The manufactured housing unit located on the land is not real property under the law of the state where the Land described in Schedule A is located.

   (c)   The owner of the Land is not the owner of the manufactured housing unit.

   (d)   Any lien is attached to the manufactured housing unit as personal property, including

      (i)   a federal, state, or other governmental tax lien,

      (ii)   UCC security interest,

      (iii)   a motor vehicular lien,

      (iv)   other personal property lien.

   (e)   The lien of the Insured Mortgage is not enforceable against the Land.

   (f)   The lien of the Insured Mortgage is not enforceable in a single foreclosure procedure.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

[Witness clause optional]
DATED:
Chicago Title Insurance Company
BY:_____
      AUTHORIZED SIGNATORY

ALTA Endorsement Form 7.1-06
(Manufactured Housing – Conversion; Loan) (6/17/06)
©American Land Title Association

© 2013 Chicago Title, a member of the Fidelity National Financial family of companies. | NYSE:FNF

**ENDORSEMENT**

Attached to Policy No._____
Issued by
Chicago Title Insurance
Company

1.   The term "Land" as defined in this policy includes the manufactured housing unit located on the land described in Schedule A at Date of Policy.

2.   Unless excepted in Schedule B, the Company insures against loss or damage, sustained by the Insured if, at Date of Policy

   (a)   A manufactured housing unit is not located on the Land described in Schedule A.

   (b)   The manufactured housing unit located on the Land is not real property under the law of the state where the Land described in Schedule A is located.

   (c)   The Insured is not the owner of the manufactured housing unit.

   (d)   Any lien is attached to the manufactured housing unit as personal property, including

      (i)    a federal, state, or other governmental tax lien,

      (ii)   UCC security interest,

      (iii)  a motor vehicular lien,

      (iv)   other personal property lien.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

[Witness clause optional]
DATED:
Chicago Title Insurance Company
BY:_____
      AUTHORIZED SIGNATORY

ALTA Endorsement Form 7.2-06
(Manufactured Housing – Conversion; Owners) (6/17/06)
©American Land Title Association

**ENVIRONMENTAL PROTECTION LIEN COMMERCIAL ENVIRONMENTAL LIEN**
**ALTA 8.1-06 (06-17-06) and 8.2-06 (10-16-08)**

These endorsements provide affirmative insurance that the lien of the Insured Mortgage has priority over unrecorded or unfiled environmental protection liens.

© 2013 Chicago Title, a member of the Fidelity National Financial family of companies. | NYSE:FNF

**ENDORSEMENT**

Attached to Policy No._____
Issued by
Chicago Title Insurance
Company

The insurance afforded by this endorsement is only effective if the Land is used or is to be used primarily for residential purposes.

The Company insures against loss or damage sustained by the Insured by reason of lack of priority of the lien of the Insured Mortgage over

(a)     any environmental protection lien that, at Date of Policy, is recorded in those records established under state statutes at Date of Policy for the purpose of imparting constructive notice of matters relating to real property to purchasers for value and without knowledge, or is filed in the records of the clerk of the United States district court for the district in which the Land is located, except as set forth in Schedule B; or

(b)     any environmental protection lien provided by any state statute in effect at Date of Policy, except environmental protection liens provided by the following state statutes:

FILL IN

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

[Witness clause optional]
DATED:
Chicago Title Insurance Company
BY:_____
AUTHORIZED SIGNATORY

ALTA Endorsement Form 8.1-06
(Environmental Protection Lien) (6/17/06)
©American Land Title Association

**ENDORSEMENT**

Attached to Policy No._____
Issued by
Chicago Title Insurance
Company


      The Company insures against loss or damage sustained by the Insured by reason of an environmental protection lien that, at Date of Policy, is recorded in the Public Records or filed in the records of the clerk of the United States district court for the district in which the Land is located, unless the environmental protection lien is set forth as an exception in Schedule B.


      This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.


[Witness clause optional]
DATED:
Chicago Title Insurance Company
BY:_____
    AUTHORIZED SIGNATORY


ALTA Endorsement Form 8.2-06
(Commercial Environmental Lien) (10/16/08)
©American Land Title Association

**ALTA 9**
**SERIES 9**
**ALTA  9-06 to 9.10-06**
**[ALTA 9.4-06 AND 9.5-06 WITHDRAWN EFFECTIVE 4/2/2012]**

It is common for institutional lenders to require certain additional title insurance coverages for loans secured by first mortgages on improved real property when these mortgages are to be sold on the secondary market. The original ALTA Form 9 was designed to provide those coverages in a single, inclusive form. It afforded the lender various protections with respect to private property restrictions, building setback lines, encroachments and excepted minerals. Forms for use with owner's policies were subsequently adopted also.

In 2012 and 2013 ALTA completely revised all of the endorsements in the series, withdrawing the 9.4-06 and 9.5-06 and adding 5 new forms- the 9.6-06, 9.7-06,  9.8-06, 9.9-06 and 9.10-06.

# ALTA 9 Series Summary
**Actual Endorsement Availability Depends Upon Case by Case Title Insurer's Underwriting Analysis**

| | Coverage Requested | Loan Policy | Owners Policy |
|---|---|---|---|
| **A L T A 9 S E R I E S** | Restrictions, Encroachments, Minerals | **Use:** **ALTA 9-06[1]** for existing improvements, **ALTA 9.7-06[1]** for Land under Development, and **ALTA 9.10-06[1]** where a possibility of forfeiture exists but there is no current violation. | To get this coverage for: vacant land combine - ALTA **9.1-06[1], ALTA 28.1-06[2]** and ALTA **35.1-06**. improved land - combine ALTA **9.2-06[1]**, ALTA **28.1-06[2]** and ALTA **35.1-06**. |
| | Covenants, Conditions & Restrictions | **Use:** **ALTA 9.3-06[1]** (It has the same coverage as Section 3 of the ALTA 9-06, so the ALTA 9-06 is more inclusive with its encroachment and mineral coverages in Section 4). | **Use:** **ALTA 9.1-06[1]** for unimproved land, **ALTA 9.2-06[1]** available for improved Land, or **ALTA 9.8[2]** for Land Under Development |
| | Private Rights | **Use:** **ALTA 9.6-06** (A private charge or assessment, option, right of first refusal or right of prior approval). | **Use:** **ALTA 9.9-06 06** (An option, right of first refusal or right of prior approval). |

© 2013 Chicago Title, a member of the Fidelity National Financial family of companies. | NYSE:FNF

**ENDORSEMENT**

Attached to Policy No._____
Issued by
Chicago Title Insurance
Company

1.  The insurance provided by this endorsement is subject to the exclusions in Section 5 of this endorsement; and the Exclusions from Coverage, the Exceptions from Coverage contained in Schedule B, and the Conditions in the policy.

2.  For the purposes of this endorsement only:

    a.  "Covenant" means a covenant, condition, limitation or restriction in a document or instrument in effect at Date of Policy.

    b.  "Improvement" means an improvement, including any lawn, shrubbery, or trees, affixed to either the Land or adjoining land at Date of Policy that by law constitutes real property.

3.  The Company insures against loss or damage sustained by the Insured by reason of:

    a.  A violation of a Covenant that:

        i.   divests, subordinates, or extinguishes the lien of the Insured Mortgage,
        ii.  results in the invalidity, unenforceability or lack of priority of the lien of the Insured Mortgage, or
        iii. causes a loss of the Insured's Title acquired in satisfaction or partial satisfaction of the Indebtedness;

    b.  A violation on the Land at Date of Policy of an enforceable Covenant, unless an exception in Schedule B of the policy identifies the violation;

    c.  Enforced removal of an Improvement located on the Land as a result of a violation, at Date of Policy, of a building setback line shown on a plat of subdivision recorded or filed in the Public Records, unless an exception in Schedule B of the policy identifies the violation; or

    d.  A notice of a violation, recorded in the Public Records at Date of Policy, of an enforceable Covenant relating to environmental protection describing any part of the Land and referring to that Covenant, but only to the extent of the violation of the Covenant referred to in that notice, unless an exception in Schedule B of the policy identifies the notice of the violation.

4.  The Company insures against loss or damage sustained by reason of:

    a.  An encroachment of:

        i.  an Improvement located on the Land, at Date of Policy, onto adjoining land or onto that portion of the Land subject to an easement; or

        ii. an Improvement located on adjoining land onto the Land at Date of Policy,

unless an exception in Schedule B of the policy identifies the encroachment otherwise insured against in Sections 4.a.i. or 4.a.ii.;

    b.  A final court order or judgment requiring the removal from any land adjoining the Land of an encroachment identified in Schedule B; or

    c.  Damage to an Improvement located on the Land, at Date of Policy:

        i.  that is located on or encroaches onto that portion of the Land subject to an easement excepted in Schedule B, which damage results from the exercise of the right to maintain the easement for the purpose for which it was granted or reserved; or

      ii.       resulting from the future exercise of a right to use the surface of the Land for the extraction or development of minerals or any other subsurface substances excepted from the description of the Land or excepted in Schedule B.

5.  This endorsement does not insure against loss or damage (and the Company will not pay costs, attorneys' fees, or expenses) resulting from:

   a.  any Covenant contained in an instrument creating a lease;

   b.  any Covenant relating to obligations of any type to perform maintenance, repair, or remediation on the Land;

   c.  except as provided in Section 3.d, any Covenant relating to environmental protection of any kind or nature, including hazardous or toxic matters, conditions, or substances;

   d.  contamination, explosion, fire, fracturing, vibration, earthquake or subsidence; or

   e.  negligence by a person or an Entity exercising a right to extract or develop minerals or other subsurface substances.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements

[Witness clause optional]
DATED:
Chicago Title Insurance Company
BY:_____
      AUTHORIZED SIGNATORY

ALTA Endorsement Form 9-06
(Restrictions, Encroachments, Minerals-Loan Policy) (Rev. 4/2/12)
©American Land Title Association

© 2013 Chicago Title, a member of the Fidelity National Financial family of companies. | NYSE:FNF

**ENDORSEMENT**

Attached to Policy No._____
Issued by
Chicago Title Insurance
Company

1.      The insurance provided by this endorsement is subject to the exclusions in Section 4 of this endorsement; and the Exclusions from Coverage, the Exceptions from Coverage contained in Schedule B, and the Conditions in the policy.

2.      For the purposes of this endorsement only, "Covenant" means a covenant, condition, limitation or restriction in a document or instrument in effect at Date of Policy.

3.      The Company insures against loss or damage sustained by the Insured by reason of:

    a.    A violation on the Land at Date of Policy of an enforceable Covenant, unless an exception in Schedule B of the policy identifies the violation; or

    b.    A notice of a violation, recorded in the Public Records at Date of Policy, of an enforceable Covenant relating to environmental protection describing any part of the Land and referring to that Covenant, but only to the extent of the violation of the Covenant referred to in that notice, unless an exception in Schedule B of the policy identifies the notice of the violation.

4.      This endorsement does not insure against loss or damage (and the Company will not pay costs, attorneys' fees, or expenses) resulting from:

    a.    any Covenant contained in an instrument creating a lease;

    b.    any Covenant relating to obligations of any type to perform maintenance, repair, or remediation on the Land; or

    c.    except as provided in Section 3.b, any Covenant relating to environmental protection of any kind or nature, including hazardous or toxic matters, conditions, or substances.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

[Witness clause optional]

DATED:
Chicago Title Insurance Company
BY:_____
    AUTHORIZED SIGNATORY

ALTA Endorsement Form 9.1-06
(Covenants, Conditions and Restrictions-Unimproved Land – Owner's Policy–) (Rev. 4/2/12)
©American Land Title Association

**ENDORSEMENT**

Attached to Policy No._____
Issued by
Chicago Title Insurance
Company

1. The insurance provided by this endorsement is subject to the exclusions in Section 4 of this endorsement; and the Exclusions from Coverage, the Exceptions from Coverage contained in Schedule B, and the Conditions in the policy.
2. For the purposes of this endorsement only,
   a. "Covenant" means a covenant, condition, limitation or restriction in a document or instrument in effect at Date of Policy.
   b. "Improvement" means a building, structure located on the surface of the Land, road, walkway, driveway, or curb, affixed to the Land at Date of Policy and that by law constitutes real property, but excluding any crops, landscaping, lawn, shrubbery, or trees.
3. The Company insures against loss or damage sustained by the Insured by reason of:
   a. A violation on the Land at Date of Policy of an enforceable Covenant, unless an exception in Schedule B of the policy identifies the violation;
   b. Enforced removal of an Improvement as a result of a violation, at Date of Policy, of a building setback line shown on a plat of subdivision recorded or filed in the Public Records, unless an exception in Schedule B of the policy identifies the violation; or
   c. A notice of a violation, recorded in the Public Records at Date of Policy, of an enforceable Covenant relating to environmental protection describing any part of the Land and referring to that Covenant, but only to the extent of the violation of the Covenant referred to in that notice, unless an exception in Schedule B of the policy identifies the notice of the violation.
4. This endorsement does not insure against loss or damage (and the Company will not pay costs, attorneys' fees, or expenses) resulting from:
   a. any Covenant contained in an instrument creating a lease;
   b. any Covenant relating to obligations of any type to perform maintenance, repair, or remediation on the Land; or
   c. except as provided in Section 3.c., any Covenant relating to environmental protection of any kind, including hazardous or toxic matters, conditions, or substances.

   This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

[Witness clause optional]
DATED:
Chicago Title Insurance Company
BY:_____
        AUTHORIZED SIGNATORY

ALTA Endorsement Form 9.2-06
(Covenants, Conditions and Restrictions – Improved Land -Owner's Policy (Rev. 4/1/12)
©American Land Title Association

© 2013 Chicago Title, a member of the Fidelity National Financial family of companies. | NYSE:FNF

**ENDORSEMENT**

Attached to Policy No._____
Issued by
Chicago Title Insurance
Company

1.   The insurance provided by this endorsement is subject to the exclusions in Section 4 of this endorsement; and the Exclusions from Coverage, the Exceptions from Coverage contained in Schedule B, and the Conditions in the policy.

2.   For the purposes of this endorsement only:

a.   "Covenant" means a covenant, condition, limitation or restriction in a document or instrument in effect at Date of Policy.

b.   "Improvement" means an improvement, including any lawn, shrubbery, or trees, affixed to the Land at Date of Policy that by law constitutes real property.

3.   The Company insures against loss or damage sustained by the Insured by reason of:

a.   A violation of a Covenant that:

i.   divests, subordinates, or extinguishes the lien of the Insured Mortgage,

ii.   results in the invalidity, unenforceability or lack of priority of the lien of the Insured Mortgage, or

iii.   causes a loss of the Insured's Title acquired in satisfaction or partial satisfaction of the Indebtedness;

b.   A violation on the Land at Date of Policy of an enforceable Covenant, unless an exception in Schedule B of the policy identifies the violation;

c.   Enforced removal of an Improvement as a result of a violation, at Date of Policy, of a building setback line shown on a plat of subdivision recorded or filed in the Public Records, unless an exception in Schedule B of the policy identifies the violation; or

d.   A notice of a violation, recorded in the Public Records at Date of Policy, of an enforceable Covenant relating to environmental protection describing any part of the Land and referring to that Covenant, but only to the extent of the violation of the Covenant referred to in that notice, unless an exception in Schedule B of the policy identifies the notice of the violation.

4.   This endorsement does not insure against loss or damage (and the Company will not pay costs, attorneys' fees, or expenses) resulting from:

a.   any Covenant contained in an instrument creating a lease;

b.   any Covenant relating to obligations of any type to perform maintenance, repair, or remediation on the Land; or

© 2013 Chicago Title, a member of the Fidelity National Financial family of companies. | NYSE:FNF

c.   except as provided in Section 3.c, any Covenant pertaining to environmental protection of any kind or nature, including hazardous or toxic matters, conditions, or substances.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

[Witness clause optional]
DATED:
Chicago Title Insurance Company
BY:_____
      AUTHORIZED SIGNATORY

ALTA Endorsement Form 9.3-06
(Covenants, Conditions and Restrictions-Loan Policy) (Rev. 4/2/12)
©American Land Title Association

**ENDORSEMENT**

Attached to Policy No._____
Issued by
Chicago Title Insurance
Company

1.   The insurance provided by this endorsement is subject to the exclusions in Section 4 of this endorsement; and the Exclusions from Coverage, the Exceptions from Coverage contained in Schedule B, and the Conditions in the policy.

2.   For purposes of this endorsement only:

  a.   "Covenant" means a covenant, condition, limitation or restriction in a document or instrument in effect at Date of Policy.

  b.    "Private Right" means (i) a private charge or assessment; (ii) an option to purchase; (iii) a right of first refusal; or (iv) a right of prior approval of a future purchaser or occupant.

3.   The Company insures against loss or damage sustained by the Insured under this Loan Policy if enforcement of a Private Right in a Covenant affecting the Title at Date of Policy (a) results in the invalidity, unenforceability or lack of priority of the lien of the Insured Mortgage, or (b) causes a loss of the Insured's Title acquired in satisfaction or partial satisfaction of the Indebtedness.

4.   This endorsement does not insure against loss or damage (and the Company will not pay costs, attorneys' fees, or expenses) resulting from:

  a.   any Covenant contained in an instrument creating a lease;

  b.   any Covenant relating to obligations of any type to perform maintenance, repair, or remediation on the Land;

  c.   any Covenant relating to environmental protection of any kind or nature, including hazardous or toxic matters, conditions, or substances; or

  d.   any Private Right in an instrument identified in Exception(s)_____in Schedule B.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

[Witness clause optional]
DATED:
Chicago Title Insurance Company
BY:_____
      AUTHORIZED SIGNATORY

ALTA Endorsement Form 9.6-06
(Private Rights-Loan Policy) (Rev. 4/2/13)
©American Land Title Association

**ENDORSEMENT**

Attached to Policy No._____
Issued by
Chicago Title Insurance
Company

1.    The insurance provided by this endorsement is subject to the exclusions in Section 5 of this endorsement; and the Exclusions from Coverage, the Exceptions from Coverage contained in Schedule B, and the Conditions in the policy.

2.    For purposes of this endorsement only:

a.    "Covenant" means a covenant, condition, limitation or restriction in a document or instrument in effect at Date of Policy.

b.    "Future Improvement" means a building, structure, road, walkway, driveway, curb, lawn, shrubbery or trees to be constructed on or affixed to the Land in the locations according to    the Plans and that by law will constitute real property.

c.    "Improvement" means an improvement, including any lawn, shrubbery, or trees, affixed to  either the Land or adjoining land at Date of Policy that by law constitutes real property.

d.    "Plans" means the survey, site and elevation plans or other depictions or drawings prepared by
(*insert name of architect or engineer*)  dated_____, last revised _____, designated as (*insert name of project or project number*)  consisting of____sheets.

3.    The Company insures against loss or damage sustained by the Insured by reason of:

a.    A violation of a Covenant that:

i.    divests, subordinates, or extinguishes the lien of the Insured Mortgage,

ii.    results in the invalidity, unenforceability or lack of priority of the lien of the Insured Mortgage, or

iii.    causes a loss of the Insured's Title acquired in satisfaction or partial satisfaction of the Indebtedness;

b.    A violation of an enforceable Covenant by an Improvement on the Land at Date of Policy or by a Future Improvement, unless an exception in Schedule B of the policy identifies the violation;

c.    Enforced removal of an Improvement located on the Land or of a Future Improvement as a result of a violation of a building setback line shown on a plat of subdivision recorded or filed in the Public Records at Date of Policy, unless an exception in Schedule B of the policy identifies the violation; or

d.    A notice of a violation, recorded in the Public Records at Date of Policy, of an enforceable Covenant relating to environmental protection describing any part of the Land and referring to that Covenant, but only to the extent of the violation of the Covenant referred to in that notice, unless an exception in Schedule B of the policy identifies the notice of the violation.

4.    The Company insures against loss or damage sustained by reason of:

a.    An encroachment of:

i.    an Improvement located on the Land at Date of Policy or a Future Improvement, onto adjoining land or onto that portion of the Land subject to an easement; or

© 2013 Chicago Title, a member of the Fidelity National Financial family of companies. | NYSE:FNF

      ii.      an Improvement located on adjoining land onto the Land at Date of Policy,

unless an exception in Schedule B of the policy identifies the encroachment otherwise insured against in Sections 4.a.i. or 4.a.ii.;

      b.      Damage to an Improvement located on the Land at Date of Policy or a Future Improvement:

      i.      that encroaches onto that portion of the Land subject to an easement excepted in Schedule B, which damage results from the exercise of the right to maintain the easement for the purpose for which it was granted or reserved; or

      ii.      resulting from the future exercise of a right to use the surface of the Land for the extraction or development of minerals or any other subsurface substances excepted from the description of the Land or excepted in Schedule B.

5.      This endorsement does not insure against loss or damage (and the Company will not pay costs, attorneys' fees, or expenses) resulting from:

      a.      any Covenant contained in an instrument creating a lease;

      b.      any Covenant relating to obligations of any type to perform maintenance, repair, or remediation on the Land;

      c.      except as provided in Section 3.d, any Covenant relating to environmental protection of      any kind or nature, including hazardous or toxic matters, conditions, or substance

      d.      contamination, explosion, fire, vibration, fracturing, earthquake or subsidence; or

      e.      negligence by a person or an Entity exercising a right to extract or develop minerals or other subsurface substances.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

[Witness clause optional]

DATED:
Chicago Title Insurance Company
BY:_____
      AUTHORIZED SIGNATORY

ALTA Endorsement Form 9.7-06
(Restrictions, Encroachments, Minerals-Land Under Development-Loan Policy) (4/2/12)
©American Land Title Association

**ENDORSEMENT**

Attached to Policy No._____
Issued by
Chicago Title Insurance
Company

1.    The insurance provided by this endorsement is subject to the exclusions in Section 4 of this endorsement; and the Exclusions from Coverage, the Exceptions from Coverage contained in Schedule B, and the Conditions in the policy.

2.    For purposes of this endorsement only:

   a.    "Covenant" means a covenant, condition, limitation or restriction in a document or instrument in effect at Date of Policy.

   b.    "Future Improvement" means a building, structure, road, walkway, driveway, curb to be constructed on or affixed to the Land in the locations according to the Plans and that by law will constitute real property, but excluding any crops, landscaping, lawn, shrubbery, or trees.

   c.    "Improvement" means a building, structure located on the surface of the Land, road, walkway, driveway, or curb, affixed to the Land at Date of Policy and that by law constitutes real property, but excluding any crops, landscaping, lawn, shrubbery, or trees.

   d.    "Plans" means the survey, site and elevation plans or other depictions or drawings prepared by (*insert name of architect or engineer*) dated_____, last revised _____, designated as (*insert name of project or project number*) consisting of ____sheets.

3.    The Company insures against loss or damage sustained by the Insured by reason of:

   a.    A violation of an enforceable Covenant by an Improvement on the Land at Date of Policy or by a Future Improvement, unless an exception in Schedule B of the policy identifies the violation;

   b.    Enforced removal of an Improvement located on the Land or of a Future Improvement as a result of a violation of a building setback line shown on a plat of subdivision recorded or filed in the Public Records at Date of Policy, unless an exception in Schedule B of the   policy identifies the violation; or

   c.    A notice of a violation, recorded in the Public Records at Date of Policy, of an enforceable Covenant relating to environmental protection describing any part of the Land and referring to that Covenant, but only to the extent of the violation of the Covenant referred    to in that notice, unless an exception in Schedule B of the policy identifies the notice of the violation.

4.    This endorsement does not insure against loss or damage (and the Company will not pay costs, attorneys' fees, or expenses) resulting from:

   a.    any Covenant contained in an instrument creating a lease;

   b.    any Covenant relating to obligations of any type to perform maintenance, repair, or remediation on the Land; or

   c.    except as provided in Section 3.c, any Covenant relating to environmental protection of any kind or nature, including hazardous or toxic matters, conditions, or substances.

© 2013 Chicago Title, a member of the Fidelity National Financial family of companies. | NYSE:FNF

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

[Witness clause optional]

DATED:
Chicago Title Insurance Company
BY:_____
    AUTHORIZED SIGNATORY

ALTA Endorsement Form 9.8-06
(Covenants, Conditions and Restrictions-Land Under Development-Owners Policy) (4/2/12)
©American Land Title Association

*[includes technical correction of 12-3-12]*

**ENDORSEMENT**

Attached to Policy No._____
Issued by
Chicago Title Insurance
Company

1.    The insurance provided by this endorsement is subject to the exclusions in Section 4 of this endorsement; and the Exclusions from Coverage, the Exceptions from Coverage contained in Schedule B, and the Conditions in the policy.

2.    For purposes of this endorsement only:

    a.    "Covenant" means a covenant, condition, limitation or restriction in a document or instrument in effect at Date of Policy.

    b.    "Private Right" means (i) an option to purchase; (ii) a right of first refusal; or (iii) a right of prior approval of a future purchaser or occupant.

3.    The Company insures against loss or damage sustained by the Insured under this Owner's Policy if enforcement of a Private Right in a Covenant affecting the Title at Date of Policy based on a transfer of Title on or before Date of Policy causes a loss of the Insured's Title.

4.    This endorsement does not insure against loss or damage (and the Company will not pay costs, attorneys' fees, or expenses) resulting from: restriction:

    a.    any Covenant  contained in an instrument creating a lease;

    b.    any Covenant relating to obligations of any type to perform maintenance, repair, or remediation on the Land;

    c.    any Covenant relating to environmental protection of any kind or nature, including hazardous or toxic matters, conditions, or substances; or

    d.    any Private Right in an instrument identified in Exception(s)_____in Schedule B.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

[Witness clause optional]

DATED:
Chicago Title Insurance Company
BY:_____
    AUTHORIZED SIGNATORY

ALTA Endorsement Form 9.9-06
(Private Rights-Owner's Policy) ( 4/2/13)
©American Land Title Association

**ENDORSEMENT**

Attached to Policy No._____
Issued by
Chicago Title Insurance
Company

1. The insurance provided by this endorsement is subject to the exclusions in Section 5 of this endorsement; and the Exclusions from Coverage, the Exceptions from Coverage contained in Schedule B, and the Conditions in the policy.

2. For the purposes of this endorsement only:

    a. "Covenant" means a covenant, condition, limitation or restriction in a document or instrument in effect at Date of Policy.

    b. "Improvement" means an improvement, including any lawn, shrubbery, or trees, affixed to either the Land or adjoining land at Date of Policy that by law constitutes real property.

3. The Company insures against loss or damage sustained by the Insured by reason of:

    a. A violation at Date of Policy of a Covenant that:

        i. divests, subordinates, or extinguishes the lien of the Insured Mortgage,

        ii. results in the invalidity, unenforceability or lack of priority of the lien of the Insured Mortgage, or

        iii. causes a loss of the Insured's Title acquired in satisfaction or partial satisfaction of the Indebtedness;

    b. A violation on the Land at Date of Policy of an enforceable Covenant, unless an exception in Schedule B of the policy identifies the violation;

    c. Enforced removal of an Improvement located on the Land as a result of a violation, at Date of Policy, of a building setback line shown on a plat of subdivision recorded or filed in the Public Records, unless an exception in Schedule B of the policy identifies the violation; or

    d. A notice of a violation, recorded in the Public Records at Date of Policy, of an enforceable Covenant relating to environmental protection describing any part of the Land and referring to that Covenant, but only to the extent of the violation of the Covenant referred to in that notice, unless an exception in Schedule B of the policy identifies the notice of the violation.

4. The Company insures against loss or damage sustained by reason of:

    a. An encroachment of:

        i. an Improvement located on the Land, at Date of Policy, onto adjoining land or onto that portion of the Land subject to an easement; or

        ii. an Improvement located on adjoining land onto the Land at Date of Policy,

unless an exception in Schedule B of the policy identifies the encroachment otherwise insured against in Sections 4.a.i. or 4.a.ii.;

    b. A final court order or judgment requiring the removal from any land adjoining the Land of an encroachment identified in Schedule B; or

    c. Damage to an Improvement located on the Land, at Date of Policy:

        i. that is located on or encroaches onto that portion of the Land subject to an easement excepted in Schedule B, which damage results from the exercise of

© 2013 Chicago Title, a member of the Fidelity National Financial family of companies. | NYSE:FNF

the right to maintain the easement for the purpose for which it was granted or reserved; or

ii.  resulting from the future exercise of a right to use the surface of the Land for the extraction or development of minerals or any other subsurface substances excepted from the description of the Land or excepted in Schedule B.

5.      This endorsement does not insure against loss or damage (and the Company will not pay costs, attorneys' fees, or expenses) resulting from:

a. any Covenant contained in an instrument creating a lease;

b. any Covenant relating to obligations of any type to perform maintenance, repair, or remediation on the Land;

c. except as provided in Section 3.d, any Covenant relating to environmental protection of any kind or nature, including hazardous or toxic matters, conditions, or substances;

d. contamination, explosion, fire, fracturing, vibration, earthquake or subsidence; or

e. negligence by a person or an Entity exercising a right to extract or develop minerals or other subsurface substances.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements

[Witness clause optional]

DATED:
Chicago Title Insurance Company
BY:_____
        AUTHORIZED SIGNATORY

ALTA Endorsement Form 9.10-06
(Restrictions, Encroachments, Minerals-Current Violations-Loan Policy) ( 4/2/13)
©American Land Title Association

© 2013 Chicago Title, a member of the Fidelity National Financial family of companies. | NYSE:FNF

**ASSIGNMENT OF MORTGAGE**
**ALTA 10-06 (02-03-10) AND 10.1-06 (02-03-10)**

The ALTA 10-06 endorsement insures the effectiveness of the assignment of the Insured Mortgage and that there have been no releases or reconveyances placed of record other than as shown. The ALTA 10.1-06 provides the same coverage as the 10-06 and gives additional coverage over only certain matters occurring after the original Date of Policy and before the Date of Endorsement, which is a defined term within the endorsement.

The policy is modified by naming the assignee under the assignment as the Insured. The endorsement provides additional affirmative coverage against the ineffectiveness of the assignment and the effect of any full or partial releases or reconveyances recorded after the Date of Policy and before the Date of Endorsement. In addition, the ALTA 10.1-06 provides coverage for the matters described above. Both forms of endorsement are conditioned upon the proper delivery and endorsement of the underlying notes.

© 2013 Chicago Title, a member of the Fidelity National Financial family of companies. | NYSE:FNF

**ENDORSEMENT**

Attached to Policy No._____
Issued by
Chicago Title Insurance
Company

1.      The name of the Insured at Date of Endorsement and referred to in this endorsement as the "Assignee" is amended to read:

2.      The Company insures against loss or damage sustained by the Assignee by reason of:

   a.      The failure of the following assignment to vest title to the Insured Mortgage in the Assignee:

   b.      Any modification, partial or full reconveyance, release, or discharge of the lien of the Insured Mortgage recorded on or prior to Date of Endorsement in the Public Records other than those shown in the policy or a prior endorsement, except:

This endorsement does not insure against loss or damage, and the Company will not pay costs, attorneys' fees, or expenses, by reason of any claim that arises out of the transaction creating the assignment by reason of the operation of federal bankruptcy, state insolvency, or similar creditors' rights laws that is based on:

   1. the assignment being deemed a fraudulent conveyance or fraudulent transfer; or

   2. the assignment being deemed a preferential transfer.

This endorsement shall be effective provided that, at Date of Endorsement, (1) the note or notes secured by the lien of the Insured Mortgage have been properly endorsed and delivered to the Assignee, or (2) if the note or notes are transferable records, the Assignee has "control" of the single authoritative copy of each "transferable record" as these terms are defined by applicable electronic transaction laws.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

Date of Endorsement_____

Chicago Title Insurance Company
BY:_____
      AUTHORIZED SIGNATORY

ALTA Endorsement Form 10-06
(Assignment) (Rev. 02/03/10)
©American Land Title Association

**ENDORSEMENT**

Attached to Policy No._____
Issued by
Chicago Title Insurance
Company

1.      The name of the Insured at Date of Endorsement and referred to in this endorsement as the "Assignee" is amended to read:

2.      The Company insures against loss or damage sustained by the Assignee by reason of:

   a.      The failure of the following assignment to vest title to the Insured Mortgage in the Assignee:

   b.      Any liens for taxes or assessments that are due and payable on Date of Endorsement, except:

   c.      Lack of priority of the lien of the Insured Mortgage over defects, liens, or encumbrances other than those shown in the policy or a prior endorsement, except:

   d.      Notices of federal tax liens or notices of pending bankruptcy proceedings affecting the Title and recorded subsequent to Date of Policy in the Public Records and on or prior to Date of Endorsement, except:

   e.      Any modification, partial or full reconveyance, release or discharge of the lien of the Insured Mortgage recorded on or prior to Date of Endorsement in the Public Records other than those shown in the policy or a prior endorsement, except:

This endorsement does not insure against loss or damage, and the Company will not pay costs, attorneys' fees, or expenses, by reason of any claim that arises out of the transaction creating the assignment by reason of the operation of federal bankruptcy, state insolvency, or similar creditors' rights laws that is based on:

   1. the assignment being deemed a fraudulent conveyance or fraudulent transfer; or

   2. the assignment being deemed a preferential transfer.

This endorsement shall be effective provided that, at Date of Endorsement, (1) the note or notes secured by the lien of the Insured Mortgage have been properly endorsed and delivered to the Assignee, or (2) if the note or notes are transferable records, the Assignee has "control" of the single authoritative copy of each "transferable record" as these terms are defined by applicable electronic transaction laws.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or
(iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

Date of Endorsement _____

[Witness clause optional]

Chicago Title Insurance Company

© 2013 Chicago Title, a member of the Fidelity National Financial family of companies. | NYSE:FNF

BY:_____
     AUTHORIZED SIGNATORY

ALTA Endorsement Form 10.1-06
(Assignment and Date Down) (Rev.02/03/10)
©American Land Title Association

© 2013 Chicago Title, a member of the Fidelity National Financial family of companies. | NYSE:FNF

**MORTGAGE MODIFICATION**
**ALTA 11-06 (6-07-06) & 11.1-06 (10-22-09)**

These endorsements were created to insure lenders that the modification of the Insured Mortgage evidenced by the document referred to within the endorsement does not impair the validity, enforceability or priority of the Insured Mortgage as of the Date of Endorsement, which is a defined term within the endorsements. In addition, the 11.1-06 insures against loss based upon a specific matter not being subordinate to the lien of the Insured Mortgage.

© 2013 Chicago Title, a member of the Fidelity National Financial family of companies. | NYSE:FNF

**ENDORSEMENT**

Attached to Policy No._____
Issued by
Chicago Title Insurance
Company

The Company insures against loss or damage sustained by the Insured by reason of:

1.      The invalidity or unenforceability of the lien of the Insured Mortgage upon the Title at Date of Endorsement as a result of the agreement dated ____ recorded ____ ("Modification"); and

2.      The lack of priority of the lien of the Insured Mortgage, at Date of Endorsement, over defects in or liens or encumbrances on the Title, except for those shown in the policy or any prior endorsement and except:      ADD EXCEPTIONS HERE

This endorsement does not insure against loss or damage, and the Company will not pay costs, attorneys' fees, or expenses, by reason of any claim that arises out of the transaction creating the Modification by reason of the operation of federal bankruptcy, state insolvency, or similar creditors' rights laws that is based on:

1.      the Modification being deemed a fraudulent conveyance or fraudulent transfer; or

2.      the Modification being deemed a preferential transfer except where the preferential transfer results from the failure

    a.      to timely record the instrument of transfer; or

    b.      of such recordation to impart notice to a purchaser for value or to a judgment or lien creditor.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

Date of Endorsement _____

[Witness clause optional]

Chicago Title Insurance Company
BY:_____
        AUTHORIZED SIGNATORY

ALTA Endorsement Form 11-06
(Mortgage Modification) (6/17/06)
©American Land Title Association

**ENDORSEMENT**

Attached to Policy No._____
Issued by
Chicago Title Insurance
Company

The Company insures against loss or damage sustained by the Insured by reason of:

1.      The invalidity or unenforceability of the lien of the Insured Mortgage upon the Title at Date of Endorsement as a result of the agreement dated_____ , recorded_____, ("Modification"); and

2.      The lack of priority of the lien of the Insured Mortgage, at Date of Endorsement, over defects in or liens or encumbrances on the Title, except for those shown in the policy or any prior endorsement and except:        ADD EXCEPTIONS HERE

3.      The following matters not being subordinate to the lien of the Insured Mortgage: ADD SUBORDINATE MATTERS HERE

        This endorsement does not insure against loss or damage, and the Company will not pay costs, attorneys' fees, or expenses, by reason of any claim that arises out of the transaction creating the Modification by reason of the operation of federal bankruptcy, state insolvency, or similar creditors' rights laws that is based on:

1.      the Modification being deemed a fraudulent conveyance or fraudulent transfer; or

2.      the Modification being deemed a preferential transfer except where the preferential transfer results from the failure

        a.      to timely record the instrument of transfer; or

        b.      of such recordation to impart notice to a purchaser for value or to a judgment or lien creditor.

        This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

Date of Endorsement_____

[Witness clause optional]

Chicago Title Insurance Company

BY:_____

ALTA Endorsement Form 11.1-06
(Mortgage Modification with Subordination) (10/22/09)
©American Land Title Association

© 2013 Chicago Title, a member of the Fidelity National Financial family of companies. | NYSE:FNF

**AGGREGATION (TIE-IN)**
**ALTA 12-06 (04-02-13) and 12.1-06 (04-12-13)**

Mortgages covering many parcels in different recording districts or jurisdictions may each be recorded for the full amount of the secured indebtedness, or the allocated collateral value of each site, or a combination of full and allocated values.

The allocated amount is often used in states which impose a mortgage tax.   In any case, the lender views the transaction as one debt and wants insurance coverage for the total amount of the secured indebtedness.   Instead of combining all of the parcels into one large loan policy, the aggregation endorsement allows an insurer to issue a number of policies for lesser amounts but to tie the policies together so that the Insured can aggregate the coverage and take advantage of any increases in the value of a particular parcel should there be a loss.  Form 12-06 can be used for aggregating policies on sites all located in a single state or sites located in multiple states none of which have state statutory limitations on the amount which can be insured.  Form 12.1-06 is intended to be used for aggregating policies in multiple states one or more of which have state statutory limitations on the amount which can be insured.

This endorsement changes the provisions of Conditions 8(a)(i) of the  ALTA Loan Policy so that the Amount of Insurance available to cover a loss is the aggregate of the Amount of Insurance available under the policy to which this endorsement is attached plus the Amounts of Insurance available under the other policies identified in this endorsement.  Effective April 2, 2013 Form 12-06 was modified by adding new paragraphs which change the provisions of Sections 7(a)(i), 8(a), 8(b), 10 of the Conditions of the ALTA Loan Policy.  New Form 12.1-06 also contains the new paragraphs.  These new paragraphs clarify the effect of the endorsement on the options of the Company under the policy in the event of a claim and the extent of the Company's liability.

© 2013 Chicago Title, a member of the Fidelity National Financial family of companies. | NYSE:FNF

**ENDORSEMENT**

Attached to Policy No._____
Issued by
Chicago Title Insurance
Company

1. The following policies are issued in conjunction with one another:

POLICY NUMBER:     STATE:     AMOUNT OF INSURANCE:

$

$

$

2. The amount of insurance available to cover the Company's liability for loss or damage under this policy at the time of payment of loss shall be the Aggregate Amount of Insurance defined in Section 3 of this endorsement.

3. Subject to the limits in Section 4 of this endorsement, the Aggregate Amount of Insurance under these policies is $_____.

4. Section 7(a)(i) of the Conditions of this policy is amended to read:

**7. OPTIONS TO PAY OR OTHERWISE SETTLE CLAIMS; TERMINATION OF LIABILITY**

In case of a claim under this policy, the Company shall have the following additional options:

(a) to pay or tender payment of the lesser of the value of the Title as insured or the Aggregate Amount of Insurance applicable under this policy at the date the claim was made by the Insured Claimant, or to purchase the Indebtedness.

(i) to pay or tender payment of the lesser of the value of the Title as insured at the date the claim was made by the Insured Claimant, or the Aggregate Amount of Insurance applicable under this policy together with any cost, attorneys' fees, and costs and expenses incurred by the Insured Claimant that were authorized by the Company up to the time of payment or tender of payment and that the Company is obligated to pay; or

5. Section 8(a) and 8(b) of the Conditions of this policy are amended to read:

**8. DETERMINATION AND EXTENT OF LIABILITY**

This policy is a contract of indemnity against actual monetary loss or damage sustained or incurred by the Insured Claimant who has suffered loss or damage by reason of matters insured against by this policy.

(a) The extent of liability of the Company for loss or damage under this policy shall not exceed the least of

© 2013 Chicago Title, a member of the Fidelity National Financial family of companies. | NYSE:FNF

(i)   the Aggregate Amount of Insurance,

(ii)  the Indebtedness,

(iii) the difference between the value of the Title as insured and the value of the Title subject to the risk insured against by this policy, or

(iv)  if a government agency or instrumentality is the Insured Claimant, the amount it paid in the acquisition of the Title or the Insured Mortgage in satisfaction of its insurance contract or guaranty.

(b)  If the Company pursues its rights under Section 5 of these Conditions and is unsuccessful in establishing the Title or the lien of the Insured Mortgage, as insured, the Insured Claimant shall have the right to have the loss or damage determined either as of the date the claim was made by the Insured Claimant or as the date it is settled and paid.

6.   Section 10 of the Conditions of this policy is amended to read:

### 10.   REDUCTION OF INSURANCE; REDUCTION OR TERMINATION OF LIABILITY

(a)  All payments under this policy, except payments made for costs, attorneys' fees, and expenses, shall reduce the Aggregate Amount of Insurance by the amount of the payment.

(b)  However, any payments made prior to the acquisition of Title as provided in Section 2 of these Conditions shall not reduce the Aggregate Amount of Insurance afforded under this endorsement except to the extent that the payments reduce the Indebtedness.

(c)  The voluntary satisfaction or release of the Insured Mortgage shall terminate all liability of the Company under this policy, except as provided in Section 2 of these Conditions, but it will not reduce the Aggregate Amount of Insurance for the other policies identified in Section 1 of this endorsement.

This endorsement is issued as part of the policy.    Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance.   To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

[Witness clause optional]

DATED:
Chicago Title Insurance Company
BY:_____
        AUTHORIZED SIGNATORY

ALTA Endorsement Form 12-06
(Aggregation-Loan) (rev. 4/2/13)
© American Land Title Association

© 2013 Chicago Title, a member of the Fidelity National Financial family of companies. | NYSE:FNF

**ENDORSEMENT**

Attached to Policy No._____
Issued by
Chicago Title Insurance
Company

1. The following policies are issued in conjunction with one another:

| POLICY NUMBER: | STATE: | AMOUNT OF INSURANCE: |
|---|---|---|
| | | $ |
| | | $ |
| | | $ |

2. The amount of insurance available to cover the Company's liability for loss or damage under this policy at the time of payment of loss shall be the Aggregate Amount of Insurance defined in Section 3 of this endorsement.

3. The Aggregate Amount of Insurance under this policy is either:

   a. $ ; or

   b. If the Land is located in one of the states identified in this subsection, then the Aggregate Amount of Insurance is restricted to the amount shown below:

| STATE | AGGREGATE AMOUNT OF INSURANCE |
|---|---|
| | $ |
| | $ |

4. Section 7(a)(i) of the Conditions of this policy is amended to read:

   **7.  OPTIONS TO PAY OR OTHERWISE SETTLE CLAIMS; TERMINATION OF LIABILITY**

   In case of a claim under this policy, the Company shall have the following additional options:

   (a)        to pay or tender payment of the lesser of the value of  the Title as insured or the Aggregate Amount of Insurance applicable under this policy at the date the claim was made by the Insured Claimant, or to purchase the Indebtedness.

   (i) To pay or tender payment of the lesser of the value of the Title as insured at the date the claim was made by the Insured Claimant, or the Aggregate Amount of Insurance applicable under this policy, together with any cost, attorneys' fees, and costs and expenses incurred by the Insured Claimant that were authorized by the Company up to the time of payment or tender of payment and that the Company is obligated to pay; or

5.   Section 8(a) and 8(b) of the Conditions of this policy are amended to read:

**8. DETERMINATION AND EXTENT OF LIABILITY**

This policy is a contract of indemnity against actual monetary loss or damage sustained or incurred by the Insured Claimant who has suffered loss or damage by reason of matters insured against by this policy.

(a) The extent of liability of the Company for loss or damage under this policy shall not exceed the least of

(i)   the Aggregate Amount of Insurance for the State where the Land is located,

(ii)  the Indebtedness,

(iii) the difference between the value of the Title as insured and the value of the Title subject to the risk insured against by this policy, or

(iv)  if a government agency or instrumentality is the Insured Claimant, the amount it paid in the acquisition of the Title or the Insured Mortgage in satisfaction of its insurance contract or guaranty.

(b) If the Company pursues its rights under Section 5 of these Conditions and is unsuccessful in establishing the Title or the lien of the Insured Mortgage, as insured, the Insured Claimant shall have the right to have the loss or damage determined either as of the date the claim was made by the Insured Claimant or as the date it is settled and paid.

6.   Section 10 of the Conditions of this policy is amended to read:

**10.  REDUCTION OF INSURANCE; REDUCTION OR TERMINATION OF LIABILITY**

(a) All payments under this policy, except payments made for costs, attorneys' fees, and expenses, shall reduce the applicable Aggregate Amount of Insurance by the amount of the payment.

(b) If this policy insures the Title to Land located in a state identified in Section 3 b. of this endorsement:

(i)   all payments under this policy, except payments made for costs, attorneys' fees, and expenses, shall reduce the Aggregate Amount of Insurance  by the amount of the payment; but

(ii)  a payment made for loss or damage on Land insured in one of the policies identified in Section 1 on Land located outside this state shall not reduce the Aggregate Amount of Insurance in Section 3.b. of this endorsement until the Aggregate Amount of Insurance in Section 3.a. is reduced below the  Aggregate Amount of Insurance in Section 3.b .

(c) However, any payments made prior to the acquisition of Title as provided in Section 2 of these Conditions shall not reduce the Aggregate Amount of Insurance afforded under this endorsement except to the extent that the payments reduce the Indebtedness.

(d) The voluntary satisfaction or release of the Insured Mortgage shall terminate all liability of the Company under this policy, except as

© 2013 Chicago Title, a member of the Fidelity National Financial family of companies. | NYSE:FNF

provided in Section 2 of these Conditions, but it will not reduce the Aggregate Amount of Insurance for the other policies identified in Section 1 of this endorsement.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

[Witness clause optional]

DATED:
Chicago Title Insurance Company
BY:_____
        AUTHORIZED SIGNATORY

ALTA Endorsement Form 12.1-06
(Aggregation- State Limits-Loan) (4/2/13)
© American Land Title Association

© 2013 Chicago Title, a member of the Fidelity National Financial family of companies. | NYSE:FNF

**LEASEHOLD-OWNER'S AND LEASEHOLD-LOAN**

**ALTA 13-06 (04-02-12) AND 13.1-06 (04-02-12)**

The ALTA Endorsement Forms 13-06 and 13.1-06 were created to be attached to the ALTA Owner's Policy and ALTA Loan Policy respectively. They were revised April 2, 2012. They are intended to be used either with policies covering only Leasehold Estates or for those that insure both Leasehold Estates and the ownership of improvements located on them.

**ENDORSEMENT**

Attached to Policy No._____
Issued by
Chicago Title Insurance
Company

1. As used in this endorsement, the following terms shall mean:

   a. "Evicted" or "Eviction": (a) the lawful deprivation, in whole or in part, of the right of possession insured by this policy, contrary to the terms of the Lease or (b) the lawful prevention of the use of the Land or the Tenant Leasehold Improvements for the purposes permitted by the Lease, in either case as a result of a matter covered by this policy.
   b. "Lease": the lease described in Schedule A.
   c. "Leasehold Estate": the right of possession granted in the Lease for the Lease Term.
   d. "Lease Term": the duration of the Leasehold Estate, as set forth in the Lease, including any renewal or extended term if a valid option to renew or extend is contained in the Lease.
   e. "Personal Property": property, in which and to the extent the Insured has rights, located on or affixed to the Land on or after Date of Policy that by law does not constitute real property because (i) of its character and manner of attachment to the Land and (ii) the property can be severed from the Land without causing material damage to it or to the Land.
   f. "Remaining Lease Term": the portion of the Lease Term remaining after the Insured has been Evicted.
   g. "Tenant Leasehold Improvements": Those improvements, in which and to the extent the Insured has rights, including landscaping, required or permitted to be built on the Land by the Lease that have been built at the Insured's expense or in which the Insured has an interest greater than the right to possession during the Lease Term.

2. Valuation of Estate or Interest Insured:

If in computing loss or damage it becomes necessary to value the Title, or any portion of it, as the result of an Eviction of the Insured, then, as to that portion of the Land from which the Insured is Evicted, that value shall consist of the value for the Remaining Lease Term of the Leasehold Estate and any Tenant Leasehold Improvements existing on the date of the Eviction. The Insured Claimant shall have the right to have the Leasehold Estate and the Tenant Leasehold Improvements affected by a defect insured against by the policy valued either as a whole or separately. In either event, this determination of value shall take into account rent no longer required to be paid for the Remaining Lease Term.

3. Additional items of loss covered by this endorsement:

If the Insured is Evicted, the following items of loss, if applicable to that portion of the Land from which the Insured is Evicted shall be included, without duplication, in computing loss or damage incurred by the Insured, but not to the extent that the same are included in the valuation of the Title determined pursuant to Section 2 of this endorsement, any other endorsement to the policy or Section 8(a)(ii) of the Conditions:

   a. The reasonable cost of (i) removing and relocating any Personal Property that the Insured has the right to remove and relocate, situated on the Land at the time of Eviction,(ii) transportation of that Personal Property for the initial one hundred miles incurred in connection with the relocation,(iii) repairing the Personal Property damaged by reason of the removal and relocation, and (iv) restoring the Land to the extent damaged as a result of the removal and relocation of the Personal Property and required of the Insured solely because of the Eviction .

© 2013 Chicago Title, a member of the Fidelity National Financial family of companies. | NYSE:FNF

b.  Rent or damages for use and occupancy of the Land prior to the Eviction that the Insured as owner of the Leasehold Estate may be obligated to pay to any person having paramount title to that of the lessor in the Lease.

c.  The amount of rent that, by the terms of the Lease, the Insured must continue to pay to the lessor after Eviction with respect to the portion of the Leasehold Estate and Tenant Leasehold Improvements from which the Insured has been Evicted.

d.  The fair market value, at the time of the Eviction, of the estate or interest of the Insured in any lease or sublease permitted by the Lease and made by Insured as lessor of all or part of the Leasehold Estate or the Tenant Leasehold Improvements.

e.  Damages caused by the Eviction that the Insured is obligated to pay to lessees or sublessees on account of the breach of any lease or sublease permitted by the Lease and made by the Insured as lessor of all or part of the Leasehold Estate or the Tenant Leasehold Improvements.

f.  The reasonable cost to obtain land use, zoning, building and occupancy permits, architectural and engineering services and environmental testing and reviews for leasehold reasonably equivalent to the Leasehold Estate.

g.  If Tenant Leasehold Improvements are not substantially completed at the time of Eviction, the actual cost incurred by the Insured, less the salvage value, for the Tenant Leasehold Improvements up to the time of Eviction.  Those costs include costs incurred to obtain land use, zoning, building and occupancy permits, architectural and engineering services, construction management services, environmental testing and reviews, and landscaping.

4.  This endorsement does not insure against loss, damage or costs of remediation (and the Company will not pay cost, attorneys' fees or expenses) resulting from environmental damage or contamination.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

[Witness clause optional]

Chicago Title Insurance Company

BY:_____ _____

ALTA Endorsement Form 13-06
(Leasehold – Owners) (Rev. 4/2/12)
© American Land Title Association Association

**ENDORSEMENT**

Attached to Policy No._____
Issued by
Chicago Title Insurance
Company

1.
2.      As used in this endorsement, the following terms shall mean:

     a.      "Evicted" or "Eviction": (a) the lawful deprivation, in whole or in part, of the right of possession insured by this policy, contrary to the terms of the Lease or (b) the lawful prevention of the use of the Land or the Tenant Leasehold Improvements for the purposes permitted by the Lease, in either case as a result of a matter covered by this policy.

     b.      "Lease": the lease described in Schedule A.

     c.      "Leasehold Estate": the right of possession granted in the Lease for the Lease Term.

     d.      "Lease Term": the duration of the Leasehold Estate, as set forth in the Lease, including any renewal or extended term if a valid option to renew or extend is contained in the Lease.

     e.      "Personal Property": property, in which and to the extent the Insured has rights, located on or affixed to the Land on or after Date of Policy that by law does not constitute real property because (i) of its character and manner of attachment to the Land and (ii) the property can be severed from the Land without causing material damage to the property or to the Land.

     f.      "Remaining Lease Term": the portion of the Lease Term remaining after the Tenant has been Evicted.

     g.      "Tenant": the tenant under the Lease and, after acquisition of all or any part of the Title in accordance with the provisions of Section 2 of the Conditions of the policy, the Insured Claimant.

     h.      "Tenant Leasehold Improvements": Those improvements, in which and to the extent the Insured has rights, including landscaping, required or permitted to be built on the Land by the Lease that have been built at the Tenant's expense or in which the Tenant has an interest greater than the right to possession during the Lease Term.

3.      Valuation of Estate or Interest Insured:

If in computing loss or damage it becomes necessary to value the Title, or any portion of it, as the result of an Eviction of the Tenant, then, as to that portion of the Land from which the Tenant is Evicted, that value shall consist of the value for the Remaining Lease Term of the Leasehold Estate and any Tenant Leasehold Improvements existing on the date of the Eviction. The Insured Claimant shall have the right to have the Leasehold Estate and the Tenant Leasehold Improvements affected by a defect insured against by the policy valued either as a whole or separately. In either event, this determination of value shall take into account rent no longer required to be paid for the Remaining Lease Term.

4.      Additional items of loss covered by this endorsement:

If the Insured acquires all or any part of the Title in accordance with the provisions of Section 2 of the Conditions of this policy and thereafter is Evicted, the following items of loss, if applicable to that portion of the Land from which the Insured is Evicted shall be included, without duplication, in computing loss or damage incurred by the Insured, but not to the extent that the same are included in the valuation of the Title determined pursuant to Section 2 of this endorsement, any other endorsement to the policy, or Section 8(a)(iii) of the Conditions:

     a.      The reasonable cost of (i) removing and relocating any Personal Property that the Insured has the right to remove and relocate, situated on the Land at the time

© 2013 Chicago Title, a member of the Fidelity National Financial family of companies. | NYSE:FNF

of Eviction,(ii) transportation of that Personal Property for the initial one hundred miles incurred in connection with the relocation,(iii) repairing the Personal Property damaged by reason of the removal and relocation, and (iv) restoring the Land to the extent damaged as a result of the removal and relocation of the Personal Property and required of the Insured solely because of the Eviction

b.      Rent or damages for use and occupancy of the Land prior to the Eviction that the Insured as owner of the Leasehold Estate may be obligated to pay to any person having paramount title to that of the lessor in the Lease.

c.      The amount of rent that, by the terms of the Lease, the Insured must continue to pay to the lessor after Eviction with respect to the portion of the Leasehold Estate and Tenant Leasehold Improvements from which the Insured has been Evicted.

d.      The fair market value, at the time of the Eviction, of the estate or interest of the Insured in any lease or sublease permitted by the Lease and made by Tenant as lessor of all or part of the Leasehold Estate or the Tenant Leasehold Improvements.

e.      Damages caused by the Eviction that the Insured is obligated to pay to lessees or sublessees on account of the breach of any lease or sublease permitted by the Lease and made by the Tenant as lessor of all or part of the Leasehold Estate or the Tenant Leasehold Improvements.

f.      The reasonable cost to obtain land use, zoning, building and occupancy permits, architectural and engineering services and environmental testing and reviews for a replacement leasehold reasonably equivalent to the Leasehold Estate.

g.      If Tenant Leasehold Improvements are not substantially completed at the time of Eviction, the actual cost incurred by the Insured, less the salvage value, for the Tenant Leasehold Improvements up to the time of Eviction. Those costs include costs incurred to obtain land use, zoning, building and occupancy permits, architectural and engineering services, construction management services, environmental testing and reviews, and landscaping.

5.      This endorsement does not insure against loss, damages, or costs of remediation (and the Company will not pay cost, attorneys' fees or expenses) resulting from environmental damage or contamination.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

[Witness clause optional]
DATED:
Chicago Title Insurance Company
BY:_____
        AUTHORIZED SIGNATORY

ALTA Endorsement Form 13.1-06
(Leasehold – Loan) (Rev. 4/1/12)
© American Land Title Association

© 2013 Chicago Title, a member of the Fidelity National Financial family of companies. | NYSE:FNF

**FUTURE ADVANCES ALTA ENDORSEMENT – FORMS 14-06 (02-03-11), 14.1-06 (02-03-11), 14.2-06 (02-03-11) and 14.3-06 (02-03-11 tech correction 12-03-12)**

These endorsements affirmatively insure the priority and enforceability of the lien of the Insured Mortgage with respect to future advances and repayments and re-advances of Indebtedness. In addition, they include coverage for the consequences of a variable rate, including possible negative amortization (or interest on interest), as discussed above in the ALTA 6-06 endorsement section. These endorsements also cover the effect on the priority and enforceability of the Insured Mortgage of the Indebtedness having been reduced to zero before being increased by subsequent advances ("zero-balance"), and state law requirements to secure these advances not having been met. Unique to the 14.3-06 (Reverse Mortgages) is additional coverage for failure of the Insured Mortgage to state a term or maximum dollar amount, and failure of the mortgagors to be at least 62 years old.

© 2013 Chicago Title, a member of the Fidelity National Financial family of companies. | NYSE:FNF

**ENDORSEMENT**

Attached to Policy No._____
Issued by
Chicago Title Insurance
Company

1.　　The insurance for Advances added by Sections 2 and 3 of this endorsement is subject to the exclusions in Section 4 of this endorsement and the Exclusions from Coverage in the Policy, except Exclusion 3(d), the provisions of the Conditions, and the exceptions contained in Schedule B.

　　　a.　　"Agreement," as used in this endorsement, shall mean the note or loan agreement, the repayment of Advances under which is secured by the Insured Mortgage.

　　　b.　　"Advance," as used in this endorsement, shall mean only an advance of principal made after the Date of Policy as provided in the Agreement, including expenses of foreclosure, amounts advanced pursuant to the Insured Mortgage to pay taxes and insurance, assure compliance with laws, or to protect the lien of the Insured Mortgage before the time of acquisition of the Title, and reasonable amounts expended to prevent deterioration of improvements, together with interest on those advances.

　　　c.　　"Changes in the rate of interest," as used in this endorsement, shall mean only those changes in the rate of interest calculated pursuant to a formula provided in the Insured Mortgage or the Agreement at Date of Policy.

2.　　The Company insures against loss or damage sustained by the Insured by reason of:

　　　a.　　The invalidity or unenforceability of the lien of the Insured Mortgage as security for each Advance.

　　　b.　　The lack of priority of the lien of the Insured Mortgage as security for each Advance over any lien or encumbrance on the Title.

　　　c.　　The invalidity or unenforceability or lack of priority of the lien of the Insured Mortgage as security for the Indebtedness, Advances and unpaid interest resulting from (i) re-Advances and repayments of Indebtedness, (ii) earlier periods of no indebtedness owing during the term of the Insured Mortgage, or (iii) the Insured Mortgage not complying with the requirements of state law of the state in which the Land is located to secure Advances.

3.　　The Company also insures against loss or damage sustained by the Insured by reason of:

　　　a.　　The invalidity or unenforceability of the lien of the Insured Mortgage resulting from any provisions of the Agreement that provide for (i) interest on interest, (ii) changes in the rate of interest, or (iii) the addition of unpaid interest to the Indebtedness.

　　　b.　　Lack of priority of the lien of the Insured Mortgage as security for the Indebtedness, including any unpaid interest that was added to principal in accordance with any provisions of the Agreement, interest on interest, or interest as changed in accordance with the provisions of the Insured Mortgage, which lack of priority is caused by (i) changes in the rate of interest, (ii) interest on

© 2013 Chicago Title, a member of the Fidelity National Financial family of companies. | NYSE:FNF

interest, or (iii) increases in the Indebtedness resulting from the addition of unpaid interest.

4.     This endorsement does not insure against loss or damage (and the Company will not pay costs, attorneys' fees, or expenses) resulting from:

a.     The invalidity, unenforceability or lack of priority of the lien of the Insured Mortgage as security for any Advance made after a Petition for Relief under the Bankruptcy Code (11 U.S.C.) has been filed by or on behalf of the mortgagor;

b.     The lien of real estate taxes or assessments on the Title imposed by governmental authority arising after Date of Policy;

c.     The lack of priority of the lien of the Insured Mortgage as security for any Advance to a federal tax lien, which Advance is made after the earlier of (i) actual knowledge of the Insured that a federal tax lien was filed against the mortgagor, or (ii) the expiration, after notice of a federal tax lien filed against the mortgagor, of any grace period for making disbursements with priority over the federal tax lien provided in the Internal Revenue Code (26 U.S.C.);

d.     Any federal or state environmental protection lien; [or]

e.     Usury, or any consumer credit protection or truth-in-lending law. *[; or*

f.     *Any mechanic's or materialmen's lien.]*

5.     The Indebtedness includes Advances.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.


[Witness clause optional]

DATED:
Chicago Title Insurance Company
BY:_____
        AUTHORIZED SIGNATORY


ALTA Endorsement Form 14-06
(Future Advance - Priority) (Rev. 2/3/11)
© American Land Title Association

© 2013 Chicago Title, a member of the Fidelity National Financial family of companies. | NYSE:FNF

**ENDORSEMENT**

Attached to Policy No._____
Issued by
Chicago Title Insurance
Company

1.  The insurance for Advances added by Sections 2 and 3 of this endorsement is subject to the exclusions in Section 4 of this endorsement and the Exclusions from Coverage in the Policy, except Exclusion 3(d), the provisions of the Conditions, and the exceptions contained in Schedule B.

    a.  "Agreement," as used in this endorsement, shall mean the note or loan agreement, the repayment of Advances under which is secured by the Insured Mortgage.

    b.  "Advance," as used in this endorsement, shall mean only an advance of principal made after the Date of Policy as provided in the Agreement, including expenses of foreclosure, amounts advanced pursuant to the Insured Mortgage to pay taxes and insurance, assure compliance with laws, or to protect the lien of the Insured Mortgage before the time of acquisition of the Title, and reasonable amounts expended to prevent deterioration of improvements, together with interest on those advances.

    c.  "Changes in the rate of interest," as used in this endorsement, shall mean only those changes in the rate of interest calculated pursuant to a formula provided in the Insured Mortgage or the Agreement at Date of Policy.

2.  The Company insures against loss or damage sustained by the Insured by reason of:

    a.  The invalidity or unenforceability of the lien of the Insured Mortgage as security for each Advance.

    b.  The lack of priority of the lien of the Insured Mortgage as security for each Advance over any lien or encumbrance on the Title.

    c.  The invalidity or unenforceability or lack of priority of the lien of the Insured Mortgage as security for the Indebtedness, Advances and unpaid interest resulting from (i) re-Advances and repayments of Indebtedness, (ii) earlier periods of no Indebtedness owing during the term of the Insured Mortgage, or (iii) the Insured Mortgage not complying with the requirements of state law of the state in which the Land is located to secure Advances.

3.  The Company also insures against loss or damage sustained by the Insured by reason of:

    a.  The invalidity or unenforceability of the lien of the Insured Mortgage resulting from any provisions of the Agreement that provide for (i) interest on interest, (ii) changes in the rate of interest, or (iii) the addition of unpaid interest to the Indebtedness.

    b.  Lack of priority of the lien of the Insured Mortgage as security for the Indebtedness, including any unpaid interest that was added to principal in accordance with any provisions of the Agreement, interest on interest, or interest as changed in accordance with the provisions of the Insured Mortgage, which

© 2013 Chicago Title, a member of the Fidelity National Financial family of companies. | NYSE:FNF

lack of priority is caused by (i) changes in the rate of interest, (ii) interest on interest, or (iii) increases in the Indebtedness resulting from the addition of unpaid interest.

4. This endorsement does not insure against loss or damage (and the Company will not pay costs, attorneys' fees or expenses) resulting from:

 a. The invalidity, unenforceability or lack of priority of the lien of the Insured Mortgage as security for any Advance made after a Petition for Relief under the Bankruptcy Code (11 U.S.C.) has been filed by or on behalf of the mortgagor;

 b. The lien of real estate taxes or assessments on the Title imposed by governmental authority arising after Date of Policy;

 c. The lack of priority of the lien of the Insured Mortgage as security for any Advance to a federal tax lien, which Advance is made after the earlier of (i) actual knowledge of the Insured that a federal tax lien was filed against the mortgagor, or (ii) the expiration, after notice of a federal tax lien filed against the mortgagor, of any grace period for making disbursements with priority over the federal tax lien provided in the Internal Revenue Code (26 U.S.C.);

 d. Any federal or state environmental protection lien;

 e. The lack of priority of any Advance made after the Insured has Knowledge of the existence of liens, encumbrances or other matters affecting the Land intervening between Date of Policy and the Advance, as to the intervening lien, encumbrance or other matter; [or]

 f. Usury, or any consumer credit protection or truth-in-lending law. *[; or*

 g. *Any mechanic's or materialmen's lien.]*

5. The Indebtedness includes Advances.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

[Witness clause optional]

DATED:
Chicago Title Insurance Company
BY:_____
  AUTHORIZED SIGNATORY

ALTA Endorsement Form 14.1-06
(Future Advance - Knowledge) (Rev. 2/3/11)
©American Land Title Association

© 2013 Chicago Title, a member of the Fidelity National Financial family of companies. | NYSE:FNF

**ENDORSEMENT**

Attached to Policy No._____
Issued by
Chicago Title Insurance
Company

1. The insurance for Advances added by Section 2 of this endorsement is subject to the exclusions in Section 3 of this endorsement and the Exclusions from Coverage in the Policy, except Exclusion 3(d), the provisions of the Conditions, and the exceptions contained in Schedule B.

   a. "Agreement," as used in this endorsement, shall mean the letter of credit and its reimbursement agreement, the repayment of Advances under which is secured by the Insured Mortgage.

   b. "Advance," as used in this endorsement, shall mean only an advance made after the Date of Policy as provided in the Agreement, including expenses of foreclosure, amounts advanced pursuant to the Insured Mortgage to pay taxes and insurance, assure compliance with laws, or to protect the lien of the Insured Mortgage before the time of acquisition of the Title, and reasonable amounts expended to prevent deterioration of improvements, together with interest on those advances.

2. The Company insures against loss or damage sustained by the Insured by reason of:

   a. The invalidity or unenforceability of the lien of the Insured Mortgage as security for each Advance.

   b. The lack of priority of the lien of the Insured Mortgage as security for each Advance over any lien or encumbrance on the Title.

   c. The invalidity or unenforceability or loss of priority of the lien of the Insured Mortgage as security for the Indebtedness, Advances and unpaid interest resulting from (i) re-Advances and repayments of Indebtedness, (ii) earlier periods of no indebtedness owing during the term of the Insured Mortgage, or (iii) the Insured Mortgage not complying with the requirements of state law of the state in which the Land is located to secure Advances.

3. This endorsement does not insure against loss or damage (and the Company will not pay costs, attorneys' fees or expenses) resulting from:

   a. The lien of real estate taxes or assessments on the Title imposed by governmental authority arising after Date of Policy; or

   b. Any federal or state environmental protection lien; or

   c. Limitations, if any, imposed under the Bankruptcy Code (11 U.S.C.) on the amount that may be recovered from the mortgagor's estate. *[; or*

   d. *Any mechanic's or materialmen's lien.]*

4. The Indebtedness includes Advances.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

[Witness clause optional]

© 2013 Chicago Title, a member of the Fidelity National Financial family of companies. | NYSE:FNF

DATED:

Chicago Title Insurance Company

BY:_____

      AUTHORIZED SIGNATORY

ALTA Endorsement Form 14.2-06
(Future Advance – Letter of Credit) (Rev. 2/3/11)
© American Land Title Association

© 2013 Chicago Title, a member of the Fidelity National Financial family of companies. | NYSE:FNF

**ENDORSEMENT**

Attached to Policy No._____
Issued by
Chicago Title Insurance
Company

1.  The insurance for Advances added by Sections 2 and 3 of this endorsement is subject to the exclusions in Section 4 of this endorsement and the Exclusions in the Policy, except Exclusion 3(d), the provisions of the Conditions, and the exceptions contained in Schedule B.

    a.  "Agreement," as used in this endorsement, shall mean the note or loan agreement, repayment of Advances under which is secured by the Insured Mortgage.

    b.  "Advance," as used in this endorsement, shall mean only an advance of principal made after the Date of Policy as provided in the Agreement, including expenses of foreclosure, amounts advanced pursuant to the Insured Mortgage to pay taxes and insurance, assure compliance with laws, or to protect the lien of the Insured Mortgage before the time of acquisition of the Title, and reasonable amounts expended to prevent deterioration of improvements, together with interest on those advances.

    c.  "Changes in the rate of interest," as used in this endorsement, shall mean only those changes in the rate of interest calculated pursuant to a formula provided in the Insured Mortgage or the Agreement at Date of Policy.

2.  The Company insures against loss or damage sustained by the Insured by reason of:

    a.  The invalidity or unenforceability of the lien of the Insured Mortgage as security for each Advance.

    b.  The lack of priority of the lien of the Insured Mortgage as security for each Advance over any lien or encumbrance on the Title.

    c.  The invalidity or unenforceability or lack of priority of the lien of the Insured Mortgage as security for the Indebtedness, Advances and unpaid interest resulting from (i) re-Advances and repayments of Indebtedness, (ii) earlier periods of no indebtedness owing during the term of the Insured Mortgage, (iii) the Insured Mortgage not complying with the requirements of state law of the state in which the Land is located to secure Advances, (iv) failure of the Insured Mortgage to state the term for Advances, or (v) failure of the Insured Mortgage to state the maximum amount secured by the Insured Mortgage.

    d.  The invalidity or unenforceability of the lien of the Insured Mortgage because of the failure of the mortgagors to be at least 62 years of age at Date of Policy.

3.  The Company also insures against loss or damage sustained by the Insured by reason of:

    a.  The invalidity or unenforceability of the lien of the Insured Mortgage resulting from any provisions of the Agreement that provide for (i) interest on interest, (ii) changes in the rate of interest, or (iii) the addition of unpaid interest to the principal portion of the Indebtedness.

© 2013 Chicago Title, a member of the Fidelity National Financial family of companies. | NYSE:FNF

b.   Lack of priority of the lien of the Insured Mortgage as security for the Indebtedness, including any unpaid interest that was added to principal in accordance with any provisions of the Agreement, interest on interest, or interest as changed in accordance with the provisions of the Insured Mortgage, which lack of priority is caused by (i) changes in the rate of interest, (ii) interest on interest, or (iii) increases in the Indebtedness resulting from the addition  of unpaid interest.

"Interest," as used in this Paragraph 3, shall include lawful interest based on appreciated value.

4.   This endorsement does not insure against loss or damage (and the Company will not pay costs, attorneys' fees, or expenses) resulting from:

a.   The invalidity, unenforceability or lack of priority of the lien of the Insured Mortgage as security for any Advance made after a Petition for Relief under the Bankruptcy Code (11 U.S.C.) has been filed by or on behalf of the mortgagor;

b.   The lien of real estate taxes or assessments on the Title imposed by governmental authority arising after Date of Policy;

c.   The lack of priority of the lien of the Insured Mortgage as security for any Advance to a federal tax lien, which Advance is made after the earlier of (i) actual knowledge of the Insured that a federal tax lien was filed against the mortgagor, or (ii) the expiration, after notice of a federal tax lien filed against the mortgagor, of any grace period for making disbursements with priority over the federal tax lien provided in the Internal Revenue Code (26 U.S.C.);

d.   Any federal or state environmental protection lien; [or]

e.   Usury, or any consumer credit protection or truth-in-lending law. *[; or*

f.   *Any mechanic's or materialmen's lien.]*

5.   The Indebtedness includes Advances.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

[Witness clause optional]

*[BRACKETED MATERIAL OPTIONAL]*

Chicago Title Insurance Company

BY:_____

ALTA Endorsement Form 14.3-06
(Future Advance – Reverse Mortgage) (Rev. 2/3/11)
© American Land Title Association                                      *[includes technical corrections of 12-3-12]*

© 2013 Chicago Title, a member of the Fidelity National Financial family of companies. | NYSE:FNF

**NON-IMPUTATION**
**ALTA 15-06 (FULL-EQUITY TRANSFER) (06-17-06);**
**15.1-06 (ADDITIONAL INSURED) (06-17-06)**
**15.2-06 (PARTIAL EQUITY) (06-17-06)**

These ALTA forms give coverage over matters known to specified parties that would otherwise be excluded from coverage on the basis of imputed knowledge, but also over the consequences of the actions or inactions of those parties which affect the Title. Form 15-06 is to be used when the entire beneficial interest of the entity holding Title and named as the insured on Schedule A (e.g., partnership interest, corporate stock, membership interest of limited liability company) has been transferred for value. Form 15.1-06 is to be used when only a portion of the beneficial interest of the entity holding Title and named on Schedule A as the insured has been transferred and the incoming beneficial owner is identified on the form as an additional insured. Form 15.2-06 is to be used when the incoming beneficial owner requests to be the insured in its own policy, and its interest has been transferred for value.

Exclusions from Coverage 3(a) and (b) in the ALTA Owner's Policy and ALTA Loan Policy exclude from coverage matters created, suffered, assumed, or agreed to by the insured or known to the insured, but not to the Company, and not disclosed by the public records.

© 2013 Chicago Title, a member of the Fidelity National Financial family of companies. | NYSE:FNF

**ENDORSEMENT**

Attached to Policy No._____
Issued by
Chicago Title Insurance
Company

The Company agrees that it will not assert the provisions of Exclusions from Coverage 3(a), (b), or (e) to deny liability for loss or damage otherwise insured against under the terms of the policy solely by reason of the action or inaction or Knowledge, as of Date of Policy, of_____ whether or not imputed to the Insured by operation of law, provided_____acquired  the Insured as a purchaser for value without Knowledge of the asserted defect, lien, encumbrance, adverse claim, or other matter insured against by the policy.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

[Witness clause optional]

Chicago Title Insurance Company

BY:_____

ALTA Endorsement Form 15-06
(Nonimputation – Full Equity Transfer) (6/17/06)
©American Land Title Association

**ENDORSEMENT**

Attached to Policy No._____
Issued by
Chicago Title Insurance
Company

For purposes of the coverage provided by this endorsement,_____ ("Additional Insured") is added as an Insured under the policy. By execution below, the Insured named in Schedule A acknowledges that any payment made under this endorsement shall reduce the Amount of Insurance as provided in Section 10 of the Conditions.

The Company agrees that it will not assert the provisions of Exclusions from Coverage 3(a), (b), or (e) to deny liability for loss or damage otherwise insured against under the terms of the policy solely by reason of the action or inaction or Knowledge, as of Date of Policy, of_____ whether or not imputed to the Additional Insured by operation of law, to the extent of the percentage interest in the Insured acquired by Additional Insured as a purchaser for value without Knowledge of the asserted defect, lien, encumbrance, adverse claim, or other matter insured against by the policy.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

AGREED AND CONSENTED TO:

_____
INSURED

[Witness clause optional]

Chicago Title Insurance Company

BY:_____

ALTA Endorsement Form 15.1-06
(Nonimputation – Additional Insured) (6/17/06)
©American Land Title Association

© 2013 Chicago Title, a member of the Fidelity National Financial family of companies. | NYSE:FNF

**ENDORSEMENT**

Attached to Policy No._____
Issued by
Chicago Title Insurance
Company

The Company agrees that it will not assert the provisions of Exclusions from Coverage 3(a), (b), or (e) to deny liability for loss or damage otherwise insured against under the terms of the policy solely by reason of the action or inaction or Knowledge, as of Date of Policy, of_____ whether or not imputed to the entity identified in paragraph 3 of Schedule A or to the Insured by operation of law, but only to the extent that the Insured acquired the Insured's interest in entity as a purchaser for value without Knowledge of the asserted defect, lien, encumbrance, adverse claim, or other matter insured against by the policy.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

[Witness clause optional]

Chicago Title Insurance Company

BY:_____

ALTA Endorsement Form 15.2-06
(Nonimputation – Partial Equity Transfer) (6/17/06)
©American Land Title Association

**MEZZANINE FINANCING**
**ALTA 16-06 (06-17-06)**

This endorsement provides insurance to a lender whose loan is secured not by a lien against the land but rather by some form of security against the beneficial interest of the business entity that owns the Land. The security may be a pledge of  and security interest in  the stock in a corporation, partnership interest in a partnership, or membership interest in a limited liability company. The endorsement is made a part of an Owner's Policy rather than a Loan Policy, because the lender's personal property security interest is not being insured so no Loan Policy is issued to the lender. The endorsement assigns the rights under the policy of the Insured owner of the Land to the defined Mezzanine Lender. The endorsement provides that the Company will not assert as a defense matters known to the Insured owner, as long as they were not known to the Mezzanine Lender. It further provides that the Company will not deny liability on the basis that ownership interests in the Insured have been transferred to or acquired by the Mezzanine Lender.

Conditions paragraph 7 (b) is amended to provide that the Company can terminate its liability under the policy by paying the Mezzanine Lender rather than the Insured. Exclusions from Coverage Nos. 3 (a), (b), (c) or (e) are amended with respect to defects, liens, encumbrances, adverse claims or other matters which were not known to the Mezzanine Lender, or failure of the Mezzanine Lender to pay value.

© 2013 Chicago Title, a member of the Fidelity National Financial family of companies. | NYSE:FNF

**ENDORSEMENT**

Attached to Policy No._____
Issued by
Chicago Title Insurance
Company

1.    The Mezzanine Lender is:_____and each successor in ownership of its loan ("Mezzanine Loan") reserving, however, all rights and defenses as to any successor that the Company would have had against the Mezzanine Lender, unless the successor acquired the Indebtedness as a purchaser for value without Knowledge of the asserted defect, lien, encumbrance, adverse claim, or other matter insured against by this policy as affecting Title.

2.    The Insured

    a.    assigns to the Mezzanine Lender the right to receive any amounts otherwise payable to the Insured under this policy, not to exceed the outstanding indebtedness under the Mezzanine Loan; and

    b.    agrees that no amendment of or endorsement to this policy can be made without the written consent of the Mezzanine Lender.

3.    The Company does not waive any defenses that it may have against the Insured, except as expressly stated in this endorsement.

4.    In the event of a loss under the policy, the Company agrees that it will not assert the provisions of Exclusions from Coverage 3(a), (b) or (e) to refuse payment to the Mezzanine Lender solely by reason of the action or inaction or Knowledge, as of Date of Policy, of the Insured, provided

    a.    the Mezzanine Lender had no actual Knowledge of the defect, lien, encumbrance or other matter creating or causing loss on Date of Policy.

    b.    this limitation on the application of Exclusions from Coverage 3(a), (b) and (e) shall

        i.    apply whether or not the Mezzanine Lender has acquired an interest (direct or indirect) in the Insured either on or after Date of Policy, and

        ii.    benefit the Mezzanine Lender only without benefiting any other individual or entity that holds an interest (direct or indirect) in the Insured or the Land.

5.    In the event of a loss under the Policy, the Company also agrees that it will not deny liability to the Mezzanine Lender on the ground that any or all of the ownership interests (direct or indirect) in the Insured have been transferred to or acquired by the Mezzanine Lender, either on or after the Date of Policy.

6.    The Mezzanine Lender acknowledges

    a.    that the amount of insurance under this policy shall be reduced by any amount the Company may pay under any policy insuring a mortgage to which exception is taken in Schedule B or to which the Insured has agreed, assumed, or taken subject, or which is hereafter executed by an Insured and which is a charge or

lien on the estate or interest described or referred to in Schedule A, and the amount so paid shall be deemed a payment under this policy; and

b.   that the Company shall have the right to insure mortgages or other conveyances of an interest in the Land, without the consent of the Mezzanine Lender.

7.   If the Insured, the Mezzanine Lender or others have conflicting claims to all or part of the loss payable under the Policy, the Company may interplead the amount of the loss into Court. The Insured and the Mezzanine Lender shall be jointly and severally liable for the Company's cost for the interpleader and subsequent proceedings, including attorneys' fees. The Company shall be entitled to payment of the sums for which the Insured and Mezzanine Lender are liable under the preceding sentence from the funds deposited into Court, and it may apply to the Court for their payment.

8.   Whenever the Company has settled a claim and paid the Mezzanine Lender pursuant to this endorsement, the Company shall be subrogated and entitled to all rights and remedies that the Mezzanine Lender may have against any person or property arising from the Mezzanine Loan. However, the Company agrees with the Mezzanine Lender that it shall only exercise these rights, or any right of the Company to indemnification, against the Insured, the Mezzanine Loan borrower, or any guarantors of the Mezzanine Loan after the Mezzanine Lender has recovered its principal, interest, and costs of collection.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

AGREED AND CONSENTED TO:

*(Name of Insured)*                                    *(Name of Mezzanine Lender)*

By: _____    By: _____

[Witness clause optional]

Chicago Title Insurance Company

BY:_____

ALTA Endorsement Form 16-06
(Mezzanine Financing) (6/17/06)
©American Land Title Association

© 2013 Chicago Title, a member of the Fidelity National Financial family of companies. | NYSE:FNF

**ACCESS**
**ALTA 17-06 (Access & Entry) (06-17-06)**
**17.1-06 (Indirect Access & Entry) (06-17-06) and**
**17.2-06 (Utility Access) (10-16-08)**

These endorsements are designed to provide insurance against loss if the Land does not abut or have actual vehicular and pedestrian access to and from a specific open and publicly maintained street by way of existing curb cuts or entries. In addition, ALTA 17.1-06 provides the same coverage with respect to a specific easement insured in Schedule A which connects the Land to a specific public street. The ALTA 17.2-06 adopts a version of the generic "Utilities Facilities" endorsement which covers access to utility installations in a public street.

© 2013 Chicago Title, a member of the Fidelity National Financial family of companies. | NYSE:FNF

**ENDORSEMENT**

Attached to Policy No._____
Issued by
Chicago Title Insurance
Company

The Company insures against loss or damage sustained by the Insured if, at Date of Policy (i) the Land does not abut and have both actual vehicular and pedestrian access to and from FILL IN (the "Street"), (ii) the Street is not physically open and publicly maintained, or (iii) the Insured has no right to use existing curb cuts or entries along that portion of the Street abutting the Land.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

[Witness clause optional]

DATED:
Chicago Title Insurance Company
BY:_____
        AUTHORIZED SIGNATORY

ALTA Endorsement Form 17-06
(Access and Entry) (6/17/06)
©American Land Title Association

**ENDORSEMENT**

Attached to Policy No._____
Issued by
Chicago Title Insurance
Company

The Company insures against loss or damage sustained by the Insured if, at Date of Policy (i) the easement identified as FILLIN in Schedule FILLIN (the "Easement") does not provide that portion of the Land identified as FILLIN in Schedule FILLIN both actual vehicular and pedestrian access to and from FILLIN (the "Street"), (ii) the Street is not physically open and publicly maintained, or (iii) the Insured has no right to use existing curb cuts or entries along that portion of the Street abutting the Easement.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

[Witness clause optional]

DATED:
Chicago Title Insurance Company
BY:_____
AUTHORIZED SIGNATORY

ALTA Endorsement Form 17.1-06
(Indirect Access and Entry) (6/17/06)
©American Land Title Association

**ENDORSEMENT**

Attached to Policy No._____
Issued by
Chicago Title Insurance
Company

The Company insures against loss or damage sustained by the Insured by reason of the lack of a right of access to the following utilities or services:  [CHECK ALL THAT APPLY]

☐ Water service             ☐ Natural gas service        ☐ Telephone service
☐ Electrical power service  ☐ Sanitary sewer             ☐ Storm water drainage
☐ _____         ☐ _____          ☐ _____

either over, under or upon rights-of-way or easements for the benefit of the Land because of:

> (1) a gap or gore between the boundaries of the Land and the rights-of-way or easements;
>
> (2) a gap between the boundaries of the rights-of-way or easements; or
>
> (3) a termination by a grantor, or its successor, of the rights-of-way or easements.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

[Witness clause optional]

Chicago Title Insurance Company

BY:_____

ALTA Endorsement Form 17.2-06
(Utility Access)  (10/16/08)
©American Land Title Association

**TAX PARCEL**
**ALTA 18-06 (Single) (06-17-06)**
**18.1 (Multiple) [with tax sale protection] (06-17-06)**

These endorsements cover the tax parcel or tax identification numbers often included in the policy for informational. Form 18-06 insures against loss if the tax number shown does not include all the Land described in the policy or includes land not described in the policy. Form 18.1-06 is for use when there are multiple parcels and multiple numbers. In addition, Form 18.1-06 insures that any easement included as an insured parcel in Schedule A or C will not be wiped out by the subsequent foreclosure of taxes on the servient tenement.

© 2013 Chicago Title, a member of the Fidelity National Financial family of companies. | NYSE:FNF

**ENDORSEMENT**

Attached to Policy No._____
Issued by
Chicago Title Insurance
Company

The Company insures against loss or damage sustained by the Insured by reason of the Land being taxed as part of a larger parcel of land or failing to constitute a separate tax parcel for real estate taxes.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

[Witness clause optional]

Chicago Title Insurance Company

BY:_____

ALTA Endorsement Form 18-06
(Single Tax Parcel) (6/17/06)
©American Land Title Association

**ENDORSEMENT**

Attached to Policy No._____
Issued by
Chicago Title Insurance
Company

The Company insures against loss or damage sustained by the Insured by reason of:

1.       those portions of the Land identified below not being assessed for real estate taxes under the listed tax identification numbers or those tax identification numbers including any additional land:

|  |  |
|---|---|
| Parcel: | PARCEL 1 |
| Tax Identification Number(s): | TAX ID 1 |

|  |  |
|---|---|
| Parcel: | PARCEL 2 |
| Tax Identification Number(s): | TAX ID 2 |

|  |  |
|---|---|
| Parcel: | PARCEL 3 |
| Tax Identification Number(s): | TAX ID 3 |

2.       the easements, if any, described in Schedule A being cut off or disturbed by the nonpayment of real estate taxes, assessments or other charges imposed on the servient estate by a governmental authority.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

[Witness clause optional]

Chicago Title Insurance Company

BY:_____

ALTA Endorsement Form 18.1-06
(Multiple Tax Parcel) (6/17/06)
©American Land Title Association

**CONTIGUITY**

**ALTA 19-06 (MULTIPLE PARCELS) [within Land] AND (06-17-06)**
**FORM 19.1-06 (SINGLE PARCEL) [with property other than Land] (06-17-06)**

ALTA Form 19-06 is designed to provide insurance that (1) each parcel, in a policy which insures multiple parcels, is contiguous to at least one other parcel insured by the policy, or (2) if some parcels are not contiguous to at least one other parcel, that certain parcels are contiguous to certain other parcels. The ALTA Form 19.1-06 provides coverage that the Land in the policy is contiguous to some other specific parcel not insured in the policy.

© 2013 Chicago Title, a member of the Fidelity National Financial family of companies. | NYSE:FNF

**ENDORSEMENT**

Attached to Policy No._____
Issued by
Chicago Title Insurance
Company

The Company insures against loss or damage sustained by the Insured by reason of:

1.    The failure [of the _____ boundary line of Parcel A] of the Land to be contiguous to [the_____ boundary line of Parcel B] **[for more than two parcels, continue as follows: "; of [the_____boundary line of Parcel B] of the Land to be contiguous to [the _____boundary line of Parcel C] and so on until all contiguous parcels described in the policy have been accounted for]**; or

2.    The presence of any gaps, strips, or gores separating any of the contiguous boundary lines described above.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

[Witness clause optional]

Chicago Title Insurance Company

BY:_____

ALTA Endorsement Form 19-06
(Contiguity – Multiple Parcels) (6/17/06)
©American Land Title Association

© 2013 Chicago Title, a member of the Fidelity National Financial family of companies. | NYSE:FNF

**ENDORSEMENT**

Attached to Policy No._____
Issued by
Chicago Title Insurance
Company

The Company insures against loss or damage sustained by the Insured by reason of:

1. The failure of the Land to be contiguous to **[describe the land that is contiguous to the Land by its legal description or by reference to a recorded instrument – e.g. ". . . that certain parcel of real property legally described in the deed recorded as Instrument No._____, records of _____ County, State of_____]** along the _____ boundary line[s]; or

2. The presence of any gaps, strips, or gores separating the contiguous boundary lines described above.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

[Witness clause optional]

Chicago Title Insurance Company

BY:_____

ALTA Endorsement Form 19.1-06
(Contiguity – Single Parcel) (6/17/06)
©American Land Title Association

© 2013 Chicago Title, a member of the Fidelity National Financial family of companies. | NYSE:FNF

**FIRST LOSS**
**ALTA 20-06 (06-17-06)**

This endorsement is designed to alter the established criteria for determining when a loss is recognized under a loan policy. Loss is normally the difference between the value of the property with or without the defect, lien or encumbrance insured against. Under normal circumstances, a loss would be difficult to determine until the land was sold after foreclosure. If the sale was for an amount less than the debt, and the difference between the sales price and the indebtedness was caused by a matter covered by the policy, the lender could claim a loss. Consequently, an insured lender would normally be required to foreclose to prove this loss before being able to make a claim. This endorsement, to be issued only when there is more than one insured parcel, allows a loss to be recognized whenever a title defect materially impairs the value of a parcel securing the loan without requiring acceleration of the debt and foreclosure against any of the parcels securing the loan.

© 2013 Chicago Title, a member of the Fidelity National Financial family of companies. | NYSE:FNF

**ENDORSEMENT**

Attached to Policy No._____
Issued by
Chicago Title Insurance
Company

This endorsement is effective only if the Collateral includes at least two parcels of real property.

1.      For the purposes of this endorsement

      a.     "Collateral" means all property, including the Land, given as security for the Indebtedness.

      b.     "Material Impairment Amount" means the amount by which any matter covered by the policy for which a claim is made diminishes the value of the Collateral below the Indebtedness.

2.      In the event of a claim resulting from a matter insured against by the policy, the Company agrees to pay that portion of the Material Impairment Amount that does not exceed the extent of liability imposed by Section 8 of the Conditions without requiring

      a.     maturity of the Indebtedness by acceleration or otherwise,

      b.     pursuit by the Insured of its remedies against the Collateral, or

      c.     pursuit by the Insured of its remedies under any guaranty, bond or other insurance policy.

3.      Nothing in this endorsement shall impair the Company's right of subrogation. However, the Company agrees that its right of subrogation shall be subordinate to the rights and remedies of the Insured. The Company's right of subrogation shall include the right to recover the amount paid to the Insured pursuant to Section 2 of this endorsement from any debtor or guarantor of the Indebtedness, after payment or other satisfaction of the remainder of the Indebtedness and other obligations secured by the lien of the Insured Mortgage. The Company shall have the right to recoup from the Insured Claimant any amount received by it in excess of the Indebtedness up to the amount of the payment under Section 2.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

[Witness clause optional]

Chicago Title Insurance Company

BY:_____ _____

ALTA Endorsement Form 20-06
(First Loss – Multiple Parcel Transactions) (6/17/06)
©American Land Title Association

© 2013 Chicago Title, a member of the Fidelity National Financial family of companies. | NYSE:FNF

**CREDITORS' RIGHTS**

**ALTA ENDORSEMENT FORM 21-06**


**This endorsement was decertified by ALTA on 2/8/10 and is no longer available.**

**LOCATION**
**ALTA 22-06**
**Form 22.1-06 (with map) (06-17-06)**

These endorsements insure against loss or damage if an improvement of the type identified in the endorsement having the address set forth in the endorsement is not located on the Land. In addition, the 22.1-06 insures that a copy of a recorded plat or map that may be attached as an exhibit to the endorsement accurately reflects the location and dimensions of the Land as shown in the public records.

© 2013 Chicago Title, a member of the Fidelity National Financial family of companies. | NYSE:FNF

**ENDORSEMENT**

Attached to Policy No._____
Issued by
Chicago Title Insurance
Company

The Company insures against loss or damage sustained by the Insured by reason of the failure of a FILL IN, known as FILL IN, to be located on the Land at Date of Policy.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

[Witness clause optional]

Chicago Title Insurance Company

BY:_____

ALTA Endorsement Form 22-06
(Location) (6/17/06)
©American Land Title Association

**ENDORSEMENT**

Attached to Policy No._____
Issued by
Chicago Title Insurance
Company

The Company insures against loss or damage sustained by the Insured by reason of the failure of (i) a FILL IN, known as FILL IN, to be located on the Land at Date of Policy, or (ii) the map, if any, attached to this policy to correctly show the location and dimensions of the Land according to the Public Records.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

[Witness clause optional]

Chicago Title Insurance Company

BY:_____

ALTA Endorsement Form 22.1-06
(Location and Map) (6/17/06)
©American Land Title Association

## CO-INSURANCE-SINGLE POLICY
### ALTA 23-06 (10-16-08)

This endorsement was designed to facilitate the delivery of a single policy when co-insurance with other underwriters is involved with allocation of liability by endorsement from each co-insurer.

© 2013 Chicago Title, a member of the Fidelity National Financial family of companies. | NYSE:FNF

**ENDORSEMENT**

Attached to Policy No.[_lead policy_]
Issued by
[_lead policy issurer_]**("Issuing Co-Insurer")**

CO-INSURANCE ENDORSEMENT

Attached to and made a part of Issuing Co-Insurer's Policy No. [_lead policy_] ("Co-Insurance Policy"). Each title insurance company executing this Co-Insurance Endorsement, other than the Issuing Co-Insurer, shall be referred to as "Co-Insurer." Issuing Co-Insurer and each Co-Insurer are collectively referred to as "Co-Insuring Companies".

1.  By issuing this endorsement to the Co-Insurance Policy, each of the Co-Insuring Companies adopts the Co-Insurance Policy's Covered Risks, Exclusions, Conditions, Schedules and endorsements, subject to the limitations of this endorsement.

| Co-Insuring Companies | Name and Address | Policy Number [File Number] | Amount of Insurance | Percentage of Liability |
|---|---|---|---|---|
| Issuing Co-Insurer | | | $ | |
| Co-Insurer | | | $ | |
| Co-Insurer | | | $ | |
| Co-Insurer | | | $ | |
| Aggregate Amount of Insurance | | | $ | |

2. Each of the Co-Insuring Companies shall be liable to the Insured only for its Percentage of Liability of: (a) the total of the loss or damage under the Co-Insurance Policy, in no event greater than its respective Amount of Insurance set forth in this endorsement; and (b) costs, attorneys' fees and expenses provided for in the Conditions.

3. Any notice of claim and any other notice or statement in writing required to be given under the Co-Insurance Policy must be given to each of the Co-Insuring Companies at its address set forth above.

4. Any endorsement to the Co-Insurance Policy issued after the date of this Co-Insurance Endorsement must be signed on behalf of each Co-Insuring Company by its authorized officer or agent.

5. This Co-Insurance Endorsement is effective as of the Date of Policy of the Co-Insurance Policy. This Co-Insurance Endorsement may be executed in counterparts.

This endorsement is issued as part of the Co-insurance Policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements to it.

_ALTA 23-06 Continued_

[Witness Optional]

DATED:
Issuing Co-Insurer:

[lead underwriter]

BY:_____ _____


Co-Insurer:

[BLANK] Title Insurance Company

By: _____


Co-Insurer:

[BLANK] Title Insurance Company

By: _____


Co-Insurer:

[BLANK] Title Insurance Company

By: _____


[Additional Co-Insurer signatures may be added if needed.]

ALTA Endorsement Form 23-06
(Co-Insurance - Single Policy) (Rev. 10/16/08)
©American Land Title Association

© 2013 Chicago Title, a member of the Fidelity National Financial family of companies. | NYSE:FNF

**DOING BUSINESS**
**ALTA FORM 24-06 (10-16-08)**

This endorsement for a loan policy provides coverage to the lender concerning the consequences of the failure to comply with state "doing business" laws.

© 2013 Chicago Title, a member of the Fidelity National Financial family of companies. | NYSE:FNF

**ENDORSEMENT**

Attached to Policy No._____
Issued by
Chicago Title Insurance
Company

The Company insures against loss or damage sustained by the Insured by reason of the invalidity or unenforceability of the lien of the Insured Mortgage on the ground that making the loan secured by the Insured Mortgage constituted a violation of the "doing business" laws of the State where the Land is located because of the failure of the Insured to qualify to do business under those laws.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements to it.

[Witness Optional]

DATED:

Chicago Title Insurance Company

BY:_____
    AUTHORIZED SIGNATORY

ALTA Endorsement Form 24-06
(Doing Business) (10/16/08)
©American Land Title Association

© 2013 Chicago Title, a member of the Fidelity National Financial family of companies. | NYSE:FNF

**SAME AS SURVEY & SAME AS PORTION OF SURVEY**
**ALTA 25-06 (10-16-08)**
**25.1-06 (10-16-08)**

These endorsements expand policy coverage by providing insurance in the event the survey identified in the endorsement is not the same land a described in Schedule A(or C) of the policy.

© 2013 Chicago Title, a member of the Fidelity National Financial family of companies. | NYSE:FNF

**ENDORSEMENT**

Attached to Policy No._____
Issued by
Chicago Title Insurance
Company

The Company insures against loss or damage sustained by the Insured by reason of the failure of the Land as described in Schedule A to be the same as that identified on the survey made by _____dated_____  _, and designated Job No._____.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements to it.

[Witness Optional]

DATED:

Chicago Title Insurance Company

BY:_____
       AUTHORIZED SIGNATORY

ALTA Endorsement Form 25-06
(Same as Survey) (10/16/08)
©American Land Title Association

© 2013 Chicago Title, a member of the Fidelity National Financial family of companies. | NYSE:FNF

**ENDORSEMENT**

Attached to Policy No._____
Issued by
Chicago Title Insurance
Company

The Company insures against loss or damage sustained by the Insured by reason of the failure of the Land as described in Schedule A to be the same as that identified as [Example:  Parcel A, B, C or Parcel 1, 2, 3] on the survey made by_____ dated _____, and designated Job No._____.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements to it.

[Witness Optional]

DATED:

Chicago Title Insurance Company

BY:_____
     AUTHORIZED SIGNATORY

ALTA Endorsement Form 25.1-06
(Same as Portion of Survey) (10/16/08)
©American Land Title Association

**SUBDIVISION**
**ALTA 26-06 (10-16-08)**

The ALTA Form 26-06 insures against loss based upon the Land described in Schedule A (or Schedule C) not constituting a legally created parcel pursuant to applicable state statutes or local governmental regulations.

This endorsement modifies exclusion 1(a)(iii) which excludes any law, ordinance, permit or governmental regulation which pertains to the subdivision of land.

© 2013 Chicago Title, a member of the Fidelity National Financial family of companies. | NYSE:FNF

**ENDORSEMENT**

Attached to Policy No._____
Issued by
Chicago Title Insurance
Company

The Company insures against loss or damage sustained by the Insured by reason of the failure of the Land to constitute a lawfully created parcel according to the subdivision statutes and local subdivision ordinances applicable to the Land.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements to it.

[Witness Optional]

DATED:

Chicago Title Insurance Company

BY:_____
     AUTHORIZED SIGNATORY

ALTA Endorsement Form 26-06
(Subdivision) (10/16/08)
©American Land Title Association

© 2013 Chicago Title, a member of the Fidelity National Financial family of companies. | NYSE:FNF

**USURY ENDORSEMENT**
**ALTA 27-06 (10-16-08)**

This endorsement is for use with an ALTA loan policy. It provides insurance against loss the Insured may suffer if the Insured Mortgage is determined to be usurious under state statute.

© 2013 Chicago Title, a member of the Fidelity National Financial family of companies. | NYSE:FNF

**ENDORSEMENT**

Attached to Policy No._____
Issued by
Chicago Title Insurance
Company

The Company insures against loss or damage sustained by the Insured  by reason of the invalidity or unenforceability of the lien of the Insured Mortgage as security for the Indebtedness because the loan secured by the Insured Mortgage violates the usury law of the state where the Land is located.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

[Witness clause optional]

Chicago Title Insurance Company

BY:_____

ALTA Endorsement Form 27-06
(Usury) (10/16//08)
©American Land Title Association

**EASEMENT - DAMAGE OR ENFORCED REMOVAL ENCROACHMENTS - BOUNDARIES AND EASEMENTS**
**ALTA 28-06 (02-03-10)**
**ALTA 28.1-06 (04-02-12)**
**ALTA 28.2-06 (04-02-13)**

**ALTA Endorsement Form 28-06 (EASEMENT - DAMAGE OR ENFORCED REMOVAL)**

Endorsement Form 28.06 was developed to insure against loss caused by the encroachment of a building located on the Land onto or over an easement shown as an exception in Schedule B, as disclosed by a survey or inspection of the Land. The loss must be based on an exercise of the easement and is only for damage to an existing building or enforced removal or alteration.

**ALTA 28.1-06 (ENCROACHMENTS - BOUNDARIES AND EASEMENTS)**
**ALTA 28.2-06 (ENCROACHMENTS – BOUNDARIES AND EASEMENTS – DESCRIBED IMPROVEMENTS)**

Endorsement Forms 28.1-06 and 28.2-06 were developed to provide coverage with respect to certain boundary and easement encroachments. This coverage was previously included in the former ALTA 9 series. It is no longer contained within those endorsements other than the revised ALTA 9-06 and the new ALTA 9.7-06 and 9.10-06 (which additionally afford coverage as to violations of covenants, violations of setbacks, and damage to existing improvements because of development of minerals). The Form 28.2-06 specifically covers only the Improvements described at item 2 of the endorsement.

**The coverage in these Endorsements include:**

• The loss occasioned by the existence of an encroachment by an Improvement onto a neighboring property or onto an easement area within the insured Land, other than as disclosed in Schedule B exceptions.

• The loss occasioned by the existence of an encroachment by a neighboring Improvement onto the insured Land, other than as disclosed in Schedule B exceptions.
• Enforced removal of an insured Improvement based upon the encroachment into the easement area or onto neighboring property.

These forms allow the exclusion of an encroachment raised as an exception in Schedule B from the enforced removal coverage by reference to the exception that describes it, if the title insurer elects not to include that encroachment within the coverage afforded by these endorsements.

© 2013 Chicago Title, a member of the Fidelity National Financial family of companies. | NYSE:FNF

**ENDORSEMENT**

Attached to Policy No._____
Issued by
Chicago Title Insurance
Company

The Company insures against loss or damage sustained by the Insured if the exercise of the granted or reserved rights to use or maintain the easement(s) referred to in Exception (s)_____ of Schedule B results in:

    (1)      damage to an existing building located on the Land, or

    (2)      enforced removal or alteration of an existing building located on the Land.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements to it.

[Witness Optional]

DATED:

Chicago Title Insurance Company

BY:_____
      AUTHORIZED SIGNATORY

ALTA Endorsement Form 28-06
(Easement-Damage or Enforced Removal) (rev. 02/03/10)
©American Land Title Association

© 2013 Chicago Title, a member of the Fidelity National Financial family of companies. | NYSE:FNF

**ENDORSEMENT**

Attached to Policy No._____
Issued by
Chicago Title Insurance
Company

1. The insurance provided by this endorsement is subject to the exclusions in Section 4 of this endorsement; and the Exclusions from Coverage, the Exceptions from Coverage contained in Schedule B, and the Conditions in the policy.

2. For purposes of this endorsement only, "Improvement" means an existing building, located on either the Land or adjoining land at Date of Policy and that by law constitutes real property.

3. The Company insures against loss or damage sustained by the Insured by reason of:

   a. An encroachment of any Improvement located on the Land onto adjoining land or onto that portion of the Land subject to a easement, unless an exception in Schedule B of the policy identifies the encroachment;

   b. An encroachment of any Improvement located on adjoining land onto the Land at Date of Policy, unless an exception in Schedule B of the policy identifies the encroachment;

   c. Enforced removal of any Improvement located on the Land as a result of an encroachment by the Improvement onto any portion of the Land subject to any easement, in the event that the owners of the easement shall, for the purpose of exercising the right of use or maintenance of the easement, compel removal or relocation of the encroaching Improvement; or

   d. Enforced removal of any Improvement located on the Land that encroaches onto adjoining land.

4. This endorsement does not insure against loss or damage (and the Company will not pay costs, attorneys' fees, or expenses) resulting from the encroachments listed as Exceptions _____of Schedule B.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

[Witness clause optional]

DATED:

Chicago Title Insurance Company

BY:_____
     AUTHORIZED SIGNATORY

ALTA Endorsement Form 28.1-06
(Encroachments-Boundaries and Easements) (4/2/12)
©American Land Title Association

© 2013 Chicago Title, a member of the Fidelity National Financial family of companies. | NYSE:FNF

**ENDORSEMENT**

Attached to Policy No._____
Issued by
Chicago Title Insurance
Company

1. The insurance provided by this endorsement is subject to the exclusions in Section 4 of this  endorsement; and the Exclusions from Coverage, the Exceptions from Coverage contained in  Schedule B, and the Conditions in the policy.

2. For purposes of this endorsement only, "Improvement" means each improvement  on the Land or  adjoining land at Date of Policy , itemized below:

.

3. The Company insures against loss or damage sustained by the Insured by reason of:

   a. An encroachment of any Improvement located on the Land onto adjoining land or onto that  portion of the Land subject to an easement, unless  an exception in Schedule B of the policy  identifies the encroachment;

   b. An encroachment of any Improvement located on adjoining land onto the Land at Date of Policy,   unless an exception in Schedule B of the policy identifies the encroachment;

   c. Enforced removal of any Improvement located on the Land as a result of an encroachment by  the Improvement onto any portion of the Land subject to any easement, in the event that the  owners of the easement shall, for the purpose of exercising the right of use or maintenance of  the easement, compel removal or relocation of the encroaching Improvement; or

   d. Enforced removal of any Improvement located on the Land that encroaches onto adjoining land.

4. Sections 3.c and 3.d. of this endorsement do not insure against loss or damage (and the Company  will not pay costs, attorneys' fees, or expenses) resulting from the following Exceptions, if any, listed  in Schedule B:

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of  the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or
(iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is  inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this   endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

[Witness clause optional]

DATED:
Chicago Title Insurance Company
BY:_____
        AUTHORIZED SIGNATORY

© 2013 Chicago Title, a member of the Fidelity National Financial family of companies. | NYSE:FNF

ALTA Endorsement Form 28.2-06
(Encroachments-Boundaries and Easements-Described Improvements) (4/2/13)
©American Land Title Association

© 2013 Chicago Title, a member of the Fidelity National Financial family of companies. | NYSE:FNF

**SWAP ENDORSEMENT (INTEREST RATE EXCHANGE AGREEMENT SECURED BY INSURED MORTGAGE)**
**ALTA 29-06 (02-03-10)**
**ALTA 29.1-06 (02-03-10)**
**ALTA 29.2-06 (08-01-11)**
**ALTA 29.3-06 (08-01-11)**

Lenders occasionally request that the Loan Policy insure amounts which are described in an Interest Rate Exchange Agreement or Swap Agreement, the terms of which are contained in or referenced in the Insured Mortgage. Such agreements obligate the mortgagor for damages the lender may suffer under swap transactions it enters into on the borrower's behalf in order to achieve a favorable interest rate. If the borrower defaults on its loan, the lender becomes obligated itself under the swap loan for amounts known as breakage fees. This endorsement is designed to provide additional coverage for these amounts. These amounts are contingent and would accrue as an obligation of the borrower post-policy.

© 2013 Chicago Title, a member of the Fidelity National Financial family of companies. | NYSE:FNF

**ENDORSEMENT**

Attached to Policy No._____
Issued by
Chicago Title Insurance
Company

1. The insurance provided by this endorsement is subject to the exclusions in Section 3 of this endorsement, the Exclusions from Coverage in the Policy, the Exceptions from Coverage contained in Schedule B, and the Conditions. As used in this endorsement:

   a. The "Date of Endorsement" is_____; and

   b. "Swap Obligation" means a monetary obligation under the interest rate exchange agreement dated_____, between _____ and the Insured existing at Date of Endorsement and secured by the Insured Mortgage. The Swap Obligation is included as a part of the Indebtedness.

2. The Company insures against loss or damage sustained by the Insured by reason of the invalidity, unenforceability or lack of priority of the lien of the Insured Mortgage as security for the repayment of the Swap Obligation at Date of Endorsement.

3. This endorsement does not insure against loss or damage, and the Company will not pay costs, attorneys' fees, or expenses that arise by reason of:

   a. Rights or obligations set, created or confirmed after the Date of Endorsement under a master interest rate exchange agreement existing on or after Date of Endorsement;

   b. The stay, rejection or avoidance of the lien of the Insured Mortgage as security for the Swap Obligation, or a court order providing some other remedy, by the operation of federal bankruptcy, state insolvency, or similar creditors' rights laws;

   c. The calculation of the amount, if any, determined by a court of competent jurisdiction as the amount of the Swap Obligation[; *or*]

   d. [*The invalidity, unenforceability or lack of priority of the lien of the Insured Mortgage as security for repayment of the Swap Obligation because all applicable mortgage recording or similar intangible taxes were not paid; or* ]

   e. [*If Date of Endorsement is after Date of Policy, add any necessary additional exceptions here*].

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements to it.

[Witness clause optional]
DATED:
Chicago Title Insurance Company
BY:_____
    AUTHORIZED SIGNATORY

ALTA Endorsement - Form 29 - 06
(Interest Rate Swap –Direct Obligations**)** (2/3/10)
©American Land Title Association

**ENDORSEMENT**

Attached to Policy No._____
Issued by
Chicago Title Insurance
Company

1.  The insurance provided by this endorsement is subject to the exclusions in Section 3 of this endorsement, the Exclusions from Coverage in the Policy, the Exceptions from Coverage contained in  Schedule B, and the Conditions. As used in this endorsement:

    a.  The "Date of Endorsement" is_____; and

    b.  "Swap Obligation" means a monetary obligation under the interest rate exchange              . agreement dated
    ____, between_____and the Insured existing at Date of Endorsement and secured by the  Insured Mortgage.

    c.  "Additional Interest" means the additional interest calculated pursuant to the formula provided in the  loan documents secured by the Insured Mortgagee at Date of Endorsement.

2.  The Company insures against loss or damage sustained by the Insured by reason of the invalidity,  unenforceability or lack of priority of the lien of the Insured Mortgage as security for the repayment of  the Additional Interest at Date of Endorsement.

3.  This endorsement does not insure against loss or damage, and the Company will not pay costs,  attorneys' fees, or expenses that arise by reason of:

    a.  Rights or obligations set, created or confirmed after the Date of Endorsement under a master  interest rate exchange agreement existing on or after Date of Endorsement;

    b.  The stay, rejection or avoidance of the lien of the Insured Mortgage as security for the Swap  Obligation, or a court order providing some other remedy, by the operation of federal bankruptcy, state  insolvency, or similar creditors' rights laws;

    c.  The calculation of the amount, if any, determined by a court of competent jurisdiction as the amount  of the Additional Interest*[; or*]

    d.  [*The invalidity, unenforceability or lack of priority of the lien of the Insured Mortgage as security for  repayment of the Swap Obligation because all applicable mortgage recording or similar intangible taxes  were not paid; or* ]

    e.  [*If Date of Endorsement is after Date of Policy, add any necessary additional exceptions here].*

    This endorsement is issued as part of the policy. Except as it expressly states, it does not  (i)  modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date  of Policy or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous  endorsement is inconsistent with an express provision of this endorsement, this endorsement controls.  Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior  endorsements to it.

Dated:

By_____
      Authorized Signatory

ALTA Endorsement - Form 29.1 - 06

© 2013 Chicago Title, a member of the Fidelity National Financial family of companies. | NYSE:FNF

(Interest Rate Swap – Additional Interest) (2/3/10)
©American Land Title Association

**ENDORSEMENT**

Attached to Policy No._____
Issued by
Chicago Title Insurance
Company

1.       The insurance provided by this endorsement is subject to the exclusions in Section 3 of this endorsement, the Exclusions from Coverage in the Policy, the Exceptions from Coverage contained in Schedule B, and the Conditions. As used in this endorsement:

a.       The "Date of Endorsement" is_____; and

b.       "Swap Obligation" means a monetary obligation under the interest rate exchange agreement dated_____, between_____and the Insured existing at Date of Endorsement and secured by the Insured Mortgage. The Swap Obligation is included as a part of the Indebtedness.

c. "Additional Amount of Insurance" is $____that is in addition to the Amount of Insurance stated in Schedule A and is Applicable only to loss or damage under this endorsement.

2.       The Company insures against loss or damage sustained by the Insured by reason of the invalidity, unenforceability or lack of priority of the lien of the Insured Mortgage as security for the repayment of the Swap Obligation at Date of Endorsement.

3       This endorsement does not insure against loss or damage, and the Company will not pay costs, attorneys' fees, or expenses that arise by reason of:

a.       Rights or obligations set, created or confirmed after the Date of Endorsement under a master interest rate exchange agreement existing on or after Date of Endorsement;

b.       The stay, rejection or avoidance of the lien of the Insured Mortgage as security for the Swap Obligation, or a court order providing some other remedy, by the operation of       federal bankruptcy, state insolvency, or similar creditors' rights laws;

c.       The calculation of the amount, if any, determined by a court of competent jurisdiction as the amount of the Swap Obligation[; *or*]

d.       [*The invalidity, unenforceability or lack of priority of the lien of the Insured Mortgage as security for repayment of the Swap Obligation because all applicable mortgage recording or similar intangible taxes were not paid; or* ]

e.       [*If Date of Endorsement is after Date of Policy, add any necessary additional exceptions here*].

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy or
(iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements to it.

Dated:

By_____
            Authorized Signatory

© 2013 Chicago Title, a member of the Fidelity National Financial family of companies. | NYSE:FNF

ALTA Endorsement - Form 29 .2 - 06
(Interest Rate Swap –Direct Obligations-Defined Amount) (8/01/11)
©American Land Title Association

**ENDORSEMENT**

Attached to Policy No._____
Issued by
Chicago Title Insurance
Company

1.  The insurance provided by this endorsement is subject to the exclusions in Section 3 of this endorsement, the Exclusions from Coverage in the Policy, the Exceptions from Coverage contained in  Schedule B, and the Conditions. As used in this endorsement:

    a.  The "Date of Endorsement" is_____; and

    b.  "Swap Obligation" means a monetary obligation under the interest rate exchange agreement dated
    ____, between_____and the Insured existing at Date of Endorsement and secured by the  Insured Mortgage.

    c.  "Additional Interest" means the additional interest calculated pursuant to the formula provided in the  loan documents secured by the Insured Mortgagee at Date of Endorsement.

    d.  "Additional Amount of Insurance" is $___that is in addition to the Amount of Insurance stated in  Schedule A and is applicable  only to loss or damage under this endorsement.

2.  The Company insures against loss or damage sustained by the Insured by reason of the invalidity,   unenforceability or lack of priority of the lien of the Insured Mortgage as security for the repayment of  the Additional Interest at Date of Endorsement.

3.  This endorsement does not insure against loss or damage, and the Company will not pay costs,   attorneys' fees, or expenses that arise by reason of:

    a.  Rights or obligations set, created or confirmed after the Date of Endorsement under a master  interest rate exchange agreement existing on or after Date of Endorsement;

    b.  The stay, rejection or avoidance of the lien of the Insured Mortgage as security for the Swap  Obligation, or a court order providing some other remedy, by the operation of federal bankruptcy, state  insolvency, or similar creditors' rights laws;

    c.  The calculation of the amount, if any, determined by a court of competent jurisdiction as the amount  of the Additional Interest*[; or*]

    d.  [*The invalidity, unenforceability or lack of priority of the lien of the Insured Mortgage as security for  repayment of the Swap Obligation because all applicable mortgage recording or similar intangible taxes  were not paid; or* ]

    e.  [*If Date of Endorsement is after Date of Policy, add any necessary additional exceptions here*].

    This endorsement is issued as part of the policy. Except as it expressly states, it does  not (i)  modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date  of  Policy or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous  endorsement is inconsistent with an express provision of this endorsement, this endorsement controls.  Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior  endorsements to it.

Dated:

By_____
        Authorized Signatory

© 2013 Chicago Title, a member of the Fidelity National Financial family of companies. | NYSE:FNF

ALTA Endorsement - Form 29.3 - 06
(Interest Rate Swap – Additional Interest-Defined Amount) (8/01/11)
©American Land Title Association

© 2013 Chicago Title, a member of the Fidelity National Financial family of companies. | NYSE:FNF

**ONE TO FOUR FAMILY SHARED APPRECIATION MORTGAGE ENDORSEMENT**
**COMMERCIAL PARTICIPATION INTEREST**
**ALTA 30-06 (07-26-10)**
**ALTA 30.1-06 (08-01-12)**

These endorsements are designed to provide additional coverage to the lender when the loan documents provide that the lender will participate in the appreciation in value of the property or a share of the cash flow (as additional interest). The residential version (30-06) was developed for use with government programs that modified and reduced the outstanding debt of homeowners in the face of the downturn of the housing market. These programs allow the recapture of appreciation up to the amount of forgiveness of previously outstanding debt.   The commercial version (30.1-06) is for use only with commercial transactions and includes, in addition to the increase in the value of the property (appreciation), a share of the cash flow from the property and any increase in the equity of the borrower in the property.   These endorsements provide coverage in the event of an attack on the validity, priority or enforceability of the Insured Mortgage based upon the provisions regarding shared appreciation and participation.

© 2013 Chicago Title, a member of the Fidelity National Financial family of companies. | NYSE:FNF

**ENDORSEMENT**

Attached to Policy No._____
Issued by
Chicago Title Insurance
Company

The insurance afforded by this endorsement is only effective if the Land is a one to four family residence.

For the purposes of this endorsement, "Shared Appreciation" shall mean increases in the Indebtedness  secured by the Insured Mortgage by reason of shared equity or appreciation in the value of the Land.

The Company insures against loss or damage sustained by the Insured by reason of:

    (a)  The invalidity or unenforceability of the lien of the Insured Mortgage as security for the  Indebtedness caused by the provisions for Shared Appreciation; or

    (b)  Loss of priority of the lien of the Insured Mortgage as security for the Indebtedness caused by  the provisions for Shared Appreciation.

Nothing contained in this endorsement shall be construed as insuring against loss or damage sustained or   incurred by reason of:

    (a)  usury;

    (b)  any consumer credit protection or truth in lending law;

    (c)  costs, expenses or attorney's fees required to obtain a determination, by judicial proceedings  or otherwise, of the amount of the Shared Appreciation;

    (d)  failure to comply with applicable laws and regulations regarding Shared Appreciation;

    (e)  the stay, rejection or avoidance of the lien of the Insured Mortgage as security for the Shared  Appreciation, or a court order providing some other remedy, by the operation of federal  bankruptcy, state insolvency or similar creditors' rights laws; or

    (f)  the invalidity, unenforceability or lack of priority of the lien of the Insured Mortgage as security  for the Indebtedness because all applicable mortgage recording or similar intangible taxes  were not paid.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of  the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or
(iv) crease the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is  inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this   endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

Dated:

By_____

  Authorized Signatory

© 2013 Chicago Title, a member of the Fidelity National Financial family of companies. | NYSE:FNF

ALTA Endorsement Form 30-06
(One to Four Family Shared Appreciation Mortgage) (7/26/10)
©American Land Title Association

**ENDORSEMENT**

Attached to Policy No._____
Issued by
Chicago Title Insurance
Company

1.  This endorsement is subject to the exclusions in Section 4 of this endorsement, the Exclusions  from Coverage in the policy, the Exceptions from Coverage contained in Schedule B, and the  Conditions.

2.  As used in this endorsement,

a.  "Loan Documents" means those documents, as they exist at Date of Policy, creating the  Indebtedness.

b.  "Participation Interest" means those elements of interest, established and calculated pursuant to  the formula provided in the Loan Documents, that are payable or allocated to the Insured based  upon:

    i.  the borrower's equity in the Title;
    ii.  the increase in value of the Title; or
    iii.  cash flow.

3.  The policy insures as of Date of Policy against loss or damage sustained by the Insured by  reason of:

a.  The invalidity or unenforceability of the lien of the Insured Mortgage resulting from the provisions in  the Insured Mortgage or in the Loan Documents which provide for Participation Interest.

b.  Lack of priority of the lien of the Insured Mortgage at Date of Policy as security for (i) the unpaid  principal balance of the loan and (ii) the interest on the loan, including the Participation Interest, if  any, which lack of priority is caused by the provisions in the Loan Documents for payment or  allocation to the Insured of any Participation Interest.

4.  The policy does not insure against loss or damage, and the Company will not pay costs,   attorneys' fees, or expenses that arise by reason of:

a.  usury; unconscionability; or any consumer credit protection or truth-in-lending law;
b.  disputes over the amount of Participation Interest;
c.  failure to comply with applicable laws and regulations regarding Participation Interest;
d.  the invalidity, unenforceability or lack of priority of the lien of the Insured Mortgage as security for  the Participation Interest because all applicable mortgage recording or similar intangible taxes were  not paid; or
e.  any statutory lien for services provided, labor performed, or materials or equipment furnished  arising after Date of Policy.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of  the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or
(iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is  inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this   endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

Dated:

By_____

© 2013 Chicago Title, a member of the Fidelity National Financial family of companies. | NYSE:FNF

Authorized Signatory

ALTA Endorsement Form 30.1-06
(Commercial Participation Interest) (8/1/12)
©American Land Title Association

**SEVERABLE IMPROVEMENTS**
**ALTA 31-06 (02-03-11)**

This endorsement adds, as a part of the calculation of the Insured's loss, the diminution in value of the Insured's interest in any defined Severable Improvement affixed to the Land, as well as the reasonable cost of removal or relocation of these. Severable Improvements are defined as property that by law does not constitute real property. Land is defined in the policy as land and improvements that by law constitute real property.

© 2013 Chicago Title, a member of the Fidelity National Financial family of companies. | NYSE:FNF

**ENDORSEMENT**

Attached to Policy No._____
Issued by
Chicago Title Insurance
Company

1.  As used in this endorsement, "Severable Improvement" means property affixed to the Land on or after Date of Policy that by law does not constitute real property because:

    a.  of its character and manner of attachment to the Land; and

    b.  it can be severed from the Land without causing material damage to it or to the Land.

2.  In the event of a loss by reason of a defect, lien, encumbrance, or other matter covered by this Policy ("Defect"), the calculation of the loss shall include (but not to the extent that these items of loss are included in the valuation of the Title determined pursuant to Section 8 of the Conditions or any other endorsement to the Policy):

    a.  the diminution in value of the Insured's interest in any Severable Improvement resulting from the Defect, reduced by the salvage value of the Severable Improvement; and

    b.  the reasonable cost actually incurred by the Insured in connection with the removal or relocation of the Severable Improvement resulting from the Defect and the cost of transportation of that Severable Improvement for the initial one hundred miles incurred in connection with the relocation.

3.  This endorsement relates solely to the calculation of the Insured's loss resulting from a claim based on a defect, lien, encumbrance or other matter otherwise insured against by the Policy. This Policy does not insure against loss or damage (and the Company will not pay any costs, attorneys' fees or expenses) relating to:

    a.  the attachment, perfection or priority of any security interest in the Severable Improvement;

    b.  the vesting or ownership of title to or rights in any Severable Improvement;

    c.  any defect in or lien or encumbrance on the title to any Severable Improvement; or

    d.  the determination of whether any specific property is real or personal in nature.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

[Witness clause optional]

Dated:
Chicago Title Insurance Company
BY: _____
          AUTHORIZED SIGNATORY

ALTA Endorsement Form 31-06
(Severable Improvements) (2-3-11)
©American Land Title Association

© 2013 Chicago Title, a member of the Fidelity National Financial family of companies. | NYSE:FNF

**CONSTRUCTION LOAN**
**ALTA 32-06 (Construction Loan – Loss of Priority) (02-03-11) ALTA 32.1-06 (Construction Loan – Loss of Priority-Direct Payment) (04-02-13)**
**ALTA 32.2-06 (Construction Loan –Loss of Priority- Insured's Direct Payment) (04-02-13)**

These endorsements, together with the 33-06 (Disbursement) replace the ALTA Construction Loan Policy and the Construction Loan Policy Endorsements A through D which have been decertified and are no longer available.

These endorsements were developed to give limited coverage where priority has been lost. They only give coverage to the extent of work that the lender has paid for, with the ALTA 32-06 and the ALTA 32.1-06 further limited to liens filed by parties that have been identified on a draw request either paid by the Insured or the Company. They do not give coverage over other inchoate liens that can prime the construction mortgage. The 32-06 covers payment as disclosed by a draw request.

ALTA Endorsement 32.1-06 is designed for loan policies during construction in situations where the mortgage or deed of trust can never have priority over mechanic's liens or where the mortgage or deed of trust has lost priority to mechanic's liens (e.g., due to commencement of work prior to the recording of the mortgage or deed of trust). However, this endorsement may also be used for situations where the mortgage or deed of trust has priority over mechanic's liens.

Specifically, the ALTA 32.1-06 insures only to the extent that direct payment to the Mechanic's Lien claimant has been made by the Company or by the Insured with the Company's written approval.  It does not insure against loss or damage by reason of any mechanic's lien arising from services, labor, material or equipment:

a Furnished after Date of Coverage; or
to the extent that a Mechanic's Lien claimant was not directly paid by the Company or by the Insured with the Company's written approval.

The endorsement contemplates that the Company or its agent will be involved in the direct payment to specific mechanic's lien claimants – either by making the payment or by approving it.

The ALTA 32.2-06 covers a lien filed for payment of previously paid amounts by the title insurer or with the title insurer's consent.

© 2013 Chicago Title, a member of the Fidelity National Financial family of companies. | NYSE:FNF

**ENDORSEMENT**

Attached to Policy No._____
Issued by
Chicago Title Insurance
Company

1. Covered Risk 11(a) of this policy is deleted.

2. The insurance [for Construction Loan Advances] added by Section 3 of this endorsement is subject to the exclusions in  Section 4 of this endorsement and the Exclusions from Coverage in the Policy, the provisions of the Conditions, and the  exceptions contained in Schedule B. For the purposes of this endorsement and each subsequent Disbursement Endorsement:

   a. "Date of Coverage" is_unless the Company sets a different Date of Coverage by an ALTA 33-06 Disbursement  Endorsement issued at the discretion of the Company.

   b. "Construction Loan Advance" shall mean an advance that constitutes Indebtedness made on or before Date of Coverage  for the purpose of financing in whole or in part the construction of improvements on the Land.

   c. "Mechanic's Lien" shall mean any statutory lien or claim of lien, affecting the Title, that arises from services provided,  labor performed, or materials or equipment furnished.

3. The Company insures against loss or damage sustained by the Insured by reason of:

   a. The invalidity or unenforceability of the lien of the Insured Mortgage as security for each Construction Loan Advance  made on or before the Date of Coverage;

   b. The lack of priority of the lien of the Insured Mortgage as security for each Construction Loan Advance made on or before  the Date of Coverage, over any lien or encumbrance on the Title recorded in the Public Records and not shown in  Schedule B; and

   c. The lack of priority of the lien of the Insured Mortgage, as security for each Construction Loan Advance made on or before  the Date of Coverage over any Mechanic's Lien, if notice of the Mechanic's Lien is not filed or recorded in the  Public Records, but only to the extent that the charges for the services, labor, materials or equipment for which the  Mechanic's Lien is claimed were designated for payment in the documents supporting a Construction Loan Advance  disbursed by or on behalf of the Insured on or before Date of Coverage.

4  This policy does not insure against loss or damage (and the Company will not pay costs, attorneys' fees or expenses) by  reason of any Mechanic's Lien arising from services, labor, material or equipment:
   a. furnished after Date of Coverage; or
   b. not designated for payment in the documents supporting a Construction Loan Advance disbursed by or on behalf of the  Insured on or before Date of Coverage.

This endorsement is issued as part of the policy.  Except as it expressly states, it does not (i) modify any of the terms and provisions  of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the  extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this  endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior  endorsements.

Dated:
Chicago Title Insurance Company
BY: _____

© 2013 Chicago Title, a member of the Fidelity National Financial family of companies. | NYSE:FNF

AUTHORIZED  SIGNATORY

ALTA Endorsement Form 32-06
(Construction Loan-Loss of Priority) (2-3-11)
© American Land Title Association

**ENDORSEMENT**

Attached to Policy No._____
Issued by
Chicago Title Insurance
Company

1. Covered Risk 11(a) of this policy is deleted.

2. The insurance [for Construction Loan Advances] added by Section 3 of this endorsement is subject to  the exclusions in Section 4 of this endorsement and the Exclusions from Coverage in the Policy, the  provisions of the Conditions, and the exceptions contained in Schedule B. For the purposes of this  endorsement and each subsequent Disbursement Endorsement:

    a. "Date of Coverage" is_____unless the Company sets a different Date of Coverage by  an ALTA 33-06 Disbursement Endorsement issued at the discretion of the Company.

    b. "Construction Loan Advance" shall mean an advance that constitutes Indebtedness made on or  before Date of Coverage for the purpose of financing in whole or in part the construction of  improvements on the Land.

    c. "Mechanic's Lien" shall mean any statutory lien or claim of lien, affecting the Title, that arises from   services provided, labor performed, or materials or equipment furnished.

3. The Company insures against loss or damage sustained by the Insured by reason of:

    a. The invalidity or unenforceability of the lien of the Insured Mortgage as security for each  Construction Loan Advance made on or before the Date of Coverage;

    b. The lack of priority of the lien of the Insured Mortgage as security for each Construction Loan  Advance made on or before the Date of Coverage, over any lien or encumbrance on the Title  recorded in the Public Records and not shown in Schedule B; and

    c. The lack of priority of the lien of the Insured Mortgage as security for each Construction Loan  Advance made on or before the Date of Coverage over any Mechanic's Lien if notice of the  Mechanic's Lien is not filed or recorded in the Public Records, but only to the extent that direct  payment to the Mechanic's Lien claimant for the charges for the services, labor, materials or  equipment  for which the Mechanic's Lien is claimed  has been made by the Company or by the  Insured with the Company's written approval.

4. This policy does not insure against loss or damage (and the Company will not pay costs, attorneys' fees  or expenses) by reason of any Mechanic's Lien arising from services, labor, material or equipment:
    a. furnished after Date of Coverage; or
    b. to the extent that the Mechanic's Lien claimant was not directly paid by the Company or by the  Insured with the Company's written approval.

This endorsement is issued as part of the policy.  Except as it expressly states, it does not (i) modify any of  the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or
(iv) increase the Amount of Insurance.  To the extent a provision of the policy or a previous endorsement is  inconsistent with an express provision of this endorsement, this endorsement controls.  Otherwise, this   endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

[Witness clause optional]

© 2013 Chicago Title, a member of the Fidelity National Financial family of companies. | NYSE:FNF

DATED:

Chicago Title Insurance Company

BY:_____
       AUTHORIZED SIGNATORY

ALTA Endorsement Form 32.1-06
(Construction Loan-Loss of Priority-Direct Payment) (rev. 4-2-13)
American Land Title Association

© 2013 Chicago Title, a member of the Fidelity National Financial family of companies. | NYSE:FNF

**ENDORSEMENT**

Attached to Policy No._____
Issued by
Chicago Title Insurance
Company

1. Covered Risk 11(a) of this policy is deleted.

2. The insurance [for Construction Loan Advances] added by Section 3 of this endorsement is subject to the exclusions in  Section 4 of this endorsement and the Exclusions from Coverage in the Policy, the provisions of the Conditions, and the  exceptions contained in Schedule B. For the purposes of this endorsement and each subsequent Disbursement Endorsement:

   a. "Date of Coverage" is[ unless the Company sets a different Date of Coverage by an ALTA 33-06 Disbursement  Endorsement issued at the discretion of the Company.

   b. "Construction Loan Advance" shall mean an advance that constitutes Indebtedness made on or before Date of Coverage  for the purpose of financing in whole or in part the construction of improvements on the Land.

   c. "Mechanic's Lien" shall mean any statutory lien or claim of lien, affecting the Title, that arises from services provided,  labor performed, or materials or equipment furnished.

3. The Company insures against loss or damage sustained by the Insured by reason of:

   a. The invalidity or unenforceability of the lien of the Insured Mortgage as security for each Construction Loan Advance  made on or before the Date of Coverage;

   b. The lack of priority of the lien of the Insured Mortgage as security for each Construction Loan Advance made on or before  the Date of Coverage, over any lien or encumbrance on the Title recorded in the Public Records and not shown in Schedule B;  and

   c. The lack of priority of the lien of the Insured Mortgage, as security for each Construction Loan Advance made on or  before the Date of Coverage over any Mechanic's Lien, if notice of the Mechanic's Lien is not filed or recorded in the Public  Records, but only to the extent that a direct payment to the Mechanic's Lien claimant for the charges for the services, labor,  materials or equipment  for which the Mechanic's Lien is claimed  has been made by the Insured  or on the Insured's behalf on  or before Date of Coverage.

4 This policy does not insure against loss or damage (and the Company will not pay costs, attorneys' fees or expenses) by  reason of any Mechanic's Lien arising from services, labor, material or equipment:
   a. furnished after Date of Coverage; or
   b. To the extent that the Mechanic's lien claimant was not directly paid by the Insured  or on the Insured's behalf.

This endorsement is issued as part of the policy.  Except as it expressly states, it does not (i) modify any of the terms and provisions  of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the  extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this  endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior  endorsements.

[Witness clause optional]

© 2013 Chicago Title, a member of the Fidelity National Financial family of companies. | NYSE:FNF

DATED:

Chicago Title Insurance Company

BY:_____
        AUTHORIZED SIGNATORY

ALTA Endorsement Form 32.2-06
(Construction Loan-Loss of Priority-Insured's Direct Payment) (rev. 4/2/13)
© American Land Title Association

**CONSTRUCTION LOAN DISBURSEMENT**
**ALTA 33-06 (02-03-11)**

This endorsement is used in conjunction with ALTA Forms 32-06, 32.1-06 or 32.2-06 when the Date of Coverage to be extended.

© 2013 Chicago Title, a member of the Fidelity National Financial family of companies. | NYSE:FNF

**ENDORSEMENT**

Attached to Policy No._____
Issued by
Chicago Title Insurance
Company

1.  The Date of Coverage is amended to _____.

    [a.  The current disbursement is: $_____]

    [b.  The aggregate amount, including the current disbursement, recognized by the Company
         as disbursed by the Insured is: $_____]

2.  Schedule A is amended as follows:

3.  Schedule B is amended as follows:

    [Part I]

    [Part II]

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i)
modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii)
extend the Date of Policy or (iv) increase the Amount of Insurance. To the extent a provision of
the policy or a previous endorsement is inconsistent with an express provision of this
endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the
terms and provisions of the policy and of any prior endorsements to it.

[Witness Optional]
[Bracketed material optional]

DATED:

Chicago Title Insurance Company

BY:_____
      AUTHORIZED SIGNATORY

ALTA Endorsement Form 33-06
(Disbursement) (2-3-11)
© American Land Title Association

**IDENTIFIED RISK COVERAGE**

**ALTA 34-06 (08-01-11)**

This endorsement should be used whenever we decide to assume a specific risk or "Identified Risk" as defined therein. Sometime this is referred to as "insuring over", especially when we have raised that risk in a commitment or policy.

© 2013 Chicago Title, a member of the Fidelity National Financial family of companies. | NYSE:FNF

**ENDORSEMENT**

Attached to Policy No._____
Issued by
Chicago Title Insurance
Company

1.  As used in this endorsement "Identified Risk" means: [*insert description of the title defect, restriction encumbrance or other matter*] described in Exception _____of Schedule B.

2.  The Company insures against loss or damage sustained by the Insured by reason of:

    a.  A final order or decree enforcing the Identified Risk in favor of an adverse party; or

    b.  The release of a prospective purchaser or lessee of the Title or lender on the Title from the obligation to purchase, lease, or lend as a result of the Identified Risk, but only if

        i.   there is a contractual condition requiring the delivery of marketable title, and

        ii.  neither the Company nor any other title insurance company is willing to insure over the Identified Risk with the same conditions as in this endorsement.

3.  The Company will also pay the costs, attorneys' fees, and expenses incurred in defense of the Title by reason of the Identified Risk insured against by Paragraph 2 of this endorsement, but only to the extent provided in the Conditions.

4.  This endorsement does not obligate the Company to establish the Title free of the Identified Risk or to remove the Identified Risk, but if the Company does establish the Title free of the Identified Risk or removes it, Section 9(a) of the Conditions applies.

This endorsement is issued as part of the policy.  Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy or (iv) increase the Amount of Insurance.  To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls.  Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements to it.

[Witness Optional]

DATED:

Chicago Title Insurance Company

BY:_____
    AUTHORIZED SIGNATORY

ALTA Endorsement Form 34-06
(Identified Risk Coverage) (8-1-11)
© American Land Title Association

**MINERALS AND OTHER
SUBSURFACE
SUBSTANCES
ALTA 35-06 thru 35.3-06
(04.02.12)**

These endorsement forms were developed to provide coverage to lenders with respect to the enforced removal or alteration of improvements resulting from the extraction or development of minerals or other subsurface substances. This coverage was previously included in the former ALTA 9 series. It is no longer contained within those endorsements other than the revised ALTA 9-06 and the new ALTA 9.7-06.

© 2013 Chicago Title, a member of the Fidelity National Financial family of companies. | NYSE:FNF

**ENDORSEMENT**

Attached to Policy No._____
Issued by
Chicago Title Insurance
Company

1.  The insurance provided by this endorsement is subject to the exclusion in Section 4 of this endorsement; and the Exclusions from Coverage, the Exceptions from Coverage contained in Schedule B, and the Conditions in the policy.

2.  For purposes of this endorsement only, "Improvement" means a building on the Land at Date of Policy.

3.  The Company insures against loss or damage sustained by the Insured by reason of the enforced removal or alteration of any Improvement resulting from the future exercise of any right existing at Date of Policy to use the surface of the Land for the extraction or development of minerals or any other subsurface substances excepted from the description of the Land or excepted in Schedule B.

4.  This endorsement does not insure against loss or damage (and the Company will not pay costs, attorneys' fees, or expenses) resulting from:

    a.  contamination, explosion, fire, vibration, fracturing, earthquake or subsidence; [or]

    b.  negligence by a person or an Entity exercising a right to extract or develop minerals or other subsurface substances[; or

    c.  the exercise of the rights described in (                    )]. *

        * Instructional note:  identify the interest excepted from the description of the Land in Schedule A or excepted in Schedule B that you intend to exclude from this coverage.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

[Witness clause optional]

DATED:
Chicago Title Insurance Company
BY:_____
        AUTHORIZED SIGNATORY

ALTA Endorsement Form 35-06
(Minerals and other Subsurface Substances-Buildings) (4/2/12)
©American Land Title Association

© 2013 Chicago Title, a member of the Fidelity National Financial family of companies. | NYSE:FNF

**ENDORSEMENT**

Attached to Policy No._____
Issued by
Chicago Title Insurance
Company

1. The insurance provided by this endorsement is subject to the exclusion in Section 4 of this endorsement; and the Exclusions from Coverage, the Exceptions from Coverage contained in Schedule B, and the Conditions in the policy.

2. For purposes of this endorsement only, "Improvement" means a building, structure located on the surface of the Land, and any paved road, walkway, parking area, driveway, or curb, affixed to the Land at Date of Policy and that by law constitutes real property, but excluding any crops, landscaping, lawn, shrubbery, or trees.

3. The Company insures against loss or damage sustained by the Insured by reason of the enforced removal or alteration of any Improvement, resulting from the future exercise of any right existing at Date of Policy to use the surface of the Land for the extraction or development of minerals or any other subsurface substances excepted from the description of the Land or excepted in Schedule B.

4. This endorsement does not insure against loss or damage (and the Company will not pay costs, attorneys' fees, or expenses) resulting from:

    a. contamination, explosion, fire, vibration, fracturing, earthquake or subsidence; [or]

    b. negligence by a person or an Entity exercising a right to extract or develop minerals or other subsurface substances[; or

    c. the exercise of the rights described in (                    )]. *

       * Instructional note:  identify the interest excepted from the description of the Land in Schedule A or excepted in Schedule B that you intend to exclude from this coverage.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

[Witness clause optional]

DATED:
Chicago Title Insurance Company
BY:_____
    AUTHORIZED SIGNATORY

ALTA Endorsement Form 35.1-06
(Minerals and other Subsurface Substances-Improvements) (4/2/12)
©American Land Title Association

© 2013 Chicago Title, a member of the Fidelity National Financial family of companies. | NYSE:FNF

**ENDORSEMENT**

Attached to Policy No._____
Issued by
Chicago Title Insurance
Company

1.  The insurance provided by this endorsement is subject to the exclusion in Section 4 of this endorsement; and the Exclusions from Coverage, the Exceptions from Coverage contained in Schedule B, and the Conditions in the policy.

2.  For purposes of this endorsement only, "Improvement" means each improvement on the Land at Date of Policy itemized [on the exhibit attached to this endorsement] [below:]

3.  The Company insures against loss or damage sustained by the Insured by reason of the enforced removal or alteration of any Improvement resulting from the future exercise of any right existing at Date of Policy to use the surface of the Land for the extraction or development of minerals or any other subsurface substances excepted from the description of the Land or excepted in Schedule B.

4.  This endorsement does not insure against loss or damage (and the Company will not pay costs, attorneys' fees, or expenses) resulting from:

    a.  contamination, explosion, fire, vibration, fracturing, earthquake or subsidence; [or]

    b.  negligence by a person or an Entity exercising a right to extract or develop minerals or other subsurface substances[; or

    c.  the exercise of the rights described in (                )]. *

        * Instructional note:  identify the interest excepted from the description of the Land in Schedule A or excepted in Schedule B that you intend to exclude from this coverage.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

[Witness clause optional]

**Chicago Title Insurance Company**

By: _____
        Authorized Signatory

ALTA Endorsement Form 35.2-06
(Minerals and other Subsurface Substances-Described Improvements) (4/2/12)
©American Land Title Association

© 2013 Chicago Title, a member of the Fidelity National Financial family of companies. | NYSE:FNF

**ENDORSEMENT**

Attached to Policy No._____
Issued by
Chicago Title Insurance
Company

1. The insurance provided by this endorsement is subject to the exclusion in Section 4 of this endorsement; and the Exclusions from Coverage, the Exceptions from Coverage contained in Schedule B, and the Conditions in the policy.

2. For purposes of this endorsement only:

    a. "Improvement" means a building, structure located on the surface of the Land, and any paved road,  walkway, parking area, driveway, or curb, affixed to the Land at Date of Policy and that by law  constitutes real property, but excluding any crops, landscaping, lawn, shrubbery, or trees.

    b. "Future Improvement" means a building, structure, and any paved road, walkway, parking area,  driveway, or curb to be constructed on or affixed to the Land in the locations according to the Plans  and that by law will constitute real property, but excluding any crops, landscaping, lawn, shrubbery,  or trees.

    c. "Plans" means the survey, site and elevation plans or other depictions or drawings prepared by  (*insert name of architect or engineer*)  dated_____, last revised__, designated as  (*insert  name of project or project number*)  consisting of_sheets.

3. The Company insures against loss or damage sustained by the Insured by reason of the enforced  removal or alteration of an Improvement or a Future Improvement, resulting from the future exercise of  any right existing at Date of Policy to use the surface of the Land for the extraction or development of  minerals or any other subsurface substances excepted from the description of the Land or excepted in  Schedule B.

4. This endorsement does not insure against loss or damage (and the Company will not pay costs,  attorneys' fees, or expenses) resulting from:

    a. contamination, explosion, fire, vibration, fracturing, earthquake or subsidence; [or]

    b. negligence by a person or an Entity exercising a right to extract or develop minerals or other  subsurface substances[; or

    c. the exercise of the rights described in (            )]. *

    * Instructional note:  identify the interest excepted from the description of the Land in Schedule A or  excepted in Schedule B that you intend to exclude from this coverage.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of  the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or
(iv) crease the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is  inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this   endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

[Witness clause optional]

**Chicago Title Insurance Company**

By: _____
             Authorized Signatory

ALTA Endorsement Form 35.3-06
(Minerals and other Subsurface Substances-Land Under Development) (4/2/12)
©American Land Title Association

**ENERGY PROJECT Series**

**ALTA 36.06 thru 36.6-06 (04-02-12)**

The ALTA 36 series of endorsement forms were developed to provide coverages to energy project owners and lenders which use a leasehold or easement rights structure. Examples of such projects would include solar or wind farms.

© 2013 Chicago Title, a member of the Fidelity National Financial family of companies. | NYSE:FNF

**ENDORSEMENT**

Attached to Policy No._____
Issued by
Chicago Title Insurance
Company

1. The insurance provided by this endorsement is subject to the exclusions in Section 6 of this endorsement; and the Exclusions from Coverage, the Exceptions from Coverage contained in Schedule B, and the Conditions in the policy.

2. For purposes of this endorsement only:

   a. "Constituent Parcel" means one of the parcels of Land described in Schedule A that together constitute one integrated project.

   b. "Easement" means each easement described in Schedule A.

   c. "Easement Interest" means the right of use granted in the Easement for the Easement Term.

   d. "Easement Term" means the duration of the Easement Interest, as set forth in the Easement, including any renewal or extended term if a valid option to renew or extend is contained in the Easement.

   e. "Electricity Facility" means an electricity generating facility which may include one or more of the following: a substation; a transmission, distribution or collector line; an interconnection, inverter, transformer, generator, turbine, array, solar panel, or module; a circuit breaker, footing, tower, pole, cross-arm, guy line, anchor, wire, control system, communications or radio relay system, safety protection facility, road, and other building, structure, fixture, machinery, equipment, appliance and item associated with or incidental to the generation, conversion, storage, switching, metering, step-up, step-down, inversion, transmission, conducting, wheeling, sale or other use or conveyance of electricity, on the Land at Date of Policy or to be built or constructed on the Land in the locations according to the Plans, that by law constitutes real property.

   f. "Evicted" or "Eviction" means (a) the lawful deprivation, in whole or in part, of the right of possession or use insured by this policy, contrary to the terms of any Lease or Easement or (b) the lawful prevention of the use of the Land or any Electricity Facility or Severable Improvement for the purposes permitted by the Lease or the Easement, as applicable, in either case as a result of a matter covered by this policy.

   g. "Lease" means each lease described in Schedule A.

   h. "Leasehold Estate" means the right of possession granted in the Lease for the Lease Term.

   i. "Lease Term" means the duration of the Leasehold Estate, as set forth in the Lease, including any renewal or extended term if a valid option to renew or extend is contained in the Lease.

   j. "Plans" means the survey, site and elevation plans or other depictions or drawings prepared by _(insert name of architect or engineer)_ dated, last revised_____,designated as _(insert name of project or project number)_ consisting of_____sheets.

   k. "Remaining Term" means the portion of the Easement Term or the Lease Term remaining after the Insured has been Evicted.

   l. "Severable Improvement" means property affixed to the Land at Date of Policy or to be affixed in the locations according to the Plans, that would constitute an Electricity Facility but for its characterization as personal property, and that by law does not constitute real property because (a) of its character and manner of attachment to the Land and (b) the property can be severed from the Land without causing material damage to the property or to the Land.

3. Valuation of Title as an Integrated Project:

   a. If in computing loss or damage it becomes necessary to value the Title, or any portion of it, as the result of an Eviction, then, as to that portion of the Land from which the Insured is Evicted, that value shall consist of (i) the value of (A) the Leasehold Estate or the Easement Interest for the Remaining Term, as applicable, (B) any Electricity Facility existing on the date of the Eviction, and, if applicable, (ii) any reduction in value of another insured Lease or Easement as computed in Section 3(b) below.

   b. A computation of loss or damage resulting from an Eviction affecting any Constituent Parcel shall include loss or damage to the integrated project caused by the covered matter affecting the Constituent Parcel from which the Insured is Evicted.

   c. The Insured Claimant shall have the right to have the Leasehold Estate, the Easement Interest, and any Electricity Facility affected by a defect insured against by this policy valued either as a whole or separately.  In either event, this determination of value shall take into account any rent or use payments no longer required to be paid for the Remaining Term.

© 2013 Chicago Title, a member of the Fidelity National Financial family of companies. | NYSE:FNF

d.   The provisions of this Section 3 shall not diminish the Insured's rights under any other endorsement to the policy; however, the calculation of loss or damage pursuant to this endorsement shall not allow duplication of recovery for loss or damage calculated pursuant to Section 8 of the Conditions or any other endorsement to the policy.

4.   Valuation of Severable Improvements:

a.   In the event of an Eviction, the calculation of the loss shall include (but not to the extent that these items of loss are included in the valuation of the Title determined pursuant to Section 8 of the Conditions or any other provision of this or any other endorsement) the diminution in value of the Insured's interest in any Severable Improvement resulting from the Eviction, reduced by the salvage value of the Severable Improvement.

b.   The policy does not insure against loss or damage (and the Company will not pay any costs, attorneys' fees or expenses) relating to:

i.    the attachment, perfection or priority of any security interest in any Severable Improvement;

ii.   the vesting or ownership of title to or rights in any Severable Improvement;

iii.  any defect in or lien or encumbrance on the title to any Severable Improvement; or

iv.   the determination of whether any specific property is real or personal in nature.

5.   Additional items of loss covered by this endorsement:

If the Insured is Evicted, the following items of loss, if applicable to that portion of the Land from which the Insured is Evicted, shall be included, without duplication, in computing loss or damage incurred by the Insured, but not to the extent that the same are included in the valuation of the Title determined pursuant to Section 3 of this endorsement, the valuation of Severable Improvements pursuant to Section 4 of this endorsement, or Section 8(a)(ii) of the Conditions.

a.   The reasonable cost of: (i) disassembling, removing, relocating and reassembling any Severable Improvement that the Insured has the right to remove and relocate, situated on the Land at the time of Eviction, to the extent necessary to restore and make functional the integrated project; (ii) transportation of that Severable Improvement for the initial one hundred miles incurred in connection with the restoration or relocation; and (iii) restoring the Land to the extent damaged as a result of the disassembly, removal and relocation of the Severable Improvement and required of the Insured solely because of the Eviction.

b.   Rent, easement payments or damages for use and occupancy of the Land prior to the Eviction that the Insured as owner of the Leasehold Estate or the Easement Interest, as applicable, may be obligated to pay to any person having paramount title to that of the lessor or the grantor in the Easement, as applicable.

c.   The amount of rent, easement payments or damages that, by the terms of the Lease or the Easement, as applicable, the Insured must continue to pay to the lessor or grantor after Eviction with respect to the portion of the Leasehold Estate or Easement Interest, as applicable, from which the Insured has been Evicted.

d.   The fair market value, at the time of the Eviction, of the estate or interest of the Insured in any lease, sublease or easement specifically permitted by the Lease or Easement, as applicable, and made by the Insured as lessor or grantor of all or part of the Leasehold Estate or Easement Interest, as applicable.

e.   Damages caused by the Eviction that the Insured is obligated to pay to lessees or sublessees or easement or subeasement grantees on account of the breach of any lease or sublease or easement or subeasement specifically permitted by the Lease or the Easement, as applicable, and made by the Insured as lessor or grantor of all or part of the Leasehold Estate or Easement Interest, as applicable.

f.   The reasonable cost to obtain land use, zoning, building and occupancy permits, architectural and engineering services and environmental testing and reviews for a replacement leasehold reasonably equivalent to the Leasehold Estate or a replacement easement reasonably equivalent to the Easement Interest, as applicable.

g.   If any Electricity Facility is not substantially completed at the time of Eviction, the actual cost incurred by the Insured up to the time of Eviction, less the salvage value, for the Electricity Facility located on that portion of the Land from which the Insured is Evicted.  Those costs include costs incurred to construct and fabricate the Electricity Facility, obtain land use, zoning, building and occupancy permits, architectural and engineering services, construction management services, environmental testing and reviews, and landscaping, and cancellation fees related to the foregoing.

6.   This endorsement does not insure against loss, damage or costs of remediation (and the Company will not pay costs, attorneys' fees, or expenses) resulting from environmental damage or contamination.

© 2013 Chicago Title, a member of the Fidelity National Financial family of companies. | NYSE:FNF

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

[Witness clause optional]

**Chicago Title Insurance Company**

By: _____
            Authorized Signatory

ALTA Endorsement Form 36-06
(Energy Project –Leasehold/Easement-Owners) (4/2/12)
©American Land Title Association

**ENDORSEMENT**

Attached to Policy No._____

Issued by

Chicago Title Insurance

Company

1.  The insurance provided by this endorsement is subject to the exclusions in Section 6 of this endorsement; and the Exclusions from Coverage, the Exceptions from Coverage contained in Schedule B, and the Conditions in the policy.

2.  For purposes of this endorsement only:

    a.  "Constituent Parcel" means one of the parcels of Land described in Schedule A that together constitute one integrated project.

    b.  "Easement" means each easement described in Schedule A.

    c.  "Easement Interest" means the right of use granted in the Easement for the Easement Term.

    d.  "Easement Term" means the duration of the Easement Interest, as set forth in the Easement, including any renewal or extended term if a valid option to renew or extend is contained in the Easement.

    e.  "Electricity Facility" means an electricity generating facility which may include one or more of the following: a substation; a transmission, distribution or collector line; an interconnection, inverter, transformer, generator, turbine, array, solar panel, or module; a circuit breaker, footing, tower, pole, cross-arm, guy line, anchor, wire, control system, communications or radio relay system, safety protection facility, road, and other building, structure, fixture, machinery, equipment, appliance and item associated with or incidental to the generation, conversion, storage, switching, metering, step-up, step-down, inversion, transmission, conducting, wheeling, sale or other use or conveyance of electricity, on the Land at Date of Policy or to be built or constructed on the Land in the locations according to the Plans, that by law constitutes real property.

    f.  "Evicted" or "Eviction" means (a) the lawful deprivation, in whole or in part, of the right of possession or use insured by this policy, contrary to the terms of any Lease or Easement or (b) the lawful prevention of the use of the Land or any Electricity Facility or Severable Improvement for the purposes permitted by the Lease or the Easement, as applicable, in either case as a result of a matter covered by this policy.

    g.  "Lease" means each lease described in Schedule A.

    h.  "Leasehold Estate" means the right of possession granted in the Lease for the Lease Term.

    i.  "Lease Term" means the duration of the Leasehold Estate, as set forth in the Lease, including any renewal or extended term if a valid option to renew or extend is contained in the Lease.

    j.  "Plans" means the survey, site and elevation plans or other depictions or drawings prepared by _(insert name of architect or engineer)_ dated, last revised_____,designated as _(insert name of project or project number)_ consisting of_____sheets.

    k.  "Remaining Term" means the portion of the Easement Term or the Lease Term remaining after the Insured has been Evicted.

    l.  "Severable Improvement" means property affixed to the Land at Date of Policy or to be affixed in the locations according to the Plans, that would constitute an Electricity Facility but for its characterization as personal property, and that by law does not constitute real property because (a) of its character and manner of attachment to the Land and (b) the property can be severed from the Land without causing material damage to the property or to the Land.

    m.  "Tenant" means the tenant under the Lease or a grantee under the Easement, as applicable, and, after acquisition of all or any part of the Title in accordance with the provisions of Section 2 of the Conditions of the policy, the Insured Claimant.

3.  Valuation of Title as an Integrated Project:

    a.  If in computing loss or damage it becomes necessary to value the Title, or any portion of it, as the result of an Eviction, then, as to that portion of the Land from which the Tenant is Evicted, that value shall consist of (i) the value of (A) the Leasehold Estate or the Easement Interest for the Remaining Term, as applicable, (B) any Electricity Facility existing on the date of the Eviction, and, if applicable, (ii) any reduction in value of another insured Lease or Easement as computed in Section 3(b) below.

    b.  A computation of loss or damage resulting from an Eviction affecting any Constituent Parcel shall include loss or damage to the integrated project caused by the covered matter affecting the Constituent Parcel from which the Insured is Evicted.

    c.  The Insured Claimant shall have the right to have the Leasehold Estate, the Easement Interest, and any Electricity Facility affected by a defect insured against by the policy valued either as a whole or separately.  In

either event, this determination of value shall take into account any rent or use payments no longer required to be paid for the Remaining Term.

d.  The provisions of this Section 3 shall not diminish the Insured's rights under any other endorsement to the policy; however, the calculation of loss or damage pursuant to this endorsement shall not allow duplication of recovery for loss or damage calculated pursuant to Section 8 of the Conditions or any other endorsement to the policy.

4.  Valuation of Severable Improvements:

a.  In the event of an Eviction, the calculation of the loss shall include (but not to the extent that these items of loss are included in the valuation of the Title determined pursuant to Section 8 of the Conditions or any other provision of this or any other endorsement) the diminution in value of the Insured's interest in any Severable Improvement resulting from the Eviction, reduced by the salvage value of the Severable Improvement.

b.  The policy does not insure against loss or damage (and the Company will not pay any costs, attorneys' fees or expenses) relating to:

i.  the attachment, perfection or priority of any security interest in any Severable Improvement;

ii.  the vesting or ownership of title to or rights in any Severable Improvement;

iii.  any defect in or lien or encumbrance on the title to any Severable Improvement; or

iv.  the determination of whether any specific property is real or personal in nature.

5.  Additional items of loss covered by this endorsement:

If the Insured acquires all or any part of the Title in accordance with the provisions of Section 2 of the Conditions of the policy and thereafter is Evicted, the following items of loss, if applicable to that portion of the Land from which the Insured is Evicted shall be included, without duplication, in computing loss or damage incurred by the Insured, but not to the extent that the same are included in the valuation of the Title determined pursuant to Section 3 of this endorsement, the valuation of Severable Improvements pursuant to Section 4 of this endorsement, or Section 8(a)(iii) of the Conditions:

a.  The reasonable cost of: (i) disassembling, removing, relocating and reassembling any Severable Improvement that the Insured has the right to remove and relocate, situated on the Land at the time of Eviction, to the extent necessary to restore and make functional the integrated project; (ii) transportation of that Severable Improvement for the initial one hundred miles incurred in connection with the restoration or relocation; and (iii) restoring the Land to the extent damaged as a result of the disassembly, removal and relocation of the Severable Improvement and required of the Insured solely because of the Eviction.

b.  Rent, easement payments or damages for use and occupancy of the Land prior to the Eviction that the Insured as owner of the Leasehold Estate or the Easement Interest, as applicable, may be obligated to pay to any person having paramount title to that of the lessor in the Lease or the grantor in the Easement, as applicable.

c.  The amount of rent, easement payments or damages that, by the terms of the Lease or the Easement, as applicable, the Insured must continue to pay to the lessor or grantor after Eviction with respect to the portion of the Leasehold Estate or Easement Interest, as applicable, from which the Insured has been Evicted.

d.  The fair market value, at the time of the Eviction, of the estate or interest of the Insured in any lease, sublease or easement specifically permitted by the Lease or Easement, as applicable, and made by the Tenant as lessor or grantor of all or part of the Leasehold Estate or Easement Interest, as applicable.

e.  Damages caused by the Eviction that the Insured is obligated to pay to lessees or sublessees or easement or subeasement grantees on account of the breach of any lease or sublease or easement or subeasement specifically permitted by the Lease or the Easement, as applicable, and made by the Tenant as lessor or grantor of all or part of the Leasehold Estate or Easement Interest, as applicable.

f.  The reasonable cost to obtain land use, zoning, building and occupancy permits, architectural and engineering services and environmental testing and reviews for a replacement leasehold reasonably equivalent to the Leasehold Estate or a replacement easement reasonably equivalent to the Easement Interest, as applicable.

g.  If any Electricity Facility is not substantially completed at the time of Eviction, the actual cost incurred by the Insured up to the time of Eviction, less the salvage value, for the Electricity Facility located on that portion of the Land from which the Insured is Evicted.  Those costs include costs incurred to construct and fabricate the Electricity Facility, obtain land use, zoning, building and occupancy permits, architectural and engineering services, construction management services, environmental testing and reviews, and landscaping, and cancellation fees related to the foregoing.

6.  This endorsement does not insure against loss, damage or costs of remediation (and the Company will not pay costs, attorneys' fees, or expenses) resulting from environmental damage or contamination.

© 2013 Chicago Title, a member of the Fidelity National Financial family of companies. | NYSE:FNF

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

[Witness clause optional]

Chicago Title Insurance Company

By: _____
　　　　Authorized Signatory

ALTA Endorsement Form 36.1-06
(Energy Project –Leasehold/Easement-Loan) (4/2/12)
©American Land Title Association

**ENDORSEMENT**

Attached to Policy No._____
Issued by
Chicago Title Insurance
Company

1. The insurance provided by this endorsement is subject to the exclusions in Section 6 of this endorsement; and the Exclusions from Coverage, the Exceptions from Coverage contained in Schedule B, and the Conditions in the policy.

2. For purposes of this endorsement only:

   a. "Constituent Parcel" means one of the parcels of Land described in Schedule A that together constitute one integrated project.

   b. "Electricity Facility" means an electricity generating facility which may include one or more of the following: a substation; a transmission, distribution or collector line; an interconnection, inverter, transformer, generator, turbine, array, solar panel, or module; a circuit breaker, footing, tower, pole, cross-arm, guy line, anchor, wire, control system, communications or radio relay system, safety protection facility, road, and other building, structure, fixture, machinery, equipment, appliance and item associated with or incidental to the generation, conversion, storage, switching, metering, step-up, step-down, inversion, transmission, conducting, wheeling, sale or other use or conveyance of electricity, on the Land at Date of Policy or to be built or constructed on the Land in the locations according to the Plans, that by law constitutes real property.

   c. "Evicted" or "Eviction" means (a) the lawful deprivation, in whole or in part, of the right of possession insured by this policy, contrary to the terms of any Lease or (b) the lawful prevention of the use of the Land or any Electricity Facility or Severable Improvement for the purposes permitted by the Lease, in either case as a result of a matter covered by this policy.

   d. "Lease" means each lease described in Schedule A.

   e. "Leasehold Estate" means the right of possession granted in the Lease for the Lease Term.

   f. "Lease Term" means the duration of the Leasehold Estate, as set forth in the Lease, including any renewal or extended term if a valid option to renew or extend is contained in the Lease.

   g. "Plans" means the survey, site and elevation plans or other depictions or drawings prepared by _(insert name of architect or engineer)_ dated, last revised_____,designated as _(insert name of project or project number)_ consisting of____sheets.

   h. "Remaining Term" means the portion of the Lease Term remaining after the Insured has been Evicted.

   i. "Severable Improvement" means property affixed to the Land at Date of Policy or to be affixed in the locations according to the Plans, that would constitute an Electricity Facility but for its characterization as personal property, and that by law does not constitute real property because (a) of its character and manner of attachment to the Land and (b) the property can be severed from the Land without causing material damage to the property or to the Land.

3. Valuation of Title as an Integrated Project:

   a. If in computing loss or damage it becomes necessary to value the Title, or any portion of it, as the result of an Eviction, then, as to that portion of the Land from which the Insured is Evicted, that value shall consist of (i) the value of (A) the Leasehold Estate for the Remaining Term, (B) any Electricity Facility existing on the date of the Eviction, and, if applicable, (ii) any reduction in value of another insured Lease as computed in Section 3(b) below.

   b. A computation of loss or damage resulting from an Eviction affecting any Constituent Parcel shall include loss or damage to the integrated project caused by the covered matter affecting the Constituent Parcel from which the Insured is Evicted.

   c. The Insured Claimant shall have the right to have the Leasehold Estate and any Electricity Facility affected by a defect insured against by this policy valued either as a whole or separately.  In either event, this determination of value shall take into account any rent no longer required to be paid for the Remaining Term.

   d. The provisions of this Section 3 shall not diminish the Insured's rights under any other endorsement to the policy; however, the calculation of loss or damage pursuant to this endorsement shall not allow duplication of recovery for loss or damage calculated pursuant to Section 8 of the Conditions or any other endorsement to the policy.

4. Valuation of Severable Improvements:

   b. In the event of an Eviction, the calculation of the loss shall include (but not to the extent that these items of loss are included in the valuation of the Title determined pursuant to Section 8 of the Conditions or any other provision of this or any other endorsement) the diminution in value of the Insured's interest in any Severable Improvement resulting from the Eviction, reduced by the salvage value of the Severable Improvement.

      b.    The policy does not insure against loss or damage (and the Company will not pay any costs, attorneys' fees or expenses) relating to:

         i.    the attachment, perfection or priority of any security interest in any Severable Improvement;

        ii.    the vesting or ownership of title to or rights in any Severable Improvement;

       iii.    any defect in or lien or encumbrance on the title to any Severable Improvement; or

       iv.    the determination of whether any specific property is real or personal in nature.

5.    Additional items of loss covered by this endorsement:

If the Insured is Evicted, the following items of loss, if applicable to that portion of the Land from which the Insured is Evicted shall be included, without duplication, in computing loss or damage incurred by the Insured, but not to the extent that the same are included in the valuation of the Title determined pursuant to Section 3 of this endorsement, the valuation of Severable Improvements pursuant to Section 4 of this endorsement, or Section 8(a)(ii) of the Conditions.

      a.    The reasonable cost of: (i) disassembling, removing, relocating and reassembling any Severable Improvement that the Insured has the right to remove and relocate, situated on the Land at the time of Eviction, to the extent necessary to restore and make functional the integrated project; (ii) transportation of that Severable Improvement for the initial one hundred miles incurred in connection with the restoration or relocation; and (iii) restoring the Land to the extent damaged as a result of the disassembly, removal and relocation of the Severable Improvement and required of the Insured solely because of the Eviction.

      b.    Rent or damages for use and occupancy of the Land prior to the Eviction that the Insured as owner of the Leasehold Estate  may be obligated to pay to any person having paramount title to that of the lessor in the Lease.

      c.    The amount of rent or damages that, by the terms of the Lease , the Insured must continue to pay to the lessor after Eviction with respect to the portion of the Leasehold Estate from which the Insured has been Evicted.

      d.    The fair market value, at the time of the Eviction, of the estate or interest of the Insured in any lease or sublease specifically permitted by the Lease and made by the Insured as lessor of all or part of the Leasehold Estate.

      e.    Damages caused by the Eviction that the Insured is obligated to pay to lessees or sublessees on account of the breach of any lease or sublease specifically permitted by the Lease and made by the Insured as lessor of all or part of the Leasehold Estate.

      f.    The reasonable cost to obtain land use, zoning, building and occupancy permits, architectural and engineering services and environmental testing and reviews for a replacement leasehold reasonably equivalent to the Leasehold Estate.

      g.    If any Electricity Facility is not substantially completed at the time of Eviction, the actual cost incurred by the Insured up to the time of Eviction, less the salvage value, for the Electricity Facility located on that portion of the Land from which the Insured is Evicted.  Those costs include costs incurred to construct and fabricate the Electricity Facility, obtain land use, zoning, building and occupancy permits, architectural and engineering services, construction management services, environmental testing and reviews, and landscaping, and cancellation fees related to the foregoing.

6.    This endorsement does not insure against loss, damage or costs of remediation (and the Company will not pay costs, attorneys' fees, or expenses) resulting from environmental damage or contamination.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

[Witness clause optional]

Chicago Title Insurance

Company


By: _____
             Authorized Signatory

ALTA Endorsement Form 36.2-06
(Energy Project –Leasehold-Owners) (4/2/12)
©American Land Title Association

© 2013 Chicago Title, a member of the Fidelity National Financial family of companies. | NYSE:FNF

**ENDORSEMENT**

Attached to Policy No._____
Issued by
Chicago Title Insurance
Company

1. The insurance provided by this endorsement is subject to the exclusions in Section 6 of this endorsement; and the Exclusions from Coverage, the Exceptions from Coverage contained in Schedule B, and the Conditions in the policy.

2. For purposes of this endorsement only:

   a. "Constituent Parcel" means one of the parcels of Land described in Schedule A that together constitute one integrated project.

   b. "Electricity Facility" means an electricity generating facility which may include one or more of the following: a substation; a transmission, distribution or collector line; an interconnection, inverter, transformer, generator, turbine, array, solar panel, or module; a circuit breaker, footing, tower, pole, cross-arm, guy line, anchor, wire, control system, communications or radio relay system, safety protection facility, road, and other building, structure, fixture, machinery, equipment, appliance and item associated with or incidental to the generation, conversion, storage, switching, metering, step-up, step-down, inversion, transmission, conducting, wheeling, sale or other use or conveyance of electricity, on the Land at Date of Policy or to be built or constructed on the Land in the locations according to the Plans, that by law constitutes real property.

   c. "Evicted" or "Eviction" means (a) the lawful deprivation, in whole or in part, of the right of possession insured by this policy, contrary to the terms of any Lease or (b) the lawful prevention of the use of the Land or any Electricity Facility or Severable Improvement for the purposes permitted by the Lease, in either case as a result of a matter covered by this policy.

   d. "Lease" means each lease described in Schedule A.

   e. "Leasehold Estate" means the right of possession granted in the Lease for the Lease Term.

   f. "Lease Term" means the duration of the Leasehold Estate, as set forth in the Lease, including any renewal or extended term if a valid option to renew or extend is contained in the Lease.

   g. "Plans" means the survey, site and elevation plans or other depictions or drawings prepared by _(insert name of architect or engineer)_ dated, last revised_____,designated as _(insert name of project or project number)_ consisting of_____sheets.

   h. "Remaining Term" means the portion of the Lease Term remaining after the Insured has been Evicted.

   i. "Severable Improvement" means property affixed to the Land at Date of Policy or to be affixed in the locations according to the Plans, that would constitute an Electricity Facility but for its characterization as personal property, and that by law does not constitute real property because (a) of its character and manner of attachment to the Land and (b) the property can be severed from the Land without causing material damage to the property or to the Land.

   j. "Tenant" means the tenant under the Lease  and, after acquisition of all or any part of the Title in accordance with the provisions of Section 2 of the Conditions of the policy, the Insured Claimant.

3. Valuation of Title as an Integrated Project:

   a. If in computing loss or damage it becomes necessary to value the Title, or any portion of it, as the result of an Eviction, then, as to that portion of the Land from which the Tenant is Evicted, that value shall consist of (i) the value of (A) the Leasehold Estate  for the Remaining Term,  (B) any Electricity Facility existing on the date of the Eviction, and, if applicable, (ii) any reduction in value of another insured Lease as computed in Section 3(b) below.

   b. A computation of loss or damage resulting from an Eviction affecting any Constituent Parcel shall include loss or damage to the integrated project caused by the covered matter affecting the Constituent Parcel from which the Insured is Evicted.

   c. The Insured Claimant shall have the right to have the Leasehold Estate and any Electricity Facility affected by a defect insured against by the policy valued either as a whole or separately. In either event, this determination of value shall take into account any rent no longer required to be paid for the Remaining Term.

   d. The provisions of this Section 3 shall not diminish the Insured's rights under any other endorsement to the policy; however, the calculation of loss or damage pursuant to this endorsement shall not allow duplication of recovery for loss or damage calculated pursuant to Section 8 of the Conditions or any other endorsement to the policy.

4. Valuation of Severable Improvements:

   c. In the event of an Eviction, the calculation of the loss shall include (but not to the extent that these items of loss are included in the valuation of the Title determined pursuant to Section 8 of the Conditions or any other

© 2013 Chicago Title, a member of the Fidelity National Financial family of companies. | NYSE:FNF

provision of this or any other endorsement) the diminution in value of the Insured's interest in any Severable Improvement resulting from the Eviction, reduced by the salvage value of the Severable Improvement.

b.   The policy does not insure against loss or damage (and the Company will not pay any costs, attorneys' fees or expenses) relating to:

    i.   the attachment, perfection or priority of any security interest in any Severable Improvement;

    ii.   the vesting or ownership of title to or rights in any Severable Improvement;

    iii.   any defect in or lien or encumbrance on the title to any Severable Improvement; or

    iv.   the determination of whether any specific property is real or personal in nature.

5.   Additional items of loss covered by this endorsement:
If the Insured acquires all or any part of the Title in accordance with the provisions of Section 2 of the Conditions of the policy and thereafter is Evicted, the following items of loss, if applicable to that portion of the Land from which the Insured is Evicted shall be included, without duplication, in computing loss or damage incurred by the Insured, but not to the extent that the same are included in the valuation of the Title determined pursuant to Section 3 of this endorsement, the valuation of Severable Improvements pursuant to Section 4 of this endorsement, or Section 8(a)(iii) of the Conditions:

a.   The reasonable cost of: (i) disassembling, removing, relocating and reassembling any Severable Improvement that the Insured has the right to remove and relocate, situated on the Land at the time of Eviction, to the extent necessary to restore and make functional the integrated project; (ii) transportation of that Severable Improvement for the initial one hundred miles incurred in connection with the restoration or relocation; and (iii) restoring the Land to the extent damaged as a result of the disassembly, removal and relocation of the Severable Improvement and required of the Insured solely because of the Eviction.

b.   Rent or damages for use and occupancy of the Land prior to the Eviction that the Insured as owner of the Leasehold Estate may be obligated to pay to any person having paramount title to that of the lessor in the Lease.

c.   The amount of rent or damages that, by the terms of the Lease , the Insured must continue to pay to the lessor after Eviction with respect to the portion of the Leasehold Estate  from which the Insured has been Evicted.

d.   The fair market value, at the time of the Eviction, of the estate or interest of the Insured in any lease or sublease specifically permitted by the Lease and made by the Tenant as lessor of all or part of the Leasehold Estate.

e.   Damages caused by the Eviction that the Insured is obligated to pay to lessees or sublessees on account of the breach of any lease or sublease specifically permitted by the Lease and made by the Tenant as lessor of all or part of the Leasehold Estate.

f.   The reasonable cost to obtain land use, zoning, building and occupancy permits, architectural and engineering services and environmental testing and reviews for a replacement leasehold reasonably equivalent to the Leasehold Estate.

g.   If any Electricity Facility is not substantially completed at the time of Eviction, the actual cost incurred by the Insured up to the time of Eviction, less the salvage value, for the Electricity Facility located on that portion of the Land from which the Insured is Evicted.  Those costs include costs incurred to construct and fabricate the Electricity Facility, obtain land use, zoning, building and occupancy permits, architectural and engineering services, construction management services, environmental testing and reviews, and landscaping, and cancellation fees related to the foregoing.

6.   This endorsement does not insure against loss, damage or costs of remediation (and the Company will not pay costs, attorneys' fees, or expenses) resulting from environmental damage or contamination.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

[Witness clause optional]  DATED:
Chicago Title Insurance Company
BY:_____
    AUTHORIZED SIGNATORY

ALTA Endorsement Form 36.3-06
(Energy Project –Leasehold-Loan) (4/2/12)
©American Land Title Association

© 2013 Chicago Title, a member of the Fidelity National Financial family of companies. | NYSE:FNF

**ENDORSEMENT**

Attached to Policy No._____
Issued by
Chicago Title Insurance Company

1. The insurance provided by this endorsement is subject to the exclusions in Section 4 of this endorsement; and the Exclusions from Coverage, the Exceptions from Coverage contained in Schedule B, and the Conditions in the policy.

2. For purposes of this endorsement only:

   a. "Covenant" means a covenant, condition, limitation or restriction in a document or instrument in effect at Date of Policy.

   b. "Electricity Facility" means an electricity generating facility that may include one or more of the following:  a substation; a transmission, distribution or collector line; an interconnection, inverter, transformer, generator, turbine, array, solar panel, or module; a circuit breaker, footing, tower, pole, cross-arm, guy line, anchor, wire, control system, communications or radio relay system, safety protection facility, road, and other building, structure, fixture, machinery, equipment, appliance and item associated with or incidental to the generation, conversion, storage, switching, metering, step-up, step-down, inversion, transmission, conducting, wheeling, sale or other use or conveyance of electricity, on the Land at Date of Policy or to be built or constructed on the Land in the locations according to the Plans, that by law constitutes real property.

   c. "Plans" means the survey, site and elevation plans or other depictions or drawings prepared by _(insert name of architect or engineer)_ dated_____, last revised_____, designated as _(insert name of project or project number)_ consisting of____sheets.

   d. "Severable Improvement" means property affixed to the Land at Date of Policy or to be affixed to the Land in the locations according to the Plans, that would constitute an Electricity Facility but for its characterization as personal property, and that by law does not constitute real property because (a) of its character and manner of attachment to the Land and (b) the property can be severed from the Land without causing material damage to the property or to the Land.

3. The Company insures against loss or damage sustained by the Insured by reason of:

   i. A violation of an enforceable Covenant by any Electricity Facility or Severable Improvement, unless an exception in Schedule B of the policy identifies  the violation;

   ii. Enforced removal of any Electricity Facility or Severable Improvement as a result of a violation of a building setback line shown on a plat of subdivision recorded or filed in the Public Records, unless an exception in Schedule B of the policy identifies the violation; or

   iii. A notice of a violation, recorded in the Public Records at Date of Policy, of an enforceable Covenant relating to environmental protection, describing any part of the Land and referring to that Covenant, but only to the extent of the violation of the Covenant referred to in that notice, unless an exception in Schedule B of the policy identifies the notice of the violation.

4. This endorsement does not insure against loss or damage (and the Company will not pay costs, attorneys' fees, or expenses) resulting from:

   a. any Covenant contained in an instrument creating a lease or easement;

   b. any Covenant relating to obligations of any type to perform maintenance, repair, or remediation on the Land; or

   c. except as provided in Section 3.c., any Covenant pertaining to environmental protection of any kind or nature, including hazardous or toxic matters, conditions, or substances.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

[Witness clause optional]
DATED:
Chicago Title Insurance Company
BY:___
AUTHORIZED SIGNATORY

ALTA Endorsement Form 36.4-06
(Energy Project –Covenants, Conditions and Restrictions-Land Under Development-Owners) (4/2/12)
©American Land Title Association

**ENDORSEMENT**

Attached to Policy No._____

Issued by

Chicago Title Insurance

Company

1.   The insurance provided by this endorsement is subject to the exclusions in Section 4 of this endorsement; and the Exclusions from Coverage, the Exceptions from Coverage contained in Schedule B, and the Conditions in the policy.

2.   For purposes of this endorsement only:

   a.   "Covenant" means a covenant, condition, limitation or restriction in a document or  instrument in effect at Date of Policy.

   b.   "Electricity Facility" means an electricity generating facility that may include one or more  of the following: a substation; a transmission, distribution or collector line; an interconnection, inverter, transformer, generator, turbine, array, solar panel, or module; a   circuit breaker, footing, tower, pole, cross-arm, guy line, anchor, wire, control system,   communications or radio relay system, safety protection facility, road, and other building,   structure, fixture, machinery, equipment, appliance and item associated with or incidental   to the generation, conversion, storage, switching, metering, step-up, step-down,   inversion, transmission, conducting, wheeling, sale or other use or conveyance of  electricity, on the Land at Date of Policy or to be built or constructed on the Land in the  locations according to the Plans, that by law constitutes real property.

   c.   "Plans" means the survey, site and elevation plans or other depictions or drawings  prepared by
 (*insert name of architect or engineer*) dated_____, last revised _____ ,designated as
 (*insert name of project or project number*) consisting of____sheets.

   d.   "Severable Improvement" means property affixed to the Land at Date of Policy or to be  affixed to the Land in the locations according to the Plans, that would constitute an  Electricity Facility but for its characterization as personal property, and that by law does  not constitute real property because (a) of its character and manner of attachment to the  Land and (b) the property can be severed from the Land without causing material  damage to the property or to the Land.

3.   The Company insures against loss or damage sustained by the Insured by reason of:

   a.   A violation of a Covenant that:

      i.   divests, subordinates, or extinguishes the lien of the Insured Mortgage;

      ii.   results in the invalidity, unenforceability, or lack of priority of the lien of the Insured  Mortgage; or

      iii.   causes a loss of the Insured's Title acquired in satisfaction or partial satisfaction of  the Indebtedness.

© 2013 Chicago Title, a member of the Fidelity National Financial family of companies. | NYSE:FNF

    b.   A violation of an enforceable Covenant by any Electricity Facility or Severable Improvement, unless an exception in Schedule B of the policy identifies the violation;

    c.   Enforced removal of any Electricity Facility or Severable Improvement, as a result of a violation of a building setback line shown on a plat of subdivision recorded or filed in the Public Records, unless an exception in Schedule B of the policy identifies the violation; or

    d.   A notice of a violation, recorded in the Public Records at Date of Policy, of an enforceable Covenant relating to environmental protection, describing any part of the Land and referring to that Covenant, but only to the extent of the violation of the Covenant referred to in that notice, unless an exception in Schedule B of the policy identifies the notice of the violation.

4.   This endorsement does not insure against loss or damage (and the Company will not pay costs, attorneys' fees, or expenses) resulting from:

    a.   any Covenant contained in an instrument creating a lease or easement;

    b.   any Covenant relating to obligations of any type to perform maintenance, repair, or remediation on the Land; or

    c.   except as provided in Section 3.d., any Covenant pertaining to environmental protection of any kind or nature, including hazardous or toxic matters, conditions, or substances.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

[Witness clause optional]

**Chicago Title Insurance Company**

By: _____
       Authorized Signatory

ALTA Endorsement Form 36.5-06
(Energy Project –Covenants, Conditions and Restrictions-Land Under Development-Loan) (4/2/12)
©American Land Title Association

**ENDORSEMENT**

Attached to Policy No._____
Issued by
Chicago Title Insurance
Company

1. The insurance provided by this endorsement is subject to the exclusions in Section 4 of this endorsement; and the Exclusions from Coverage, the Exceptions from Coverage contained in Schedule B, and the Conditions in the policy.

2. For purposes of this endorsement only:

   a. "Electricity Facility" means an electricity generating facility that may include one or more of the following:  a substation; a transmission, distribution or collector line; an interconnection, inverter,  transformer, generator, turbine, array, solar panel, or module; a circuit breaker, footing, tower, pole, cross-arm, guy line, anchor, wire, control system, communications or radio relay system, safety protection facility, road, and other building, structure, fixture, machinery, equipment, appliance and item associated with or incidental to the generation, conversion, storage, switching, metering, step-up, step-down, inversion, transmission, conducting, wheeling, sale or other use or conveyance of electricity, on the Land at Date of Policy or to be built or constructed on the Land in the locations according to the Plans, that by law constitutes real property.

   b. "Plans" means the survey, site and elevation plans or other depictions or drawings prepared by
    (*insert name of architect or engineer*)  dated_____, last revised _____, designated as
    (*insert name of project or project number*)  consisting of____sheets.

   c. "Severable Improvement" means property affixed to the Land at Date of Policy or to be affixed to the Land in the locations according to the Plans, that would constitute an Electricity Facility but for its characterization as personal property, and that by law does not constitute real property because (a) of its character and manner of attachment to the Land and (b) the property can be severed from the Land without causing material damage to the property or to the Land.

3. The Company insures against loss or damage sustained by the Insured by reason of:

   a. An encroachment of any Electricity Facility or Severable Improvement located on the Land onto adjoining land or onto that portion of the Land subject to an easement, unless an exception in Schedule B of the policy identifies the encroachment;

   b. An encroachment of an improvement located on adjoining land onto the Land at Date of Policy, unless an exception in Schedule B of the policy identifies the encroachment;

   c. Enforced removal of any Electricity Facility or Severable Improvement, as a result of an encroachment by the Electricity Facility or Severable Improvement onto any portion of the Land subject to any easement, in the event that the owners of the easement shall, for the purpose of exercising the right of use or maintenance of the easement, compel removal or relocation of the encroaching Electricity Facility or Severable Improvement; [or]

© 2013 Chicago Title, a member of the Fidelity National Financial family of companies. | NYSE:FNF

d. Damage to any Electricity Facility or Severable Improvement that is located on or encroaches onto that portion of the Land subject to an easement excepted in Schedule B, which damage results from the exercise of the right to maintain the easement for the purpose for which it was granted or reserved [; or]

[e. The coverage of Sections 3.c. and 3.d. shall not apply to the encroachments listed in Exception(s)_____of Schedule B].

4    This endorsement does not insure against loss or damage (and the Company will not pay costs, attorneys' fees, or expenses) resulting from contamination, explosion, fire, vibration, fracturing, earthquake or subsidence.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

[Witness clause optional]

**Chicago Title Insurance Company**


By: _____
        Authorized Signatory



ALTA Endorsement Form 36.6-06
(Energy Project –Encroachments) (4/2/12)
©American Land Title Association

**ASSIGNMENT OF RENTS OR LEASES**

**ALTA 37-06 (12-03-12)**

Lenders occasionally request that the loan policy insure certain recorded interests that are taken as additional security for the loan primarily secured by the Insured Mortgage. The most common additional security, other than a security interest under the Uniform Commercial Code, is an assignment of rents or leases.

This endorsement is issued to provide certain coverages with respect to a separate assignment of rents or leases shown in Schedule B, Part II of the policy. This endorsement provides insurance that the assignment of rents or leases is properly executed, and that the Public Records do not disclose any prior assignments of these same rents or leases.

These endorsements do not amend or modify any specific policy provisions, but add additional coverage to the terms of the policy.

**ENDORSEMENT**

Attached to Policy No._____
Issued by
Chicago Title Insurance
Company

1.  The insurance provided by this endorsement is subject to the Exclusions from Coverage, the Exceptions from Coverage contained in Schedule B, and the Conditions in the policy.

2.   The Company insures against loss or damage sustained by the Insured by reason of:

a. any defect in the execution of the [*Insert Title of Assignment of Rents or Leases Document*] referred to in paragraph_____[*of Part II*] of Schedule B; or

b. any assignment of the lessor's interest in any lease or leases or any assignment of rents affecting the Title and recorded in the Public Records at Date of Policy other than as set forth in any instrument referred to in Schedule B.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

[Witness clause optional]

Chicago Title Insurance Company
BY:_____

ALTA Endorsement Form 37-06
(Assignment of Rents or Leases) (12/03/12)
©American Land Title Association

**MORTGAGE TAX**

**ALTA ENDORSEMENT - FORM 38-06**

This endorsement provides coverage to the insured lender if there is a deficiency in the recordation tax paid at the time the Insured Mortgage is recorded that is subsequently paid. The endorsement provides that, if the deficiency is paid, the Company will provide coverage against the invalidity or unenforceability of the Insured Mortgage or the lack of priority of the Insured Mortgage, from the failure to pay at the time of recording any portion of the recording tax. The Company does not provide coverage if the insured lender fails to pay the recordation tax deficiency.

© 2013 Chicago Title, a member of the Fidelity National Financial family of companies. | NYSE:FNF

**ENDORSEMENT**

Attached to Policy No._____
Issued by
Chicago Title Insurance
Company

1. The insurance provided by this endorsement is subject to the exclusions in Sections 4 and 5 of this endorsement, the Exclusions from Coverage, the Exceptions from Coverage contained in Schedule B, and the Conditions in the policy.

2. For the purposes of this endorsement only, "Mortgage Tax" means a recordation, registration or related tax or charge required to be paid when the Insured Mortgage is recorded in the Public Records.

3. Upon payment of any deficiency in the Mortgage Tax, including interest and penalties, by the Insured, the Company insures against loss or damage sustained by the Insured by reason of:

    a. the invalidity or unenforceability of the lien of the Insured Mortgage as security for the Indebtedness resulting from the failure to pay, at the time of recording, any portion of the Mortgage Tax; or

    b. the lack of priority of the lien of the Insured Mortgage as security for the Indebtedness resulting from the failure to pay, at the time of recording, any portion of the Mortgage Tax.

4. The Company does not insure against loss or damage (and the Company will not pay costs, attorneys' fees, or expenses) resulting from the failure of the Insured to pay the Mortgage Tax deficiency, together with interest and penalties.

5. The Company is not liable for the payment of any portion of the Mortgage Tax, including interest or penalties

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

[Witness clause optional]

Chicago Title Insurance Company
BY:_____

ALTA Endorsement Form 38-06
(Mortgage Tax) (12/3/12)
©American Land Title Association

**POLICY AUTHENTICATION**
**ALTA 39-06 (04-02-13)**

This endorsement provides coverage to the insured lender if a policy is issued electronically, or does not have a signature which may be required by the form of policy cover used. This endorsement for the insured lender modifies the cover and Conditions 14 (c) of the Policy which requires an authentication by an authorized person. This typically would be the signature of a licensed employee or agent.

© 2013 Chicago Title, a member of the Fidelity National Financial family of companies. | NYSE:FNF

**ENDORSEMENT**

Attached to Policy No._____
Issued by
Chicago Title Insurance
Company

When the policy is issued by the Company with a policy number and Date of Policy, the Company will not deny liability under the policy or any endorsements issued with the policy solely on the grounds that the policy or endorsements were issued electronically or lack signatures in accordance with the Conditions.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

[Witness clause optional]

Chicago Title Insurance Company
BY:_____

ALTA Endorsement Form 39-06
(Policy Authentication) (4/3/13)
©American Land Title Association

Endorsements descriptions and sample forms are provided as a courtesy only. Information is deemed reliable but not guaranteed. Please contact your local Sales Executive with questions.

© 2013 Chicago Title, a member of the Fidelity National Financial family of companies. | NYSE:FNF



© 2013 Chicago Title, a member of the Fidelity National Financial family of companies. | NYSE:FNF

# EXHIBIT 3

# EXHIBIT 3



# Endorsements

## Common Endorsements requested by Residential Lenders

FORM DESCRIPTION
CLTA

*Generally, endorsements will provide additional coverage for matters which would ordinarily be excluded by the Exclusions from Coverage, or excepted from coverage either by the pre-printed exceptions, if any, or by the specific exceptions shown in Schedule B of the policy.*

*Because of this, most endorsements are not general in nature, but are specific as to items for which the insured desires coverage. Some are specifically designed for owner's policies and others for lender's policies.*

*The issuance of any endorsement is conditioned upon the circumstances surrounding the property involved, and upon the fulfillment of the underwriting criteria established by the Company.*

*The following descriptions do not define the coverage of the endorsement, which can only be determined by reading the same. This list is provided as a convenience in locating the endorsement which may fit a particular set of facts. CLTA Endorsement (with ALTA Equivalent) Numbers Available*

**100** Provides comprehensive coverage for insured ALTA lender against loss by reason of present or future CC&Rs violations, the encroachment of improvements, or by reason of surface entry for mineral development.

Endorsement provides insurance that:

1. There are no CC&Rs under which the lien of the insured mortgage can be cut off, subordinated or impaired;

2. There are no present CC&R violations on the land; and

3. Except as shown in Schedule B, there are no encroachments of improvements on the land onto adjoining land, and no encroachments of improvements on adjoining land onto the land. Endorsement insures against loss by reason of:

I . Future violations of CC&Rs which result in loss of the insured mortgage lien or title to the land if the insured lender has acquired same by foreclosure or conveyance in lieu thereof;

2. Unmarketability of title by reason of CC&R violations occurring prior to acquisition of title by the insured lender;

3. Damage to improvements which encroach on any portion of the land subject to an easement excepted in Schedule B;

4. Damage to improvements resulting from the exercise of any right to use the surface of the land

for the extraction or development of excepted minerals; and

5. Final court order or judgment requiring removal from any land adjoining the land of any encroachment shown in Schedule B.

**100.12** Provides insured lender with insurance concerning the enforceability of reverter rights found in CC&Rs.

**100.13** Provides insured ALTA lender with insurance concerning the priority of a mortgage lien over maintenance or upkeep assessment liens.

**100.18** Provides insured lender with coverage against loss by reason of the exercise or attempted exercise of reverter rights in CC&Rs.

**100.23** Provides insured ALTA lender with coverage against loss by reason of the exercise of surface rights for the extraction or development of minerals leased under oil lease.

**100.24** Provides insured ALTA lender with insurance that lessee under mineral lease does not have any right to enter on or use the surface of the land.

## FIDELITY NATIONAL TITLE

Template Copyright © 2009 EffectiveSolutions,LLC for HelpMyTitleRep.com members only

# Endorsements

100.26 Provides insured ALTA lender with coverage against loss by reason of damage to proposed or completed improvements under FHA project, resulting from the exercise of surface or subsurface rights for the extraction or development of minerals excepted from the description of the land.

100.29 Provides insured owner or lender with coverage against loss by reason of the exercise of surface rights for the extraction or development of minerals excepted from the description of the land or shown as a reservation in Schedule B.

101.2   Provides insured construction lender with coverage against loss by reason of a lack of priority of the insured mortgage over statutory liens for services, labor or material arising out of a work of improvement referred to in a recorded notice of completion.

102.4   Provides insured construction lender with insurance that the foundations of the structure under construction are within the boundaries of the land and that their location docs not violate referenced CC&Rs.

102.5   Provides insured construction lender with insurance that the foundations of the structure under construction are within the boundaries of the land, that their location does not violate referenced CC&Rs and that they do not encroach upon referenced easements. (Broader coverage than Form 102.4).

103.1   Provides insured lender with coverage against loss by reason of the exercise of the right of use or maintenance of a particular easement by the easement holder.

103.1a   Provides insured lender with against loss resulting from (1) damage to the existing improvements, including lawns, shrubbery and trees, on the land, and (2) interference with the continuing use, as presently utilized, of the existing improvements on the land, arising from a particular easement described in Schedule B.

103.3   Provides insured lender with coverage against loss by reason of the forced removal of improvements which encroach upon a particular easement which easement right is presently being exercised

103.4   Provides insured owner or lender with insurance that an insured easement affords ingress and egress to and from a specified public street.

103.7   Provides insured owner or lender with assurance that the land described in Schedule A abuts upon a specific, physically- open public street.

104.1   Provides assignee of the insured mortgage with assurance concerning (a) validity of a recorded assignment to evidence transfer of the entire beneficial interest to the named assured assignee and (b) full or partial reconveyances, modification or subordination of the insured mortgage.

108.7   Provides insured CLTA lender with coverage against loss concerning vesting of title, subsistence and priority of insured mortgage lien insofar as same secures an additional (optional) advance and increases policy liability by the amount of the advance.

108.8   Provides insured ALTA lender with coverage against loss concerning vesting of title, subsistence and priority of insured mortgage lien insofar as same secures an additional (optional) advance and increases policy liability by the amount of the advance

110.5   Provides insured ALTA lender insurance concerning proper modification of the insured mortgage, including express priority coverage.

110.9   (ALTA form 8.1) Provides insured ALTA residential lender with coverage against loss by reason of lack of priority over (a) any federal or state environmental protection lien which is recorded in the public records, except as set forth in Schedule B, and (b) any state environmental protection lien provided for by any state statute in effect at Date of Policy, except as provided for by state statutes specified in the endorsement.

111.5   (ALTA Form 6) Provides insured ALTA variable rate mortgage lender with coverage against loss by reason of (1) invalidity or unenforceability of the insured mortgage resulting from terms therein providing for changes in the rate of interest, or (2) loss of priority of the insured mortgage lien caused by the changes in the rate of interest.

111.8   (ALTA Form 6.2) Provides insured ALTA variable rate mortgage lender with coverage against changes in the rate of interest, the addition of unpaid interest to principal and/or interest on interest, or (2) loss of priority of the insured mortgage lien caused by the changes in the rate of interest, unpaid interest added to principal and/or interest on interest.

111.9   Provides insured ALTA lender with insurance concerning the priority of a mortgage lien relating to FNMA Balloon mortgage, conditional right to refinance, extension of the loan term and change in the interest rate.

111.10  (Optional Advance) Provides insured lender with coverage against (1) loss by reason of invalidity or unenforceability of the insured mortgage or of (2) loss of priority of said mortgage for the unpaid balance together with interest caused by changes in the rate of interest in

# Endorsements

accordance with the terms of a specified loan agreement. Except as to intervening matters of which the insured has actual knowledge.

111.11 (Obligatory Advance) Provides insured lender with coverage against (1) loss by reason of invalidity or unenforceability of the insured mortgage or of (2) loss of priority of said mortgage for the unpaid balance together with interest caused by changes in the rate of interest in accordance with the terms of a specified loan agreement.

115 Provides insured lender with insurance that the estate or interest covered by the policy is a condominium, in fee, and is entitled to be assessed and taxed as a separate parcel.

115.1 Provides coverage for an insured ALTA lender against loss concerning statutory compliance. Violations of CC&Rs, homeowners association charges and assessments, the separate assessment of real property taxes , encroachments and the exercise of a right of first refusal to purchase, all with respect to a condominium unit within a condominium project.

115.2 Provides coverage for an insured ALTA lender against loss concerning violations of CC&Rs, homeowners association charges and assessments, encroachments and the exercise of a right of first refusal to purchase, all with respect to a parcel of land in a planned development.

116 Provides insured ALTA lender with insurance concerning the street address of designated improvements on the land; and, with respect to the sufficiency of the policy plat to show the record location and dimensions of that land.

116.1 Provides insured lender with insurance that the land described in the policy is the same as that delineated on plat of a survey attached to and made a part of the policy.

116.2 Provides insured ALTA lender with insurance concerning the street address of designated separately-owned elements comprising pan of the insured condominium and with respect to the sufficiency of the referenced map or plan to show the exterior boundary of the condominium project as a whole.

116.7 Provides insured with insurance that the land described is a lawfully created parcel according to the California Subdivision Map Act and local ordinances adopted pursuant thereto.

122 Provides insured ALTA lender with insurance concerning obligatory advance made under the insured mortgage; liability limited to face amount of policy.

123.1 (ALTA form 3) Provides insured ALTA owner or lender with insurance concerning the zoning classification of the land and the broad, allowable use or uses under that classification.

123.2 (ALTA Form 3.I) Provides insured ALTA owner or lender with insurance concerning the zoning classification of the land, the allowable use or uses under that classification and with respect to the existing structure on the land, limited coverage concerning compliance with applicable provisions of the zoning ordinance.

124.1 Provides insured owner or lender with insurance concerning affirmative and/or negative covenants contained in a deed or agreement between landowners.

124.2 Provides insured owner or lender with insurance concerning affirmative covenants contained in a lease.

124.3 Provides insured owner or lender with insurance concerning negative covenants contained in a lease.

125 Provides coverage for the insured ALTA lender against loss by reason of a judicial determination that (a) the insured mortgage lien (or the lender's title after foreclosure) has been defeated by a valid exercise of the right of rescission conferred by the Federal Truth in Lending Act, and that (b) such right of rescission existed because neither the loan transaction nor the right of rescission there of was exempted or excepted by the provision of Regulation Z.

126.1 Provides coverage for insured CLTA owner of a one-to-four family residence against defined loss by reason of lack of a right of access, rights to liens for services, labor or material, encroachments, zoning and restrictions violations and surface entry for mineral development.

126.2 Provides coverage for insured CLTA fee owner of a residential condominium against defined loss concerning the separate assessment of taxes, lack of a right of access, rights to liens for services, labor or material, encroachments, zoning and restrictions violations and surface entry for mineral development.

# EXHIBIT 4

# EXHIBIT 4

# Future Version of the Future - The ALTA 9

AUTHOR: Douglass W. Dewing

At its 1988 convention the American Land Title Association adopted the ALTA 9, which is a comprehensive endorsement similar to a form issued by the California Land Title Association, and similar to the "Comprehensive Endorsement" issued by LTIC for use in commercial transactions. As this endorsement provides affirmative insurance over most recorded exceptions to title, it is anticipated that many lenders, especially those selling their loans in the secondary market, will request the endorsement.

The endorsement has five numbered paragraphs and several of those have numbered subparagraphs. The lender **must** request the endorsement. Some lenders may request the endorsement on all loan policies, but that request will need to go through the Virginia State Office. The endorsement should **not** be issued automatically upon the lender's request. The issuing office must closely review all relevant documents, including easements, restrictions and surveys. The Company has not decided if the endorsement will carry a separate premium.

The endorsement should be issued **only** on loan policies. Because of references to matters excepted in Schedule B, it should not be used with the ALTA Short Form Residential Loan Policy (Policy series 121-xx-xxxxxx) or LTIC's Short Form Residential Loan Policy (Policy series 117-xx-xxxxxx). The endorsement should be used **only** on residential loan policies for one-to-four family residential properties with existing improvements. It must be issued at the time the policy is issued. Due to some language which could be construed as date-down coverage, title must be examined to the date of the request if the lender asks for the endorsement after the policy has been issued. **A current physical survey is mandatory.** If the coverage of one of the paragraphs cannot be given, the paragraph may be stricken, initialed by the underwriter, and the endorsement, as amended, may then be issued.

The Company insures the owner of the indebtedness secured by the insured mortgage against loss or damage sustained by reason of:

1.  Any incorrectness in the assurance that, at Date of Policy:

    a)  There are no covenants, conditions or restrictions under which the lien of the mortgage referred to in Schedule A can be divested, subordinated or extinguished, or its validity, priority or enforceability impaired.

To give this coverage, the underwriter must review all covenants, conditions and restriction listed in the title report to determine if there is language which could result in forfeiture, reversion or other impairment. Note that other impairment is added to traditional forfeiture or reversion. This includes a provision permitting a home owners or civic association to levy an assessment, secured by a lien with priority over the insured deed of trust. Under the Property Owners Association Act, 55-508, et seq., some owners associations can levy for limited purposes, with limited super-priority.

    b)  Unless excepted in Schedule B:

1)  There are no present violations on the land of any enforceable covenants, conditions or restrictions, nor do any existing improvements on the land violated any building setback lines shown on a plat of subdivision recorded or filed in the public records.

2)  Any instrument referred to in Schedule B as containing covenants, conditions or restrictions on the land does not, in addition, (i) establish an easement on the land; (ii) provide a lien for liquidated damages; (iii) provide for a private charge or assessment; (iv) provide for an option to purchase, a right of first refusal or the prior approval of a future purchaser or occupant.

3)  There is not encroachment of existing improvements located on the land onto adjoining land, nor any encroachment onto the land of existing improvements located on adjoining land.

4)  There is no encroachment of existing improvements located on the land onto that portion of the land subject to any easement excepted in Schedule B.

Paragraphs b) 1), 3), and 4) provide assurances that there are no violations or encroachments. To provide this assurance, all restrictions and conditions must be reviewed to determine if there has been a violation. Note that this does not say we insure against damage if there is a violation, it says there are none. Encroachments will only be found on the physical survey, but remember that some physical features may be shown on plats recorded in the records.

If we will be providing coverage over the violation, the policy will need to say so. The legal staff at the branch or state office will make this determination, as in the past. Review the underwriting manual sections on Encroachments and Restrictions for preliminary guidance. The phrasing of the endorsement says the coverage is there unless there is an exception in Schedule B. This implies that an omission of the exception for an encroachment in Schedule B, coupled with this endorsement, provides the coverage. But, in that case, we won't know if we assumed the risk, or if careless underwriting was involved, when facing a claim on that risk. To make the position clear, an exception with an affirmative statement that the Company is covering the risk should appear.

Obviously, these paragraphs must be deleted if 1) no survey is submitted; 2) if you do not have copies of the restrictions or 3) there is no attorneys' certificate stating there has been no violation.

2.  Any future violation on the land of any existing covenants, conditions or restrictions occurring prior to the acquisition of title to the estate or interest in land by the insured, provided the violation results in:

a)  impairment or loss of the lien of the insured mortgage; or

b)  loss of title to the estate or interest in the land if the insured shall acquire title in satisfaction of the indebtedness secured by the insured mortgage.

This paragraph speaks only in terms of future violations of the restrictions. The underwriting for this section is comparable to that for paragraph 1(a).

3.   Damage to the existing improvements, including lawns, shrubbery or trees:

   a)   which are located on or encroach upon that portion of the land subject to any easement excepted in Schedule B, which damage results from the exercise of the right to maintain the easement for the purpose for which is was granted or reserved;

   b)   resulting from the future exercise of any right to use the surface of the land for the extraction or development of minerals excepted from the description of the land or excepted to in Schedule B.

This coverage is an extension of the coverage offered in paragraph 1(b)(4). Again, reference to the underwriting manual section on Encroachments will provide preliminary guidance. To provide affirmative coverage over encroachments, contact the legal staff.

The coverage against damage to lawns, shrubbery, or trees is extremely broad, but for our purposes, you should worry about that coverage only if the security includes such items. Examples would be orchards, vineyards, working farms, and historical properties with gardens, golf courses, and other similar properties.

Paragraph 3(b) can be given only if there is no reservation or conveyance of mineral rights. This would include oil and gas leases, coal, specific minerals or substances. If your property is being used as a borrow pit, this coverage should not be given. For exceptions or affirmative coverages, contact the legal staff.

4.   Any final court order or judgment required the removal from any land adjoining the land of any encroachment excepted in Schedule B.

This is an extension of paragraph 1(b)(3), and as in the case of future violation coverage, extends to something which will happen after the policy is issued. This provides coverage over encroachments from the insured land onto other land, including neighbors or public rights of way. There must be a physical survey, and if there are significant encroachments, the coverage must be deleted. For exceptions or affirmative coverages, contact the legal staff.

5.   Any final order or judgment denying the right to maintain any existing improvements on the land because of any violation of covenants, conditions or restrictions or building setback lines shown on a plat of subdivision recorded or filed in the public records.

This paragraph also speaks of a post-policy event, the entry of a court order denying the right to maintain the existing improvements because they violate the restrictions or setback lines. If there are any violations, or if you have not received a physical survey, then this coverage cannot be given without approval from the legal staff.

Wherever in this endorsement the words "covenants, conditions or restrictions" appear, they shall not be deemed to refer to or included the terms, covenants, conditions or limitations contained in an instrument creating a lease.

This endorsement is made a part of the policy and is subject to all the terms and provisions

1/29/2010

thereof and any prior endorsements thereto. Except to the extent expressly state, it neither modified any of terms and provisions of the policy and any prior endorsements, not does it extend the effective date of the policy and any prior endorsements, nor does it increase the face amount thereof.

These final two paragraphs limit the coverage to restrictions, which are called restrictions, and not covenants contained in a lease. The final paragraph is the standard language for endorsements intended to limit the effective date of the endorsement. Notwithstanding that language, the endorsement should not be issued for a previously issued policy without running the title current.

The following comments are my personal editorial and are not to be construed as company policy. This endorsement provides lenders with virtually every affirmative coverage they have asked for. It insures that they will suffer no loss or damage from matters which are of record and for which they have knowledge (because we told them about them). It ignores the reality of real property that people have been using and living on our land for over 300 years, and no title policy will be completely free of exceptions. It also ignores the fact that lenders receive interest payments to compensate them for their risk.

*Remember*, you are the underwriter. If you do not receive anything that you need to offer these coverages, you are entitled to, and I hope you will feel free to, delete all or any specific paragraph of coverage.

# EXHIBIT 5

# EXHIBIT 5

# ENDORSEMENT MANUAL

Foreword
Introduction
Table of Contents
CLTA/ALTA Conversion Charts

FIDELITY NATIONAL
TITLE GROUP, INC.

August 2013

**FOREWORD**

**PURPOSE OF ENDORSEMENT MANUAL**

This Endorsement Manual ("Manual") is prepared exclusively for the use of employees and agents of the Fidelity National Title Group, Inc. family of title insurance companies ("Company") which includes: Alamo Title Insurance, Chicago Title Insurance Company, Commonwealth Land Title Insurance Company, and Fidelity National Title Insurance Company.

The endorsement forms contained in the Manual are representative versions of acceptable forms generally in use.  Local practices and regulatory requirements may result in different versions of these forms.  No endorsement form, whether one contained in the Manual or any accepted version thereof in use in a particular area, should be modified at a customer's request without considering the state regulatory requirements for filing and approval of forms and discussing the request for modification with a Company underwriting advisor.

**CONFIDENTIALITY OF MANUAL**

All materials contained in the Manual are confidential communications from the Company to you.  Under no circumstances are the instructions or any other part of the Manual to be given or communicated to anyone who is not an employee or agent of the Company.  However, the endorsement forms contained in the Manual may be duplicated and given to our customers as specimen copies in order to facilitate the issuance of our title insurance policies.  Such specimen copies must clearly indicate that they are specimens through the use of the words SPECIMEN COPY or other such words.

**ISSUANCE OF ENDORSEMENTS**

No endorsement in the Manual is to be issued unless the instructions associated with that endorsement are followed or any additional instructions or conditions that may be contained in other memos or directions from the Company are complied with.  When the instructions require approval by a Company underwriting advisor, such approval must be obtained and maintained in the file.  No endorsement to a policy may be issued without compliance with applicable state insurance statutes and regulations.

Several of the endorsements in the Manual provide insurance for matters not disclosed by the public records at the date the policy is issued.  Therefore, any time the Date of Policy of a policy containing any endorsement is updated or changed, consideration must be given to whether or not the new effective date will have an unintended consequence on the insurance provided by the endorsement.  When in doubt, contact a Company underwriting advisor.

© Copyright 1999-2013 Fidelity National Title Group, Inc.  All Rights Reserved.

**TABLE OF CONTENTS**

Foreword
Introduction
CLTA/ALTA conversion charts

SECTION:

1.   Street Assessments
     ALTA Form 1-06

2.   Truth-in-Lending
     ALTA Form 2-06

3.   Zoning
     ALTA Form 3-06 (Zoning)
     ALTA Form 3.1-06 (Zoning -Completed structure)
     ALTA Form 3.2-06 (Zoning-Land Under Development)

4.   Condominium
     ALTA Form 4-06
     ALTA Form 4.1-06 (no priority over subsequent HOA assessments)

5.   Planned Unit Development
     ALTA Form 5-06
     ALTA Form 5.1-06 (no priority over subsequent HOA assessments)

6.   Variable Rate Mortgage
     ALTA Form 6-06
     ALTA Form 6.2-06 (Negative Amortization)
     ALTA Form 6.1 [old form with statute blanks]

7.   Manufactured Housing
     ALTA Form 7-06 (expands definition only)
     ALTA Form 7.1-06 (Loan Policy)
     ALTA Form 7.2-06 (Owner's Policy)

8.   Environmental Protection Lien
     ALTA Form 8.1-06
     ALTA Form 8.2-06 (Commercial)

9.   Restrictions, Encroachments, Minerals
     ALTA Form 9-06 (REM-Loan Policy)
     ALTA Form 9.1-06 (CCR-Unimproved Land-Owner's Policy)
     ALTA Form 9.2-06 (CCR-Improved Land- Owner's Policy)
     ALTA Form 9.3-06 (CCR-Loan Policy)
     ALTA Form 9.6-06 (Private Rights – Loan Policy)
     ALTA Form 9.7-06 (REM –Land under Development-Loan Policy)
     ALTA Form 9.8-06 (CCR-Land Under Development – Owners Policy)
     ALTA Form 9.9-06 (Private Rights-Owner's Policy)
     ALTA Form 9.10-06 (REM-Current violations-Loan Policy)

10.  Assignment of Mortgage
     ALTA Form 10-06
     ALTA Form 10.1-06 (With Date Down)

11.  Mortgage Modification
     ALTA Form 11-06

© Copyright 1999-2013 Fidelity National Title Group, Inc.  All Rights Reserved.

ALTA Form 11.1-06 (With Subordination)

12. Aggregation ("Tie-in")
ALTA Form 12-06 (Aggregation-Loan)
ALTA Form 12.1-06 (Aggregation-State Limits-Loan)

13. Leasehold
ALTA Form 13-06 (Owner's)
ALTA Form 13.1-06 (Loan)

14. Future Advances
ALTA Forms 14-06 (Priority)
ALTA Forms 14.1-06 (Knowledge)
ALTA Forms 14.2-06 (Letter of Credit)
ALTA Forms 14.3-06 (Reverse Mortgage)

15. Non-Imputation
ALTA Form 15-06 (Full-Equity Transfer)
ALTA Form 15.1-06 (Additional Insured)
ALTA Form 15.2-06 (Partial Equity Transfer)

16. Mezzanine Financing Endorsement
ALTA Form 16-06

17. Access and Entry
ALTA Form 17-06 (Direct)
ALTA Form 17.1-06 (Indirect)
ALTA Form 17.2-06 (Utility Access)

18. Tax Parcel
ALTA Form 18-06 (Single)
ALTA Form 18.1-06 (Multiple)[with tax sale protection]

19. Contiguity
ALTA Form 19-06 (Multiple Parcels)[within Land]
ALTA Form 19.1-06 (Single Parcel)[with property other than Land]

20. First Loss Endorsement [Contingent liability]
ALTA Form 20-06

21. Creditors' Rights
ALTA Form 21-06 (Decertified)

22. Location
ALTA Form 22-06
ALTA Form 22.1-06 (location with map)

23. Coinsurance – Single Parcel
ALTA Form 23-06

24. Doing Business
ALTA Form 24-06

25. Same as Survey
ALTA Form 25-06
ALTA Form 25.1-06 (Portion of Survey)

© Copyright 1999-2013 Fidelity National Title Group, Inc.  All Rights Reserved.

26. Subdivision
ALTA Form 26-06

27. Usury
ALTA Form 27-06

28. Easements and Encroachments
ALTA Form 28-06 (Easement -Damage or Enforced Removal)
ALTA Form 28.1-06 (Encroachments-Boundaries and Easements)
ALTA Form 28.2-06 (Encroachments-Boundaries and Easements-Described Improvements)

29. Interest Rate Swap
ALTA Form 29-06 (Direct Obligation)
ALTA Form 29.1-06 (Additional Interest)
ALTA Form 29.2-06 (Direct Obligation – Defined Amount)
ALTA Form 29.3-06 (Additional Interest – Defined Amount)

30.  Shared Appreciation Mortgage
ALTA Form 30-06  (One to Four Family )
ALTA Form 30.1-06 (Commercial Participation Interest)

31. Severable Improvements
ALTA Form 31-06

32. Construction Loan
ALTA Form 32-06 (Construction Loan –Loss of Priority)
ALTA Form 32.1-06 (Construction Loan –Loss of Priority – Direct Payment)
ALTA Form 32.2-06 (Construction Loan – Loss of Priority-Insured's Direct Payment)

33. Disbursement (*to be used in conjunction with ALTA Forms 32-06 and 32.1-06*)
ALTA Form 33-06

34. Identified Risk Coverage
ALTA Form 34-06

35. Minerals and Other Subsurface Substances
ALTA Form 35-06 (Buildings)
ALTA Form 35.1-06 (Improvements)
ALTA Form 35.2-06 (Described Improvements)
ALTA Form 35.3-06 (Land Under Development)

36. Energy Projects
ALTA Form 36-06 (Leasehold/Easement-Owners Policy)
ALTA Form 36.1-06 (Leasehold/Easement- Loan Policy)
ALTA Form 36.2-06 (Leasehold- Owners Policy)
ALTA Form 36.3-06 (Leasehold-Loan Policy)
ALTA Form 36.4-06 (CCR-Land Under Development-Owners Policy)
ALTA Form 36.5-06 (CCR-Land Under Development-Loan Policy)
ALTA Form 36.6-06 (Encroachments)

37. Assignment of Rents or Leases
ALTA Form 37-06

38. Mortgage Tax
ALTA Form 38-06

39. Policy Authentication
ALTA Form 39-06

© Copyright 1999-2013 Fidelity National Title Group, Inc.  All Rights Reserved.

**[Nos.40 through 49 have been reserved for insertion of future ALTA Endorsements.]**

50.    CLTA Endorsement 100 - Comprehensive
(Similar to ALTA Form 9)

51.    Shared Appreciation Mortgage Endorsement- Commercial
Form A – Total Sum as Policy amount
Form B – Separate Additional Insurance

52.    Share of Cash Flow (Additional Interest)

53.    Interest of Incoming Partner
Form A – for use with 2006 Policy
Form B – for use with the Former ALTA 1970(rev.84) Policy

54.    Excess Insurance Endorsement (for Use In Insuring Existing Partnership or Interest of New Partner in Existing Partnership)

55.    Option to Purchase Endorsements
Form A – Option priority primed by intervening matters
Form B – Option priority relates back

56.    Assignment of Rents Endorsement
Contained in Insured Mortgage

57.    Issuance of Future Insurance Endorsement
Form A - No pending Claims
Form B - New Construction

58.    Covenants Run with the Land [shopping center]
(Same as CLTA Endorsement No. 124.1)

59.    Revolving Credit Endorsements–Non-ALTA forms
Form A – Obligatory Advance, Majority View
Form B – Obligatory Advance, Minority View
Form C - Optional Advance, Majority View
Form D - Optional Advance, Minority View

60.    Last Dollar – for policies OTHER than ALTA 2006

61.    Tax Credit Benefit Endorsement

© Copyright 1999-2013 Fidelity National Title Group, Inc.  All Rights Reserved.

## INTRODUCTION

**What is an endorsement?**

"*A provision added to an insurance contract whereby the scope of its coverage is restricted or enlarged.*"

In order to understand what an endorsement is, we must first take a look at the underlying insurance policy. A title insurance policy is a contract of indemnity. The American Land Title Association ("ALTA") forms that we issue in the vast majority of states provide in Condition 8 of the Owners and the Loan policies:

> "This policy is a contract of indemnity against actual monetary loss or damage sustained or incurred by the Insured Claimant who has suffered loss or damage by reason of matters insured against by this policy."

We must be careful to support this definition in the construction of our endorsements. Why is this distinction so important?  In order to have our liability capped at the policy amount, the courts must determine our liability within the scope of the contract (the four corners of the instrument), under rules of contract law and not on the basis of tort liability (negligence).  In tort, the liability amounts might not be limited by the policy amount, but could be determined to be all damages, regardless of the amount of policy.  This opened ended liability is similar to what is sometimes referred to as "abstractors' liability".

A contract of indemnity, as used in our forms, insures against loss or damage occasioned by the risk we have identified. In response to a series of cases in the mid 1990's (called the "Alliance" cases) the endorsement forms were changed to conform the language to the indemnity structure of the policy. Previously, the format of some endorsements used the following style of language:

> *……any inaccuracies in the following (or previous) statements…..*

The court held that this language made the endorsements *opinions* of title and therefore subject to a law suit in tort for negligence based upon a negligent rendering of that opinion. Because the action would be held to be in tort and not in contract, the limitation on liability in the policy would not be effective.

We should be specifying the risk we will undertake, not opining on the state of facts. A way to remember this is that we do not insure the sky is blue. We insure against loss or damage

© Copyright 1999-2013 Fidelity National Title Group, Inc.  All Rights Reserved.

occasioned by the sky not being blue. It may be difficult to see the difference at first. But the policies themselves are written in the same indemnity language:

> "SUBJECT TO THE EXCLUSIONS FROM COVERAGE, THE EXCEPTIONS FROM COVERAGE CANTAINED IN SCHEDULE B AND THE CONDITIONS…[The Company] insures….against loss or damage, ….sustained or incurred by the Insured by reason of:"

The Covered Risks then listed are written in the indemnity language form:

> "1. Title being vested other than as stated in Schedule A"

We don't insure "title is vested as shown"; we insure against loss if title is not vested as shown, (vested in a different manner than is shown). Sometimes this language looks "negative" at first glance. But once again, it is important to utilize this language in endorsements to conform to the policy structure.

If you come across old endorsement language, or are requested to issue an endorsement utilizing that old format – DON'T USE IT!  Please discuss any such form or request with the Company's underwriting advisor.

**ALTA Policies**

In most states we issue policies that are promulgated by the American Land Title Association (usually referred to as ALTA).  This is the national professional organization for our industry.  Not all states issue ALTA policies.  In California, they also issue the CLTA (or California Land Title Association) forms. Texas, New Mexico and New York also issue their own type of policy.  Some states, such as Florida and Pennsylvania, issue ALTA Policies, but issue only a few of the hundreds of endorsements that are available nationwide. This manual contains forms that were prepared for use with the ALTA policy forms. Some endorsements were written by ALTA; they are designated as such and are located in the first part of the manual.  Each title company also writes its own endorsements which are sometimes referred to as "proprietary" or "non-ALTA" forms. These are shown after the ALTA form sections.

© Copyright 1999-2013 Fidelity National Title Group, Inc.  All Rights Reserved.

**Loan Policy vs. Owners Policy Endorsements**

As you look through the manual, you will see that some endorsement forms are available ONLY for Loan Policies, some ONLY for Owners Policies and some for both. There are usually more endorsements available for the lender because the risk is different than for an owner.

The equity an owner has in a piece of property is a buffer we benefit from when we insure the lender. In other words, if there is a loss, and the loss does not exceed the equity, the lender is not affected. The owner is harmed from dollar one of the loss, so the odds of there being a loss from any specific risk is always greater for an owner.

In addition, in order to prove a loss, the lender might have to go through foreclosure and not get sufficient proceeds to cover its debt, AND the loss has to be based on the title issue, not other economic market factors. That type of loss is harder to prove than the owners' loss. That is why one of the first questions the underwriter asks when discussing coverage requests is what type of policy is being issued. They need this information to assess the risk properly, again, because they are different risks.


**Rates and Forms**

The Forms contained in this manual are the standard forms that have been approved generally for use. If you are located in a state that has a forms filing requirement, you must verify that these forms have been filed for use. Some forms may have been modified in order to be filed. You must use the appropriate form filed for your state instead of the form shown here, if that is an issue for your state.

Rates are usually based upon the risk assumed, the work involved to analyze that risk and the market.

There are four approaches used throughout the country for the filing of rates and forms which the Company is subject to: Promulgated; Rating Bureaus; Filing required; No filing required.

In promulgated states, rates and forms are created legislatively, and are usually set forth in a state's Administrative Code. All companies issuing title insurance in promulgated states must adhere to the rates set forth in the Code and usually must use the forms prescribed by the Code. The three promulgated states are Florida, New Mexico and Texas. New Mexico and Texas prescribe all forms that must be used. Florida prescribes many forms, particularly endorsements, but title insurers may also individually file their own forms.

© Copyright 1999-2013 Fidelity National Title Group, Inc.  All Rights Reserved.

A Rating Bureau is comprised of a consortium of Title Insurers that, pursuant to statute, are permitted to set rates and, in most cases, prescribe forms for use in a particular state. All rates set by, and forms prescribed by, a rating bureau must be filed with and approved by the state agency that regulates the title insurance industry. The eight rating bureau states are Delaware, Louisiana, New Jersey, New York, North Carolina, Ohio, Oregon and Pennsylvania. All rating bureaus permit the filing of "additional" rates and forms by individual title insurers that are in addition to those filed by the rating bureau. Unless an "additional" rate or form is being used, all title insurers must charge the rates and use the forms created by the rating bureau.

Many states require that rates and/or forms be filed with and approved by the state agency that regulates the title insurance industry. Some states require that both rates and forms be filed, while others only require that rates or forms be filed. In all instances where a rate or form is required to be filed, title insurers must use the rate and/or form filed in that state. In a state that requires rates, but not forms, to be filed title insurers may not issue any title insurance products until there is a rate filed for those products. Conversely, in states that require forms to be filed, but not rates, no title insurance products can be issued until the applicable form has been filed. In all cases where a filing is required, the filed rate and/or form must be supported by the underwriter's filed rate manual.

A handful of states do not require that any rates or forms be filed. These states include District of Columbia, Illinois, Indiana, Massachusetts, Mississippi and Oklahoma. Even though filings are not required in these states, some have published rate manuals which must be followed when determining rates to be used and forms to be issued. Some of the states publish rates on a local or regional basis, which published rates should be followed when issuing title insurance products. Each underwriter in the non-filed states has a prescribed set of forms which are intended for use by all operations.

Questions about the application of rates or approved forms in any of the states should be discussed with the Company's underwriting advisor.

*REMEMBER:* We are prohibited from discussing or setting rates between companies outside of a Rating Bureau.  Rates may or may not be the same between companies.

© Copyright 1999-2013 Fidelity National Title Group, Inc.  All Rights Reserved.

***SAMPLE ENDORSEMENT*:**

ENDORSEMENT

**_A_**    Attached to and forming a part of

Policy of Insurance No. _____(File no_____)

Issued By

[FNTG BRAND] TITLE INSURANCE COMPANY

**_B_**

**_C_**

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls.  Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

**_D_**

Dated:

**_E_**    [FNTG BRAND] TITLE INSURANCE COMPANY

_____

**_F_**    Authorized signatory

**A**: Identify the policy

**B**: Describe the coverage

**C**: Integration or "boilerplate" clause

**D**: Date endorsement is issued, NOT the effective date of the coverage, unless specifically defined as such (see ALTA 10 and ALTA 11). If the endorsement is issued contemporaneously with the policy, it may be dated with the effective Date of Policy.

**E**: Identify Company

**F**: Signed by licensed agent or authorized party.

© Copyright 1999-2013 Fidelity National Title Group, Inc.  All Rights Reserved.

**Uses**

As was mentioned at the beginning of this introduction, an endorsement can be used to restrict or enlarge coverage. Most commonly they are to *increase* coverage, either by identifying additional risks assumed or deleting a limiting provision, such as an exception or exclusion. A caution on using an endorsement to decrease coverage: the endorsement may be easily removed from the policy. The policy might then be offered up as giving coverage where none was meant. An example - endorsing a commitment to add an exception such as an additional easement not contained in the original commitment. If the party issuing the final policy did not have or know about the endorsement, the policy would be issued without the additional exception, and this mistake could be carried forward in the future. The current insured buyer might be found to have had knowledge of the matter and be bound by it, but perhaps not its lender (if they had not seen the endorsement) and presumably not a future buyer.

A good rule of thumb is to use an endorsement to increase liability; amend the commitment or policy to decrease the liability. An endorsement reducing the Amount of Insurance after the claims process would be an exception to this rule.

**Drafting Endorsements Not Included in This Manual**

There are many instances in which the Company will agree to assume specific liability for matters not covered by any of the sample endorsements included within this manual. Where appropriate, for those endorsements containing affirmative insurance that we want to extend only after a court determination ( as opposed to giving the coverage against an assertion of an interest or challenge to the title before an action is commenced, as we sometimes may be willing to do) the following format is preferred:

> *The Company insures the Insured against loss or damage that the Insured shall sustain by reason of the entry of a final, non-appealable order or judgment finding ……*

 If you are an Agent, any requests for this type of coverage must be discussed with your Company underwriting advisor.

Return to Table of Contents

© Copyright 1999-2013 Fidelity National Title Group, Inc.  All Rights Reserved.

## CLTA to ALTA ENDORSEMENT CONVERSION CHART AS OF 04-02-13

| CLTA | ALTA | Description | Adoption (Rev.) |
|---|---|---|---|
| | 38-06 | Mortgage Tax | 12-03-12 |
| | 1-06 | Street Assessments | 6-17-06 |
| (100.2.6-06) | 9.6-06 | Private Rights - Loan | 04-02-13 |
| (100.2.7-06) | 9.7-06 | Restrictions, Encroachments, Minerals – Land under Development-Loan | 04-02-12 |
| (100.2.8-06) | 9.8-06 | Covenants, Conditions and Restrictions-Land under Development-Owners | 04-02-12 (Tech. Correction 12-3-12) |
| 100.10-06 | 9.2-06 | Covenants, Conditions and Restrictions (Owner's Policy - Improved Land) | (04-02-12) |
| **100.2.10-06** | **9.10-06** | **Restrictions, Encroachments, Minerals – Current Violations - Loan** | **(04-02-13)** |
| 100.2.1-06 | 9.3-06 | Covenants, Conditions and Restrictions-Loan | (04-02-12) |
| 100.2.2-06 | 9.4-06 | Restrictions, Encroachments, Minerals-Future Improvements re Minerals Extraction– OP-Unimproved Land | Withdrawn 04-02-12) |
| 100.2.3-06 | 9.5-06 | Restrictions, Encroachments, Minerals –Future Improvements re Minerals Extraction- OP– Improved Land | (Withdrawn 04-02-12) |
| **100.2.9-06** | **9.9-06** | **Private Rights – Owner's** | **(04-02-13)** |
| 100.2-06 | 9-06 | Restrictions, Encroachments & Minerals-Loan | (04-02-12) |
| 100.9-06 | 9.1-06 | Covenants, Conditions and Restrictions (Owner's Policy - Unimproved Land) | (04-02-12) |
| 103.1-06 | 28-06 | Easement – Damage or Enforced Removal | 02-03-10 |
| 103.11-06 | 17-06 | Access and Entry | 6-17-06 |
| 103.12-06 | 17.1-06 | Indirect Access and Entry | 6-17-06 |
| 103.13-06 | 17.2-06 | Utility Access | 10-16-08 |
| 103.14-06 | 28.1-06 | Encroachments-Boundaries and Easements | 04-02-12 |
| **103.15-06** | **28.2-06** | **Encroachments-Boundaries and Easements – Described Improvements** | **04-02-13** |
| 104.12-06 | 10-06 | Assignment of Mortgage | (02-03-10) |
| 104.13-06 | 10.1-06 | Assignment and Date Down | (02-03-10) |
| **104.6-06** | **37-06** | **Assignment of Rents or Leases** | **12-03-12** |
| 110.11.1-06 | 11.1-06 | Mortgage Modification with Subordination | 10-22-09 |
| 110.11-06 | 11-06 | Mortgage Modification | 6-17-06 |
| 110.9.1-06 | 8.2-06 | Commercial Environmental Protection Lien | 10-16-08 |
| 110.9-06 | 8.1-06 | Environmental Protection Lien | 6-17-06 |
| 111.14.1-06 | 14.1-06 | Future Advance-Knowledge [See Note for ALTA 14] | (02-03-11) |
| 111.14.2-06 | 14.2-06 | Future Advance-Letter of Credit [See Note for ALTA 14] | (02-03-11) |
| 111.14.3 -06 | 14.3-06 | Future Advance-Reverse Mortgage [See Note for ALTA 14] | (02-03-11) (Tech. Correction 12-3-12) |
| 111.14-06 | 14-06 | Future Advance-Priority [Note: Version A gives ML Coverage: Version B Does Not] | (02-03-11) |
| 111.5-06 | 6-06 | Variable rate | (10-16-08) |
| 111.8-06 | 6.2-06 | Variable Rate - Negative Amortization | (10-16-08) |
| 114.3-06 | 23-06 | Co-Insurance – Single Policy (01-01-08) | 10-16-08 |
| 115.1-06 | 4-06 | Condominium | (02-03-10) |
| 115.2-06 | 5-06 | Planned Unit Development | (02-03-10) |
| 115.3-06 | 4.1-06 | Condominium (for NV & HI not CA) | (10-16-08) |
| 115.4-06 | 5.1-06 | Planned Unit Development (for NV & HI not CA) | (10-16-08) |
| 116.01-06 | 22-06 | Location | 6-17-06 |
| 116.02-06 | 22.1-06 | Location & Map | 6-17-06 |
| 116.1.2-06 | 25.1-06 | Same as Portion of Survey | 10-16-08 |
| 116.1-06 | 25-06 | Same as Survey | 10-16-08 |
| 116.4.1-06 | 19-06 | Contiguity-Multiple Parcels | 6-17-06 |
| 116.4-06 | 19.1-06 | Contiguity-Single Parcel | 6-17-06 |
| 116.5. 1-06 | 7.1-06 | Manufactured Housing Unit-Conversion; Loan | 6-17-06 |
| 116.5. 2-06 | 7.2-06 | Manufactured Housing Unit-Conversion; Owner's | 6-17-06 |
| 116.5-06 | 7-06 | Manufactured Housing Unit | 6-17-06 |
| 116.8-06 | 26-06 | Subdivision | 10-16-08 |
| **117.1-06** | **12.1-06** | **Aggregation – State Limits – Loan** | **04-02-13** |
| **117-06** | **12-06** | **Aggregation - Loan** | **(04-02-13)** |
| 119.5-06 | 13-06 | Leasehold – Owner's | 04-02-12 |
| 119.6-06 | 13.1-06 | Leasehold – Loan | 04-02-12 |
| 123.1-06 | 3-06 | Zoning – Unimproved Land | 6-17-06 |
| 123.2-06 | 3.1-06 | Zoning – Improved Land | (10-22-09) |

© Copyright 1999-2013 Fidelity National Title Group, Inc.  All Rights Reserved.

| 123.3-06 | 3.2-06 | Zoning – Land Under Development (OP or LP) | 04-02-12 (Tech. Correction 12-3-12) |
|---|---|---|---|
| 125-06 | 2-06 | Truth in Lending | 6-17-06 |
| 127.1-06 | 15.1-06 | Non-imputation-Additional Insured [Owner's Policy Only] | 6-17-06 |
| 127.2-06 | 15.2-06 | Non-imputation-Partial Equity Transfer [Owner's Policy Only] | 6-17-06 |
| 127-06 | 15-06 | Non-imputation-Full Equity Transfer [Owner's Policy Only] | 6-17-06 |
| 128-06 | 16-06 | Mezzanine Financing [Owner's Policy Only] | 6-17-06 |
| 129.1-06 | 18.1-06 | Multiple Tax Parcels | 6-17-06 |
| 129-06 | 18-06 | Single Tax Parcel | 6-17-06 |
| 130-06 | 20-06 | First Loss-(Multiple Parcels) Transaction [Loan Policy Only] | 6-17-06 |
| 131-06 | 21-06 | Creditors' Rights (Decertification effective 03-08-10) | 6-17-06 |
| 132-06 | 27-06 | Usury | 10-16-08 |
| 133-06 | 24-06 | Doing Business | 10-16-08 |
| 134.1-06 | 29.1-06 | Interest Rate SWAP-Additional Interest | 02-03-10 |
| 134.2-06 | 29.2-06 | Interest Rate SWAP-Direct Obligation – Defined Amount | 08-01-11 |
| 134.3-06 | 29.3-06 | Interest Rate SWAP-Additional Interest – Defined Amount | 08-01-11 |
| 134-06 | 29-06 | Interest Rate SWAP-Direct Obligation | 02-03-10 |
| 135.1-06 | 30.1-06 | Commercial Participation Interest | 08-01-12 |
| 135-06 | 30-06 | Shared Appreciation Mortgage | 07-26-10 |
| 136-06 | 31-06 | Severable Improvements | 02-03-11 |
| **137.1-06** | **32.1-06** | **Construction Loan – Loss of Priority – Direct Payment** | **(04-02-13)** |
| **137.2-06** | **32.2-06** | **Construction Loan – Loss of Priority – Insured's Direct Payment** | **(04-02-13)** |
| 137-06 | 32-06 | Construction Loan – Loss of Priority | 02-03-11 |
| 138-06 | 33-06 | Disbursement Endorsement | 02-03-11 |
| 139-06 | 34-06 | Identified Risk Coverage | 08-01-11 |
| 140.1-06 | 35.1-06 | Minerals and Other Subsurface Substances-Described Improvements –OP or LP | 04-02-12 |
| 140.2-06 | 35.2-06 | Minerals and Other Subsurface Substances-Improvements- OP or LP_ | 04-02-12 |
| 140.3-06 | 35.3-06 | Minerals and Other Subsurface Substances-Land Under Development-OP or LP | 04-02-12 |
| 140-06 | 35-06 | Minerals and Other Subsurface Substances – Buildings-OP or LP | 04-02-12 |
| 141.1-06 | 36.1-06 | Energy Project-Leasehold/Easement-LP | 04-02-12 |
| 141.2-06 | 36.2-06 | Energy Project-Leasehold-OP | 04-02-12 |
| 141.3-06 | 36.3-06 | Energy Project-Leasehold-LP | 04-02-12 |
| 141.4-06 | 36.4-06 | Energy Project- CC and Rs- Land Under Development-OP | 04-02-12 |
| 141.5-06 | 36.5-06 | Energy Project- CC and Rs- Land Under Development-LP | 04-02-12 |
| 141.6-06 | 36.6-06 | Energy Project-Encroachments- LP or OP | 04-02-12 |
| 141-06 | 36-06 | Energy Project-Leasehold/Easement-OP | 04-02-12 |
| **142-06** | **39-06** | **Policy Authentication** | **04-02-13** |

CLTA to ALTA Endorsement Conversion Chart (Rev. 04-02-13)

Return to Table of Contents

© Copyright 1999-2013 Fidelity National Title Group, Inc.  All Rights Reserved.

*ALTA to CLTA ENDORSEMENT CONVERSION CHART AS OF 04-02-13*

| ALTA | CLTA | Description | Adoption (Rev.) |
|------|------|-------------|-----------------|
| 1-06 | | Street Assessments | 6-17-06 |
| 2-06 | 125-06 | Truth in Lending | 6-17-06 |
| 3-06 | 123.1-06 | Zoning – Unimproved Land | 6-17-06 |
| 3.1-06 | 123.2-06 | Zoning – Improved Land | (10-22-09) |
| 3.2-06 | 123.3-06 | Zoning – Land Under Development (OP or LP) | 04-02-12 (Tech. Correction 12-3-12) |
| 4-06 | 115.1-06 | Condominium | (02-03-10) |
| 4.1-06 | 115.3-06 | Condominium (for NV & HI not CA) | (10-16-08) |
| 5-06 | 115.2-06 | Planned Unit Development | (02-03-10) |
| 5.1-06 | 115.4-06 | Planned Unit Development (for NV & HI not CA) | (10-16-08) |
| 6-06 | 111.5-06 | Variable rate | (10-16-08) |
| 6.2-06 | 111.8-06 | Variable Rate - Negative Amortization | (10-16-08) |
| 7-06 | 116.5-06 | Manufactured Housing Unit | 6-17-06 |
| 7.1-06 | 116.5. 1-06 | Manufactured Housing Unit-Conversion; Loan | 6-17-06 |
| 7.2-06 | 116.5. 2-06 | Manufactured Housing Unit-Conversion; Owner's | 6-17-06 |
| 8.1-06 | 110.9-06 | Environmental Protection Lien | 6-17-06 |
| 8.2-06 | 110.9.1-06 | Commercial Environmental Protection Lien | 10-16-08 |
| 9-06 | 100.2-06 | Restrictions, Encroachments & Minerals-Loan | (04-02-12) |
| 9.1-06 | 100.9-06 | Covenants, Conditions and Restrictions (Owner's Policy - Unimproved Land) | (04-02-12) |
| 9.2-06 | 100.10-06 | Covenants, Conditions and Restrictions (Owner's Policy - Improved Land) | (04-02-12) |
| 9.3-06 | 100.2.1-06 | Covenants, Conditions and Restrictions-Loan | (04-02-12) |
| 9.4-06 | 100.2.2-06 | Restrictions, Encroachments, Minerals-Future Improvements re Minerals Extraction– OP-Unimproved Land | Withdrawn 04-02-12) |
| 9.5-06 | 100.2.3-06 | Restrictions, Encroachments, Minerals –Future Improvements re Minerals Extraction- OP– Improved Land | (Withdrawn 04-02-12) |
| 9.6-06 | (100.2.6-06) | Private Rights - Loan | 04-02-12 |
| 9.7-06 | (100.2.7-06) | Restrictions, Encroachments, Minerals – Land under Development-Loan | 04-02-12 |
| 9.8-06 | (100.2.8-06) | Covenants, Conditions and Restrictions-Land under Development-Owners | 04-02-12 (Tech. Correction 12-3-12) |
| **9.9-06** | **100.2.9-06** | **Private Rights – Owner's** | **(04-02-13)** |
| **9.10-06** | **100.2.10-06** | **Restrictions, Encroachments, Minerals – Current Violations - Loan** | **(04-02-13)** |
| 10-06 | 104.12-06 | Assignment of Mortgage | (02-03-10) |
| 10.1-06 | 104.13-06 | Assignment and Date Down | (02-03-10) |
| 11-06 | 110.11-06 | Mortgage Modification | 6-17-06 |
| 11.1-06 | 110.11.1-06 | Mortgage Modification with Subordination | 10-22-09 |
| **12-06** | **117-06** | **Aggregation - Loan** | **(04-02-13)** |
| **12.1-06** | **117.1-06** | **Aggregation – State Limits – Loan** | **04-02-13** |
| 13-06 | 119.5-06 | Leasehold – Owner's | 04-02-12 |
| 13.1-06 | 119.6-06 | Leasehold – Loan | 04-02-12 |
| 14-06 | 111.14-06 | Future Advance-Priority [Note: Version A gives ML Coverage: Version B Does Not] | (02-03-11) |
| 14.1-06 | 111.14.1-06 | Future Advance-Knowledge [See Note for ALTA 14] | (02-03-11) |
| 14.2-06 | 111.14.2-06 | Future Advance-Letter of Credit [See Note for ALTA 14] | (02-03-11) |
| 14.3-06 | 111.14.3 -06 | Future Advance-Reverse Mortgage [See Note for ALTA 14] | (02-03-11) (Tech. Correction 12-3-12) |
| 15-06 | 127-06 | Non-imputation-Full Equity Transfer [Owner's Policy Only] | 6-17-06 |
| 15.1-06 | 127.1-06 | Non-imputation-Additional Insured [Owner's Policy Only] | 6-17-06 |
| 15.2-06 | 127.2-06 | Non-imputation-Partial Equity Transfer [Owner's Policy Only] | 6-17-06 |
| 16-06 | 128-06 | Mezzanine Financing [Owner's Policy Only] | 6-17-06 |
| 17-06 | 103.11-06 | Access and Entry | 6-17-06 |
| 17.1-06 | 103.12-06 | Indirect Access and Entry | 6-17-06 |
| 17.2-06 | 103.13-06 | Utility Access | 10-16-08 |
| 18-06 | 129-06 | Single Tax Parcel | 6-17-06 |
| 18.1-06 | 129.1-06 | Multiple Tax Parcels | 6-17-06 |
| 19-06 | 116.4.1-06 | Contiguity-Multiple Parcels | 6-17-06 |
| 19.1-06 | 116.4-06 | Contiguity-Single Parcel | 6-17-06 |
| 20-06 | 130-06 | First Loss-(Multiple Parcels) Transaction [Loan Policy Only] | 6-17-06 |
| 21-06 | 131-06 | Creditors' Rights (Decertification effective 03-08-10) | 6-17-06 |
| 22-06 | 116.01-06 | Location | 6-17-06 |

© Copyright 1999-2013 Fidelity National Title Group, Inc.  All Rights Reserved.

| 22.1-06 | 116.02-06 | Location & Map | 6-17-06 |
| 23-06 | 114.3-06 | Co-Insurance – Single Policy (01-01-08) | 10-16-08 |
| 24-06 | 133-06 | Doing Business | 10-16-08 |
| 25-06 | 116.1-06 | Same as Survey | 10-16-08 |
| 25.1-06 | 116.1.2-06 | Same as Portion of Survey | 10-16-08 |
| 26-06 | 116.8-06 | Subdivision | 10-16-08 |
| 27-06 | 132-06 | Usury | 10-16-08 |
| 28-06 | 103.1-06 | Easement – Damage or Enforced Removal | 02-03-10 |
| 28.1-06 | 103.14-06 | Encroachments-Boundaries and Easements | 04-02-12 |
| **28.2-06** | **103.15-06** | **Encroachments-Boundaries and Easements – Described Improvements** | **04-02-13** |
| 29-06 | 134-06 | Interest Rate SWAP-Direct Obligation | 02-03-10 |
| 29.1-06 | 134.1-06 | Interest Rate SWAP-Additional Interest | 02-03-10 |
| 29.2-06 | 134.2-06 | Interest Rate SWAP-Direct Obligation – Defined Amount | 08-01-11 |
| 29.3-06 | 134.3-06 | Interest Rate SWAP-Additional Interest – Defined Amount | 08-01-11 |
| 30-06 | 135-06 | Shared Appreciation Mortgage | 07-26-10 |
| 30.1-06 | 135.1-06 | Commercial Participation Interest | 08-01-12 |
| 31-06 | 136-06 | Severable Improvements | 02-03-11 |
| 32-06 | 137-06 | Construction Loan – Loss of Priority | 02-03-11 |
| **32.1-06** | **137.1-06** | **Construction Loan – Loss of Priority – Direct Payment** | **(04-02-13)** |
| **32.2-06** | **137.2-06** | **Construction Loan – Loss of Priority – Insured's Direct Payment** | **(04-02-13)** |
| 33-06 | 138-06 | Disbursement Endorsement | 02-03-11 |
| 34-06 | 139-06 | Identified Risk Coverage | 08-01-11 |
| 35-06 | 140-06 | Minerals and Other Subsurface Substances – Buildings-OP or LP | 04-02-12 |
| 35.1-06 | 140.1-06 | Minerals and Other Subsurface Substances-Described Improvements –OP or LP | 04-02-12 |
| 35.2-06 | 140.2-06 | Minerals and Other Subsurface Substances-Improvements- OP or LP_ | 04-02-12 |
| 35.3-06 | 140.3-06 | Minerals and Other Subsurface Substances-Land Under Development-OP or LP | 04-02-12 |
| 36-06 | 141-06 | Energy Project-Leasehold/Easement-OP | 04-02-12 |
| 36.1-06 | 141.1-06 | Energy Project-Leasehold/Easement-LP | 04-02-12 |
| 36.2-06 | 141.2-06 | Energy Project-Leasehold-OP | 04-02-12 |
| 36.3-06 | 141.3-06 | Energy Project-Leasehold-LP | 04-02-12 |
| 36.4-06 | 141.4-06 | Energy Project- CC and Rs- Land Under Development-OP | 04-02-12 |
| 36.5-06 | 141.5-06 | Energy Project- CC and Rs- Land Under Development-LP | 04-02-12 |
| 36.6-06 | 141.6-06 | Energy Project-Encroachments- LP or OP | 04-02-12 |
| **37-06** | **104.6-06** | **Assignment of Rents or Leases** | **12-03-12** |
| **38-06** | | **Mortgage Tax** | **12-03-12** |
| **39-06** | **142-06** | **Policy Authentication** | **04-02-13** |

ALTA to CLTA Endorsement Conversion Chart (Rev. 04-02-13)
Prepared by Paul Flores

Return to Table of Contents

© Copyright 1999-2013 Fidelity National Title Group, Inc.  All Rights Reserved.

ENDORSEMENT MANUAL – Fidelity National Title Group, Inc.                    SECTION 1

**Return to Table of Contents**

**STREET ASSESSMENTS**

**ALTA ENDORSEMENT - FORM 1-06**

**PURPOSE**

The repair and maintenance of public streets is either contracted for by a governmental body or done directly by government employees.   The property owners adjoining the streets or in the generally benefited area are usually assessed the costs of the work on some basis.   The governmental body is almost universally given a lien to secure the payment of this assessment.

This endorsement is concerned with the priority of that lien if the improvements are either in process or completed at the Date of Policy.  If this lien is prior to the lien of the Insured Mortgage and the assessments are not paid by the borrower, the lender will have to pay them in order to stop a tax foreclosure.   This endorsement covers the loss or damage which the lender may sustain by having to pay the assessments which have gained priority over the Insured Mortgage. Whether the assessment lien has priority at the Date of Policy or gains that priority later is immaterial.  This endorsement covers the lender in either event.

**SECTION OF THE POLICY AMENDED BY ENDORSEMENT**

This endorsement is incorporated into the terms of the ALTA Loan Policy in use in some states, particularly in the West.   Those policies contain the note that they include "ALTA Form 1 Coverage."  The instructions set out below should be followed when issuing such a policy form or the Form 1-06 endorsement.

**BASIS FOR PROVIDING COVERAGE**

This endorsement may be issued to all ALTA Loan Policies under the following circumstances:

1.      Access to the Land is by a private easement and the land or easement does not adjoin a public street or generally benefited area.

2.      At Date of Policy, there are no street improvements under construction or recently completed which could generate a later assessment lien.

3.      The Insured Mortgage is recorded prior to the commencement of work on new subdivision streets or other streets adjoining the Land or in the generally benefited area.

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

4.      All street improvements are currently complete and you have determined that the assessments for them have been fully paid.

5.      The lien securing the street assessments attaches to the title to the Land after the Insured Mortgage is recorded and does not relate back to a prior point in time.  While this is a possibility, it is very unlikely.  The law usually gives governmental units assessment liens the same priority as real estate tax liens.  Therefore, before proceeding on this basis, you must obtain the approval of the Company's underwriting adviser.

You must obtain the approval of the Company's underwriting adviser to issue this endorsement on any basis other than as specified above.

**MODIFICATION**

In the event that modification of an endorsement is requested, it is necessary to consider your state regulatory requirements for filing and approval of forms.  If the endorsement is modified, the endorsement is not an ALTA form and should not reference ALTA in the title.  You must obtain the approval of the Company's underwriting adviser before complying with any request for a modification.

Return to Table of Contents

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

**ENDORSEMENT**

Attached to Policy No._____
Issued by
[FNTG BRAND]


        The Company insures against loss or damage sustained by the Insured by reason of the lack of priority of the lien of the Insured Mortgage over the lien of any assessments for street improvements under construction or completed at Date of Policy.


        This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.


[Witness Clause Optional]


DATED:

[FNTG BRAND]

BY: _____
        AUTHORIZED SIGNATORY


ALTA Endorsement Form 1-06
(Street Assessments) (6/17/06)
© American Land Title Association

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

**Return to Table of Contents**

## TRUTH IN LENDING
## ALTA ENDORSEMENT - FORM 2-06

### PURPOSE

This endorsement is for loan policies only.  It provides insurance against some losses the Insured may suffer if the borrower exercises a right of rescission under Regulation Z of the Federal Truth in Lending Act.  To be covered, the loss would have to come from a termination of the mortgage lien or the voiding of the Title of a mortgagee who acquired it in a proper foreclosure or workout.

### SECTION OF THE POLICY AMENDED BY ENDORSEMENT

This endorsement amends Exclusions from Coverage No. 5 of the ALTA Loan Policy.   This section eliminates the policy coverage for enforceability of the Insured Mortgage if enforceability is denied because of usury, or violation of any consumer credit protection or truth-in-lending law.

### BASIS FOR PROVIDING COVERAGE

**This endorsement is not to be issued on the basis of the lender's compliance with Regulation Z.**  It is to be issued only if the transaction is <u>not covered</u> by the regulation.  For our purposes, this includes only transactions in which:

The borrower is a corporation, partnership or governmental unit; or

The loan is for **non-agricultural** business or commercial purposes.

**CAUTION**:  LOANS SECURED BY OWNER OCCUPIED SINGLE FAMILY DWELLINGS CAN NEVER BE CONSIDERED LOANS FOR COMMERCIAL PURPOSES.

You must obtain the authority of the Company's underwriting adviser before honoring any request to issue this endorsement in any case not specified above.

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

ENDORSEMENT MANUAL – Fidelity National Title Group, Inc.                    **SECTION 2**

**MODIFICATION**

In the event that modification of an endorsement is requested, it is necessary to consider your state regulatory requirements for filing and approval of forms.  If the endorsement is modified, the endorsement is not an ALTA form and should not reference that in the title.  You must obtain the approval of the Company's underwriting adviser before complying with any request for a modification.

Return to Table of Contents

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

**ENDORSEMENT**
Attached to Policy No._____
Issued by
[FNTG BRAND]

The Company insures against loss or damage sustained by the Insured by reason of:

any final judgment of a court of competent jurisdiction that either the lien of the Insured Mortgage has been terminated or the Title of an Insured, who has acquired all or any part of the Land by foreclosure, trustee's sale, conveyance in lieu of foreclosure, or other legal manner, which discharges the lien of the Insured Mortgage, has been defeated by a valid exercise of the right of rescission conferred by the Federal Truth-in-Lending Act and that the right or rights of rescission existed because neither the credit transaction evidenced by the Insured Mortgage nor the right of rescission was exempted or excepted by the provisions of Regulation Z (12 CFR 226).

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

[Witness Optional]

DATED:

[FNTG BRAND]

BY: _____
        AUTHORIZED SIGNATORY

ALTA Endorsement Form 2-06
(Truth in Lending) (6/17/06)
© American Land Title Association.

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

ENDORSEMENT MANUAL – Fidelity National Title Group, Inc.                    **SECTION 3**

Return to Table of Contents

**ZONING**

**ALTA ENDORSEMENT - FORMS 3-06, 3.1-06 and 3.2-06**

**CAUTION:**    ZONING INSURANCE CONSTITUTES AN EXTRA HAZARDOUS RISK. THEREFORE, NO ZONING ENDORSEMENT IS TO BE ISSUED WITHOUT THE EXPRESS AUTHORIZATION OF THE COMPANY'S UNDERWRITING ADVISER.

**PURPOSE**

These forms carefully select certain zoning issues for coverage.  They do not provide unlimited zoning insurance.

**ALTA Endorsement Form 3-06 (Zoning-Unimproved Land)**

This endorsement provides insurance with respect to the zoning classification covering the Land and the uses permitted on the Land in that zone.  It also insures against loss if any of those uses are prohibited by a court order that invalidates the zoning ordinance.  However, it does not insure against losses suffered because the Land can't be sold or mortgaged due to any zoning problem. This endorsement is appropriate for both vacant and improved land.

**ALTA Endorsement 3.1-06 (Zoning-Completed Structure)**

This endorsement provides the same coverage as Endorsement Form 3-06, above, and is subject to the same limitations.  It also insures against losses from court orders which:

>    Prohibit use of the Land for specified purposes allowed by the zoning because certain physical characteristics of the Land violate the ordinance; and

>    Require removal or modification of the structure located on the Land due to these violations.

This endorsement is issued for policies covering improved property.

**ALTA Endorsement 3.2-06 (Zoning – Land Under Development)**

This endorsement became effective on April 2, 2012 and extends the coverage available in the Endorsement Form 3.1-06. That coverage, previously only available for Land which contained

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

existing improvements, can now be given for Land on which proposed buildings are to be built or constructed, if the proposed building is built or constructed according to site and elevation plans identified therein.

This endorsement is issued for policies covering property upon which improvements are to be built or constructed. *[a technical correction to the language was made by ALTA 12-3-2012]*

## SECTION OF THE POLICY AMENDED BY THE ENDORSEMENT

These endorsements amend Exclusions from Coverage No. 1 (a) of the ALTA Owner's and Loan Policies.  Use with other policy versions must be approved by your Company's underwriting advisor.

## BASIS FOR PROVIDING COVERAGE

**CAUTION:**  A CERTIFICATE FROM A ZONING OR PLANNING AUTHORITY OR A LETTER FROM A MUNICIPALITY, A SO-CALLED MUNI-LETTER, IS **NOT** A SUFFICIENT BASIS FOR ANY DETERMINATION TO BE MADE BELOW.  THESE LETTERS DO NOT ESTOP THE AUTHORITY OR MUNICIPALITY IF THEY ARE INCORRECT.  FURTHERMORE, THEY DO NOT COVER CONSTITUTIONALITY CONCERNS OR SPOT ZONING PROBLEMS.

1.      We must determine the zone designation in which the Land lies from the **most recent, official** zoning maps.

        All of the endorsements require this designation to be inserted in the space provided at paragraph No. 1(a) [for Forms 3-06 and 3.1-o6] or 2(a) [for Form 3.2-06].

        The Land must fall clearly within the boundaries of the zone designation.  If the scale of the maps is too small, or the maps are too unclear to make this determination accurately, you must be able to determine it by the legal description in the ordinance or resolution, if it contains such a description.  Otherwise, we will not provide the insurance.

2.      We must be satisfied that the zoning ordinance or resolution is valid before these endorsements may be issued.

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

This requirement can be satisfied by an attorney's opinion from an attorney **skilled in zoning matters.**  This opinion must meet the following requirements:

a.       It must either be written to us or the attorney must give us a letter authorizing us to rely on it for the purposes of our zoning insurance.

b.       It must cover at least the following matters:

>    The constitutionality of the zoning ordinance or resolution under the federal and state constitutions.

>    The compliance with all state laws in the process of the adoption of the ordinance or resolution with respect to the land being insured.

>    This includes, but is not limited to, an analysis of the following matters: (1) The propriety of notices for the hearing on the zoning change; (2) the compliance of the hearing with state "open meeting" or "sunshine" laws; (3) the presence of a quorum of the necessary officials; (4) the approval of the necessary majority of officials at that meeting; (5) the approval of any other officials or public bodies which may be necessary; (6) the recordation or filing of the ordinances with the county recorder or other body, if necessary; and (7) the expiration of all periods of appeal without appeal being taken.

c.       It must also address the susceptibility of the ordinance to attack because it constitutes spot zoning, contract zoning, or zoning which violates some public policy, such as zoning excluding the elderly.

Frequently, the Company's underwriting advisor will undertake to determine these matters.  If this is the case, no separate attorney's opinion will be required.  You should check with the underwriting adviser on this issue prior to requiring an attorney's opinion. In special situations such as newly enacted zoning, newly annexed property and in certain areas such as Washington, D.C., (and other areas of the Northeast) an opinion letter may still be necessary.  Some areas have zoning that is extremely complex, requiring special expertise.

3.       We must determine the likelihood of an attack on the zoning we are asked to insure.

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

This requires an assessment of the compatibility of the uses permitted under the ordinance or resolution with the use being made of the surrounding land.  Therefore, we must be informed by a reliable source of the public sentiment concerning the project. The number of persons objecting at the hearing to the imposition of the zoning, who they represented and the nature of their complaints are some indications of public sentiment. This factor is more critical in the case of newly changed zoning than where the zoning has been long standing.

4.    We must determine the uses permitted as a matter of right in the zone from the **most recent, official** zoning ordinances or resolutions.

If we issue Endorsement Form 3-06 or 3.1-06, these uses will be inserted in the space provided at the end of paragraph no. 1b of the forms.  If we issue Endorsement Form 3.2-06, these uses will be inserted in the space provided at the end of paragraph no. 2b of the form. When the uses are inserted, they must be inserted **exactly in the form in which they are set forth in the ordinance or resolution.**

Interpretation of the designated uses can be extremely dangerous.  For example, if the ordinance allows the use of the Land for "shopping centers," and the customer intends to build a department store on the property, you are not to insert "department stores" into the endorsement, but rather use the words "shopping centers" contained in the ordinance.

Requests for coverage of **conditional uses** must be approved by the Company's underwriting adviser on a case by case basis and require adjustment of the language of the endorsements.

5.    If the Endorsement Form 3.1-06 is requested, the following additional requirements must be met:

An analysis of the zoning ordinance or resolution, and of the site and elevation plans identified in paragraph 1b, to determine any restrictions, with respect to the following matters:

- Area, width or depth of the Land as a building site for the structure constructed on it.
- Floor space area of the structures on the Land.

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

- Setback requirements for the structures on the Land.
- Height of the structures on the Land.
- Number of parking spaces striped.

If the ordinance or resolution contains any or all such restrictions, then we will require a current accurate survey from a reputable surveyor which includes the representation of any such matter in order to evaluate compliance with the restrictions.

It is not possible to say categorically just what the survey must contain.  For example, whether the Land contains sufficient area for the Improvements may depend upon more than just its area and the floor space of the building. Among other issues, parking, open space and landscaping requirements may also have to be considered.

6. If the Endorsement Form 3.2-06 is requested, the following additional requirements must be met:

An analysis of the zoning ordinance or resolution, and of the site and elevation plans identified in paragraph 1b, to determine any restrictions, with respect to the following matters:

- Area, width or depth of the Land as a building site for the Improvements to be built or constructed on it.
- Floor space area of the proposed Improvements on the Land.
- Setback requirements for the proposed Improvements on the Land.
- Height of the proposed Improvements on the Land.
- Number of parking spaces to be striped.

If the ordinance or resolution contains any or all such restrictions, then we will require the site and elevation plans identified in paragraph 1 (b) which must contain the same elements as those in a current, accurate survey, in order to evaluate compliance with the restrictions.

It is not possible to say categorically just what the Plans must contain.  For example, whether the Land contains sufficient area for the proposed Improvements may depend upon more than just its area and the floor space of the building. Among other issues, parking, open space and landscaping requirements may also have to be considered.

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

Occasionally, you may receive requests to cover matters in addition to those above.  Requests to cover compliance with parking "requirements" are common, but not acceptable. We can count the number of spaces, but we do not want to analyze whether the spaces themselves are proper dimensions or include sufficient handicap spots.  Coverage requests for conditional uses and non-conforming uses are also frequent, but, as mentioned before, the language of the endorsements must be changed to accommodate those issues.  Before responding to such a request, you should contact the Company's underwriting advisor.

**MODIFICATION**

In the event that modification of an endorsement is requested, it is necessary to consider your state regulatory requirements for filing and approval of forms. If the endorsement is modified, the endorsement may not be considered an ALTA form and should not reference ALTA in the title. You must obtain the approval of the Company's underwriting advisor before complying with any request for a modification.

Return to Table of Contents

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

**ENDORSEMENT**

Attached to Policy No._____
Issued by
[FNTG BRAND]

1.        The Company insures against loss or damage sustained by the Insured in the event that, at Date of Policy,

          a.        According to applicable zoning ordinances and amendments, the Land is not classified Zone *[FILL IN]*;

          b.        The following use or uses are not allowed under that classification:

          *[FILL IN]*

2.        There shall be no liability under this endorsement based on

          a.        Lack of compliance with any conditions, restrictions, or requirements contained in the zoning ordinances and amendments, including but not limited to the failure to secure necessary consents or authorizations as a prerequisite to the use or uses.  This paragraph 2.a. does not modify or limit the coverage provided in Covered Risk 5.

          b.        The invalidity of the zoning ordinances and amendments until after a final decree of a court of competent jurisdiction adjudicating the invalidity, the effect of which is to prohibit the use or uses.

          c.        The refusal of any person to purchase, lease or lend money on the estate or interest covered by this policy.

This endorsement is issued as part of the policy.  Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy or (iv) increase the Amount of Insurance.  To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls.  Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements to it.

[Witness Optional]

DATED:

[FNTG BRAND]

BY: _____
          AUTHORIZED SIGNATORY

ALTA Endorsement Form 3-06
(Zoning – Unimproved Land) (6/17/06)
©American Land Title Association

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

**ENDORSEMENT**
Attached to Policy No._____
Issued by
[FNTG BRAND]

1.   The Company insures against loss or damage sustained by the Insured in the event that, at Date of Policy,

    a.   according to applicable zoning ordinances and amendments, the Land is not classified Zone FILL IN;

    b.   the following use or uses are not allowed under that classification:
        FILL IN

    c.   There shall be no liability under paragraph 1.b. if the use or uses are not allowed as the result of any lack of compliance with any conditions, restrictions, or requirements contained in the zoning ordinances and amendments, including but not limited to the failure to secure necessary consents or authorizations as a prerequisite to the use or uses.  This paragraph 1.c. does not modify or limit the coverage provided in Covered Risk 5.

2.   The Company further insures against loss or damage sustained by the Insured by reason of a final decree of a court of competent jurisdiction either prohibiting the use of the Land, with any existing structure, as specified in paragraph 1.b. or requiring the removal or alteration of the structure, because, at Date of Policy, the zoning ordinances and amendments have been violated with respect to any of the following matters:

    a.   Area, width, or depth of the Land as a building site for the structure
    b.   Floor space area of the structure
    c.   Setback of the structure from the property lines of the Land
    d.   Height of the structure, or
    e.   Number of parking spaces.

3.   There shall be no liability under this endorsement based on:

    a.   the invalidity of the zoning ordinances and amendments until after a final decree of a court of competent jurisdiction adjudicating the invalidity, the effect of which is to prohibit the use or uses;

    b.   the refusal of any person to purchase, lease or lend money on the Title covered by this policy.

This endorsement is issued as part of the policy.  Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy or (iv) increase the Amount of Insurance.  To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls.  Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements to it.
[Witness Optional]

DATED:
[FNTG BRAND]
BY: _____
       AUTHORIZED SIGNATORY

ALTA Endorsement Form 3.1-06
(Zoning-Completed Structure) (rev. 10/22/09)
©American Land Title Association

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

**ENDORSEMENT**

**Attached to Policy No. _____**

**Issued by**

***[FNTG BRAND]***

1. For purposes of this endorsement:
   a. "Improvement" means a building, structure, road, walkway, driveway, curb, subsurface utility or water well existing at Date of Policy or to be built or constructed according to the Plans that is or will be located on the Land, but excluding crops, landscaping, lawns, shrubbery, or trees.

   b. "Plans" means those site and elevation plans made by [*name of architect or engineer*] dated ____, last revised _____, designated as [*name of project*] consisting of ___sheets.

2. The Company insures against loss or damage sustained by the Insured in the event that, at Date of Policy
   a. according to applicable zoning ordinances and amendments, the Land is not classified Zone _____;

   b. the following use or uses are not allowed under that classification:

   c. There shall be no liability under paragraph 2.b. if the use or uses are not allowed as the result of any lack of compliance with any condition, restriction, or requirement contained in the zoning ordinances and amendments, including but not limited to the failure to secure necessary consents or authorizations as a prerequisite to the use or uses.  This paragraph 2.c. does not modify or limit the coverage provided in Covered Risk 5.

3. The Company further insures against loss or damage sustained by the Insured by reason of a final decree of a court of competent jurisdiction either prohibiting the use of the Land, with any existing Improvement, as specified in paragraph 2.b. or requiring the removal or alteration of the Improvement, because of a violation of the zoning ordinances and amendments in effect at  Date of Policy with respect to any of the following matters:
   a.         Area, width, or depth of the Land as a building site for the Improvement

   b.         Floor space area of the Improvement

   c.         Setback of the Improvement from the property lines of the Land

   d.         Height of the Improvement, or

   e.         Number of parking spaces.

4. There shall be no liability under this endorsement based on:
   a. the invalidity of the zoning ordinances and amendments until after a final decree of a court of competent jurisdiction adjudicating the invalidity, the effect of which is to prohibit the use or uses;

   b. the refusal of any person to purchase, lease or lend money on the Title covered by this policy.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

[Witness clause optional]

**[FNTG BRAND]**

**By: _____**

        **Authorized Signatory**

ALTA Endorsement Form 3.2-06
(Zoning-Land Under Development) (4/2/12)
©American Land Title Association

*[includes technical correction of 12-3-12]*

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

ENDORSEMENT MANUAL – Fidelity National Title Group, Inc.                                    **SECTION 4**

**Return to Table of Contents**

**CONDOMINIUM**
**ALTA ENDORSEMENT FORMS 4-06 and 4.1-06**

**PURPOSE**

These endorsements provide affirmative insurance to mortgage lenders loaning on the security of condominium units.  There are seven matters selected for insurance in these endorsements. Some of them would be covered by the policy without these endorsements but they are stated anyway to facilitate the sale of mortgage loans in the secondary market. The ALTA 4.1-06 differs from the ALTA 4-06 only in that there is no insurance of priority over future assessments in paragraph 4 of the endorsement. Thus, the 4.1-06 is appropriate for use in states where insured second mortgages do not have priority, or where first mortgages are primed by certain assessments. The ALTA 4.1-06 is also the appropriate form to be used with an Owners Policy.

This endorsement is designed to be issued **only** after considering the relevant aspects of the condominium project in which the unit exists.  If the requirements presented below cannot be met, you must either decline to issue this endorsement or offer to issue a modified version deleting one or more insuring clauses.

**SECTION OF THE POLICY AMENDED BY ENDORSEMENT**

No specific section of the policy is amended by these endorsements; however additional affirmative coverages are added.

**BASIS FOR PROVIDING COVERAGE**

Insuring Paragraph Nos. 1 and 2 insure against loss if the unit is not part of a condominium regime or if Title to the unit is affected by any failure of the condominium documents to comply with applicable statutes.

**First**, the project must comply with all requirements of the condominium statutes in the state where it is located, including meeting all statutory requirements for form and content for the declaration, plat and any other required instruments or processes.

**Second**, the insured unit must be properly identified in the declaration and on the plat or map so as to be included within the project.

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

Insuring Paragraph No. 3 insures against loss from the violation of covenants or restrictions contained in the condominium documents or the existence of rights of reverter or powers of termination in those documents.

**First**, the condominium declaration must not contain any provisions for the reversion of Title due to violation of the covenants contained in it.  Similarly, no power of termination must exist. To determine this, you must be sure that all of the restraints against use of the premises are in the form of covenants rather than conditions.   A declaration violates this requirement if it contains any statement that the unit is owned "on the condition that" certain acts not occur. Similarly, provisions that the unit may be owned "as long as" certain conditions exist or certain events do not occur should be viewed as violating this requirement.

**Second**, you must determine that there are no existing violations of covenants by the unit owner which affect the unit, the common elements, or any other physical improvements which are subject to the declaration.  A lender acquiring the unit in a foreclosure will suffer a loss if it has to spend money correcting these problems. Examples would be the removal of walls within the unit contrary to the provisions of the declaration, and the unauthorized modification of balconies which constitute limited common elements.  You are authorized to rely on an affidavit from the unit owner that no such unauthorized modifications exist where you are issuing the endorsement to a loan policy on **a residential condominium unit.**  You should consult with the Company's underwriting adviser where a commercial condominium is involved.

Insuring Paragraph No. 4 is where the two endorsements differ. In many states a properly imposed HOA assessment can have super lien priority, which means that it might be treated like the lien for taxes, and have priority over subsequently filed mortgages, or it might be inchoate or "hidden" like a mechanic's or construction lien and the priority of the assessment could date back to the passing of a resolution by the board approving work to be done or an assessment to be imposed, even though the contracts or actual assessments come later.

The ALTA 4-06 insures against loss if the assessment liens of the condominium association have priority over the lien of the Insured Mortgage. **In order to provide this coverage the declaration or state law must provide that the lien of the mortgage to be insured is prior to the lien for unpaid condominium assessments.**  In most cases the declaration or state law will provide that only a **first** mortgage lender's lien is superior to the association's lien for charges assessed after the recording of the mortgage or deed of trust. In such cases, a second or lower priority lender would not be protected from assessment liens, and the 4-06 could not

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

be given. In those situations you would need to issue the 4.1-06, which merely insures there are no liens *due and unpaid* on Date of Policy. The 4.1-06 is also the endorsement form to be used with an Owner's Policy.

To issue the ALTA 4.1-06, you must determine that all charges or assessments provided for in the condominium statutes and condominium documents, which are due, have been paid.  If there is a ground lease or recreation lease which the unit owner or association is obligated to pay, you must determine that all charges are current.

Insuring Paragraph No. 5 insures against loss if the condominium unit is not a separate parcel from all other units for real estate tax purposes.  If it is not a separate parcel, the payment of taxes which would otherwise discharge the tax lien on the unit and its share of the common elements each year will not do so.  An ensuing tax foreclosure would require payment of the taxes on the entire project in order to prevent the owner from losing title to the unit and the lender from losing its mortgage lien.  Moreover, the lender's ownership of the unit upon a foreclosure would leave the lender with the recurring problem of making payment of taxes due on the entire project in order to keep its unit.

**First**, the law of the state in which the condominium is located **must** provide for the separate taxation of all condominium units.  This is the usual case.  However, if the law does not so provide, then paragraph 5 must be deleted.

**Second**, you must determine that the local tax assessor is, in fact, assessing each unit in the condominium project as a separate tax parcel.

Insuring Paragraph No. 6 insures against loss because of both currently existing encroachments and those which may be unintentionally created in the future.  The problem of present encroachments results from the construction of the improvements after the filing of the declaration. If the structures are not built exactly in the places shown on the map, there can be an encroachment of common elements into the space provided for airspace units, and vice versa.  The conventional sort of encroachment of improvements over easements or over the property line can also result.

The future encroachment problem would result from the rebuilding of the condominium project after a fire or other casualty.  If the new structures are not built precisely where the map shows they should be, an encroachment into the airspace of one or more unit owners can result.  The units might also encroach into areas provided for common elements.

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

The declaration must provide an easement for any projection of units onto common elements, or common elements into units.  This provision must be effective for both present problems and those which may arise in the future from rebuilding, expansion or alteration.

As to the ordinary kinds of encroachments noted above, you must have an adequate survey or inspection which shows no such problems exist.  If they do, you should modify the coverage of the endorsement so as to take exception to them.  One way to do this would be to raise exceptions for these matters in Schedule B, Part I of the policy and note on the endorsement that this paragraph is subject to those exceptions.

Insuring Paragraph No. 7 covers the right of first refusal which is often contained in condominium projects.  If the right is properly exercised, it may defeat the Title of a borrower who had not procured a waiver or relinquishment.  This, in turn, might extinguish the lien of the Insured Mortgage.

There must either be **no provision** in any of the condominium documents for a right of first refusal or you must require and receive a **proper waiver or relinquishment** of it before insuring the transaction.  If a waiver or relinquishment is involved, you must be sure it comes from the proper party or parties.  The waiver by the condominium association should not be relied on to accomplish a waiver by the unit owners, if the right runs in their favor.

**MODIFICATION**

In the event that modification of an endorsement is requested, it is necessary to consider your state regulatory requirements for filing and approval of forms. If the endorsement is modified, the endorsement is not an ALTA form and should not reference ALTA in the title.  You must obtain the approval of the Company's underwriting adviser before complying with any request for a modification.

Return to Table of Contents

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

**ENDORSEMENT**

Attached to Policy No. _____

**Issued By**
**[FNTG BRAND]**

The Company insures against loss or damage sustained by the Insured by reason of:

1.      The failure of the unit identified in Schedule A and its common elements to be part of a condominium within the meaning of the condominium statutes of the jurisdiction in which the unit and its common elements are located.

2.      The failure of the documents required by the condominium statutes to comply with the requirements of the statutes to the extent that such failure affects the Title to the unit and its common elements.

3.      Present violations of any restrictive covenants that restrict the use of the unit and its common elements and that are contained in the condominium documents or the forfeiture or reversion of Title by reason of any provision contained in the restrictive covenants. As used in this paragraph 3, the words "restrictive covenants" do not refer to or include any covenant, condition, or restriction (a) relating to obligations of any type to perform maintenance, repair, or remediation on the Land, or (b) pertaining to environmental protection of any kind or nature, including hazardous or toxic matters, conditions, or substances, except to the extent that a notice of a violation or alleged violation affecting the Land has been recorded in the Public Records at Date of Policy and is not excepted in Schedule B.

4.      The priority of any lien for charges and assessments provided for in the condominium statutes and condominium documents at Date of Policy over the lien of any Insured Mortgage identified in Schedule A.

5.      The failure of the unit and its common elements to be entitled by law to be assessed for real property taxes as a separate parcel.

6.      Any obligation to remove any improvements that exist at Date of Policy because of any present encroachments or because of any future unintentional encroachment of the common elements upon any unit or of any unit upon the common elements or another unit.

7.      The failure of the Title by reason of a right of first refusal to purchase the unit and its common elements that was exercised or could have been exercised at Date of Policy.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

[Witness clause optional]
[FNTG BRAND]

BY: _____

ALTA Endorsement Form 4-06
(Condominium) (Rev. 02/03/10)
©American Land Title Association

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

**ENDORSEMENT**

Attached to Policy No. _____

**Issued By**
**[FNTG BRAND]**

The Company insures against loss or damage sustained by the Insured by reason of:

1.      The failure of the unit identified in Schedule A and its common elements to be part of a condominium within the meaning of the condominium statutes of the jurisdiction in which the unit and its common elements are located.

2.      The failure of the documents required by the condominium statutes to comply with the requirements of the statutes to the extent that such failure affects the Title to the unit and its common elements.

3.      Present violations of any restrictive covenants that restrict the use of the unit and its common elements and that are contained in the condominium documents or the forfeiture or reversion of Title by reason of any provision contained in the restrictive covenants.  As used in this paragraph 3, the words "restrictive covenants" do not refer to or include any covenant, condition, or restriction (a) relating to obligations of any type to perform maintenance, repair, or remediation on the Land, or (b) pertaining to environmental protection of any kind or nature, including hazardous or toxic matters, conditions, or substances, except to the extent that a notice of a violation or alleged violation affecting the Land has been recorded in the Public Records at Date of Policy and is not excepted in Schedule B.

4.      Any charges or assessments provided for in the condominium statutes and condominium documents due and unpaid at Date of Policy.

5.      The failure of the unit and its common elements to be entitled by law to be assessed for real property taxes as a separate parcel.

6.      Any obligation to remove any improvements that exist at Date of Policy because of any present encroachments or because of any future unintentional encroachment of the common elements upon any unit or of any unit upon the common elements or another unit.

7.      The failure of the Title by reason of a right of first refusal to purchase the unit and its common elements which was exercised or could have been exercised at Date of Policy.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

[Witness clause optional]
[FNTG BRAND]

BY: _____

ALTA Endorsement Form 4.1-06
(Condominium) (Rev. 10/16/08)
©American Land Title Association

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

ENDORSEMENT MANUAL - Fidelity National Title Group, Inc.                    **SECTION 5**

**Return to Table of Contents**

**PLANNED UNIT DEVELOPMENT**

**ALTA ENDORSEMENT FORMS 5-06 and 5.1-06**

**PURPOSE**

These endorsements provide affirmative coverage for lenders loaning on the security of units in a Planned Unit Development, or PUD. While designed for policies on individual residences in PUDs, they can be used in any situation where a homeowners association agreement or other type of master agreement is recorded. Affirmative coverage is provided against loss caused by violation of restrictions or by the existence of certain kinds of restrictions. In addition, both cover loss from enforced removal of buildings by reason of encroachments and from failure of Title caused by the exercise of any right of first refusal. The ALTA 5-06 insures against loss from lack of priority of the mortgage lien over the lien for homeowners' association assessments. The ALTA 5.1-06 differs in that there is no insurance of priority over future assessments in Paragraph 2 of the 5.1-06; instead it only covers unpaid assessments at date of policy.  In that regard, the 5.1-06 is appropriate for use where the agreement or applicable law do not allow insurance of priority of the Insured Mortgage. The ALTA 5.1-06 is also the appropriate form for use with an Owners Policy.

**SECTION OF THE POLICY AMENDED BY ENDORSEMENT**

The provisions of these endorsements expand coverage of the policies as described below. The coverages do overlap coverages afforded in the CLTA 100 and ALTA Endorsement Series 9.

**BASIS FOR PROVIDING COVERAGE**

<u>Insuring Clause No. 1</u> provides coverage against loss resulting from violation of restrictive covenants affecting the Land.  It also covers the lender against loss because covenants exist which would cause a forfeiture of the Title if violated.  **This latter coverage is effective whether or not the violation occurs.**  It is designed to cover losses by the lender if the loan cannot be sold due to the existence of such a covenant.

The coverage of this clause may be given only where one or more of the following circumstances exist:

1.        No covenant, condition or restriction appears in your title examination; **<u>or</u>**

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

2.      Any covenant or restriction which does appear does not contain any provision for reversion of Title or any power to terminate the Title upon violation;

**and** one or more of the following circumstances exists:

a.      None of the covenants or restrictions are enforceable under state or federal laws. **CAUTION: Extra-Hazardous Risk** is involved and you **must receive the approval of the Company's underwriting adviser** to use this as the basis of issuance **in any case other than covenants, conditions or restrictions based on race, color, religion, sex, handicap, familial status, or national origin.**

b.      The covenants and restrictions provide that the kind of mortgage lien you are insuring is protected against the effect of any violation.  NOTE:  MOST OFTEN, ONLY FIRST MORTGAGE LIENS ARE PROTECTED.

c.      The covenants or restrictions relate only to physical characteristics of the property or improvements on it and you have an adequate **current** survey or inspection which discloses there are no violations.

IF YOU FIND ANY **CONDITIONS** IN YOUR EXAMINATION OF TITLE, YOU MUST NOT ISSUE THIS ENDORSEMENT unless the condition is based upon race, color, religion, sex, handicap, familial status, or national origin, since   conditions based on these characteristics are not enforceable under state and  federal law.

Statements to the effect that the property is owned "on the condition that" certain things not occur or "as long as" a certain state of facts exist create conditions on the ownership of the Land. Though not commonly found in planned developments, they are **extremely dangerous** because of their effect on title.  If you are in doubt as to the existence of a **condition**, contact the Company's underwriting adviser.

Insuring Clause No. 2 is where the two endorsements differ.

The ALTA 5-06 provides coverage for the priority of the lien of the Insured Mortgage over the lien of assessments by a homeowner's association.  This would not be covered by the policy without an endorsement because the policy should have an exception in Schedule B for the covenants or restrictions which create the lien for these assessments.

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

This coverage may be given only if state law or the covenants and restrictions, which provide for the lien for assessments, also provide that the lien of the mortgage you are insuring is prior to the assessment lien. The usual provision is that a first mortgage lender's lien is superior to the association's lien for charges assessed after the recording of the mortgage or deed of trust.  Such a provision would not protect a second or lower priority lender, and in those situations you would need to issue the 5.1-06, which merely insures there are no liens *due and unpaid* on Date of Policy.  The 5.1-06 is also the appropriate form to issue with an Owner's Policy.

To issue the ALTA 5.1-06, you must determine that all charges or assessments provided for in any documents shown in Schedule B, which are due, have been paid.  If there is a ground lease or recreation lease which the PUD owner or HOA association is obligated to pay, you must determine that all charges are current.

Insuring Clause No. 3 provides coverage against forced removal of improvements.  This is an element of loss covered by the ALTA Loan policies which have no exceptions for survey matters in Schedule B.

This coverage should be given only when you have an adequate current survey or inspection of the Land and improvements which discloses there are no encroachments of improvements over boundary lines or easements.  Since boundary walls and fences are excluded, you need not be concerned with them for purposes of issuing this endorsement.  However, if you are issuing an ALTA Loan Policy without any exceptions for survey matters in Schedule B, you must be concerned with boundary walls and fences because the policy will provide coverage over them with or without this endorsement.

Insuring Clause No. 4 covers loss because of failure of Title of the borrower resulting from exercise of a right of first refusal which existed at the Date of Policy, whether such exercise was before or after that date.  The consequent failure of Title to property acquired by the insured lender through foreclosure or deed-in-lieu-of-foreclosure would also be covered.  The policy would not cover these matters without this endorsement because an exception should appear in Schedule B for the instrument or instruments creating this right.

You must determine that there are no provisions in any of the documents affecting the Title which create a right of first refusal to purchase the Land.  This kind of provision might be included in the covenants and restrictions of the project itself.  If you do find such a right, you must require a **proper waiver or relinquishment from the proper person or party** prior to issuing this

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

ENDORSEMENT MANUAL - Fidelity National Title Group, Inc.                    **SECTION 5**

endorsement.  A waiver by the homeowner's association is not likely to be sufficient as a waiver by any of the property owners if the right runs in their favor.  Similarly, an association's waiver would do no good where the right was in a governmental body, as is the case for certain low income multifamily housing developments.

**MODIFICATION**

In the event that modification of an endorsement is requested, it is necessary to consider your state regulatory requirements for filing and approval of forms. If the endorsement is modified, the endorsement is not an ALTA form and should not reference ALTA in the title.  You must obtain the approval of the Company's underwriting adviser before complying with any request for a modification.

Return to Table of Contents

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

**ENDORSEMENT**

Attached to Policy No. _____

**Issued By**
**[FNTG BRAND]**

The Company insures against loss or damage sustained by the Insured by reason of:

1.      Present violations of any restrictive covenants referred to in Schedule B that restrict the use of the Land or the forfeiture or reversion of Title by reason of any provision contained in the restrictive covenants. As used in this paragraph 1, the words "restrictive covenants" do not refer to or include any covenant, condition or restriction (a) relating to obligations of any type to perform maintenance, repair or remediation on the Land, or (b) pertaining to environmental protection of any kind or nature, including  hazardous or toxic matters, conditions, or substances, except to the extent that a notice of a violation or alleged violation affecting the Land has been recorded in the Public Records at Date of Policy and is not excepted in Schedule B.

2.      The priority of any lien for charges and assessments in favor of any association of homeowners which are provided for in any document at Date of Policy referred to in Schedule B over the lien of any Insured Mortgage identified in Schedule A.

3.      The enforced removal of any existing structure on the Land (other than a boundary wall or fence) because it encroaches onto adjoining land or onto any easements.

4.      The failure of the Title by reason of a right of first refusal to purchase the Land which was exercised or could have been exercised at Date of Policy.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

[Witness clause optional]

[FNTG BRAND]

BY: _____

ALTA Endorsement Form 5-06
(Planned Unit Development) (Rev. 02/03/10)
© American Land Title Association

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

ENDORSEMENT MANUAL - Fidelity National Title Group, Inc.                    SECTION 5

**ENDORSEMENT**

Attached to Policy No. _____

**Issued By**
**[FNTG BRAND]**

The Company insures against loss or damage sustained by the Insured by reason of:

1.      Present violations of any restrictive covenants referred to in Schedule B that restrict the use of the Land or the forfeiture or reversion of Title by reason of any provision contained in the restrictive covenants. As used in this paragraph 1, the words "restrictive covenants" do not refer to or include any covenant, condition, or restriction (a) relating to obligations of any type to perform maintenance, repair, or remediation on the Land, or (b) pertaining to environmental protection of any kind or nature, including hazardous or toxic matters, conditions, or substances, except to the extent that a notice of a violation or alleged violation affecting the Land has been recorded in the Public Records at Date of Policy and is not excepted in Schedule B.

2.      Any charges or assessments in favor of any association of homeowners, which are provided for in any document referred to in Schedule B, due and unpaid at Date of Policy.

3.      The enforced removal of any existing structure on the Land (other than a boundary wall or fence) because it encroaches onto adjoining land or onto any easements.

4.      The failure of the Title by reason of a right of first refusal to purchase the Land that was exercised or could have been exercised at Date of Policy.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

[Witness clause optional]

[FNTG BRAND]

BY: _____

ALTA Endorsement Form 5.1-06
(Planned Unit Development) (Rev. 10/16/08)
©American Land Title Association

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

ENDORSEMENT MANUAL - Fidelity National Title Group, Inc.                    **SECTION 6**

**Return to Table of Contents**

**VARIABLE RATE MORTGAGE**

**ALTA ENDORSEMENT - FORMS 6-06, 6.1 and 6.2-06**

**PURPOSE**

These endorsements were created to insure the validity and priority of the mortgage liens securing loans with variable interest rates. The ALTA 6-06 is the basic variable interest rate endorsement. The ALTA 6.1 is designed for use where lenders face regulatory requirements which must be followed in order to make such loans. (Note: there is no 2006 version of the ALTA Form 6.1). The ALTA 6.2-06 was created to the validity and priority of mortgage liens as security for interest at variable rates and as security for additional principal created by the negative amortization of unpaid interest.

**CAUTION:**     *THE LAW IN MANY STATES PROHIBITS OR GREATLY IMPAIRS THE ENFORCEMENT OF THE KINDS OF LOANS TO WHICH THE ALTA 6.2-06 ENDORSEMENT IS APPLICABLE.   THEREFORE, YOU SHOULD NOT ISSUE IT WITHOUT THE APPROVAL OF THE COMPANY'S UNDERWRITING ADVISER.*

**SECTION OF POLICY AMENDED BY ENDORSEMENT**

Section 3(d) of the Exclusions from Coverage of all of the ALTA Loan Policies is modified by each of these endorsements.

**BASIS FOR PROVIDING COVERAGE**

**Endorsement Form 6-06**

You are authorized to issue this endorsement only when **all** of the following requirements are met:

1.      The Insured Mortgage contains a clear statement that it secures interest at a variable rate**.**

2.      It is not sufficient for the mortgage or deed of trust to state merely that the interest secured is pursuant to the terms of the note or other security agreement.

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

ENDORSEMENT MANUAL - Fidelity National Title Group, Inc.                    **SECTION 6**

3.      The interest rate varies according to **a formula disclosed in the Insured Mortgage** which is **based on an index that cannot be easily manipulated by the lender** to change the rate of interest it receives.

**Examples of indices which comply with this requirement are:**

Federal cost of funds indices,

Treasury bill interest rates,

The Prime rate of a substantial local, national or international bank other than the lender (if a bank); **and**

The Prime rate of the lending bank (if a bank loan), if the bank is a large commercial bank.

4.      The documents comply with all requirements of any state statute which governs validity and priority of mortgages securing variable interest rate loans.

**Endorsement Form 6.1**

The coverage of this endorsement is identical to the coverage of ALTA 6-06 except it adds an exception to coverage.  It does not cover loss resulting from the lender's failure to comply with statutes or regulations specified in the endorsement which govern the ability of the lender to make a variable interest rate mortgage.

While this endorsement has not been withdrawn by the ALTA, it is today mostly a matter of historical interest.  The relaxation of federal and state regulation on lending institutions with respect to variable interest rate mortgages has drastically reduced its utility.  Any request you receive for this endorsement should be discussed with the Company's underwriting adviser.

**Endorsement Form 6.2-06** **(Variable Rate –Negative Amortization)**
(See **CAUTION** at beginning of this Section 6**)**

*Preliminary Considerations*

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

This endorsement combines the provisions of ALTA 6-06 with provisions covering the security of negative amortization of interest.

Negative amortization is one name commonly given to a process which adds interest which is due and unpaid to the principal balance of the loan. It is also called "interest on interest". Amortization is the process which reduces the principal balance as payments are made on a loan.

Negative amortization loans are usually structured so that the principal balance increases rather than declining over time.  The most common arrangement is to allow the borrower to make its monthly payments as if the interest rate were lower than it actually is.  This produces a deficit in the interest payments which is then added to the principal.  Interest is then charged on the new principal amount, thus compounding interest.  The borrower makes lower payments in the initial years of the loan and higher payments at the end.  This may be a benefit to borrowers who are likely to have greater income in later years, such as first time home purchasers.

*Endorsement Coverage*

The coverage for the variable rate aspect of the Insured Mortgage is identical to that provided in the ALTA 6-06.

In addition, this endorsement provides the following coverage for the negative amortization aspects:

- coverage against loss if the lien of the Insured Mortgage is rendered unenforceable as a result of its negative amortization provisions

- coverage against loss if the lien of the Insured Mortgage loses its priority as security for the principal of the loan, including interest added through negative amortization because of its negative amortization provisions

This endorsement may be issued only if all of the following requirements are met:

1.       All of the requirements for issuing an ALTA 6-06 have been met.

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

2.      The Insured Mortgage clearly states that it secures a loan providing for negative amortization or adding unpaid interest to principal.

3.      The law of the state in which the Land lies does not prohibit the making of negative amortization loans or the compounding of interest.  This may be based on a different public policy than the one on which usury is based.

4.      The amount of interest which will be charged as a result of the negative amortization program does not appear to be unconscionably high as that determination is generally understood under state law.

If any transaction appears to you to require the payment of extreme rates or amounts of interest, you should contact the Company's underwriting adviser.

The policy is issued in a face amount which reflects the increased principal amount of the loan as a result of negative amortization, often up to 125% of the original principal amount of the mortgage, but not in excess of the amount allowed by any state insurance laws or regulations.

**MODIFICATION**

In the event that modification of an endorsement is requested, it is necessary to consider your state regulatory requirements for filing and approval of forms.  If the endorsement is modified, the endorsement is not an ALTA form and should not reference ALTA in the title.  You must obtain the approval of the Company's underwriting adviser before complying with any request for a modification.

Return to Table of Contents

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

ENDORSEMENT MANUAL - Fidelity National Title Group, Inc.                    **SECTION 6**

**ENDORSEMENT**

Attached to Policy No. _____

**Issued By**
**[FNTG BRAND]**

The Company insures against loss or damage sustained by the Insured by reason of:

1.    The invalidity or unenforceability of the lien of the Insured Mortgage resulting from its provisions that provide for changes in the rate of interest.

2.    Loss of priority of the lien of the Insured Mortgage as security for the unpaid principal balance of the loan, together with interest as changed in accordance with the provisions of the Insured Mortgage, which loss of priority is caused by the changes in the rate of interest.

"Changes in the rate of interest", as used in this endorsement, shall mean only those changes in the rate of interest calculated pursuant to the formula provided in the documents secured by the Insured Mortgage at Date of Policy.

This endorsement does not insure against loss or damage based upon:

1.    usury, or

2.    any consumer credit protection or truth in lending law.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

[Witness clause optional]

[FNTG BRAND]

BY: _____

ALTA Endorsement Form 6-06
(Variable Rate) (Rev. 10/16/08)
©American Land Title Association

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

ENDORSEMENT MANUAL - Fidelity National Title Group, Inc.                    **SECTION 6**

**For use with 1992 policies or older**

**ENDORSEMENT**

Attached to Policy No. _____

**Issued by**

**[FNTG BRAND]**

The Company insures the owner of the indebtedness secured by the insured mortgage against loss or damage sustained by reason of:

1.      The invalidity or unenforceability of the lien of the insured mortgage resulting from the provisions therein which provide for changes in the rate of interest.

2.      Loss of priority of the lien of the insured mortgage as security for the unpaid principal balance of the loan, together with interest as changed in accordance with the provisions of the insured mortgage, which loss of priority is caused by the changes in the rate of interest.

"Changes in the rate of interest", as used in this endorsement, shall mean only those changes in the rate of interest calculated pursuant to the formula provided in the insured mortgage at Date of Policy.

This endorsement does not insure against loss or damage by reason of the failure of the insured to comply with the following statutes or regulations concerning variable rate mortgages:

This endorsement does not insure against loss or damage based upon (a) usury, or (b) any consumer credit protection or truth in lending law.

This endorsement is issued as part of the policy.  Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy or (iv) increase the Amount of Insurance.  To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls.  Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

[Witness clause optional]

[FNTG BRAND]

BY:_____

ALTA Endorsement - Form 6.1
(Variable Rate Mortgage**)** (1/17/04)
©American Land Title Association

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

ENDORSEMENT MANUAL - Fidelity National Title Group, Inc.                    **SECTION 6**

**ENDORSEMENT**

Attached to Policy No. _____

**Issued By**
**[FNTG BRAND]**

The Company insures against loss or damage sustained by the Insured by reason of:

1.      The invalidity or unenforceability of the lien of the Insured Mortgage resulting from its provisions that provide for (a) interest on interest, (b) changes in the rate of interest, or (c) the addition of unpaid interest to the principal balance of the loan.

2.      Loss of priority of the lien of the Insured Mortgage as security for the principal balance of the loan, including any unpaid interest which was added to principal in accordance with the provisions of the Insured Mortgage, interest on interest, or interest as changed in accordance with the provisions of the Insured Mortgage, which loss of priority is caused by (a) changes in the rate of interest, (b) interest on interest, or (c) increases in the unpaid principal balance of the loan resulting from the addition of unpaid interest.

"Changes in the rate of interest", as used in this endorsement shall mean only those changes in the rate of interest calculated pursuant to the formula provided in the loan documents secured by the Insured Mortgage at Date of Policy.

This endorsement does not insure against loss or damage based upon:

1.      usury, or

2.      any consumer credit protection or truth in lending law.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

[Witness clause optional]

[FNTG BRAND]

BY: _____

ALTA Endorsement Form 6.2-06
(Variable Rate, Negative Amortization) (Rev. 10/16/08)
©American Land Title Association

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

**Return to Table of Contents**

**MANUFACTURED HOUSING**
**ALTA ENDORSEMENT – FORMS 7-06, 7.1-06 and 7.2-06**


**PURPOSE**


These endorsements clarify whether or not a manufactured housing unit ("MHU") located on the Land is covered by the insurance policy. The ALTA 7-06 adds the MHU to the definition of Land. In addition the ALTA 7.1-06 and the ALTA 7.2-06 insure against loss or damage if the MHU is not located on the subject premises, if there are UCC type liens filed against the MHU and if the MHU does not constitute real property under state law. The ALTA 7.1-06, which is the form to be used with a Loan Policy, also insures that the Insured Mortgage can be enforced in a single foreclosure action against both the MHU and the Land.


**SECTION OF POLICY AMENDED BY ENDORSEMENT**


These endorsements do not amend any section of the policy.  However, they do modify the impact on coverage of the definition of "Land" contained in Conditions No. 1(g) of the ALTA Owner's Policy and No. 1(i) of the ALTA Loan Policy.  Because of this definition, the policies normally only insure titles to or mortgage liens on a MHU if the MHU is considered a fixture under state law.  Issuance of these endorsements constitutes the Company's recognition that the MHU on the Land **is** covered by the policy, and, in the case of the ALTA 7.1-06 and the 7.2-06, against loss occasioned by the failure to meet state requirements for conversion of the MHU from personal to real property.



**BASIS FOR PROVIDING COVERAGE**
**ALTA 7-06 (inclusion of MHU within the definition of Land)**


You may issue this endorsement if all of the following requirements are met:

1.      There must be no state law which would make it impossible for the MHU to become real property.


**CAUTION:**  THE COMPANY'S UNDERWRITING ADVISOR SHOULD BE CONSULTED FOR INSURABILITY IN YOUR STATE.



© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

2.      You must determine that the owner of the underlying Land is the owner of the MHU.  This should be done by examining the **current** motor vehicle title certificate which was issued when the unit was purchased or registered in the last state of residence of the owner.

3.      You must determine that the MHU is actually located on the Land.

4.      You must determine that the unit is permanently affixed to the Land.  To be permanently affixed, the wheels and axles of the unit must have been removed.  It must also be hooked up to public utilities such as gas or electricity.

5.      You must determine whether any security interests encumbering the unit at the time it was affixed to the Land still exist.  If they do, you must require their release, or you must show them as an exception in Schedule B of any Owner's Policy and Schedule B, Part I of any ALTA Loan Policy which you issue and to which you  add the following:

> This is a matter covered under the Uniform Commercial Code or under the motor vehicle registration laws of the state of residence of the owner of the unit.

The problem of existing security interests is complex.  State law generally treats MHUs as motor vehicles, at least until they are affixed to a parcel of land.  While they are motor vehicles, liens which encumber them must be filed in the place designated for motor vehicles.  These are shown on the most current vehicle title certificates.  Even after becoming affixed, they may still retain their motor vehicle registration in some states.  Thus, examination of the vehicle title certificate may be required each time a transaction takes place after affixation to the land.  It is possible such laws may prevent the unit from ever being considered real property. Consult the Company's underwriting advisor for the status of the law in your state.

Prior to being permanently affixed, mobile homes are also personal property subject to Article 9 of the Uniform Commercial Code, which relates to security interests.  Therefore, a UCC search may have to be done both in the capitol of the state where the Land is located and, under some circumstances, in the capitol of the state where the unit was last registered.  For searching requirements, consult the Company's underwriting adviser.

6.      You must add a notation in the legal description in Schedule A identifying the mobile home unit as a part of the property insured. The unit's make and serial number should be included.

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

ENDORSEMENT MANUAL – Fidelity National Title Group, Inc.                                                **SECTION 7**

**ALTA 7.1-06 and 7.2-06** **Conversion**

You may issue this endorsement if all of the following requirements are met:

1.        There must be no state law which would make it impossible for the MHU to become real property.

**CAUTION:**  THE COMPANY'S UNDERWRITING ADVISOR SHOULD BE CONSULTED FOR INSURABILITY IN YOUR STATE**.**

2.    You must determine that the MHU has become real property under state law, *and that all procedures necessary for the conversion of the MHU from personal property to real property have been accomplished.* This could include the surrender and cancellation of the motor vehicle title.

**CAUTION:**  THE COMPANY'S UNDERWRITING ADVISOR SHOULD BE CONSULTED FOR INSURABILITY IN YOUR STATE.

3.        You must determine that the owner of the underlying Land is the owner of the MHU. This should be done by examining the **current** motor vehicle title certificate issued when the unit was purchased or registered in the last state of residence of the owner, or by verifying the chain of title since the conversion discussed at No. 2 above.

4.        You must determine that the MHU is actually located on the Land. Appraisal, survey, inspection, or affidavit a few of the ways to accomplish this. Consult the Company's underwriting advisor for the specific requirements for your state.

5.        You must determine that the unit is permanently affixed to the Land.  To be permanently affixed, the wheels and axles of the unit must have been removed.  It must also be hooked up to public utilities such as gas or electricity.

6.        You must determine whether any security interests encumbering the unit at the time it was affixed to the Land still exist.  If they do, you must require their release, or you must show them as an exception in Schedule B of any Owner's Policy and Schedule B, Part I of any ALTA  Loan Policy which you issue, and add the following:

This is a matter covered under the Uniform Commercial Code or under the motor vehicle registration laws of the state of residence of the owner of the unit.

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

The problem of existing security interests is complex.  State law generally treats mobile homes as motor vehicles, at least until they are removed from the vehicle title registration scheme and/or affixed to a parcel of land.  While they are motor vehicles, liens which encumber them must be filed in the place designated for motor vehicles.  These are shown on the most current vehicle title certificates.  *Even after becoming affixed, they may still retain their motor vehicle registration in some states*.  Thus, examination of the vehicle title certificate may be required each time a transaction takes place after affixation to the Land.  *It is possible such laws may prevent the unit from ever being considered real property; consult the Company's underwriting advisor for the status of law in your state.*

Prior to being permanently affixed, mobile homes are also personal property subject to Article 9 of the Uniform Commercial Code, which relates to security interests.  Therefore, a UCC search may have to be done both in the capitol of the state where the Land is located and, under some circumstances, in the capitol of the state where the unit was last registered.  For searching requirements, consult the Company's underwriting advisor.

7.      You may need to add a notation in the legal description in Schedule A identifying the MHU as a part of the property insured. The unit's make and serial number should be included. Refer to the Company's underwriting advisor for the specific requirements for your state.

8.      You must verify with the Company's underwriting adviser for your state that the Insured Mortgage will be enforceable against the MHU within any foreclosure action against the balance of the real property.

**MODIFICATION**

In the event that modification of an endorsement is requested, it is necessary to consider your state regulatory requirements for filing and approval of forms.  If the endorsement is modified, the endorsement is not an ALTA form and should not reference ALTA in the title.  You must obtain the approval of the Company's underwriting advisor before complying with any request for a modification.

Return to Table of Contents

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

ENDORSEMENT MANUAL – Fidelity National Title Group, Inc.                                **SECTION 7**

ENDORSEMENT

Attached to Policy No. _____

**Issued By**
**[FNTG BRAND]**


The term "Land" includes the manufactured housing unit located on the land described in Schedule A at Date of Policy.

      This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.


[Witness clause optional]




[FNTG BRAND]

BY: _____


ALTA Endorsement Form 7-06
(Manufactured Housing Unit) (6/17/06)
©American Land Title Association

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

ENDORSEMENT MANUAL – Fidelity National Title Group, Inc.                    **SECTION 7**

ENDORSEMENT

Attached to Policy No. _____

**Issued By**
**[FNTG BRAND]**

1.      The term "Land" as defined in this policy includes the manufactured housing unit located on the land described in Schedule A at Date of Policy.

2.      Unless excepted in Schedule B, the Company insures against loss or damage sustained by the Insured if, at Date of Policy,

   (a)     A manufactured housing unit is not located on the land described in Schedule A.

   (b)     The manufactured housing unit located on the land is not real property under the law of the state where the Land described in Schedule A is located.

   (c)     The owner of the Land is not the owner of the manufactured housing unit.

   (d)     Any lien is attached to the manufactured housing unit as personal property, including

      (i)      a federal, state, or other governmental tax lien,

      (ii)     UCC security interest,

      (iii)    a motor vehicular lien,

      (iv)    other personal property lien.

   (e)     The lien of the Insured Mortgage is not enforceable against the Land.

   (f)      The lien of the Insured Mortgage is not enforceable in a single foreclosure procedure.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

[Witness clause optional]

[FNTG BRAND]

BY: _____
ALTA Endorsement Form 7.1-06
(Manufactured Housing – Conversion; Loan) (6/17/06)
©American Land Title Association

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

ENDORSEMENT MANUAL – Fidelity National Title Group, Inc.                    **SECTION 7**

ENDORSEMENT

Attached to Policy No. _____

**Issued By**
**[FNTG BRAND]**

1.        The term "Land" as defined in this policy includes the manufactured housing unit located on the land described in Schedule A at Date of Policy.

2.        Unless excepted in Schedule B, the Company insures against loss or damage, sustained by the Insured if, at Date of Policy

      (a)        A manufactured housing unit is not located on the Land described in Schedule A.

      (b)        The manufactured housing unit located on the Land is not real property under the law of the state where the Land described in Schedule A is located.

      (c)        The Insured is not the owner of the manufactured housing unit.

      (d)        Any lien is attached to the manufactured housing unit as personal property, including

            (i)        a federal, state, or other governmental tax lien,

            (ii)        UCC security interest,

            (iii)        a motor vehicular lien,

            (iv)        other personal property lien.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

[Witness clause optional]

[FNTG BRAND]

BY: _____

ALTA Endorsement Form 7.2-06
(Manufactured Housing – Conversion; Owners) (6/17/06)
©American Land Title Association

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

ENDORSEMENT MANUAL – Fidelity National Title Group, Inc.                           **SECTION 8**

**Return to Table of Contents**

**ENVIRONMENTAL PROTECTION LIEN**

**COMMERCIAL ENVIRONMENTAL LIEN**

**ALTA ENDORSEMENT FORMS 8.1-06 and 8.2-06**

**PURPOSE**

These endorsements provide affirmative insurance that the lien of the Insured Mortgage has priority over unrecorded or unfiled environmental protection liens.

**SECTION OF POLICY AMENDED BY ENDORSEMENT**

This endorsement reiterates the coverage afforded by Covered Risk 5 (d). In addition, the ALTA 8.1-06, for use with loan policies insuring residential mortgages, adds affirmative coverage against loss caused by priority over the Insured Mortgage of any environmental protection lien created by a state statute, if the statute is not disclosed in the endorsement or the lien is not shown as an exception in Schedule B of the policy. The ALTA 8.2-06, which was developed for commercial property, does not contain this additional coverage.

**BASIS FOR PROVIDING COVERAGE**

You may issue the ALTA 8.1-06 endorsement to any ALTA Loan Policy covering a **residential** mortgage loan (1 to 4 family)  if all of the following requirements are met:

1.      No environmental liens are recorded or filed which affect the Title to the Land which is described in the policy; or

2.      You have taken an exception in Schedule B to any environmental liens which have been recorded or filed.

3.      You must insert the citation to any state statute which creates secret or hidden environmental protection liens or environmental liens which have "super priority".  By this we mean a statute that either:

A. Does not require the filing of any notice of the lien in the county recorder's office where the land is located; or

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

     B. Gives the lien a priority over all outstanding liens or encumbrances.

A space for this citation is provided at the end of paragraph (b) of the endorsement. If there are no citations for your state, indicate that by inserting the word "none" in the blank.

**You must consult the Company's underwriting adviser for instructions as to which, if any, citations are applicable.**

**CAUTION:**  NOTICES OF FEDERAL ENVIRONMENTAL LIENS CREATED BY THE COMPREHENSIVE ENVIRONMENTAL RESPONSE, CLEANUP AND LIABILITY ACT (CERCLA) ARE REQUIRED TO BE <u>RECORDED</u> IN COUNTY RECORDERS' OFFICES **ONLY** IF THE STATE HAS ADOPTED THE UNIFORM FEDERAL LIEN REGISTRATION ACT OR SIMILAR STATUTE.  **OTHERWISE, CONSTRUCTIVE NOTICE OF THE LIENS EXISTS IF THE NOTICE IS <u>FILED</u> WITH THE CLERK OF THE U.S. DISTRICT COURT FOR THE DISTRICT IN WHICH THE LAND SUBJECT TO THE LIEN IS LOCATED.**

**Therefore,** if the state in which the Land lies has **not** adopted such an act, <u>you must search the records in the office of the Clerk of the U.S. District Court for such liens before issuing this endorsement.</u>

You may issue the ALTA 8.2-06 (Commercial Environmental Lien) endorsement to any ALTA Loan Policy covering a **commercial** mortgage loan (including multi-family residential), or an ALTA Owners Policy if all of the following requirements are met:

1.    You have checked BOTH the office you would normally check under state law *and* the **District Court** for the District in which the Land is located, even if your state has adopted the Uniform Federal Lien Registration Act or similar statute as discussed above.

2.    No environmental liens are recorded or filed which affect the Title to the Land which is described in the policy; or

3.    You have taken an exception in Schedule B to any environmental liens which have been recorded or filed.

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

ENDORSEMENT MANUAL – Fidelity National Title Group, Inc.                    **SECTION 8**

As mentioned earlier, the commercial form does not include the second coverage, and that should **not** be added without consulting your Company underwriting advisor.

## MODIFICATION

In the event that modification of an endorsement is requested, it is necessary to consider your state regulatory requirements for filing and approval of forms.  If the endorsement is modified, the endorsement is not an ALTA form and should not reference ALTA in the title.  You must obtain the approval of the Company's underwriting adviser before complying with any request for a modification.

Return to Table of Contents

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

ENDORSEMENT MANUAL – Fidelity National Title Group, Inc.                              **SECTION 8**

ENDORSEMENT

Attached to Policy No. _____

**Issued By**
**[FNTG BRAND]**

The insurance afforded by this endorsement is only effective if the Land is used or is to be used primarily for residential purposes.

The Company insures against loss or damage sustained by the Insured by reason of lack of priority of the lien of the Insured Mortgage over

(a)      any environmental protection lien that, at Date of Policy, is recorded in those records established under state statutes at Date of Policy for the purpose of imparting constructive notice of matters relating to real property to purchasers for value and without knowledge, or is filed in the records of the clerk of the United States district court for the district in which the Land is located, except as set forth in Schedule B; or

(b)      any environmental protection lien provided by any state statute in effect at Date of Policy, except environmental protection liens provided by the following state statutes:

FILL IN

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

[Witness clause optional]

[FNTG BRAND]

BY: _____

ALTA Endorsement Form 8.1-06
(Environmental Protection Lien) (6/17/06)
©American Land Title Association

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

ENDORSEMENT MANUAL – Fidelity National Title Group, Inc.                                    **SECTION 8**

ENDORSEMENT

Attached to Policy No. _____

**Issued By**
**[FNTG BRAND]**


        The Company insures against loss or damage sustained by the Insured by reason of an environmental protection lien that, at Date of Policy, is recorded in the Public Records or filed in the records of the clerk of the United States district court for the district in which the Land is located, unless the environmental protection lien is set forth as an exception in Schedule B.

        This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.


[Witness clause optional]




[FNTG BRAND]

BY: _____




ALTA Endorsement Form 8.2-06
(Commercial Environmental Lien) (10/16/08)
©American Land Title Association

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

ENDORSEMENT MANUAL – Fidelity National Title Group, Inc.                    **SECTION 9**

**Return to Table of Contents**

**SERIES 9**

**ALTA ENDORSEMENTS 9-06 to 9.10-06**
**[THE ALTA 9.4-06 AND 9.5-06 HAVE BEEN WITHDRAWN EFFECTIVE 4/2/2012]**

**PURPOSE**

In General

It is common for institutional lenders to require certain additional title insurance coverages for loans secured by first mortgages on improved real property when these mortgages are to be sold on the secondary market.  The original ALTA Form 9 was designed to provide those coverages in a single, inclusive form. It afforded the lender various protections with respect to private property restrictions, building setback lines, encroachments and excepted minerals. Forms for use with owner's policies were subsequently adopted also.

In 2012 ALTA completely revised all of the endorsements in the series, withdrawing the 9.4-06 and 9.5-06 and adding 3 new forms- the 9.6-06, 9.7-06, and 9.8-06. In 2013 the 9.9-06 and the 9.10-06 were adopted. We will discuss each form and the corresponding underwriting requirements.

**SECTIONS OF POLICY AMENDED BY ENDORSEMENT**

These endorsements expand policy coverage by minimizing the risk to the Insured with respect to certain policy exclusions or exceptions.

**REMINDER:** All exceptions for documents in our standard form policies should be characterized appropriately. For example:

> *The matters contained in the document shown below which, among other things, contains or provides for: [establishment of easements] [liens for liquidated damages] [private charges or assessments]  [and] [option to purchase, a right of first refusal or the prior approval of a future purchaser or occupant] and covenants, conditions and restrictions but omitting any covenants or restrictions, if any, including, but not limited to those based upon race, color, religion, sex, sexual orientation, familial status, marital status, disability, handicap, national origin, ancestry, or source of income, as set forth in applicable state or federal laws, except to the extent that said covenant or restriction is permitted by applicable law.*

> *Entitled: ^*
> *Recording Date: ^*
> *Recording No: ^*

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

The form for showing exceptions varies from state to state, but it should always disclose any of the Private Rights (as discussed at ALTA 9.6-06 and 9.9-06  below) and other appropriate terms and provisions, and  include the mandated carve out for "omitted" provisions.

**BASIS FOR PROVIDING COVERAGE**

**ALTA Form 9-06 (Restrictions, Encroachments, Minerals - Loan Policy)**
**ALTA Form 9.3-06 (Covenants, Conditions and Restrictions-Loan Policy)**
**ALTA Form 9.7-06 (Restrictions, Encroachments, Minerals-Land Under Development-Loan Policy)**
**ALTA Form 9.10-06 (Restrictions, Encroachments, Mineralt-Current Violations-Loan Policy**

Forms 9-06, 9.10-06  and 9.7-06 most closely resemble the coverages given under the old loan policy endorsement forms. The revised 9-06 is used for existing Improvements and the new 9.7-06 is used for Land under development, by expanding the coverages to Future Improvements, as defined therein. The 9.10-06 is used when violation of a Covenant could result in forfeiture or reversion, but there is no current violation. The revised 9.3-06 has no mineral or encroachment coverage found at section 4 in the other two endorsements.

The following is a discussion of the various provisions:

- 3.a. – All  give coverage for loss by reason of a violation of a Covenant that divests the lien of the Insured Mortgage or impairs the priority of the Insured Mortgage, or affects the Title of the lender after foreclosure. An example of such a loss would be as the result of forfeiture or reversion provisions in a covenant. Form 9.10-06 is used when a <u>future</u> violation could result in the forfeiture or reversion, there is <u>no current violation</u> of any such Covenants.
- 3.b.-Coverage is given over any violation of a Covenant **unless an exception in Schedule B identifies the violation.**
- 3.c. -Coverage is given for enforced removal for a building set back violation **unless an exception in Schedule B identifies the violation.**
- 3.d.-Coverage is given for notice of a violation of a Covenant that relates to environmental protection but only to the extent of the violation in the notice **unless an exception in Schedule B identifies the notice of violation.**
- 4.a.-[In Forms 9-06, 9.10-06 and 9.7-06 only] Coverage for an encroachment onto neighboring property, onto an easement, or onto our Land by a neighboring Improvement **unless an exception in Schedule B identifies any such encroachment.**

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

- 4.b.-[In Forms 9-06 and 9.10-06] Enforced removal of our Improvement if it encroaches over the boundary line (**even if such encroachment is shown on Schedule B).**
- 4.c.i. [in Form 9-06 and 9.10-06] or 4.b.i [in Form 9.7-06]-Damage to an Improvement that encroaches onto an easement resulting from the exercise of the right to maintain the easement **(even if such encroachment is shown on Schedule B).**
- 4.c.ii.[in Form 9-06and 9.10-06] or  4.b.ii. [in Form 9.7-06] Damage to an Improvement resulting from the exercise of any mineral rights excepted in the legal description or on Schedule B**.**

**UNDERWRITING GUIDELINES**

**For anything other than a policy insuring a residential 1-4 family loan an accurate current survey must be examined and reflected in the policy.**

*Coverage 3.a. may be given if any of the following situations apply:*

- There are no covenants, conditions or restrictions.
- The covenants, conditions or restrictions are not enforceable under state or federal law.
- The restrictions contain a clause protecting the lien of a mortgage made in good faith and for value against a violation.
- Rights to enforce the restrictions have been waived or are subordinated to the Insured Mortgage.
- If there is a no CURRENT violation that could result in Forfeiture or reversion, but a FUTURE violation might result in the loss of priority or enforceability of the lien of the Insured Mortgage, the 9.10-06 must be used.

*Coverage 3.b. may be given provided:*

- There are no covenants, conditions or restrictions or
- it has been determined that either there are no violations that are enforceable, or
- all enforceable violations that have been disclosed by inspection, survey or other means are identified and excepted in Schedule B.

*Coverage 3.c. may be given provided:*

- There are no building setback lines shown on a recorded or filed plat of subdivision or
- it has been determined that either there are no violations that are enforceable, or

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

- all enforceable violations that have been disclosed by inspection, survey or other means are identified and excepted in Schedule B.

*Coverage 3.d. may be given provided:*

- Either there are no notices of violation of covenants, conditions and restrictions relating to environmental protection recorded or
- filed in the public records or the notices of violations are identified and excepted in Schedule B.

*Coverage 4.a.i.[in Form 9-06 , 9.10-06 and 9.7-06]  may be given if any of the following situations apply:*

- There are no encroachments onto adjoining land OR any such encroachments are identified in Schedule B.
- There are no easements excepted in Schedule B.
- There are no encroachments onto easements identified in Schedule B OR any such encroachments are identified in Schedule B.

*Coverage 4.a.ii.[in Form 9-06, 9.10-06 and 9.7-06] may be given if any of the following situations apply:*

- There are no encroachments onto the Land by neighbors' Improvements OR
- any such encroachments are identified in Schedule B.

*Coverage 4.b. Form 9-06 and 9.10-06 may be given if any of the following situations apply:*

- There are no encroachments of Improvements onto neighboring land.
- There is an encroachment identified in Schedule B and with respect to the encroachment, the Company's underwriting advisor has determined that it would be unlikely that there would be any attempted enforced removal or is satisfied that a state court would not deny the right to maintain the existing improvements because of adverse possession or other protections.

**[See also Section 28 for encroachment coverage]**

*Coverage 4.c.i [in Form 9-06 and 9.10-06] or Coverage 3.b.i.[in Form 9.7-06] may be given if any of the following situations apply:*

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

ENDORSEMENT MANUAL – Fidelity National Title Group, Inc.                                    **SECTION 9**

- There are no encroachments of an Improvement onto an easement
- The encroachment does not interfere with the right to maintain the easement for the purpose for which it was granted.

[See also Section 28 for encroachment coverage]

*Coverage 4.c.ii [in Form 9-06] or Coverage 3.b.ii [in Form 9.7-06] may be given if any of the following situations apply:*

- There is no separation of minerals from the surface estate by deed, lease or otherwise.
- There is a separate mineral estate but it does not include any rights of surface entry.
- Mineral rights, with rights of surface entry either expressed or implied, have been severed from the surface estate.  However, the land and surrounding area is entirely improved with residential development.  Under these circumstances, submit the request for coverage to the Company's underwriting advisor who will consider the risk based upon such things as the size of the parcel, use, (proposed or current), local zoning, ownership of minerals and the possibility of waiver of mineral rights.

**[See also - Section 35 for mineral rights coverage]**

**ALTA Form 9.1–06 (Covenants, Conditions and Restrictions-Unimproved Land–Owner's Policy)**
**ALTA Form 9.2–06 (Covenants, Conditions and Restrictions-Improved Land-Owner's Policy)**
**ALTA Form 9.8–06 (Covenants, Conditions and Restrictions-Land Under Improvement–Owner's Policy** *[technically corrected by ALTA 12-3-12]*

**An accurate current survey must be examined and reflected in the policy**

These 3 forms give various levels of coverage to an owner. They contain some but not all of the coverages in the loan policy forms. They do not contain coverage for encroachments or mineral rights. See Section 28 for encroachment coverage and Section 35 for mineral rights coverage. The following is a discussion of the various provisions:

- 3.a.-[in all Forms] Coverage is given over any violation of a Covenant **unless an exception in Schedule B identifies the violation.**

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

- 3.b. [in Form 9.2-06 and 9.8-06 only]-Coverage is given for enforced removal for a building set back violation **unless an exception in Schedule B identifies the violation.**
- 3.c. [in Form 9.2-06 and 9.8-06, it is coverage 3.b. in Form 9.1-06]-Coverage is given for notice of a violation of a Covenant that relates to environmental protection but only to the extent of the violation in the notice **unless an exception in Schedule B identifies the notice of violation.**

*Coverage 3.a. may be given provided:*

- There are no covenants, conditions or restrictions; or
- it has been determined that either there are no violations that are enforceable, or
- all enforceable violations that have been disclosed by inspection, survey, or other means are identified and excepted by description of such matter in Schedule B.

*Coverage 3.b. [in Form 9.2-06 and 9.8-06] may be given provided:*

- There are no building setback lines shown on a recorded or filed plat of subdivision; or
- It has been determined that either there are no violations that are enforceable, or
- all enforceable violations that have been disclosed by inspection, survey or other means are identified and excepted in Schedule B.

*Coverage 3.c. [in Form 9.2-06 and 9.8-06] or 3.b. [in Form 9.1-06] may be given provided:*

- Either there are no notices of violations of covenants, conditions and restrictions relating to environmental protection recorded or filed in the public records, or
- the notices of violations are identified and excepted in Schedule B.

**ALTA Form 9.6–06 (Private Rights-Loan Policy)**
**ALTA Form 9.9-06 (Private Rights-Owners Policy)**

This form addresses the existence of Private Rights within instruments which provide for covenants, conditions or restrictions (CCRs) and are excepted on Schedule B. These Private Rights are defined as:

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

- Option to purchase
- Right of first refusal
- Right of prior approval of a future purchaser or occupant (often found in retail developments)
- Private Charge or assessment (such as home owners or other association fees or dues or private transfer fees, for example) NOTE: **The 9.9-06 for Owners Policies does not contain this coverage.**

The endorsement gives coverage over loss as a result of the enforcement of such a right as it affects the priority or enforceability of the lien of the Insured Mortgage, or affects the title of the lender after foreclosure.

*Coverage may be given provided if:*

- There are no recorded instruments that contain covenants, conditions or restrictions (CCRs) on the Land; or
- All recorded instruments which contain CCRs are examined and they contain no such Private Rights as shown above for Owners or Loan Policy usage. Do not rely upon the classification of the document in the commitment failing to identify such rights. All documents must be examined for these rights before the coverage can be given, or
- Any exception for an instrument that contains a Private Right is indicated in the blank at item 4. D. of the endorsement.
-  If there are no such private rights in an instrument or there is no instrument as an exception,  the blank at item 4.d. should be filled in with the word "**NONE** "
- Also- See **REMINDER** at beginning of this Section.

## MODIFICATION

In the event that modification of an endorsement is requested, it is necessary to consider your state regulatory requirements for filing and approval of Forms.  If the endorsement is modified, the endorsement is not an ALTA Form and should not reference ALTA in the title.  You must obtain the approval of the Company's underwriting advisor before complying with any request for a modification.

**Charts:**

| ALTA Endorsement | Original Title | New Revision |
|---|---|---|
| 9-06 | REM (LP) | Restriction Encroachments Mineral (LP) |

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

| 9.1-06 | REM (OP-Unimproved) | CCR (OP-Unimproved Land) |
|--------|----------------------|---------------------------|
| 9.2-06 | REM (OP-Improved) | CCR ((OP-Improved Land) |
| 9.3-06 | REM (LP) | CCR (LP) |
| 9.4-06 | Decertified | |
| 9.5-06 | Decertified | |
| 9.6-06 | New | Private Rights (LP) |
| 9.7-06 | New | REM (LP-Land under development) |
| 9.8-06 | New | CCR (OP-Land under Development) |
| 9.9-06 | New | Private Rights (OP) |
| 9.10-06 | New | REM-Current violations (LP) |

**Another way to classify the new forms:**

Restrictions, Encroachments, Minerals

    ALTA 9-06 Loan Policy

    ALTA 9.7-06 Loan Policy- Land Under Development

    ALTA 9.10-06 Loan Policy- Current Violations

Covenants, Conditions, Restrictions:

    ALTA 9.1-06 Owner - Unimproved

    ALTA 9.2-06 Owner - Improved

    ALTA 9.8-06 Owner - Land Under Development

    ALTA 9.3-06 Loan Policy

Private Rights

    ALTA 9.6-06 Loan Policy

    ALTA 9.9-06 Owner

[See Section 28 for Encroachment coverages and Section 35 for Mineral coverages.]

Return to Table of Contents

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

ENDORSEMENT

Attached to Policy No. _____

**Issued By**

*[FNTG BRAND]*

1. The insurance provided by this endorsement is subject to the exclusions in Section 5 of this endorsement; and the Exclusions from Coverage, the Exceptions from Coverage contained in Schedule B, and the Conditions in the policy.

2. For the purposes of this endorsement only:

   a. "Covenant" means a covenant, condition, limitation or restriction in a document or instrument in effect at Date of Policy.

   b. "Improvement" means an improvement, including any lawn, shrubbery, or trees, affixed to either the Land or adjoining land at Date of Policy that by law constitutes real property.

3. The Company insures against loss or damage sustained by the Insured by reason of:

   a. A violation of a Covenant that:

      i. divests, subordinates, or extinguishes the lien of the Insured Mortgage,
      ii. results in the invalidity, unenforceability or lack of priority of the lien of the Insured Mortgage, or
      iii. causes a loss of the Insured's Title acquired in satisfaction or partial satisfaction of the Indebtedness;

   b. A violation on the Land at Date of Policy of an enforceable Covenant, unless an exception in Schedule B of the policy identifies the violation;

   c. Enforced removal of an Improvement located on the Land as a result of a violation, at Date of Policy, of a building setback line shown on a plat of subdivision recorded or filed in the Public Records, unless an exception in Schedule B of the policy identifies the violation; or

   d. A notice of a violation, recorded in the Public Records at Date of Policy, of an enforceable Covenant relating to environmental protection describing any part of the Land and referring to that Covenant, but only to the extent of the violation of the Covenant referred to in that notice, unless an exception in Schedule B of the policy identifies the notice of the violation.

4. The Company insures against loss or damage sustained by reason of:

   a. An encroachment of:

      i. an Improvement located on the Land, at Date of Policy, onto adjoining land or onto that portion of the Land subject to an easement; or

      ii. an Improvement located on adjoining land onto the Land at Date of Policy,

unless an exception in Schedule B of the policy identifies the encroachment otherwise insured against in Sections 4.a.i. or 4.a.ii.;

   b. A final court order or judgment requiring the removal from any land adjoining the Land of an encroachment identified in Schedule B; or

   c. Damage to an Improvement located on the Land, at Date of Policy:

      i. that is located on or encroaches onto that portion of the Land subject to an easement excepted in Schedule B, which damage results from the exercise of the right to maintain the easement for the purpose for which it was granted or reserved; or

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

ii.        resulting from the future exercise of a right to use the surface of the Land for the extraction or development of minerals or any other subsurface substances excepted from the description of the Land or excepted in Schedule B.

5.   This endorsement does not insure against loss or damage (and the Company will not pay costs, attorneys' fees, or expenses) resulting from:

a.   any Covenant contained in an instrument creating a lease;

b.   any Covenant relating to obligations of any type to perform maintenance, repair, or remediation on the Land;

c.   except as provided in Section 3.d, any Covenant relating to environmental protection of any kind or nature, including hazardous or toxic matters, conditions, or substances;

d.   contamination, explosion, fire, fracturing, vibration, earthquake or subsidence; or

e.   negligence by a person or an Entity exercising a right to extract or develop minerals or other subsurface substances.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements

[Witness clause optional]

[FNTG BRAND]

BY: _____

ALTA Endorsement Form 9-06
(Restrictions, Encroachments, Minerals-Loan Policy) (Rev. 4/2/12)
©American Land Title Association

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

**ENDORSEMENT**
**Attached to Policy No. _____**

**Issued By**
*[FNTG BRAND]*

1.      The insurance provided by this endorsement is subject to the exclusions in Section 4 of this endorsement; and the Exclusions from Coverage, the Exceptions from Coverage contained in Schedule B, and the Conditions in the policy.

2.      For the purposes of this endorsement only, "Covenant" means a covenant, condition, limitation or restriction in a document or instrument in effect at Date of Policy.

3.      The Company insures against loss or damage sustained by the Insured by reason of:

      a.   A violation on the Land at Date of Policy of an enforceable Covenant, unless an exception in Schedule B of the policy identifies the violation; or

      b.   A notice of a violation, recorded in the Public Records at Date of Policy, of an enforceable Covenant relating to environmental protection describing any part of the Land and referring to that Covenant, but only to the extent of the violation of the Covenant referred to in that notice, unless an exception in Schedule B of the policy identifies the notice of the violation.

4.      This endorsement does not insure against loss or damage (and the Company will not pay costs, attorneys' fees, or expenses) resulting from:

      a.   any Covenant contained in an instrument creating a lease;

      b.   any Covenant relating to obligations of any type to perform maintenance, repair, or remediation on the Land; or

      c.   except as provided in Section 3.b, any Covenant relating to environmental protection of any kind or nature, including hazardous or toxic matters, conditions, or substances.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

[Witness clause optional]

[FNTG BRAND]

BY: _____

ALTA Endorsement Form 9.1-06
(Covenants, Conditions and Restrictions-Unimproved Land – Owner's Policy–) (Rev. 4/2/12)
©American Land Title Association

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

ENDORSEMENT MANUAL – Fidelity National Title Group, Inc.                    **SECTION 9**

**ENDORSEMENT**
**Attached to Policy No. _____**

**Issued By**

*[FNTG BRAND]*

1.  The insurance provided by this endorsement is subject to the exclusions in Section 4 of this endorsement; and the Exclusions from Coverage, the Exceptions from Coverage contained in Schedule B, and the Conditions in the policy.
2.  For the purposes of this endorsement only,
    a.  "Covenant" means a covenant, condition, limitation or restriction in a document or instrument in effect at Date of Policy.
    b.  "Improvement" means a building, structure located on the surface of the Land, road, walkway, driveway, or curb, affixed to the Land at Date of Policy and that by law constitutes real property, but excluding any crops, landscaping, lawn, shrubbery, or trees.
3.  The Company insures against loss or damage sustained by the Insured by reason of:
    a.  A violation on the Land at Date of Policy of an enforceable Covenant, unless an exception in Schedule B of the policy identifies the violation;
    b.  Enforced removal of an Improvement as a result of a violation, at Date of Policy, of a building setback line shown on a plat of subdivision recorded or filed in the Public Records, unless an exception in Schedule B of the policy identifies the violation; or
    c.  A notice of a violation, recorded in the Public Records at Date of Policy, of an enforceable Covenant relating to environmental protection describing any part of the Land and referring to that Covenant, but only to the extent of the violation of the Covenant referred to in that notice, unless an exception in Schedule B of the policy identifies the notice of the violation.
4.  This endorsement does not insure against loss or damage (and the Company will not pay costs, attorneys' fees, or expenses) resulting from:
    a.  any Covenant contained in an instrument creating a lease;
    b.  any Covenant relating to obligations of any type to perform maintenance, repair, or remediation on the Land; or
    c.  except as provided in Section 3.c., any Covenant relating to environmental protection of any kind or nature, including hazardous or toxic matters, conditions, or substances.

      This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.
Witness clause optional]


 [FNTG BRAND]


BY: _____

ALTA Endorsement Form 9.2-06
(Covenants, Conditions and Restrictions – Improved Land -Owner's Policy (Rev. 4/1/12)
©American Land Title Association

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

ENDORSEMENT MANUAL – Fidelity National Title Group, Inc. **SECTION 9**

**ENDORSEMENT**
**Attached to Policy No. _____**
**Issued By**

**[FNTG BRAND]**

1.   The insurance provided by this endorsement is subject to the exclusions in Section 4 of this endorsement; and the Exclusions from Coverage, the Exceptions from Coverage contained in Schedule B, and the Conditions in the policy.

2.   For the purposes of this endorsement only:

a.   "Covenant" means a covenant, condition, limitation or restriction in a document or instrument in effect at Date of Policy.

b.   "Improvement" means an improvement, including any lawn, shrubbery, or trees, affixed to the Land at Date of Policy that by law constitutes real property.

3.   The Company insures against loss or damage sustained by the Insured by reason of:

a.   A violation of a Covenant that:

i.    divests, subordinates, or extinguishes the lien of the Insured Mortgage,

ii.   results in the invalidity, unenforceability or lack of priority of the lien of the Insured Mortgage, or

iii.  causes a loss of the Insured's Title acquired in satisfaction or partial satisfaction of the Indebtedness;

b.   A violation on the Land at Date of Policy of an enforceable Covenant, unless an exception in Schedule B of the policy identifies the violation;

c.   Enforced removal of an Improvement as a result of a violation, at Date of Policy, of a building setback line shown on a plat of subdivision recorded or filed in the Public Records, unless an exception in Schedule B of the policy identifies the violation; or

d.   A notice of a violation, recorded in the Public Records at Date of Policy, of an enforceable Covenant relating to environmental protection describing any part of the Land and referring to that Covenant, but only to the extent of the violation of the Covenant referred to in that notice, unless an exception in Schedule B of the policy identifies the notice of the violation.

4.   This endorsement does not insure against loss or damage (and the Company will not pay costs, attorneys' fees, or expenses) resulting from:

a.   any Covenant contained in an instrument creating a lease;

b.   any Covenant relating to obligations of any type to perform maintenance, repair, or remediation on the Land; or

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

    c.   except as provided in Section 3.c, any Covenant pertaining to environmental protection of any kind or nature, including hazardous or toxic matters, conditions, or substances.

    This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

[Witness clause optional]

[FNTG BRAND]

BY: _____

ALTA Endorsement Form 9.3-06
(Covenants, Conditions and Restrictions-Loan Policy) (Rev. 4/2/12)
©American Land Title Association

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

**ENDORSEMENT**

**Attached to Policy No. _____**

**Issued by**

*[FNTG BRAND]*

1.   The insurance provided by this endorsement is subject to the exclusions in Section 4 of this endorsement; and the Exclusions from Coverage, the Exceptions from Coverage contained in Schedule B, and the Conditions in the policy.

2.   For purposes of this endorsement only:

    a.   "Covenant" means a covenant, condition, limitation or restriction in a document or instrument in effect at Date of Policy.

    b.    "Private Right" means (i) a private charge or assessment; (ii) an option to purchase; (iii) a right of first refusal; or (iv) a right of prior approval of a future purchaser or occupant.

3.   The Company insures against loss or damage sustained by the Insured under this Loan Policy if enforcement of a Private Right in a Covenant affecting the Title at Date of Policy (a) results in the invalidity, unenforceability or lack of priority of the lien of the Insured Mortgage, or (b) causes a loss of the Insured's Title acquired in satisfaction or partial satisfaction of the Indebtedness.

4.   This endorsement does not insure against loss or damage (and the Company will not pay costs, attorneys' fees, or expenses) resulting from:

    a.   any Covenant contained in an instrument creating a lease;

    b.   any Covenant relating to obligations of any type to perform maintenance, repair, or remediation on the Land;

    c.   any Covenant relating to environmental protection of any kind or nature, including hazardous or toxic matters, conditions, or substances; or

    d.   any Private Right in an instrument identified in Exception(s) _____ in Schedule B.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

[Witness clause optional]

[FNTG BRAND]

By: _____
          Authorized Signatory

ALTA Endorsement Form 9.6-06
(Private Rights-Loan Policy) (Rev. 4/2/13)
©American Land Title Association

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

**ENDORSEMENT**

**Attached to Policy No. _____**

**Issued by**

*[FNTG BRAND]*

1.      The insurance provided by this endorsement is subject to the exclusions in Section 5 of this endorsement; and the Exclusions from Coverage, the Exceptions from Coverage contained in Schedule B, and the Conditions in the policy.

2.      For purposes of this endorsement only:

a.      "Covenant" means a covenant, condition, limitation or restriction in a document or instrument in effect at Date of Policy.

b.      "Future Improvement" means a building, structure, road, walkway, driveway, curb, lawn, shrubbery or trees to be constructed on or affixed to the Land in the locations according to    the Plans and that by law will constitute real property.

c.      "Improvement" means an improvement, including any lawn, shrubbery, or trees, affixed to  either the Land or adjoining land at Date of Policy that by law constitutes real property.

d.      "Plans" means the survey, site and elevation plans or other depictions or drawings prepared by *(insert name of architect or engineer)* dated \_\_\_\_, last revised _____, designated as *(insert name of project or project number)* consisting of \_\_\_ sheets.

3.      The Company insures against loss or damage sustained by the Insured by reason of:

a.      A violation of a Covenant that:

i.      divests, subordinates, or extinguishes the lien of the Insured Mortgage,

ii.      results in the invalidity, unenforceability or lack of priority of the lien of the Insured Mortgage, or

iii.      causes a loss of the Insured's Title acquired in satisfaction or partial satisfaction of the Indebtedness;

b.      A violation of an enforceable Covenant by an Improvement on the Land at Date of Policy or by a Future Improvement, unless an exception in Schedule B of the policy identifies the violation;

c.      Enforced removal of an Improvement located on the Land or of a Future Improvement as a result of a violation of a building setback line shown on a plat of subdivision recorded or filed in the Public Records at Date of Policy, unless an exception in Schedule B of the policy identifies the violation; or

d.      A notice of a violation, recorded in the Public Records at Date of Policy, of an enforceable Covenant relating to environmental protection describing any part of the Land and referring to that Covenant, but only to the extent of the violation of the Covenant referred to in that notice, unless an exception in Schedule B of the policy identifies the notice of the violation.

4.      The Company insures against loss or damage sustained by reason of:

a.      An encroachment of:

i.      an Improvement located on the Land at Date of Policy or a Future Improvement, onto adjoining land or onto that portion of the Land subject to an easement; or

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

ENDORSEMENT MANUAL – Fidelity National Title Group, Inc.                                    **SECTION 9**

       ii.         an Improvement located on adjoining land onto the Land at Date of Policy,

unless an exception in Schedule B of the policy identifies the encroachment otherwise insured against in Sections 4.a.i. or 4.a.ii.;

      b.      Damage to an Improvement located on the Land at Date of Policy or a Future Improvement:

       i.         that encroaches onto that portion of the Land subject to an easement excepted in Schedule B, which damage results from the exercise of the right to maintain the easement for the purpose for which it was granted or reserved; or

       ii.         resulting from the future exercise of a right to use the surface of the Land for the extraction or development of minerals or any other subsurface substances excepted from the description of the Land or excepted in Schedule B.

5.      This endorsement does not insure against loss or damage (and the Company will not pay costs, attorneys' fees, or expenses) resulting from:

      a.      any Covenant contained in an instrument creating a lease;

      b.      any Covenant relating to obligations of any type to perform maintenance, repair, or remediation on the Land;

      c.      except as provided in Section 3.d, any Covenant relating to environmental protection of    any kind or nature, including hazardous or toxic matters, conditions, or substance

      d.      contamination, explosion, fire, vibration, fracturing, earthquake or subsidence; or

      e.      negligence by a person or an Entity exercising a right to extract or develop minerals or other subsurface substances.

      This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

[Witness clause optional]

[FNTG BRAND]

By: _____

Authorized Signatory

ALTA Endorsement Form 9.7-06
(Restrictions, Encroachments, Minerals-Land Under Development-Loan Policy) (4/2/12)
 ©American Land Title Association

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

**ENDORSEMENT**

**Attached to Policy No. _____**

**Issued by**

*[FNTG BRAND]*

1.      The insurance provided by this endorsement is subject to the exclusions in Section 4 of this endorsement; and the Exclusions from Coverage, the Exceptions from Coverage contained in Schedule B, and the Conditions in the policy.

2.      For purposes of this endorsement only:

   a.      "Covenant" means a covenant, condition, limitation or restriction in a document or instrument in effect at Date of Policy.

   b.      "Future Improvement" means a building, structure, road, walkway, driveway, curb to be constructed on or affixed to the Land in the locations according to the Plans and that by law will constitute real property, but excluding any crops, landscaping, lawn, shrubbery, or trees.

   c.      "Improvement" means a building, structure located on the surface of the Land, road, walkway, driveway, or curb, affixed to the Land at Date of Policy and that by law constitutes real property, but excluding any crops, landscaping, lawn, shrubbery, or trees.

   d.      "Plans" means the survey, site and elevation plans or other depictions or drawings prepared by (*insert name of architect or engineer*) dated _____, last revised _____, designated as (*insert name of project or project number*) consisting of ____ sheets.

3.   The Company insures against loss or damage sustained by the Insured by reason of:

   a.      A violation of an enforceable Covenant by an Improvement on the Land at Date of Policy or by a Future Improvement, unless an exception in Schedule B of the policy identifies the violation;

   b.      Enforced removal of an Improvement located on the Land or of a Future Improvement as a result of a violation of a building setback line shown on a plat of subdivision recorded or filed in the Public Records at Date of Policy, unless an exception in Schedule B of the   policy identifies the violation; or

   c.      A notice of a violation, recorded in the Public Records at Date of Policy, of an enforceable Covenant relating to environmental protection describing any part of the Land and referring to that Covenant, but only to the extent of the violation of the Covenant referred    to in that notice, unless an exception in Schedule B of the policy identifies the notice of the violation.

4.   This endorsement does not insure against loss or damage (and the Company will not pay costs, attorneys' fees, or expenses) resulting from:

   a.      any Covenant contained in an instrument creating a lease;

   b.      any Covenant relating to obligations of any type to perform maintenance, repair, or remediation on the Land; or

   c.      except as provided in Section 3.c, any Covenant relating to environmental protection of any kind or nature, including hazardous or toxic matters, conditions, or substances.

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

ENDORSEMENT MANUAL – Fidelity National Title Group, Inc.                                    **SECTION 9**

This endorsement is issued as part of the policy. Except as it expressly states, it does not
(i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements,
(iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision
of the policy or a previous endorsement is inconsistent with an express provision of this
endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the
terms and provisions of the policy and of any prior endorsements.

[Witness clause optional]

[FNTG BRAND]
By: _____

Authorized Signatory

ALTA Endorsement Form 9.8-06
(Covenants, Conditions and Restrictions-Land Under Development-Owners Policy) (4/2/12)
©American Land Title Association

*[includes technical correction of 12-3-12]*

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

**ENDORSEMENT**

**Attached to Policy No. _____**

**Issued by**

*[FNTG BRAND]*

1.   The insurance provided by this endorsement is subject to the exclusions in Section 4 of this endorsement; and the Exclusions from Coverage, the Exceptions from Coverage contained in Schedule B, and the Conditions in the policy.

2.   For purposes of this endorsement only:

   a.   "Covenant" means a covenant, condition, limitation or restriction in a document or instrument in effect at Date of Policy.

   b.   "Private Right" means (i) an option to purchase; (ii) a right of first refusal; or (iii) a right of prior approval of a future purchaser or occupant.

3.   The Company insures against loss or damage sustained by the Insured under this Owner's Policy if enforcement of a Private Right in a Covenant affecting the Title at Date of Policy based on a transfer of Title on or before Date of Policy causes a loss of the Insured's Title.

4.   This endorsement does not insure against loss or damage (and the Company will not pay costs, attorneys' fees, or expenses) resulting from: restriction:

   a.   any Covenant  contained in an instrument creating a lease;

   b.   any Covenant relating to obligations of any type to perform maintenance, repair, or remediation on the Land;

   c.   any Covenant relating to environmental protection of any kind or nature, including hazardous or toxic matters, conditions, or substances; or

   d.   any Private Right in an instrument identified in Exception(s) _____ in Schedule B.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

[Witness clause optional]

[FNTG BRAND]

By: _____
         Authorized Signatory

ALTA Endorsement Form 9.9-06
(Private Rights-Owner's Policy) ( 4/2/13)
©American Land Title Association

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

**ENDORSEMENT**

**Attached to Policy No. _____**
**Issued By**

*[FNTG BRAND]*

1. The insurance provided by this endorsement is subject to the exclusions in Section 5 of this endorsement; and the Exclusions from Coverage, the Exceptions from Coverage contained in Schedule B, and the Conditions in the policy.

2.  For the purposes of this endorsement only:

   a.  "Covenant" means a covenant, condition, limitation or restriction in a document or instrument in effect at Date of Policy.

   b.  "Improvement" means an improvement, including any lawn, shrubbery, or trees, affixed to either the Land or adjoining land at Date of Policy that by law constitutes real property.

3.  The Company insures against loss or damage sustained by the Insured by reason of:

   a.  A violation at Date of Policy of a Covenant that:

      i. divests, subordinates, or extinguishes the lien of the Insured Mortgage,

      ii. results in the invalidity, unenforceability or lack of priority of the lien of the Insured Mortgage, or

      iii. causes a loss of the Insured's Title acquired in satisfaction or partial satisfaction of the Indebtedness;

   b.  A violation on the Land at Date of Policy of an enforceable Covenant, unless an exception in Schedule B of the policy identifies the violation;

   c.  Enforced removal of an Improvement located on the Land as a result of a violation, at Date of Policy, of a building setback line shown on a plat of subdivision recorded or filed in the Public Records, unless an exception in Schedule B of the policy identifies the violation; or

   d.  A notice of a violation, recorded in the Public Records at Date of Policy, of an enforceable Covenant relating to environmental protection describing any part of the Land and referring to that Covenant, but only to the extent of the violation of the Covenant referred to in that notice, unless an exception in Schedule B of the policy identifies the notice of the violation.

4.  The Company insures against loss or damage sustained by reason of:

   a.  An encroachment of:

      i.   an Improvement located on the Land, at Date of Policy, onto adjoining land or onto that portion of the Land subject to an easement; or

      ii.  an Improvement located on adjoining land onto the Land at Date of Policy,

unless an exception in Schedule B of the policy identifies the encroachment otherwise insured against in Sections 4.a.i. or 4.a.ii.;

   b. A final court order or judgment requiring the removal from any land adjoining the Land of an encroachment identified in Schedule B; or

   c. Damage to an Improvement located on the Land, at Date of Policy:

      i.   that is located on or encroaches onto that portion of the Land subject to an easement excepted in Schedule B, which damage results from the exercise of

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

the right to maintain the easement for the purpose for which it was granted
or reserved; or

   ii.   resulting from the future exercise of a right to use the surface of the Land  for the
         extraction or development of minerals or any other subsurface substances
         excepted from the description of the Land or excepted in Schedule B.


5.       This endorsement does not insure against loss or damage (and the Company will not pay
         costs, attorneys' fees, or expenses) resulting from:

         a. any Covenant contained in an instrument creating a lease;

         b. any Covenant relating to obligations of any type to perform maintenance, repair,
         or remediation on the Land;

         c. except as provided in Section 3.d, any Covenant relating to environmental protection of
         any kind or nature, including hazardous or toxic matters, conditions, or substances;

         d. contamination, explosion, fire, fracturing, vibration, earthquake or subsidence; or

         e. negligence by a person or an Entity exercising a right to extract or develop minerals or
         other subsurface substances.

This endorsement is issued as part of the policy. Except as it expressly states, it does not
(i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements,
(iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision
of the policy or a previous endorsement is inconsistent with an express provision of this
endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the
terms and provisions of the policy and of any prior endorsements

[Witness clause optional]

[FNTG BRAND]

BY: _____

ALTA Endorsement Form 9.10-06
(Restrictions, Encroachments, Minerals-Current Violations-Loan Policy) ( 4/2/13)
©American Land Title Association

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

ENDORSEMENT MANUAL – Fidelity National Title Group, Inc.                                    SECTION 10

**Return to Table of Contents**

**ASSIGNMENT OF MORTGAGE**

**ALTA ENDORSEMENT - FORMS 10-06 AND 10.1-06**


**PURPOSE**


The ALTA 10-06 endorsement insures the effectiveness of the assignment of the Insured Mortgage and that there have been no releases or reconveyances placed of record other than as shown. The ALTA 10.1-06 provides the same coverage as the 10-06 and gives additional coverage over only certain matters occurring after the original Date of Policy and before the Date of Endorsement, which is a defined term within the endorsement, unless those matters are disclosed by filling in the blanks contained within the endorsement. These matters include:  real estate taxes or assessments; priority of intervening defects, liens or encumbrances; and federal tax liens or bankruptcy proceedings.

**Warning: These forms are not the equivalent of complete date-down endorsements. They provide coverage only for the matters discussed. Any request to add the assignment of the Insured Mortgage to Schedule A without doing a complete policy date down or by use of any other type of endorsement other than these forms must be approved by your Company underwriting advisor.**


**SECTION OF POLICY AMENDED BY ENDORSEMENT**


The policy is modified by naming the assignee under the assignment as the Insured. The endorsement provides additional affirmative coverage against the ineffectiveness of the assignment and the effect of any full or partial releases or reconveyances recorded after the Date of Policy and before the Date of Endorsement. In addition, the ALTA 10.1-06 provides coverage for the matters described above. Both forms of endorsement are conditioned upon the proper delivery and endorsement of the underlying notes.

**BASIS FOR PROVIDING COVERAGE**


Title must be examined **through** the "Date of Endorsement", which is a defined term in the endorsement and must cover the recording of the assignment of the Insured Mortgage. This requirement may vary from the normal procedure of dating an endorsement the day it is issued.

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

The Date of Policy is **not** changed except to the extent of the liability assumed under the endorsement for matters specifically addressed in the endorsement. If you find a previous assignment to a different party, without a re-assignment back to the current Insured, you cannot issue this endorsement without approval of your Company underwriting advisor.

The name of the assignee as disclosed by the recorded assignment is to be inserted at item 1.

All modifications, releases or partial releases must be shown at Paragraph No. 2(b) of ALTA 10-06 and at Paragraph No. 2(e) of ALTA 10.1-06.

All taxes that are **due and payable** are shown at Paragraph No. 2(b) of ALTA 10.1-06.

All intervening matters that gain priority over the Insured Mortgage must be shown at Paragraph No. 2(c) of ALTA 10.1-06.

Any federal tax liens and/or notices of bankruptcy should be shown at Paragraph No. 2(d) of ALTA 10.1-06.  Please note that federal tax liens must be shown at 2(d) *even if you have determined that these liens are junior to the mortgage and therefore are not shown at 2(c)*, since the existence of the notice of federal tax lien on the record does affect the title.

In addition, for this and any other type of endorsement or policy that insures a subsequent assignee of an Insured Mortgage the following requirements must be met if the Insured Mortgage is <u>more than one year old and the loan is **not known**</u> to be non-performing:

- If the Land is  one-to-four family residential property and the assignor is a non-institutional lender; OR
- If the land is commercial or multi-family (i.e., other than one to four family), regardless of the type of lender THEN

you must require an estoppel statement from the borrower acknowledging the existence of the debt and stating that the debt is still valid and free of all defenses in law and equity by use of this requirement:

> *A written sworn statement by the record owner of the land, stating that the lien of the mortgages(s) is (are) still good and valid, and in all respects, free from all defenses, both in law and in equity, should be furnished to the Company.*

For large portfolios this may be impractical for the assignor to obtain. Nonetheless we should not insure the assignment unless we have something which addresses the current status of the debt. Your Company underwriting advisor must be consulted for guidance.

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

For insurance of assignments of loans **known to be non-performing**, which you might discover when you request an estoppel statement, you should raise the following exception, which addresses the possibility that the loan is so far past due as to be unenforceable and excepts the consequences of other actions of the lender that may be raised as defenses to the foreclosure.

*Consequences, if any, arising out of any inability to foreclose or delay in  foreclosing the Insured Mortgage(s) based upon the expiration of any statute of limitations, or challenges raised to the priority or enforceability of the Insured Mortgage based upon the acts or conduct of the original or subsequent lender.*

Any offer of an indemnity to cover these issues must be referred to Regional Counsel by your Company underwriting advisor.

## MODIFICATION

In the event that modification of an endorsement is requested, it is necessary to consider your state regulatory requirements for filing and approval of forms.  If the endorsement is modified, the endorsement is not an ALTA form and should not reference ALTA in the title.  You must obtain the approval of the Company's underwriting adviser before complying with any request for a modification.

Return to Table of Contents

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

**ENDORSEMENT**

Attached to Policy No. _____

**Issued By**
**[FNTG BRAND]**

1.      The name of the Insured at Date of Endorsement and referred to in this endorsement as the "Assignee" is amended to read:

2.      The Company insures against loss or damage sustained by the Assignee by reason of:

   a.      The failure of the following assignment to vest title to the Insured Mortgage in the Assignee:

   b.      Any modification, partial or full reconveyance, release, or discharge of the lien of the Insured Mortgage recorded on or prior to Date of Endorsement in the Public Records other than those shown in the policy or a prior endorsement, except:

This endorsement does not insure against loss or damage, and the Company will not pay costs, attorneys' fees, or expenses, by reason of any claim that arises out of of the transaction creating the  assignment by reason of the operation of federal bankruptcy, state insolvency, or similar creditors' rights laws that is based on:

   1.  the assignment being deemed a fraudulent conveyance or fraudulent transfer; or

   2. the assignment being deemed a preferential transfer.

This endorsement shall be effective provided that, at Date of Endorsement, (1) the note or notes secured by the lien of the Insured Mortgage have been properly endorsed and delivered to the Assignee, or (2) if the note or notes are transferable records, the Assignee has "control" of the single authoritative copy of each "transferable record" as these terms are defined by applicable electronic transaction laws.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

Date of Endorsement_____

[Witness clause optional]


[FNTG BRAND]


BY: _____

ALTA Endorsement Form 10-06
(Assignment) (Rev. 02/03/10)
©American Land Title Association

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

**ENDORSEMENT**
Attached to Policy No. _____

**Issued By**
**[FNTG BRAND]**

1.      The name of the Insured at Date of Endorsement and referred to in this endorsement as the "Assignee" is amended to read:

2.      The Company insures against loss or damage sustained by the Assignee by reason of:

   a.      The failure of the following assignment to vest title to the Insured Mortgage in the Assignee:

   b.      Any liens for taxes or assessments that are due and payable on Date of Endorsement, except:

   c.      Lack of priority of the lien of the Insured Mortgage over defects, liens, or encumbrances other than those shown in the policy or a prior endorsement, except:

   d.      Notices of federal tax liens or notices of pending bankruptcy proceedings affecting the Title and recorded subsequent to Date of Policy in the Public Records and on or prior to Date of Endorsement, except:

   e.      Any modification, partial or full reconveyance, release or discharge of the lien of the Insured Mortgage recorded on or prior to Date of Endorsement in the Public Records other than those shown in the policy or a prior endorsement, except:

This endorsement does not insure against loss or damage, and the Company will not pay costs, attorneys' fees, or expenses, by reason of any claim that arises  out of the transaction creating the  assignment by reason of the operation of federal bankruptcy, state insolvency, or similar creditors' rights laws that is based on:

   1.  the assignment being deemed a fraudulent conveyance or fraudulent transfer; or

   2. the assignment being deemed a preferential transfer.


This endorsement shall be effective provided that, at Date of Endorsement, (1) the note or notes secured by the lien of the Insured Mortgage have been properly endorsed and delivered to the Assignee, or (2) if the note or notes are transferable records, the Assignee has "control" of the single authoritative copy of each "transferable record" as these terms are defined by applicable electronic transaction laws.


This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

Date of Endorsement _____

[Witness clause optional]

[FNTG BRAND]


BY: _____

ALTA Endorsement Form 10.1-06
(Assignment and Date Down) (Rev.02/03/10)
©American Land Title Association

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

ENDORSEMENT MANUAL – Fidelity National Title Group, Inc.                    SECTION 11

Return to Table of Contents

**MORTGAGE MODIFICATION**
**ALTA ENDORSEMENT - FORMS 11-06 & 11.1-06**

**PURPOSE**

These endorsements were created to insure lenders that the modification of the Insured Mortgage evidenced by the document referred to within the endorsement does not impair the validity, enforceability or priority of the Insured Mortgage as of the Date of Endorsement, which is a defined term within the endorsements. In addition, the 11.1-06 insures against loss based upon a specific matter not being subordinate to the lien of the Insured Mortgage.

**SECTION OF POLICY AMENDED BY ENDORSEMENT**

No specific sections of the policy are amended by these endorsements. However, additional affirmative coverages are added.

**BASIS FOR PROVIDING COVERAGE**

Title must be examined **through** the Date of Endorsement, which must cover the recording of the modification of the Insured Mortgage. This requirement may vary from the normal procedure of dating an endorsement the day it is issued. The Date of Policy is not changed except to the extent of the liability assumed under the endorsement for matters specifically addressed in the endorsement.

The modification agreement must be examined to determine that it does not contain anything which will impair the validity, enforceability or priority of the Insured Mortgage under state law. If anything is found in the agreement which will impair validity, enforceability or priority, then intervening matters such as liens or outstanding taxes must be shown in the space provided below Paragraph No. 2.  For example, if the law in your state provides that a modification of a mortgage that increases the principal will subject that additional principal to intervening matters, then all intervening matters disclosed by the title examination must be shown. If issuing the 11.1-06, any matter that is specifically subordinated to the Insured Mortgage by separate document or state law may be shown in the space following Paragraph No. 3.

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

These endorsements do not extend the Date of Policy so as to bring forward coverages contained in any other endorsements that are a part of the policy. To the extent that the examination covering the recording of the modification agreement discloses any matter which affects the coverages afforded by other endorsements, they should be reflected on the office file for consideration by future examiners.

These endorsements contain a "creditors' rights" exception relating to the modification agreement.

This was included to cover those situations where "creditor's rights" coverage may have been given in the underlying policy based on the terms of the original mortgage or deed of trust and the structure of the original transaction. The modification could change those terms or structure.  Any request for coverage over or deletion of this provision of the endorsement must be referred to the Company's underwriting adviser.

**MODIFICATION**

In the event that modification of an endorsement is requested, it is necessary to consider your state regulatory requirements for filing and approval of forms.  If the endorsement is modified, the endorsement is not an ALTA form and should not reference ALTA in the title.  You must obtain the approval of the Company's underwriting adviser before complying with any request for a modification.

Return to Table of Contents

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

ENDORSEMENT MANUAL – Fidelity National Title Group, Inc.                    **SECTION 11**

ENDORSEMENT

Attached to Policy No. _____

**Issued By**
**[FNTG BRAND]**

The Company insures against loss or damage sustained by the Insured by reason of:

1.      The invalidity or unenforceability of the lien of the Insured Mortgage upon the Title at Date of Endorsement as a result of the agreement dated ___ recorded ____ ("Modification"); and

2.      The lack of priority of the lien of the Insured Mortgage, at Date of Endorsement, over defects in or liens or encumbrances on the Title, except for those shown in the policy or any prior endorsement and except:      ADD EXCEPTIONS HERE


This endorsement does not insure against loss or damage, and the Company will not pay costs, attorneys' fees, or expenses, by reason of any claim that arises out of the transaction creating the Modification by reason of the operation of federal bankruptcy, state insolvency, or similar creditors' rights laws that is based on:

1.      the Modification being deemed a fraudulent conveyance or fraudulent transfer; or

2.      the Modification being deemed a preferential transfer except where the preferential transfer results from the failure

        a.      to timely record the instrument of transfer; or

        b.      of such recordation to impart notice to a purchaser for value or to a judgment or lien creditor.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

Date of Endorsement _____

[Witness clause optional]


[FNTG BRAND]

BY: _____

ALTA Endorsement Form 11-06
(Mortgage Modification) (6/17/06)
©American Land Title Association

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

ENDORSEMENT
Attached to Policy No. _____

**Issued By**
**[FNTG BRAND]**

The Company insures against loss or damage sustained by the Insured by reason of:

1.      The invalidity or unenforceability of the lien of the Insured Mortgage upon the Title at Date of Endorsement as a result of the agreement dated _____ , recorded _____, ("Modification"); and

2.      The lack of priority of the lien of the Insured Mortgage, at Date of Endorsement, over defects in or liens or encumbrances on the Title, except for those shown in the policy or any prior endorsement and except:      ADD EXCEPTIONS HERE

3.      The following matters not being subordinate to the lien of the Insured Mortgage: ADD SUBORDINATE MATTERS HERE

        This endorsement does not insure against loss or damage, and the Company will not pay costs, attorneys' fees, or expenses, by reason of any claim that arises out of the transaction creating the Modification by reason of the operation of federal bankruptcy, state insolvency, or similar creditors' rights laws that is based on:

1.      the Modification being deemed a fraudulent conveyance or fraudulent transfer; or

2.      the Modification being deemed a preferential transfer except where the preferential transfer results from the failure

        a.      to timely record the instrument of transfer; or

        b.      of such recordation to impart notice to a purchaser for value or to a judgment or lien creditor.

        This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

Date of Endorsment  _____

[Witness clause optional]

[FNTG BRAND]

BY: _____

ALTA Endorsement Form 11.1-06
(Mortgage Modification with Subordination) (10/22/09)
©American Land Title Association

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

**Return to Table of Contents**

**AGGREGATION**

**ALTA ENDORSEMENT - FORM 12-06**


**PURPOSE**


These endorsements are also known as "tie-in" endorsements.    Mortgages covering many parcels in different recording districts or jurisdictions may each be recorded for the full amount of the secured indebtedness, or the allocated collateral value of each site, or a combination of full and allocated values.    The allocated amount is often used in states which impose a mortgage tax.   In any case, the lender views the transaction as one debt and wants insurance coverage for the total amount of the secured indebtedness.   Instead of combining all of the parcels into one large loan policy, the aggregation endorsement allows an insurer to issue a number of policies for lesser amounts but to tie the policies together so that the Insured can aggregate the coverage and take advantage of any increases in the value of a particular parcel should there be a loss. Form 12-06 can be used for aggregating policies on sites all located in a single state or sites located in multiple states none of which have state statutory limitations on the amount which can be insured.  Form 12.1-06 is intended to be used for aggregating policies in multiple states one or more of which have state statutory limitations on the amount which can be insured.


**SECTIONS OF POLICY AMENDED BY ENDORSEMENT**


This endorsement changes the provisions of Conditions 8(a)(i) of the  ALTA Loan Policy so that the Amount of Insurance available to cover a loss is the aggregate of the Amount of Insurance available under the policy to which this endorsement is attached plus the Amounts of Insurance available under the other policies identified in this endorsement.  Effective April 2, 2013 Form 12-06 was modified by adding new paragraphs which change the provisions of Sections 7(a)(i), 8(a), 8(b), 10 of the Conditions of the ALTA Loan Policy.  New Form 12.1-06 also contains the new paragraphs.  These new paragraphs clarify the effect of the endorsement on the options of the Company under the policy in the event of a claim and the extent of the Company's liability.

**BASIS FOR PROVIDING COVERAGE**


If a Loan Policy is issued insuring more than one parcel, the liability for a Title defect affecting any one of the parcels is not limited by an apportioned amount of insurance allocated to that parcel. Therefore, the coverage can be shifted among the parcels from those which are not affected by a

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

defect causing a loss to a parcel affected by such a defect.   If the affected property has increased in value since the policy was issued, this shift of coverage provides protection up to the parcel's increased value without the face amount of the policy being increased.  This is basically the theory behind this coverage.

If one policy could be issued covering multiple parcels, an aggregation endorsement would not be necessary.   Since a single policy covering all parcels is often not feasible because policy forms, rates and other regulatory issues vary between states, or such a policy could result in a highly complex policy when attempting to cover multiple parcels, with all of their individual exceptions, even within the same state, the ALTA 12-06 was designed to reach the same results as a single policy insuring multiple parcels.

Example:  There is a mortgage securing a debt of $10 million.  The $10 million mortgage is recorded against a parcel in Illinois and a parcel in California. The Illinois and California policies are each to be issued for $5 million, based on the lender's evaluation. The tie-in endorsement would allow the lender to make a claim of up to $10 million against either parcel, if the parcel against which the claim is made had increased in value to that extent. In no event would the total liability under both policies be more than $10 million.

You may be asked to issue an alternative format in which both the Illinois and California policies would be issued for a face amount of $10 million but each would include an endorsement limiting our total liability to $10 million under both policies notwithstanding the fact that the sum of the two policies is $20 million. **This format is not acceptable**. We should never issue a policy with an Amount of Insurance that exceeds the amount for which premium was collected for the insured parcel.   In addition, this format could cause the Company to over-reserve based on the Amount of Insurance reported for each policy, and perhaps to pay additional premium tax that would not otherwise be due.

ALTA Form 12.1-06 was designed for multistate transactions involving one or more states with statutory limitations which are less than the aggregate amount of insurance under all the policies to be issued in the transaction.  This form allows the full amount of available coverage to be provided for sites in state in which the statutory limit is not a problem, while at the same time limiting coverage in states in which the statutory limit prevents the full amount of coverage from being provided.  This form may **not** be used without the approval of the Reinsurance Department in transactions in which the aggregate amount of insurance will exceed the self-imposed limit of the Fidelity family, or if a party to the transaction is requiring reinsurance from an outside company.

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

Example:  The policies in a multistate transaction will aggregate $100 million.  The sites to be insured are located in states X, Y, and Z.  In state X the policy aggregate is $70 million, and there is no statutory limit; in state Y the policy aggregate is $20 million, and the state statutory limit is also $20 million; and in state Z the policy aggregate is $10 million and so is the statutory limit.  When Form 12.1-06 is completed, the Aggregate Amount of Insurance which will be shown in section 3.a. will be $100 million.  This will also be the amount of coverage available for the sites in state X since there is no statutory limit in that state.  In section 3.b. of the form state Y will be listed with an Aggregate Amount of Insurance of $20 million, as will state Z with an Aggregate Amount of Insurance of $10 million.  The net effect is to provide the full amount of coverage available under the policies to the sites in state X, while limiting coverage for the sites in states Y and Z to the applicable statutory limits.

The following conditions apply to the aggregation endorsements:

1.      All of the loan policies to which either of the endorsements will be attached must be of the same type.

2.      The loan amount must be secured by mortgages on two or more parcels.

3.      The Insured Mortgage must state that each secures the entire Indebtedness or the sum of the amounts secured by all of the Insured Mortgages must equal the entire Indebtedness.

4.      The Amount of Insurance shown on Schedule A of  any policy must be equal to the amount the Insured allocates to the property described in Schedule A and not to the total aggregate amount shown on the tie-in endorsement.

5.      Policies of other companies, including our sister companies, **cannot** be tied in with policies issued by any one particular company.

6.      If Form 12.1-06 is requested for a transaction in which the aggregate amount of insurance will exceed the self-imposed limit of the Fidelity family, or if a party to the transaction is requiring reinsurance from an outside the Fidelity family for any transaction, you must contact the Reinsurance Department before committing to issue the form.

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

ENDORSEMENT MANUAL – Fidelity National Title Group, Inc.                    **SECTION 12**

This endorsement is not available in all states.    You must verify it is available before agreeing to issue it.

## MODIFICATION

In the event that modification of an endorsement is requested, it is necessary to consider your state regulatory requirements for filing and approval of forms.  If the endorsement is modified, the endorsement is not an ALTA form and should not reference ALTA in the title.  You must obtain the approval of the Company's underwriting advisor before complying with any request for a modification.

Return to Table of Contents

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

ENDORSEMENT

Attached to Policy No.   _____

**Issued By**

***[FNTG BRAND]***

1. The following policies are issued in conjunction with one another:

   <u>POLICY NUMBER</u>:                <u>STATE</u>:                <u>AMOUNT OF INSURANCE</u>:

   _____ $ _____

   _____ $ _____

   _____ $ _____

2. The amount of insurance available to cover the Company's liability for loss or damage under this policy at the time of payment of loss shall be the Aggregate Amount of Insurance defined in Section 3 of this endorsement.

3. Subject to the limits in Section 4 of this endorsement, the Aggregate Amount of Insurance under these policies is $ _____.

4. Section 7(a)(i) of the Conditions of this policy is amended to read:

   **7.  OPTIONS TO PAY OR OTHERWISE SETTLE CLAIMS; TERMINATION OF LIABILITY**

   In case of a claim under this policy, the Company shall have the following additional options:

   (a) to pay or tender payment of the lesser of the value of  the Title as insured or the Aggregate Amount of Insurance applicable under this policy at the date the claim was made by the Insured Claimant, or to purchase the Indebtedness.

      (i)     to pay or tender payment of the lesser of the value of the Title as insured at the date the claim was made by the Insured Claimant, or the Aggregate Amount of Insurance applicable under this policy together with any cost, attorneys' fees, and costs and expenses incurred by the Insured Claimant that were authorized by the Company up to the time of payment or tender of payment and that the Company is obligated to pay; or

5. Section 8(a) and 8(b) of the Conditions of this policy are amended to read:

   **8. DETERMINATION AND EXTENT OF LIABILITY**

   This policy is a contract of indemnity against actual monetary loss or damage sustained or incurred by the Insured Claimant who has suffered loss or damage by reason of matters insured against by this policy.

   (a) The extent of liability of the Company for loss or damage under this policy shall not exceed the least of

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

ENDORSEMENT MANUAL – Fidelity National Title Group, Inc.                    **SECTION 12**

       (i)  the Aggregate Amount of Insurance,

       (ii)  the Indebtedness,

       (iii)  the difference between the value of the Title as insured and the value of the Title subject to the risk insured against by this policy, or

       (iv)  if a government agency or instrumentality is the Insured Claimant, the amount it paid in the acquisition of the Title or the Insured Mortgage in satisfaction of its insurance contract or guaranty.

    (b)  If the Company pursues its rights under Section 5 of these Conditions and is unsuccessful in establishing the Title or the lien of the Insured Mortgage, as insured, the Insured Claimant shall have the right to have the loss or damage determined either as of the date the claim was made by the Insured Claimant or as the date it is settled and paid.

6.   Section 10  of the Conditions of this policy is amended to read:

### 10.  REDUCTION OF INSURANCE; REDUCTION OR TERMINATION OF LIABILITY

    (a)  All payments under this policy, except payments made for costs, attorneys' fees, and expenses, shall reduce the Aggregate Amount of Insurance by the amount of the payment.

    (b)  However, any payments made prior to the acquisition of Title as provided in Section 2 of these Conditions shall not reduce the Aggregate Amount of Insurance afforded under this endorsement except to the extent that the payments reduce the Indebtedness.

    (c)  The voluntary satisfaction or release of the Insured Mortgage shall terminate all liability of the Company under this policy, except as provided in Section 2 of these Conditions, but it will not reduce the Aggregate Amount of Insurance for the other policies identified in Section 1 of this endorsement.

       This endorsement is issued as part of the policy.   Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance.   To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls.   Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

[Witness clause optional]

[FNTG BRAND]

BY: _____

ALTA Endorsement Form 12-06
(Aggregation-Loan) (rev. 4/2/13)
© American Land Title Association

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

**ENDORSEMENT**

**Attached to Policy No. _____**

**Issued By**

*[FNTG BRAND]*

1. The following policies are issued in conjunction with one another:

POLICY NUMBER:                STATE:                AMOUNT OF INSURANCE:

$

$

$

2. The amount of insurance available to cover the Company's liability for loss or damage under this policy at the time of payment of loss shall be the Aggregate Amount of Insurance defined in Section 3 of this endorsement.

3. The Aggregate Amount of Insurance under this policy is either:

   a. $ _____; or

   b. If the Land is located in one of the states identified in this subsection, then the Aggregate Amount of Insurance is restricted to the amount shown below:

   STATE                     AGGREGATE AMOUNT OF INSURANCE

   $

   $

4. Section 7(a)(i) of the Conditions of this policy is amended to read:

   **7. OPTIONS TO PAY OR OTHERWISE SETTLE CLAIMS; TERMINATION OF LIABILITY**

   In case of a claim under this policy, the Company shall have the following additional options:

   (a)    to pay or tender payment of the lesser of the value of the Title as insured or the Aggregate Amount of Insurance applicable under this policy at the date the claim was made by the Insured Claimant, or to purchase the Indebtedness.

   (i) To pay or tender payment of the lesser of the value of the Title as insured at the date the claim was made by the Insured Claimant, or the Aggregate Amount of Insurance applicable under this policy, together with any cost, attorneys' fees, and costs and expenses incurred by the Insured Claimant that were authorized by the Company up to the time of payment or tender of payment and that the Company is obligated to pay; or

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

5.   Section 8(a) and 8(b) of the Conditions of this policy are amended to read:

### 8. DETERMINATION AND EXTENT OF LIABILITY

This policy is a contract of indemnity against actual monetary loss or damage sustained or incurred by the Insured Claimant who has suffered loss or damage by reason of matters insured against by this policy.

(a) The extent of liability of the Company for loss or damage under this policy shall not exceed the least of

(i)   the Aggregate Amount of Insurance for the State where the Land is located,

(ii)  the Indebtedness,

(iii)  the difference between the value of the Title as insured and the value of the Title subject to the risk insured against by this policy, or

(iv) if a government agency or instrumentality is the Insured Claimant, the amount it paid in the acquisition of the Title or the Insured Mortgage in satisfaction of its insurance contract or guaranty.

(b) If the Company pursues its rights under Section 5 of these Conditions and is unsuccessful in establishing the Title or the lien of the Insured Mortgage, as insured, the Insured Claimant shall have the right to have the loss or damage determined either as of the date the claim was made by the Insured Claimant or as the date it is settled and paid.

6.   Section 10 of the Conditions of this policy is amended to read:

### 10.  REDUCTION OF INSURANCE; REDUCTION OR TERMINATION OF LIABILITY

(a) All payments under this policy, except payments made for costs, attorneys' fees, and expenses, shall reduce the applicable Aggregate Amount of Insurance by the amount of the payment.

(b) If this policy insures the Title to Land located in a state identified in Section 3 b. of this endorsement:

(i)   all payments under this policy, except payments made for costs, attorneys' fees, and expenses, shall reduce the Aggregate Amount of Insurance  by the amount of the payment; but

(ii)  a payment made for loss or damage on Land insured in one of the policies identified in Section 1 on Land located outside this state shall not reduce the Aggregate Amount of Insurance in Section 3.b. of this endorsement until the Aggregate Amount of Insurance in Section 3.a. is reduced below the  Aggregate Amount of Insurance in Section 3.b .

(c) However, any payments made prior to the acquisition of Title as provided in Section 2 of these Conditions shall not reduce the Aggregate Amount of Insurance afforded under this endorsement except to the extent that the payments reduce the Indebtedness.

(d) The voluntary satisfaction or release of the Insured Mortgage shall terminate all liability of the Company under this policy, except as

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

provided in Section 2 of these Conditions, but it will not reduce the Aggregate Amount of Insurance for the other policies identified in Section 1 of this endorsement.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

[Witness clause optional]

[FNTG BRAND]

By: _____
          Authorized Signatory

ALTA Endorsement Form 12.1-06
(Aggregation- State Limits-Loan) (4/2/13)
© American Land Title Association

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

Return to Table of Contents

## LEASEHOLD-OWNER'S AND LEASEHOLD-LOAN
## ALTA ENDORSEMENT – FORMS 13-06 AND 13.1-06

### PURPOSE

The ALTA Endorsement Forms 13-06 and 13.1-06 were created to be attached to the ALTA Owner's Policy and ALTA Loan Policy respectively.   They were revised April 2, 2012. They are intended to be used either with policies covering only Leasehold Estates or for those that insure both Leasehold Estates and the ownership of improvements located on them.

### SECTIONS OF POLICY AMENDED BY ENDORSEMENT

The previous ALTA Leasehold Owner's and Leasehold Loan Policies were designed to provide insurance for space tenants that had no significant investment in Tenant Improvements.  As a result, these policies did not provide compensation for the loss of Tenant Improvements or for the value of the loss of use of the leasehold for legitimate purposes as the result of a matter covered by the policies.

The ALTA 13-06 and 13.1-06 provide all of the coverages previously provided by the former leasehold policy forms but in addition include the value of improvements in the calculation of losses resulting from eviction based on a matter insured by the current policy forms.  Similarly, improvement value is included if the Insured is unable to use the property for its intended purpose as a result of a matter covered by the policy, assuming the lease permits such a use.

Reimbursement to the Insured for specified out-of-pocket construction costs for improvements on the land that were not substantially completed at the time of eviction is also provided.  Similar coverage is provided to insured leasehold lenders for improvements they construct after they acquire the property by foreclosure or conveyance in lieu thereof.

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

ENDORSEMENT MANUAL – Fidelity National Title Group, Inc.                                    SECTION 13

Finally, both endorsements also increase to 100 miles the distance for which the Company will pay the costs of relocating personal property.

The April 2, 2012 revision consists of:

- A revision of the definition of "Personal Property" to make it consistent with the use of the term in other endorsements such as the ALTA 36-06 (Energy Project – Leasehold/Easement –Owners) and the ALTA 36.2-06 (Energy Project –Leasehold-Owners).

- A revision of the definition of "Tenant Leasehold Improvements" to relate only to the extent the Insured has rights in such Improvements.

- A revision of the "Valuation of Estate or Interest Insured" to clarify that it covers the entire Title, or any portion of it, from which the Insured suffers eviction. In addition, it clarifies that the loss must come from a defect insured against by the policy.

- "Additional items of loss" is clarified to make coverage applicable to the portion of Land from which the Insured is Evicted, if it is not the entire Land, and references the Condition in the policy that determines the measure of loss (Owners Policy, Section 8(a)(ii) and Loan Policy, Section 8(a)(iii)).

- Adds the cost of restoring the property to the extent it is damaged because of Eviction.

- Adds a limitation that the coverage does not include loss resulting from environmental damage or contamination, to conform to policy provisions.

**BASIS FOR PROVIDING COVERAGE**

The ALTA Leasehold Owner's and Leasehold Loan Policies were withdrawn as official ALTA Forms.  The ALTA 13-06 and 13.1-06 were meant to replace the old policy forms.  Since these

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

endorsements give more coverage than the old policies, it is not expected that there will be any requests for the old forms, which now must be titled "formerly ALTA" to indicate that they have been withdrawn by ALTA.


These endorsements will be issued when the customer is seeking the additional coverages provided therein. The searching and examining procedures for insuring leaseholds remain the same, as does the modification of Schedule A. The estate or interest in the Land is not a Fee, but rather the Leasehold Estate created by and between the parties, with a reference to the underlying lease information. The entire lease must be examined, and many states require any short form lease or memorandum of the lease to contain the signatures of both parties to give effective constructive notice on the record of the tenants' rights and interests (if the full lease is not recorded).


Consult your Company underwriting advisor for instructions on how to correctly modify the fee policies for use with these endorsements.


**MODIFICATION**


In the event that modification of an endorsement is requested, it is necessary to consider your state regulatory requirements for filing and approval of forms.  If the endorsement is modified, the endorsement is not an ALTA form and should not reference ALTA in the title.  You must obtain the approval of the Company's underwriting advisor before complying with any request for a modification.


Return to Table of Contents

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

ENDORSEMENT
Attached to Policy No. _____

**Issued By**
**[FNTG BRAND]**

1.  As used in this endorsement, the following terms shall mean:

    a.  "Evicted" or "Eviction": (a) the lawful deprivation, in whole or in part, of the right of possession insured by this policy, contrary to the terms of the Lease or (b) the lawful prevention of the use of the Land or the Tenant Leasehold Improvements for the purposes permitted by the Lease, in either case as a result of a matter covered by this policy.
    b.   "Lease": the lease described in Schedule A.
    c.  "Leasehold Estate": the right of possession granted in the Lease for the Lease Term.
    d.  "Lease Term": the duration of the Leasehold Estate, as set forth in the Lease, including any renewal or extended term if a valid option to renew or extend is contained in the Lease.
    e.  "Personal Property":  property, in which and to the extent the Insured has rights, located on or affixed to the Land on or after Date of Policy that by law does not constitute real property because (i) of its character and manner of attachment to the Land and (ii) the property can be severed from the Land without causing material damage to it or to the Land.
    f.  "Remaining Lease Term": the portion of the Lease Term remaining after the Insured has been Evicted.
    g.  "Tenant Leasehold Improvements": Those improvements, in which and to the extent the Insured has rights, including landscaping, required or permitted to be built on the Land by the Lease that have been built at the Insured's expense or in which the Insured has an interest greater than the right to possession during the Lease Term.

2.  Valuation of Estate or Interest Insured:

If in computing loss or damage it becomes necessary to value the Title, or any portion of it, as the result of an Eviction of the Insured, then, as to that portion of the Land from which the Insured is Evicted, that value shall consist of the value for the Remaining Lease Term of the Leasehold Estate and any Tenant Leasehold Improvements existing on the date of the Eviction.  The Insured Claimant shall have the right to have the Leasehold Estate and the Tenant Leasehold Improvements affected by a defect insured against by the policy valued either as a whole or separately.  In either event, this determination of value shall take into account rent no longer required to be paid for the Remaining Lease Term.

3.  Additional items of loss covered by this endorsement:

If the Insured is Evicted, the following items of loss, if applicable to that portion of the Land from which the Insured is Evicted shall be included, without duplication, in computing loss or damage incurred by the Insured, but not to the extent that the same are included in the valuation of the Title determined pursuant to Section 2 of this endorsement, any other endorsement to the policy or Section 8(a)(ii) of the Conditions:

    a.  The reasonable cost of (i) removing and relocating any Personal Property that the Insured has the right to remove and relocate, situated on the Land at the time of Eviction,(ii) transportation of that Personal Property for the initial one hundred miles incurred in connection with the relocation,(iii) repairing the Personal Property damaged by reason of the removal and relocation, and (iv) restoring the Land to the extent damaged as a result of the removal and relocation of the Personal Property and required of the Insured solely because of the Eviction .

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

b. Rent or damages for use and occupancy of the Land prior to the Eviction that the Insured as owner of the Leasehold Estate may be obligated to pay to any person having paramount title to that of the lessor in the Lease.

c. The amount of rent that, by the terms of the Lease, the Insured must continue to pay to the lessor after Eviction with respect to the portion of the Leasehold Estate and Tenant Leasehold Improvements from which the Insured has been Evicted.

d. The fair market value, at the time of the Eviction, of the estate or interest of the Insured in any lease or sublease permitted by the Lease and made by Insured as lessor of all or part of the Leasehold Estate or the Tenant Leasehold Improvements.

e. Damages caused by the Eviction that the Insured is obligated to pay to lessees or sublessees on account of the breach of any lease or sublease permitted by the Lease and made by the Insured as lessor of all or part of the Leasehold Estate or the Tenant Leasehold Improvements.

f. The reasonable cost to obtain land use, zoning, building and occupancy permits, architectural and engineering services and environmental testing and reviews for a leasehold reasonably equivalent to the Leasehold Estate.

g. If Tenant Leasehold Improvements are not substantially completed at the time of Eviction, the actual cost incurred by the Insured, less the salvage value, for the Tenant Leasehold Improvements up to the time of Eviction.  Those costs include costs incurred to obtain land use, zoning, building and occupancy permits, architectural and engineering services, construction management services, environmental testing and reviews, and landscaping.

4.  This endorsement does not insure against loss, damage or costs of remediation (and the Company will not pay cost, attorneys' fees or expenses) resulting from environmental damage or contamination.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.


[Witness clause optional]


[FNTG BRAND]

BY: _____

ALTA Endorsement Form 13-06
(Leasehold – Owners) (Rev. 4/2/12)
© American Land Title Association

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

ENDORSEMENT
Attached to Policy No. _____
**Issued By**
**[FNTG BRAND]**

1.        As used in this endorsement, the following terms shall mean:

a.        "Evicted" or "Eviction": (a) the lawful deprivation, in whole or in part, of the right of possession insured by this policy, contrary to the terms of the Lease or (b) the lawful prevention of the use of the Land or the Tenant Leasehold Improvements for the purposes permitted by the Lease, in either case as a result of a matter covered by this policy.

b.        "Lease": the lease described in Schedule A.

c.        "Leasehold Estate": the right of possession granted in the Lease for the Lease Term.

d.        "Lease Term": the duration of the Leasehold Estate, as set forth in the Lease, including any renewal or extended term if a valid option to renew or extend is contained in the Lease.

e.        "Personal Property": property, in which and to the extent the Insured has rights, located on or affixed to the Land on or after Date of Policy that by law does not constitute real property because (i) of its character and manner of attachment to the Land and (ii) the property can be severed from the Land without causing material damage to the property or to the Land.

f.        "Remaining Lease Term": the portion of the Lease Term remaining after the Tenant has been Evicted.

g.        "Tenant": the tenant under the Lease and, after acquisition of all or any part of the Title in accordance with the provisions of Section 2 of the Conditions of the policy, the Insured Claimant.

h.        "Tenant Leasehold Improvements": Those improvements, in which and to the extent the Insured has rights, including landscaping, required or permitted to be built on the Land by the Lease that have been built at the Tenant's expense or in which the Tenant has an interest greater than the right to possession during the Lease Term.

2.        Valuation of Estate or Interest Insured:

If in computing loss or damage it becomes necessary to value the Title, or any portion of it, as the result of an Eviction of the Tenant, then, as to that portion of the Land from which the Tenant is Evicted, that value shall consist of the value for the Remaining Lease Term of the Leasehold Estate and any Tenant Leasehold Improvements existing on the date of the Eviction.  The Insured Claimant shall have the right to have the Leasehold Estate and the Tenant Leasehold Improvements affected by a defect insured against by the policy valued either as a whole or separately.  In either event, this determination of value shall take into account rent no longer required to be paid for the Remaining Lease Term.

3.        Additional items of loss covered by this endorsement:

If the Insured acquires all or any part of the Title in accordance with the provisions of Section 2 of the Conditions of this policy and thereafter is Evicted, the following items of loss, if applicable to that portion of the Land from which the Insured is Evicted shall be included, without duplication, in computing loss or damage incurred by the Insured, but not to the extent that the same are included in the valuation of the Title determined pursuant to Section 2 of this endorsement, any other endorsement to the policy, or Section 8(a)(iii) of the Conditions:

a.        The reasonable cost of (i) removing and relocating any Personal Property that the Insured has the right to remove and relocate, situated on the Land at the time

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

of Eviction,(ii) transportation of that Personal Property for the initial one hundred miles incurred in connection with the relocation,(iii) repairing the Personal Property damaged by reason of the removal and relocation, and (iv) restoring the Land to the extent damaged as a result of the removal and relocation of the Personal Property and required of the Insured solely because of the Eviction

b.   Rent or damages for use and occupancy of the Land prior to the Eviction that the Insured as owner of the Leasehold Estate may be obligated to pay to any person having paramount title to that of the lessor in the Lease.

c.   The amount of rent that, by the terms of the Lease, the Insured must continue to pay to the lessor after Eviction with respect to the portion of the Leasehold Estate and Tenant Leasehold Improvements from which the Insured has been Evicted.

d.   The fair market value, at the time of the Eviction, of the estate or interest of the Insured in any lease or sublease permitted by the Lease and made by Tenant as lessor of all or part of the Leasehold Estate or the Tenant Leasehold Improvements.

e.   Damages caused by the Eviction that the Insured is obligated to pay to lessees or sublessees on account of the breach of any lease or sublease permitted by the Lease and made by the Tenant as lessor of all or part of the Leasehold Estate or the Tenant Leasehold Improvements.

f.   The reasonable cost to obtain land use, zoning, building and occupancy permits, architectural and engineering services and environmental testing and reviews for a replacement leasehold reasonably equivalent to the Leasehold Estate.

g.   If Tenant Leasehold Improvements are not substantially completed at the time of Eviction, the actual cost incurred by the Insured, less the salvage value, for the Tenant Leasehold Improvements up to the time of Eviction.  Those costs include costs incurred to obtain land use, zoning, building and occupancy permits, architectural and engineering services, construction management services, environmental testing and reviews, and landscaping.

4.   This endorsement does not insure against loss, damages, or costs of remediation (and the Company will not pay cost, attorneys' fees or expenses) resulting from environmental damage or contamination.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

 [Witness clause optional]

[FNTG BRAND]

BY: _____

ALTA Endorsement Form 13.1-06
(Leasehold – Loan) (Rev. 4/1/12)
© American Land Title Association

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

ENDORSEMENT MANUAL – Fidelity National Title Group, Inc.                          **SECTION 14**

Return to Table of Contents

**FUTURE ADVANCES**

**ALTA ENDORSEMENT – FORMS 14-06, 14.1-06, 14.2-06 and 14.3-06**


**PURPOSE**


These endorsements, like the Revolving Credit Endorsements discussed in Section 60, affirmatively insure the priority and enforceability of the lien of the Insured Mortgage with respect to future advances and repayments and re-advances of Indebtedness. In addition, they include coverage for the consequences of a variable rate, including possible negative amortization (or interest on interest), as discussed in Section 6. These endorsements also cover the effect on the priority and enforceability of the Insured Mortgage of the Indebtedness having been reduced to zero before being increased by subsequent advances ("zero-balance"), and state law requirements to secure these advances not having been met. Unique to the 14.3-06 (Reverse Mortgages) is additional coverage for failure of the Insured Mortgage to state a term or maximum dollar amount, and failure of the mortgagors to be at least 62 years old.


**SECTIONS OF POLICY AMENDED BY ENDORSEMENT**


Each endorsement modifies Exclusions from Coverage No. 3(d) and Conditions No. 1 (d)(ii). They also expand the coverage granted by Covered Risks 9 and 10 to those amounts included within the definition of Indebtedness at Condition 1(d) by using and defining the term "Advances" to include those amounts.


**BASIS FOR PROVIDING COVERAGE**


The underwriting issues discussed in Section 6 must be considered in order to issue the variable rate coverage included in all these forms. In addition, refer to Section 59 for a complete discussion of the various factors to take into consideration when analyzing which form of endorsement to use to cover revolving credit and future advances. These factors include:


**1. Preliminary Considerations**


*Security*

A mortgage or deed of trust will secure repayment of future advances of funds by the lender if it so provides.  It doesn't matter whether the loan provides for revolving credit or not. However, except in the case where the principal balance has been paid down to zero, the security instrument may not secure future advances unless the parties agree that it will.

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

Under Section 549 of the Bankruptcy Code, the bankruptcy trustee of a borrower may have the power to avoid the lien of a mortgage or trust deed to the extent it secures advances made after the lender has notice of the bankruptcy.  The recording or filing of a copy of the petition, or a notice that the petition has been filed, is sufficient to give the lender that notice.  Therefore, draws against a revolving credit line and other loan advances which are funded after this point may be in jeopardy of being unsecured.

*Priority*

The priority of the mortgage or deed of trust as security for future advances depends upon the factors discussed below.  The problems arise where a lien or encumbrance is created or attaches after recording of the mortgage or trust deed but prior to a future advance.

**2. Ordinary Liens and Encumbrances**

*Notice*

To be prior, notice that the mortgage or trust deed secures future advances must be given to future holders of liens and encumbrances.  Therefore, the recorded mortgage must disclose that it secures future advances.

*Obligation to Advance*

Whether the lender is obligated to make the advance after an intervening party's lien or encumbrance attaches to the borrower's Title is important to priority in most states.  If the lender is legally obligated to make the advance ("obligatory advance"), the lien securing it is prior to the lien or encumbrance of the intervening party.  An advance is obligatory if the lender could be successfully sued for damages if it did not make it.  Therefore, any conditions on the lender's obligation to fund must not be under the lender's control.   If the lender is not obligated to fund after a lien or encumbrance attaches to the title, any advances made thereafter are optional ("optional advance"). The rule differs among the states as to whether a lien securing optional advances will have priority over an intervening lien or encumbrance:

> *Majority Rule:*  A future advance mortgage lien is prior if the lender does not have actual notice of the intervening interest at the time of the advance.

> *Minority Rule:*  A future advance mortgage lien is prior if the lender has neither actual nor constructive notice of the intervening interest at the time of the advance.

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

ENDORSEMENT MANUAL – Fidelity National Title Group, Inc.                                     **SECTION 14**

Unless the agreement between the lender and borrower provides for a cure by the borrower, any advance made after a default by the borrower is an optional advance.  Where an obligatory advance agreement contains a cure provision, advances made after cure are again obligatory. Therefore they would be entitled to priority over encumbrances attaching after cure but before the advance.  Advances made after default and before cure would be treated as optional advances.

**3. Special Cases:   Federal Tax Liens, Mechanics' Liens and Environmental Protection Liens**

*Federal Tax Liens*

There is some argument about the priority of federal tax liens with respect to the lien for disbursements under a construction loan.  Under the worst case view, the construction loan mortgage lien has the same priority over federal tax liens as it would have over a judgment lien under state law. However, no advance made under a non-construction future advance mortgage is protected against a federal tax lien recorded after recording of the mortgage where the advance is made (1) more than 45 days after the recording of the tax lien notice or (2) after actual notice of the tax lien, whichever occurs first.  Whether the advance is optional or obligatory is immaterial.

*Mechanics' Liens*

The law of many states gives mechanics' liens priority over the lien of mortgages or trust deeds. In some states, this is limited to those mortgages or trust deeds which finance the construction out of which the liens arise.  Others treat mechanic's liens like other liens with respect to future advance mortgages if the mortgage was recorded before the visible commencement of construction. **The exception or carve out for Mechanics' Liens appears as bracketed optional material. Some states may require a separate form filing for each version of the endorsement (with or without the optional material). The version that may be available in your state will be determined by your Company underwriting advisor.**

*Environmental Protection Liens*

Currently, federal law and the laws of many states create governmental liens to secure repayment for the cost of cleaning the environment of toxic or hazardous waste.  These liens may also secure repayment for the damage done to the environment.  Under some state laws, these liens have priority over existing liens.  It is possible for them to be created without recording or filing in the local real estate records. The impact of such liens on the priority of future advances of loan proceeds is uncertain.

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

**Forms**

Form 14-06 is the broadest coverage and is only available where your state law provides absolute priority for the additional advances, without regard to the knowledge (even the actual knowledge) of the insured lender. All requirements of state law must be met, such as the inclusion of specific language on the face of the recorded mortgage. Paragraph No. 4 of the endorsement must include any other specific matter that primes the additional advance under your state law, such as construction or mechanics liens (which is shown as optional item f.)

Form 14.1-06 is comparable to Form C in Section 59.  The form excepts "actual knowledge", only, not constructive knowledge.  Therefore, this can only be issued in those jurisdictions where the law protects additional advances or re-advances made in the face of recorded matters of which the lender did not have *actual* knowledge, i.e., where constructive notice alone will not prime the advance. In other words, if an advance or re-advance is subordinate to intervening recorded matters, without regard to whether the lender had actual knowledge, you would not be able to issue this form of endorsement as it is written. It would be possible to issue this endorsement if an exception for such matters is included under Paragraph No. 4. For example:  "The loss of priority of any Advance made after the Insured has actual or constructive notice of the existence of liens, encumbrances or other matters affecting the Land intervening between Date of Policy and the Advance, as to the intervening lien, encumbrance or other matter."

Form 14.2-06 affords affirmative coverage for a mortgage which collateralizes the obligations of a borrower under a letter of credit.  Since those obligations will not arise until the letter is drawn on, the same kinds of factors will need to be analyzed under your state law to see what kind of priority these types of *possible* future advances might enjoy, and add to Paragraph No. 4 any additional matters that prime these types of future advances. The fact that these advances are, in a sense, conditional may mean that they do not enjoy the same priority as other types of future advances under your state law. This endorsement was revised by ALTA in 2009 and now it contains a bankruptcy carve-out, which is similar to older proprietary versions.

Form 14.3-06 deals with reverse mortgages, which are sometimes structured as a series of additional advances. It is comparable to Form C in Section 59.  The form excepts "actual knowledge", not constructive knowledge.  Therefore, like the 14.1-06, this can only be issued in those jurisdictions where the law protects additional advances or re-advances made in the face of recorded matters of which the lender did not have actual knowledge, i.e., where constructive notice alone will not prime the advance.  In addition, state law must be reviewed to determine if failure to state a length of term or maximum dollar amount in the Insured Mortgage will affect the

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

priority and enforceability of the Insured Mortgage. The endorsement was created to support the HUD approved form of reverse mortgage, and the statutory support and recognition of this type of loan product may be found in separate statutes passed after HUD began this program. Additionally, you must verify the mortgagors are at least 62 years old, which is another HUD requirement. [*technically corrected by ALTA 12-3-2012]*

## AUTHORITY FOR ISSUANCE OF THIS COVERAGE

These endorsements may not be issued without the approval of the Company's underwriting advisor.

## MODIFICATION

In the event that modification of an endorsement is requested, it is necessary to consider your state regulatory requirements for filing and approval of forms.  If the endorsement is modified, other than as discussed in this section, the endorsement is not an ALTA form and should not reference ALTA in the title.  You must obtain the approval of the Company's underwriting advisor before complying with any request for a modification.

Return to Table of Contents

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

**ENDORSEMEN**T

Attached to Policy No. _____

**Issued By**
**[FNTG BRAND]**

1.      The insurance for Advances added by Sections 2 and 3 of this endorsement is subject to the exclusions in Section 4 of this endorsement and the Exclusions from Coverage in the Policy, except Exclusion 3(d), the provisions of the Conditions, and the exceptions contained in Schedule B.

   a.      "Agreement," as used in this endorsement, shall mean the note or loan agreement, the repayment of Advances under which is secured by the Insured Mortgage.

   b.      "Advance," as used in this endorsement, shall mean only an advance of principal made after the Date of Policy as provided in the Agreement, including expenses of foreclosure, amounts advanced pursuant to the Insured Mortgage to pay taxes and insurance, assure compliance with laws, or to protect the lien of the Insured Mortgage before the time of acquisition of the Title, and reasonable amounts expended to prevent deterioration of improvements, together with interest on those advances.

   c.      "Changes in the rate of interest," as used in this endorsement, shall mean only those changes in the rate of interest calculated pursuant to a formula provided in the Insured Mortgage or the Agreement at Date of Policy.

2.      The Company insures against loss or damage sustained by the Insured by reason of:

   a.      The invalidity or unenforceability of the lien of the Insured Mortgage as security for each Advance.

   b.      The lack of priority of the lien of the Insured Mortgage as security for each Advance over any lien or encumbrance on the Title.

   c.      The invalidity or unenforceability or lack of priority of the lien of the Insured Mortgage as security for the Indebtedness, Advances and unpaid interest resulting from (i) re-Advances and repayments of Indebtedness, (ii) earlier periods of no indebtedness owing during the term of the Insured Mortgage, or (iii) the Insured Mortgage not complying with the requirements of state law of the state in which the Land is located to secure Advances.

3.      The Company also insures against loss or damage sustained by the Insured by reason of:

   a.      The invalidity or unenforceability of the lien of the Insured Mortgage resulting from any provisions of the Agreement that provide for (i) interest on interest, (ii) changes in the rate of interest, or (iii) the addition of unpaid interest to the Indebtedness.

   b.      Lack of priority of the lien of the Insured Mortgage as security for the Indebtedness, including any unpaid interest that was added to principal in accordance with any provisions of the Agreement, interest on interest, or interest as changed in accordance with the provisions of the Insured Mortgage, which lack of priority is caused by (i) changes in the rate of interest, (ii) interest on

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

interest, or (iii) increases in the Indebtedness resulting from the addition of unpaid interest.

4.      This endorsement does not insure against loss or damage (and the Company will not pay costs, attorneys' fees, or expenses) resulting from:

a.      The invalidity, unenforceability or lack of priority of the lien of the Insured Mortgage as security for any Advance made after a Petition for Relief under the Bankruptcy Code (11 U.S.C.) has been filed by or on behalf of the mortgagor;

b.      The lien of real estate taxes or assessments on the Title imposed by governmental authority arising after Date of Policy;

c.      The lack of priority of the lien of the Insured Mortgage as security for any Advance to a federal tax lien, which Advance is made after the earlier of (i) actual knowledge of the Insured that a federal tax lien was filed against the mortgagor, or (ii) the expiration, after notice of a federal tax lien filed against the mortgagor, of any grace period for making disbursements with priority over the federal tax lien provided in the Internal Revenue Code (26 U.S.C.);

d.      Any federal or state environmental protection lien; [or]

e.      Usury, or any consumer credit protection or truth-in-lending law. *[; or*

f.      *Any mechanic's or materialmen's lien.]*

5.      The Indebtedness includes Advances.

        This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

[Witness clause optional]

*[BRACKETED MATERIAL OPTIONAL]*

[FNTG BRAND]

BY: _____

ALTA Endorsement Form 14-06
(Future Advance - Priority) (Rev. 2/3/11)
© American Land Title Association

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

**ENDORSEMEN**T

Attached to Policy No. _____

**Issued By**
**[FNTG BRAND]**

1.  The insurance for Advances added by Sections 2 and 3 of this endorsement is subject to the exclusions in Section 4 of this endorsement and the Exclusions from Coverage in the Policy, except Exclusion 3(d), the provisions of the Conditions, and the exceptions contained in Schedule B.

    a.  "Agreement," as used in this endorsement, shall mean the note or loan agreement, the repayment of Advances under which is secured by the Insured Mortgage.

    b.  "Advance," as used in this endorsement, shall mean only an advance of principal made after the Date of Policy as provided in the Agreement, including expenses of foreclosure, amounts advanced pursuant to the Insured Mortgage to pay taxes and insurance, assure compliance with laws, or to protect the lien of the Insured Mortgage before the time of acquisition of the Title, and reasonable amounts expended to prevent deterioration of improvements, together with interest on those advances.

    c.  "Changes in the rate of interest," as used in this endorsement, shall mean only those changes in the rate of interest calculated pursuant to a formula provided in the Insured Mortgage or the Agreement at Date of Policy.

2.  The Company insures against loss or damage sustained by the Insured by reason of:

    a.  The invalidity or unenforceability of the lien of the Insured Mortgage as security for each Advance.

    b.  The lack of priority of the lien of the Insured Mortgage as security for each Advance over any lien or encumbrance on the Title.

    c.  The invalidity or unenforceability or lack of priority of the lien of the Insured Mortgage as security for the Indebtedness, Advances and unpaid interest resulting from (i) re-Advances and repayments of Indebtedness, (ii) earlier periods of no Indebtedness owing during the term of the Insured Mortgage, or (iii) the Insured Mortgage not complying with the requirements of state law of the state in which the Land is located to secure Advances.

3.  The Company also insures against loss or damage sustained by the Insured by reason of:

    a.  The invalidity or unenforceability of the lien of the Insured Mortgage resulting from any provisions of the Agreement that provide for (i) interest on interest, (ii) changes in the rate of interest, or (iii) the addition of unpaid interest to the Indebtedness.

    b.  Lack of priority of the lien of the Insured Mortgage as security for the Indebtedness, including any unpaid interest that was added to principal in accordance with any provisions of the Agreement, interest on interest, or interest as changed in accordance with the provisions of the Insured Mortgage, which

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

lack of priority is caused by (i) changes in the rate of interest, (ii) interest on interest, or (iii) increases in the Indebtedness resulting from the addition of unpaid interest.

4.      This endorsement does not insure against loss or damage (and the Company will not pay costs, attorneys' fees or expenses) resulting from:

a.      The invalidity, unenforceability or lack of priority of the lien of the Insured Mortgage as security for any Advance made after a Petition for Relief under the Bankruptcy Code (11 U.S.C.) has been filed by or on behalf of the mortgagor;

b.      The lien of real estate taxes or assessments on the Title imposed by governmental authority arising after Date of Policy;

c.      The lack of priority of the lien of the Insured Mortgage as security for any Advance to a federal tax lien, which Advance is made after the earlier of (i) actual knowledge of the Insured that a federal tax lien was filed against the mortgagor, or (ii) the expiration, after notice of a federal tax lien filed against the mortgagor, of any grace period for making disbursements with priority over the federal tax lien provided in the Internal Revenue Code (26 U.S.C.);

d.      Any federal or state environmental protection lien;

e.      The lack of priority of any Advance made after the Insured has Knowledge of the existence of liens, encumbrances or other matters affecting the Land intervening between Date of Policy and the Advance, as to the intervening lien, encumbrance or other matter; [or]

f.      Usury, or any consumer credit protection or truth-in-lending law. *[; or*

g.      *Any mechanic's or materialmen's lien.]*

5.      The Indebtedness includes Advances.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

[Witness clause optional]

*[BRACKETED MATERIAL OPTIONAL]*

[FNTG BRAND]

BY: _____

ALTA Endorsement Form 14.1-06
(Future Advance - Knowledge) (Rev. 2/3/11)
©American Land Title Association

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

ENDORSEMENT MANUAL – Fidelity National Title Group, Inc.                                            SECTION 14

**ENDORSEMENT**
Attached to Policy No. _____

**Issued By**
**[FNTG BRAND]**

1. The insurance for Advances added by Section 2 of this endorsement is subject to the exclusions in Section 3 of this endorsement and the Exclusions from Coverage in the Policy, except Exclusion 3(d), the provisions of the Conditions, and the exceptions contained in Schedule B.

    a. "Agreement," as used in this endorsement, shall mean the letter of credit and its reimbursement agreement, the repayment of Advances under which is secured by the Insured Mortgage.

    b. "Advance," as used in this endorsement, shall mean only an advance made after the Date of Policy as provided in the Agreement, including expenses of foreclosure, amounts advanced pursuant to the Insured Mortgage to pay taxes and insurance, assure compliance with laws, or to protect the lien of the Insured Mortgage before the time of acquisition of the Title, and reasonable amounts expended to prevent deterioration of improvements, together with interest on those advances.

2. The Company insures against loss or damage sustained by the Insured by reason of:

    a. The invalidity or unenforceability of the lien of the Insured Mortgage as security for each Advance.

    b. The lack of priority of the lien of the Insured Mortgage as security for each Advance over any lien or encumbrance on the Title.

    c. The invalidity or unenforceability or loss of priority of the lien of the Insured Mortgage as security for the Indebtedness, Advances and unpaid interest resulting from (i) re-Advances and repayments of Indebtedness, (ii) earlier periods of no indebtedness owing during the term of the Insured Mortgage, or (iii) the Insured Mortgage not complying with the requirements of state law of the state in which the Land is located to secure Advances.

3. This endorsement does not insure against loss or damage (and the Company will not pay costs, attorneys' fees or expenses) resulting from:

    a. The lien of real estate taxes or assessments on the Title imposed by governmental authority arising after Date of Policy; or

    b. Any federal or state environmental protection lien; or

    c. Limitations, if any, imposed under the Bankruptcy Code (11 U.S.C.) on the amount that may be recovered from the mortgagor's estate. *[; or*

    d. *Any mechanic's or materialmen's lien.]*

4. The Indebtedness includes Advances.

    This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

[Witness clause optional]

*[BRACKETED MATERIAL OPTIONAL]*

[FNTG BRAND]

BY: _____

ALTA Endorsement Form 14.2-06
(Future Advance – Letter of Credit) (Rev. 2/3/11)
© American Land Title Association

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

## ENDORSEMENT

Attached to Policy No. _____

### Issued By
### [FNTG BRAND]

1.  The insurance for Advances added by Sections 2 and 3 of this endorsement is subject to the exclusions in Section 4 of this endorsement and the Exclusions in the Policy, except Exclusion 3(d), the provisions of the Conditions, and the exceptions contained in Schedule B.

    a.   "Agreement," as used in this endorsement, shall mean the note or loan agreement, repayment of Advances under which is secured by the Insured Mortgage.

    b.   "Advance," as used in this endorsement, shall mean only an advance of principal made after the Date of Policy as provided in the Agreement, including expenses of foreclosure, amounts advanced pursuant to the Insured Mortgage to pay taxes and insurance, assure compliance with laws, or to protect the lien of the Insured Mortgage before the time of acquisition of the Title, and reasonable amounts expended to prevent deterioration of improvements, together with interest on those advances.

    c.   "Changes in the rate of interest," as used in this endorsement, shall mean only those changes in the rate of interest calculated pursuant to a formula provided in the Insured Mortgage or the Agreement at Date of Policy.

2.  The Company insures against loss or damage sustained by the Insured by reason of:

    a.   The invalidity or unenforceability of the lien of the Insured Mortgage as security for each Advance.

    b.   The lack of priority of the lien of the Insured Mortgage as security for each Advance over any lien or encumbrance on the Title.

    c.   The invalidity or unenforceability or lack of priority of the lien of the Insured Mortgage as security for the Indebtedness, Advances and unpaid interest resulting from (i) re-Advances and repayments of Indebtedness, (ii) earlier periods of no indebtedness owing during the term of the Insured Mortgage, (iii) the Insured Mortgage not complying with the requirements of state law of the state in which the Land is located to secure Advances, (iv) failure of the Insured Mortgage to state the term for Advances, or (v) failure of the Insured Mortgage to state the maximum amount secured by the Insured Mortgage.

    d.   The invalidity or unenforceability of the lien of the Insured Mortgage because of the failure of the mortgagors to be at least 62 years of age at Date of Policy.

3.  The Company also insures against loss or damage sustained by the Insured by reason of:

    a.   The invalidity or unenforceability of the lien of the Insured Mortgage resulting from any provisions of the Agreement that provide for (i) interest on interest, (ii) changes in the rate of interest, or (iii) the addition of unpaid interest to the principal portion of the Indebtedness.

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

     b.     Lack of priority of the lien of the Insured Mortgage as security for the Indebtedness, including any unpaid interest that was added to principal in accordance with any provisions of the Agreement, interest on interest, or interest as changed in accordance with the provisions of the Insured Mortgage, which lack of priority is caused by (i) changes in the rate of interest, (ii) interest on interest, or (iii) increases in the Indebtedness resulting from the addition of unpaid interest.

"Interest," as used in this Paragraph 3, shall include lawful interest based on appreciated value.

4.     This endorsement does not insure against loss or damage (and the Company will not pay costs, attorneys' fees, or expenses) resulting from:

     a.     The invalidity, unenforceability or lack of priority of the lien of the Insured Mortgage as security for any Advance made after a Petition for Relief under the Bankruptcy Code (11 U.S.C.) has been filed by or on behalf of the mortgagor;

     b.     The lien of real estate taxes or assessments on the Title imposed by governmental authority arising after Date of Policy;

     c.     The lack of priority of the lien of the Insured Mortgage as security for any Advance to a federal tax lien, which Advance is made after the earlier of (i) actual knowledge of the Insured that a federal tax lien was filed against the mortgagor, or (ii) the expiration, after notice of a federal tax lien filed against the mortgagor, of any grace period for making disbursements with priority over the federal tax lien provided in the Internal Revenue Code (26 U.S.C.);

     d.     Any federal or state environmental protection lien; [or]

     e.     Usury, or any consumer credit protection or truth-in-lending law. *[; or*

     f.     *Any mechanic's or materialmen's lien.]*

5.     The Indebtedness includes Advances.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

[Witness clause optional]

*[BRACKETED MATERIAL OPTIONAL]*

[FNTG BRAND]

BY: _____

ALTA Endorsement Form 14.3-06
(Future Advance – Reverse Mortgage) (Rev. 2/3/11)
© American Land Title Association)                          *[includes technical corrections of 12-3-12]*

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

ENDORSEMENT MANUAL – Fidelity National Title Group, Inc.                                    **SECTION 15**

**Return to Table of Contents**

**NON-IMPUTATION**

**ALTA ENDORSEMENT – FORMS 15-06 (FULL-EQUITY TRANSFER);**

**15.1-06 (ADDITIONAL INSURED) and 15.2-06 (PARTIAL EQUITY)**


**PURPOSE**

These ALTA forms give coverage over matters known to specified parties that would otherwise be excluded from coverage on the basis of imputed knowledge, but also over the consequences of the actions or inactions of those parties which affect the Title. Form 15-06 is to be used when the *entire beneficial interest* of the entity holding Title and named as the insured on Schedule A (e.g., partnership interest, corporate stock, membership interest of limited liability company) has been transferred for value. Form 15.1-06 is to be used when only a *portion of the beneficial interest* of the entity holding Title and named on Schedule A as the insured has been transferred and the incoming beneficial owner is identified on the form as an additional insured. Form 15.2-06 is to be used when the incoming beneficial owner requests to be the insured in its own policy, and its interest has been transferred for value.


**SECTIONS OF POLICY AMENDED BY ENDORSEMENT**

Exclusions from Coverage 3(a) and (b) in the ALTA Owner's Policy and ALTA Loan Policy exclude from coverage matters created, suffered, assumed, or agreed to by the insured or known to the insured, but not to the Company, and not disclosed by the public records. With these endorsements, the Company agrees not to assert these Exclusions as defenses to coverage for matters that would be legally binding on a business entity under the law of imputed knowledge. The ALTA forms further clarify that the Company will not raise as a defense the failure to utilize the protection of recording acts, which is the purpose of Exclusion 3(e). These endorsements are usually requested in situations where no deed will be recorded, thereby precluding this protection.


**BASIS FOR PROVIDING COVERAGE**

These endorsements are only to be given when we have received adequate assurances in affidavit form that there are no matters known by the party or parties from whom knowledge is to be imputed to the insured entity, and we are provided a satisfactory indemnity from an appropriate indemnitor. Specimen affidavits are included at the end of this Section as Exhibits A and B and are to used only after the appropriate credit underwriting has been completed. The affidavit must provide that the affiant has done proper due diligence to support the statements

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

made therein. When issuance of one of these endorsements is authorized, the endorsement must be completed so as to provide the coverage to the "innocent party" **only**.

**Underwriting considerations:**

*Owner's policy*

The knowledge of one party having an interest in an insured entity may be imputed by law to the entity and to other parties having an interest in the named entity. This means that if one partner knows about some off-record matter (such as the interest of a purchaser under a contract), the partnership and the other partners are held to "know" it. Since the partnership, in this example, is the Insured under the Policy, this may result in the denial of coverage as a matter known to the Insured and not known to the Company and not disclosed by the public records.

Unlike the ALTA 15-06, the coverage in the ALTA 15.1-06 and 15.2-06 is not designed to protect the Insured entity itself, but instead to protect one or more of the so-called "innocent parties" that have an interest in the named entity.

*Loan policy*

Because knowledge may be imputed to a lender through its agents, partners or other participating lenders, requests for this coverage may be made by the insured lender.  This is quite common where the lender, in addition to loaning money, participates directly or indirectly in the development entity.

Examples

*Example:*  Title is presently vested in A.  B has agreed to participate in a project with A to develop the land for an office building.  A will convey the land to a new partnership being formed between himself and B.  B is concerned that A may have knowledge or have done some act that B is unaware of that would be imputed to the new partnership.

*Example:*  In the example above, after A and B form their partnership they proceed to arrange financing for the project. A and B discover that the best deal they can structure involves lender C who will forego market interest rates in exchange for an equity participation interest for its wholly-owned subsidiary D.  Title is conveyed to a new partnership composed of the A&B partnership and D and the new partnership AB&D gets a loan from C.  D is concerned that knowledge by A

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

and B will be imputed to the A&B partnership which would then be imputed to the new partnership AB&D.

In the first example, coverage could be provided to B with regard to the knowledge of A *prior* to the conveyance to the A&B partnership.  This coverage would be provided by an owner's policy insuring A&B partnership and an ALTA 15.1-06 naming B as the additional insured.

In the second example, coverage could be provided to D with regard to the knowledge of A and B *prior* to the conveyance to AB&D partnership.  Again this coverage would be in an owner's policy insuring the partnership and an ALTA Form 15.1-06 naming the new partner as the additional insured, or an ALTA 15.2-06 attached to a policy wherein D is the named Insured for the partial ownership interest it has acquired in the partnership.

**Forms of Coverage**

For <u>ALTA Form 15-06</u>, the parties that need to be queried would be some or all of the outgoing beneficial owners. For a partnership, it would be all of the outgoing partners. For any other business entity, your underwriting advisor should be consulted as to the identity of the parties from whom we require assurances.

For <u>ALTA Form 15.1-06</u>, the parties to be questioned would be some or all of the outgoing beneficial owners. For a partnership, it would be all of the outgoing *and remaining* general partners. For any other business entity, your underwriting advisor should be consulted as to the identity of the parties from whom we require assurances.

For <u>ALTA Form 15.2-06</u>, the parties to be queried would be some or all of the outgoing beneficial owners. For a partnership, it would be all of the outgoing *and remaining general* partners. For any other business entity, your underwriting advisor should be consulted as to the identity of the parties from whom we require assurances

> **NOTE:** For Form 15.2-06 (but **not** for Form 15-06 or 15.1-06), it may be necessary to coordinate the benefits of the Owners Policy to which it is attached and any *other* Owner's Policy which the Company may have previously issued naming the entity vested with Title as the Insured on Schedule A.  This coordination may be accomplished with an exception on Schedule B of both policies that provides that the Company's liability thereunder is noncumulative. Such an exception might read as follows "It is understood that the Amount of Insurance under this policy shall be reduced by any amount the

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

ENDORSEMENT MANUAL – Fidelity National Title Group, Inc.                              **SECTION 15**

Company may pay under [identify other Owner's Policy], and the amount so paid shall be deemed a payment under this policy to the Insured."  The question of the need for or the form of coordination of the policies must be referred to your underwriting advisor.

### AUTHORITY FOR ISSUANCE OF THIS COVERAGE

This endorsement may not be issued without the approval of the Company's underwriting advisor.

### MODIFICATION

In the event that modification of an endorsement is requested, it is necessary to consider your state regulatory requirements for filing and approval of forms.  If the endorsement is modified, the endorsement is not an ALTA form and should not reference ALTA in the title.  You must obtain the approval of the Company's underwriting adviser before complying with any request for a modification.

Return to Table of Contents

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

## Exhibit A

[Affiant to be personally liable on indemnity, e.g., a general partner]


State of   _____)
                                                            )   ss.
County of   _____)


Affidavit and Indemnity

The undersigned, being first duly sworn, on oath, deposes and says the following:

1.       The undersigned is _____[*title or capacity*] of _____[*name of entity*]_____.

2.       To the best knowledge of the undersigned,

a.       There are presently no defects in or liens, encumbrances or other claims against the Title to the property described in the Commitment for Title Insurance No. _____, having an Effective Date of _____, issued by [*insert name of the insuring company* ] (hereinafter referred to as "the Company") other than as disclosed in exceptions Nos. _____on Schedule B - Section 2 of said commitment, other than the following: (If none, state "None"); and;

b.       There are presently no inchoate rights which may ripen into any defect, lien, encumbrance or claim against the Title to said property except as may be created by any instrument or action required in Schedule B - Section 1 of said commitment, other than the following: (If none, state "None")

3.       The undersigned makes these statements after having questioned all of the other partners and the employees and agents, if any, of [*name of entity*] who have had any substantial contact with any transaction or negotiation involving the property described in said commitment.

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

4.      The undersigned hereby indemnifies the Company and agrees to hold it harmless against any loss which the Company may suffer by virtue of any valid claim made under the said endorsement based on the existence of any defect in or lien, encumbrance, right or claim against or with respect to the Title to the aforesaid property which was not disclosed above but which should have been so disclosed in order to make all statements above true and correct.

The undersigned understands such losses may include court costs and attorney's fees expended by the Company in defending the Title or interest of the insured against such lien, encumbrance, right or claim.

5.      The undersigned makes these statements and gives the aforesaid indemnity for the purpose of inducing the Company to issue the endorsement attached hereto as Exhibit A to one or more of the owner's or loan policies issued pursuant to the said Commitment for Title Insurance.

The undersigned further agrees to pay all court costs and reasonable attorney's fees which the Company may expend in enforcing the terms of this indemnity agreement.

Dated:_____


_____
      [Name of Affiant & Indemnitor]

[Standard form jurat.]

[Standard form acknowledgment, if useful.]

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

ENDORSEMENT MANUAL – Fidelity National Title Group, Inc.                    **SECTION 15**

## **Exhibit B**

*[Affiant to be personally liable on indemnity, e.g,. a corporate partner]*

State of     _____ )
                              )   ss.
County of   _____ )

Affidavit and Indemnity

The undersigned, being first duly sworn, on oath, deposes and says the following:

1.       The undersigned is _____*[title or capacity]* of _____*[name of entity]*.

2.       To the best knowledge of the undersigned,

a.       There are presently no defects in or liens, encumbrances or other claims against the Title to the property described in the Commitment for Title Insurance No. _____, having an Effective Date of _____, issued by *[insert the name of the company insuring]* (hereinafter referred to as "the Company") other than as disclosed in exceptions Nos. _____ on Schedule B - Section 2 of said commitment, other than the following: (If none, state "None"); and

b.       There are presently no inchoate rights which may ripen into any defect, lien, encumbrance or claim against the Title to said property except as may be created by any instrument or action required in Schedule B - Section 1 of said commitment, other than the following: (If none, state "None")

3.       The undersigned makes these statements after having questioned all of the other officers, directors, employees, partners and agents, if any, of [name of entity] who have had any substantial contact with any transaction or negotiation involving the property described in said commitment.

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

4.      The undersigned makes these statements for the purpose of inducing the Company to issue the endorsement attached hereto as Exhibit A to one or more of the owner's or loan policies issued pursuant to the said Commitment for Title Insurance.


Dated: _____

_____
                [Name of Affiant]


The following indemnity is given to the Company as a further inducement to it to issue the said endorsement, as aforesaid.


The undersigned hereby indemnifies the Company against any loss which the Company may suffer by virtue of any valid claim made under the said endorsement based on the existence of any defect in or lien, encumbrance, right or claim against or with respect to the Title to the aforesaid property which was not disclosed in the above affidavit but which should have been so disclosed in order to make all statements in the affidavit true and correct.  The undersigned understands such losses may include court costs and attorney's fees expended by the Company in defending the title or interest of the insured against such lien, encumbrance, right or claim.


The undersigned further agrees to pay all court costs and reasonable attorney's fees which the Company may expend in enforcing the terms of this indemnity agreement.


Dated: _____

[ Name of Company ]

By: _____
[Name and title of officer]

[Standard form jurat.]


[Standard form acknowledgment, if useful.]

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

ENDORSEMENT

Attached to Policy No. _____

**Issued By**
**[FNTG BRAND]**

The Company agrees that it will not assert the provisions of Exclusions from Coverage 3(a), (b), or (e) to deny liability for loss or damage otherwise insured against under the terms of the policy solely by reason of the action or inaction or Knowledge, as of Date of Policy, of _____ whether or not imputed to the Insured by operation of law, provided _____ acquired the Insured as a purchaser for value without Knowledge of the asserted defect, lien, encumbrance, adverse claim, or other matter insured against by the policy.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

[Witness clause optional]

[FNTG BRAND]

BY: _____

ALTA Endorsement Form 15-06
(Nonimputation – Full Equity Transfer) (6/17/06)
©American Land Title Association

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

ENDORSEMENT

Attached to Policy No. _____

**Issued By**
**[FNTG BRAND]**

For purposes of the coverage provided by this endorsement, _____ ("Additional Insured") is added as an Insured under the policy.  By execution below, the Insured named in Schedule A acknowledges that any payment made under this endorsement shall reduce the Amount of Insurance as provided in Section 10 of the Conditions.

The Company agrees that it will not assert the provisions of Exclusions from Coverage 3(a), (b), or (e) to deny liability for loss or damage otherwise insured against under the terms of the policy solely by reason of the action or inaction or Knowledge, as of Date of Policy, of _____ whether or not imputed to the Additional Insured by operation of law, to the extent of the percentage interest in the Insured acquired by Additional Insured as a purchaser for value without Knowledge of the asserted defect, lien, encumbrance, adverse claim, or other matter insured against by the policy.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.


AGREED AND CONSENTED TO:


_____
INSURED


[Witness clause optional]




[FNTG BRAND]

BY: _____


ALTA Endorsement Form 15.1-06
(Nonimputation – Additional Insured) (6/17/06)
©American Land Title Association

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

ENDORSEMENT

Attached to Policy No. _____

**Issued By**
**[FNTG BRAND]**

The Company agrees that it will not assert the provisions of Exclusions from Coverage 3(a), (b), or (e) to deny liability for loss or damage otherwise insured against under the terms of the policy solely by reason of the action or inaction or Knowledge, as of Date of Policy, of _____ whether or not imputed to the entity identified in paragraph 3 of Schedule A or to the Insured by operation of law, but only to the extent that the Insured acquired the Insured's interest in entity as a purchaser for value without Knowledge of the asserted defect, lien, encumbrance, adverse claim, or other matter insured against by the policy.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

[Witness clause optional]

[FNTG BRAND]

BY: _____

ALTA Endorsement Form 15.2-06
(Nonimputation – Partial Equity Transfer) (6/17/06)
©American Land Title Association

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

ENDORSEMENT MANUAL – Fidelity National Title Group, Inc.                    **SECTION 16**

**Return to Table of Contents**

**MEZZANINE FINANCING ENDORSEMENT**
**ALTA ENDORSEMENT- FORM 16-06**


**PURPOSE**

This endorsement provides insurance to a lender whose loan is secured not by a lien against the land but rather by some form of security against the beneficial interest of the business entity that owns the Land.   The security may be a pledge of and security interest in the stock in a corporation, partnership interest in a partnership, or membership interest in a limited liability company.   The endorsement is made a part of an Owner's Policy rather than a Loan Policy, because the lender's personal property security interest is not being insured so no Loan Policy is issued to the lender. The endorsement assigns the rights under the policy of the Insured owner of the Land to the defined Mezzanine Lender. The endorsement provides that the Company will not assert as a defense matters known to the Insured owner, as long as they were not known to the Mezzanine Lender (see also Non-Imputation Endorsements under Section 15). It further provides that the Company will not deny liability on the basis that ownership interests in the Insured have been transferred to or acquired by the Mezzanine Lender.


**SECTIONS OF POLICY AMENDED BY ENDORSEMENT**

Conditions paragraph 7 (b) is amended to provide that the Company can terminate its liability under the policy by paying the Mezzanine Lender rather than the Insured.   Exclusions from Coverage Nos. 3 (a), (b), (c) or (e) are amended with respect to defects, liens, encumbrances, adverse claims or other matters which were not known to the Mezzanine Lender, or failure of the Mezzanine Lender to pay value.


**BASIS FOR PROVIDING COVERAGE**

You may issue this endorsement to an ALTA Owner's Policy if all of the following requirements are met:

1.   The Insured (corporation, partnership, limited liability company or other business entity) has agreed to assign to the Mezzanine Lender the amounts payable under the policy as indicated by the Insured's  signature at the end of the Endorsement, and the terms of the endorsement are accepted by the Mezzanine Lender as  indicated by its signature on the Endorsement.

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

2.  The requirements for issuance of a Non-Imputation Endorsement have been met (see Section 15). That is, we must receive adequate assurances that there are no matters known by the party or parties from whom knowledge is to be imputed. In most cases this assurance would be in the form of a sworn statement from the party together with a satisfactory indemnity.

3.  If the Insured is also insured by the Company under a different Owner's Policy, the benefits of that policy must be coordinated with the benefits of the policy to which the endorsement will be attached. This can be accomplished by adding to Schedule B of the already issued policy the following: "It is expressly understood that the amount of insurance under this policy shall be reduced by any amount the Company may pay under Owner's Policy Number [new policy], and the amount so paid shall be deemed a payment under this policy to the Insured owner."

### AUTHORITY FOR ISSUANCE OF THIS COVERAGE

This endorsement may not be issued without the approval of the Company's underwriting advisor.

### MODIFICATION

In the event that modification of an endorsement is requested, it is necessary to consider your state regulatory requirements for filing and approval of forms.  If the endorsement is modified, the endorsement is not an ALTA form and should not reference ALTA in the title.  You must obtain the approval of the Company's underwriting adviser before complying with any request for a modification.

Return to Table of Contents

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

**ENDORSEMENT**

Attached to Policy No. _____

**Issued By**
**[FNTG BRAND]**

1. The Mezzanine Lender is: _____ and each successor in ownership of its loan ("Mezzanine Loan") reserving, however, all rights and defenses as to any successor that the Company would have had against the Mezzanine Lender, unless the successor acquired the Indebtedness as a purchaser for value without Knowledge of the asserted defect, lien, encumbrance, adverse claim, or other matter insured against by this policy as affecting Title.

2. The Insured

   a. assigns to the Mezzanine Lender the right to receive any amounts otherwise payable to the Insured under this policy, not to exceed the outstanding indebtedness under the Mezzanine Loan; and

   b. agrees that no amendment of or endorsement to this policy can be made without the written consent of the Mezzanine Lender.

3. The Company does not waive any defenses that it may have against the Insured, except as expressly stated in this endorsement.

4. In the event of a loss under the policy, the Company agrees that it will not assert the provisions of Exclusions from Coverage 3(a), (b) or (e) to refuse payment to the Mezzanine Lender solely by reason of the action or inaction or Knowledge, as of Date of Policy, of the Insured, provided

   a. the Mezzanine Lender had no actual Knowledge of the defect, lien, encumbrance or other matter creating or causing loss on Date of Policy.

   b. this limitation on the application of Exclusions from Coverage 3(a), (b) and (e) shall

      i. apply whether or not the Mezzanine Lender has acquired an interest (direct or indirect) in the Insured either on or after Date of Policy, and

      ii. benefit the Mezzanine Lender only without benefiting any other individual or entity that holds an interest (direct or indirect) in the Insured or the Land.

5. In the event of a loss under the Policy, the Company also agrees that it will not deny liability to the Mezzanine Lender on the ground that any or all of the ownership interests (direct or indirect) in the Insured have been transferred to or acquired by the Mezzanine Lender, either on or after the Date of Policy.

6. The Mezzanine Lender acknowledges

   a. that the amount of insurance under this policy shall be reduced by any amount the Company may pay under any policy insuring a mortgage to which exception is taken in Schedule B or to which the Insured has agreed, assumed, or taken subject, or which is hereafter executed by an Insured and which is a charge or

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

lien on the estate or interest described or referred to in Schedule A, and the amount so paid shall be deemed a payment under this policy; and

    b.    that the Company shall have the right to insure mortgages or other conveyances of an interest in the Land, without the consent of the Mezzanine Lender.

7.    If the Insured, the Mezzanine Lender or others have conflicting claims to all or part of the loss payable under the Policy, the Company may interplead the amount of the loss into Court.  The Insured and the Mezzanine Lender shall be jointly and severally liable for the Company's cost for the interpleader and subsequent proceedings, including attorneys' fees.  The Company shall be entitled to payment of the sums for which the Insured and Mezzanine Lender are liable under the preceding sentence from the funds deposited into Court, and it may apply to the Court for their payment.

8.    Whenever the Company has settled a claim and paid the Mezzanine Lender pursuant to this endorsement, the Company shall be subrogated and entitled to all rights and remedies that the Mezzanine Lender may have against any person or property arising from the Mezzanine Loan. However, the Company agrees with the Mezzanine Lender that it shall only exercise these rights, or any right of the Company to indemnification, against the Insured, the Mezzanine Loan borrower, or any guarantors of the Mezzanine Loan after the Mezzanine Lender has recovered its principal, interest, and costs of collection.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

AGREED AND CONSENTED TO:

*(Name of Insured)*                                  *(Name of Mezzanine Lender)*

By: _____    By: _____

[Witness clause optional]

[FNTG BRAND]

BY: _____

ALTA Endorsement Form 16-06
(Mezzanine Financing) (6/17/06)
©American Land Title Association

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

ENDORSEMENT MANUAL – Fidelity National Title Group, Inc.                                  **SECTION 17**

Return to Table of Contents

**ACCESS**

**ALTA ENDORSEMENT - FORMS 17-06 (Access & Entry)**

**17.1-06 (Indirect Access & Entry)**

**and 17.2-06 (Utility Access)**

**PURPOSE**

These endorsements are designed to provide insurance against loss if the Land does not abut or have actual vehicular and pedestrian access to and from a specific open and publicly maintained street by way of existing curb cuts or entries. In addition, ALTA 17.1-06 provides the same coverage with respect to a specific easement insured in Schedule A which connects the Land to a specific public street. The ALTA 17.2-06 adopts a version of the generic "Utilities Facilities" endorsement which covers access to utility installations in a public street.

**SECTIONS OF POLICY AMENDED BY ENDORSEMENT**

The ALTA policies do not insure a particular means of access.  The policies do insure against loss or damage by reason of a lack of **"a right of access to and from the Land".** The policy, as written, does not address the extent of that access, nor the location or means by which that access is utilized.

The definition of "Land" contained in the policy specifically excludes property beyond the bounds of the area described in Schedule A.  Furthermore, Land is so defined as to not include any "right, title, interest, estate or easement in abutting streets".

These endorsements go quite a bit further.  They specifically address the location, use and quality of access. The ALTA 17.2-06 will be discussed separately.

**BASIS FOR PROVIDING COVERAGE (ALTA 17-06 and 17.1-06)**

These endorsements have more extensive requirements than the old "access" type endorsements, and include the need for a comprehensive survey. The examiner must verify:

1.   The named street is in fact a **physically open** and **public** street;
2.   The land **abuts** thereon; and

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

3.  There is nothing to prohibit access from the Land either **legally or physically** (i.e., not only is there access as a matter of law, at the currently existing points of access, but there is also no physical impediment to access).

4.  There are no limitations on access imposed at the local, county, state or federal levels, depending on who controls or maintains the street and how it was created.

> ***Example:***  A portion of Blackacre was condemned for an Interstate Highway.  In the condemnation, the State also condemned all abutting rights of access.  Because of the way the road was built, the owner of Blackacre can actually drive his car onto the highway at several points along this boundary.
>
> This is an example of a situation where there is a physical means of access, but **no legal right of access.**  This endorsement could not be given in this situation.

The examiner must be very careful to determine which governmental authorities (which can include city, county, state and/or federal agencies) have jurisdiction over a particular street.  The examiner must also check the surrounding land and the chain of title to determine if access was limited when the land was a part of a larger tract. If such a limitation exists, and all allowable curb cuts or points of access have been used in conjunction with other parts of the original tract, there may be no access for the land as it currently is described, even though it does abut an open and public street.   A survey showing present, physically open access must be supplied to the Company.  Any such request for any variation of the endorsement language or a request to issue the endorsement without a survey must be approved by the Company underwriting advisor.

In addition to compliance with items 1 through 4 above, in order to issue the ALTA 17.1-06, the examination and insurance of the easement in question must be undertaken pursuant to customary underwriting guidelines.

**CAUTION:** IF THE LAND ABUTS A PHYSICALLY OPEN <u>PRIVATE </u>STREET THIS COVERAGE MAY NOT BE GIVEN WITHOUT APPROVAL OF THE COMPANY'S UNDERWRITING ADVISOR.

**BASIS FOR PROVIDING COVERAGE for ALTA 17.2-06 (Utility Access)**

What is commonly referred to as the "Utility Facility" endorsement requires us to do all of the following:

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

(1) Review the survey to ascertain that the Land adjoins the public way in which the utility lines are located with no gaps or gores in between.

(2) Determine the insurability of private easements (if any) providing services listed on the endorsement and verify they are shown on the survey and abut the property with no gaps or gores.

(3) Verify that the land is improved.

(4) Obtain an affidavit from the seller or borrower that the Land is serviced by all of the recited utilities.

Special attention should be paid to the possibility that although  other utilities are in place and service is provided by a lateral connection to installations in the public right of way,  a septic system is being utilized in lieu of connecting to a public sewer system, especially in newer industrial parks,  large commercial tracts or rural residential properties. If that is the factual situation, or any other listed utility is provided via any type of private easement that would otherwise not be insurable, you must leave the box on the endorsement which corresponds to such utility **underlined underchecked**, thereby indicating that no access is being insured.

Even if you have not specifically insured the private easement rights in Schedule A, you must do the same search and analysis of the benefit to the Land as if you had insured them, including making sure they are still viable and have not been released or terminated either voluntarily or involuntarily through foreclosure or other process (i.e.,  tax sale, forfeiture, etc.) if you will be relying on a private easement to insure access to utilities.

**MODIFICATION**

In the event that modification of an endorsement is requested, it is necessary to consider your state regulatory requirements for filing and approval of forms.  If the endorsement is modified, the endorsement is not an ALTA form and should not reference ALTA in the title.  You must obtain the approval of the Company's underwriting advisor before complying with any request for a modification.

Return to Table of Contents

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

ENDORSEMENT

Attached to Policy No. _____

**Issued By**
**[FNTG BRAND]**

The Company insures against loss or damage sustained by the Insured if, at Date of Policy (i) the Land does not abut and have both actual vehicular and pedestrian access to and from FILL IN (the "Street"), (ii) the Street is not physically open and publicly maintained, or (iii) the Insured has no right to use existing curb cuts or entries along that portion of the Street abutting the Land.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

[Witness clause optional]

[FNTG BRAND]

BY: _____

ALTA Endorsement Form 17-06
(Access and Entry) (6/17/06)
©American Land Title Association

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

ENDORSEMENT

Attached to Policy No. _____

**Issued By**
**[FNTG BRAND]**

The Company insures against loss or damage sustained by the Insured if, at Date of Policy (i) the easement identified as FILLIN in Schedule FILLIN (the "Easement") does not provide that portion of the Land identified as FILLIN in Schedule FILLIN both actual vehicular and pedestrian access to and from FILLIN (the "Street"), (ii) the Street is not physically open and publicly maintained, or (iii) the Insured has no right to use existing curb cuts or entries along that portion of the Street abutting the Easement.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

[Witness clause optional]

[FNTG BRAND]

BY: _____

ALTA Endorsement Form 17.1-06
(Indirect Access and Entry) (6/17/06)
©American Land Title Association

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

ENDORSEMENT

Attached to Policy No. _____

**Issued By**
**[FNTG BRAND]**

The Company insures against loss or damage sustained by the Insured by reason of the lack of a right of access to the following utilities or services:  [CHECK ALL THAT APPLY]

☐ Water service               ☐ Natural gas service          ☐ Telephone service
☐ Electrical power service    ☐ Sanitary sewer               ☐ Storm water drainage
☐ _____         ☐ _____         ☐ _____

either over, under or upon rights-of-way or easements for the benefit of the Land because of:

(1) a gap or gore between the boundaries of the Land and the rights-of-way or easements;

(2)  a gap between the boundaries of the rights-of-way or easements; or

(3)  a termination by a grantor, or its successor, of the rights-of-way or easements.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

[Witness clause optional]

[FNTG BRAND]

BY: _____

ALTA Endorsement Form 17.2-06
(Utility Access)  (10/16/08)
©American Land Title Association

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

**Return to Table of Contents**

**TAX PARCEL**

**ALTA ENDORSEMENT - FORM 18-06 (Single)**

**AND 18.1 (Multiple) [with tax sale protection]**

**PURPOSE**

These endorsements cover the tax parcel or tax identification numbers often included in the policy for informational purposes. Form 18-06 insures against loss if the tax number shown does not include all the Land described in the policy or includes land not described in the policy.  Form 18.1-06 is for use when there are multiple parcels and multiple numbers. In addition, Form 18.1-06 insures that any easement included as an insured parcel in Schedule A or C will not be wiped out by the subsequent foreclosure of taxes on the servient tenement.  This endorsement does not provide coverage for the Insured it the easement itself is separately assessed and the Insured fails to pay such taxes.

**SECTIONS OF POLICY AMENDED BY ENDORSEMENT**

This endorsement for the Insured does not expressly amend any provisions of the Policy.  It does affect on paragraph 3(d) of the Exclusions from Coverage ("Defects, liens, encumbrances, adverse claims or other matters: ... attaching or created subsequent to Date of Policy...") in that the non-payment of real property taxes, or the foreclosure of the lien imposed by those taxes on the servient tenement over which the easement exists, will, in the majority of cases, be a post policy occurrence.

**BASIS FOR PROVIDING COVERAGE**

To issue ALTA Form 18-06, the above the legal description in Schedule A or C must be carefully compared to the legal description on the tax rolls to verify that they cover the exact same property, that neither includes additional lands, and that all tax parcel numbers are correctly shown. If the Land includes only a portion of a tax description, these endorsements may not be given.

To issue ALTA Form 18.1-06, the above comparison should be made for each parcel included.  In addition, to give the easement coverage, if appropriate, the following matters must be taken into consideration:

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

The easement referred to in this endorsement must be shown in the Policy in Schedule A or C as an insured parcel. This will insure that a complete search of title to the servient parcel encumbered by the easement, along with a determination of the status of taxes and assessments, has been done.

An absolute essential element will be the existence of state statutes or binding case law that specifically protects the validity of any properly created easement from the effects of any non-payment of taxes or the foreclosure of the lien of such taxes as imposed on the servient tenement. This protection must exist no matter when the easement is created or when the taxes are imposed.

The most common factual scenarios are:

1.      Easement created.  Taxes for the year in which easement is created are all paid. Taxes for subsequent years go into foreclosure. State law provides purchaser at tax sale takes subject to easement.

2.      Same as 1, but state law provides purchaser at tax sale to get land free and clear of easement interest.

3.      Outstanding taxes owed.  Easement created. State law provides that foreclosure of taxes effectively forecloses easement rights. State law may not require notice of tax foreclosure to holder of easement rights.

4.      Easement created.  Taxes are assessed after the creation of the easement, but state law provides that the lien of the taxes dates back to a date preceding the creation of the easement. Again, state law provides that foreclosure of taxes effectively forecloses easement rights.

5.      Taxes or special assessments may be scheduled to be paid off over a number of years in the future. In many jurisdictions these are called "bonds" or "future assessments".  Even if the current year's liabilities are paid, the failure to pay any of the future bonds may result in a lien that dates back to the original creation of the liability which, if it predates the creation of the easement, could cause the easement to be foreclosed when those bond amounts are foreclosed.

Obviously, in examples 2, 3, 4 and 5 above we would not be able to issue this coverage.

If this coverage is requested by the Lender, the Insured Mortgage must be secured by the referenced easement.

### AUTHORITY FOR ISSUANCE OF ENDORSEMENT

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

ENDORSEMENT MANUAL – Fidelity National Title Group, Inc.                              **SECTION 18**

If there is no binding authority in the state wherein the property lies, any request for this endorsement must be submitted to the Company's underwriting adviser for approval.

## MODIFICATION

In the event that modification of an endorsement is requested, it is necessary to consider your state regulatory requirements for filing and approval of forms.  If the endorsement is modified, the endorsement is not an ALTA form and should not reference ALTA in the title.  You must obtain the approval of the Company's underwriting adviser before complying with any request for a modification.

Return to Table of Contents

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

ENDORSEMENT MANUAL – Fidelity National Title Group, Inc.                           **SECTION 18**

**ENDORSEMENT**

Attached to Policy No. _____

**Issued By**
**[FNTG BRAND]**

The Company insures against loss or damage sustained by the Insured by reason of the Land being taxed as part of a larger parcel of land or failing to constitute a separate tax parcel for real estate taxes.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

[Witness clause optional]

[FNTG BRAND]

BY: _____

ALTA Endorsement Form 18-06
(Single Tax Parcel) (6/17/06)
©American Land Title Association

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

ENDORSEMENT MANUAL – Fidelity National Title Group, Inc.                           **SECTION 18**

**ENDORSEMENT**

Attached to Policy No. _____

**Issued By**
**[FNTG BRAND]**

The Company insures against loss or damage sustained by the Insured by reason of:

1.      those portions of the Land identified below not being assessed for real estate taxes under the listed tax identification numbers or those tax identification numbers including any additional land:

>       Parcel:                            PARCEL 1
>       Tax Identification Number(s):      TAX ID 1


>       Parcel:                            PARCEL 2
>       Tax Identification Number(s):      TAX ID 2


>       Parcel:                            PARCEL 3
>       Tax Identification Number(s):      TAX ID 3

2.      the easements, if any, described in Schedule A being cut off or disturbed by the nonpayment of real estate taxes, assessments or other charges imposed on the servient estate by a governmental authority.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

[Witness clause optional]

[FNTG BRAND]

BY: _____

ALTA Endorsement Form 18.1-06
(Multiple Tax Parcel) (6/17/06)
©American Land Title Association

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

**Return to Table of Contents**

**CONTIGUITY**

**ALTA ENDORSEMENT - FORM 19-06 (MULTIPLE PARCELS) [within Land]
AND FORM 19.1-06 (SINGLE PARCEL) [with property other than Land]**

**PURPOSE**

ALTA Form 19-06 is designed to provide insurance that (1) each parcel, in a policy which insures multiple parcels, is contiguous to at least one other parcel insured by the policy, or (2) if some parcels are not contiguous to at least one other parcel, that certain parcels are contiguous to certain other parcels. The ALTA Form 19.1-06 provides coverage that the Land in the policy is contiguous to some other specific parcel not insured in the policy.

**SECTION OF POLICY AMENDED BY ENDORSEMENT**

The ALTA policies do not insure contiguity. These endorsements add an insuring provision and additional liability.

**BASIS FOR PROVIDING COVERAGE**

A survey must be presented to the Company. The survey must adequately depict the absence of gaps, strips or gores insured against, and contain a statement by the surveyor that the parcels are contiguous. Providing the coverage on some other basis, for example because the parcels are adjacent lots in the same subdivision or because the line which separates them in a metes and bounds description has identical points of beginning and identical calls to describe that line, can only be done with the approval of your Company underwriting advisor.

The problem that often arises with the ALTA 19.1-06 is that there is not a single survey of both the Land included within the policy and the additional parcel as to which contiguity is being insured. Again, any request to issue this endorsement without a single survey showing both parcels with a certification by the surveyor that the parcels are contiguous must be referred to your Company underwriting advisor.

**MODIFICATION**

In the event that modification of an endorsement is requested, it is necessary to consider your state regulatory requirements for filing and approval of forms.  If the endorsement is modified, the endorsement is not an ALTA form and should not reference ALTA in the title.  You must obtain the approval of the Company's underwriting adviser before complying with any request for a modification.

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

ENDORSEMENT MANUAL – Fidelity National Title Group, Inc.                    **SECTION 19**

Return to Table of Contents

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

**ENDORSEMENT**

Attached to Policy No. _____

**Issued By**
**[FNTG BRAND]**

The Company insures against loss or damage sustained by the Insured by reason of:

1.       The failure [of the _____ boundary line of Parcel A] of the Land to be contiguous to [the _____ boundary line of Parcel B] **[for more than two parcels, continue as follows: "; of [the _____ boundary line of Parcel B] of the Land to be contiguous to [the _____ boundary line of Parcel C] and so on until all contiguous parcels described in the policy have been accounted for]**; or

2.       The presence of any gaps, strips, or gores separating any of the contiguous boundary lines described above.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

[Witness clause optional]

[FNTG BRAND]

BY: _____

ALTA Endorsement Form 19-06
(Contiguity – Multiple Parcels) (6/17/06)
©American Land Title Association

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

ENDORSEMENT MANUAL – Fidelity National Title Group, Inc.                    **SECTION 19**

## ENDORSEMENT

Attached to Policy No. _____

**Issued By**
**[FNTG BRAND]**

The Company insures against loss or damage sustained by the Insured by reason of:

1.   The failure of the Land to be contiguous to **[describe the land that is contiguous to the Land by its legal description or by reference to a recorded instrument – e.g. ". . . that certain parcel of real property legally described in the deed recorded as Instrument No. _____, records of County, State of _____]** along the _____ boundary line[s]; or

2.   The presence of any gaps, strips, or gores separating the contiguous boundary lines described above.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

[Witness clause optional]

[FNTG BRAND]

BY: _____

ALTA Endorsement Form 19.1-06
(Contiguity – Single Parcel) (6/17/06)
©American Land Title Association

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

ENDORSEMENT MANUAL – Fidelity National Title Group, Inc.                    **SECTION 20**

Return to Table of Contents

**FIRST LOSS**
**ALTA ENDORSEMENT FORM 20-06**

**PURPOSE**

This endorsement is designed to alter the established criteria for determining when a loss is recognized under a loan policy. Loss is normally the difference between the value of the property with or without the defect, lien or encumbrance insured against. Under normal circumstances, a loss would be difficult to determine until the land was sold after foreclosure.  If the sale was for an amount less than the debt, and the difference between the sales price and the indebtedness was caused by a matter covered by the policy, the lender could claim a loss.   Consequently, an insured lender would normally be required to foreclose to prove this loss before being able to make a claim. This endorsement, to be issued only when there is more than one insured parcel, allows a loss to be recognized whenever a title defect materially impairs the value of a parcel securing the loan without requiring acceleration of the debt and foreclosure against **any** of the parcels securing the loan. There was a technical correction of this endorsement by ALTA on 10/13/2011, but they did not change the ALTA adopted date.

**SECTION OF THE POLICY AMENDED BY THE ENDORSEMENT**

This endorsement allows assertion of loss on the basis of impairment of security as if we had insured separate loans secured by separate parcels, even though the insured transaction is actually a single loan secured by multiple parcels. The Company and the courts have applied Condition 8 to the determination of what is a loss in such a way that "loss", as described in the endorsement, would be considered an interim situation, contingent upon the remaining property failing to provide adequate security for the unpaid debt. For that reason, this endorsement is often described as Contingent Loss (First Loss).

**BASIS FOR PROVIDING COVERAGE**

While allowing the lender to claim a loss without foreclosing against any of the parcels, included in the endorsement form is an acknowledgement of the subrogation rights of the Company, which includes entitlement to reimbursement in a case where payment under the terms of this endorsement might result in a windfall for a lender who later was fully repaid from the remaining property.

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

**CAUTION:** YOU MUST CONFER WITH THE COMPANY'S UNDERWRITING ADVISOR TO DETERMINE THE COMPANY'S WILLINGNESS TO ISSUE THIS ENDORSEMENT IN A GIVEN STATE**.** A LENDER WHO IS ALERT TO THE ANTI-DEFICIENCY PROBLEM OF THIS COVERAGE MAY
DELIBERATELY HAVE THE BORROWER REMOVE WARRANTIES FROM THE SECURITY INSTRUMENT SO THAT ONLY PAYMENT DEFAULTS ARE ACTIONABLE. ADVISE THE COMPANY'S UNDERWRITING ADVISOR IF THIS IS THE CASE.

The coverage is not appropriate for loans with only one parcel.

**MODIFICATION**

In the event that modification of an endorsement is requested, it is necessary to consider your state regulatory requirements for filing and approval of forms.  If the endorsement is modified, the endorsement is not an ALTA form and should not reference ALTA in the title.  You must obtain the approval of the Company's underwriting adviser before complying with any request for a modification.

Return to Table of Contents

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

**ENDORSEMEN**T

Attached to Policy No. _____

**Issued By**
**[FNTG BRAND]**

This endorsement is effective only if the Collateral includes at least two parcels of real property.

1.      For the purposes of this endorsement

   a.      "Collateral" means all property, including the Land, given as security for the Indebtedness.
   b.      "Material Impairment Amount" means the amount by which any matter covered by the policy for which a claim is made diminishes the value of the Collateral below the Indebtedness.

2.      In the event of a claim resulting from a matter insured against by the policy, the Company agrees to pay that portion of the Material Impairment Amount that does not exceed the extent of liability imposed by Section 8 of the Conditions without requiring

   a.      maturity of the Indebtedness by acceleration or otherwise,
   b.      pursuit by the Insured of its remedies against the Collateral, or
   c.      pursuit by the Insured of its remedies under any guaranty, bond or other insurance policy.

3.      Nothing in this endorsement shall impair the Company's right of subrogation. However, the Company agrees that its right of subrogation shall be subordinate to the rights and remedies of the Insured. The Company's right of subrogation shall include the right to recover the amount paid to the Insured pursuant to Section 2 of this endorsement from any debtor or guarantor of the Indebtedness, after payment or other satisfaction of the remainder of the Indebtedness and other obligations secured by the lien of the Insured Mortgage. The Company shall have the right to recoup from the Insured Claimant any amount received by it in excess of the Indebtedness up to the amount of the payment under Section 2.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

[Witness clause optional]

[FNTG BRAND]

BY: _____

ALTA Endorsement Form 20-06
(First Loss – Multiple Parcel Transactions) (6/17/06)
©American Land Title Association

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

Return to Table of Contents

**CREDITORS' RIGHTS**

**ALTA ENDORSEMENT FORM 21-06**

**This endorsement was decertified by ALTA on 2/8/10 and is no longer available.**

Return to Table of Contents

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

ENDORSEMENT MANUAL – Fidelity National Title Group, Inc.                                   SECTION 22

**Return to Table of Contents**

**LOCATION**

**ALTA ENDORSEMENT – FORM 22-06**

**AND Form 22.1-06 (with map)**

**PURPOSE**

These endorsements insure against loss or damage if an improvement of the type identified in the endorsement having the address set forth in the endorsement is not located on the Land. In addition, the 22.1-06 insures that a copy of a <u>recorded</u> plat or map that may be attached as an exhibit to the endorsement accurately reflects the location and dimensions of the Land as shown in the public records.

**SECTIONS OF POLICY AMENDED BY ENDORSEMENT**

This endorsement does not expressly amend any provisions of the Policy.

**BASIS FOR PROVIDING COVERAGE**

There must be some type of independent verification of the information requested, usually from a survey or an appraisal. The address should also be verified from the tax records, as should the fact that the property is being taxed as improved. The description of the type of improvement ["dwelling", "residence" etc.] should be taken from the appraisal or survey, or determined by a direct inspection of the premises.

The use of the 22.1-06, to which a copy of a recorded plat or map may be attached, is not universal.  The document to be attached as an exhibit to the endorsement should be limited to copies of instruments, such as plat maps, taken directly from the public records. The use of a survey or a sketch taken from other sources that includes more or different information than the recorded plat could expose the Company to increased liability.

**AUTHORITY FOR ISSUANCE OF THIS COVERAGE**

The ALTA Form 22.1-06 endorsement may not be issued without the approval of the Company's underwriting advisor.

**MODIFICATION**

In the event that modification of an endorsement is requested, it is necessary to consider your state regulatory requirements for filing and approval of forms.  If the endorsement is modified, the endorsement is not an ALTA form and should not reference ALTA in the title.  You must obtain the approval of the Company's underwriting adviser before complying with any request for a modification.

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

Return to Table of Contents

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

ENDORSEMENT MANUAL – Fidelity National Title Group, Inc.                    **SECTION 22**

**ENDORSEMENT**

Attached to Policy No. _____

**Issued By**
**[FNTG BRAND]**

The Company insures against loss or damage sustained by the Insured by reason of the failure of a FILL IN, known as FILL IN, to be located on the Land at Date of Policy.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

[Witness clause optional]

[FNTG BRAND]

BY: _____

ALTA Endorsement Form 22-06
(Location) (6/17/06)
©American Land Title Association

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

**ENDORSEMENT**
Attached to Policy No. _____

**Issued By**
**[FNTG BRAND]**


The Company insures against loss or damage sustained by the Insured by reason of the failure of (i) a FILL IN, known as FILL IN, to be located on the Land at Date of Policy, or (ii) the map, if any, attached to this policy to correctly show the location and dimensions of the Land according to the Public Records.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.


[Witness clause optional]




[FNTG BRAND]


BY: _____



ALTA Endorsement Form 22.1-06
(Location and Map) (6/17/06)
©American Land Title Association

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

ENDORSEMENT MANUAL – Fidelity National Title Group, Inc.                                    SECTION 23

**Return to Table of Contents**

**CO-INSURANCE-SINGLE POLICY**

**ALTA ENDORSEMENT – FORM 23-06**

**PURPOSE**

This endorsement was designed to facilitate the delivery of a single policy when co-insurance with other underwriters is involved with allocation of liability by endorsement from each co-insurer.

**SECTIONS OF POLICY AMENDED BY ENDORSEMENT**

It does not amend any section of the policy, but rather operates to incorporate the terms and conditions of another policy into our policy.

**BASIS FOR PROVIDING COVERAGE**

Many large transactions use the concept of Co-insurance to spread the risk between underwriters. Basically, co-insurers each share a percentage or dollar amount of any claim. Each is primarily liable for their share of risk which means they share in the risk from the first dollar of loss. This is accomplished by each company issuing a separate policy in the amount of risk they have undertaken, and each policy would have an exception or a note to acknowledge that other policies share these same risks. This differs from *Reinsurance*, in which one company issues a policy and is primarily liable for the whole amount but purchases reinsurance from other underwriters to spread that risk to secondary (and other) levels of liability. In reinsurance, the ALTA policy issued by the primary insurer is the source of coverage to the Insured. The liability of the Reinsurers is to the Ceder (the one who purchased the Reinsurance) under the terms of the Reinsurance Agreement. The terms of that agreement may allow direct access to the Reinsurers, but that is a different topic, and will not be discussed in this section.

Instead of having multiple policies from multiple underwriters, each in a percentage or fractional dollar amount, which in a multi-site deal could result in tens or hundreds of policies, the Insured may want to have just one policy for each site that all underwriters agree will act as their policy in form and substance. This can be accomplished by use of this endorsement attached to the original or copies of the policy written by what is sometimes called the "lead underwriter" or "Issuing Co-insurer".

*To issue this endorsement to some other underwriter's policy (when we are NOT the lead underwriter) you must do the following:*

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

1.  Open a file and produce a policy with our policy number on it. That policy must agree in all aspects, except amount, with the policy written by the lead underwriter. If you do not agree with any of the provisions or coverages issued by the lead underwriter, you cannot issue this endorsement.

2.  Prepare and deliver this endorsement (not our underlying policy) to the Insured. Often the endorsement will be prepared by the "Issuing Co-Insurer", who has collected all of the policy amounts and file information. If that is the case, you can sign the endorsement after verifying:

- The Issuing Co-Insurer's policy number is in the first blank in the heading.
- In the chart we are shown as one of the Co-Insurers. The Amount of Insurance, Percentage of Liability, policy information and claims address must be checked. The lead underwriter (or "Issuing Co-insurer" in the endorsement) may fill in the Amounts and Percentages for the policies and send it to you for our policy number and signature. Keep a copy of the signed endorsement in our policy file.

3.  Report and remit premium on the amount of <u>our policy</u> that you produced for the file.

*To issue this endorsement where we are the lead underwriter ("Issuing Co-Insurer") you must do the following:*

1.  Open a file and produce a policy with our policy number on it. <u>THE AMOUNT OF THIS POLICY IS **NOT** THE AGGREGATE POLICY AMOUNT ON THE ENDORSMENT</u>. The Amount of Insurance on Schedule A of the Policy must be the Amount of Insurance allocated to us. It can be additionally shown as a percentage of the Aggregate Amount of Insurance amount reflected on the endorsement. The policy should contain a footnote similar to the following:

> "This policy is issued contemporaneously with the policies reflected on the Co-Insurance Endorsement attached hereto, which policies total the Aggregate Amount of Insurance as shown therein. It is understood and agreed that for all loss or aggregate losses against which said policies protect, the Company shall be liable only for the Percentage of Liability up to the Amount of Insurance as allocated to the Company therein. In no event shall the Company be liable for loss in excess of the Amount of Insurance as shown therein."

2.  Prepare a sample Endorsement with the information supplied by the other underwriters. Send to the other underwriters so they may fill in any of their missing policy information in the chart and execute.

3.  Report the policy.

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

**MODIFICATION**

In the event that modification of an endorsement is requested, it is necessary to consider your state regulatory requirements for filing and approval of forms.  If the endorsement is modified, the endorsement is not an ALTA form and should not reference ALTA in the title.  You must obtain the approval of the Company's underwriting adviser before complying with any request for a modification.

Return to Table of Contents

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

**ENDORSEMENT**

Attached to Policy No.[*lead policy*]
Issued by
[*lead policy issuer*]**("Issuing Co-Insurer")**

CO-INSURANCE ENDORSEMENT

Attached to and made a part of Issuing Co-Insurer's Policy No. [*lead policy*] ("Co-Insurance Policy").  Each title insurance company executing this Co-Insurance Endorsement, other than the Issuing Co-Insurer, shall be referred to as "Co-Insurer."  Issuing Co-Insurer and each Co-Insurer are collectively referred to as "Co-Insuring Companies".

1.  By issuing this endorsement to the Co-Insurance Policy, each of the Co-Insuring Companies adopts the Co-Insurance Policy's Covered Risks, Exclusions, Conditions, Schedules and endorsements, subject to the limitations of this endorsement.

| Co-Insuring Companies | Name and Address | Policy Number [File Number] | Amount of Insurance | Percentage of Liability |
|---|---|---|---|---|
| Issuing Co-Insurer | | | $ | |
| Co-Insurer | | | $ | |
| Co-Insurer | | | $ | |
| Co-Insurer | | | $ | |
| Aggregate Amount of Insurance | | | $ | |

2. Each of the Co-Insuring Companies shall be liable to the Insured only for its Percentage of Liability of: (a) the total of the loss or damage under the Co-Insurance Policy, in no event greater than its respective Amount of Insurance set forth in this endorsement; and (b) costs, attorneys' fees and expenses provided for in the Conditions.

3. Any notice of claim and any other notice or statement in writing required to be given under the Co-Insurance Policy must be given to each of the Co-Insuring Companies at its address set forth above.

4. Any endorsement to the Co-Insurance Policy issued after the date of this Co-Insurance Endorsement must be signed on behalf of each Co-Insuring Company by its authorized officer or agent.

5. This Co-Insurance Endorsement is effective as of the Date of Policy of the Co-Insurance Policy.  This Co-Insurance Endorsement may be executed in counterparts.

This endorsement is issued as part of the Co-insurance Policy.  Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy or (iv) increase the Amount of Insurance.  To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls.  Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements to it.

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

*ALTA 23-06 Continued*

[Witness Optional]

DATED:
Issuing Co-Insurer:

[lead underwriter]

BY: _____


Co-Insurer:

[BLANK] Title Insurance Company

By: _____


Co-Insurer:

[BLANK] Title Insurance Company

By: _____


Co-Insurer:

[BLANK] Title Insurance Company

By: _____



[Additional Co-Insurer signatures may be added if needed.]



ALTA Endorsement Form 23-06
(Co-Insurance - Single Policy) (Rev. 10/16/08)
©American Land Title Association


© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

ENDORSEMENT MANUAL – Fidelity National Title Group, Inc.                    **SECTION 24**

**Return to Table of Contents**

**DOING BUSINESS**

**ALTA ENDORSEMENT - FORM 24-06**

**PURPOSE**

This endorsement for a loan policy provides coverage to the lender concerning the consequences of the failure to comply with state "doing business" laws.

**SECTIONS OF POLICY AMENDED BY ENDORSEMENT**

Exclusions from Coverage 4 of the Loan Policy excludes from coverage any loss from unenforceability of the lien of the insured mortgage resulting from the lender's failure to comply with  any doing-business laws of the state where the Land is located.

**BASIS FOR PROVIDING COVERAGE**

Most states regulate the lending industry within the state. Many require lenders to be authorized to "do business" if they are chartered or incorporated in another state or jurisdiction. This type of regulation can be found in statutes or administrative/regulatory policies. The penalties for failure to follow these rules often include fines or the requirement to appoint a specific state agency (such as the secretary of state or financial regulatory agency) as agent of service of process, neither of which affects the priority or enforceability of the lien of the Insured Mortgage. HOWEVER, some states designate that the failure to comply with the regulations results in the mortgage or deed of trust being void or voidable. THEREFORE, you must ascertain that the state in which the Land is located does not have any statutory or regulatory policies or procedures that impact the priority or prohibit the enforcement of mortgages or deeds of trust held by lenders not authorized or licensed to do business in that state. Your Company underwriting advisor should be consulted for issuance within your state.

**MODIFICATION**

In the event that modification of an endorsement is requested, it is necessary to consider your state regulatory requirements for filing and approval of forms. If the endorsement is modified, the endorsement is not an ALTA form and should not reference ALTA in the title.  You must obtain the approval of the Company's underwriting adviser before complying with any request for a modification.

Return to Table of Contents

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

ENDORSEMENT MANUAL – Fidelity National Title Group, Inc.                                    **SECTION 24**

**ENDORSEMENT**

Attached to Policy No._____

Issued by

[FNTG BRAND]

The Company insures against loss or damage sustained by the Insured by reason of the invalidity or unenforceability of the lien of the Insured Mortgage on the ground that making the loan secured by the Insured Mortgage constituted a violation of the "doing business" laws of the State where the Land is located because of the failure of the Insured to qualify to do business under those laws.

This endorsement is issued as part of the policy.  Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance.  To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls.  Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements to it.

[Witness Optional]

DATED:

[FNTG BRAND]

BY: _____
           AUTHORIZED SIGNATORY

ALTA Endorsement Form 24-06
(Doing Business) (10/16/08)
©American Land Title Association

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

ENDORSEMENT MANUAL – Fidelity National Title Group, Inc.                    **SECTION 25**

**Return to Table of Contents**

### SAME AS SURVEY & SAME AS PORTION OF SURVEY
### ALTA ENDORSEMENT – FORMS 25-06 AND 25.1-06

#### PURPOSE

These endorsements expand policy coverage by specifying that the description on Schedule A (or C) is legally identical to a description contained in a survey which incorporates differing language.

#### SECTIONS OF POLICY AMENDED BY ENDORSEMENT

No specific section of the policy is amended by these endorsements. However, additional coverage is added.

#### BASIS FOR PROVIDING COVERAGE

These endorsements are available for owner's and loan policies. They insure that the Land as described in Schedule A is **legally** identical with the land as described in the survey identified in the endorsement, despite the fact that there is different language in each of the descriptions. The endorsement is usually requested for loan policies when the mortgage being insured contains a legal description which varies slightly when compared with Schedule A of the Policy or the survey submitted for the file.

This endorsement may be issued only after a careful review of the relevant legal descriptions and a determination that the legal descriptions are not ambiguous and, in fact, delineate the identical property, and are legally sufficient to convey title under state law. It is customary in some areas to require the surveyor to certify that the legal descriptions are one and the same.

The ALTA 25-06 is used when the entire legal description is identical to the entire legal description on the survey.

The ALTA 25.1-06 is used when the legal description in the Policy is one or more parcels on a survey that contains additional parcels besides the ones being insured. This is normally only an issue in a new development where we are being asked to rely on a survey of a larger development to insure less than all of that development. Care must be taken that the survey

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

correctly reflects any internal improvements and dimensions, and includes sufficient information to make this determination.

**MODIFICATION**

In the event that modification of an endorsement is requested, it is necessary to consider your state regulatory requirements for filing and approval of forms. If the endorsement is modified, the endorsement is not an ALTA form and should not reference ALTA in the title.  You must obtain the approval of the Company's underwriting adviser before complying with any request for a modification.

Return to Table of Contents

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

ENDORSEMENT MANUAL – Fidelity National Title Group, Inc.                              **SECTION 25**

**ENDORSEMENT**
Attached to Policy No._____
Issued by
[FNTG BRAND]


The Company insures against loss or damage sustained by the Insured by reason of the failure of the Land as described in Schedule A to be the same as that identified on the survey made by _____ dated _____, and designated Job No. _____.

This endorsement is issued as part of the policy.  Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance.  To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls.  Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements to it.


[Witness Optional]


DATED:

[FNTG BRAND]

BY: _____
        AUTHORIZED SIGNATORY


ALTA Endorsement Form 25-06
(Same as Survey) (10/16/08)
©American Land Title Association


© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

ENDORSEMENT MANUAL – Fidelity National Title Group, Inc.                    **SECTION 25**

**ENDORSEMENT**
Attached to Policy No._____
Issued by
[FNTG BRAND]

The Company insures against loss or damage sustained by the Insured by reason of the failure of the Land as described in Schedule A to be the same as that identified as [Example:  Parcel A, B, C or Parcel 1, 2, 3] on the survey made by _____ dated _____, and designated Job No. _____.

This endorsement is issued as part of the policy.  Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy or (iv) increase the Amount of Insurance.  To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls.  Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements to it.

[Witness Optional]

DATED:

[FNTG BRAND]

BY: _____
          AUTHORIZED SIGNATORY

ALTA Endorsement Form 25.1-06
(Same as Portion of Survey) (10/16/08)
©American Land Title Association

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

ENDORSEMENT MANUAL – Fidelity National Title Group, Inc.                    **SECTION 26**

**Return to Table of Contents**

**SUBDIVISION**

**ALTA ENDORSEMENT - FORM 26-06**


**PURPOSE**


The ALTA Form 26-06 insures against loss based upon the Land described in Schedule A (or Schedule C) not constituting a legally created parcel pursuant to applicable state statutes or local governmental regulations.


**SECTIONS OF POLICY AMENDED BY ENDORSEMENT**


This endorsement modifies exclusion 1(a)(iii) which excludes any law, ordinance, permit or governmental regulation which pertains to the subdivision of land.  Historically, the title policy and search did not address such restrictions on the subdivision of land since they did not constitute matters that affected title or the ability to convey. In some areas of the country (most notably on the west coast) there have been enacted statutes and ordinances which make it a criminal act to convey by or use a legal description not in conformance with subdivision laws.


**BASIS FOR PROVIDING COVERAGE**


The issuance of this coverage is extra hazardous, and not to be taken lightly. You must have approval of your Company underwriting advisor. It requires the analysis of both  state statutes and local building and use ordinances or laws. We are experiencing a rise in the number of counties across the country that are seeking ways to increase their fees, and have started to challenge legal descriptions that have been in use for, in one instance, over 70 years!  You will need to have the following information to be able to discuss the matter with your Company underwriting advisor:

Items to consider:

1.      State Statute:

        What are the provisions of the appropriate statute(s) regarding legally created parcels?

        Are there any penalties if a parcel of land does not conform to the statute(s)?

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

How severe are the penalties? Are documents using the non-conforming description void or not recordable? Even if recorded, are they held to be insufficient to give constructive notice to subsequent parties under the recording acts or statute of frauds in place in the state? Are mortgages which use a non-conforming description held to be unenforceable?

Does our parcel conform to the statute? If not, how not?

2.      Local governmental regulations:

What are the provisions of the appropriate regulations regarding legally created parcels? These could be contained in the zoning ordinances, building use or permitting ordinances or anywhere in between.

Are there any penalties if a parcel of land does not conform to the regulations?

How severe are the penalties? Will the owner be unable to get a permit to build, modify, or re-hab? Will they (or the title company) be subject to civil fines or criminal action?

Does our parcel conform to the regulations? If not, how not?

3.      Understand exactly what coverage the proposed Insured is expecting to obtain by this endorsement.

NOTE: *Be careful, in modifying this endorsement pursuant to customer requests, not to Broaden the endorsement to provide coverage for other matters, such as development and zoning issues, that were not intended to be provided by this endorsement.*

## MODIFICATION

In the event that modification of an endorsement is requested, it is necessary to consider your state regulatory requirements for filing and approval of forms. If the endorsement is modified, *as discussed in the Note above*, the endorsement is not an ALTA form and should not reference ALTA in the title.  You must obtain the approval of the Company's underwriting adviser before complying with any request for a modification.

Return to Table of Contents

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

**ENDORSEMENT**

Attached to Policy No._____

Issued by

[FNTG BRAND]

The Company insures against loss or damage sustained by the Insured by reason of the failure of the Land to constitute a lawfully created parcel according to the subdivision statutes and local subdivision ordinances applicable to the Land.

This endorsement is issued as part of the policy.  Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy or (iv) increase the Amount of Insurance.  To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls.  Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements to it.

[Witness Optional]

DATED:

[FNTG BRAND]

BY: _____
     AUTHORIZED SIGNATORY

ALTA Endorsement Form 26-06
(Subdivision) (10/16/08)
©American Land Title Association

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

ENDORSEMENT MANUAL – Fidelity National Title Group, Inc.                    **SECTION 27**

Return to Table of Contents

**USURY ENDORSEMENT**

**ALTA Form 27-06**

**PURPOSE**

This endorsement is for use with an ALTA loan policy. It provides insurance against loss the Insured may suffer if the Insured Mortgage is determined to be usurious under state statute.

**NOTE: *STATES WHERE USURY COVERAGE CANNOT BE GIVEN*:** ARKANSAS, FLORIDA, KANSAS, MISSOURI, NEW JERSEY, NEW MEXICO, NEW YORK, OREGON, PENNSYLVANIA, TEXAS, AND WYOMING.

**SECTION OF THE POLICY AMENDED BY THE ENDORSEMENT**

This endorsement amends Exclusions 5 of the ALTA Loan Policy.

**BASIS FOR PROVING COVERAGE**

.

The term "usury" refers to the charging of an excessive rate of "interest" upon a loan or for the forbearance of collection.  The existence of usury depends entirely upon the specific wording of the applicable statute or constitutional provision. This endorsement should be issued **only** if a state statute exempts the specific type of lender, borrower or type transaction from its usury laws. The endorsement cannot be issued if the exemption is based upon some type of mathematical formulae or limit of interest rate. A court might designate other fees or charges as "interest" and the result could provide an amount of interest that exceeds the statutory amount. The issuance of usury coverage is extra-hazardous and you **must** confer with the Company's underwriting advisor for authority to issue this endorsement.

The endorsement can not be used in the following states without modification (which would no longer make it an ALTA form) : Colorado, Georgia, Massachusetts, Michigan, and North Carolina. These states impose a limitation on the interest that can be charged on loans that are otherwise exempt from usury statutes. The following is additional language which **must** be added to the endorsement:

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

**Colorado:**  …excepting any of said loss or damage as may be caused as a result of a determination that the interest rate as calculated is in excess of forty-five percent (45%) per annum.

**Georgia**:  …excepting any of said loss or damage as may be caused as a result of a determination that the interest rate as calculated is in excess of five percent (5%) per month.

**Massachusetts:**  …excepting any of said loss or damage as may be caused as a result of a determination that the interest rate as calculated is in excess of twenty percent (20%) per annum; unless notification is made to the Massachusetts Attorney General as required by Chapter 271, Section 49, Massachusetts General Laws.

**Michigan:**  …excepting any of said loss or damage as may be caused as a result of a determination that the interest rate as calculated is in excess of twenty-five percent (25%) per annum.

**North Carolina:  …**excepting any of said loss or damage as may be caused as a result of provisions for the charging of or payment of late charges as provided in Section 24-10.1 North Carolina statutes.

### MODIFICATION

In the event that modification of an endorsement is requested, it is necessary to consider your state regulatory requirements for filing and approval of forms.  **If the endorsement is modified, as discussed above,  the endorsement is NOT an ALTA form and should not reference ALTA in the title**.  You must obtain the approval of the Company's underwriting adviser before complying with any request for a modification.

Return to Table of Contents

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

# ENDORSEMENT

Attached to policy No. _____

**Issued by**
**[FNTG BRAND]**

The Company insures against loss or damage sustained by the Insured  by reason of the invalidity or unenforceability of the lien of the Insured Mortgage as security for the Indebtedness because the loan secured by the Insured Mortgage violates the usury law of the state where the Land is located.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

[Witness clause optional]

[FNTG BRAND]

BY: _____

ALTA Endorsement Form 27-06
(Usury) (10/16//08)
©American Land Title Association

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

ENDORSEMENT MANUAL – Fidelity National Title Group, Inc.                                   **SECTION 28**

**Return to Table of Contents**

**EASEMENT - DAMAGE OR ENFORCED REMOVAL**
**ENCROACHMENTS - BOUNDARIES AND EASEMENTS**
**ALTA ENDORSEMENT FORMS 28-06; 28.1-06 and 28.2-06**

**PURPOSE**

**ALTA Endorsement Form 28-06 (Easement - Damage or Enforced Removal)**
Endorsement Form 28.06 was developed to insure against loss caused by the encroachment of a building located on the Land onto or over an easement shown as an exception in Schedule B, as disclosed by a survey or inspection of the Land. The loss must be based on an exercise of the easement and is only for damage to an existing building or enforced removal or alteration.

**ALTA Endorsement Form 28.1-06 (Encroachments - Boundaries and Easements)**
**ALTA Endorsement Form 28.2-06 (Encroachments - Boundaries and Easements-Described Improvements)**

Endorsement Forms 28.1-06 and 28.2 were developed to provide coverage with respect to certain boundary and easement encroachments. This coverage was previously included in the former ALTA 9 series. It is no longer contained within those endorsements other than the revised ALTA 9-06 and the new ALTA 9.7-06 and 9.10-06 (which additionally afford coverage as to violations of covenants, violations of setbacks, and damage to existing improvements because of development of minerals). The Endorsement Form 28.2-06 is used when the encroachment of a specific Improvement is meant to be covered and is specifically described at item 2. . You may have a situation when you are willing to give coverage over encroachments by one improvement and not another, perhaps because one has been in place without objection for a longer period of time.

The coverages in theses Endorsements include:

- The loss occasioned by the existence of an encroachment by an Improvement onto a neighboring property or onto an easement area within the insured Land, **other than as disclosed** in Schedule B exceptions.
- The loss occasioned by the existence of an encroachment by a neighboring Improvement onto the insured Land, **other than as disclosed** in Schedule B exceptions.
- Enforced removal of an insured Improvement based upon the encroachment into the easement area or onto neighboring property.

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

ENDORSEMENT MANUAL – Fidelity National Title Group, Inc.                                    **SECTION 28**

These forms allow the exclusion of an encroachment raised as an exception in Schedule B from the enforced removal coverage by reference to the exception that describes it, if we choose not to include that encroachment within the coverage afforded by these endorsements.

## SECTIONS OF POLICY AMENDED BY ENDORSEMENT

No specific sections of the policy are amended by this endorsement; however additional coverages are added.

## BASIS FOR PROVIDING COVERAGE

### ALTA Form 28-06
**An accurate current survey or inspection of the Land is required for coverage**

The basis for giving these coverages can vary by local custom and law. You should always confer with your Company underwriting advisor to determine the appropriate risk. Some of the factors to take into consideration would be:

- Type and location of easement (Under ground? Overhead? Common utility? Residential or Commercial type of use [e.g., oil pipeline]?)
- Age of easement vs. age of improvement (Which came first?).  Age of improvement with no interference historically.
- Size or amount of encroachment (De minimis or substantial? Across small portion or entire width?).
- Can easement still be used with encroachment?  Are there other access points for maintenance?
- Cost of moving easement or improvement if the encroachment interferes with the maintenance and use of easement.

Note: The endorsement specifically covers only the "building" and not other improvements on the Land. Any request to expand this coverage must be discussed with your Company underwriting advisor.

### ALTA Form 28.1-06 and 28.2
**An accurate current survey of the Land is required for coverage on any policy other than a residential, 1-4 family Loan Policy.**

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

Coverage 3a may be given provided:

> For encroachments onto adjoining land
> - Any encroachments disclosed by inspection, survey or other means, are also expressly excepted by description of such matter in Schedule B.

> For encroachments onto easements located on the Land, either
> - there are no easements excepted in Schedule B; or
> - encroachments onto easements, disclosed by inspection, survey or other means, are also expressly excepted by description of such matter in Schedule B.

Coverage 3b may be provided if any of the following situations apply:

- for encroachments on the Land by a neighboring Improvement - any such encroachments disclosed by inspection, survey or other means, are expressly excepted by description of such matter in Schedule B.

Coverage 3c may be given if any of the following situations apply:

1. There are no easements excepted in Schedule B.
2. There are no encroachments onto easements excepted in Schedule B.
3. Encroachments shown are minor, would not interfere with maintenance of the easement and could not be forcibly removed under state law.

Coverage 3d may be given if any of the following situations apply:

1. There are no encroachments onto adjoining land excepted in Schedule B.
2. The encroachment is minor and could be removed at minimal cost.
3. The encroachment is minor; is not onto a parcel of vacant land; is not necessary to the support of the main structure; and your Company underwriting advisor is satisfied that a state court would not require its removal.

Note:

The Form 28.1-06 specifically covers only the "building" and not other improvements on the Land. Any request to expand this coverage must be discussed with your Company underwriting advisor.

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

It allows all of the coverages to be denied for a specific named exception if you do not want to give coverage for that encroachment.

The Form 28.2-06 specifically covers only the Improvements described at item 2 of the endorsement. This allows you to choose which Improvements, and therefore which encroachments created by the specific improvement, for which you are granting coverage. Form 28.2 further varies in that it allows the coverage at 3.c and 3.d (enforced removal) only to be denied to matters specifically identified by exception numbers.

**MODIFICATION**

In the event that modification of an endorsement is requested, it is necessary to consider your state regulatory requirements for filing and approval of forms. If the endorsement is modified, *as discussed in the Note above, or for any other reason*, the endorsement is not an ALTA form and should not reference ALTA in the title.   You must obtain the approval of the Company's underwriting adviser before complying with any request for a modification.

Return to Table of Contents

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

**ENDORSEMENT**

Attached to Policy No._____
Issued by
[FNTG BRAND]


The Company insures against loss or damage sustained by the Insured if the exercise of the granted or reserved rights to use or maintain the easement(s) referred to in Exception (s)\_\_\_\_\_ of Schedule B results in:


(1)     damage to an existing building located on the Land, or

(2)     enforced removal or alteration of an existing building located on the Land.


This endorsement is issued as part of the policy.  Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy or (iv) increase the Amount of Insurance.  To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls.  Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements to it.


[Witness Optional]


DATED:

[FNTG BRAND]

BY: _____
        AUTHORIZED SIGNATORY


ALTA Endorsement Form 28-06
(Easement-Damage or Enforced Removal) (rev. 02/03/10)
©American Land Title Association

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

ENDORSEMENT MANUAL – Fidelity National Title Group, Inc.                    **SECTION 28**

**ENDORSEMENT**

**Attached to Policy No. _____**

**Issued by**

*[FNTG BRAND]*

1.  The insurance provided by this endorsement is subject to the exclusions in Section 4 of this endorsement; and the Exclusions from Coverage, the Exceptions from Coverage contained in Schedule B, and the Conditions in the policy.

2.  For purposes of this endorsement only, "Improvement" means an existing building, located on either the Land or adjoining land at Date of Policy and that by law constitutes real property.

3.  The Company insures against loss or damage sustained by the Insured by reason of:

    a.  An encroachment of any Improvement located on the Land onto adjoining land or onto that portion of the Land subject to an easement, unless an exception in Schedule B of the policy identifies the encroachment;

    b.  An encroachment of any Improvement located on adjoining land onto the Land at Date of Policy, unless an exception in Schedule B of the policy identifies the encroachment;

    c.  Enforced removal of any Improvement located on the Land as a result of an encroachment by the Improvement onto any portion of the Land subject to any easement, in the event that the owners of the easement shall, for the purpose of exercising the right of use or maintenance of the easement, compel removal or relocation of the encroaching Improvement; or

    d.  Enforced removal of any Improvement located on the Land that encroaches onto adjoining land.

4.  This endorsement does not insure against loss or damage (and the Company will not pay costs, attorneys' fees, or expenses) resulting from the encroachments listed as Exceptions _____ of Schedule B.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

[Witness clause optional]

[FNTG BRAND]

By: _____
            Authorized Signatory

ALTA Endorsement Form 28.1-06
(Encroachments-Boundaries and Easements) (4/2/12)
©American Land Title Association

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

ENDORSEMENT MANUAL – Fidelity National Title Group, Inc.                    **SECTION 28**

**ENDORSEMENT**
**Attached to Policy No. _____**
**Issued by**
*[FNTG BRAND]*

1.   The insurance provided by this endorsement is subject to the exclusions in Section 4 of this endorsement; and the Exclusions from Coverage, the Exceptions from Coverage contained in Schedule B, and the Conditions in the policy.

2.   For purposes of this endorsement only, "Improvement" means each improvement  on the Land or adjoining land at Date of Policy , itemized below:

.

3.   The Company insures against loss or damage sustained by the Insured by reason of:

   a. An encroachment of any Improvement located on the Land onto adjoining land or onto that portion of the Land subject to an easement, unless an exception in Schedule B of the policy identifies the encroachment;

   b. An encroachment of any Improvement located on adjoining land onto the Land at Date of Policy, unless an exception in Schedule B of the policy identifies the encroachment;

   c. Enforced removal of any Improvement located on the Land as a result of an encroachment by the Improvement onto any portion of the Land subject to any easement, in the event that the owners of the easement shall, for the purpose of exercising the right of use or maintenance of the easement, compel removal or relocation of the encroaching Improvement; or

   d. Enforced removal of any Improvement located on the Land that encroaches onto adjoining land.

4.   Sections 3.c and 3.d. of this endorsement do not insure against loss or damage (and the Company will not pay costs, attorneys' fees, or expenses) resulting from the following Exceptions, if any, listed in Schedule B:

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

[Witness clause optional]

[FNTG BRAND]

By: _____

       Authorized Signatory

ALTA Endorsement Form 28.2-06
(Encroachments-Boundaries and Easements-Described Improvements) (4/2/13)
©American Land Title Association

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

**Return to Table of Contents**

**SWAP ENDORSEMENT**

**(INTEREST RATE EXCHANGE AGREEMENT SECURED BY**

**INSURED MORTGAGE)**

**ALTA ENDORSEMENT – FORMS 29-06, 29.1-06, 29.2-06 AND 29.3-06**


**PURPOSE**

Lenders occasionally request that the Loan Policy insure amounts which are described in an Interest Rate Exchange Agreement or Swap Agreement, the terms of which are contained in or referenced in the Insured Mortgage. Such agreements obligate the mortgagor for damages the lender may suffer under swap transactions it enters into on the borrower's behalf in order to achieve a favorable interest rate. If the borrower defaults on its loan, the lender becomes obligated itself under the swap loan for amounts known as breakage fees. This endorsement is designed to provide additional coverage for these amounts. These amounts are contingent and would accrue as an obligation of the borrower post-policy. Without an endorsement, it is questionable whether the definition of Indebtedness at Conditions number 1(d) would cover such obligations, whether they were characterized as additional principal or additional interest on the loan.


**SECTION OF POLICY AMENDED BY ENDORSEMENT**

Since the loan documents provide that the obligations described in the agreements may accrue in the future, this endorsement provides coverage for breakage fees paid by the insured lender post policy despite Exclusions from Coverage 3(d), which excludes "defects, liens, encumbrances, adverse claims, or other matters attaching or created subsequent to Date of Policy." That Exclusion expressly does not modify or limit the coverage provided under Covered Risk 11, 13, or 14, but none of those provisions would provide coverage for breakage fees. The definitions of Indebtedness at Condition 1(d) (ii) (principal disbursed subsequent to Date of Policy) and (iv) (interest on the loan) do not apply to those mortgages which provide that what is secured are amounts advanced to pay sums due under the agreements, which are neither principal disbursed nor additional interest. In states with a mortgage tax, these agreements are often structured so that the sums due are treated as additional interest, and in that case breakage fees might be treated as covered under Condition 1(d)(iv) for purposes of determining the **Amount of Insurance;** however, inclusion for such purpose would not result in coverage of the **validity, enforceability and priority** of  advances made to fund breakage fees.


© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

**BASIS FOR PROVIDING COVERAGE**

1. **State Law – Obligatory advances; Incorporation by Reference.**

Many states have statutory or case law which provides that if the costs expended by the lender on behalf of the borrower under the swap agreement are obligatory, they may be afforded the same priority as if they had been expended at the date of the mortgage. For states in which this is the law, the loan documents must be reviewed to verify that the payment of breakage fees is obligatory.  For other states, the law must be reviewed by the Company's underwriting advisor to determine if the obligations of the lender will be afforded the same priority as if they had been expended at the date of the mortgage. Note that the endorsement specifically excludes coverage with respect to laws relating to bankruptcy, usury, unconscionability or unreasonableness. Further, the question of whether  a swap agreement referred to in a note, which itself is referred to in the Insured Mortgage,  is effectively incorporated by reference into the  Insured Mortgage so as to give notice to third parties, is a question of state law which must be referred to the Company's underwriting advisor.

2. **The mortgage must state the maximum amount secured by the agreement, in addition to the principal loan amount secured.**

The Insured Mortgage must state the additional amounts to be secured by reason of lender obligations under the swap or interest exchange agreements. Premium must be paid on these amounts.

3. **The swap or interest exchange agreement must be in place.**

State priority law will usually require either that the agreement be in place at the time of execution of the Insured Mortgage. The question of the sufficiency of a swap agreement not yet in place at Date of Policy should be referred to the Company's underwriting advisor.

4. **In states with a mortgage tax, swap enhanced loans may structure the swap obligations as additional interest. In such cases, provisions for treatment of the swap obligations as additional interest must be contained in the note and not merely in the interest rate exchange agreement.**

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

For a number of reasons, including the imposition of taxes, the swap obligations to be secured by the Insured Mortgage may be defined as additional interest. If this is the situation, the provisions for this treatment must be contained in the note so as to give notice to intervening parties that the mortgage secures such additional interest (see State Law - Incorporation by Reference above). New York is one such state which has a specific form which must be used. Since normal additional interest is included in the Amount of Indebtedness, the breakage fees thus characterized would be included. Consideration should be given to the position that these special types of "additional interest" were not contemplated as normal components of liability when assessing the premium to be charged for this endorsement. Therefore, the endorsement merits a charge notwithstanding that at the time of issuance of the policy the amount of exposure for loss under the endorsement may be minimal or non-existent.

**OBLIGATORY ADVANCE – FORMS 29-06 and 29.2-06**

These forms treat the swap obligation amounts as additional principal. Form 29-06 requires the Insured to include the amount of any breakage fees in the face amount of the Insured Mortgage to provide for coverage as to those amounts. Form 29.2-06 allows the additional amount of liability to be separately shown in the endorsment. Additional premium would be collected on the amounts shown in the endorsement.

**ADDITIONAL INTEREST - FORM 29.1-06 and 29.3-06**

Form 29.1-06 treats the swap obligation amounts as additional interest. While Conditions 1 (d) (iv) of the 2006 ALTA Loan Policy includes "interest on the loan" as part of the definition of Indebtedness, the endorsement is still necessary in order to insure the validity, priority and enforceability of post-policy interest. Form 29.3-06 allows the additional amount of liability to be separately shown in the endorsment. Additional premium would be collected on the amounts shown in the endorsement.

**MODIFICATION**

In the event that modification of an endorsement is requested, it is necessary to consider your state regulatory requirements for filing and approval of forms.  If the endorsement is modified, the endorsement is not an ALTA form and should not reference ALTA in the title.  You must obtain the approval of the Company's underwriting adviser before complying with any request for a modification.

Return to Table of Contents

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

ENDORSEMENT MANUAL – Fidelity National Title Group, Inc.                                    **SECTION 29**

ENDORSEMENT

Attached to Policy No._____

**Issued by**
**[FNTG BRAND]**

1.  The insurance provided by this endorsement is subject to the exclusions in Section 3 of this endorsement, the Exclusions from Coverage in the Policy, the Exceptions from Coverage contained in Schedule B, and the Conditions. As used in this endorsement:

    a.  The "Date of Endorsement" is _____; and

    b.  "Swap Obligation" means a monetary obligation under the interest rate exchange agreement dated _____, between _____ and the Insured existing at Date of Endorsement and secured by the Insured Mortgage. The Swap Obligation is included as a part of the Indebtedness.

2.  The Company insures against loss or damage sustained by the Insured by reason of the invalidity, unenforceability or lack of priority of the lien of the Insured Mortgage as security for the repayment of the Swap Obligation at Date of Endorsement.

3.  This endorsement does not insure against loss or damage, and the Company will not pay costs, attorneys' fees, or expenses that arise by reason of:

    a.  Rights or obligations set, created or confirmed after the Date of Endorsement under a master interest rate exchange agreement existing on or after Date of Endorsement;

    b.  The stay, rejection or avoidance of the lien of the Insured Mortgage as security for the Swap Obligation, or a court order providing some other remedy, by the operation of federal bankruptcy, state insolvency, or similar creditors' rights laws;

    c.  The calculation of the amount, if any, determined by a court of competent jurisdiction as the amount of the Swap Obligation[; *or*]

    d.  [*The invalidity, unenforceability or lack of priority of the lien of the Insured Mortgage as security for repayment of the Swap Obligation because all applicable mortgage recording or similar intangible taxes were not paid; or* ]

    e.  [*If Date of Endorsement is after Date of Policy, add any necessary additional exceptions here*].

This endorsement is issued as part of the policy.  Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy or (iv) increase the Amount of Insurance.  To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls.  Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements to it.

Dated:

By_____
        Authorized Signatory
ALTA Endorsement - Form 29 - 06
(Interest Rate Swap –Direct Obligations) (2/3/10)
©American Land Title Association

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

ENDORSEMENT
Attached to Policy No. _____
**Issued by**
**[FNTG BRAND]**

1.  The insurance provided by this endorsement is subject to the exclusions in Section 3 of this endorsement, the Exclusions from Coverage in the Policy, the Exceptions from Coverage contained in Schedule B, and the Conditions. As used in this endorsement:

    a.   The "Date of Endorsement" is  _____; and

    b.   "Swap Obligation" means a monetary obligation under the interest rate exchange agreement dated _____, between _____and the Insured existing at Date of Endorsement and secured by the Insured Mortgage.

    c.   "Additional Interest" means the additional interest calculated pursuant to the formula provided in the loan documents secured by the Insured Mortgagee at Date of Endorsement.

2.  The Company insures against loss or damage sustained by the Insured by reason of the invalidity, unenforceability or lack of priority of the lien of the Insured Mortgage as security for the repayment of the Additional Interest at Date of Endorsement.

3.  This endorsement does not insure against loss or damage, and the Company will not pay costs, attorneys' fees, or expenses that arise by reason of:

    a.   Rights or obligations set, created or confirmed after the Date of Endorsement under a master interest rate exchange agreement existing on or after Date of Endorsement;

    b.   The stay, rejection or avoidance of the lien of the Insured Mortgage as security for the Swap Obligation, or a court order providing some other remedy, by the operation of federal bankruptcy, state insolvency, or similar creditors' rights laws;

    c.   The calculation of the amount, if any, determined by a court of competent jurisdiction as the amount of the Additional Interest*[; or]*

    d.   [*The invalidity, unenforceability or lack of priority of the lien of the Insured Mortgage as security for repayment of the Swap Obligation because all applicable mortgage recording or similar intangible taxes were not paid; or* ]

    e.   [*If Date of Endorsement is after Date of Policy, add any necessary additional exceptions here*].

    This endorsement is issued as part of the policy.  Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy or (iv) increase the Amount of Insurance.  To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements to it.

Dated:

By_____
            Authorized Signatory

ALTA Endorsement - Form 29.1 - 06
(Interest Rate Swap – Additional Interest**)** (2/3/10)
©American Land Title Association

ENDORSEMENT

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

ENDORSEMENT MANUAL – Fidelity National Title Group, Inc.                                    **SECTION 29**

Attached to Policy No._____

**Issued by**
**[FNTG BRAND]**

1. The insurance provided by this endorsement is subject to the exclusions in Section 3 of this endorsement, the Exclusions from Coverage in the Policy, the Exceptions from   Coverage contained in Schedule B, and the Conditions. As used in this endorsement:

a. The "Date of Endorsement" is  _____; and

b. "Swap Obligation" means a monetary obligation under the interest rate exchange agreement dated _____, between _____ and the Insured existing at Date of Endorsement and secured by the Insured Mortgage.  The Swap Obligation is included as a part of the Indebtedness.

c. "Additional Amount of Insurance" is $_____ that is in addition to the Amount of Insurance stated in Schedule A and is Applicable only to loss or damage under this endorsement.

2. The Company insures against loss or damage sustained by the Insured by reason of the invalidity, unenforceability or lack of priority of the lien of the Insured Mortgage as security  for the repayment of the Swap Obligation at Date of Endorsement.

3 This endorsement does not insure against loss or damage, and the Company will not pay  costs, attorneys' fees, or expenses that arise by reason of:

a. Rights or obligations set, created or confirmed after the Date of Endorsement under a master interest rate exchange agreement existing on or after Date of Endorsement;

b. The stay, rejection or avoidance of the lien of the Insured Mortgage as security for the Swap Obligation, or a court order providing some other remedy, by the operation of        federal bankruptcy, state insolvency, or similar creditors' rights laws;

c. The calculation of the amount, if any, determined by a court of competent jurisdiction as the amount of the Swap Obligation[; or]

d. [*The invalidity, unenforceability or lack of priority of the lien of the Insured Mortgage as security for repayment of the Swap Obligation because all applicable mortgage recording  or similar intangible taxes  were not paid; or* ]

e. [*If Date of Endorsement is after Date of Policy, add any necessary additional exceptions here*].

This endorsement is issued as part of the policy.  Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy or (iv) increase the Amount of Insurance.  To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls.   Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements to it.

Dated:

By_____
 Authorized Signatory

ALTA Endorsement - Form 29 .2 - 06
(Interest Rate Swap –Direct Obligations-Defined Amount**)** (8/01/11)
©American Land Title Association

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

ENDORSEMENT
Attached to Policy No. _____
**Issued by**
**[FNTG BRAND]**

1.   The insurance provided by this endorsement is subject to the exclusions in Section 3 of this endorsement, the Exclusions from Coverage in the Policy, the Exceptions from Coverage contained in Schedule B, and the Conditions. As used in this endorsement:

     a.   The "Date of Endorsement" is _____; and

     b.   "Swap Obligation" means a monetary obligation under the interest rate exchange agreement dated _____, between _____ and the Insured existing at Date of Endorsement and secured by the Insured Mortgage.

     c.   "Additional Interest" means the additional interest calculated pursuant to the formula provided in the loan documents secured by the Insured Mortgagee at Date of Endorsement.

     d.   "Additional Amount of Insurance" is $ _____ that is in addition to the Amount of Insurance stated in Schedule A and is applicable  only to loss or damage under this endorsement.

2.   The Company insures against loss or damage sustained by the Insured by reason of the invalidity, unenforceability or lack of priority of the lien of the Insured Mortgage as security for the repayment of the Additional Interest at Date of Endorsement.

3.   This endorsement does not insure against loss or damage, and the Company will not pay costs, attorneys' fees, or expenses that arise by reason of:

     a.   Rights or obligations set, created or confirmed after the Date of Endorsement under a master interest rate exchange agreement existing on or after Date of Endorsement;

     b.   The stay, rejection or avoidance of the lien of the Insured Mortgage as security for the Swap Obligation, or a court order providing some other remedy, by the operation of federal bankruptcy, state insolvency, or similar creditors' rights laws;

     c.   The calculation of the amount, if any, determined by a court of competent jurisdiction as the amount of the Additional Interest*[; or]*

     d.   [*The invalidity, unenforceability or lack of priority of the lien of the Insured Mortgage as security for repayment of the Swap Obligation because all applicable mortgage recording or similar intangible taxes were not paid; or* ]

     e.   [*If Date of Endorsement is after Date of Policy, add any necessary additional exceptions here*].

          This endorsement is issued as part of the policy.  Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy or (iv) increase the Amount of Insurance.  To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls.  Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements to it.

Dated:

By_____
          Authorized Signatory

ALTA Endorsement - Form 29.3 - 06
(Interest Rate Swap – Additional Interest-Defined Amount**)** (8/01/11)
©American Land Title Association

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

ENDORSEMENT MANUAL – Fidelity National Title Group, Inc.                    **SECTION 30**

Return to Table of Contents

## ONE TO FOUR FAMILY SHARED APPRECIATION MORTGAGE ENDORSEMENT
## COMMERCIAL PARTICIPATION INTEREST
## ALTA ENDORSEMENT FORMS 30-06 and 30.1-06

### PURPOSE

These endorsements are designed to provide additional coverage to the lender when the loan documents provide that the lender will participate in the appreciation in value of the property or a share of the cash flow (as additional interest). The residential version (30-06) was developed for use with government programs that modified and reduced the outstanding debt of homeowners in the face of the downturn of the housing market. These programs allow the recapture of appreciation up to the amount of forgiveness of previously outstanding debt. The use of this endorsement for any other purpose must be approved by the Company's underwriting advisor.

The commercial version (30.1-06) is for use only with commercial transactions and includes, in addition to the increase in the value of the property (appreciation), a share of the cash flow from the property and any increase in the equity of the borrower in the property, and must be approved by the Company's underwriting advisor.  These endorsements provide coverage in the event of an attack on the validity, priority or enforceability of the Insured Mortgage based upon the provisions regarding shared appreciation and participation.

### SECTION OF POLICY AMENDED BY ENDORSEMENT

Since any appreciation or additional interest will occur in the future, these endorsements specifically provide that the coverage is not subject to Section 3(d) of the Exclusions from Coverage which excludes "Defects, liens, encumbrances, adverse claims, or other matters . . . attaching or created subsequent to Date of Policy . . . ."

### BASIS FOR PROVIDING COVERAGE

**ALTA Form 30-06: One To Four Family Shared Appreciation Mortgage Endorsement**

1. **State Law:**  Many states have passed legislation specifically authorizing the lender to share in the appreciation of the property.  The state statute must be examined for provisions setting specific limits and formulas, and the loan documents must be reviewed to verify that the loan complies with those limits and formulas.   If the statute has no such limits or formulas, consideration should be given to the possibility that (a) the method of calculation used in the

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

Insured Mortgage, or (b) the extent to which certain additional obligations might continue even after the principal is paid, might be so weighted in the lender's favor as to "shock the conscience" of the court and perhaps render the shared appreciation provisions of the Insured Mortgage invalid, or which could lead to a claim of "clogging" the equity of redemption in a bankruptcy or foreclosure situation.

2. **Insured Mortgage must include the formula for calculation:**  The Insured Mortgage must expressly state that it is a Shared Appreciation Mortgage **and** include the actual formula or calculation method used to determine the lender's share.   The formula or calculation method **cannot** simply be incorporated by reference to the provisions of the note or loan agreement.

3.  **Loan is not a joint venture:**  Consideration must also be given to whether or not the loan is really a loan.  Could it be recharacterized as a joint venture arrangement with the borrower?  The terms and provisions of the loan documentation must be reviewed for a determination as to the nature and extent of control that the lender will have over the operations of the borrower.  If these controls are extensive and there is a risk that the loan will be recharacterized, then this endorsement should not be issued. Any such issues must be discussed with the Company underwriting advisor before this endorsement is offered.

This endorsement is designed for use with an ALTA Loan Policy issued in connection with a **residential** transaction. See Section 51 (Shared Appreciation Mortgage Endorsement-Commercial), Section 52 (Share of Cash Flow (Additional Interest) Endorsement) and the discussion of the ALTA 30.1-06 below for Commercial coverages.

**NOTE:**  THIS ENDORSEMENT MAY ONLY BE USED IN CONNECTION WITH LOANS ON ONE TO FOUR FAMILY RESIDENTIAL PROPERTIES.

**ALTA FORM 30.1-06: Commercial Participation Interest**

1.  **State Law:**  Some states have passed legislation specifically authorizing the charge of "additional interest" which is how the participation interest is designated. These statutes must be examined for provisions setting specific limits and formulas, and the loan documents must be reviewed to verify that the loan complies with those limits and formulas.  If the statute has no such limits or formulas, consideration should be given to the possibility that (a) the method of calculation used in the Insured Mortgage, or (b) the extent to which certain additional obligations might continue even after the principal is paid, might be so weighted in the lender's favor as to

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

"shock the conscience" of the court and perhaps render the shared appreciation provisions of the Insured Mortgage invalid or which could lead to a claim of "clogging" the equity of redemption in a bankruptcy or foreclosure situation.

2. **Insured Mortgage must include the formula for calculation:**  The Insured Mortgage must expressly state that it is a Shared Appreciation Mortgage (if that is what the statutes require)  **and** include the actual formula or calculation method used to determine the lender's additional interest.   The formula or calculation method **cannot** simply be incorporated by reference to the provisions of the note or loan agreement.

3. **Loan is not a joint venture:**  Consideration must also be given to whether or not the loan is really a loan.  Could it be recharacterized as a joint venture arrangement with the borrower?  The terms and provisions of the loan documentation must be reviewed for a determination as to the nature and extent of control that the lender will have over the operations of the borrower.  If these controls are extensive and there is a risk that the loan will be recharacterized, then this endorsement should not be issued. Any such issues must be discussed with the Company Underwriting advisor before this endorsement is offered.

4. **Amount of Insurance:** The minimum Policy Amount should be the sum of the principal debt plus a reasonable estimate of the amount of "shared appreciation interest". Usury, consumer credit protection or truth in lending laws, and costs required to obtain a determination of the amount of additional interest due are specifically mentioned to reinforce the idea that the express insurance does not cover these matters.

This endorsement is designed for use with an ALTA Loan Policy issued in connection with a **commercial** transaction.

## MODIFICATION

In the event that modification of an endorsement is requested, it is necessary to consider your state regulatory requirements for filing and approval of forms. If the endorsement is modified, the endorsement is not an ALTA form and should not reference ALTA in the title.  You must obtain the approval of the Company's underwriting advisor before complying with any request for a modification.

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

ENDORSEMENT MANUAL – Fidelity National Title Group, Inc.                    **SECTION 30**

ENDORSEMENT

Attached to Policy No.

**Issued by**

**[FNTG Brand]**

The insurance afforded by this endorsement is only effective if the Land is a one to four family residence.

For the purposes of this endorsement, "Shared Appreciation" shall mean increases in the Indebtedness secured by the Insured Mortgage by reason of shared equity or appreciation in the value of the Land.

The Company insures against loss or damage sustained by the Insured by reason of:

   (a)   The invalidity or unenforceability of the lien of the Insured Mortgage as security for the Indebtedness caused by the provisions for Shared Appreciation; or

   (b)   Loss of priority of the lien of the Insured Mortgage as security for the Indebtedness caused by the provisions for Shared Appreciation.

Nothing contained in this endorsement shall be construed as insuring against loss or damage sustained or incurred by reason of:

   (a)   usury;

   (b)   any consumer credit protection or truth in lending law;

   (c)   costs, expenses or attorney's fees required to obtain a determination, by judicial proceedings or otherwise, of the amount of the Shared Appreciation;

   (d)   failure to comply with applicable laws and regulations regarding Shared Appreciation;

   (e)   the stay, rejection or avoidance of the lien of the Insured Mortgage as security for the Shared Appreciation, or a court order providing some other remedy, by the operation of federal bankruptcy, state insolvency or similar creditors' rights laws; or

   (f)   the invalidity, unenforceability or lack of priority of the lien of the Insured Mortgage as security for the Indebtedness because all applicable mortgage recording or similar intangible taxes were not paid.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

Dated:

By_____

   Authorized Signatory

ALTA Endorsement Form 30-06
(One to Four Family Shared Appreciation Mortgage) (7/26/10)
©American Land Title Association

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

ENDORSEMENT MANUAL – Fidelity National Title Group, Inc.                                    **SECTION 30**

ENDORSEMENT

Attached to Policy No.

**Issued by**

**[FNTG Brand]**

1.  This endorsement is subject to the exclusions in Section 4 of this endorsement, the Exclusions from Coverage in the policy, the Exceptions from Coverage contained in Schedule B, and the Conditions.

2.  As used in this endorsement,

 a. "Loan Documents" means those documents, as they exist at Date of Policy, creating the Indebtedness.

 b. "Participation Interest" means those elements of interest, established and calculated pursuant to the formula provided in the Loan Documents, that are payable or allocated to the Insured based upon:

   i. the borrower's equity in the Title;
   ii. the increase in value of the Title; or
   iii. cash flow.

3.  The policy insures as of Date of Policy against loss or damage sustained by the Insured by reason of:

 a. The invalidity or unenforceability of the lien of the Insured Mortgage resulting from the provisions in the Insured Mortgage or in the Loan Documents which provide for Participation Interest.

 b. Lack of priority of the lien of the Insured Mortgage at Date of Policy as security for (i) the unpaid principal balance of the loan and (ii) the interest on the loan, including the Participation Interest, if any, which lack of priority is caused by the provisions in the Loan Documents for payment or allocation to the Insured of any Participation Interest.

4.  The policy does not insure against loss or damage, and the Company will not pay costs, attorneys' fees, or expenses that arise by reason of:

 a.   usury; unconscionability; or any consumer credit protection or truth-in-lending law;
 b.   disputes over the amount of Participation Interest;
 c.   failure to comply with applicable laws and regulations regarding Participation Interest;
 d. the invalidity, unenforceability or lack of priority of the lien of the Insured Mortgage as security for the Participation Interest because all applicable mortgage recording or similar intangible taxes were not paid; or
 e. any  statutory lien for services provided, labor performed, or materials or equipment furnished arising after Date of Policy.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

Dated:


By_____

 Authorized Signatory

ALTA Endorsement Form 30.1-06
(Commercial Participation Interest) (8/1/12)
©American Land Title Association

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

ENDORSEMENT MANUAL – Fidelity National Title Group, Inc.                    **SECTION 31**

Return to Table of Contents

**SEVERABLE IMPROVEMENTS**
**ALTA ENDORSEMENT - FORM 31-06**


**PURPOSE**

This endorsement adds, as a part of the calculation of the Insured's loss, the diminution in value of the Insured's interest in any defined Severable Improvement affixed to the Land, as well as the reasonable cost of removal or relocation of these. Severable Improvements are defined as property that by law does not constitute real property. Land is defined in the policy as land and improvements that by law constitute real property.


**SECTIONS OF POLICY AMENDED BY ENDORSEMENT**

This endorsement amends Section 8 of the Conditions of the policy. However, it explicitly states that the calculation of loss under the endorsement shall not be in addition to valuations of the Title otherwise determined pursuant to Section 8 or any other endorsement to the Policy. For instance, ALTA Endorsements 13.0-06 and 13.1-06 already provide coverage for the reasonable costs of relocating personal property.

**BASIS FOR PROVIDING COVERAGE**

**CAUTION:** THE COMPANY'S UNDERWRITING ADVISOR SHOULD BE CONSULTED FOR INSURABILITY IN YOUR STATE.

While the endorsement clearly indicates at paragraph 3 that it is **not** providing insurance with respect to the title to personal property, nonetheless the question of compliance with state mono-line regulations must be considered before agreeing to issue. The Amount of Insurance on Schedule A should be in excess of the amount which would otherwise be applicable pursuant to Section 8 of the Conditions of the policy if the endorsement were not to be issued.

**MODIFICATION**

In the event that modification of an endorsement is requested, it is necessary to consider your state regulatory requirements for filing and approval of forms. If the endorsement is modified, the endorsement is not an ALTA form and should not reference ALTA in the title.  You must obtain the approval of the Company's underwriting adviser before complying with any request for a modification.

Return to Table of Contents


© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

## ENDORSEMENT

Attached to Policy No._____
Issued by
[FNTG BRAND]

1.   As used in this endorsement, "Severable Improvement" means property affixed to the Land on or after Date of Policy that by law does not constitute real property because:

  a.   of its character and manner of attachment to the Land; and

  b.   it can be severed from the Land without causing material damage to it or to the Land.

2.   In the event of a loss by reason of a defect, lien, encumbrance, or other matter covered by this Policy ("Defect"), the calculation of the loss shall include (but not to the extent that these items of loss are included in the valuation of the Title determined pursuant to Section 8 of the Conditions or any other endorsement to the Policy):

  a.   the diminution in value of the Insured's interest in any Severable Improvement resulting from the Defect, reduced by the salvage value of the Severable Improvement; and

  b.   the reasonable cost actually incurred by the Insured in connection with the removal or relocation of the Severable Improvement resulting from the Defect and the cost of transportation of that Severable Improvement for the initial one hundred miles incurred in connection with the relocation.

3.   This endorsement relates solely to the calculation of the Insured's loss resulting from a claim based on a defect, lien, encumbrance or other matter otherwise insured against by the Policy. This Policy does not insure against loss or damage (and the Company will not pay any costs, attorneys' fees or expenses) relating to:

  a.   the attachment, perfection or priority of any security interest in the Severable Improvement;

  b.   the vesting or ownership of title to or rights in any Severable Improvement;

  c.   any defect in or lien or encumbrance on the title to any Severable Improvement; or

  d.   the determination of whether any specific property is real or personal in nature.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

[Witness clause optional]
Dated:
[FNTG Brand]
BY: _____
          AUTHORIZED SIGNATORY

ALTA Endorsement Form 31-06
(Severable Improvements) (2-3-11)
©American Land Title Association

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

ENDORSEMENT MANUAL – Fidelity National Title Group, Inc.                    **SECTION 32**

**Return to Table of Contents**

**CONSTRUCTION LOAN**

**ALTA ENDORSEMENT – FORMS 32-06 (Construction Loan – Loss of Priority)**

**32.1-06 (Construction Loan – Loss of Priority-Direct Payment)**

**32.2-06 (Construction Loan –Loss of Priority- Insured's Direct Payment)**

**PURPOSE**

These endorsements, together with the 33-06 (Disbursement) replace the ALTA Construction Loan Policy and the Construction Loan Policy Endorsements A through D which have been decertified and are no longer available.

***The issuance of any construction lien or mechanic's lien coverage is extra-hazardous and all Company guidelines and authority limits must be strictly observed. The availability of these endorsements must be authorized by your Company underwriting advisor. Many states use state specific forms for these coverages and in all cases those state forms would be used unless directed to use this form by your Company underwriting advisor. This or similar coverage may not be available in your state.***

These endorsements were developed to give limited coverage where priority has been lost.  They only give coverage to the extent of work that the lender has paid for, with the ALTA 32-06 and the ALTA 32.1-06 further limited to liens filed by parties that have been identified on a draw request either paid by the Insured or the Company. They do not give coverage over other inchoate liens that can prime the construction mortgage. The 32-06 covers payment as disclosed by a draw request; the 32.1-06 is for use when payments are made directly to the sub-contractor or supplier, the 32.2 covers a lien filed for payment of previously paid amounts. Please see each section below for further guidance.

Each gives coverage over FILED mechanic's liens <u>if we have not disclosed them</u> in the policy or ALTA 33-06 (Disbursement) Endorsements which change the Date of Coverage as defined therein.

The issuance of these endorsements **requires** the following exception to be included in Schedule B of the policy in the place of the general mechanic's lien exception:

> ***Any statutory lien or claim of lien, affecting the Title, that arises from services provided, labor performed, or materials or equipment furnished, except as insured by the attached ALTA 32-06 Endorsement [or 32.1-06 or 32.2-06 whichever is used] as it may be revised by ALTA 33-06 (Disbursement) Endorsements.***

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

ENDORSEMENT MANUAL – Fidelity National Title Group, Inc.                              **SECTION 32**

You may modify this exception to use local terminology. The important thing is to raise the exception for all other mechanic's lien issues not covered by these limited endorsements but carve out the coverage that is afforded by them.

<u>ALTA ENDORSEMENT – FORM 32-06 (Construction Loan – Loss of Priority)</u>

This endorsement insures the priority of a construction loan disbursement where the Insured Mortgage does not have priority over Construction or Mechanic's Liens (hereafter referred to as "mechanic's lien") to the extent that the mechanic's lien arises from a misdisbursement of funds to pay for services, labor or material that "…were designated for payment in the documents supporting a Construction Loan Advance disbursed by or on behalf of the Insured on or before Date of Coverage."  This misdisbursement coverage does not require the names of the parties providing the services, labor or material being paid for and covers lower tier derivative liens such as material suppliers of a paid subcontractor.    Note that the misdisbursement risk includes the risk of inadequate descriptions of who is doing the work and how much they were paid.  This endorsement is similar in coverage to the old ALTA Endorsement A type mechanic lien coverage, which has been withdrawn (decertified).

**SECTIONS OF POLICY AMENDED BY ENDORSEMENT**

The endorsement deletes Covered Risk 11(a) of the policy.

**BASIS FOR PROVIDING COVERAGE**

Coverage is provided based upon a combination of

- disclosure of any filed or recorded liens on the Land
- evidence of sufficiency of funds to pay for the cost of construction;
- draw by draw documentation indicating who is to be paid or what is to be paid  or what services, labor or material is being paid for and how much is to be paid as disclosed in the lender approved draw request and as supplemented by lower tier documentation as is appropriate;
- evidence of payment (usually in the form of lien waivers indicating payment);  and
- indemnification to cover misdisbursement or non-payment by any party at any level, since funds may flow from the owner to the contractor to a subcontractor to a sub-subcontractor to a material supplier for the defined work.

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

The Company has specific departments which specialize in construction disbursing and documentation review.   Their use to review construction documentation when issuing this endorsement will often be required by underwriting.

Consider the typical scenario where the lender pays the general contractor ("GC") $20,000 for electric work.  While we should strive for statements and lien waivers showing that $20,000 (at times less the GC's overhead and profit) went to an electrician and its suppliers or went to the electrician who paid its suppliers, the indemnity covers the risk of the GC not paying all to the electrician or the electrician not paying an undisclosed supplier.

The ALTA 32-06 is often issued in conjunction with an ALTA 33-06, which extends the Date of Coverage as defined therein but should not be used to extend the Date of Policy.
The form does not lend itself to delayed draws without further modification. You must consult with your Company Underwriting Advisor for any variations.

This is a generic endorsement that would customarily be used in states where the construction lender could have obtained statutory priority but did not and the company is unwilling to insure the lender without a mechanic lien exception.  **REMEMBER: Any use of this endorsement must be approved by your Company underwriting advisor.**

<u>ALTA ENDORSEMENT – FORM 32.1-06 (Construction Loan – Loss of Priority – Direct Payment)</u>

This endorsement insures the priority of a construction loan disbursement where the Insured Mortgage does not have priority over any mechanic lien to the extent that the mechanic's lien arises from a misdisbursement of funds to pay for services, labor or material "…to the extent that direct payment to the Mechanic's Lien claimant has been made by the Company or by the Insured with the Company's written approval." The effective coverage given is as to that portion of a mechanic's lien claim due to amounts that we acknowledge as having been directly paid to the claimant, either by the Company or under an agreement with a third party to pay directly.   This coverage does not cover lower tier derivative liens such as material suppliers of a paid subcontractor. The customary payment practice of many lenders is to pay the general contractor ("GC") directly, and such payments would <u>not</u> be covered under this endorsement for mechanic's lien claims filed by parties claiming by, through or under the GC since only the GC received direct payment.  Payment directly to the owner for disbursement to the trades gives no mechanic's lien coverage to the Insured either.

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

## SECTIONS OF POLICY AMENDED BY ENDORSEMENT

The endorsement deletes Covered Risk 11(a) of the policy.

## BASIS FOR PROVIDING COVERAGE

Coverage is provided based upon draw by draw documentation indicating who is to be paid what amount directly by the Company or by the Insured, and the collection of evidence, such as lien waivers, to support such payment and coverage.

 The ALTA 32.1-06 is often issued in conjunction with an ALTA 33-06, which extends the Date of Coverage as defined therein. The policy and any subsequent endorsements must disclose any filed or recorded liens.

Note that while the coverage to the Insured lender is limited to those funds the Company has either paid directly or has agreed to recognize as paid by the Insured, additional documentation and indemnification to cover misdisbursement or non-payment by any party at any level will likely be required if mechanic's lien coverage is given either to a third party purchaser, a purchaser's lender or a permanent lender who pays off the construction loan where those insureds do not have statutory protections and liens may still be filed which affect their interests.

This is a generic endorsement that would customarily be used in states where the construction lender could have obtained statutory priority but did not and the company is unwilling to insure the lender without a mechanic lien exception.  **REMEMBER: Any use of this endorsement must be approved by your Company underwriting advisor.**

ALTA ENDORSEMENT – FORM 32.2-06 (Construction Loan – Loss of Priority – Insured's Direct Payment)

This endorsement insures the priority of a construction loan disbursement where the Insured Mortgage does not have priority over any mechanic's lien to the extent that the mechanic's lien arises from a disbursement of funds to pay for services, labor or material "…to the extent that direct payment to the Mechanic's Lien claimant has been made by the Insured or on the Insured's behalf". The effective coverage given is as to that portion of a mechanic's lien claim due to amounts that that the Insured actually paid directly to the claimant,  or actual payments made on behalf of the Insured  by a third party.   This coverage does not cover lower tier derivative liens such as material suppliers of a paid subcontractor. The customary payment practice of many

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

lenders is to pay the general contractor ("GC") directly, and such payments would <u>not</u> be covered under this endorsement for mechanic lien claims filed by parties claiming by, through or under the GC since only the GC received direct payment.  Payment directly to the owner for disbursement to the trades gives no mechanics lien coverage to the Insured either.

## SECTIONS OF POLICY AMENDED BY ENDORSEMENT

The endorsement deletes Covered Risk 11(a) of the policy.

## BASIS FOR PROVIDING COVERAGE

Coverage is provided based upon the a check of the Public Records for each extension of time under the issuance of an ALTA 33-06, which extends the Date of Coverage as defined therein. Any recorded liens would be raised in the ALTA 33-06.

Note that while the coverage to the Insured lender is limited to those funds the Insured has either paid directly or has had paid directly to the lien claimant on its behalf, additional documentation and indemnification to cover misdisbursement or non-payment by any party at any level will likely be required if mechanic's lien coverage is given either to a third party purchaser, a purchaser's lender or a permanent lender who pays off the construction loan where those insureds do not have statutory protections and liens may still be filed which affect their interests.

This is a generic endorsement that would customarily be used in states where the construction lender could have obtained statutory priority but did not and the company is unwilling to insure the lender without a mechanic lien exception.  **REMEMBER: Any use of this endorsement must be approved by your Company underwriting advisor.**

## MODIFICATION

In the event that modification of an endorsement is requested, it is necessary to consider your state regulatory requirements for filing and approval of forms. The ALTA has provided that the title underwriters "are free to use these endorsements, [32-06, 32.1-06 and 32.2-06] subject to any changes or limitations they …consider appropriate." You must obtain the approval of the Company's underwriting advisor before complying with any request for a modification.

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

ENDORSEMENT MANUAL – Fidelity National Title Group, Inc.                                    SECTION 32

**ENDORSEMENT**

**Attached to Policy No. _____**

**Issued by [FNTG BRAND]**

1.   Covered Risk 11(a) of this policy is deleted.

2.   The insurance [for Construction Loan Advances] added by Section 3 of this endorsement is subject to the exclusions in Section 4 of this endorsement and the Exclusions from Coverage in the Policy, the provisions of the Conditions, and the exceptions contained in Schedule B. For the purposes of this endorsement and each subsequent Disbursement Endorsement:

   a.   "Date of Coverage" is _____ unless the Company sets a different Date of Coverage by an ALTA 33-06 Disbursement Endorsement issued at the discretion of the Company.

   b.   "Construction Loan Advance" shall mean an advance that constitutes Indebtedness made on or before Date of Coverage for the purpose of financing in whole or in part the construction of improvements on the Land.

   c.   "Mechanic's Lien" shall mean any statutory lien or claim of lien, affecting the Title, that arises from services provided, labor performed, or materials or equipment furnished.

3.   The Company insures against loss or damage sustained by the Insured by reason of:

   a.   The invalidity or unenforceability of the lien of the Insured Mortgage as security for each Construction Loan Advance made on or before the Date of Coverage;

   b.   The lack of priority of the lien of the Insured Mortgage as security for each Construction Loan Advance made on or before the Date of Coverage, over any lien or encumbrance on the Title recorded in the Public Records and not shown in Schedule B; and

   c.   The lack of priority of the lien of the Insured Mortgage, as security for each Construction Loan Advance made on or before the Date of Coverage over any Mechanic's Lien, if notice of the Mechanic's Lien is not filed or recorded in the Public Records, but only to the extent that the charges for the services, labor, materials or equipment for which the Mechanic's Lien is claimed were designated for payment in the documents supporting a Construction Loan Advance disbursed by or on behalf of the Insured on or before Date of Coverage.

4    This policy does not insure against loss or damage (and the Company will not pay costs, attorneys' fees or expenses) by reason of any Mechanic's Lien arising from services, labor, material or equipment:
   a.   furnished after Date of Coverage: or
   b.   not designated for payment in the documents supporting a Construction Loan Advance disbursed by or on behalf of the Insured on or before Date of Coverage.

This endorsement is issued as part of the policy.  Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance.  To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls.  Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

[Witness clause optional]

[Bracketed material optional]

 [FNTG BRAND]

BY: _____
            Authorized Signatory

ALTA Endorsement Form 32-06
(Construction Loan-Loss of Priority) (2-3-11)
© American Land Title Association

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

**ENDORSEMENT**

**Attached to Policy No. _____**

**Issued by [FNTG BRAND]**

1.  Covered Risk 11(a) of this policy is deleted.

2.  The insurance [for Construction Loan Advances] added by Section 3 of this endorsement is subject to the exclusions in Section 4 of this endorsement and the Exclusions from Coverage in the Policy, the provisions of the Conditions, and the exceptions contained in Schedule B. For the purposes of this endorsement and each subsequent Disbursement Endorsement:

    a.  "Date of Coverage" is_____ unless the Company sets a different Date of Coverage by an ALTA 33-06 Disbursement Endorsement issued at the discretion of the Company.

    b.  "Construction Loan Advance" shall mean an advance that constitutes Indebtedness made on or before Date of Coverage for the purpose of financing in whole or in part the construction of improvements on the Land.

    c.  "Mechanic's Lien" shall mean any statutory lien or claim of lien, affecting the Title, that arises from services provided, labor performed, or materials or equipment furnished.

3.  The Company insures against loss or damage sustained by the Insured by reason of:

    a.  The invalidity or unenforceability of the lien of the Insured Mortgage as security for each Construction Loan Advance made on or before the Date of Coverage;

    b.  The lack of priority of the lien of the Insured Mortgage as security for each Construction Loan Advance made on or before the Date of Coverage, over any lien or encumbrance on the Title recorded in the Public Records and not shown in Schedule B; and

    c.  The lack of priority of the lien of the Insured Mortgage as security for each Construction Loan Advance made on or before the Date of Coverage over any Mechanic's Lien if notice of the Mechanic's Lien is not filed or recorded in the Public Records, but only to the extent that direct payment to the Mechanic's Lien claimant for the charges for the services, labor, materials or equipment  for which the Mechanic's Lien is claimed  has been made by the Company or by the Insured with the Company's written approval.

4.  This policy does not insure against loss or damage (and the Company will not pay costs, attorneys' fees or expenses) by reason of any Mechanic's Lien arising from services, labor, material or equipment:
    a.  furnished after Date of Coverage; or
    b.  to the extent that the Mechanic's Lien claimant was not directly paid by the Company or by the Insured with the Company's written approval.

This endorsement is issued as part of the policy.  Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance.  To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls.  Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

 [Witness clause optional]

[Bracketed material optional]

[FNTG BRAND]

By: _____

ALTA Endorsement Form 32.1-06
(Construction Loan-Loss of Priority-Direct Payment) (rev. 4-2-13)
 American Land Title Association

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

**ENDORSEMENT**

**Attached to Policy No. _____**

**Issued by [FNTG BRAND]**

1.   Covered Risk 11(a) of this policy is deleted.

2.   The insurance [for Construction Loan Advances] added by Section 3 of this endorsement is subject to the exclusions in Section 4 of this endorsement and the Exclusions from Coverage in the Policy, the provisions of the Conditions, and the exceptions contained in Schedule B. For the purposes of this endorsement and each subsequent Disbursement Endorsement:

  a.   "Date of Coverage" is[_____ unless the Company sets a different Date of Coverage by an ALTA 33-06 Disbursement Endorsement issued at the discretion of the Company.

  b.   "Construction Loan Advance" shall mean an advance that constitutes Indebtedness made on or before Date of Coverage for the purpose of financing in whole or in part the construction of improvements on the Land.

  c.   "Mechanic's Lien" shall mean any statutory lien or claim of lien, affecting the Title, that arises from services provided, labor performed, or materials or equipment furnished.

3.   The Company insures against loss or damage sustained by the Insured by reason of:

  a.   The invalidity or unenforceability of the lien of the Insured Mortgage as security for each Construction Loan Advance made on or before the Date of Coverage:

  b.   The lack of priority of the lien of the Insured Mortgage as security for each Construction Loan Advance made on or before the Date of Coverage, over any lien or encumbrance on the Title recorded in the Public Records and not shown in Schedule B; and

  c.   The lack of priority of the lien of the Insured Mortgage, as security for each Construction Loan Advance made on or before the Date of Coverage over any Mechanic's Lien, if notice of the Mechanic's Lien is not filed or recorded in the Public Records, but only to the extent that a direct payment to the Mechanic's Lien claimant  for the charges for the services, labor, materials or equipment  for which the Mechanic's Lien is claimed  has been made by the Insured  or on the Insured's behalf on or before Date of Coverage.

4   This policy does not insure against loss or damage (and the Company will not pay costs, attorneys' fees or expenses) by reason of any Mechanic's Lien arising from services, labor, material or equipment:
  a.   furnished after Date of Coverage: or
  b.   To the extent that the Mechanic's lien claimant was not directly paid by the Insured  or on the Insured's behalf.

This endorsement is issued as part of the policy.  Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance.  To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls.  Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

[Witness clause optional]

[Bracketed material optional]

 [FNTG BRAND]

BY: _____
            Authorized Signatory

ALTA Endorsement Form 32.2-06
(Construction Loan-Loss of Priority-Insured's Direct Payment) (rev. 4/2/13)
© American Land Title Association

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

ENDORSEMENT MANUAL – Fidelity National Title Group, Inc.                                    **SECTION 33**

**Return to Table of Contents**

**CONSTRUCTION LOAN DISBURSEMENT**

**ALTA ENDORSEMENT - FORM 33-06**

**PURPOSE**

This endorsement is used in conjunction with ALTA Form 32-06 or 32.1-06 when the Date of Coverage to be extended.

***The issuance of any construction lien or mechanic lien coverage is extra-hazardous and all Company guidelines and authority limits must be strictly observed. The availability of this endorsement must be authorized by your Company underwriting advisor. Many states use state specific forms for this coverage and in all cases those forms would be used unless directed to use this form by your Company underwriting advisor.***

**SECTIONS OF POLICY AMENDED BY ENDORSEMENT**

As used with the Construction Loan forms discussed in Section 32, this endorsement modifies the Date of Coverage originally indicated in those forms.

**BASIS FOR PROVIDING COVERAGE**

A search of the Public Records according to state underwriting guidelines should be done before each draw and any matters disclosed by such a search should be added to the endorsement in the appropriate place. The Date of Coverage is the date through which we are willing to extend the liability for mechanic liens as discussed in Section 32. It may be the date of the draw request, but in all cases the title search must cover that date. It is especially important to verify that any ML notices or other instruments of that nature have been found and disclosed. If matters are added to Schedule A and B of the policy, care should be taken that all matters are shown appropriately.

**REMEMBER: Any use of this endorsement must be approved by your Company underwriting advisor.**

**MODIFICATION**

In the event that modification of an endorsement is requested, it is necessary to consider your state regulatory requirements for filing and approval of forms. The ALTA has provided that the title underwriters "are free to use [Form 33-06], subject to any changes or limitations they …consider appropriate." You must obtain the approval of the Company's underwriting advisor before complying with any request for a modification.

Return to Table of Contents

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

**ENDORSEMENT**

Attached to Policy No._____
Issued by
[FNTG BRAND]


1.   The Date of Coverage is amended to _____.

    [a.   The current disbursement is: $ _____ ]

    [b.   The aggregate amount, including the current disbursement, recognized by the Company
         as disbursed by the Insured is: $_____]


2.   Schedule A is amended as follows:



3.   Schedule B is amended as follows:

    [Part I]

    [Part II]


This endorsement is issued as part of the policy.  Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy or (iv) increase the Amount of Insurance.  To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls.  Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements to it.


[Witness Optional]
[Bracketed material optional]

DATED:

[FNTG BRAND]

BY: _____
      AUTHORIZED SIGNATORY


ALTA Endorsement Form 33-06
(Disbursement) (2-3-11)
© American Land Title Association

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

ENDORSEMENT MANUAL – Fidelity National Title Group, Inc.                                    **SECTION 34**

**Return to Table of Contents**

**IDENTIFIED RISK COVERAGE**

**ALTA ENDORSEMENT – FORM 34-06**

**PURPOSE**

This endorsement should be used whenever we decide to assume a specific risk or "Identified Risk" as defined therein. Sometime this is referred to as "insuring over", especially when we have raised that risk in a commitment or policy. It may also be referred to as "affirmative coverage".  There are many ways for the Company to assume the risk of a known title issue, and they vary in clarity and scope. Any such coverage should be granted in conformance with the structure of the commitment or policy, using indemnity language and limiting the scope to expressly identify the quantity of risk undertaken. Our willingness to give additional coverage is a matter to be discussed with your Company underwriting advisor.  Once we have decided what specific risks we will cover, the use of this endorsement is strongly recommended. The Company would like to standardize the format for the granting of this type of coverage. The use of the endorsement clarifies the impact of the coverage on the general marketability coverage afforded by the policy. It also clarifies that although we require a final court decree before loss can be determined, it does not relieve us of the duty to defend. If we are unwilling to include defense costs in our coverage, additional language and modifications must be made to the endorsement.

**SECTIONS OF POLICY AMENDED BY ENDORSEMENT**

The endorsement modifies the referenced exception, or Identified Risk. It modifies the definition of Covered Risk 3 (Unmarketable Title) to provide that, for the Identified Risk, only insurable title is being offered. In other words, loss can only be occasioned upon the refusal to subsequently insure with the limited coverage granted.

**BASIS FOR PROVIDING COVERAGE**

The underwriting for the granting of any type of additional coverage in reference to a specific exception must be according to Company guidelines and approved at the proper levels. Your Company underwriting advisor must be consulted. Typically, the description of the "Identified Risk" required in Item 1 of the endorsement would be the same as the exception shown in Schedule  B – "Mortgage from---to---…." or "Violation of Restriction …." Occasionally, such as with an encroachment, we should limit the Identified Risk to the enforced removal of that encroachment only, or consider the use of the ALTA Form 28-06 if the encroachment is onto an easement.  We don't intend to assume liability for any other type of loss that could be imposed by an encroachment, such as money damages, other rights imposed in lieu of enforced removal or

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

ENDORSEMENT MANUAL – Fidelity National Title Group, Inc.                                    **SECTION 34**

zoning issues. In the case of any type of encroachment that is being shown as an exception, we should describe the Identified Risk as the "enforced removal of the improvement" shown as the encroachment described in the exception.

**MODIFICATION**

In the event that modification of an endorsement is requested, it is necessary to consider your state regulatory requirements for filing and approval of forms. If the endorsement is modified, the endorsement is not an ALTA form and should not reference ALTA in the title.  You must obtain the approval of the Company's underwriting adviser before complying with any request for a modification.

Return to Table of Contents

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

**ENDORSEMENT**

Attached to Policy No._____

Issued by

[FNTG BRAND]

1.  As used in this endorsement "Identified Risk" means: [*insert description of the title defect, restriction encumbrance or other matter*] described in Exception _____ of Schedule B.

2.  The Company insures against loss or damage sustained by the Insured by reason of:

    a.  A final order or decree enforcing the Identified Risk in favor of an adverse party; or

    b.  The release of a prospective purchaser or lessee of the Title or lender on the Title from the obligation to purchase, lease, or lend as a result of the Identified Risk, but only if

        i.   there is a contractual condition requiring the delivery of marketable title, and

        ii.  neither the Company nor any other title insurance company is willing to insure over the Identified Risk with the same conditions as in this endorsement.

3.  The Company will also pay the costs, attorneys' fees, and expenses incurred in defense of the Title by reason of the Identified Risk insured against by Paragraph 2 of this endorsement, but only to the extent provided in the Conditions.

4.  This endorsement does not obligate the Company to establish the Title free of the Identified Risk or to remove the Identified Risk, but if the Company does establish the Title free of the Identified Risk or removes it, Section 9(a) of the Conditions applies.

This endorsement is issued as part of the policy.  Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy or (iv) increase the Amount of Insurance.  To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls.  Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements to it.

[Witness Optional]

DATED:

[FNTG BRAND]

BY: _____
         AUTHORIZED SIGNATORY

ALTA Endorsement Form 34-06
(Identified Risk Coverage) (8-1-11)
© American Land Title Association

ENDORSEMENT MANUAL – Fidelity National Title Group, Inc.                    **SECTION 35**

Return to Table of Contents

## MINERALS AND OTHER SUBSURFACE SUBSTANCES

## ALTA ENDORSEMENT – FORMS 35-06, 35.1-06, 35.2-06, 35.3-06

### PURPOSE

These endorsement forms were originally  developed to provide coverage to lenders with respect to the enforced removal or alteration of improvements resulting from the extraction or development of minerals or other subsurface substances. This coverage was previously included in the former ALTA 9 series. It is no longer contained within those endorsements other than the revised ALTA 9-06 and the new ALTA 9.7-06. This coverage may be available in some areas for owners policies also.

### SECTIONS OF POLICY AMENDED BY ENDORSEMENT

No specific sections of the policy are amended by this endorsement; however additional coverages are added.

### BASIS FOR PROVIDING COVERAGE

These endorsements differ only in the definitions of "Improvement".

- Form 35-06 - "Improvement" means a building on the Land at Date of Policy.
- Form 35.1-06 - "Improvement" means a building, structure located on the surface of the Land, and any paved road, walkway, parking area, driveway, or curb, affixed to the Land at Date of Policy and that by law constitutes real property, but excluding any crops, landscaping, lawn, shrubbery, or trees.
- Form 35.2-06 - "Improvement" means each improvement on the Land at Date of Policy specifically described and itemized on the exhibit attached to the endorsement.
- Form 35.3-06 - "Improvement" and "Future Improvement" are included in the coverage.
    - o "Improvement" means a building, structure located on the surface of the Land, and any paved road, walkway, parking area, driveway, or curb, affixed to the Land at Date of Policy and that by law constitutes real property, but excluding any crops, landscaping, lawn, shrubbery, or trees.
    - o  "Future Improvement" means a building, structure, and any paved road, walkway, parking area, driveway, or curb to be constructed on or affixed to the Land in the locations according to certain Plans identified in the endorsement and that by law will constitute real property, but excluding any crops, landscaping, lawn, shrubbery, or trees.

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

The insurance is afforded only for damage caused by the enforced removal based up the right to use the surface of the land to extract or develop mineral interests. It is not appropriate for other mineral interests. Coverage may be given provided:

- There is no separation of minerals from the surface estate by deed, lease or otherwise; or
- There is a separate mineral estate but it does not include any rights of surface entry; or
- Mineral rights, with rights of surface entry either expressed or implied, have been severed from the surface estate.  However, the land and surrounding area is entirely improved with residential development.  Under these circumstances, submit the request for coverage to the Company's underwriting advisor who will consider the risk based upon such things as the size of the parcel, use (proposed or current), local zoning, ownership of minerals and the possibility of waiver of mineral rights. The Company's underwriting advisor will review appropriate surveys, or site and elevations plans; or
- The instrument containing the rights includes the obligation of the mineral owner to not damage any existing buildings. Care must be taken to verify the current improvements were in existence at the time of the creation of the mineral interest. Form 35.3-06 would not be available in this instance.

The form allows you to identify any specific grants or reservations of mineral rights that you do NOT wish to give coverage over.

## MODIFICATION

In the event that modification of an endorsement is requested, it is necessary to consider your state regulatory requirements for filing and approval of forms. If the endorsement is modified, the endorsement is not an ALTA form and should not reference ALTA in the title.  You must obtain the approval of the Company's underwriting adviser before complying with any request for a modification.

Return to Table of Contents

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

ENDORSEMENT MANUAL – Fidelity National Title Group, Inc.                    SECTION 35

**ENDORSEMENT**

**Attached to Policy No. _____**

**Issued by**

*[FNTG BRAND]*

1.  The insurance provided by this endorsement is subject to the exclusion in Section 4 of this endorsement; and the Exclusions from Coverage, the Exceptions from Coverage contained in Schedule B, and the Conditions in the policy.

2.  For purposes of this endorsement only, "Improvement" means a building on the Land at Date of Policy.

3.  The Company insures against loss or damage sustained by the Insured by reason of the enforced removal or alteration of any Improvement resulting from the future exercise of any right existing at Date of Policy to use the surface of the Land for the extraction or development of minerals or any other subsurface substances excepted from the description of the Land or excepted in Schedule B.

4.  This endorsement does not insure against loss or damage (and the Company will not pay costs, attorneys' fees, or expenses) resulting from:

    a.  contamination, explosion, fire, vibration, fracturing, earthquake or subsidence; [or]

    b.  negligence by a person or an Entity exercising a right to extract or develop minerals or other subsurface substances[; or

    c.  the exercise of the rights described in (                    )]. *

        * Instructional note:  identify the interest excepted from the description of the Land in Schedule A or excepted in Schedule B that you intend to exclude from this coverage.


This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.


[Witness clause optional]


[FNTG BRAND]


By: _____

          Authorized Signatory


ALTA Endorsement Form 35-06
(Minerals and other Subsurface Substances-Buildings) (4/2/12)
©American Land Title Association

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

ENDORSEMENT MANUAL – Fidelity National Title Group, Inc.                    **SECTION 35**

**ENDORSEMENT**

**Attached to Policy No. _____**

**Issued by**

*[FNTG BRAND]*

1. The insurance provided by this endorsement is subject to the exclusion in Section 4 of this endorsement; and the Exclusions from Coverage, the Exceptions from Coverage contained in Schedule B, and the Conditions in the policy.

2. For purposes of this endorsement only, "Improvement" means a building, structure located on the surface of the Land, and any paved road, walkway, parking area, driveway, or curb, affixed to the Land at Date of Policy and that by law constitutes real property, but excluding any crops, landscaping, lawn, shrubbery, or trees.

3. The Company insures against loss or damage sustained by the Insured by reason of the enforced removal or alteration of any Improvement, resulting from the future exercise of any right existing at Date of Policy to use the surface of the Land for the extraction or development of minerals or any other subsurface substances excepted from the description of the Land or excepted in Schedule B.

4. This endorsement does not insure against loss or damage (and the Company will not pay costs, attorneys' fees, or expenses) resulting from:

   a. contamination, explosion, fire, vibration, fracturing, earthquake or subsidence; [or]

   b. negligence by a person or an Entity exercising a right to extract or develop minerals or other subsurface substances[; or

   c. the exercise of the rights described in (                    )]. *

   * Instructional note:  identify the interest excepted from the description of the Land in Schedule A or excepted in Schedule B that you intend to exclude from this coverage.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

[Witness clause optional]

[FNTG BRAND]

By: _____
          Authorized Signatory

ALTA Endorsement Form 35.1-06
(Minerals and other Subsurface Substances-Improvements) (4/2/12)
©American Land Title Association

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

**ENDORSEMENT**

**Attached to Policy No. _____**

**Issued by**

*[FNTG BRAND]*

1. The insurance provided by this endorsement is subject to the exclusion in Section 4 of this endorsement; and the Exclusions from Coverage, the Exceptions from Coverage contained in Schedule B, and the Conditions in the policy.

2. For purposes of this endorsement only, "Improvement" means each improvement on the Land at Date of Policy itemized [on the exhibit attached to this endorsement] [below:]

3. The Company insures against loss or damage sustained by the Insured by reason of the enforced removal or alteration of any Improvement resulting from the future exercise of any right existing at Date of Policy to use the surface of the Land for the extraction or development of minerals or any other subsurface substances excepted from the description of the Land or excepted in Schedule B.

4. This endorsement does not insure against loss or damage (and the Company will not pay costs, attorneys' fees, or expenses) resulting from:

   a. contamination, explosion, fire, vibration, fracturing, earthquake or subsidence; [or]

   b. negligence by a person or an Entity exercising a right to extract or develop minerals or other subsurface substances[; or

   c. the exercise of the rights described in (                    )]. *

      * Instructional note:  identify the interest excepted from the description of the Land in Schedule A or excepted in Schedule B that you intend to exclude from this coverage.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

[Witness clause optional]

**[FNTG BRAND]**

By: _____
              Authorized Signatory

ALTA Endorsement Form 35.2-06
(Minerals and other Subsurface Substances-Described Improvements) (4/2/12)
©American Land Title Association

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

ENDORSEMENT MANUAL – Fidelity National Title Group, Inc.                    **SECTION 35**

**ENDORSEMENT**

**Attached to Policy No. _____**

**Issued by**

*[FNTG BRAND]*

3.   The insurance provided by this endorsement is subject to the exclusion in Section 4 of this endorsement; and the Exclusions from Coverage, the Exceptions from Coverage contained in Schedule B, and the Conditions in the policy.

4.   For purposes of this endorsement only:

   a.   "Improvement" means a building, structure located on the surface of the Land, and any paved road, walkway, parking area, driveway, or curb, affixed to the Land at Date of Policy and that by law constitutes real property, but excluding any crops, landscaping, lawn, shrubbery, or trees.

   b.   "Future Improvement" means a building, structure, and any paved road, walkway, parking area, driveway, or curb to be constructed on or affixed to the Land in the locations according to the Plans and that by law will constitute real property, but excluding any crops, landscaping, lawn, shrubbery, or trees.

   c.   "Plans" means the survey, site and elevation plans or other depictions or drawings prepared by *(insert name of architect or engineer)* dated _____, last revised _____, designated as *(insert name of project or project number)* consisting of ____ sheets.

3.   The Company insures against loss or damage sustained by the Insured by reason of the enforced removal or alteration of an Improvement or a Future Improvement, resulting from the future exercise of any right existing at Date of Policy to use the surface of the Land for the extraction or development of minerals or any other subsurface substances excepted from the description of the Land or excepted in Schedule B.

4.   This endorsement does not insure against loss or damage (and the Company will not pay costs, attorneys' fees, or expenses) resulting from:

   a.   contamination, explosion, fire, vibration, fracturing, earthquake or subsidence; [or]

   b.   negligence by a person or an Entity exercising a right to extract or develop minerals or other subsurface substances[; or

   c.   the exercise of the rights described in (                    )]. *

       * Instructional note:  identify the interest excepted from the description of the Land in Schedule A or excepted in Schedule B that you intend to exclude from this coverage.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

[Witness clause optional]

**[FNTG BRAND]**

By: _____
           Authorized Signatory

ALTA Endorsement Form 35.3-06
(Minerals and other Subsurface Substances-Land Under Development) (4/2/12)
©American Land Title Association

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

ENDORSEMENT MANUAL – Fidelity National Title Group, Inc.                    **SECTION 36**

**Return to Table of Contents**

**ENERGY PROJECT Series**

**ALTA ENDORSEMENT – FORMS**
**36.06, 36.1-06, 36.2-06, 36.3-06, 36.4-06, 36.5-06, 36.6-06**

**PURPOSE**

The ALTA 36 series of endorsement forms were developed to provide coverages to energy project owners and lenders which use a leasehold or easement rights structure. Examples of such projects would include solar or wind farms.

**SECTIONS OF POLICY AMENDED BY ENDORSEMENT**

Forms 36.06 (Energy Project-Leasehold/Easement-Owners)

Form 36.1-06 (Energy Project-Leasehold/Easement-Loan)

 These endorsement forms provide coverage to an owner or a lender on an energy project which uses a leasehold **and** easement rights structure. They are similar to the ALTA 13-06 (Leasehold Owner's) and 13.1-06 (Leasehold-Loan) endorsements. In addition, these endorsement forms:

- Add specific energy project definitions
- Add coverage for insured easement interests that are a common component of energy projects
- Expand the "Valuation of Title" to clarify that loss on a single parcel shall include resulting loss to the integrated project as a whole
- Add coverage for "Severable Improvements" which is separately available with the previously filed ALTA 31-06 (Severable Improvements) form
- Modify the "Additional items of loss" section to include items appropriate to the energy project transaction
- Add a limitation that the coverage does not include loss resulting from environmental damage or contamination, to conform to policy provisions.

Form 36.2-06 (Energy Project-Leasehold-Owner's)

Form 36.3-06 (Energy Project-Leasehold-Loan)

These endorsement forms provide coverage to an owner or a lender on an energy project which uses only a leasehold structure. They are similar to the ALTA 13-06 (Leasehold Owner's) and 13.1-06 (Leasehold-Loan) endorsements. In addition, these endorsement forms:

- Add specific energy project definitions

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

- Expand the "Valuation of title" to clarify that loss on a single parcel shall include resulting loss to the integrated project as a whole
- Add coverage for "Severable Improvements" which is separately available with the previously filed ALTA 31-06 (Severable Improvements)
- Modify the "Additional items of loss" section to include items appropriate to the energy project transaction
- Add a limitation that the coverage does not include loss resulting from environmental damage or contamination, to conform to policy provisions.

Form 36.4-06 (Energy Project-Covenants, Conditions and Restrictions-Land Under Development-Owners)

Form 36.5-06(Energy Project-Covenants, Conditions and Restrictions-Land Under Development-Loan)

These endorsement forms provide coverage to an owner or a lender on an energy project which is under development, with respect to covenants, conditions and restrictions. These forms are similar to the ALTA 9.8-06 (Covenants, Conditions and Restrictions – Land Under Development-Owners) and the ALTA 9.7-06 (Covenants, Conditions and Restrictions – Land Under Development-Loan) endorsement forms. In addition, these endorsement forms:

- Add specific energy project definitions

- Add coverage for violation of an enforceable Covenant unless shown in Schedule B

- Add coverage for enforced removal as a result of a building setback encroachment not shown as an exception on Schedule B

- Add coverage for loss occasioned by a recorded notice of a violation of a Covenant relating to environmental protection if not shown as an exception on Schedule B

- Include a limitation that the coverage does not include loss resulting from Covenants contained in an easement or lease, any obligation to perform maintenance, or any covenant pertaining to environmental damage or contamination.

Endorsement Form 36.6-06 (Energy Project-Encroachments): This endorsement form provides coverage to an owner or a lender on an energy project, such as a solar or wind farm, with respect to boundary line and easement encroachments. This form is similar to the ALTA 28.1-06 (Encroachments-Boundaries and Easements) endorsement form. This endorsement form:

- Adds specific energy project definitions

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

- Provides coverage for the loss occasioned by the existence of an encroachment by improvements onto a neighboring property or onto an easement area within the insured Land, other than as disclosed in Schedule B exceptions

- Provides coverage for the loss occasioned by the existence of an encroachment by a neighboring improvement onto the insured Land, other than as disclosed in Schedule B exceptions

- Provides coverage for the enforced removal of or damage to insured Improvements based upon an encroachment into the easement area or onto neighboring property.

This form also allows the exclusion of a listed encroachment from the enforced removal and damage coverage.

**BASIS FOR PROVIDING COVERAGE**

Endorsements 36.06, 36.1-06, 36.2-06 and 36.3-06 [Leasehold/ Easement and Leasehold] are to be issued when the customer is seeking the additional coverages provided therein and the Land consists of leasehold interests only, or leasehold and easement interests. The searching and examining procedures for insuring leaseholds as discussed under Section 13 of this manual remain the same, as does the modification of Schedule A. In Forms 36.2-06 and 36.3-06, the estate or interest in the Land is not a Fee, but rather the Leasehold Estate created by and between the parties, with a reference to the underlying lease information. That is correct for Forms 36-06 and 36.1-06 also, which additionally have the easement interests as part of the Land. For all of these forms, the entire lease must be examined, and many states require any short form lease or memorandum of the lease (if the full lease is not recorded) to contain the signatures of both parties to give effective constructive notice on the record of the tenants' rights and interests. Additionally all underwriting guidelines for the search, examination and insurance of easement interests must be followed for Forms 36-06 and 36.1-06.

Consult your Company underwriting advisor for instructions on how to correctly modify the fee policies for use with these endorsements.

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

Form 36.4-06 [CCR-Land under development-Owners]

**An accurate current survey of the Land and the Plans as defined therein is required for coverage. The survey may be incorporated into the Plans, if appropriate.**

Coverage 3.a. may be given provided:

- There are no covenants, conditions or restrictions, or
-  it has been determined that either there are no violations that are enforceable, or
-  all enforceable violations that have been disclosed by inspection, survey, or other means are identified and excepted by description of such matter in Schedule B.

Coverage 3.b. may be given provided:

- There are no building setback lines shown on a recorded or filed plat of subdivision, or
-  It has been determined that either there are no violations that are enforceable, or
- All enforceable violations that have been disclosed by inspection, survey or other means are identified and excepted in Schedule B.

Coverage 3.c. may be given provided:

- Either there are no notices of violations of covenants, conditions and restrictions relating to environmental protection recorded or filed in the public records, or
-  the notices of violations are identified and excepted in Schedule B.

Form36.5-06 [CCR-Land Under Development-Loan]

**An accurate current survey of the Land and the Plans as defined therein is required for coverage. The survey may be incorporated into the Plans, if appropriate.**

Coverage 3.a. may be given if any of the following situations apply:

- There are no covenants, conditions or restrictions.
- The covenants, conditions or restrictions are not enforceable under state or federal law.
- The restrictions contain a clause protecting the lien of a mortgage made in good faith and for value against a violation.
- Rights to enforce the restrictions have been waived or are subordinated to the Insured Mortgage.

Coverage 3.b. may be given provided:

- There are no covenants, conditions or restrictions, or

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

- it has been determined that either there are no violations that are enforceable, or
- all enforceable violations that have been disclosed by inspection, survey or other means are identified and excepted in Schedule B.

Coverage 3.c. may be given provided:

- There are no building setback lines shown on a recorded or filed plat of subdivision, or
- it has been determined that either there are no violations that are enforceable, or
- all enforceable violations that have been disclosed by inspection, survey or other means are identified and excepted in Schedule B.

Coverage 3 (d) may be given provided:

- Either there are no notices of violation of covenants, conditions and restrictions relating to environmental protection recorded or filed in the public records, or
- the notices of violations are identified and excepted in Schedule B.

Endorsement 36.6-06[Encroachments]:

**An accurate current survey of the Land and the Plans as defined therein is required for coverage.**

Coverage 3.a. may be given provided:

For encroachments onto adjoining land
- Any encroachments disclosed by inspection, survey or other means, are also expressly excepted by description of such matter in Schedule B.

For encroachments onto easements located on the Land, either
- there are no easements excepted in Schedule B; or
- encroachments onto easements, disclosed by inspection, survey or other means, are also expressly excepted by description of such matter in Schedule B.

Coverage 3.b. may be provided if any of the following situations apply:

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

- for encroachments on the Land by a neighboring improvement- any such encroachments disclosed by inspection, survey or other means, are expressly excepted by description of such matter in Schedule B.

Coverage 3.c. may be given if any of the following situations apply:

- There are no easements excepted in Schedule B.
- There are no encroachments onto easements excepted in Schedule B.
- Encroachments shown are minor, would not interfere with the use or maintenance of the easement and your Company underwriting advisor is satisfied that the Electricity Facility or Severable Improvement could not be forcibly removed under state law.

Coverage 3.d. may be given if any of the following situations apply:

- There are no easements excepted in Schedule B.
- There are no encroachments onto easements excepted in Schedule B.
- The encroachment is minor; would not interfere with the maintenance of the easement and your Company underwriting advisor is satisfied that a state court would not require its removal.

The form allows you to list the encroachments for which you do not wish to give coverage.

## MODIFICATION

In the event that modification of an endorsement is requested, it is necessary to consider your state regulatory requirements for filing and approval of forms. If the endorsement is modified, the endorsement is not an ALTA form and should not reference ALTA in the title. You must obtain the approval of the Company's underwriting adviser before complying with any request for a modification.

Return to Table of Contents

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

**ENDORSEMENT**

**Attached to Policy No. _____**

**Issued by**

*[FNTG BRAND]*

5.  The insurance provided by this endorsement is subject to the exclusions in Section 6 of this endorsement; and the Exclusions from Coverage, the Exceptions from Coverage contained in Schedule B, and the Conditions in the policy.

2.  For purposes of this endorsement only:

    a.  "Constituent Parcel" means one of the parcels of Land described in Schedule A that together constitute one integrated project.

    b.  "Easement" means each easement described in Schedule A.

    c.  "Easement Interest" means the right of use granted in the Easement for the Easement Term.

    d.  "Easement Term" means the duration of the Easement Interest, as set forth in the Easement, including any renewal or extended term if a valid option to renew or extend is contained in the Easement.

    e.  "Electricity Facility" means an electricity generating facility which may include one or more of the following: a substation; a transmission, distribution or collector line; an interconnection, inverter, transformer, generator, turbine, array, solar panel, or module; a circuit breaker, footing, tower, pole, cross-arm, guy line, anchor, wire, control system, communications or radio relay system, safety protection facility, road, and other building, structure, fixture, machinery, equipment, appliance and item associated with or incidental to the generation, conversion, storage, switching, metering, step-up, step-down, inversion, transmission, conducting, wheeling, sale or other use or conveyance of electricity, on the Land at Date of Policy or to be built or constructed on the Land in the locations according to the Plans, that by law constitutes real property.

    f.  "Evicted" or "Eviction" means (a) the lawful deprivation, in whole or in part, of the right of possession or use insured by this policy, contrary to the terms of any Lease or Easement or (b) the lawful prevention of the use of the Land or any Electricity Facility or Severable Improvement for the purposes permitted by the Lease or the Easement, as applicable, in either case as a result of a matter covered by this policy.

    g.  "Lease" means each lease described in Schedule A.

    h.  "Leasehold Estate" means the right of possession granted in the Lease for the Lease Term.

    i.  "Lease Term" means the duration of the Leasehold Estate, as set forth in the Lease, including any renewal or extended term if a valid option to renew or extend is contained in the Lease.

    j.  "Plans" means the survey, site and elevation plans or other depictions or drawings prepared by ____(*insert name of architect or engineer*) dated _____, last revised _____ ,designated as ____(*insert name of project or project number*) consisting of ____sheets.

    k.  "Remaining Term" means the portion of the Easement Term or the Lease Term remaining after the Insured has been Evicted.

    l.  "Severable Improvement" means property affixed to the Land at Date of Policy or to be affixed in the locations according to the Plans, that would constitute an Electricity Facility but for its characterization as personal property, and that by law does not constitute real property because (a) of its character and manner of attachment to the Land and (b) the property can be severed from the Land without causing material damage to the property or to the Land.

3.  Valuation of Title as an Integrated Project:

    a.  If in computing loss or damage it becomes necessary to value the Title, or any portion of it, as the result of an Eviction, then, as to that portion of the Land from which the Insured is Evicted, that value shall consist of (i) the value of (A) the Leasehold Estate or the Easement Interest for the Remaining Term, as applicable, (B) any Electricity Facility existing on the date of the Eviction, and, if applicable, (ii) any reduction in value of another insured Lease or Easement as computed in Section 3(b) below.

    b.  A computation of loss or damage resulting from an Eviction affecting any Constituent Parcel shall include loss or damage to the integrated project caused by the covered matter affecting the Constituent Parcel from which the Insured is Evicted.

    c.  The Insured Claimant shall have the right to have the Leasehold Estate, the Easement Interest, and any Electricity Facility affected by a defect insured against by this policy valued either as a whole or separately.  In either event, this determination of value shall take into account any rent or use payments no longer required to be paid for the Remaining Term.

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

ENDORSEMENT MANUAL – Fidelity National Title Group, Inc.        **SECTION 36**

    d.    The provisions of this Section 3 shall not diminish the Insured's rights under any other endorsement to the policy; however, the calculation of loss or damage pursuant to this endorsement shall not allow duplication of recovery for loss or damage calculated pursuant to Section 8 of the Conditions or any other endorsement to the policy.

4.    Valuation of Severable Improvements:

    a.    In the event of an Eviction, the calculation of the loss shall include (but not to the extent that these items of loss are included in the valuation of the Title determined pursuant to Section 8 of the Conditions or any other provision of this or any other endorsement) the diminution in value of the Insured's interest in any Severable Improvement resulting from the Eviction, reduced by the salvage value of the Severable Improvement.

    b.    The policy does not insure against loss or damage (and the Company will not pay any costs, attorneys' fees or expenses) relating to:

        i.    the attachment, perfection or priority of any security interest in any Severable Improvement;

        ii.    the vesting or ownership of title to or rights in any Severable Improvement;

        iii.    any defect in or lien or encumbrance on the title to any Severable Improvement; or

        iv.    the determination of whether any specific property is real or personal in nature.

5.    Additional items of loss covered by this endorsement:

If the Insured is Evicted, the following items of loss, if applicable to that portion of the Land from which the Insured is Evicted, shall be included, without duplication, in computing loss or damage incurred by the Insured, but not to the extent that the same are included in the valuation of the Title determined pursuant to Section 3 of this endorsement, the valuation of Severable Improvements pursuant to Section 4 of this endorsement, or Section 8(a)(ii) of the Conditions.

    a.    The reasonable cost of: (i) disassembling, removing, relocating and reassembling any Severable Improvement that the Insured has the right to remove and relocate, situated on the Land at the time of Eviction, to the extent necessary to restore and make functional the integrated project; (ii) transportation of that Severable Improvement for the initial one hundred miles incurred in connection with the restoration or relocation; and (iii) restoring the Land to the extent damaged as a result of the disassembly, removal and relocation of the Severable Improvement and required of the Insured solely because of the Eviction.

    b.    Rent, easement payments or damages for use and occupancy of the Land prior to the Eviction that the Insured as owner of the Leasehold Estate or the Easement Interest, as applicable, may be obligated to pay to any person having paramount title to that of the lessor in the Lease or the grantor in the Easement, as applicable.

    c.    The amount of rent, easement payments or damages that, by the terms of the Lease or the Easement, as applicable, the Insured must continue to pay to the lessor or grantor after Eviction with respect to the portion of the Leasehold Estate or Easement Interest, as applicable, from which the Insured has been Evicted.

    d.    The fair market value, at the time of the Eviction, of the estate or interest of the Insured in any lease, sublease or easement specifically permitted by the Lease or Easement, as applicable, and made by the Insured as lessor or grantor of all or part of the Leasehold Estate or Easement Interest, as applicable.

    e.    Damages caused by the Eviction that the Insured is obligated to pay to lessees or sublessees or easement or subeasement grantees on account of the breach of any lease or sublease or easement or subeasement specifically permitted by the Lease or the Easement, as applicable, and made by the Insured as lessor or grantor of all or part of the Leasehold Estate or Easement Interest, as applicable.

    f.    The reasonable cost to obtain land use, zoning, building and occupancy permits, architectural and engineering services and environmental testing and reviews for a replacement leasehold reasonably equivalent to the Leasehold Estate or a replacement easement reasonably equivalent to the Easement Interest, as applicable.

    g.    If any Electricity Facility is not substantially completed at the time of Eviction, the actual cost incurred by the Insured up to the time of Eviction, less the salvage value, for the Electricity Facility located on that portion of the Land from which the Insured is Evicted.  Those costs include costs incurred to construct and fabricate the Electricity Facility, obtain land use, zoning, building and occupancy permits, architectural and engineering services, construction management services, environmental testing and reviews, and landscaping, and cancellation fees related to the foregoing.

6.    This endorsement does not insure against loss, damage or costs of remediation (and the Company will not pay costs, attorneys' fees, or expenses) resulting from environmental damage or contamination.

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

ENDORSEMENT MANUAL – Fidelity National Title Group, Inc.                                     **SECTION 36**

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

[Witness clause optional]


**[FNTG BRAND]**



By: _____
            Authorized Signatory




ALTA Endorsement Form 36-06
(Energy Project –Leasehold/Easement-Owners) (4/2/12)
©American Land Title Association

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

ENDORSEMENT MANUAL – Fidelity National Title Group, Inc.                                    **SECTION 36**

**ENDORSEMENT**

**Attached to Policy No. _____**

**Issued by**

*[FNTG BRAND]*

1.  The insurance provided by this endorsement is subject to the exclusions in Section 6 of this endorsement; and the Exclusions from Coverage, the Exceptions from Coverage contained in Schedule B, and the Conditions in the policy.

2.  For purposes of this endorsement only:

    a.  "Constituent Parcel" means one of the parcels of Land described in Schedule A that together constitute one integrated project.

    b.  "Easement" means each easement described in Schedule A.

    c.  "Easement Interest" means the right of use granted in the Easement for the Easement Term.

    d.  "Easement Term" means the duration of the Easement Interest, as set forth in the Easement, including any renewal or extended term if a valid option to renew or extend is contained in the Easement.

    e.  "Electricity Facility" means an electricity generating facility which may include one or more of the following: a substation; a transmission, distribution or collector line; an interconnection, inverter, transformer, generator, turbine, array, solar panel, or module; a circuit breaker, footing, tower, pole, cross-arm, guy line, anchor, wire, control system, communications or radio relay system, safety protection facility, road, and other building, structure, fixture, machinery, equipment, appliance and item associated with or incidental to the generation, conversion, storage, switching, metering, step-up, step-down, inversion, transmission, conducting, wheeling, sale or other use or conveyance of electricity, on the Land at Date of Policy or to be built or constructed on the Land in the locations according to the Plans, that by law constitutes real property.

    f.  "Evicted" or "Eviction" means (a) the lawful deprivation, in whole or in part, of the right of possession or use insured by this policy, contrary to the terms of any Lease or Easement or (b) the lawful prevention of the use of the Land or any Electricity Facility or Severable Improvement for the purposes permitted by the Lease or the Easement, as applicable, in either case as a result of a matter covered by this policy.

    g.  "Lease" means each lease described in Schedule A.

    h.  "Leasehold Estate" means the right of possession granted in the Lease for the Lease Term.

    i.  "Lease Term" means the duration of the Leasehold Estate, as set forth in the Lease, including any renewal or extended term if a valid option to renew or extend is contained in the Lease.

    j.  "Plans" means the survey, site and elevation plans or other depictions or drawings prepared by _(insert name of architect or engineer)_ dated _____, last revised _____ ,designated as _(insert name of project or project number)_ consisting of ___sheets.

    k.  "Remaining Term" means the portion of the Easement Term or the Lease Term remaining after the Insured has been Evicted.

    l.  "Severable Improvement" means property affixed to the Land at Date of Policy or to be affixed in the locations according to the Plans, that would constitute an Electricity Facility but for its characterization as personal property, and that by law does not constitute real property because (a) of its character and manner of attachment to the Land and (b) the property can be severed from the Land without causing material damage to the property or to the Land.

    m.  "Tenant" means the tenant under the Lease or a grantee under the Easement, as applicable, and, after acquisition of all or any part of the Title in accordance with the provisions of Section 2 of the Conditions of the policy, the Insured Claimant.

3.  Valuation of Title as an Integrated Project:

    a.  If in computing loss or damage it becomes necessary to value the Title, or any portion of it, as the result of an Eviction, then, as to that portion of the Land from which the Tenant is Evicted, that value shall consist of (i) the value of (A) the Leasehold Estate or the Easement Interest for the Remaining Term, as applicable, (B) any Electricity Facility existing on the date of the Eviction, and, if applicable, (ii) any reduction in value of another insured Lease or Easement as computed in Section 3(b) below.

    b.  A computation of loss or damage resulting from an Eviction affecting any Constituent Parcel shall include loss or damage to the integrated project caused by the covered matter affecting the Constituent Parcel from which the Insured is Evicted.

    c.  The Insured Claimant shall have the right to have the Leasehold Estate, the Easement Interest, and any Electricity Facility affected by a defect insured against by the policy valued either as a whole or separately.  In

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

either event, this determination of value shall take into account any rent or use payments no longer required to be paid for the Remaining Term.

d.   The provisions of this Section 3 shall not diminish the Insured's rights under any other endorsement to the policy; however, the calculation of loss or damage pursuant to this endorsement shall not allow duplication of recovery for loss or damage calculated pursuant to Section 8 of the Conditions or any other endorsement to the policy.

4.   Valuation of Severable Improvements:

a.   In the event of an Eviction, the calculation of the loss shall include (but not to the extent that these items of loss are included in the valuation of the Title determined pursuant to Section 3 of the Conditions or any other provision of this or any other endorsement) the diminution in value of the Insured's interest in any Severable Improvement resulting from the Eviction, reduced by the salvage value of the Severable Improvement.

b.   The policy does not insure against loss or damage (and the Company will not pay any costs, attorneys' fees or expenses) relating to:

i.   the attachment, perfection or priority of any security interest in any Severable Improvement;

ii.   the vesting or ownership of title to or rights in any Severable Improvement;

iii.   any defect in or lien or encumbrance on the title to any Severable Improvement; or

iv.   the determination of whether any specific property is real or personal in nature.

5.   Additional items of loss covered by this endorsement:

If the Insured acquires all or any part of the Title in accordance with the provisions of Section 2 of the Conditions of the policy and thereafter is Evicted, the following items of loss, if applicable to that portion of the Land from which the Insured is Evicted shall be included, without duplication, in computing loss or damage incurred by the Insured, but not to the extent that the same are included in the valuation of the Title determined pursuant to Section 3 of this endorsement, the valuation of Severable Improvements pursuant to Section 4 of this endorsement, or Section 8(a)(iii) of the Conditions:

a.   The reasonable cost of: (i) disassembling, removing, relocating and reassembling any Severable Improvement that the Insured has the right to remove and relocate, situated on the Land at the time of Eviction, to the extent necessary to restore and make functional the integrated project; (ii) transportation of that Severable Improvement for the initial one hundred miles incurred in connection with the restoration or relocation; and (iii) restoring the Land to the extent damaged as a result of the disassembly, removal and relocation of the Severable Improvement and required of the Insured solely because of the Eviction.

b.   Rent, easement payments or damages for use and occupancy of the Land prior to the Eviction that the Insured as owner of the Leasehold Estate or the Easement Interest, as applicable, may be obligated to pay to any person having paramount title to that of the lessor in the Lease or the grantor in the Easement, as applicable.

c.   The amount of rent, easement payments or damages that, by the terms of the Lease or the Easement, as applicable, the Insured must continue to pay to the lessor or grantor after Eviction with respect to the portion of the Leasehold Estate or Easement Interest, as applicable, from which the Insured has been Evicted.

d.   The fair market value, at the time of the Eviction, of the estate or interest of the Insured in any lease, sublease or easement specifically permitted by the Lease or Easement, as applicable, and made by the Tenant as lessor or grantor of all or part of the Leasehold Estate or Easement Interest, as applicable.

e.   Damages caused by the Eviction that the Insured is obligated to pay to lessees or sublessees or easement or subeasement grantees on account of the breach of any lease or sublease or easement or subeasement specifically permitted by the Lease or the Easement, as applicable, and made by the Tenant as lessor or grantor of all or part of the Leasehold Estate or Easement Interest, as applicable.

f.   The reasonable cost to obtain land use, zoning, building and occupancy permits, architectural and engineering services and environmental testing and reviews for a replacement leasehold reasonably equivalent to the Leasehold Estate or a replacement easement reasonably equivalent to the Easement Interest, as applicable.

g.   If any Electricity Facility is not substantially completed at the time of Eviction, the actual cost incurred by the Insured up to the time of Eviction, less the salvage value, for the Electricity Facility located on that portion of the Land from which the Insured is Evicted.  Those costs include costs incurred to construct and fabricate the Electricity Facility, obtain land use, zoning, building and occupancy permits, architectural and engineering services, construction management services, environmental testing and reviews, and landscaping, and cancellation fees related to the foregoing.

6.   This endorsement does not insure against loss, damage or costs of remediation (and the Company will not pay costs, attorneys' fees, or expenses) resulting from environmental damage or contamination.

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

ENDORSEMENT MANUAL – Fidelity National Title Group, Inc.                    **SECTION 36**

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

[Witness clause optional]

[FNTG BRAND]

By: _____
         Authorized Signatory

ALTA Endorsement Form 36.1-06
(Energy Project –Leasehold/Easement-Loan) (4/2/12)
©American Land Title Association

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

**ENDORSEMENT**

**Attached to Policy No. _____**

**Issued by**

*[FNTG BRAND]*

1. The insurance provided by this endorsement is subject to the exclusions in Section 6 of this endorsement; and the Exclusions from Coverage, the Exceptions from Coverage contained in Schedule B, and the Conditions in the policy.

2. For purposes of this endorsement only:

    a. "Constituent Parcel" means one of the parcels of Land described in Schedule A that together constitute one integrated project.

    b. "Electricity Facility" means an electricity generating facility which may include one or more of the following: a substation; a transmission, distribution or collector line; an interconnection, inverter, transformer, generator, turbine, array, solar panel, or module; a circuit breaker, footing, tower, pole, cross-arm, guy line, anchor, wire, control system, communications or radio relay system, safety protection facility, road, and other building, structure, fixture, machinery, equipment, appliance and item associated with or incidental to the generation, conversion, storage, switching, metering, step-up, step-down, inversion, transmission, conducting, wheeling, sale or other use or conveyance of electricity, on the Land at Date of Policy or to be built or constructed on the Land in the locations according to the Plans, that by law constitutes real property.

    c. "Evicted" or "Eviction" means (a) the lawful deprivation, in whole or in part, of the right of possession insured by this policy, contrary to the terms of any Lease or (b) the lawful prevention of the use of the Land or any Electricity Facility or Severable Improvement for the purposes permitted by the Lease, in either case as a result of a matter covered by this policy.

    d. "Lease" means each lease described in Schedule A.

    e. "Leasehold Estate" means the right of possession granted in the Lease for the Lease Term.

    f. "Lease Term" means the duration of the Leasehold Estate, as set forth in the Lease, including any renewal or extended term if a valid option to renew or extend is contained in the Lease.

    g. "Plans" means the survey, site and elevation plans or other depictions or drawings prepared by _(insert name of architect or engineer)_ dated ____, last revised _____ ,designated as _(insert name of project or project number)_ consisting of ___sheets.

    h. "Remaining Term" means the portion of the Lease Term remaining after the Insured has been Evicted.

    i. "Severable Improvement" means property affixed to the Land at Date of Policy or to be affixed in the locations according to the Plans, that would constitute an Electricity Facility but for its characterization as personal property, and that by law does not constitute real property because (a) of its character and manner of attachment to the Land and (b) the property can be severed from the Land without causing material damage to the property or to the Land.

3. Valuation of Title as an Integrated Project:

    a. If in computing loss or damage it becomes necessary to value the Title, or any portion of it, as the result of an Eviction, then, as to that portion of the Land from which the Insured is Evicted, that value shall consist of (i) the value of (A) the Leasehold Estate for the Remaining Term, (B) any Electricity Facility existing on the date of the Eviction, and, if applicable, (ii) any reduction in value of another insured Lease as computed in Section 3(b) below.

    b. A computation of loss or damage resulting from an Eviction affecting any Constituent Parcel shall include loss or damage to the integrated project caused by the covered matter affecting the Constituent Parcel from which the Insured is Evicted.

    c. The Insured Claimant shall have the right to have the Leasehold Estate and any Electricity Facility affected by a defect insured against by this policy valued either as a whole or separately.  In either event, this determination of value shall take into account any rent no longer required to be paid for the Remaining Term.

    d. The provisions of this Section 3 shall not diminish the Insured's rights under any other endorsement to the policy; however, the calculation of loss or damage pursuant to this endorsement shall not allow duplication of recovery for loss or damage calculated pursuant to Section 8 of the Conditions or any other endorsement to the policy.

4. Valuation of Severable Improvements:

    b. In the event of an Eviction, the calculation of the loss shall include (but not to the extent that these items of loss are included in the valuation of the Title determined pursuant to Section 8 of the Conditions or any other provision of this or any other endorsement) the diminution in value of the Insured's interest in any Severable Improvement resulting from the Eviction, reduced by the salvage value of the Severable Improvement.

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

ENDORSEMENT MANUAL – Fidelity National Title Group, Inc.                                    **SECTION 36**

b.   The policy does not insure against loss or damage (and the Company will not pay any costs, attorneys' fees or expenses) relating to:

    i.   the attachment, perfection or priority of any security interest in any Severable Improvement;

    ii.   the vesting or ownership of title to or rights in any Severable Improvement;

    iii.   any defect in or lien or encumbrance on the title to any Severable Improvement; or

    iv.   the determination of whether any specific property is real or personal in nature.

5.   Additional items of loss covered by this endorsement:

If the Insured is Evicted, the following items of loss, if applicable to that portion of the Land from which the Insured is Evicted shall be included, without duplication, in computing loss or damage incurred by the Insured, but not to the extent that the same are included in the valuation of the Title determined pursuant to Section 3 of this endorsement, the valuation of Severable Improvements pursuant to Section 4 of this endorsement, or Section 8(a)(ii) of the Conditions.

a.   The reasonable cost of: (i) disassembling, removing, relocating and reassembling any Severable Improvement that the Insured has the right to remove and relocate, situated on the Land at the time of Eviction, to the extent necessary to restore and make functional the integrated project; (ii) transportation of that Severable Improvement for the initial one hundred miles incurred in connection with the restoration or relocation; and (iii) restoring the Land to the extent damaged as a result of the disassembly, removal and relocation of the Severable Improvement and required of the Insured solely because of the Eviction.

b.   Rent or damages for use and occupancy of the Land prior to the Eviction that the Insured as owner of the Leasehold Estate  may be obligated to pay to any person having paramount title to that of the lessor in the Lease.

c.   The amount of rent or damages that, by the terms of the Lease , the Insured must continue to pay to the lessor after Eviction with respect to the portion of the Leasehold Estate from which the Insured has been Evicted.

d.   The fair market value, at the time of the Eviction, of the estate or interest of the Insured in any lease or sublease specifically permitted by the Lease and made by the Insured as lessor of all or part of the Leasehold Estate.

e.   Damages caused by the Eviction that the Insured is obligated to pay to lessees or sublessees on account of the breach of any lease or sublease specifically permitted by the Lease and made by the Insured as lessor of all or part of the Leasehold Estate.

f.   The reasonable cost to obtain land use, zoning, building and occupancy permits, architectural and engineering services and environmental testing and reviews for a replacement leasehold reasonably equivalent to the Leasehold Estate.

g.   If any Electricity Facility is not substantially completed at the time of Eviction, the actual cost incurred by the Insured up to the time of Eviction, less the salvage value, for the Electricity Facility located on that portion of the Land from which the Insured is Evicted.  Those costs include costs incurred to construct and fabricate the Electricity Facility, obtain land use, zoning, building and occupancy permits, architectural and engineering services, construction management services, environmental testing and reviews, and landscaping, and cancellation fees related to the foregoing.

6.   This endorsement does not insure against loss, damage or costs of remediation (and the Company will not pay costs, attorneys' fees, or expenses) resulting from environmental damage or contamination.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

[Witness clause optional]

[FNTG BRAND]


By: _____
         Authorized Signatory

ALTA Endorsement Form 36.2-06
(Energy Project –Leasehold-Owners) (4/2/12)
©American Land Title Association

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

ENDORSEMENT MANUAL – Fidelity National Title Group, Inc.                    SECTION 36

ENDORSEMENT

**Attached to Policy No. _____**

**Issued by**

*[FNTG BRAND]*

1.  The insurance provided by this endorsement is subject to the exclusions in Section 6 of this endorsement; and the Exclusions from Coverage, the Exceptions from Coverage contained in Schedule B, and the Conditions in the policy.

2.  For purposes of this endorsement only:

    a.  "Constituent Parcel" means one of the parcels of Land described in Schedule A that together constitute one integrated project.

    b.  "Electricity Facility" means an electricity generating facility which may include one or more of the following: a substation; a transmission, distribution or collector line; an interconnection, inverter, transformer, generator, turbine, array, solar panel, or module; a circuit breaker, footing, tower, pole, cross-arm, guy line, anchor, wire, control system, communications or radio relay system, safety protection facility, road, and other building, structure, fixture, machinery, equipment, appliance and item associated with or incidental to the generation, conversion, storage, switching, metering, step-up, step-down, inversion, transmission, conducting, wheeling, sale or other use or conveyance of electricity, on the Land at Date of Policy or to be built or constructed on the Land in the locations according to the Plans, that by law constitutes real property.

    c.  "Evicted" or "Eviction" means (a) the lawful deprivation, in whole or in part, of the right of possession insured by this policy, contrary to the terms of any Lease or (b) the lawful prevention of the use of the Land or any Electricity Facility or Severable Improvement for the purposes permitted by the Lease, in either case as a result of a matter covered by this policy.

    d.  "Lease" means each lease described in Schedule A.

    e.  "Leasehold Estate" means the right of possession granted in the Lease for the Lease Term.

    f.  "Lease Term" means the duration of the Leasehold Estate, as set forth in the Lease, including any renewal or extended term if a valid option to renew or extend is contained in the Lease.

    g.  "Plans" means the survey, site and elevation plans or other depictions or drawings prepared by *(insert name of architect or engineer)* dated ____, last revised _____ ,designated as *(insert name of project or project number)* consisting of ___sheets.

    h.  "Remaining Term" means the portion of the Lease Term remaining after the Insured has been Evicted.

    i.  "Severable Improvement" means property affixed to the Land at Date of Policy or to be affixed in the locations according to the Plans, that would constitute an Electricity Facility but for its characterization as personal property, and that by law does not constitute real property because (a) of its character and manner of attachment to the Land and (b) the property can be severed from the Land without causing material damage to the property or to the Land.

    j.  "Tenant" means the tenant under the Lease  and, after acquisition of all or any part of the Title in accordance with the provisions of Section 2 of the Conditions of the policy, the Insured Claimant.

3.  Valuation of Title as an Integrated Project:

    a.  If in computing loss or damage it becomes necessary to value the Title, or any portion of it, as the result of an Eviction, then, as to that portion of the Land from which the Tenant is Evicted, that value shall consist of (i) the value of (A) the Leasehold Estate  for the Remaining Term,  (B) any Electricity Facility existing on the date of the Eviction, and, if applicable, (ii) any reduction in value of another insured Lease as computed in Section 3(b) below.

    b.  A computation of loss or damage resulting from an Eviction affecting any Constituent Parcel shall include loss or damage to the integrated project caused by the covered matter affecting the Constituent Parcel from which the Insured is Evicted.

    c.  The Insured Claimant shall have the right to have the Leasehold Estate and any Electricity Facility affected by a defect insured against by the policy valued either as a whole or separately.  In either event, this determination of value shall take into account any rent no longer required to be paid for the Remaining Term.

    d.  The provisions of this Section 3 shall not diminish the Insured's rights under any other endorsement to the policy; however, the calculation of loss or damage pursuant to this endorsement shall not allow duplication of recovery for loss or damage calculated pursuant to Section 8 of the Conditions or any other endorsement to the policy.

4.  Valuation of Severable Improvements:

    c.  In the event of an Eviction, the calculation of the loss shall include (but not to the extent that these items of loss are included in the valuation of the Title determined pursuant to Section 8 of the Conditions or any other

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

provision of this or any other endorsement) the diminution in value of the Insured's interest in any Severable Improvement resulting from the Eviction, reduced by the salvage value of the Severable Improvement.

b.  The policy does not insure against loss or damage (and the Company will not pay any costs, attorneys' fees or expenses) relating to:

i.  the attachment, perfection or priority of any security interest in any Severable Improvement;

ii.  the vesting or ownership of title to or rights in any Severable Improvement;

iii.  any defect in or lien or encumbrance on the title to any Severable Improvement; or

iv.  the determination of whether any specific property is real or personal in nature.

5.  Additional items of loss covered by this endorsement:
If the Insured acquires all or any part of the Title in accordance with the provisions of Section 2 of the Conditions of the policy and thereafter is Evicted, the following items of loss, if applicable to that portion of the Land from which the Insured is Evicted shall be included, without duplication, in computing loss or damage incurred by the Insured, but not to the extent that the same are included in the valuation of the Title determined pursuant to Section 3 of this endorsement, the valuation of Severable Improvements pursuant to Section 4 of this endorsement, or Section 8(a)(iii) of the Conditions:

a.  The reasonable cost of: (i) disassembling, removing, relocating and reassembling any Severable Improvement that the Insured has the right to remove and relocate, situated on the Land at the time of Eviction, to the extent necessary to restore and make functional the integrated project; (ii) transportation of that Severable Improvement for the initial one hundred miles incurred in connection with the restoration or relocation; and (iii) restoring the Land to the extent damaged as a result of the disassembly, removal and relocation of the Severable Improvement and required of the Insured solely because of the Eviction.

b.  Rent or damages for use and occupancy of the Land prior to the Eviction that the Insured as owner of the Leasehold Estate may be obligated to pay to any person having paramount title to that of the lessor in the Lease.

c.  The amount of rent or damages that, by the terms of the Lease , the Insured must continue to pay to the lessor after Eviction with respect to the portion of the Leasehold Estate  from which the Insured has been Evicted.

d.  The fair market value, at the time of the Eviction, of the estate or interest of the Insured in any lease or sublease specifically permitted by the Lease and made by the Tenant as lessor of all or part of the Leasehold Estate.

e.  Damages caused by the Eviction that the Insured is obligated to pay to lessees or sublessees on account of the breach of any lease or sublease specifically permitted by the Lease and made by the Tenant as lessor of all or part of the Leasehold Estate.

f.  The reasonable cost to obtain land use, zoning, building and occupancy permits, architectural and engineering services and environmental testing and reviews for a replacement leasehold reasonably equivalent to the Leasehold Estate.

g.  If any Electricity Facility is not substantially completed at the time of Eviction, the actual cost incurred by the Insured up to the time of Eviction, less the salvage value, for the Electricity Facility located on that portion of the Land from which the Insured is Evicted.  Those costs include costs incurred to construct and fabricate the Electricity Facility, obtain land use, zoning, building and occupancy permits, architectural and engineering services, construction management services, environmental testing and reviews, and landscaping, and cancellation fees related to the foregoing.

6.  This endorsement does not insure against loss, damage or costs of remediation (and the Company will not pay costs, attorneys' fees, or expenses) resulting from environmental damage or contamination.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

[Witness clause optional]

[FNTG BRAND]

By: _____
                Authorized Signatory

ALTA Endorsement Form 36.3-06
(Energy Project –Leasehold-Loan) (4/2/12)
©American Land Title Association

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

ENDORSEMENT MANUAL – Fidelity National Title Group, Inc.                                    SECTION 36

**ENDORSEMENT**

**Attached to Policy No. _____**

**Issued by**

**[FNTG BRAND]**

iii.    The insurance provided by this endorsement is subject to the exclusions in Section 4 of this endorsement; and the Exclusions from Coverage, the Exceptions from Coverage contained in Schedule B, and the Conditions in the policy.

iv.    For purposes of this endorsement only:

    a.    "Covenant" means a covenant, condition, limitation or restriction in a document or instrument in effect at Date of Policy.

    b.    "Electricity Facility" means an electricity generating facility that may include one or more of the following:  a substation; a transmission, distribution or collector line; an interconnection, inverter, transformer, generator, turbine, array, solar panel, or module; a circuit breaker, footing, tower, pole, cross-arm, guy line, anchor, wire, control system, communications or radio relay system, safety protection facility, road, and other building, structure, fixture, machinery, equipment, appliance and item associated with or incidental to the generation, conversion, storage, switching, metering, step-up, step-down, inversion, transmission, conducting, wheeling, sale or other use or conveyance of electricity, on the Land at Date of Policy or to be built or constructed on the Land in the locations according to the Plans, that by law constitutes real property.

    c.    "Plans" means the survey, site and elevation plans or other depictions or drawings prepared by  *(insert name of architect or engineer)*  dated ____, last revised _____, designated as  *(insert name of project or project number)*  consisting of ___sheets.

    d.    "Severable Improvement" means property affixed to the Land at Date of Policy or to be affixed to the Land in the locations according to the Plans, that would constitute an Electricity Facility but for its characterization as personal property, and that by law does not constitute real property because (a) of its character and manner of attachment to the Land and (b) the property can be severed from the Land without causing material damage to the property or to the Land.

v.    The Company insures against loss or damage sustained by the Insured by reason of:

    i.    A violation of an enforceable Covenant by any Electricity Facility or Severable Improvement, unless an exception in Schedule B of the policy identifies  the violation;

    ii.    Enforced removal of any Electricity Facility or Severable Improvement as a result of a violation of a building setback line shown on a plat of subdivision recorded or filed in the Public Records, unless an exception in Schedule B of the policy identifies the violation; or

    iii.    A notice of a violation, recorded in the Public Records at Date of Policy, of an enforceable Covenant relating to environmental protection, describing any part of the Land and referring to that Covenant, but only to the extent of the violation of the Covenant referred to in that notice, unless an exception in Schedule B of the policy identifies the notice of the violation.

    4.    This endorsement does not insure against loss or damage (and the Company will not pay costs, attorneys' fees, or expenses) resulting from:

    a.    any Covenant contained in an instrument creating a lease or easement;

    b.    any Covenant relating to obligations of any type to perform maintenance, repair, or remediation on the Land; or

    c.    except as provided in Section 3.c., any Covenant pertaining to environmental protection of any kind or nature, including hazardous or toxic matters, conditions, or substances.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

[Witness clause optional]

[FNTG BRAND]

By: _____
          Authorized Signatory

ALTA Endorsement Form 36.4-06
(Energy Project –Covenants, Conditions and Restrictions-Land Under Development-Owners) (4/2/12)
©American Land Title Association

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

**ENDORSEMENT**

**Attached to Policy No. _____**

**Issued by**

*[FNTG BRAND]*

1.   The insurance provided by this endorsement is subject to the exclusions in Section 4 of this endorsement; and the Exclusions from Coverage, the Exceptions from Coverage contained in Schedule B, and the Conditions in the policy.

6.   For purposes of this endorsement only:

   a.   "Covenant" means a covenant, condition, limitation or restriction in a document or instrument in effect at Date of Policy.

   b.   "Electricity Facility" means an electricity generating facility that may include one or more of the following: a substation; a transmission, distribution or collector line; an interconnection, inverter, transformer, generator, turbine, array, solar panel, or module; a circuit breaker, footing, tower, pole, cross-arm, guy line, anchor, wire, control system, communications or radio relay system, safety protection facility, road, and other building, structure, fixture, machinery, equipment, appliance and item associated with or incidental to the generation, conversion, storage, switching, metering, step-up, step-down, inversion, transmission, conducting, wheeling, sale or other use or conveyance of electricity, on the Land at Date of Policy or to be built or constructed on the Land in the locations according to the Plans, that by law constitutes real property.

   c.   "Plans" means the survey, site and elevation plans or other depictions or drawings prepared by
 (*insert name of architect or engineer*)  dated ____, last revised _____ ,designated as (*insert name of project or project number*)  consisting of ___sheets.

   d.   "Severable Improvement" means property affixed to the Land at Date of Policy or to be affixed to the Land in the locations according to the Plans, that would constitute an Electricity Facility but for its characterization as personal property, and that by law does not constitute real property because (a) of its character and manner of attachment to the Land and (b) the property can be severed from the Land without causing material damage to the property or to the Land.

7.   The Company insures against loss or damage sustained by the Insured by reason of:

   a.   A violation of a Covenant that:

      i.   divests, subordinates, or extinguishes the lien of the Insured Mortgage;

      ii.   results in the invalidity, unenforceability, or lack of priority of the lien of the Insured Mortgage; or

      iii.   causes a loss of the Insured's Title acquired in satisfaction or partial satisfaction of the Indebtedness.

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

    b.   A violation of an enforceable Covenant by any Electricity Facility or Severable Improvement, unless an exception in Schedule B of the policy identifies the violation;

    c.   Enforced removal of any Electricity Facility or Severable Improvement, as a result of a violation of a building setback line shown on a plat of subdivision recorded or filed in the Public Records, unless an exception in Schedule B of the policy identifies the violation; or

    d.   A notice of a violation, recorded in the Public Records at Date of Policy, of an enforceable Covenant relating to environmental protection, describing any part of the Land and referring to that Covenant, but only to the extent of the violation of the Covenant referred to in that notice, unless an exception in Schedule B of the policy identifies the notice of the violation.

8.   This endorsement does not insure against loss or damage (and the Company will not pay costs, attorneys' fees, or expenses) resulting from:

    a.   any Covenant contained in an instrument creating a lease or easement;

    b.   any Covenant relating to obligations of any type to perform maintenance, repair, or remediation on the Land; or

    c.   except as provided in Section 3.d., any Covenant pertaining to environmental protection of any kind or nature, including hazardous or toxic matters, conditions, or substances.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

[Witness clause optional]

**[FNTG BRAND]**

By: _____
       Authorized Signatory

ALTA Endorsement Form 36.5-06
(Energy Project –Covenants, Conditions and Restrictions-Land Under Development-Loan) (4/2/12)
©American Land Title Association

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

**ENDORSEMENT**

**Attached to Policy No. _____**

**Issued by**

**BLANK TITLE INSURANCE COMPANY**

1.  The insurance provided by this endorsement is subject to the exclusions in Section 4 of this endorsement; and the Exclusions from Coverage, the Exceptions from Coverage contained in Schedule B, and the Conditions in the policy.

2.  For purposes of this endorsement only:

    a.  "Electricity Facility" means an electricity generating facility that may include one or more of the following:  a substation; a transmission, distribution or collector line; an interconnection, inverter,  transformer, generator, turbine, array, solar panel, or module; a circuit breaker, footing, tower, pole, cross-arm, guy line, anchor, wire, control system, communications or radio relay system, safety protection facility, road, and other building, structure, fixture, machinery, equipment, appliance and item associated with or incidental to the generation, conversion, storage, switching, metering, step-up, step-down, inversion, transmission, conducting, wheeling, sale or other use or conveyance of electricity, on the Land at Date of Policy or to be built or constructed on the Land in the locations according to the Plans, that by law constitutes real property.

    b.  "Plans" means the survey, site and elevation plans or other depictions or drawings prepared by
        _(insert name of architect or engineer)_  dated ____, last revised _____ ,designated as _(insert name of project or project number)_  consisting of ___sheets.

    c.  "Severable Improvement" means property affixed to the Land at Date of Policy or to be affixed to the Land in the locations according to the Plans, that would constitute an Electricity Facility but for its characterization as personal property, and that by law does not constitute real property because (a) of its character and manner of attachment to the Land and (b) the property can be severed from the Land without causing material damage to the property or to the Land.

3.  The Company insures against loss or damage sustained by the Insured by reason of:

    a.  An encroachment of any Electricity Facility or Severable Improvement located on the Land onto adjoining land or onto that portion of the Land subject to an easement, unless an exception in Schedule B of the policy identifies the encroachment;

    b.  An encroachment of an improvement located on adjoining land onto the Land at Date of Policy, unless an exception in Schedule B of the policy identifies the encroachment;

    c.  Enforced removal of any Electricity Facility or Severable Improvement, as a result of an encroachment by the Electricity Facility or Severable Improvement onto any portion of the Land subject to any easement, in the event that the owners of the easement shall, for the purpose of exercising the right of use or maintenance of the easement, compel removal or relocation of the encroaching Electricity Facility or Severable Improvement; [or]

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

    d.   Damage to any Electricity Facility or Severable Improvement that is located on or encroaches onto that portion of the Land subject to an easement excepted in Schedule B, which damage results from the exercise of the right to maintain the easement for the purpose for which it was granted or reserved [; or]

    [e.   The coverage of Sections 3.c. and 3.d. shall not apply to the encroachments listed in Exception(s) _____ of Schedule B].

4    This endorsement does not insure against loss or damage (and the Company will not pay costs, attorneys' fees, or expenses) resulting from contamination, explosion, fire, vibration, fracturing, earthquake or subsidence.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

[Witness clause optional]

**BLANK TITLE INSURANCE COMPANY**

By: _____
        Authorized Signatory

ALTA Endorsement Form 36.6-06
(Energy Project –Encroachments) (4/2/12)
©American Land Title Association

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

ENDORSEMENT MANUAL – Fidelity National Title Group, Inc.                    **SECTION 37**

**Return to Table of Contents**

## ASSIGNMENT OF RENTS OR LEASES ENDORSEMENT

## ALTA ENDORSEMENT FORM 37-06

### PURPOSE

Lenders occasionally request that the loan policy insure certain recorded interests that are taken as additional security for the loan primarily secured by the Insured Mortgage. The most common additional security, other than a security interest under the Uniform Commercial Code, is an assignment of rents or leases This endorsement is issued to provide certain coverages with respect to a separate assignment of rents or leases shown in Schedule B, Part II of the policy. This endorsement provides insurance that the assignment of rents or leases is properly executed, and that the Public Records do not disclose any prior assignments of these same rents or leases.

If you are asked to issue an endorsement to provide the above described coverages with respect to an assignment of rents or leases that is contained *within* the Insured Mortgage, please see **Section 56.**

### SECTIONS OF POLICY AMENDED BY ENDORSEMENT

These endorsements do not amend or modify any specific policy provisions, but add additional coverage to the terms of the policy.

### BASIS FOR PROVIDING COVERAGE

The assignment of rents or leases must be properly executed by the owner of the estate or interest covered by the Insured Mortgage, and there must not be any prior assignment of rents or leases of record. If a previously recorded assignment of rents or leases is found, it must be raised as an exception in Schedule B of the policy.

**NOTE: PRIOR MORTGAGES OR DEEDS OF TRUST MUST BE EXAMINED TO DETERMINE IF THEY CONTAIN ASSIGNMENTS OF RENTS OR LEASES. SEPARATE SCHEDULE B EXCEPTIONS SHOULD BE MADE FOR SUCH ASSIGNMENTS.**

### MODIFICATION

In the event that modification of this endorsement is requested, it is necessary to consider your state regulatory requirements for filing and approval of forms. If the endorsement is modified, the endorsement is not an ALTA form and should not reference ALTA in the title.  You must obtain the approval of the Company's underwriting adviser before complying with any request for a modification.   Return to Table of Contents

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

ENDORSEMENT MANUAL – Fidelity National Title Group, Inc.                                    **SECTION 37**

ENDORSEMENT

Attached to Policy No. _____

**Issued By**

**[FNTG BRAND]**

1.  The insurance provided by this endorsement is subject to the Exclusions from Coverage, the Exceptions from Coverage contained in Schedule B, and the Conditions in the policy.

2.  The Company insures against loss or damage sustained by the Insured by reason of:

      a. any defect in the execution of the [*Insert Title of Assignment of Rents or Leases Document*] referred to in paragraph ____ [*of Part II*] of Schedule B; or

      b. any assignment of the lessor's interest in any lease or leases or any assignment of rents affecting the Title and recorded in the Public Records at Date of Policy other than as set forth in any instrument referred to in Schedule B.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

[Witness clause optional]

[FNTG BRAND]
BY: _____

ALTA Endorsement Form 37-06
(Assignment of Rents or Leases) (12/03/12)
©American Land Title Association

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

ENDORSEMENT MANUAL – Fidelity National Title Group, Inc.                    **SECTION 38**

**Return to Table of Contents**

**MORTGAGE TAX**

**ALTA ENDORSEMENT - FORM 38-06**

**PURPOSE**

This endorsement provides coverage to the insured lender if there is a deficiency in the recordation tax paid at the time the Insured Mortgage is recorded that is subsequently paid. The endorsement provides that, if the deficiency is paid, the Company will provide coverage against the invalidity or unenforceability of the Insured Mortgage or the lack of priority of the Insured Mortgage, from the failure to pay at the time of recording any portion of the recording tax. The Company does not provide coverage if the insured lender fails to pay the recordation tax deficiency.

**SECTIONS OF POLICY AMENDED BY ENDORSEMENT**

This endorsement for the insured lender does not expressly amend or modify any provisions of the Policy. It adds additional coverage to the terms of the policy.

**BASIS FOR PROVIDING COVERAGE**

To issue ALTA Form 38-06, you must confirm that there is no law or regulation in the state where the property lies that would adversely affect the lien of the Insured Mortgage by reason of the failure to correctly pay a recordation, registration, or related tax or charge required to be paid when the Insured Mortgage is recorded in the Public Records. If there is no binding authority in the state wherein the property lies, any request for this endorsement must be submitted to the Company's underwriting advisor for approval. If there is no law or regulation in the state in which the Land is located that contemplates a "Mortgage Tax" as defined in the endorsement, you may issue the endorsement if not regulatorily prohibited.

**MODIFICATION**

In the event that modification of an endorsement is requested, it is necessary to consider your state regulatory requirements for filing and approval of forms. If the endorsement is modified, the endorsement is not an ALTA form and should not reference ALTA in the title.  You must obtain the approval of the Company's underwriting adviser before complying with any request for a modification.

**Return to Table of Contents**

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

ENDORSEMENT

Attached to Policy No. _____

Issued By

[FNTG BRAND]

1. The insurance provided by this endorsement is subject to the exclusions in Sections 4 and 5 of this endorsement, the Exclusions from Coverage, the Exceptions from Coverage contained in Schedule B, and the Conditions in the policy.

2. For the purposes of this endorsement only, "Mortgage Tax" means a recordation, registration or related tax or charge required to be paid when the Insured Mortgage is recorded in the Public Records.

3. Upon payment of any deficiency in the Mortgage Tax, including interest and penalties, by the Insured, the Company insures against loss or damage sustained by the Insured by reason of:

    a. the invalidity or unenforceability of the lien of the Insured Mortgage as security for the Indebtedness resulting from the failure to pay, at the time of recording, any portion of the Mortgage Tax; or

    b. the lack of priority of the lien of the Insured Mortgage as security for the Indebtedness resulting from the failure to pay, at the time of recording, any portion of the Mortgage Tax.

4. The Company does not insure against loss or damage (and the Company will not pay costs, attorneys' fees, or expenses) resulting from the failure of the Insured to pay the Mortgage Tax deficiency, together with interest and penalties.

5. The Company is not liable for the payment of any portion of the Mortgage Tax, including interest or penalties

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

[Witness clause optional]

[FNTG BRAND]

BY: _____

ALTA Endorsement Form 38-06
(Mortgage Tax) (12/3/12)
©American Land Title

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

ENDORSEMENT MANUAL – Fidelity National Title Group, Inc.                    **SECTION 39**

**Return to Table of Contents**

**POLICY AUTHENTICATION**

**ALTA ENDORSEMENT - FORM 39-06**

**PURPOSE**

This endorsement provides coverage to the insured lender if a policy is issued electronically, or does not have a signature which may be required by the form of policy cover used.

**SECTIONS OF POLICY AMENDED BY ENDORSEMENT**

This endorsement for the insured lender modifies the cover and Conditions 14 (c) of the Policy which requires an authentication by an authorized person. This typically would be the signature of a licensed (as necessary) employee or agent.

**BASIS FOR PROVIDING COVERAGE**

If the policy is issued electronically, it will not contain a "wet" signature, which is normally required by the language contained in the contract of insurance as indicated on the cover of the policy. The policy itself must be issued properly and all agency contract and Company underwriting guidelines must be followed before this endorsement can be issued. It is not the intent of the Company to include fraudulent or forged policies within this coverage.

**MODIFICATION**

In the event that modification of an endorsement is requested, it is necessary to consider your state regulatory requirements for filing and approval of forms. If the endorsement is modified, the endorsement is not an ALTA form and should not reference ALTA in the title.  You must obtain the approval of the Company's underwriting adviser before complying with any request for a modification.

Return to Table of Contents

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

ENDORSEMENT
Attached to Policy No. _____
Issued By
**[FNTG BRAND]**


When the policy is issued by the Company with a policy number and Date of Policy, the Company will not deny liability under the policy or any endorsements issued with the policy solely on the grounds that the policy or endorsements were issued electronically or lack signatures in accordance with the Conditions.


This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

[Witness clause optional]




[FNTG BRAND]
BY: _____


ALTA Endorsement Form 39-06
(Policy Authentication) (4/3/13)
©American Land Title

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

ENDORSEMENT MANUAL – Fidelity National Title Group, Inc.                              **SECTION 50**

**Return to Table of Contents**

**CLTA ENDORSEMENT 100-06**

**(SIMILAR TO ALTA FORM 9 Series)**


**PURPOSE**

***THIS ENDORSEMENT IS NO LONGER AVAILABLE IN THIS FORMAT***


In certain parts of the country, this endorsement is used quite frequently with the ALTA loan policies on both residential and commercial transactions.  In other parts of the country its use is limited to large commercial transactions. Similar in scope to the ALTA Form 9 series of endorsements, this endorsement is designed to afford the lender protection with respect to violations of private property restrictions which could impair the lien of the Insured Mortgage or the marketability of the Title.  It also insures against damage to improvements which could result from encroachments onto easements or adjacent property or because of development of minerals.  This endorsement is **not** suitable for use in policies insuring unimproved land.


**SECTIONS OF POLICY AMENDED BY ENDORSEMENT**


This endorsement expands policy coverage by reducing the risk to the Insured with respect to certain Exclusions or Schedule B Exceptions.


**BASIS FOR PROVIDING COVERAGE**


*Coverage **1(a)** may be given if any of the following situations apply:*


1.      There are no covenants, conditions and restrictions.


2.      The covenants, conditions or restrictions are not enforceable under state law.


3.      The restrictions contain provisions that provide protections against impairment or loss of the mortgage lien where the lender is a good faith lender without knowledge of a violation.


4.      Rights to enforce the restrictions have been waived or are subordinate to the Insured Mortgage.


*Coverage **1(b)** may be given if any of the following situations apply:*


© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

1.      There are no covenants, conditions and restrictions.

2.      It has been determined that there are no violations of the covenants, conditions or restrictions.

3.      The statutory period for enforcement of restrictions has run or rights of enforcement of any violation have been properly waived.

*Coverage 1(c) may be given provided:*

Encroachments, if any, disclosed by survey, affidavit, inspection or otherwise are shown on Schedule B.

*Coverage 2(a) may be given if any of the following situations apply:*

Same as Items 1 through 4, under coverage 1(a)

*Coverage 2(b) may be given if any of the following situations apply:*

Same as Items 1 through 4,under coverage 1(a)

**CAUTION:**   IF ANY RESTRICTIONS ON SCHEDULE B CONTAIN PROVISION FOR FORFEITURE OR REVERSION OF TITLE ON THE OCCURRENCE OF A SPECIFIED CONDITION,   THE AFFIRMATIVE INSURANCE  GIVEN  UNDER **1(a) and (b) AND 2(a) and (b)** CANNOT BE GIVEN**.**   THOSE SECTIONS WILL HAVE TO BE DELETED FROM THE ENDORSEMENT.

*Coverage 3(a) may be given if any of the following situations apply:*

1.      No easements are shown in Schedule B.

2.      A survey or other reliable information confirms that existing improvements do not encroach upon any Schedule B easements.

3.      There is a minor encroachment of improvements onto a Schedule B easement, but after consulting with the Company's underwriting advisor, it is determined that the

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

encroachment would not interfere with maintenance of the easement and could not result in the forced removal of the improvements under state law.

*Coverage **3(b)** may be given if any of the following situations apply:*

1.       There is no separation of minerals from the surface estate by either deed or lease.

2.       There is a separate mineral estate but it does not include any rights of surface entry.

**CAUTION:**     IF MINERAL RIGHTS WITH RIGHTS OF SURFACE ENTRY HAVE BEEN SEVERED FROM THE SURFACE ESTATE, BUT THE LAND AND SURROUNDING AREA IS ENTIRELY IMPROVED WITH RESIDENTIAL DEVELOPMENT, YOU MUST SUBMIT THESE FACTS TO THE COMPANY'S UNDERWRITING ADVISER TO CONSIDER THE RISK BEFORE GIVING ANY COVERAGE UNDER 3(b).

*Coverage **4** may be given if any of the following situations apply:*

1.       There are no encroachments onto adjoining land shown in Schedule B.

2.       The encroachment is not onto vacant land, or is minor and could be removed at minimal cost.

3.       The encroachment is minor; is not onto vacant land; is not necessary to the support of the main structure; and the Company's underwriting advisor, being so advised by you, is satisfied that a state court would not require its removal.

**MODIFICATION**

This form is a uniform form in California.  In the event that modification of this endorsement or your state form is requested, it is necessary to consider the state regulatory requirements for filing and approval of forms.  You must obtain the approval of the Company's underwriting advisor before complying with any request for modification.

Return to Table of Contents

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

ENDORSEMENT MANUAL – Fidelity National Title Group, Inc.                    **SECTION 50**

ENDORSEMENT

Attached to Policy No._____

**Issued By**
**[FNTG Brand]**

The Company insures against loss or damage sustained by reason of:

1.        The existence, at Date of Policy, of any of the following:

      (a)        Covenants, conditions or restrictions under which the lien of the Insured Mortgage can be cut off, subordinated, or otherwise impaired;

      (b)        Present violations on the Land of any enforceable covenants, conditions or restrictions;

      (c)        Except as shown in Schedule B, encroachments of buildings, structures or improvements located on the Land onto adjoining lands, or any encroachments onto the Land of buildings, structures or improvements located on adjoining lands.

2.        (a)        Any future violations on the Land of any covenants, conditions or restrictions occurring prior to acquisition of the Title by the Insured, provided such violations result in impairment or loss of the lien of the Insured Mortgage, or result in impairment or loss of the Title if the Insured shall acquire the Title in satisfaction of the Indebtedness;

      (b)        Unmarketability of the Title by reason of any violations on the Land, occurring prior to acquisition of the Title by the Insured, of any covenants, conditions or restrictions.

3.        Damage to existing improvements, including lawns, shrubbery or trees

      (a)        That are located or encroach upon that portion of the Land subject to any easement shown in Schedule B, which damage results from the exercise of the right to use or maintain such easement for the purposes for which the same was granted or reserved;

      (b)        Resulting from the exercise of any right to use the surface of the Land for the extraction or development of the minerals excepted from the description of the Land or shown as a reservation in Schedule B.

4.        Any final court order or judgment requiring removal from any land adjoining the Land of any encroachment shown in Schedule B.

As used in this endorsement, the words "covenants, conditions or restrictions" do not refer to or include the terms, covenants, conditions or restrictions contained in any lease.

As used in this endorsement, the words "covenants, conditions or restrictions" do not refer to or

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

include any covenant, condition or restriction  (a) relating to obligations of any type to perform maintenance, repair or remediation on the Land, or (b) pertaining to environmental protection of any kind or nature, including hazardous or toxic matters, conditions or substances except to the extent that a notice of a violation or alleged violation affecting the Land has been recorded in the Public Records at Date of Policy and is not excepted in Schedule B.

This endorsement is issued as part of the policy.  Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance.  To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls.  Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.


DATED:


BY:  _____
          AUTHORIZED SIGNATURE




CLTA Form 100-06 (03-09-07)
ALTA – Loan Policy

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

ENDORSEMENT MANUAL – Fidelity National Title Group, Inc.                    **SECTION 51**

Return to Table of Contents

**SHARED APPRECIATION MORTGAGE ENDORSEMENT - COMMERCIAL**

**PURPOSE**

This endorsement is designed to provide additional coverage to the lender when the loan documents provide that the lender will participate in the appreciation in value of the property. This endorsement provides coverage in the event of an attack on the validity, priority or enforceability of the Insured Mortgage based upon the provisions regarding shared appreciation. The coverage also includes the value of the shared appreciation pursuant to the formula contained in the loan documentation.

***NOTE:*** *THIS ENDORSEMENT SHOULD NOT BE USED IN CONNECTION WITH LOANS ON ONE TO FOUR FAMILY RESIDENTIAL PROPERTIES. (See Section 30 for a form to be used with residential mortgage programs.)*

**SECTION OF POLICY AMENDED BY ENDORSEMENT**

Since any appreciation will occur in the future, this endorsement specifically provides that the coverage is not subject to Section 3(d) of the Exclusions from Coverage which excludes "Defects, liens, encumbrances, adverse claims or other matters . . . attaching or created subsequent to Date of Policy . . . ."

**BASIS FOR PROVIDING COVERAGE**

1. **State Law:**  Many states have passed legislation specifically authorizing the lender to share in the appreciation of the property.  The state statute must be examined for provisions setting specific limits and formulas, and the loan documents must be reviewed to verify that the loan complies with those limits and formulas.  If the statute has no such limits or formulas, consideration should be given to the possibility that (a) the method of calculation used in the Insured Mortgage, or (b) the extent to which certain additional obligations might continue even after the principal is paid, might be so weighted in the lender's favor as to "shock the conscience" of the court and perhaps render the shared appreciation provisions of the Insured Mortgage invalid, or which could lead to a claim of "clogging" the equity of redemption in a bankruptcy or foreclosure situation.

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

2. **Insured Mortgage must include the formula for calculation:**   The Insured Mortgage must <u>expressly</u> state that it is a Shared Appreciation Mortgage **and** include the actual formula or calculation method used to determine the lender's share.    The formula or calculation method **cannot** simply be incorporated by reference to the provisions of the note or loan agreement.

3. **Loan is not a joint venture:**   Consideration must also be given to whether or not the loan is really a loan.  Could it be recharacterized as a joint venture arrangement with the borrower?  The terms and provisions of the loan documentation must be reviewed for a determination as to the nature and extent of control that the lender will have over the operations of the borrower.  If these controls are extensive and there is a risk that the loan will be recharacterized, then this endorsement should not be issued. Any such issues must be discussed with the Company Underwriting advisor before this endorsement is offered.

This endorsement is designed for use with an ALTA Loan Policy issued in connection with a **commercial** transaction.

## FORM A

When this form is provided, the minimum amount of insurance as stated in the policy shall be the sum of the principal debt plus a reasonable estimate of the amount of "shared appreciation interest".

## FORM B

When this form is provided, a reasonable estimation of the amount of "shared appreciation interest" is added in the second paragraph as additional insurance.  Usury, consumer credit protection or truth in lending laws, and costs required to obtain a determination of the amount of additional interest due are specifically mentioned to reinforce the idea that the express insurance does not cover these matters.

## MODIFICATION

These forms are not uniform forms.  In the event that modification of one or more of these forms or your state form is requested, it is necessary to consider the state regulatory requirements for filing and approval of forms.  You must obtain the approval of the Company's underwriting adviser before complying with any request for modification.

Return to Table of Contents

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

**Form A – Appreciation amounts included within Amount of Insurance**

ENDORSEMENT

Attached to Policy No._____

**Issued by**

**[FNTG BRAND]**

The Company insures the Insured against loss or damage by reason of:

1.       The invalidity or unenforceability of the lien of the Insured Mortgage resulting from the provisions therein which provide for a Shared Appreciation Interest in the increase in value of the Land subsequent to Date of Policy.

2.       Loss of priority of the lien of the Insured Mortgage as security for (i) the unpaid principal balance of the loan; (ii) the Stated Interest; and (iii) the Shared Appreciation Interest, which loss of priority is caused by the provisions in the Insured Mortgage for payment or allocation to the Insured Mortgage for payment or allocation to the Insured of any Shared Appreciation Interest.

"Stated Interest" as used in this endorsement, shall mean only the fixed percent per annum interest on the unpaid principal balance of the loan provided in the Insured Mortgage at Date of Policy.

"Shared Appreciation Interest", as used in this endorsement shall mean only those amounts (calculated pursuant to the formula provided in the Insured Mortgage) payable or allocated to the Insured, out of the amount, if any, by which the Land has appreciated in value as established pursuant to the provisions of the Insured Mortgage at Date of Policy.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

Date:

By _____
        Authorized Signatory

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

ENDORSEMENT MANUAL – Fidelity National Title Group, Inc.                    **SECTION 51**

**Form B- Appreciation amounts added by endorsement**

ENDORSEMENT

Attached to Policy No.

**Issued by**

**[FNTG Brand]**

The Company insures the Insured against loss or damage that the Insured shall sustain by reason of the entry of a final, non-appealable order or judgment finding that the lien of the Insured Mortgage as security for the additional interest based on appreciated value of the Land:

> (a)      is invalid or unenforceable, or

> (b)      does not, at the Date of Policy, share the same priority in relation to any other claims or liens against the Land as is afforded the principal of the loan secured by the Insured Mortgage.

In the event of a loss compensable under this endorsement, the coverage afforded hereunder is in addition to and not included in the Amount of Insurance stated in Schedule A of the policy. Such additional insurance shall not exceed the sum of $_____ (amount to be agreed upon prior to issue.)

Nothing contained in this endorsement shall be construed as insuring against loss or damage sustained or incurred by reason of:

> (a)      usury,

> (b)      any consumer credit protection or truth in lending law, or

> (c)      costs, expenses or attorney's fees required to obtain a determination, by judicial proceedings or otherwise, of the amount of any additional interest due.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

Dated:

By_____

  Authorized Signatory

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

ENDORSEMENT MANUAL – Fidelity National Title Group, Inc.                                         **SECTION 52**

**Return to Table of Contents**

## SHARE OF CASH FLOW (ADDITIONAL INTEREST) ENDORSEMENT

### PURPOSE

This endorsement is designed to provide additional coverage to the lender when the loan documents provide that the lender is entitled to a share of the cash flow or income (net of normal expenses) from the property or business of the borrower as "Additional Interest". The term "Additional Interest" refers to a charge for the use of money other than the percentage rate that is applied to the principal indebtedness. Like the Shared Appreciation Endorsement, it provides not only for monetary loss protection to the lender, but also for the cost of defense against an attack on the validity, priority or enforceability of the lien of the Insured Mortgage upon the net cash flow. The coverage also includes the value of the share of cash flow pursuant to the formula contained in the loan documentation.

### SECTION OF POLICY AMENDED BY ENDORSEMENT

Since the loan documents provide that the additional interest will accrue in the future, the coverage provided by this endorsement is not subject to Section 3(d) of the Exclusions from Coverage which excludes "Defects, liens, encumbrances, adverse claims or other matters ... attaching or created subsequent to Date of Policy...."

### BASIS FOR PROVIDING COVERAGE

1. **State Law**

Some states have passed statutes specifically providing for the charging of "Additional Interest". These statutes must be examined for specific requirements with regard to limits and authorized formulas. If the statute has no such limits or formulas, consideration should be given to the possibility that (a) the method of calculation used in the Insured Mortgage, or (b) the extent to which certain additional obligations might continue even after the principal is paid, might be so weighted in the lender's favor as to "shock the conscience" of the court and perhaps render the shared cash flow provisions of the Insured Mortgage invalid, or which could lead to a claim of "clogging" the equity of redemption in a bankruptcy or foreclosure situation.

2. **Insured Mortgage Must Include The Formula for Calculation**

The Insured Mortgage must state that it secures the payment of the lenders share of cash flow as "Additional Interest" and it must contain the formula for calculation. These requirements **cannot**

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

be accomplished simply by incorporation by reference to the provisions of the note or loan agreement.

3. **Loan is Not a Joint Venture**

Consideration must be given to whether or not the loan is really a loan.   Could it be recharacterized as a joint venture arrangement with the borrower?  The terms and provisions of the loan documentation must be reviewed for a determination as to the nature and extent of control that the lender will have over the operations of the borrower.   If these controls are extensive and there is a risk that the loan will be recharacterized, then this endorsement should not be issued.

Instructions for use

This endorsement is designed for use with the 2006 ALTA Loan Policy insuring mortgages on **commercial** transactions.

**NOTE:** THIS ENDORSEMENT SHOULD NOT BE USED IN CONNECTION WITH LOANS ON ONE TO FOUR FAMILY RESIDENTIAL PROPERTIES.

When this coverage is provided, the minimum Amount of Insurance as stated in the policy shall be the sum of the principal debt plus a reasonable estimate of the amount of additional interest which will be due to the Insured. Some forms of this endorsement may be filed which add the insurance incrementally as the additional interest accrues with a capping amount of additional insurance. Such an endorsement would contain language substantially as follows:

> *In the event of loss compensable under this endorsement, the coverage afforded hereunder is in addition to and not included in the Amount of Insurance stated in Schedule A of the policy.  Such additional insurance shall not exceed the sum of $_____ (amount to be agreed upon prior to issue).*

**MODIFICATION**

This form is not a uniform form.  In the event that modification of this endorsement or your state form is requested, it is necessary to consider the state regulatory requirements for filing and approval of forms.  You must obtain the approval of the Company's underwriting advisor before complying with any request for modification.

Return to Table of Contents

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

ENDORSEMENT MANUAL – Fidelity National Title Group, Inc.                    **SECTION 52**

**Share of cash flow (additional interest)**

ENDORSEMENT
Attached to Policy No. _____

**Issued by**
**[FNTG BRAND]**

The Company insures the Insured against loss or damage that the Insured shall sustain by reason of the entry of a final, non-appealable order or judgment finding that the lien of the Insured Mortgage as security for the additional interest based on a share of cash flow as described in paragraph _____ of the Insured Mortgage:

     (a)    is invalid or unenforceable, or

     (b)    does not, at the Date of Policy, share the same priority in relation to other claims or liens against the Land as is afforded the principal of the loan secured by the Insured Mortgage.

Nothing contained in this endorsement shall be construed as insuring against loss or damage sustained or incurred by reason of:

     (a)    Usury,

     (b)    Any consumer credit protection or truth in lending law, or

     (c)    Costs, expenses or attorney's fees required to obtain a determination, by judicial proceedings or otherwise, of the amount of any additional Interest due.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

Dated:

By_____
       Authorized Signatory

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

ENDORSEMENT MANUAL – Fidelity National Title Group, Inc.                    **SECTION 53**

**Return to Table of Contents**

**ENDORSEMENT INSURING THE INTEREST OF INCOMING PARTNER**

**Form A - for use with 2006 Policy**

**Form B – for use with Former ALTA 1970 (rev. 84) Policy**

**PURPOSE**

This endorsement is to be used when providing coverage to a person or entity that is acquiring an interest as a general partner in a general partnership.  The incoming partner wishes to secure title insurance in its favor to the extent of its investment in the partnership.  This endorsement limits liability for loss to the percentage interest being acquired by the incoming partner in the partnership.

**SECTION OF POLICY AMENDED BY ENDORSEMENT**

This endorsement amends Condition 8(a) of the ALTA Owner's Policy (2006) to limit the liability of the Company with regard to payment of loss.

**CAUTION:** PLEASE REFER TO FORM B FOR THE ENDORSEMENT TO BE USED WITH THE FORMER ALTA 1970 (rev. 84) OWNER'S POLICY.

**BASIS FOR PROVIDING COVERAGE**

Coverage in favor of the new partner may only be given when a full copy of the original partnership agreement and any and all amendments have been reviewed to determine that the partnership was  originally formed in compliance with local law, and the agreement provides  for the substitution and addition of new partners.  Any procedures required by the agreement and local law must be observed.  Also, the addition of new partners cannot cause a dissolution of the partnership under local law.

This endorsement does not increase coverage but limits the payment of loss.  The issuance of this endorsement is a condition to the issuance of the Policy. The Amount of Insurance is to be the proportionate interest in the partnership being acquired by the incoming partner and the Policy should be written observing the following guidelines:

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

ENDORSEMENT MANUAL – Fidelity National Title Group, Inc.                    **SECTION 53**

    a.   The Amount of Insurance would be the market value of the percentage interest being acquired by the new general partner.

    b.   The Insured would be shown as "[*new partner*], owner of a [    ]% interest in the partnership shown as the vestee in this Policy".

    c.   The partnership would be shown as the vestee.

    d.   Schedule B and the legal description would be shown in the normal manner.

This endorsement may not be issued without the approval of the Company's underwriting advisor.

.

## MODIFICATION

These forms are not uniform forms.  In the event that modification of one or more of these forms or your state form is requested, it is necessary to consider the state regulatory requirements for filing and approval of forms.  You must obtain the approval of the Company's underwriting advisor before complying with any request for modification.

Return to Table of Contents

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

ENDORSEMENT MANUAL – Fidelity National Title Group, Inc.                    **SECTION 53**

<u>**Form A – For use with the ALTA  Owners Policy (2006)**</u>

ENDORSEMENT
Attached to Policy No. _____

**Issued by
[FNTG BRAND]**

Section 8(a) of the Conditions is amended to read as follows:

The extent of liability of the Company for loss or damage under this Policy shall not exceed the least of:

(i)  _____% of the actual loss of _____ (of which the Insured Claimant is a partner), or if the interest of the Insured in said partnership is reduced below _____%, such lesser proportion of the actual loss of said partnership; or

(ii)  The Amount of Insurance; or

(iii)  _____% of the difference between the value of the Title as insured and the value of the Title subject to the risk insured against by this policy.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

Date:

BY:_____
          Authorized Signatory

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

**Form B- For use with Policy Formerly known as  ALTA 1970 (rev. 84) Policy Form**

ENDORSEMENT

Attached to Policy No. _____

**Issued by**

[**FNTG BRAND**]

Section 6(a) of the Conditions and Stipulations is amended to read as follows:

    The liability of the Company under this policy shall not exceed the least of:

    (i)    _____% of the actual loss of _____ (of which the insured claimant is a partner), or if the interest of the insured in said partnership is reduced below _____%, such lesser proportion of the actual loss of said partnership; or

    (ii)  The amount of insurance stated in Schedule A.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

Date:

BY:_____

       Authorized Signatory

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

ENDORSEMENT MANUAL – Fidelity National Title Group, Inc.                    **SECTION 54**

**Return to Table of Contents**

## EXCESS INSURANCE ENDORSEMENT FOR USE IN INSURING EXISTING PARTNERSHIP OR INTEREST OF NEW PARTNER IN EXISTING PARTNERSHIP

### PURPOSE

This endorsement is to be used in situations where there is an existing policy in favor of a partnership which was issued by another company or brand.  We are being asked to insure either the partnership currently in title at present market value upon acquisition of a new partnership interest by a new partner *or* the interest of the new partner.  In either event the new Insured is willing to let the Company treat the previous insurance as primary coverage making the new coverage "excess insurance".  This endorsement is designed to accomplish this result.

### SECTION OF POLICY AMENDED BY ENDORSEMENT

This endorsement modifies the policy to provide that loss is recoverable under the policy only to the extent that it exceeds the Insured's recovery under a prior policy.

### BASIS FOR PROVIDING COVERAGE

This endorsement must be made a part of all owners policies insuring continuing partnerships or new partners in continuing partnerships when the Company is accepting the risk under a new policy as an "excess insurer".  The examiner must be satisfied that the partnership was properly formed originally, that the partnership agreement provides for the substitution and/or addition of new partners and that the documentation intended to accomplish the change complies with the requirements of applicable law. A copy of the primary policy must be obtained and examined, and a determination must be made that there are no claims pending based upon the coverage granted thereunder.

### MODIFICATION

This form is not a uniform form.  In the event that modification of this endorsement or your state form is requested, it is necessary to consider the state regulatory requirements for filing and approval of forms.  You must obtain the approval of the Company's underwriting advisor before complying with any request for modification.

Return to Table of Contents

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

ENDORSEMENT MANUAL – Fidelity National Title Group, Inc.                    **SECTION 54**

**Excess Insurance**

ENDORSEMENT

Attached to Policy No. _____

**Issued by**
**[FNTG BRAND]**

The following paragraph 1A is added to the Conditions of this policy:

1A.    THIS IS INSURANCE COVERAGE IN EXCESS OF PREVIOUSLY ISSUED TITLE POLICY OR POLICIES COVERING THE SAME INSURANCE RISK

      (a)    The Title is insured by the following prior title policy or policies:

            1.    Type of policy <u>(owner's-loan)</u> and Date of Policy:_____
                 Insurer:
                 Insured:
                 Policy No.:
                 Amount of Insurance:

            2.    [*Continue same format if more than one prior policy issued.*]

      (b)    It is understood and agreed between the Company and the Insured that the title policy (or policies) referred to in paragraph 1A (a) of these Conditions is primary insurance coverage and that this policy constitutes "excess insurance".  Insurance coverage under this policy which insures a risk insured under any prior policy shall only be available to the Insured for loss in excess of the Insured's recovery under such prior policy.

      (c)    Nothing contained herein shall be construed to preclude the filing of a claim of loss under this policy prior to recovery under a prior policy referred to in Paragraph 1A (a) of these Conditions nor to relieve the Company of its obligations under this policy.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

Dated:

By: _____
        Authorized Signatory

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

ENDORSEMENT MANUAL – Fidelity National Title Group, Inc.                    **SECTION 55**

Return to Table of Contents

## OPTION TO PURCHASE ENDORSEMENT
### FORM A – Option primed by intervening matters
### FORM B – Option priority relates back

### PURPOSE

Form A of this endorsement is designed to provide insurance that **at the date of the endorsement** the option to purchase the Land is valid and that the rights of the optionee thereunder are vested in the Insured, subject to the terms of the option agreement. As explained more fully below, Form A provides no coverage for the priority of the option.

Form B of this  endorsement is designed to provide insurance as to the priority, validity and enforceability  of an option to purchase the Land and that the rights of the optionee thereunder are vested in the Insured as of the date of the endorsement, subject to the terms of the option agreement.

### SECTION OF POLICY AMENDED BY ENDORSEMENT

Form A does not specifically amend any portion of the policy, although it does provide limited coverage to the optionee as to the validity of the option.

Form B of this endorsement does not specifically amend any portion of the policy. It does provide additional coverage to the optionee as to the validity, priority and enforceability of the option, and also provides for payment of costs and attorneys' fees incurred in defending against an attack on the validity, priority or enforceability of the option.  However, this endorsement excludes coverage for costs and attorneys' fees incurred in connection with exercising the option.

### BASIS FOR PROVIDING COVERAGE

*Considerations*

For Form A: This endorsement is designed to be issued in those states where (1) it is uncertain as to whether Title received at the time of the exercise of the option will relate back to the granting of the option or (2) it is clear that it will **not** relate back.

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

<u>For Form B</u>: This endorsement is designed to be issued in those states where it is clear that the option is a recordable instrument and that upon conveyance of the Land pursuant to the option, Title will relate back to the recording of the option.

<u>For Both Forms</u>

The option document must be recorded.

An option to purchase land may be subject to the Rule Against Perpetuities.  Some jurisdictions have exceptions for certain types of options to purchase, such as an option contained in a lease where the option can be exercised during the term of the lease.  However, the majority rule is that an option to purchase is subject to the rule.  This endorsement should **only** be given when it is clear that the option does not violate the rule.

When an option is obtained by a lender as part of a loan transaction, consideration must be given to state law prohibitions against clogging of the equity of redemption.  This should include considering whether the option itself is void or whether, when coupled with the option, the lien of the mortgage might be rendered void or voidable.

Consideration must also be given to whether a lease containing an option to purchase is in fact what it appears to be.  The land records may disclose that the optionee is the previous owner of the Land and the transaction is in fact a sale/leaseback with option to purchase.  Care must be taken to make sure the lease states that it is a true lease and the relationship between the parties is as lessor and lessee only.  Any concern over provisions of the lease must be discussed with the Company underwriting advisor.

*Instructions for Use*

This endorsement may be issued in connection with an ALTA Owner's Policy or an ALTA Owner's Policy with the ALTA 13-06 Leasehold endorsement attached insuring a lessee's interest under a lease.  When used with an ALTA Owner's Policy, the Insured will be the optionee but Title to the fee estate will be shown as being vested in the present owner.  You should **not** describe the option interest as being the estate or interest insured.  In the case of coverage by use of an ALTA Owner's Policy modified to insure a lease, the estate insured will be the Leasehold and Title will be shown as being vested in the name of the lessee of the leasehold estate, which normally will be the same entity that is the optionee.

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

ENDORSEMENT MANUAL – Fidelity National Title Group, Inc.                         **SECTION 55**

**AUTHORITY FOR ISSUANCE OF THIS ENDORSEMENT**

This endorsement may not be issued without the approval of the Company's underwriting advisor, who will consider the issues, including the recharacterization and the clogging problems mentioned above.

**MODIFICATION**

This form is not a uniform form.  In the event that modification of this endorsement or your state form is requested, it is necessary to consider the state regulatory requirements for filing and approval of forms.  You must obtain the approval of the Company's underwriting advisor before complying with any request for modification.

Return to Table of Contents

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

**Option Form A**

ENDORSEMENT

Attached to Policy No. _____

**Issued by**
**[FNTG BRAND]**

The Company insures the Insured against loss or damage that the Insured shall sustain by reason of the entry of a final, non-appealable order or judgment finding that the rights of the Insured in the Option described in paragraph ____of Schedule B ("Option") are at the date hereof invalid, and that the rights of the optionee under the Option are not vested in the Insured subject to the terms and provisions thereof.

The insurance contained herein and in the policy of which this endorsement is a part shall cease and terminate upon the exercise of the Option or on _____, whichever occurs first.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

Dated:

By:_____
          Authorized Signatory

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

**Option Form B**

ENDORSEMENT

Attached to Policy No. _____

**Issued by**
**[FNTG BRAND]**

The Company insures the Insured against loss or damage that the Insured shall sustain by reason of the entry of a final, non-appealable order or judgment finding that  the rights of the Insured in the Option described in paragraph ___of Schedule B ("Option") are not vested in the Insured subject to the terms and provisions thereof.

The Company further insures against loss or damage which the Insured shall sustain by reason of:

1.    The unenforceability of the right to exercise the Option except to the extent that such unenforceability or claim thereof is based on the failure of the Insured to have fulfilled the terms and conditions of the Option.

2.    The priority over the Option of any conveyance made of the fee simple estate in the Land or of any liens or encumbrances created thereon after the Date of Policy, excepting such liens or encumbrances that would affect the Insured had the Insured been the owner of the fee simple Title instead of an Option as of Date of Policy, including, without limitation, real estate taxes, special assessments, demolition liens, drainage liens and water liens.

3.    The entry of a final non-appealable order or judgment that requires the Insured, as condition to receiving specific performance of the Option, to pay a sum in excess of the Option price, other than attorneys' fees and costs of litigation.

Nothing contained in this endorsement shall be construed as insuring the Insured against loss or damage sustained or incurred by reason of:

(a)    Rejection of the Option under the provisions of the Federal Bankruptcy Code or state insolvency laws.

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

(b)      The failure of the Insured to receive all or part of an award entered in a condemnation proceeding unless failure to share in said award stems solely by reason of the entry of a final, non-appealable order or judgment that finds the option invalid or incapable of specific performance.

(c)      The failure of the Insured at the time of payment of the Option price either to have obtained proper conveyances and releases from all persons then having an interest in said Land or a lien or encumbrance thereon (the determination as to the identity of such persons and the nature of the interest, lien or encumbrance owned or claimed to be at the expense of the Insured) or to have obtained a final, non-appealable order or judgment that finds those persons and interests entitled to receive the option price.

(d)      Attorneys' fees and costs in connection with the proceedings mentioned in subparagraph (c) immediately above or in connection with an action to enforce the Option, excluding attorneys' fees incurred to defend an attack on the validity or enforceability of said Option.

(e)       Any lien, or right to a lien, for services, labor or material heretofore or hereafter furnished and imposed by law.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

Dated:

By: _____

       Authorized Signatory

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

ENDORSEMENT MANUAL – Fidelity National Title Group, Inc.                    **SECTION 56**

**Return to Table of Contents**

**ASSIGNMENT OF RENTS ENDORSEMENT-**

**CONTAINED WITHIN INSURED MORTGAGE**

**PURPOSE**

Lenders occasionally request that the loan policy insure certain recorded interests that are taken as additional security for the loan primarily secured by the Insured Mortgage.  The most common additional security, other than a security interest under the Uniform Commercial Code, is an assignment of rents (leases).

This endorsement is to be issued to provide certain coverages with respect to an assignment of rents (leases) that is contained within the Insured Mortgage. This endorsement provides insurance that the Public Records do not disclose any prior assignments of these same rents (leases).  Please see Section **37** for the issuance of an endorsement insuring a separately recorded assignment of rents (leases).

**SECTION OF POLICY AMENDED BY ENDORSEMENT**

This endorsement does not amend or modify any specific policy provisions, but adds additional coverage to the terms of the policy.

**BASIS FOR PROVIDING COVERAGE**

Verify that the Public Records do not disclose any prior assignments of rents (leases). If a previously recorded assignment of rents (leases) is found, it must be raised as an exception in Schedule B of the policy.

**NOTE:**  PRIOR MORTGAGES OR DEEDS OF TRUST MUST BE EXAMINED TO DETERMINE IF THEY CONTAIN ASSIGNMENTS OF RENTS (LEASES) WITHIN THEM.  SEPARATE SCHEDULE B EXCEPTIONS SHOULD BE MADE FOR SUCH ASSIGNMENTS.

**MODIFICATION**

This form is not a uniform form.  In the event that modification of this endorsement or your state form is requested, it is necessary to consider the state regulatory requirements for filing and approval of forms.  You must obtain the approval of the Company's underwriting advisor before complying with any request for modification.

Return to Table of Contents

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

**Assignment of rents (leases) contained in Mortgage**

## ENDORSEMENT

Attached to Policy No. _____

**Issued by**
**[FNTG BRAND]**

The Company insures the Insured against loss which said Insured shall sustain by reason of the existence, as shown by the Public Records, of any assignment of the rents (leases) prior to the assignment of rents (leases) contained in the Insured Mortgage, other than as set forth in Schedule B.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

ENDORSEMENT MANUAL – Fidelity National Title Group, Inc.                    **SECTION 57**

**Return to Table of Contents**

## ISSUANCE OF FUTURE INSURANCE

### PURPOSE

This endorsement is designed to provide assurance that within a stipulated period of time we will increase the Amount of Insurance under the current policy or issue a new policy to a party designated by the Insured, subject only to then current underwriting practices and subsequent matters of record, and only if there are no claims or adverse title matters pending.

### SECTION OF POLICY AMENDED BY THE ENDORSEMENT

This endorsement does not amend or modify any section of the policy.

### BASIS FOR PROVIDING COVERAGE

This endorsement may be issued when the Insured will be acquiring a new interest or entering into a new security arrangement at a later date.  It is **not** to be used as a substitute for a binder or commitment.  Application for this endorsement **must** state the subsequent transaction for which the Insured desires insurance.  This endorsement **must** contain a time limitation on the right of the insured to request the issuance of a new policy.

### FORM A

This form does **not** obligate the Company to increase the amount of insurance in the face of a previously existing unknown defect in title, and is the **preferred form** for use in other than new construction.

### FORM B

This form obligates the Company to increase the Amount of Insurance and is to be used only in new construction situations where the original Amount of Insurance represents the value of the raw land and there is no construction loan to be insured. The new policy or endorsement should raise any matters which were created, first appeared in the Public Records, attached or  became Known to either the Insured or the Company subsequent to the date of the original policy, which could include pending claim matters. The form also obligates the Insured to apply for an increase in the Amount of Insurance either upon completion of the construction or within five years from the Date of Policy, whichever first occurs.

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

**MODIFICATION**

These forms are not uniform forms.  In the event that modification of one or more of these forms or your state form is requested, it is necessary to consider the state regulatory requirements for filing and approval of forms.  You must obtain the approval of the Company's underwriting advisor before complying with any request for modification.

Return to Table of Contents

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

ENDORSEMENT MANUAL – Fidelity National Title Group, Inc.                    **SECTION 57**

**FORM A**

## ENDORSEMENT

Attached to Policy No. _____

**Issued by**
**[FNTG BRAND]**

The Company agrees that if, within _____ years after the Date of Policy, application is made to increase the Amount of Insurance or to issue a new policy, it will issue additional title insurance policies, or increase the Amount of Insurance of this policy insuring such Title or interest as may then exist in the Insured or the Insured's designee. The Amount of Insurance to be issued will not exceed the amount of the mortgage to be placed on the Land or the fair market value of the Land at the date of the application. In the event a claim has been made or is pending against the Company, or a defect in Title has been discovered, the Company shall not be required to issue insurance for an amount greater than the face amount of this policy as to the defect discovered or resulting in said claim. Upon receipt of the application to issue a subsequent policy or increase the Amount of Insurance of this policy, the Company will extend its examination of the Title to the then current date, and will then issue its policy or increase the Amount of Insurance of this policy, subject to such matters created, first appearing in the Public Records, or attaching subsequent to the effective date of this policy, or which have become Known to either the Insured or the Company.

The insurance to be issued shall be subject to underwriting practices, rules, regulations and rates in effect at the date the subsequent insurance coverage is issued. The Company shall not be obligated to issue additional insurance coverage which would exceed the amount of the usual reinsurance retention of the Company if, after the exercise of reasonable effort, the Company is unable to obtain reinsurance or coinsurance as may be required in order for it to issue the full amount of additional insurance for which application is made.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

**FORM B**

## ENDORSEMENT

Attached to Policy No. _____

**Issued by**
**[FNTG BRAND]**

The Insured agrees to apply for an increase in the Amount of Insurance to cover the value of the actual improvements constructed on the Land and pay the charges then applicable for such increased insurance upon completion of construction of such improvements or within 5 years after the Date of Policy, whichever first occurs.  The Company agrees that when such application is made to increase the Amount of Insurance  and/or to issue a new policy to the then Insured under the policy, and/or to issue a policy to such mortgagee(s), trustee(s) under deed(s) of trust, beneficiary(s) of deed(s) of trust, parties to sales and leasebacks or other types of financial transactions (hereinafter severally and collectively, as indicated by the context, referred to as "Lending Institution(s)") as may be designated by the present Insured or the then Insured under the policy, it will issue additional title insurance coverage insuring such Title and/or interest as may then exist in the Insured and/or Lending Institution in and to said premises in an amount equal to the value of the Land on the date of said application; provided the Company may then extend its examination of the Title to the then current date and, subject to such matters, if any, created, first appearing in the Public Records, attaching and/or which have become Known to either the Insured or the Company subsequent to the effective date of this policy, will increase its liability to the requested amount upon payment of its usual charges for such additional insurance coverage; and further provided, however, that the Company shall not be obligated to issue additional insurance coverage which would exceed the amount of the usual reinsurance retention of the Company if, after the exercise of its reasonable efforts, it is unable to obtain such reinsurance or coinsurance as may be required in order for it to issue the full amount of additional insurance for which application is made. The insurance to be issued shall be subject to underwriting practices, rules, regulations and rates in effect at the date the subsequent insurance coverage is issued.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

ENDORSEMENT MANUAL – Fidelity National Title Group, Inc.                     **SECTION 58**

Return to Table of Contents

**COVENANTS RUNNING WITH THE LAND**

**(CLTA ENDORSEMENT NO. 124.1)**

**PURPOSE**

This endorsement is sometimes called a "shopping center endorsement" or CLTA 124.1 and is typically requested in connection with multiple owner shopping center developments.  Normally, the owners of the various parcels of property within a shopping center will enter into an agreement under which covenants will be made for each other's benefit to do or not to do certain acts with regard to the use, repair, maintenance or improvement of, or payment of taxes and assessments on the property of the respective covenantors. This endorsement provides assurance that conforming covenants will be binding upon the covenantors and their successors in ownership, subject to the limitations contained in the endorsement. In other words, the instrument containing the covenants will give constructive notice to subsequent owners and lenders of the other parcels that there are burdens on their parcels. It does NOT insure the enforceability of those covenants, and any request for that type of coverage should be refused.

**SECTION OF POLICY AMENDED BY ENDORSEMENT**

This endorsement does not amend any section of the title policy.  It expands the coverage of the policy by insuring the binding effect of both negative and affirmative covenants benefiting the insured Land and burdening other lands **not** included within the insured Land.

**BASIS FOR PROVIDING COVERAGE**

This endorsement is only available in those states which have sufficient legal precedent establishing criteria essential for creation of covenants that run with the land and are binding upon subsequent owners.  Counsel must tailor insurance requirements including the form of insurance coverage to fit state law requirements.

**AUTHORITY FOR ISSUANCE OF THIS COVERAGE**

This endorsement shall not be issued without approval by the Company's underwriting advisor.

**No insurance shall be issued in a form which would insure enforceability or compliance with any such covenants.**

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

ENDORSEMENT MANUAL – Fidelity National Title Group, Inc.                    **SECTION 58**

**MODIFICATION**

This form is not a uniform form.  In the event that modification of this endorsement or your state form is requested, it is necessary to consider the state regulatory requirements for filing and approval of forms.  You must obtain the approval of the Company's underwriting advisor before complying with any request for modification.

Return to Table of Contents

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

ENDORSEMENT MANUAL – Fidelity National Title Group, Inc.                    **SECTION 58**

ENDORSEMENT

Attached to Policy No.____

**Issued By**

**[FNTG BRAND]**

The Company insures against loss or damage sustained by reason of the failure of the covenants of the covenantor in favor of the covenantee set out in Section(s) _____ of the instrument recorded _____ to do or refrain from doing some act relating to the use, repair or maintenance of the improvements , or payment of taxes and assessments on the real property, or some part thereof, described as (description of burdened land of covenantor) to be binding upon the covenantor and each successive owner, during his ownership of any portion of such real property, and upon each person having any interest therein derived from the covenantor or through any such successive owner thereof, except a mortgagee of a mortgage, or the trustee or beneficiary of a deed of trust, while not in possession of such real property in such capacity.

Provided, however, that no insurance coverage is provided by this Endorsement should such covenants fail to bind a successive owner who derives Title through: a) a tax deed; b) a foreclosure of a bond or assessment; c) enforcement of a federal tax lien; d) a bankruptcy, as trustee or otherwise; e) a right or lien existing prior to the date of recording of the instrument containing said covenants.

This endorsement does not insure against loss or damage which the Insured may sustain by reason of the non-performance of any said covenants.

This endorsement is issued as part of the policy.  Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance.  To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls.  Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

DATED:

BY: _____
          AUTHORIZED SIGNATURE

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

CLTA FORM 124.1-06 (03-09-07)

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

ENDORSEMENT MANUAL – Fidelity National Title Group, Inc.                    **SECTION 59**

Return to Table of Contents

## REVOLVING CREDIT MORTGAGE ENDORSEMENTS

### PURPOSE

These endorsements provide coverage for the enforceability and priority of the lien of the Insured Mortgage as security for revolving credit loan advances.  There are four endorsements.  Each is designed to apply to one of the four general legal patterns for future advance mortgages in the United States. See also Section 14 for ALTA endorsements that may be used, if appropriate, to insure the priority of advances made under a revolving credit facility.

### SECTION OF THE POLICY AMENDED BY ENDORSEMENT

Each endorsement modifies Exclusions from Coverage No. 3(d) and Conditions No. 1 (d)(ii). They also expand the coverage granted by Covered Risks 9 and 10 to those amounts included within the definition of Indebtedness at Condition 1(d) by using and defining the term "Advances" to include those amounts.

### BASIS FOR PROVIDING COVERAGE

**Preliminary Considerations**

*Security*

To secure repayment of *future advances* of funds by the lender, the mortgage or deed of trust must provide for such future advances.  The mortgage does not need to provide for revolving credit unless the principal balance could be paid down to zero and then funds could be re-advanced under the note. If that happens (which is not unusual in a revolving line of credit) the security instrument may not secure subsequent future advances (or re-advances) unless the parties agree that it will.

Under Section 549 of the Bankruptcy Code, the bankruptcy trustee of a borrower may have the power to avoid the lien of a mortgage or trust deed to the extent it secures advances made after the lender has notice of the bankruptcy.  The recording or filing of a copy of the petition, or a notice that the petition has been filed, is sufficient to give the lender that notice. The courts have construed notice very broadly. Therefore, draws against a revolving credit line and other loan advances which are funded after a bankruptcy filing may be in jeopardy of being unsecured.

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

*Priority*

The priority of the mortgage or deed of trust as security for future advances depends upon the factors discussed below.  The problems arise where a lien or encumbrance is created or attaches after recording of the mortgage or trust deed but prior to a future advance.

**Ordinary Liens and Encumbrances**

*Notice*

In order for a future advance to have priority over an intervening matter, the mortgage or trust deed must have given notice at the time it was originally recorded that it would secure future advances. For purposes of this coverage, which deals with future advances, repayment and re-advances, the Insured Mortgage must contain whatever language about future advances or revolving credit that may be required under state law to give constructive notice and establish priority.

*Obligation to Advance*

Whether the lender is obligated to make the advance at the time the intervening party's lien or encumbrance attaches to the borrower's Title is important to priority in most states.  If the lender is legally obligated to make the advance at the time ("**obligatory advance**"), the lien securing it is prior to the lien or encumbrance of the intervening party.  An advance is obligatory if the lender could be successfully sued for damages if it did not make it. The obligation to advance may have some conditions ("the borrower must be alive", "the borrower must still own the property"), but these conditions must be objective and not subjective on the part of the lender.  Therefore, any conditions on the lender's obligation to fund must <u>not</u> be under the lender's control. If the lender is not obligated to fund after any lien or encumbrance attaches to the Title, advances made after the attachment of such a lien are optional ("optional advance").  An advance can start as obligatory, but if a lender chooses to advance when a condition has not been met the advance becomes optional. The rule differs among the states as to the priority of an optional advance over an intervening matter:

<u>Majority Rule</u>:  A future advance mortgage lien is prior if the lender does not have **actual** notice of the intervening matter at the time of the advance. Thus the advance will have priority over intervening matters even if recorded so long as the lender does not have actual knowledge of them.

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

_Minority Rule_:    A future advance mortgage lien is prior if the lender has neither **actual** nor **constructive** notice of the intervening matter at the time of the advance. A future advance will lose priority to either an unrecorded intervening matter of which the lender has knowledge or an intervening matter which has been recorded which is not known to the lender.

Unless the agreement between the lender and borrower provides for a cure by the borrower, any advance made after a default by the borrower is an optional advance.  Where an obligatory advance agreement contains a cure provision, advances made after cure are again obligatory. Therefore they would be entitled to priority over encumbrances attaching after cure but before the advance.  Advances made after default and before cure would be treated as optional advances.

**Special Cases:  Federal Tax Liens, Mechanics' Liens and Environmental Protection Liens**

_Federal Tax Liens_

There is some argument about the priority of federal tax liens with respect to the security for disbursements under a construction loan.  Under the worst case view, the construction loan mortgage lien has the same priority over federal tax liens as it would have over a judgment lien under state law.

However, **no advance** made under an ordinary future advance mortgage is protected against a federal tax lien recorded after the mortgage where the advance is made (1) more than 45 days after the recording of the tax lien notice or (2) after **actual** notice of the tax lien, whichever occurs first.  Whether the advance is optional or obligatory is immaterial.

_Mechanics' Liens (Construction Liens)_

The law of many states would give mechanics' liens priority over the lien of the Insured Mortgage. In some states, this is limited to those mortgages or trust deeds which finance the construction out of which the liens arise.  Other states may treat mechanic's liens like other types of liens with respect to future advance mortgages if the mortgage was recorded before the visible commencement of construction. The effect of mechanics' liens on the priority of future advances must always be considered.

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

*Environmental Protection Liens*

Currently, federal law and the laws of many states create governmental liens to secure repayment for the cost of cleaning the environment of toxic or hazardous waste.  These liens may also secure repayment for the damage done to the environment.  Under some state laws, these liens have priority over existing liens.  It is possible for them to be created without recording or filing in the local real estate records. The impact of such liens on the priority of future advances is uncertain.

**Forms of Coverage**

Subject to any state regulatory requirements which may exist, the following endorsements are preferred for providing of revolving credit advances:

For *obligatory* advance loans:
> Revolving Credit Endorsement A
> Revolving Credit Endorsement B

For *optional* advance loans:
> Revolving Credit Endorsement C
> Revolving Credit Endorsement D

**Effect of the Endorsements**

*Common features*

All of the endorsements relax the limitation of liability imposed by the Conditions and Exclusions from Coverage noted above, to the extent of the insurance they provide.  However, they do not cover disbursements made after the borrower no longer has Title to the Land.  All of these forms eliminate coverage for advances made after notice that the borrower has become a debtor in a bankruptcy case.

*Differences*

*These endorsements differ only in the scope of the exclusion from coverage in* **Paragraph e**. *of the Endorsement.*

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

ENDORSEMENT MANUAL – Fidelity National Title Group, Inc.                                    **SECTION 59**

<u>Endorsements A and B cover obligatory advance agreements.</u>

**Paragraph e**. excludes from priority only those advances made after the lender is no longer obligated to fund them. After that point, the law will treat advances as optional.  The endorsements differ from each other in their treatment of advances made after default or some other event excusing the lender from its funding obligations.

Endorsement A is for use in the majority law states. (Lender must have actual knowledge of intervening matter).

Endorsement B is tailored for the minority view. (Lender has actual or constructive knowledge of intervening matter).

<u>Endorsements C and D cover optional advance agreements.</u>

Endorsement C is for optional advance loans in those states applying the majority rule.  It gives no insurance of priority over matters Known (which under the policy means *actually known*) to the insured before the advance of funds.

Endorsement D is for optional advance loans in those states adopting the minority position.  It denies priority coverage against intervening encumbrances either actually or constructively known to the Insured before the advance of funds. In other words, it does not insure priority over subsequently recorded liens.

*Instructions for Issuance*

**You must check with the Company's underwriting advisor to see which forms are available in your state and whether any modification of these instructions is necessary.**  While the forms here should be sufficient for the majority of states, there may be statutes or court decisions in some states which have not been considered.  If no modification is required, you are authorized to proceed as follows:

1.      Determine that the Insured Mortgage clearly states that it secures future advances.  The statement that it secures a revolving line of credit or a revolving credit agreement is sufficient.  You must not issue any of these endorsements if the Insured Mortgage is not clear on this point.

2.      Determine whether or not it is possible for the lender to make advances after the loan balance is paid down to zero ("zero balance").  If it is, then either the Insured Mortgage must stipulate that advances made thereafter are secured or the law in your state must

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

so provide.  If neither is the case, you must either require that the Insured Mortgage be modified to provide for this or decline to issue the endorsement.

3.    Determine whether the state where the land lies applies the majority or minority rule on priority of **optional** advances.  **Consult the Company's underwriting advisor when making this determination.**

**If the minority rule is applied, you must not issue Endorsements A or C.**  If there is no law on which rule will be applied, then you may issue Endorsements A or C **only to loan policies insuring second or lower priority mortgages or deeds of trust on individual single family residential houses or condominiums.**  However, Endorsement A may only be issued if the lender is obligated to make the future advances.  (See No. 4, below)

4.    Determine whether the advances are initially obligatory or optional.  **If they are optional, neither Endorsement A nor Endorsement B may be issued.**  Agreements ("insecurity clauses,") which provide that lender is not obligated to fund if, at any point, it believes the borrower has become incapable of repaying the loan, should be considered optional advance agreements.  If in doubt, advances should be treated as optional.

If advances are initially obligatory, Endorsements A or B may be issued.  Endorsement A should be issued in states which apply the majority law on optional advances.  Endorsement B should be used in those states applying the minority law.  However, if one or more events other than a default by the borrower excuses the lender's obligation to make a further advance, those events must be added at the end of paragraph **e**. in these endorsements. If the agreement characterizes the only events relieving the lender's obligation as events of default, then no additional language is necessary in the endorsement.

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

**Selection of endorsement-summary table**

| State law on **optional** advances | **Nature of Advances** | |
|---|---|---|
| | Obligatory | Optional |
| Majority Law | A, B*, C*, D* | C,D* |
| Minority Law | B, D* | D |
| Law unsettled | A**, B | C**, D |

\* Provides less than the maximum coverage available.

\*\*For use only with second or lower priority mortgages on single family residences (see instructions, above.)

5.       You are authorized to delete the exception for mechanic's liens (paragraph **d.**) from any of these endorsements issued to loan policies covering second or lower priority mortgages on single family residence, where advances are obligatory.   **Contact the Company's underwriting advisor to determine if deletion of this exception is appropriate under any other circumstances.**

6.       If you are asked to extend the coverage of Endorsements A or B to disbursements made after a cure of a default or other event which excused the lender's obligation to fund, you may add the following language to the end of **Paragraph e**. after you have made the determination stated below:

> **but prior to a cure of said default [or other event eliminating lender's obligation to fund (if applicable)].**

To do this, you must determine that either the note or the revolving credit agreement reobligates the lender to fund after the occurrence of some stated event which cures the default.  The most usual event would be the borrower bringing his account current within a certain period of time.

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

**Any questions you may have about these instructions should be directed to the Company's underwriting advisor.**

## MODIFICATION

These forms are not uniform forms.  In the event that modification of one or more of these forms or your state form is requested, it is necessary to consider the state regulatory requirements for filing and approval of forms.  You must obtain the approval of the Company's underwriting advisor before complying with any request for modification.

Return to Table of Contents

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

**Revolving Credit Endorsement A - Obligatory Advances – [Majority Law]**

**ENDORSEMENT**

Attached to Policy No. _____

**Issued by
[FNTG BRAND]**

Any advance made by the Insured after Date of Policy is included within the coverage of this policy if:

1.      The advance is made pursuant to [name of future agreement], according to its terms at Date of Policy, and

2.      The party shown in Schedule A as vested in Title is so vested at the time of the advance and is not at that time a debtor in a bankruptcy case of which the Insured has actual or constructive notice.

The Company insures the Insured against loss the Insured shall sustain by reason of the priority of any lien or encumbrance over the lien of the Insured Mortgage as security for any such advance, except for any of the following:

      a.      Any lien or encumbrance which appears in Schedule B.

      b       Any tax or assessment which becomes a lien after Date of Policy.

      c.      Federal tax liens of which the Insured has actual or constructive notice arising subsequent to Date of Policy and prior to the making of the advance.

      d.      Any lien, or right to a lien, which is imposed by law to secure payment for labor, services or materials supplied after Date of Policy.

      e.      Any lien or encumbrance, arising after Date of Policy and prior to the making of the advance, of which the Insured has actual notice at the time the advance is made, if the advance is made after an event of default by the borrower or after [indicate other event eliminating lender's obligation to fund].

      f.      Any environmental protection lien arising after Date of Policy.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

ENDORSEMENT MANUAL – Fidelity National Title Group, Inc.                                    **SECTION 59**

**Revolving Credit Endorsement B - Obligatory Advances – [Minority Law]**

**ENDORSEMENT**

Attached to Policy No. _____

**Issued by
[FNTG BRAND]**

Any advance made by the Insured after Date of Policy is included within the coverage of this policy if:

1.      The advance is made pursuant to [name of future agreement], according to its terms at Date of Policy, and

2.      The party shown in Schedule A as vested in Title is so vested at the time of the advance and is not at that time a debtor in a bankruptcy case of which the Insured has actual or constructive notice.

The Company insures the Insured against loss the Insured shall sustain by reason of the priority of any lien or encumbrance over the lien of the Insured Mortgage as security for any such advance, except for any of the following:

        a.      Any lien or encumbrance which appears in Schedule B.

        b.      Any tax or assessment which becomes a lien after Date of Policy.

        c.      Federal tax liens of which the Insured has actual or constructive notice arising subsequent to Date of Policy and prior to the making of the advance.

        d.      Any lien, or right to a lien, which is imposed by law to secure payment for labor, services or materials supplied after Date of Policy.

        e.      Any lien or encumbrance, arising after Date of Policy and prior to the making of the advance, of which the Insured has actual or constructive notice at the time the advance is made, if the advance is made after an event of default by the borrower or after [indicate other event eliminating lender's obligation to fund].

        f.      Any environmental protection lien arising after Date of Policy.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

ENDORSEMENT MANUAL – Fidelity National Title Group, Inc.                    **SECTION 59**

## Revolving Credit Endorsement C - Optional Advances -[Majority Law]

**ENDORSEMENT**

Attached to Policy No. _____

**Issued by**
**[FNTG BRAND]**

Any advance made by the Insured after Date of Policy is included within the coverage of this policy if:

1.      The advance is made pursuant to [name of future agreement], according to its terms at Date of Policy, and

2.      The party shown in Schedule A as vested in Title is so vested at the time of the advance and is not at that time a debtor in a bankruptcy case of which the Insured has actual or constructive notice.

The Company insures the Insured against loss the Insured shall sustain by reason of the priority of any lien or encumbrance over the lien of the Insured Mortgage as security for any such advance, except for any of the following:

a.      Any lien or encumbrance which appears in Schedule B.

b.      Any tax or assessment which becomes a lien after Date of Policy.

c.      Federal tax liens of which the Insured has actual or constructive notice arising subsequent to Date of Policy and prior to the making of the advance.

d.      Any lien, or right to a lien, which is imposed by law to secure payment for labor, services or materials supplied after Date of Policy.

e.      Any lien or encumbrance, arising after Date of Policy and prior to the making of the advance, of which the Insured has actual notice at the time the advance is made.

f.      Any environmental protection lien arising after Date of Policy.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

ENDORSEMENT MANUAL – Fidelity National Title Group, Inc.                    **SECTION 59**

**Revolving Credit Endorsement D - Optional Advances – [Minority Law]**

**ENDORSEMENT**

Attached to Policy No. _____

**Issued by**
**[FNTG BRAND]**

Any advance made by the Insured after Date of Policy is included within the coverage of this policy if:

1.      The advance is made pursuant to [name of future agreement], according to its terms at Date of Policy, and

2.      The party shown in Schedule A as vested in Title is so vested at the time of the advance and is not at that time a debtor in a bankruptcy case of which the Insured has actual or constructive notice.

The Company insures the Insured against loss the Insured shall sustain by reason of the priority of any lien or encumbrance over the lien of the Insured Mortgage as security for any such advance, except for any of the following:

a.      Any lien or encumbrance which appears in Schedule B.

b.      Any tax or assessment which becomes a lien after Date of Policy.

c.      Federal tax liens of which the Insured has actual or constructive notice arising subsequent to Date of Policy and prior to the making of the advance.

d.      Any lien, or right to a lien, which is imposed by law to secure payment for labor, services or materials supplied after Date of Policy.

e.      Any lien or encumbrance, arising after Date of Policy and prior to the making of the advance, of which the Insured has actual or constructive notice at the time the advance is made.

f.      Any environmental protection lien arising after Date of Policy.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

ENDORSEMENT MANUAL – Fidelity National Title Group, Inc.                              **SECTION 60**

**Return to Table of Contents**

## LAST DOLLAR ENDORSEMENT

### (FOR USE WITH POLICY FORMS OTHER THAN THE ALTA 2006 LOAN POLICY)

### PURPOSE

This endorsement is designed to provide coverage to the lender in a situation where the loan amount exceeds the value of the real property.  This situation commonly occurs, for example, in the financing of an ongoing business.  The real property is often only a small part of the purchase price that is being borrowed. [Without this coverage, the liability under the policy could be reduced to zero by the repayment of the principal long before the entire debt is retired.]

### SECTION OF POLICY AMENDED BY ENDORSEMENT

Condition and Stipulation 9 REDUCTION OF INSURANCE of the 1987, 1990 and 1992 ALTA Loan Policy (Section 8 in 1970 version) provides for the reduction of liability by the repayment of the principal of the indebtedness.  Condition and Stipulation 7 DETERMINATION AND EXTENT OF LIABILITY (Section 6 in 1970 version) defines the loss under the loan policy as the unpaid principal indebtedness as reduced under the Condition and Stipulation 9 (Section 8 in the 1970 version).  This endorsement amends these two sections to provide that the repayment of the debt will first be applied to reduce the amount of the indebtedness **in excess** of the liability under the policy.  This would result in the insurance provided under the policy not being reduced by repayment until the outstanding balance of the debt equals the amount of liability under the policy.  At that point, the liability would be reduced, *pro tanto* (or dollar for dollar), by subsequent repayment of the debt.  The policy would then provide coverage to the *last dollar* of indebtedness.

ALTA structured the 2006 Loan Policy in such a way that this endorsement is no longer needed. Condition 9. LIMITATION OF LIABILITY no longer contains the provision that the Amount of Insurance is reduced by the repayment of principal *pro tanto*.  Rather, the definition of Indebtedness under Conditions 1. (d) provides that the amount of the Indebtedness (not the Amount of Insurance)  is reduced by the total of all payments and by any amount forgiven. The result is that as long as the Indebtedness does not fall below the Amount of Insurance, coverage will not be reduced by repayment of principal.

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

ENDORSEMENT MANUAL – Fidelity National Title Group, Inc.                    **SECTION 60**

**BASIS FOR PROVIDING COVERAGE**

**This endorsement cannot be used with the ALTA 2006 Policy Form.**

Care must be taken to make sure that the form and/or rate is filed in those states that require filing.

If the mortgage collateralizes a revolving line of credit, this endorsement should be modified to reflect that it covers money paid and repaid under the revolving credit agreement.

**MODIFICATION**

This form is not a uniform form.  In the event that modification of this endorsement or your state form is requested, it is necessary to consider the state regulatory requirements for filing and approval of forms.  You must obtain the approval of the Company's underwriting advisor before complying with any request for modification.

Return to Table of Contents

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

**Last Dollar Endorsement (For 1987, 1990 and 1992 versions)**

**ENDORSEMENT**

Attached to Policy No. _____

**Issued by**

**[FNTG Brand]**

The Company has been advised by the insured that the mortgage insured herein secures an indebtedness to the insured in an amount in excess of the amount of this policy.  The Company agrees that in calculating the amount of indebtedness secured by the insured mortgage under paragraphs 7 and 9 of the Conditions and Stipulations of this policy, payments made to reduce the amount of said indebtedness (except payments made by the Company pursuant to provisions of this policy) shall be deemed applied first to the portion of said indebtedness that is in excess of the amount of insurance stated in Schedule A.

Furthermore, it is agreed that the books and records of the insured with respect to the payment of the indebtedness secured by the mortgage shall be conclusive evidence of the application of payments of the indebtedness.  Said books and records shall be kept according to any proper and recognized method of accounting for payment of secured obligations.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

Dated:

By:_____

        Authorized Signatory

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

ENDORSEMENT MANUAL – Fidelity National Title Group, Inc.                    SECTION 61

**Return to Table of Contents**

## TAX CREDIT BENEFIT ENDORSEMENT

### PURPOSE

These endorsements are often requested in conjunction with the issuance of an Owners Policy covering Land that has been developed in such a way as to afford the owners or the investors certain tax credits, such as Low Income Housing Tax Credits, under the IRS Code.

### SECTIONS OF POLICY AMENDED BY ENDORSEMENT

These endorsements indirectly modify Condition 8 of the Owners Policy by recognizing the value of the loss of the tax benefit as a basis for loss under the policy. Without these endorsements, the value of the Title may not take into consideration any value of the Tax Benefit that was lost due to a title issue. The market value of the Land may be enhanced by the special tax treatment that the owner enjoys.

### BASIS FOR PROVIDING COVERAGE

There are 3 forms of Endorsement attached.

- The Tax Benefit Endorsement-Insured which runs to the benefit of the named Insured
- The Tax Benefit Endorsement [*limited partner/member*] which runs to the benefit of a specific investor in the Insured.
- The Tax Benefit Endorsement – No Increase in Amount of Insurance benefits the named Insured

The first two endorsements shown contain a separate amount of insurance which is in addition to the Amount of Insurance afforded under the Policy and for which a separate premium based on the specific increased amount of liability  needs to be charged and collected at the current rates. The third endorsement expands the basis for loss under the policy generally, and should have a risk premium attached to it, even though the Amount of Insurance is not increased, since this is additional coverage that would not be afforded by the policy without the endorsement.

The Tax Benefit Endorsement-[*limited partner/member*] should be customized to name the investor  and describe the specific type of investor (member or limited partner) and then name the entity that is being insured in the underlying Policy. The Additional Insured under this endorsement is different party than the Insured under the Policy.

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

**MODIFICATION**

This form is not a uniform form.  In the event that modification of this endorsement or your state form is requested, it is necessary to consider the state regulatory requirements for filing and approval of forms.  You must obtain the approval of the Company's underwriting advisor before complying with any request for modification, including the referencing of other sections of the Tax Code.

Return to Table of Contents

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

**Tax Benefit Endorsement-Insured**

**ENDORSEMENT**

Attached to Policy No._____

**Issued by**
**[FNTG BRAND]**

**Amount of Insurance: $**_____

For purposes of this Endorsement, the following general provisions shall apply:

> (a)    The term "Tax Benefit" shall mean the Low Income Housing Credit pursuant to Section 42 of the Internal Revenue Code of 1986, as amended (the "Low Income Housing Credit"). The Company acknowledges that Improvements constructed upon the land described in Schedule A may be treated by the Insured as low-income buildings pursuant to said Section 42.

> (b)    The term "Tax Benefit Loss" shall mean that, as a result of a matter falling within the insuring provisions of the Policy, subject to the Exclusions, Exceptions and Conditions of the Policy, the Insured is not able to claim the Low Income Housing Tax Credit or is required to recapture all or any portion of the Low Income Housing Tax Credit.

If a defect in the Title insured against in the Policy results in a Tax Benefit Loss, the Company agrees to pay to the Insured the amount which the Insured is required to pay, and does pay, or which the Insured is unable to claim, by reason of the application of the Internal Revenue Code of 1986, as amended, now and hereafter in effect.  The Company's obligations to pay the Insured under this Endorsement: (a) does not affect or modify and is in addition to the Company's obligations to pay the Insured under the Policy for any loss or damage incurred by the Insured under the Policy; (b) does not reduce the Amount of Insurance of the Policy; and (c) is limited to the amount of insurance stated above on this Endorsement. Any payment under this Endorsement shall reduce the Company's liability hereunder and the amount of insurance under this Endorsement shall be reduced by a corresponding amount.

The Company shall not be obligated for any costs, attorneys' fees or expenses incurred by any Insured under the Policy or this Endorsement in defending or establishing the Tax Benefit.

This endorsement is issued as part of the policy.  Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy or (iv) increase the Amount of Insurance.  To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls.  Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements to it.

[Witness Optional]

DATED:

[FNTG BRAND]

BY: _____
        AUTHORIZED SIGNATORY

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

**Tax Benefit Endorsement- [*limited partner/ member*]**

**ENDORSEMENT**
Attached to Policy No._____
**Issued by**
**[FNTG BRAND]**

**Amount of Insurance: $**_____

The Company acknowledges that _____, which is the [*limited partner/member*] of _____ (the ["*Partnership or "LLC*™]), is an Additional Insured ("Additional Insured") under this Policy but only for and limited to the specific dollar amount of coverage expressed above in this Endorsement.

For purposes of this Endorsement, the following general provisions shall apply:

(a)  The term "Tax Benefit" shall mean the Low Income Housing Credit pursuant to Section 42 of the Internal Revenue Code of 1986, as amended (the "Low Income Housing Credit"). The Company acknowledges that Improvements constructed upon the land described in Schedule A may be treated by the Additional Insureds as low-income buildings pursuant to said Section 42.

(b)  The term "Tax Benefit Loss" shall mean that, as a result of a matter falling within the insuring provisions of the policy, subject to the Exclusions, Exceptions and Conditions of the Policy, the [*Partnership/LLC*] is not able to claim the Low Income Housing Tax Credit or is required to recapture all or any portion of the Low Income Housing Tax Credit.

Except to the extent of reimbursement received by them from the [*Partnership/LLC*], if a defect in the Title insured against in the Policy results in a Tax Benefit Loss, the Company agrees to pay, to the Additional Insured named in this Endorsement,  the amount which they, or any of them are required to pay, and do pay, or which they, or any of them, are unable to claim, by reason of the application of the Internal Revenue Code of 1986, as amended, now and hereafter in effect.  The Company's obligations to pay the Additional Insured named herein to and under this Endorsement: (a) does not affect or modify and is in addition to the Company's obligations to pay the Insured under the Policy for any loss or damage incurred by the Insured under the Policy: (b) does not reduce the Amount of Insurance of the Policy: and (c) is limited to the amount of insurance stated above on this Endorsement. Any payment under this Endorsement shall reduce the Company's liability hereunder and the amount of insurance under this Endorsement shall be reduced by a corresponding amount.

The Company shall not be obligated for any costs, attorneys' fees or expenses incurred by any Insured under the Policy or this Endorsement in defending or establishing the Tax Benefit.

This endorsement is issued as part of the policy.  Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy or (iv) increase the Amount of Insurance.  To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls.  Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements to it.

[Witness Optional]

DATED:

[FNTG BRAND]

BY: _____
        AUTHORIZED SIGNATORY

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

**Tax Benefit Endorsement – no increase in Amount of Insurance**

**ENDORSEMENT**
Attached to Policy No._____

**Issued by**
**[FNTG BRAND]**

The Company hereby insures the Insured that in the event of any occurrence, defect, lien or encumbrance otherwise insured against by this policy, the loss or damage incurred by the Insured shall be deemed to be the difference between (1) the value of the Title as insured under this policy taking into consideration the tax credit status of the Insured pursuant to applicable sections of the Internal Revenue Code in effect at the Date of Policy (the "Value of the Title") prior to such occurrence, defect, lien or encumbrance, and (2) the Value of the Title after such defect, occurrence, lien or encumbrance.

This endorsement is issued as part of the policy.  Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy or (iv) increase the Amount of Insurance.  To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls.  Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements to it.

[Witness Optional]

DATED:

[FNTG BRAND]

BY: _____
      AUTHORIZED SIGNATORY

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

# EXHIBIT 6

# EXHIBIT 6

# Bulletin : NV2014002

**Date:** November 06, 2014

**To:** All Nevada Issuing Offices

**RE:** RATES AND/OR FORMS UPDATE - Use of the ALTA 9.10, the ALTA 4.1, and the ALTA 5.1

_____

Dear Associates:

Due to the recent decision by the Nevada Supreme Court in the case of SFR Investments Pool 1 LLC vs. US Bank, questions have arisen regarding the issuance of loan policies and endorsements to lenders making loans secured by condominiums, planned unit developments, or other common interest developments with a homeowners association. At this time, the only changes to our underwriting procedures are that 1) in lieu of issuing an ALTA 9 (or a CLTA 100) for a lender's policy, issue the ALTA 9.10; 2) in lieu of issuing an ALTA 4 for a lender's policy, issue the ALTA 4.1, and; 3) in lieu of issuing an ALTA 5 for a lender's policy, issue the ALTA 5.1.

If you have any questions relating to this or other bulletins, please contact a Stewart Title Guaranty Company underwriter.

For on-line viewing of this and other bulletins, please log onto www.vuwriter.com.

# References

**Bulletins Replaced :** None

**Related Bulletins :** None

**Underwriting Manual :** None

**Exceptions Manual :** None

**Forms :** None

# EXHIBIT 7

# EXHIBIT 7



200205 10
.01313



APN:

WHEN RECORDED RETURN TO:

SANTORO, DRIGGS, WALCH,
KEARNEY, JOHNSON & THOMPSON
3773 Howard Hughes Parkway, Suite 290N
Las Vegas, Nevada 89109
Attention: Rodney S. Woodbury, Esq.

124-27-4/3-006 to 013 + 014 to 017

### DECLARATION
### OF COVENANTS, CONDITIONS, AND RESTRICTIONS FOR
### SANTA ROSA

This instrument is delivered to the Recorder's
office as an accommodation, by Nevada Title Company,
for physical convenience only. It has not been
examined as to its validity, execution or it's
effect upon title, if any.

```
2002 05 10
.01313
```

# TABLE OF CONTENTS

### ARTICLE I.

**Recitals** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
1.01   Real Property . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
1.02   Planned Community . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
1.03   Owners Association . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
1.04   The Development . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
1.05   Covenants Running With Land . . . . . . . . . . . . . . . . . . . . . . . . . . 1
1.06   Declaration . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

### ARTICLE II.

**Definitions** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
2.01   "Act" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
2.02   "Annexable Area" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
2.03   "Architecture Committee" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
2.04   "Articles" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
2.05   "Assessment" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
2.06   "Association" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
2.07   "Association Property" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
2.08   "Board" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
2.09   "Bylaws" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
2.10   "Common Area" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
2.11   "Contingent Annexable Area" . . . . . . . . . . . . . . . . . . . . . . . . . . 3
2.12   "Declarant" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
2.13   "Design Guidelines" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
2.14   "Development" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
2.15   "Eligible Holder" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
2.16   "Improvement" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
2.17   "Lessee" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
2.18   "Lot" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
2.19   "Member" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
2.20   "Mortgage" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
2.21   "NRS" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
2.22   "Owner" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
2.23   "Party Walls" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
2.24   "Perimeter Walls" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
2.25   "Person" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
2.26   "Property" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
2.27   "Record, "Recording," or "Recorded" . . . . . . . . . . . . . . . . . . . . . 4
2.28   "Residence" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
2.29   "Rules and Regulations" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

J:\Forms\Data D\ch\Canyon Santa Rosa\FCCR2c.3.wpd                              ii

20020510
.01313

2.30  "Site Development Plan" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  4
2.31  "Subdivision Map" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  4

ARTICLE III.

Property and Property Rights . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  5
3.01  Description of the Property . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  5
3.02  No Representations or Warranties. . . . . . . . . . . . . . . . . . . . . . . . . . .  5
3.03  Lots . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  5
3.04  Association Property . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  6
3.05  Special Declarant's Rights . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  11

ARTICLE IV.

Owners' Association; Membership and Voting Rights . . . . . . . . . . . . . . . . . .  11
4.01  Association . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  11
4.02  Membership Rights . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  12
4.03  Control of Association . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  12
4.04  Meetings of Members . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  14
4.05  Duties of the Association . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  15
4.06  Powers and Authority of the Association . . . . . . . . . . . . . . . . . . . . . . .  18
4.07  Indemnification . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  22
4.08  Diseased Trees . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  24
4.09  Perimeter Walls . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  24
4.10  Rules . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  24
4.11  Breach of Rules, Regulations, or Restrictions . . . . . . . . . . . . . . . . . . .  25
4.12  Fines . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  25
4.13  Liability of Members of Board . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  26
4.14  Amendment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  26

ARTICLE V.

Covenant for Maintenance Assessments . . . . . . . . . . . . . . . . . . . . . . . . . . .  26
5.01  Assessments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  26
5.02  Purpose of Assessments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  26
5.03  Regular Assessments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  27
5.04  Special Assessments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  29
5.05  Notice of Special Assessments; Time for Payment  . . . . . . . . . . . . . .  29
5.06  Collection of Assessments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  29
5.07  Unpaid Assessments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  29
5.08  Mortgage Protection . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  30
5.09  Effect of Amendments on Mortgages . . . . . . . . . . . . . . . . . . . . . . . . .  30
5.10  Annual Assessments Paid By Declarant . . . . . . . . . . . . . . . . . . . . . . .  30

iii



## ARTICLE VI.

Permitted Uses and Restrictions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   31
6.01   Improvements and Use . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   31
6.02   Animals . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   31
6.03   Commercial or Other Non-Residential Uses . . . . . . . . . . . . . . . . . . . . .   31
6.04   Utility Service . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   32
6.05   Nuisances . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   32
6.06   Garbage . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   32
6.07   Antennae, Satellite Dishes and Solar Collectors . . . . . . . . . . . . . . . . .   32
6.08   Signs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   32
6.09   Equipment and Machinery . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   32
6.10   Laundry . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   33
6.11   Propane Tanks . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   33
6.12   Maintenance of Lawn and Plants . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   33
6.13   Vehicle Parking . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   33
6.14   Leases . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   34
6.15   Resubdivision . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   35
6.16   Improvements . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   35
6.17   Taxes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   35
6.18   Rules and Regulations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   35
6.19   Hazardous Substances . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   35
6.20   Party Walls . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   35
6.21   Exterior Holiday Decorations. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   35

## ARTICLE VII.

Architecture Committee . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   36
7.01   Establishment of Committee . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   36
7.02   Members of Committee . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   36
7.03   Architectural Design Guidelines . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   36
7.04   Landscape Standards . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   37
7.05   Review of Proposed Improvements . . . . . . . . . . . . . . . . . . . . . . . . . . . .   37
7.06   Meetings of the Committee . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   38
7.07   No Waiver of Future Approvals . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   38
7.08   Compensation of Members . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   38
7.09   Inspection of Work . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   38
7.10   Nonliability of Committee Members . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   39
7.11   Variances . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   40
7.12   Obligations with Respect to Zoning and Subdivisions . . . . . . . . . . . . .   40
7.13   Indemnification of Architecture Committee . . . . . . . . . . . . . . . . . . . . . .   40

## ARTICLE VIII.

Mortgagee Provisions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   40

J Print Date DL1 Canon Suna Rone CX Alia Legal                    iv

20020510
.01313

8.01   Notices of Action . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41
8.02   Special Provision . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41
8.03   Other Provisions for First Mortgages . . . . . . . . . . . . . . . . . . . . . . . . . . . 42
8.04   No Priority . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42
8.05   Notice to Association . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42
8.06   Amendment by Board . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42
8.07   Applicability . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43
8.08   Failure of Mortgagee to Respond . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

ARTICLE IX.

       Annexation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43
9.01   Annexation of Additional Property by Association . . . . . . . . . . . . . . . . . 43
9.02   Annexation by Declarant . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43
9.03   Procedure for Annexation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43
9.04   Deannexation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

ARTICLE X.

       General Provisions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44
10.01  Term . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44
10.02  Resale of Lots . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44
10.03  Lease of Property . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45
10.04  Amendment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45
10.05  Enforcement and Nonwaiver . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47
10.06  Notices . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48
10.07  Construction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48
10.08  State Law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49
10.09  Priorities, Inconsistencies . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

I  Parm  Data DCFCesxm Sxma Razca CCARa 1 wpd

v

20020510
.01313

## DECLARATION
## OF COVENANTS, CONDITIONS, AND RESTRICTIONS FOR
## SANTA ROSA

THIS DECLARATION (the "Declaration") is made this _____ day of May, 2002, by Centex Homes of Nevada, a Nevada general partnership (the "Declarant").

## ARTICLE I.

### Recitals

**1.01    Real Property.** Declarant is the owner of certain real property located entirely in Clark County, Nevada, more particularly described in Exhibit "A" attached hereto (the "Property"). The Property shall include any additional real property that may from time to time be annexed thereto.

**1.02    Planned Community.** Declarant desires to develop the Property and, if Declarant so elects, the adjacent land described in Section 2.02 (the "Annexable Area") as a residential community and to establish covenants, conditions, and restrictions relating to the use, enjoyment, maintenance, improvement, and occupancy of the Property. The residential community shall be developed as a planned community under a general plan of development pursuant to the Act (as hereinafter defined) and shall be named Santa Rosa (the "Development"). If the entire Annexable Area is annexed as provided herein, the planned community will consist of up to a maximum of one hundred twenty-five (125) Lots (as hereinafter defined).

**1.03    Owners Association.** Declarant desires to establish Santa Rosa Homeowners Association, a Nevada nonprofit corporation (the "Association"), for the purpose of maintaining and administering the Common Areas (as hereinafter defined) of the Property, administering and enforcing these covenants, conditions, and restrictions, and collecting and disbursing funds pursuant to Assessments and charges established by these covenants, conditions, and restrictions. Each Lot shall have appurtenant to it a membership in the Association.

**1.04    The Development.** Declarant contemplates developing the Property, constructing the Development, and conveying the Association Property (as hereinafter defined) to the Association in a planned multi-phase development. Although Declarant contemplates completing all phases of the Development and subjecting the Annexable Area to this Declaration, there is no guarantee that any or all of the phases of the Development or that any or all of the Annexable Area will be developed by Declarant.

**1.05    Covenants Running With Land.** This Declaration shall run with the Property and all parts and parcels thereof and shall be binding on all parties having any right, title, or interest in the Property and their heirs, successors, successors-in-title, and assigns and on the Association and all of its successors in interest and shall inure to the benefit of each owner or member thereof. Each of the limitations, easements, uses, obligations, covenants,

1 Form Chap 193 / Centex Santa Rosa CC&Rs (v-pg)



conditions, and restrictions imposed hereby shall be deemed to be and construed as equitable servitudes enforceable by any of the owners of any portion of the Property subject to this Declaration against any other owner, tenant, or occupant of the Property or portion thereof similarly restricted by this Declaration.

    **1.06   Declaration.** Declarant hereby declares that all of the Property shall be held, sold, conveyed, hypothecated, encumbered, leased, rented, used, occupied, and improved subject to the following easements, restrictions, covenants, and conditions, which are for the purpose of protecting the value and desirability of the Property.

**ARTICLE II.**

**Definitions**

    In addition to the terms elsewhere defined herein, the following terms shall have the following meanings whenever used in this Declaration.

    **2.01   "Act"** shall mean the Nevada Common Interest Ownership Act, NRS 116.1101 et seq.

    **2.02   "Annexable Area"** shall mean the real property described in Exhibit "B" hereto, including the Contingent Annexable Area described in Exhibit "C" hereto.

    **2.03   "Architecture Committee"** shall mean the committee created by Article VII of this Declaration.

    **2.04   "Articles"** shall mean the articles of incorporation of the Association as may be amended from time to time.

    **2.05   "Assessment"** shall mean those Assessments set forth in Article V of this Declaration.

    **2.06   "Association"** shall mean Santa Rosa Homeowners Association, a Nevada nonprofit corporation, and its successors and assigns.

    **2.07   "Association Property"** shall mean all property, real and personal, owned or leased by the Association, including, without limitation, the Common Area.

    **2.08   "Board"** shall mean the Board of Directors of the Association.

    **2.09   "Bylaws"** shall mean the Bylaws of the Association as may be amended from time to time.

2



20020510
.01313

**2.10    "Common Area"** shall mean all real property (including the improvements thereto) designated as common elements on the Site Development Plan (as hereinafter defined) or any subsequent subdivision or parcel map of the Property, that is now or hereafter conveyed by Declarant to the Association, including private streets, if any, sewer and water lines, easements, park areas, and other such property.

**2.11    "Contingent Annexable Area"** shall mean the real property described in Exhibit "C" hereto. The Contingent Annexable Area has been subjected to that certain Declaration of Covenants, Conditions, and Restrictions for Rancho Mirage recorded on April 5, 1995, in Book 950405 as Instrument 00740 in the Office of the Recorder of Clark County, Nevada (as amended, the "Rancho Mirage Declaration").   Anything herein to the contrary notwithstanding, in no event shall the Contingent Annexable Area or any portion thereof be added to the Property, subjected to this Declaration, or included within the jurisdiction of the Association pursuant to Article IX hereof unless and until such property has been duly deannexed from coverage of the Rancho Mirage Declaration.   Declarant makes no representation or warranty of any kind, express or implied, that the Contingent Annexable Area or any portion thereof will ever be deannexed from coverage of the Rancho Mirage Declaration or that it will be added to the Property, subjected to this Declaration, or included within the jurisdiction of the Association.

**2.12    "Declarant"** shall mean Centex Homes of Nevada, a Nevada general partnership, and its successors and assigns.

**2.13    "Design Guidelines"** shall mean the guidelines adopted by the Architecture Committee as set forth in Article VII.

**2.14    "Development"** shall mean the residential community referred to as Santa Rosa being developed by Declarant as a planned community pursuant to the Act.

**2.15    "Eligible Holder"** shall mean the Persons (as hereinafter defined) described in Article VIII of this Declaration.

**2.16    "Improvement"** shall mean the buildings, structures, improvements, roadways, parking areas, lighting fixtures, fences, walls, hedges, plantings, planted trees and shrubs, swimming pools, patios, decks, outbuildings, athletic facilities, and all other structures or landscaping of every type and kind upon the Property.

**2.17    "Lessee"** shall mean any Person who rents, leases, or subleases any Lot from an Owner (as hereinafter defined) or a Person in privity with an Owner.

**2.18    "Lot"** shall mean each of the lots, with the exception of the Common Area, shown on the Site Development Plan or any subsequent subdivision or parcel map of the Property, and all Improvements erected, constructed, or located thereon.

3

Branch :FLV,User :EDL5          Comment:          Station Id :X7QR



2.19   **"Member"** shall mean each of those Owners who are members of the Association.

2.20   **"Mortgage"** shall mean a mortgage or deed of trust that encumbers any Lot.

2.21   **"NRS"** shall mean the Nevada Revised Statutes.

2.22   **"Owner"** shall mean the record owner, whether one or more persons or entities, of a fee simple title to any Lot, including contract sellers but excluding those having such interest merely as security for the performance of an obligation.

2.23   **"Party Walls"** shall mean those walls, other than Perimeter Walls (as hereinafter defined), located anywhere on the Development that form Lot boundaries.

2.24   **"Perimeter Walls"** shall mean those walls all or a part of which are located on Association Property or separate a Lot from Association Property.

2.25   **"Person"** shall mean a person, partnership, corporation, trustee, or other legal entity.

2.26   **"Property"** shall mean that real property located entirely in Clark County, Nevada, more particularly described in Exhibit "A" attached hereto. The Property shall include any additional real property that may from time to time be annexed thereto.

2.27   **"Record, "Recording," or "Recorded"** shall mean to file, the filing, or filed of record a legal instrument in the Office of the Recorder of Clark County, Nevada, or such other place as may be designated as the official location for recording deeds, plats, and similar documents affecting title to real property in Clark.

2.28   **"Residence"** shall mean and refer to any dwelling constructed on a Lot in accordance with all local, state, and federal laws and this Declaration.

2.29   **"Rules and Regulations"** shall mean the rules and regulations adopted by the Board pursuant to Section 4.10 of this Declaration.

2.30   **"Site Development Plan"** shall mean the general plot plan of the Development attached hereto as Exhibit "D."

2.31   **"Subdivision Map"** shall mean the map(s) or plat(s) of the Development Recorded or to be Recorded in the Office of the Recorder of Clark County, Nevada.

4

Case 2:21-cv-02120-JCM-BNW   Document 1-1   Filed 11/29/21   Page 533 of 807

```
20020510
.01313
```

## ARTICLE III.

### Property and Property Rights

**3.01   Description of the Property.**  The Property shall consist of the Lots and the Common Area.

**3.02   No Representations or Warranties.**  No representations or warranties of any kind, express or implied, other than the standard warranty required by VA and FHA, have been given or made by Declarant or its agents or employees in connection with the Property or any portion thereof, or any Improvement thereon, its physical condition, zoning, compliance with applicable laws, or fitness for intended use, or in connection with the subdivision, sale, operation, maintenance, cost of maintenance, taxes, or regulation thereof as a common-interest community, except as specifically and expressly set forth in this Declaration and except as may be filed by Declarant from time to time with any governmental authority.  To the extent permitted by law, the Association, each and every Owner, and their successors and assigns hereby waive, and Declarant hereby expressly disclaims and excludes, any and all express and implied warranties created by NRS 116.4113, NRS 116.4114, and other applicable laws, including, without limitation, any implied warranty of quality, merchantability, fitness for a particular purpose, habitability, and workmanship.  By virtue of obtaining its ownership interest in the Property or any portion thereof, the Association and each and every Owner hereby covenant and agree that the period for commencing any action against Declarant for breach of any obligations or warranties arising under NRS 116.4113 or 116.4114 shall be two (2) years after the cause of action accrues.

**3.03   Lots.**

(a)   *Reciprocal Easements.*  Each Lot and its Owner shall have an easement and the same is hereby granted by the Declarant over all adjoining parcels for the purpose of accommodating any encroachment due to engineering errors, errors in original construction, settlement or shifting of the land, or any other cause; provided, however, that in no event shall an easement for encroachment be created in favor of an Owner or Owners if the encroachment occurred due to construction or alteration by the Owner (except Declarant) or the negligence or willful misconduct of the Owner.  In the event a structure on any Lot is partially or totally destroyed and then repaired or rebuilt, the Owners of each Lot agree that minor unintentional encroachments over adjoining Lots not to exceed one (1) foot shall be permitted and that there shall be easements for the maintenance of the encroachments so long as they shall exist.

(b)   *Association Easements.*  There are hereby reserved to the Association such easements across the Property as are necessary to perform the duties and obligations of the Association.

5

Case 2:21-cv-02120-JCM-BNW    Document 1-1    Filed 11/29/21    Page 534 of 807

```
2002 0510
 .01313
```

(c)    Utilities Easement.  There is hereby granted in favor of Declarant, the Association, and their respective licensees an easement across each Lot for purposes of installing, facilitating, maintaining, repairing, replacing, or inspecting sewer, drainage, underground power lines, cable television systems, or other utilities over, under, and across the Property.  All utility hook-ups and fixtures and improvements relating thereto shall be the property of the Association.

(d)    Emergency Repairs Easement.  In addition to all other easements reserved or granted herein, there is hereby reserved to the Association an easement across each Lot as is necessary to permit a reasonable right of entry onto each Lot for the purpose of performing emergency repairs or to do other work reasonably necessary for the proper maintenance of the Development.

(e)    Maintenance Obligation of Owners.  It shall be the duty of each Owner at its sole cost and expense, subject to the provisions of this Declaration requiring approval of the Architecture Committee, to maintain, repair, replace, and restore (including any mainte-nance, repairs, replacement, or restoration required as a result of any damage or destruction of the Property by casualty or otherwise) any Residence, Improvements, and landscaping located on its Lot and the Lot itself in a neat, sanitary, and attractive condition and in accordance with the Rules and Regulations of the Association, all as determined by the Board in its sole and absolute discretion.  If any Owner shall permit any Residence, Improvements, or the Lot to fall into disrepair or to become unsafe, unsightly, or unattractive or otherwise violate this Declaration, the Association shall have the right to seek any remedies at law or in equity it may have.  In addition, the Board shall have the right, but not the duty, if such unacceptable maintenance is not corrected within thirty (30) days of written notice from the Association (or such longer period if reasonably necessary under the circumstances, provided the owner is diligently performing such maintenance or repairs), to enter upon such Owner's Lot and make such repairs and perform such maintenance and charge the costs thereof to Owner.  Such costs shall be enforced, including penalty fees and costs, as an Assessment on the Lot pursuant to Article V hereof.

(f)    Insurance Obligations of Owners.  Each Owner shall insure the Residence and Improvements on its Lot against loss or damage by fire or by any other casualty in an amount as near as practical to the full replacement value of the Residence and pertinent Improvements, without deduction for depreciation or coinsurance.

**3.04    Association Property.**

(a)    Conveyance of Association Property.  The Declarant hereby covenants for itself, its successors, and assigns, at the time of the conveyance of the twelfth (12th) Lot in the Property to an Owner not the Declarant, that it will convey title to the Association Property on the Property to the Association free and clear of all encumbrances and liens, except utility easements, covenants, conditions, and reservations then of record, including, without limitation, those set forth in this Declaration.  Similar conveyances shall be made

6



to the Association at the time of the conveyance to an Owner not the Declarant of the first Lot in each subsequent phase of the Development.

(b)   Declarant's Right to Inspect Prior to Conveyance.   At any time prior to conveyance by Declarant to the Association of the Association Property with respect to any given phase of the Development, Declarant shall have the right, but not the obligation, after providing reasonable notice to the Association, to cause, from time to time, an independent third party approved by Declarant and the Association to conduct inspections and tests of all or any parts of the Common Area in order to ascertain the physical condition of the Improvements thereon and determine whether maintenance, repairs, or replacements of any such Improvements are indicated. If the Declarant causes any such tests or inspections to be conducted, it shall pay all costs thereof, restore the affected portion of the Property to its condition immediately prior to the inspections and tests, and indemnify the Association and Owner(s) of any affected unit(s) from any damage resulting therefrom.   The Declarant may have a representative accompany the inspector if it so elects. The Declarant shall provide the Association with copies of any written reports describing the results of any such inspections or tests.   The third party inspector, the Declarant, and its respective representatives shall have such rights of entry on, over, under, across, and through the Property as may be reasonably necessary to exercise the rights described in this subsection 3.04(b).

(c)   Common Area Ownership.   The Common Area shall be owned by the Association in fee simple for the use, enjoyment, and convenience of the Owners and shall contain the roadways, walkways, landscaped areas, recreational areas, parking areas, storage and trash areas, utility easements, all Perimeter Walls, and all other areas of the Property not a part of the Lots. Each Lot and its Owner shall have an easement over all of the Common Area, and such easement is hereby granted, transferred, and conveyed to all Owners by the Declarant for the benefit of the Lots, the Owners, and each of them, and for their respective families, guests, and invitees for all of the foregoing purposes. In furtherance of the establishment of this easement, the individual deeds to the Lots may, but shall not be required to, set forth the foregoing easements.

(d)   Use.   Each Member or Lessee who resides on the Property and their respective families, guests, and invitees who reside with them shall be entitled to use the Common Area subject to the following:

(i)   the right of the Association to charge reasonable dues, use fees, and other fees for those facilities or amenities for which fees are normally charged or assessed;

(ii)   the right of the Association to suspend the rights to the use of any Association Property by any Member or Lessee and their families, guests, and invitees for any period during which any Assessment against the Member's property remains past due and unpaid, and after notice and hearing by the Board, the right of the Association to invoke any remedy set forth in Article V of this Declaration;

7



(iii)     the right of the Association to require that security deposits be made and deposited with the Association to secure all sums payable to the Association and to guarantee performance of all duties due and owing or to become due and owing to the Association;

(iv)     the right of the Association to allow the general public, or certain segments thereof, to use any Association Property, and in the discretion of the Board, to charge use or other fees therefor subject to subsection (i) above provided that the Association may not charge fees for access to public parks and sport fields;

(v)     such rights to use the Association Property as may have been granted by the Association to others;

(vi)     such covenants, conditions, and restrictions as may have been imposed by the Association or prior owners on the Association Property;

(vii)     such rules and regulations for the use of the Association Property as may be imposed by the Association from time to time; and

(viii)    the right of Declarant to use the Common Area for sales, development, and related activities pertaining to the Development.

(e)     <u>Maintenance of Association Property</u>. The Association shall be responsible for all of the costs and maintenance of the Association Property. The Association may at any time and without any approval of the Owners being required:

(i)     reconstruct, repair, replace or refinish any improvement, structure, fixture, or facility located on the Common Area or any portion thereof in accordance with: (A) the last plans thereof approved by the Board; (B) the original plans for development of the Property; or (C) if neither (A) nor (B) is applicable and if such Improvement was previously in existence, then in accordance with the original designs, plans, finishing, or standards of construction of such Improvement as it was originally constructed;

(ii)     construct, reconstruct, repair, replace, or refinish any road improvement or surface upon any portion of the Common Area used as a road, street, walk, or parking area;

(iii)    replace injured and diseased trees or other vegetation on the Common Area and plant trees, shrubs, and ground cover to the extent that the Board deems necessary for the conservation of water and soil and for aesthetic purposes;

(iv)     place and maintain upon any such area such signs, markers, and lights as the Board may deem appropriate for the proper identification, use, and regulation thereof;

8



(v)     remove all papers, debris, and refuse from the Common Area, wash or sweep paved areas as required, and clean and relamp lighting fixtures as needed;

(vi)     repaint striping, markers, directional signs, and similar devices as necessary;

(vii)     maintain, repair, and replace, as necessary, the Perimeter Walls; notwithstanding the foregoing, Owners of Lots bounded by Perimeter Walls shall be responsible for all aesthetic maintenance and repair of that side of the Perimeter Walls bounding the Owners' respective Lots;

(viii)     pay all real estate and personal property taxes and Assessments on the Common Area;

(ix)     pay all electrical, water, gas sewer, trash collection, telephone, and other utility charges or fees for services furnished to the Common Area and all water charges or fees for services furnished to the Lots;

(x)     pay for and keep in force at the Association's expense public liability, casualty, and fire insurance with companies acceptable to the Association in amounts and with limits of liability desired by the Owners or required of the Owners pursuant to any other recorded document affecting the Property, such insurance to name the Association, the Owners, or both as named insureds; and

(xi)     do all such other and further acts that the Board deems necessary to preserve and protect the Common Area and the beauty thereof in accordance with the general purposes for use and enjoyment of the Property described in this Declaration;

The Board shall be the sole judge as to the appropriate maintenance of all portions of the Common Area. Nothing herein shall be construed so as to preclude the Association from delegating its powers set forth above to a manager.

(f)     Improvements on Common Area. Any other provision of this Declaration to the contrary notwithstanding, until Declarant has sold ninety percent (90%) of the Lots, no land within the Common Area may be improved by any improvement, used, or occupied except in such manner as shall have been approved by Declarant in its sole and absolute discretion. Declarant may delegate its right to grant such approvals to the Board. No approval shall be granted that would be in contravention of the zoning or other local regulation then in effect for the area in question.

(g)     Damages. Each Owner or Lessee shall be liable to the Association for any damage to the Association Property that may be sustained by reason of the negligent or intentional misconduct of such Owner or Lessee or of its family, guests, or invitees. If the Lot, the ownership or leasing of which entitles the Owner or Lessee thereof to use the Association Property, is owned or leased jointly or in common, the liability of all such joint

2002.0510
.01313

or common Owners or Lessees shall be joint and several. The amount of such damage may, in addition to any other rights or remedies, be assessed against such Person's real and personal property on or within the Property, including the leasehold estate of any Lessee, and may be collected as provided in Article V below for the collection of Assessments.

(h)   Damage and Destruction. In the case of destruction of or damage to the Association Property by fire or other casualty, the Board shall have the following rights and privileges.

(i)   Liberty to Reconstruct. If the cost to repair or replace the Association Property, over and above all insurance proceeds, is less than twenty thousand dollars ($20,000), the Board may, without the consent of the Members, determine to repair or replace the damaged property with property substantially the same as those that were destroyed or damaged.

(ii)   Decision to Reconstruct. If the cost to repair or replace the Association Property, over and above all insurance proceeds, is equal to or greater than twenty thousand dollars ($20,000) and the Board determines to rebuild any Association Property destroyed or damaged in the form substantially the same as those that were destroyed or damaged, it shall prepare plans and obtain bids following the notice proceeding for a special Assessment as set forth in Article V hereof. The Board shall submit the plans and bids to the Members for approval, which approval shall require the affirmative vote of sixty-seven percent (67%) of the Members entitled to vote. The Board will modify the plans until the required vote is obtained or the restoration becomes subject to subsection 3.03(h)(i) or (iii) hereof. If approved, the Board shall cause the repairs or replacements to be done and assess the Members for the costs as a special Assessment.

(iii)   Decision Not to Reconstruct. If the Board determines not to rebuild any Association Property so destroyed or damaged or to build facilities substantially different from those that were destroyed or damaged, it shall submit its decision to the Members for their approval or disapproval, which approval shall require the consent of eighty percent (80%) of the Members entitled to vote. If the Members elect to approve the decision, the Board shall act accordingly; but if the Members do not approve the decision, the Board shall proceed to repair or rebuild the damaged or destroyed facility pursuant to subsection 3.03(h)(i) or (ii) hereof.

(iv)   Damage During Declarant Control Period. Should any Association Property become destroyed or damaged before Declarant has sold all of the Lots, the Association shall rebuild or repair such Association Property in a manner consistent with its original condition as constructed by Declarant.

(v)   Damage or Destruction by Owner. In the event any portion of the Common Area is damaged or destroyed by an Owner, a Lessee, or any of their respective guests, tenants, licensees, or agents, the Board may repair said damaged area. In the event the Board determines to repair said damage, the amount necessary for such repairs shall

10



be paid by the Owner or Lessee, upon demand, to the Board.  If said amounts are not immediately paid, they shall be deemed to be Assessments, and the Board may enforce collection of same in the same manner as provided in Article V hereof for collection and enforcement of Assessments.

     **3.05   Special Declarant's Rights.**  Declarant and its agents shall have the following rights and privileges, all of which shall terminate immediately upon the sale by Declarant of the last Lot within the Property:

       (a)    <u>Easement for Repairs</u>.  A nonexclusive easement over the Association Property for the purpose of making repairs to the Association Property and the Lots if access thereto is not reasonably available;

       (b)    <u>Easement for Sales</u>.  A nonexclusive easement over the Association Property (which easement shall extend to the sales agents, customers, prospective customers, guests, and representatives of Declarant) for sales, display, access, ingress, egress, exhibits, and other purposes deemed useful by Declarant and its agents in advertising and promoting the sale of Lots (including the erection of signs, flags, and banners) until all Lots are sold by Declarant.  In exercising the easement, Declarant shall not unreasonably interfere with the rights and enjoyment of the Owners;

       (c)    <u>Easement for Development</u>.  A nonexclusive easement over the Association Property (which easement shall be in favor of Declarant and its agents, contractors, and licensees) for access, ingress, and egress over, in, upon, under, and across the Association Property, including, but not limited to, the right to store materials thereon and to make such other use thereof as may be reasonable, necessary, or incidental to Declarant's development of the Property; provided, however, that no such rights or easements shall be exercised in such a manner as to reasonably interfere with the occupancy, use, enjoyment, or access by any Owner;

       (d)    <u>Right to Lease</u>.  The right to lease any unsold Lot; and

       (e)    <u>Other Rights</u>.  Each of the developmental rights and special declarant's rights set forth in NRS 116.11034 and 116.110385.

## ARTICLE IV.

### Owners' Association; Membership and Voting Rights

     **4.01   Association.**

       (a)    <u>Organization</u>.  The Association is a nonprofit Nevada corporation created for the purposes, charged with the duties, and vested with the powers prescribed by law or set forth in its Articles and Bylaws or in this Declaration.  Neither the Articles nor Bylaws

11

Case 2:21-cv-02120-JCM-BNW    Document 1-1    Filed 11/29/21    Page 540 of 807

200205510
.01313

shall for any reason be amended or otherwise changed or interpreted so as to be inconsistent with this Declaration.

(b)    Successor Associations.  In the event the Association is dissolved at any time this Declaration is in force or effect, a nonprofit unincorporated association shall automatically and without further action or notice be formed to succeed to all the rights and duties of the Association.  The successor unincorporated association shall be governed by the laws of the State of Nevada and, to the extent not inconsistent therewith, by the Articles and Bylaws of the Association as if they were created for the purpose of governing the affairs of an unincorporated association.  In the event an unincorporated association is formed pursuant to this subsection 4.01(b), the appropriate officers of the Association or the successor association shall take all reasonable efforts to restore or reincorporate the Association as a nonprofit Nevada corporation.

4.02    **Membership Rights.**  Only Owners, including Declarant, shall be Members of the Association.  Each Owner shall automatically be a Member of the Association without the necessity of any further action on its part, and membership in the Association shall be appurtenant to and shall run with the property interest ownership that qualifies the Owner to membership in the Association.  Membership in the Association may not be severed from or in any way transferred, pledged, mortgaged, or alienated except with the title to the property ownership interest that qualifies the Owner thereof to membership and then only to the transferee of title to the property interest.  Any attempt to make a prohibited severance, transfer, pledge, mortgage, or alienation shall be void.  Subject to subsection 4.03(d) and Section 5.07 hereof and as set forth in the Articles, each Member shall be entitled to one (1) vote for each Lot owned by that Member.

4.03    **Control of Association.**

(a)    Period of Declarant Control of Association.  Notwithstanding any other provision of this Declaration or of the Bylaws, and subject to subsection (b) below, there shall be a period during which Declarant shall control the Association, and Declarant or a Person designated by Declarant may appoint and remove all or some of the officers and directors of the Association.  The period of Declarant control of the Association terminates no later than the earlier of:

(i)    sixty (60) days after the conveyance by Declarant of seventy-five percent (75%) of the Lots that may be created within the Property to Owners other than the Declarant;

(ii)    five (5) years after the Declarant has ceased to offer Lots for sale in the ordinary course of its business; or

(iii)    five (5) years after any right to annex new Lots was last exercised by Declarant.

12

Case 2:21-cv-02120-JCM-BNW   Document 1-1   Filed 11/29/21   Page 541 of 807

20020510
.01313

Provided, however, that Declarant may, but is not obligated to, voluntarily surrender the right to appoint and remove officers and Board members as provided herein before the termination period set forth above, provided that Declarant may require that specified actions of the Association or the Board may require Declarant approval prior to becoming effective. Such surrender of rights shall only be by a recorded instrument.

(b)     Composition of the Board.  Not later than sixty (60) days after conveyance by Declarant of twenty-five percent (25%) of the Lots that may be created within the Property to Owners other than Declarant, at least one (1) member of the Board and not less than twenty-five percent (25%) of the members of the Board must be elected by Owners other than Declarant.  Not later than sixty (60) days after conveyance by Declarant of fifty percent (50%) of the Lots that may be created within the Property to Owners other than Declarant, not less than thirty-three and one-third percent (33-1/3%) of the members of the Board must be elected by Owners other than Declarant.  Upon expiration of the Declarant control period set forth in subsection (a) above, one hundred percent (100%) of the Board shall be elected by Owners other than Declarant.

(c)     Removal of Board Members.  Notwithstanding any provision of this Declaration or the Bylaws to the contrary, the Owners, by a two-thirds (2/3) vote of all Persons present and entitled to vote at any meeting of the Owners at which a quorum is present, may remove any member of the Board with or without cause, other than a member appointed by the Declarant.

(d)     Joint or Common Ownership.  If any property interest, ownership of which entitles the Owner thereof to vote, is held jointly or in common by more than one (1) Person, the vote or votes to which such property interest is entitled shall also be held jointly or in common in the same manner.  However, the vote or votes for such property interest shall be cast, if at all, as a unit, and neither fractional votes nor split votes shall be allowed. In the event joint or common Owners are unable to agree among themselves as to how their vote or votes shall be cast as a unit, they shall lose the right to cast their vote or votes on the matter in question.  In the event more than one vote is cast for a particular membership, none of the votes shall be counted, and all such votes shall be deemed void.  Any joint or common Owner shall be entitled to cast the vote or votes belonging to the joint or common Owners unless another joint or common Owner shall have delivered to the Secretary of the Association prior to the time for casting such vote a written statement to the effect that the Owner wishing to cast the vote or votes has not been authorized to do so by the other joint or common Owner or Owners.

(e)     Proxy Voting.  Except as otherwise provided in this Section, votes allocated to a Lot may be cast pursuant to a revocable written proxy executed by the Owner thereof, authorizing the holder to cast the Owner's votes on any matter.  An Owner may give a proxy only to a member of his immediate family, his tenant who resides in the Development, another Owner who resides in the Development, or any other Person permitted by the Act.  If a Lot is owned by more than one Person, each Owner of the Lot may vote or register protest to the casting of votes by the other Owners of the Lot through a proxy.  A vote may not be cast

13

Case 2:21-cv-02120-JCM-BNW   Document 1-1   Filed 11/29/21   Page 542 of 807

```
200205 10
.01313
```

pursuant to a proxy for the election of a member of the Board. A proxy shall be void if (i) it is not dated, (ii) it purports to be revocable without notice, (iii) it does not designate the votes that must be cast on behalf of the Owner who executed it, or (iv) the holder of the proxy does not disclose at the beginning of the meeting for which the proxy is executed, the number of proxies pursuant to which he will be casting votes and the voting instructions received for each proxy. Every proxy shall terminate immediately after the conclusion of the meeting for which it was executed. An Owner may revoke a proxy only by actual notice of revocation to the person presiding over a meeting of the Association.

        (f)     Cumulative Voting. Voting shall not be cumulative.

    **4.04   Meetings of Members.** The Association shall hold an annual meeting of the Members. The annual meeting of the Members shall be held on or about one (1) year after the date of the last annual meeting. If the Members have not held a meeting for one (1) year, a meeting of the Members must be held in accordance with the Act. The Association shall also hold at least one (1) regular meeting other than the annual meeting each year. Special meetings of the Members may be called at any reasonable time and place by notice by the President of the Association, the Board, or Members having ten percent (10%) or more of the total votes.

        (a)     Notice. Not less than ten (10) days (twenty-one (21) days in the event of a meeting at which an Assessment for a capital improvement or commencement of a civil action is to be considered or action is to be taken on such an Assessment) nor more than sixty (60) days in advance of each meeting of the Members, the Secretary shall cause notice of the meeting to be hand-delivered or sent prepaid by United States mail to the mailing address of each Lot or to any other mailing address designated in writing by the Lot Owner. The notice of the meeting must state the time and place of the meeting and include a copy of the agenda for the meeting. The notice must also include notification of the right of an Owner (i) to have a copy of the minutes or a summary of the minutes of the meeting distributed to the Owner upon request and, if required by the Board, upon payment to the Association of the cost of making the distribution, and (ii) to speak to the Association.

        (b)     Agenda. The agenda for each meeting of the Owners must consist of (i) a clear and complete statement of the topics scheduled to be considered during the meeting, including, without limitation, any proposed amendment to the Declaration or Bylaws, any fees or Assessments to be imposed or increased by the Association, any budgetary changes, and any proposal to remove an officer or member of the Board, (ii) a list describing the items on which action may be taken and clearly denoting that action may be taken on those items, and (iii) a period devoted to comments by Owners and discussion of those comments. In an Emergency (as hereinafter defined), the Owners may take action on an item which is not listed on the agenda. The notice, agenda, and Owner comment requirements of subsection 4.04(a) and this subsection 4.04(b) apply to both regular and special meetings of the Members.

14



(c)    <u>Emergency</u>. As used in this Section 4.04, "Emergency" means any occurrence or combination of occurrences that (i) could not have been reasonably foreseen, (ii) affects the health, welfare, and safety of the Owners, (iii) requires the immediate attention of, and possible action by, the Board, and (iv) makes it impracticable to comply with the notice provisions of this Section.

(d)    <u>Quorum</u>. The presence at any meeting, in person or by proxy, of Members entitled to vote at least twenty percent (20%) of the total votes outstanding shall constitute a quorum. If any meeting cannot be held because a quorum is not present, the Members present, either in person or by proxy, may adjourn the meeting to a time not less than forty-eight (48) hours nor more than thirty (30) days from the time set for the original meeting, at which adjourned meeting the quorum requirement shall be the Members entitled to vote fifteen percent (15%) of the total votes outstanding.

(e)    <u>Organization</u>. The Chairman of the Board, or in his or her absence the Vice-Chairman, shall call meetings of Members to order and act as chairman of such meetings. In the absence of both of said officers, any Member entitled to vote thereat or any proxy of any such Member may call the meeting to order, and a chairman of the meeting shall be elected. The Secretary of the Association, or in his or her absence the Assistant Secretary, shall act as secretary of the meeting. In the absence of both the Secretary and the Assistant Secretary, a secretary shall be selected in the same manner as that provided above for selecting a chairman of the meeting.

(f)    <u>Action by Members</u>. Except as provided otherwise in this Declaration or the Bylaws, any action (including any approvals required under this Declaration) may be taken at any legally convened meeting of the Members at which a quorum is present upon the affirmative vote of the Members having a majority (or such greater percentage as may be required elsewhere in this Declaration for approval of the Members of any matter) of the total votes present at such meeting in person or by proxy. Only votes cast in person, by secret ballot, or by proxy may be counted.

(g)    <u>Minutes</u>. Not more than thirty (30) days after any meeting of the Members, the Secretary shall cause the minutes or a summary of the minutes of the meeting to be made available to the Members. A copy of the minutes or a summary of the minutes must be provided to any Member who pays the Association the cost of providing the copy.

**4.05   Duties of the Association**. Subject to and in accordance with this Declaration, the Association shall have and perform each of the following duties for the benefit of the Members of the Association:

(a)    <u>Members</u>. The Association shall accept all Owners as Members.

(b)    <u>Recreation and Open Space Areas and Common Area</u>. The Association shall accept, own, operate, and maintain all recreation and open space and Common Area that may be conveyed, leased, licensed, or otherwise enjoyed by it, together with all

15

Branch :FLV,User :EDL5                Comment:                                     Station Id :X7QR

```
200205 10
.01313
```

Improvements of whatever kind and for whatever purpose that may be located in said areas. The Association shall accept, own, operate, and maintain all other property easements or rights of use, whether real or personal, for which the Association, the Members, or the Property receive any benefits, whether aesthetic or tangible.

    (c)    Title to Property Upon Dissolution. The Association shall pay over or convey, upon dissolution of the Association, the assets of the Association to one or more exempt organizations of the kind described in Section 501(c) of the Internal Revenue Code of 1986, as amended from time to time.

    (d)    Repair and Maintenance of Association Property. Subject to the provisions of this Declaration pertaining to damage and destruction of Association Property and condemnation, the Association shall paint, maintain, repair, and replace the Common Area, including any Improvements thereon, and other Association Property enjoyed by, owned by, licensed to, or leased to the Association, or shall contract for such maintenance, repair, and replacement to assure maintenance thereof, in a clean, sanitary and attractive condition reasonably consistent with prudent property management practices, the Association's budget, and any manuals governing such maintenance, repair, and replacement as may from time to time be adopted by the Board. The Board shall determine, in its sole discretion, the level and frequency of such maintenance.

    (e)    Payment of Taxes. The Association shall pay all real and personal property taxes and other taxes and assessments levied upon or with respect to any Association Property to the extent that such taxes and assessments are not levied directly upon the Members. The Association shall have all rights granted by law to contest the legality and the amount of such taxes and assessments.

    (f)    Insurance. The Association shall, at its sole cost and expense, obtain and maintain in effect policies of insurance of such kind and in such amounts as the Board, in its opinion, deems adequate or desirable, but in no event less than that required by law, including the requirements of NRS § 116.3113 and, so long as the Federal National Mortgage Association ("FNMA") or the Government National Mortgage Association ("GNMA") holds a security interest in a Lot, the requirements of FNMA or GNMA. Without limiting the generality of the preceding sentence, during any time Declarant is the owner of more than five (5) Lots such policies of insurance shall include:

    (i)    Fire and extended coverage insurance on all Improvements owned by or leased to the Association in an amount not less than one hundred percent (100%) of the aggregate full insurable value, meaning actual replacement cost exclusive of the costs of excavations, foundations, and footings. Such insurance shall insure the Association and any mortgagees, as their interests may appear. As to each such policy that will not be thereby voided or impaired, the Association hereby waives and releases all claims against the Board and Declarant, and the officers, agents, and employees of each thereof, with respect to any loss covered by such insurance, whether or not caused by negligence or breach of any duty or agreement by said Persons, but only to the extent that insurance proceeds are received

16

2002051O
.01313

in compensation for the loss. If the foregoing exculpatory clause is held to be invalid, then the liability of the insurance company shall be primary, and the liability of the Board, Declarant, and the officers, agents, and employees of the Board and of Declarant shall be secondary;

       (ii)    Liability insurance, with limits in amounts reasonably determined by the Board, insuring against liability for bodily injury or property damage arising from activities of the Association or with respect to the Association Property, including, if obtainable, a cross-liability endorsement insuring each insured against liability to each other insured. The liability insurance policies referred to above shall name as separately protected insureds Declarant, the Association, the Board and each of its members, the Architecture Committee and each of its members, and the manager of the Property, if any, and such policies may also name some or all of the respective officers, employees, and agents of the foregoing;

       (iii)    Workers' compensation insurance to the extent necessary to comply with all applicable laws;

       (iv)    A fidelity bond in an amount determined by the Board naming the members of the Board and such other Persons as may be designated by the Board as principals and the Association as obligee; and

       (v)    Such other insurance, including indemnity and other bonds, as the Board shall deem necessary or desirable to carrying out the Association's functions.

    The Association shall be deemed trustee of the interests of all Members in all insurance proceeds and shall, subject to the requirements of law, including NRS §§ 116.31133, 116.31135 and any successor statutes, have full power to receive, hold, and disburse such proceeds.

       (g)    Architecture Committee. The Board shall appoint and remove members of the Architecture Committee as provided in Article VII hereof and ensure that at all reasonable times there is available a duly constituted and appointed Architecture Committee.

       (h)    Enforcement. The Association shall enforce, in its own behalf and on behalf of all Owners, all of the covenants, conditions, and restrictions set forth in this Declaration under an irrevocable agency (which is hereby granted) coupled with an interest as beneficiary of said covenants, conditions, and restrictions and as assignee of Declarant. The Association shall perform all other acts, whether or not anywhere expressly authorized, as may be reasonably necessary to enforce any of the provisions of the Rules and Regulations or the Design Guidelines.

       (i)    Long-Term Financing. The Association may, subject to compliance with NRS § 116.3112, execute mortgages and deeds of trust, both construction and permanent, for construction of facilities, including Improvements, on property owned by or leased to the Association. Such financing may be effected through conventional mortgages or deeds of trust, the issuance and sale of development or other bonds, or in any other form or manner as may be deemed appropriate by the borrower, whether that be Declarant or the Association.

17



The mortgage, deed of trust, or other security interest given to secure repayment of such debt may consist of a first lien or a second or other junior lien, as shall be deemed appropriate by such borrower, whether that be Declarant or the Association, on the Improvement or other facility to be constructed, together with such underlying and surrounding lands as Declarant or the Association, as the case may be, deems appropriate. The debt secured by such mortgage, deed of trust, or other security instrument may be retired from revenues generated by dues, use fees, Assessments of the Members of the Association, or otherwise or any combination thereof as may be deemed appropriate by Declarant or the Association, as the case may be, but subject to the limitations imposed by this Declaration and the Act.

(j)    Audit. Within one hundred twenty (120) days of the end of the Association's fiscal year, the Association shall, at its own cost, conduct an annual audit by an independent certified public accountant of the accounts of the Association and make a copy of such audit available to each Member during normal business hours at the principal office of the Association. Upon written request, the Association shall provide to any Eligible Holder, insurer, or guarantor of any Mortgage a copy of the annual audit. Any Member may at any time and at its own expense cause an audit or inspection to be made of the books and records of the Association by a certified public accountant provided that such audit or inspection is made during normal business hours and without unnecessary interference with the operations of the Association. The Association shall maintain copies of the then current Declaration, Articles, Bylaws, and Rules and Regulations, as amended, at the principal office of the Association, and the same shall be available during normal business hours for inspection by Declarant, any Owner, prospective purchasers of Lots, Eligible Holders, insurers, and any guarantors of a Mortgage.

(k)    Books and Records. The Board shall, upon the request of a Member, make available for review at the business office of the Association or other suitable location during the regular working hours of the Association, the books, records and other papers of the Association, including, without limitation, (i) the financial statement of the Association, (ii) the budgets of the Association, and (iii) the study of the reserves of the Association required to be conducted pursuant to subsection 5.03(b) of this Declaration. The Board shall provide a copy of any of the records to a Member within fourteen (14) days after receiving a written request therefor. The Board may charge a fee to cover the actual costs of preparing a copy, but not to exceed twenty-five cents ($.25) per page. The provisions of this subsection 4.05(k) do not apply to the personnel records of the employees of the Association and the records of the Association relating to another Owner.

(l)    Other. The Association shall carry out all duties of the Association set forth in the Rules and Regulations, the Articles, or the Bylaws.

**4.06   Powers and Authority of the Association.** The Association shall have all of the powers of a nonstock, nonprofit corporation organized under the laws of the State of Nevada in operating for the benefit of its members, subject only to such limitations upon the exercise of such powers as are expressly set forth in the Articles, the Bylaws, or this Declaration. It shall have the power to do any and all lawful things which may be authorized, required, or permitted to be done under and by virtue of this Declaration and to do and perform

Case 2:21-cv-02120-JCM-BNW   Document 1-1   Filed 11/29/21   Page 547 of 807

20020510
.01313

any and all acts that may be necessary or proper for or incidental to the exercise of any of the express powers of the Association for the peace, health, comfort, safety, or general welfare of the Owners. Without in any way limiting the generality of the foregoing, the Association and the Board shall have the following powers and authority to exercise in their discretion:

(a)     Right of Entry and Enforcement.  Subject to any limitations or restrictions imposed by FNMA, which are incorporated herein by this reference, the Board and its agents and representatives shall have the power and right to enter upon any Lot and the Improvements thereon without liability to any Owner for the purpose of enforcing any of the provisions of this Declaration or for the purpose of maintaining and repairing the Improvements located on said Lot as provided in this Declaration or if the Owner thereof fails to maintain and repair any portion of a Lot as required by this Declaration.  The Association shall also have the power and authority from time to time in its own name, on its own behalf, or on the behalf of any Owner or Owners who consent thereto to commence and maintain actions and suits to restrain and enjoin any breach or threatened breach of this Declaration and to enforce, by mandatory injunction or otherwise, all of the provisions of this Declaration.  The costs of any such action or suit, including reasonable attorneys' fees, shall be paid to the prevailing party as part of its judgment.

(b)     Civil Actions.  Except as otherwise provided in this subsection 4.06(b), the Association  may commence a civil action only upon a vote or written agreement of the Members holding at least a majority of the voting power of the Association.  The Association shall provide written notice to each Owner of a meeting at which commencement of a civil action is to be considered at least twenty-one (21) days before the meeting.  The provisions of this subsection do not apply to a civil action that is commenced: (i) to enforce the payment of an Assessment; (ii) to enforce the provisions of the Declaration, Bylaws, or Rules and Regulations; (iii) to proceed with a counterclaim; or (iv) to protect the health, safety and welfare of the Members.  If a civil action is commenced pursuant to this subsection without the required vote or agreement, the action must be ratified in accordance with the Act.

(c)     Construction Defect Actions.  Notwithstanding anything in this Declaration to the contrary, at least sixty (60) days before initiating any action against Declarant for construction defects, as defined in NRS 40.615, as may be amended, the Association and any Owner(s) pursuing or bringing such action must give written notice by certified mail, return receipt requested, to the Declarant, at the Declarant's last known address, specifying in reasonable detail the defects and any damages or injuries that are the subject of the complaint.  During the thirty-five (35) day period after the Declarant receives the notice, the Declarant shall be entitled, upon written request, to inspect the Lots, Residences, and Common Area that are the subject of the complaint to determine the nature and cause of the defect, damage, or injury and the nature and extent of repairs necessary to remedy the defect.  The Declarant may take reasonable steps to establish the existence of the defect.  If the Residence, Lot, or Common Area is covered by a warranty or contract of insurance issued by an insurer authorized by the State of Nevada to issue such a warranty or contract, the claimant(s) must diligently pursue a claim under the warranty or contract.  Within forty-five (45) days after the Declarant receives the notice, the Declarant may make a written offer

19

20020510
.01313

of settlement to the claimant. The offer (i) must be served to the claimant by certified mail, return receipt requested, at the claimant's last known address, (ii) must respond to each constructional defect set forth in the claimant's notice, and describe in reasonable detail the cause of the defect, if known, the nature and extent of the damage or injury resulting from the defect, and, unless the offer is limited to a proposal for monetary compensation, the method, adequacy, and estimated cost of the proposed repair; and (iii) may include (A) a proposal for monetary compensation, (B) if the Declarant is licensed to make the repairs, an agreement by the Declarant to make the repairs, or (C) an agreement by the Declarant to cause the repairs to be made, at the Declarant's expense, by another contractor who is licensed to make the repairs, bonded, and insured. The repairs must be made within forty-five (45) days after the Declarant receives written notice of acceptance of the offer, unless completion is delayed by the claimant or by other events beyond the control of the Declarant. The claimant and the Declarant may agree in writing to extend the periods prescribed by this subsection 4.06(c).

(d)    Easements and Rights-of-Way.  The Board shall have the power to grant and convey to any third party easements, licenses, and rights-of-way, in, on, over, or under any Common Area conveyed or otherwise transferred to the Association or under its jurisdiction, subject to the conditions contained in NRS § 116.3112.

(e)    Employment of Manager.  The Board shall have the power to employ, by written agreement and at its sole cost and expense, the services of a manager or management company, subject to the direction and control of the Board, to manage and carry out the affairs of the Association and, to the extent consistent with the laws of the State of Nevada and upon such conditions as are otherwise deemed advisable by the Board, to delegate to the manager any of the powers of the Board or the officers of the Association. In no event shall any management agreement be for a term greater than one (1) year, except with the approval of a majority of the Members, and any such agreement shall provide for termination without penalty on a minimum of thirty (30) days written notice. Except as otherwise provided in the Act, any manager so appointed must hold either a permit to engage in property management pursuant to NRS Chapter 645 or a certificate issued by the Nevada Real Estate Commission.

(f)    Services.  The Board shall have the power, by written agreement and at its sole cost and expense, to provide for and engage the services of others for the mainte-nance, protection, and preservation of the Association Property, including the Common Area, such as grounds keepers, painters, plumbers, and such other maintenance personnel, as the nature and character of the Common Area may require and including any such necessary personnel as the nature and character of any recreational facilities within the Common Area may require; provided, however, that no contract for such services shall be for a duration of more than one (1) year, except with the approval of a majority of the Members, and any such agreement shall provide for termination without penalty on a minimum of ninety (90) days written notice.

20



(g)     Utilities.  The Board shall have the power to contract, use, and pay for utility services to the Association Property.

(h)     Other Property.  The Board shall have the power to acquire and hold, as trustee for the benefit of the Members, tangible and intangible personal property and to dispose of the same by sale or otherwise.

(i)     Mergers.  The Association shall have the power, to the extent permitted by NRS § 116.2121, to participate in mergers and consolidations with other nonprofit corporations organized for the same purposes as the Association.

(j)     Dedication.  The Board shall have the power to dedicate any of the Association Property to an appropriate public authority for public use, provided that any such dedication shall comply with NRS § 116.3112, and that such dedication is subject to the existing easements and rights of use of all of the Members.

(k)     Delegation.  The Board may delegate any of its powers to any committees, officers, or employees as it deems necessary and proper.

(l)     Construction on Association Property.  The Board shall have the power to construct new Improvements or additions to the Association Property or demolish existing Association Property or Improvements subject to the approval of the Architecture Committee as is required in this Declaration.

(m)     Maintenance of Entry and Exit Measures.  The Board shall have the power to implement measures regulating entrance and exit at all points of entry and exit to or from the Property, which may or may not be guarded.

(n)     Conveyances.  The Board shall have the power to grant and convey to any Person real property and interests therein, including fee title, leasehold estates, easements, rights of way, mortgages, and deeds of trust, out of, in, on, over, or under any Association Property for the purpose of constructing, erecting operating, maintaining, or repairing thereon, therein or thereunder:

    (i)     parks, parkways, or other recreational facilities;

    (ii)     roads, streets, ways, driveways, trails, and paths;

    (iii)     lines, cables, wires, conduits, pipelines, or other devices for utility purposes;

    (iv)     sewers, water systems, storm water drainage systems, sprinkler systems, and pipelines; and

    (v)     any similar public, quasi-public, or private improvements or facilities.

21



Nothing above contained, however, shall be construed to permit use or occupancy of any land, Improvement, or other facility in a way that would violate applicable zoning or use and occupancy restrictions imposed thereon by other provisions of this Declaration or by city, county, or other applicable public agency.

(o)    Legal and Accounting Services.  The Board shall have the power, by written agreement and at its sole cost and expense, to retain and pay for legal and accounting services necessary or proper in the operation of the Association, the operation and management of the Association Property, the enforcement of the Rules and Regulations, or in the performance of any other duty, right, power, or authority of the Association.

(p)    Association Property Services.  The Board shall have the power to pay for water, sewer, garbage removal, electricity, telephone, gas, snow removal, landscaping, gardening, and all other utilities, services, and maintenance for the Association Property.

(q)    Other Areas.  The Board shall have the power to maintain and repair easements, roads, roadways, rights of way, parks, parkways, median strips, sidewalks, paths, trails, ponds, lakes, entry details, entry houses, Perimeter Walls, or other Common Area whether owned by or leased to the Association and to contribute toward the cost of operation and maintenance of private roads, if any, and any other Improvements or other facilities owned by or leased to the Association.

(r)    Recreational Facilities.  The Board shall have the power to operate and maintain any and all types of facilities owned by or leased to the Association for both active and passive recreation within the Common Area including, but not limited to: swimming pools; community clubs; picnic areas; parks and playgrounds; trails for hiking and bicycles; lakes and ponds for swimming, fishing, and other water sports; and other similar and dissimilar recreational facilities.

(s)    Other Services and Properties.  The Board shall have the power to obtain and pay for any other property and services and to pay any other taxes or assessments that the Association or the Board is required to secure or to pay for pursuant to applicable law, the Rules and Regulations, the Articles, or the Bylaws.

(t)    Contracts.  The Board shall have the power, at its sole cost and expense, to enter into contracts with Declarant and other Persons, on such terms and provisions as the Board shall determine, to operate and maintain any Common Area and Improvements thereon or to provide any service to the Property (including, but not limited to, cable television and laundry facilities).

**4.07   Indemnification.**

(a)    Indemnification.  The Association shall indemnify any Person who was or is a party or is threatened to be made a party to any threatened, pending, or completed

22

```
20020510
.01313
```

action, suit, or proceeding, whether civil, criminal, administrative, or investigative, by reason of the fact that it is or was a director, officer, employee, servant, or agent of the Association against expenses (including attorneys' fees), judgments, fines, and amounts paid in settlement actually and reasonably incurred by it in connection with such action, suit, or proceeding until and unless it is proved that it acted with willful or wanton misfeasance or with gross negligence and provided it acted in good faith and in a manner it reasonably believed to be in or not opposed to the best interests of the Association, and with respect to any criminal action or proceeding, had no reasonable cause to believe its conduct was unlawful. The termination of any action, suit, or proceeding by judgment, order, settlement, conviction, or upon a plea of nolo contendere or its equivalent shall not of itself create a presumption that the Person did not act in good faith or in a manner it reasonably believed to be in or not opposed to the best interests of the Association, or with respect to any criminal action or proceeding, had reasonable cause to believe that its conduct was unlawful.

Board members are not liable to the victims of crimes that may occur on the Property. Punitive damages may not be recovered against the Association but may be recovered only from Persons whose intentional activities are proved to have resulted in damages.

(b)    Determination. Any indemnification that the Association has elected to provide under this Section 4.07 (unless ordered by a court) shall be made by the Association only as authorized in the specific case by a determination that indemnification of the officer, director, employee, servant, or agent is proper in the circumstances because it has met the applicable standard of conduct set forth in subsection 4.07(a). Such determination shall be made: (i) by the Board by a majority vote of a quorum consisting of directors who were not parties to such action, suit, or proceeding; or (ii) if such a quorum is not obtainable, or even if obtainable and a quorum of disinterested directors so directs, by independent legal counsel in a written opinion; provided, however, that if a director, officer, employee, servant, or agent of the Association has been successful on the merits or otherwise in the defense of any action, suit, or proceeding referred to in subsection 4.07(a), or in defense of any claim, issue, or matter therein, then to the extent that the Association has elected to provide indemnification, it shall automatically be indemnified against expenses (including attorneys' fees) actually and reasonably incurred by it in connection therewith without the necessity of any such determination that it has met the applicable standard of conduct set forth in subsection 4.07(a).

(c)    Payment in Advance. Expenses incurred in defending a civil or criminal action, suit, or proceeding may, upon action by the Board in accordance with subsection 4.07(b), be paid by the Association in advance of the final disposition of such action, suit, or proceeding upon receipt of an undertaking by or on behalf of the director, officer, employee, servant, or agent to repay such amount unless it shall ultimately be determined that it is entitled to be indemnified by the Association as authorized in this Section 4.07.

(d)    Insurance. The Board shall purchase and maintain, at its sole cost and expense, insurance on behalf of any Person who is or was a director, officer, employee,

23

20020510
.01313

servant, or agent of the Association against any liability asserted against it or incurred by it in any such capacity or arising out of its status as such, whether or not the Association would have the power to indemnify it against such liability hereunder or otherwise.

(e) Other Coverage. The indemnification provided by this Section 4.07 shall not be deemed exclusive of any other rights to which anyone seeking indemnification may be entitled under this Declaration, any agreement, vote of the Members, vote of disinterested directors, Nevada law, or otherwise, both as to action in its official capacity and as to action in another capacity while holding such office, and may continue as to a Person who has ceased to be a director, officer, employee, servant, or agent and may inure to the benefit of the heirs and personal representatives of such a Person.

4.08 Diseased Trees. The Association may enter upon any part of the Property at any time to inspect for, prevent, and control diseased and insect infested trees and other plant life. If any diseased or insect infested trees or other plant life are found, the Association may spray, remove diseased trees and other plant life, or take such other remedial measures as it deems expedient. The cost thereof applicable to privately owned property may be levied by the Association as a special Assessment against such privately owned property pursuant to Section 5.04 hereof.

4.09 Perimeter Walls. The Association may enter upon any part of the Property at any time to inspect for, prevent, or control damage to any Perimeter Walls and to maintain, repair, or replace, as necessary, the Perimeter Walls. Owners of Lots bounded by a Perimeter Wall shall be responsible for the cost of maintenance to Perimeter Walls as set forth in subsection 3.04(e)(vii) hereof. Notwithstanding the foregoing, an Owner causing any damage to any Perimeter Walls by its acts shall be solely responsible and liable for any maintenance, repair, or replacement, as required, and for any cost or liability necessary to repair such damaged Perimeter Walls.

4.10 Rules.

(a) Rulemaking Power. The Board may, from time to time and subject to the provisions of this Declaration, propose, enact, and amend rules and regulations to be known as the "Rules and Regulations" that relate to the management, operation, and control of the Association or the Common Area. The Rules and Regulations shall become effective and binding on all Owners only after adoption by the Board. Such Rules and Regulations may concern, but need not be limited to, matters pertaining to use of the Common Area; signs; collection and disposal of refuse; minimum standards of maintenance of property; parking and traffic restrictions; limitations on maintenance of landscaping or other Improvements on any property; standards for Residences; limitations on the type of furniture, fixtures, equipment, and other objects maintained on Lots in view of other Owners; limitations on the number and type of animals that may be allowed on the Property; and any other subject or matter within the jurisdiction of the Association as provided in this Declaration. The Rules and Regulations may restrict and govern the use of the Common Area by any Member or

24

Case 2:21-cv-02120-JCM-BNW   Document 1-1   Filed 11/29/21   Page 553 of 807

--

```
20020510
.01313
```

Lessee, by the family of such Member or Lessee, or by any invitee, licensee, or guest of such Member or Lessee. Declarant retains the right to establish rules relating to the use of any portion of the Common Area owned by it until annexation and conveyance to the Association, and the Association may incorporate such rules in its Rules and Regulations. The right of an Owner or the Board to enforce Rules and Regulations is limited to those Owners that are subject to this Declaration.

        (b)   <u>Notification of Rules and Regulations</u>. A copy of the Rules and Regulations, as they may be from time to time adopted, amended, or repealed, shall be mailed or otherwise delivered to each Member and may, but are not required to, be recorded. The adoption of the Rules and Regulations shall have the same force and effect as if they were set forth in and were a part of this Declaration. No Rules and Regulations may be adopted that materially impair the rights, preferences, or privileges of any Owner as specifically set forth herein.

    **4.11   Breach of Rules, Regulations, or Restrictions**. In the event of a breach of any provision of the Rules and Regulations or of any of the restrictions contained in this Declaration by an Owner its family, guests, employees, invitees, licensees, or tenants, the Board, for and on behalf of itself and all other Owners, shall have the right to enforce the obligations of each Owner to obey the Rules and Regulations or the restrictions of this Declaration in any manner provided by law or in equity, including, but not limited to, appropriate hiring of legal counsel, the pursuing of legal action, suspension of the Owner's right to use the facilities of the Common Area, or suspension of the Owner's voting rights; provided, however, such suspension for a nonrecurring violation of the Rules and Regulations may not be for a period in excess of thirty (30) days, after notice and hearing as herein provided. Subject to Section 4.12 below and in addition to the other remedies herein set forth, including, without limitation, assessing the cost of repair of any damage resulting from a violation of the Rules and Regulations, the Board, by majority vote, may levy a fine against such Owner, after appropriate notice and hearing as herein provided. Prior to imposing any penalty provided herein for breach of the Rules and Regulations or of the restrictions contained in this Declaration, the Board shall provide the Owner with reasonable notice and a hearing before the Board, which notice must specify the nature of the violation. In the event that the Board determines that a violation has occurred and that a penalty shall be imposed, the determination of the Board shall be final, provided that a reasonable opportunity for a hearing before the Board has been provided to the Owner. In the event legal counsel is retained or legal action is instituted by the Board pursuant to this Section, any settlement prior to judgment or any judgment rendered in any such action shall include costs of collection, court costs, and reasonable attorneys' fees.

    **4.12   Fines**. Every fine must be commensurate with the severity of the violation. Additionally, if the violation does not threaten the health and welfare of the Development, the fine must not exceed one hundred dollars ($100) for each violation or a total amount of five hundred dollars ($500), whichever is less. The Rules and Regulations may be enforced by the Assessment of a fine only if (a) the Person alleged to have violated the Rules and Regulations has received notice of the alleged violation that informs him of his opportunity to request a hearing on the alleged violation, and, (b) at least thirty (30) days before the alleged

F:\Data\Doc\Deal\Conesa\Santa Fe\CC&Rs.1.wpd

25

20020510
.01313

violation, said Person was given written notice of the rule or regulation (or any amendment to the rule or regulation) that the Person allegedly violated. If a fine is imposed pursuant to this Section and the violation is not cured within fourteen (14) days or such longer cure period as the Board establishes, the violation shall be deemed a continuing violation and the Board may thereafter impose additional fines for the violation not to exceed one hundred dollars ($100) per each seven (7) day period or portion thereof that the violation remains uncured. Any additional fine may be imposed without notice and an opportunity to be heard. The Secretary of the Association shall prepare and cause to be hand-delivered or sent prepaid by United States mail to the mailing address of each Lot or to any other mailing address designated in writing by the Lot Owner, a schedule of the fines that may be imposed for particular violations of the Declaration, Rules and Regulations, and other governing documents of the Association. The Association may not foreclose a lien for the Assessment of a fine for a violation of the Declaration, Bylaws, or Rules and Regulations, unless the violation is of a type that threatens the health, safety, or welfare of the residents of the Development.

**4.13    Liability of Members of Board.** No member of the Board shall be personally liable to any of the other Board members, to the Members, or to any other Person, including Declarant, for any error or omission of the Association, its representatives and employees, or the Architecture Committee, provided that such Board member has, upon the basis of such information as may be possessed by him or her, acted in good faith.

**4.14    Amendment.** Notwithstanding anything to the contrary in Section 10.04, the provisions of Sections 4.01, 4.02, 4.03, and 4.04 shall not be amended without the vote or written consent of two-thirds (2/3rds) of the Owners.

### ARTICLE V.

### Covenant for Maintenance Assessments

**5.01    Assessments.** The Owner of any Lot, by acceptance of a deed therefor, covenants and agrees to pay to the Association annual Assessments and special Assessments for capital improvements, such Assessments to be established and collected as hereinafter provided. The annual Assessment, special Assessment, interest, costs, and reasonable attorneys' fees shall be a charge on the Lot and shall be a continuing lien upon the Lot against which each such Assessment is made until paid. Each Assessment, together with interest, costs, and reasonable attorneys' fees, shall also be the personal obligation of the Owner of the Lot at the time when the Assessment became due. The personal obligation for delinquent Assessments shall not be extinguished upon the sale or the conveyance of a Lot, but any purchaser of a Lot shall not be liable for any unpaid Assessments or fee greater than the amounts set forth in the statement of unpaid Assessments described in Section 5.07.

**5.02    Purpose of Assessments.** The Assessments levied by the Association shall be used exclusively to promote the recreation, health, safety, and welfare of the residents

Case 2:21-cv-02120-JCM-BNW   Document 1-1   Filed 11/29/21   Page 555 of 807

20029510
.01313

of the Property, for the improvement and maintenance of the Common Area, and for the daily operating expenses of the Association.

### 5.03   Regular Assessments.

(a)   Annual Assessment.   The Board shall fix the annual Assessment at an amount sufficient to cover the estimated budget of the Association prior to the beginning of each fiscal year. The Board may increase the annual Assessment by up to fifteen percent (15%) of the previous year's annual Assessment without the consent of the Owners. The Board shall, not less than thirty (30) days or more than sixty (60) days before the beginning of each fiscal year of the Association, prepare and distribute to each Owner a copy of the budget for the daily operation of the Association. The budget must include, without limitation, the estimated revenue and expenditures of the Association for the coming year and any contributions to be made to the reserve funds established by subsection 5.03(b) hereof. In lieu of distributing copies of the budget, the Board may distribute summaries of the budget, accompanied by a written notice that the budget is available for review at the business office of the Association or other suitable location and that copies of the budget will be provided upon request.

(b)   Reserve.   The annual Assessment of the Association shall, in addition to being sufficient to cover anticipated expenses, include adequate reserves for the repair, replacement, and restoration of the major components of the Common Area. The reserve funds may be used only for those purposes and not for daily maintenance. Money in the reserve accounts may not be withdrawn without the signatures of at least two (2) members of the Board or the signatures of at least one (1) member of the Board and one (1) officer of the Association who is not a member of the Board.

The Board shall, not less than thirty (30) days or more than sixty (60) days before the beginning of the fiscal year of the Association prepare and distribute to each Owner a copy of the reserve budget. In lieu of distributing copies of the reserve budget, the Board may distribute summaries of the budget, accompanied by a written notice that the budget is available for review at the business office of the Association or other suitable location and that copies of the budget will be provided upon request.

The reserve budget must include, without limitation: (i) the current estimated replacement cost, estimated remaining life, and estimated useful life of each major component of the Common Area; (ii) as of the end of the fiscal year for which the budget is prepared, the current estimate of the amount of cash reserves that are necessary, and the current amount of accumulated cash reserves that are set aside, to repair, replace, or restore the major components of the Common Area; (iii) a general statement describing the procedures used for said estimation and accumulation of cash reserves, including, without limitation, the qualifications of the Person responsible for the preparation of the reserve studies required under this subsection; and (iv) a statement as to whether the Board has determined or anticipates that the levy of one or more Special Assessments will be required to repair, replace,

27



or restore any major component of the Common Area or to provide adequate reserves for that purpose.

The Board shall cause to be conducted at least once every five (5) years, a study of the reserves required to be maintained by this subsection, review the results of that study at least annually to determine if those reserves are sufficient, and make any adjustments it deems necessary to maintain the required reserves. The study must be conducted by a person qualified by training and experience to conduct such a study, including a member of the Board, an Owner, or the manager of the Association who is so qualified. The study must include, without limitation: (i) a summary of an inspection of the major components of the Common Area that the Association is obligated to repair, replace, or restore; (ii) an identification of the major components of the Common Area that the Association is obligated to repair, replace, or restore which have a remaining useful life of less than thirty (30) years; (iii) an estimate of the remaining useful life of each major component so identified; (iv) an estimate of the cost of repair, replacement, or restoration of each major component so identified; and (v) an estimate of the total annual Assessments that may be required to cover the cost of repair, replacement, or restoration of the major components so identified after subtracting the reserves of the Association as of the date of the study.

(c)    Increases of Annual Assessment.  The annual Assessment may not be increased by more than fifteen percent (15%) of the annual Assessment for the previous year without a vote or written consent of fifty-one percent (51%) of the Members; provided, however, that following the termination of the Declarant control period described in subsection 4.03(a) hereof, any such increase shall have the vote or written consent of: (i) fifty-one percent (51%) of the Members, and (ii) fifty-one percent (51%) of the Members other than Declarant.

(d)    Budget Ratification.  The Board shall, within thirty (30) days after the adoption of any proposed budget, provide a summary of the budget to all Owners and shall set a date for a meeting of Owners to consider and ratify the budget not less than fourteen (14) nor more than thirty (30) days after the mailing of the summary.  Unless a majority of all Owners at the meeting reject the budget (whether or not a quorum is present), the budget is ratified.  If the budget is rejected, the budget last ratified shall continue to be the budget for the Association.

(e)    Inadequacy of Annual Assessment.  In the Board's sole and absolute discretion, should the annual Assessment be inadequate for any reason, including, without limitation, nonpayment of any Member's annual Assessment, to provide for the Association's costs and expenses, the Board may at any time and from time to time levy further Assessments in the same manner as described in subsection (a) of this Section 5.03.

(f)    Financial Statement.  A financial statement for the Association shall be prepared each fiscal year, which shall include a balance sheet showing the profit and loss of the Association and the funds held in reserve by the Association.

28

2002 05 10
.01313

(g)    Initial Contribution.  In addition to the allocable portion of the monthly installment of the regular Assessment for the month escrow closes on the sale of a Lot by Declarant to an Owner other than Declarant, each Owner shall be required to make at close of escrow an initial capital contribution to the reserve fund described in subsection (b) above. The initial reserve contribution shall be equal to twice the monthly installment of annual Assessments allocable to the Owner's Lot.  This initial capital contribution is not an advance payment on the Owner's annual Assessments and is not refundable to the Owner or its successors or assigns.

5.04    Special Assessments.  In addition to the annual Assessments authorized above, the Board may levy special Assessments for the purpose of construction, reconstruction, repair, or replacement of a capital Improvement upon the Common Area, including fixtures and personal property related thereto.  Any such Assessment must be approved by a majority of the Members.  The Association shall provide written notice to Owners of any meeting at which an Assessment for capital Improvements is to be considered at least twenty-one (21) calendar days before the meeting.

5.05    Notice of Special Assessments; Time for Payment.  The Association may, in its discretion, give written notice of special Assessments to each Owner, which notice shall specify the amount of the special Assessment and the date or dates of payment of the same. No payment shall be due fewer than fifteen (15) days after the written notice has been given.  Failure of the Association to give notice of the special Assessment shall not affect the liability of the Owner of any Lot, but the date when payment shall become due in such a case shall be deferred to a date fifteen (15) days after the notice shall have been given.

5.06    Collection of Assessments.  Annual Assessments shall commence with respect to each Lot in the original Property on the first (1st) day of the month immediately following the first (1st) close of escrow for the sale by Declarant to an Owner other than Declarant of a Lot in the original Property.  Annual Assessments shall so commence with respect to each Lot in any Annexable Area annexed to the Property in accordance with Article IX hereof on the first (1st) day of the month immediately following the first close of escrow for the sale by Declarant to an Owner other than Declarant of a Lot in that portion of the Annexable Area so annexed.

5.07    Unpaid Assessments.  The amount of any delinquent Assessment, whether regular or special, assessed against any Lot, a late payment charge of five percent (5%) of the delinquent Assessment, plus interest on such Assessment and late payment charge at a rate not to exceed eighteen percent (18%) per annum simple interest, and the costs of collecting such Assessment, late payment charge, and interest, including reasonable attorneys' fees, shall be a lien upon the Lot assessed until paid.  Such lien shall be prior to any declaration of homestead, and except as provided in Section 5.08 hereof, such lien shall survive and not be affected by the conveyance of the Lot subject to the delinquent Assessment to a third-party purchaser.  Such lien shall be created in accordance with NRS

29

20020510
.01313

§ 116.3116 and shall be foreclosed in the manner provided for in NRS § 116.31162-116.31168 as is now or hereafter may be in effect. A certificate executed and acknowledged by any two (2) members of the Board stating the indebtedness secured by such lien shall be conclusive upon the Association as to the amount of such indebtedness as of the date of the certificate in favor of all Persons who rely thereon in good faith, and such certificate shall be furnished to any Owner upon request at a reasonable fee not to exceed Ten Dollars ($10.00). In addition to foreclosure of the Assessment lien, the Association may, but is not obligated to, bring an action to recover judgment against the Member personally obligated to pay the delinquent regular or special Assessment after having provided to that Member thirty (30) days' written notice of the delinquency. The Board may suspend the voting rights in the Association and right to use any of the recreational facilities of the Common Area of any Owner during any period any Assessment due from such Owner is unpaid. In the event an Assessment is past due more than fifteen (15) days, the Board may declare immediately due and payable the total amount assessed against the Owner and the Lot for that fiscal year. The Association may not foreclose a lien for the Assessment of a fine for a violation of this Declaration, the Bylaws, or the Rules and Regulations, unless the violation is of a type that threatens the health, safety, or welfare of the residents of the Development.

   5.08   **Mortgage Protection.** Notwithstanding any other provision of this Declaration, no lien created under this Article V or under any other Article of this Declaration, nor any lien arising by reason of any breach of this Declaration, nor the enforcement of any provision of this Declaration, shall defeat or render invalid the rights of the beneficiary under any Recorded Mortgage of first and senior priority now or hereafter upon a Lot, made in good faith and for value, perfected before the date on which the Assessment sought to be enforced became delinquent. However, after the foreclosure of any such first Mortgage, such Lot shall remain subject to this Declaration and shall be liable for all regular Assessments and all special Assessments levied subsequent to the date six (6) months prior to the institution of an action to foreclose on any such first Mortgage.

   5.09   **Effect of Amendments on Mortgages.** Notwithstanding the provisions of Section 10.04 hereof, no amendment of Section 5.08 of this Declaration shall affect the rights of any beneficiary whose Mortgage has senior priority as provided in Section 5.08 and who does not join in the execution thereof, provided that its Mortgage is Recorded in the real property records of Clark County, Nevada, prior to the Recordation of such amendment; provided, however, that after foreclosure or conveyance in lieu of foreclosure, the property that was subject to such Mortgage shall be subject to such amendment.

   5.10   **Annual Assessments Paid By Declarant.** Declarant shall pay all Assessments on all Lots owned by Declarant (but not on any Lots in any Annexable Area until both of the following shall occur: (a) such Annexable Area is actually annexed to and becomes a part of the Property; and (b) the first day of the month following the close of the first sale by Developer to an Owner other than Developer of a Lot within that particular portion of the Annexable Area); including those Lots owned by Declarant that have not been sold to Owners

30



other than Declarant; provided, however, that Declarant may receive as a credit the costs or value of any maintenance or repair performed by Declarant on the Association Property.

## ARTICLE VI.

## Permitted Uses and Restrictions

In addition to all of the covenants contained herein, the use of the Property and each Lot therein is subject to the following:

**6.01    Improvements and Use.**  Except as expressly provided herein, the Lots shall be used exclusively for single-family residential purposes.  Timesharing is prohibited.  No mobile home may be placed or located on any Lot.

**6.02    Animals.**  No animals of any kind shall be raised, bred, or kept on any Lot, except that a reasonable number of dogs, cats, or other household pets may be kept on a Lot provided that they are not kept, bred, or maintained for any commercial purpose nor in violation of any applicable local ordinance or any other provision of this Declaration.  A "reasonable number" shall ordinarily mean three (3) or fewer pets per Lot.  All pets within the Property shall be leashed or otherwise under the direct control of the pet owner when not within an enclosed area of a Lot.  It shall be the absolute duty and responsibility of each Owner or Lessee to remove any solid animal waste after such animals have used any portion of the Property or any public property in the vicinity of the Property.  No pet shall be permitted to be kept within any portion of the Property if it makes excessive noise or is otherwise determined by the Board to be a nuisance.  If a pet is determined to be a nuisance, the Board may give notice to the Owner or Lessee to resolve the offending problem within seventy-two (72) hours, and if the problem is not resolved during that period of time, order the removal of the pet.

**6.03    Commercial or Other Non-Residential Uses.**  No commercial, professional, industrial, institutional, or other non-residential use (including residential day care facilities) shall be conducted on any Lot without the written approval of the Board, except such temporary uses as shall be permitted by Declarant while the Development is being constructed and Lots are being sold by Declarant.  Any owner wishing to conduct any commercial, institutional, or other non-residential uses on any Lot shall first apply to the Board for approval of such use and shall provide to the Board any information deemed necessary by the Board to evaluate the impacts of such use on the neighborhood.  The Board shall determine if such use diminishes the residential character of the Lot or neighborhood or imposes a nuisance on the neighborhood.  The decision of the Board shall be final and conclusive.  The Board may review, and repeal, any such approval from time to time at the discretion of the Board if, in the opinion of the Board, the use has changed or increased to a level not consistent with the original approval.  This provision may not be amended or deleted without the approval of all of the Members.

31

Case 2:21-cv-02120-JCM-BNW   Document 1-1   Filed 11/29/21   Page 560 of 807

20020510
.01313

**6.04   Utility Service.**  No lines, wires, or other devices for the communication or transmission of electric current or power, including telephone, television, and radio signals, shall be erected, placed, or maintained anywhere in or on any Lot unless the same shall be contained in conduits or cables installed and maintained underground or concealed in, under, or on buildings or other structures approved in writing by the Board.  All temporary utility outlets shall be installed and maintained in accordance with applicable provisions of the Rules and Regulations.  No provision hereof shall be deemed to forbid the erection of the temporary power or telephone installations incident to the construction of approved buildings or structures.

**6.05   Nuisances.**  No noxious, illegal, or offensive activity shall be carried out on or upon any Lot or any part of the Property, nor shall anything be done thereon that may be or may become an annoyance or nuisance, public or private, to the neighborhood, that shall in any way interfere with the quiet enjoyment of each of the Owners of their respective Lots, or that shall in any way increase the rate of insurance for the Association or for the Owners.

**6.06   Garbage.**  No rubbish, trash, garbage, or other waste shall be kept except in sanitary containers.  All equipment for the storage or disposal of such materials shall be kept in a clean and sanitary condition and shall be enclosed so as not to be visible from any public street or from any other Lot or the Common Area.

**6.07   Antennae, Satellite Dishes and Solar Collectors.**  No Owner may erect or maintain a television or radio receiving or transmitting antenna, satellite dish or similar implement or apparatus, or solar collector panels or equipment upon any Lot unless such apparatus is erected and maintained in such a way that it is screened from public view along the public street right-of-way directly in front (and to the side, in the case of a corner Lot) of the house erected on such Lot; and no such apparatus shall be erected without the prior written consent of the Architecture Committee. The Architecture Committee, as designated in this Declaration, shall have the absolute authority to determine whether an accessory is adequately screened from public view.  The provisions of this Section 6.07 and the authority of the Architecture Committee in this matter shall be subject to any regulations issued by the Federal Communications Commission and any other applicable governmental authority.

**6.08   Signs.**  No signs other than one (1) sign of customary and reasonable dimensions advertising a Lot for sale or rent shall be displayed on any Lot so that it is visible from any other Lot, public street, or the Common Area without prior written consent of the Board. No signs shall be displayed on the Common Area except signs approved by the Board.

**6.09   Equipment and Machinery.**  No power equipment or hobby shops shall be permitted on the Property except with prior written approval of the Board.  No equipment, machinery, junk, debris, building materials, or similar matter shall be placed, stored, or kept in or on any Lot, parking area, or street within or adjoining the Property.

32

Case 2:21-cv-02120-JCM-BNW  Document 1-1  Filed 11/29/21  Page 561 of 807



**6.10   Laundry.**  Outside clotheslines or other outside facilities for drying or airing clothes shall not be erected, placed, or maintained on any Lot.  No washing machine or dryer shall be kept on any Lot, except within a Residence, without the prior written approval of the Board.

**6.11   Propane Tanks.**  Only propane tanks used in connection with barbecue grills shall be permitted on any Lot; provided, however, that such tanks are in compliance with all applicable codes and laws.

**6.12   Maintenance of Lawn and Plants.**  All Lots, landscaping, driveways, and exteriors must be kept neat and tidy at all times.  No landscape trimmings shall be placed for removal on or near any public road within the Property or in a place upon the Lot where they are visible from any other Lot or the Common Area.

**6.13   Vehicle Parking.**

(a)   Owner and Occupant Parking; Priorities.  It is the intent of this Subsection to limit on-street parking within the Property. Accordingly, each Owner and the occupants of his Residence shall park all of their vehicles first within the garage and then on the driveway of the Owner's Lot; provided, however, that the number of vehicles parked on any Lot shall not exceed the maximum number of vehicles that the garage and driveway were designed to accommodate (e.g., if a Residence has a three (3) car garage and a driveway designed to accommodate three (3) additional cars, then no more than six (6) cars may be parked on the Lot).  Garage doors must be kept closed at all times, except as reasonably required for ingress and egress to and from the garage.  Only after all parking areas first within the garage and then on the driveway are full shall an Owner be allowed to park a vehicle on the streets within the Project.  In addition, no Owner shall park, store, or keep anywhere within the Property any vehicle or vehicular equipment, mobile or otherwise, deemed to be a nuisance by the Board, in its sole and absolute discretion.

(b)   Guest Parking.  Notwithstanding the provisions of Subsection 6.13(a). Persons other than Owners and occupants of the Property, including, without limitation, their guests, invitees, and licensees, may park their vehicles on the streets of the Property between the hours of 7:00 a.m. and 10:00 p.m. Pacific Standard Time. During times other than these hours, including overnight stays, vehicles of such other persons must be parked in accordance with the provisions of Subsection 6.13(a).

(c)   Campers, Boats, RVs, Trailers and Non-Passenger Vehicles.  No campers, boats, trailers, trailer coaches, camp trailers, recreational vehicles, camper units, house/cars, motor homes, mobile homes, aircraft, jet skis, wave runners, four-wheelers, off-road vehicles, buses, recreational trailers, non-passenger vehicles, or any other similar vehicles, rolling stock, equipment, implements, or accessories shall be stored or kept on any Lot unless the same are fully enclosed within the garage located on such Lot or are in operable condition,

33

2002.0510
.01313

located behind the side yard block wall and gate, and otherwise adequately screened from view, all as determined by the Board in its sole and absolute discretion.

(d)  Commercial Vehicles.  No large commercial vehicles, including, but not limited to, any dump truck, cement mixer truck, oil or gas truck, or delivery truck, shall be kept or stored on any Lot unless approval of the Board is granted.  For purposes of this Subsection 6.13(d), "large commercial vehicle" shall mean any vehicle larger than a nineteen (19) foot van or three-quarter (3/4) ton pickup truck that bears commercial insignia, names, or other common indicia indicating that the vehicle is used for commercial purposes, all as determined by the Board in its sole and absolute discretion.  Large commercial vehicles that are temporarily parked on any Lot for the sole purpose of serving such Lot are exempt from this restriction.  The Board shall have the absolute authority to grant approval for storing or keeping a large commercial vehicle on a Lot.  Any Owner wishing to keep a large commercial vehicle on any Lot shall apply for approval to the Board, and shall provide such information as the Board, in its sole authority, may require.  The Board may from time to time in its sole discretion review the approval to keep a large commercial vehicle on any Lot to determine if the vehicle complies with the intent of the original approval.  Upon an adverse determination by the Board, any vehicle shall be removed or otherwise brought into compliance with the requirements of this Section 6.13.

(e)  Disabled, Inoperable and Unregistered Vehicles.  No disabled, inoperable or unregistered vehicles, campers, boats, trailers, recreational vehicles, or other types of non-passenger vehicles, equipment, implements, or accessories may be kept or stored on any street within the Property for any period in excess of forty-eight (48) hours, nor placed on any Lot unless fully screened from view.

(f)  Vehicle Maintenance.  No dismantling, assembling or maintenance (other than emergency maintenance) of motor vehicles, boats, trailers, recreational vehicles, or other machinery, implements, accessories or equipment shall be permitted in the streets within the Property, or in any parking area, driveway or yard adjacent to a street, or that is not screened from view.

(g)  Authority to Review.  The Board shall have the absolute authority to determine from time to time whether a vehicle or accessory is operable, adequately screened from public view, and otherwise in compliance with the provisions of this Section 6.13.  Upon an adverse determination by the Board, the vehicle or accessory shall be removed or otherwise brought into compliance with this Section 6.13.

(h)  Parking Rules and Regulations.  The Board may adopt rules and regulations consistent with this Section 6.13 to further regulate vehicle parking in the Property.

**6.14  Leases.**  Any lease of a Lot shall be in writing and be of a term of at least six (6) months, shall expressly provide that such lease is subject in all respects to this Declaration, and that any failure of the Lessee to comply with any provisions of this Declaration shall constitute a default under such lease.  The Owner of a leased Lot shall be responsible for

34

Case 2:21-cv-02120-JCM-BNW   Document 1-1   Filed 11/29/21   Page 563 of 807

```
2002 05 10
.01313
```

all Assessments, penalties, and costs imposed on said Lot. No Lot may be leased for hotel or transient purposes. No portion of a Lot (less than the entire Lot) may be leased for any period.

**6.15    Resubdivision.** No Lot shall be resubdivided nor shall less than an entire Lot be sold.

**6.16    Improvements.** All Lot Improvements, including any species of plant material and placement of plants, shall be subject to the control and approval of the Architecture Committee as set forth in Article VII of this Declaration.

**6.17    Taxes.** Each Owner shall pay when due and before delinquency all taxes, Assessments, levies, fees, and all other public charges and utility fees and charges of every kind and nature imposed upon or assessed against its Lot.

**6.18    Rules and Regulations.** The Board is hereby expressly authorized to establish all rules and regulations as it shall deem necessary for the purpose of implementing, enforcing, and administering the purposes of this Declaration.

**6.19    Hazardous Substances.** No activity shall be permitted on any Lot or the Common Area that, in the sole opinion of the Board, will create or emit offensive, hazardous, or excessive quantities of dust, dirt, ash, smoke, noise, fumes, odors, or vibrations or create risk of fire, explosion, or other hazards or is not in harmony and consistent with the Property. Activities prohibited hereunder include, but are not limited to, activities that result in the disposal of hazardous substances in any form upon the Property. For the purposes of this Declaration, the term "Hazardous Substance" shall mean any product, substance, chemical, material, or waste whose presence, nature, quantity, or intensity of existence, use, manufacture, disposal transportation, spill, release, or effect, either by itself or in connection with other materials expected to be found upon any Lot, is either: (i) potentially injurious to the public health, safety, or welfare or the environment or the Property; (ii) regulated or monitored by any governmental authority; or (iii) a basis for liability of Declarant or any Owner to any governmental agency or third party under any applicable state or common law principle.

**6.20    Party Walls.** Owners of Party Walls shall share equally the responsibility and cost of all maintenance, repair, or replacement, as necessary, of their respective Party Walls. Notwithstanding the foregoing, an Owner causing any damage to any Party Walls by its acts shall be solely responsible and liable for any maintenance, repair, or replacement, as required, and for any cost or liability necessary to repair such damaged Party Walls.

**6.21    Exterior Holiday Decorations.** Lights or decorations may be erected on a Lot in commemoration or celebration of publicly observed holidays provided that such lights or decorations do not unreasonably disturb the peaceful enjoyment of Owners of adjacent Lots by illuminating bedrooms, creating noise or attracting sight-seers. Holiday decorations or lights for any publicly observed holiday between December 1 and December 31 of any

35



year, may not be displayed before November 15 of any year. For other holidays, decorations or lights may not be displayed more than two (2) weeks in advance of the holiday. All lights and decorations that are not permanent fixtures of a Lot which are part of the original construction or have been properly approved as permanent improvements by the Architecture Committee shall be removed within thirty (30) days after the holiday has ended. The Board shall have the right, upon thirty (30) days prior written notice to designate a party to enter upon any Lot and summarily remove exterior lights or decorations displayed in violation of this provision. The Board, and the individuals removing the lights and decorations, shall not be liable to the Owner for trespass, conversion, or damages of any kind except intentional misdeeds and gross negligence.

ARTICLE VII.

Architecture Committee

**7.01   Establishment of Committee.** There shall be an architecture and landscape control committee (the "Architecture Committee"), established for the purpose of enforcing the architectural standards of the community and approving or disapproving plans for Improvements proposed for the Lots.   No Improvement shall be erected, altered, added on or repaired on a Lot until plans and specifications showing the nature, kind, shape, colors, materials, and location of the Improvement have been submitted to and approved in writing by the Architecture Committee, provided, however, that Improvements erected, altered, added onto or repaired on the Property by Declarant shall be exempt from the provisions of this Article VII.

**7.02   Members of Committee.** The Architecture Committee shall consist of three (3) members, all of whom shall first be appointed by Declarant.  There shall also be two (2) alternate members of the Architecture Committee, who shall be designated by the Architecture Committee, to act as substitutes on the Architecture Committee in the event of absence or disability of any member. Each member of the Architecture Committee shall hold office until such time as he or she has resigned or has been removed or his or her successor has been appointed, as provided herein. Members of the Architecture Committee may be removed at any time with or without cause. Until ninety percent (90%) of all Lots have been sold, Declarant shall have the sole power to appoint and remove the members of the Architecture Committee. Thereafter, the Board shall have the power to appoint and remove all members of the Architecture Committee and to determine the number of members of the Architecture Committee; provided, however, that the Architecture Committee shall at no time consist of less than three (3) members. Members of the Architecture Committee need not be Members of the Association.

**7.03   Architectural Design Guidelines.** Prior to conveyance of the first Lot to an Owner other than the Declarant, the Declarant may, in its sole discretion and without the consent of anyone, adopt, amend or repeal rules and regulations to be known as "Design Guidelines," which shall interpret and implement the provisions of this Declaration, set forth

36

20020510
.01313

fees to be charged, and promulgate procedures and design and construction criteria to be followed in submitting proposals to the Architecture Committee. Thereafter, the Architecture Committee shall have the right to and may in its discretion, subject only to approval of the Board, adopt, amend or repeal the Design Guidelines. No such actions shall affect any prior Architecture Committee approval. A copy of the Design Guidelines as they may from time to time be adopted, amended, or repealed, certified by any member of the Architecture Committee, shall be maintained at the office of the Association and shall be available for inspection and copying by any Member at any reasonable time during the business hours of the Association. The following minimum standards and restrictions shall apply to all Improvements made on the Property:

(a) all Improvements shall be constructed in full compliance with all applicable zoning laws, building codes, and other laws, ordinances, and regulations applicable to the construction, use, and occupancy of Improvements; and

(b) all Improvements shall be constructed in accordance with the Design Guidelines.

7.04    **Landscape Standards**. Upon adoption of the Design Guidelines, the Architecture Committee shall, as part of the Design Guidelines, establish guidelines for plant and landscaping material that shall reflect desert landscaping to the extent practicable. Such guidelines may restrict the species and placement of any tree, plant, bush, ground cover, or other growing thing planted or placed on the Property. The Architecture Committee shall adopt a list of approved plant species that may be altered or augmented from time to time.

7.05    **Review of Proposed Improvements**. Whenever in this Declaration or in any supplemental declaration the approval of the Architecture Committee is required, it shall have the right to consider all of the plans and specifications for the Improvement or proposal in question and all other facts that in its sole discretion are relevant. Except as provided in Section 7.01, prior to commencement of construction of any Improvement upon the Property, the plans and specifications therefor shall be submitted to the Architecture Committee, and construction or placement thereof may not commence unless and until the Architecture Committee has approved such plans and specifications in writing. The Architecture Committee shall consider and act upon any and all plans and specifications submitted for its approval pursuant to this Declaration and perform such other duties assigned to it by this Declaration or as from time to time shall be assigned to it by the Board, including the inspection of construction or placement in progress to assure its conformance with plans and specifications approved by the Architecture Committee. The Architecture Committee shall approve plans and specifications submitted for its approval only if it deems that the construction, alterations, or additions contemplated thereby in the locations indicated will not be detrimental to the surrounding area or to the Property as a whole, that the appearance of any structure affected thereby will be in harmony with the surrounding structures, and that the upkeep and maintenance therefor will not become a burden on the Association. The Architecture Committee may condition its approval of plans and specifications on such changes therein as it deems appropriate and may require submission of additional plans and specifications or other

37



information prior to approving or disapproving the material submitted. The Architecture Committee may also issue rules or guidelines regarding anything relevant to its functions, including, but not limited to, minimum standards and procedures for the submission of plans and specifications for approval. The Architecture Committee, in its sole discretion, may require a reasonable fee to accompany each application for approval, which shall be used to cover the Architecture Committee and its members' reasonable costs. The Architecture Committee may require such detail in plans and specifications submitted for its review and such other information as it deems proper.

**7.06   Meetings of the Committee.** The Architecture Committee shall meet from time to time as necessary to perform its duties hereunder, but such meetings shall be held at least annually. The vote of a majority of all of the members of the Architecture Committee or the written consent of a majority of all of the members of the Architecture Committee taken without a meeting shall constitute an act of the Architecture Committee. The Architecture Committee may from time to time by resolution adopted in writing, delegate its duties, except for the granting of variances pursuant to Section 7.11, or retain the services of a professional engineer, architect, designer, inspector or other Person to assist in the performance of its duties.

**7.07   No Waiver of Future Approvals**. The approval or consent of the Architecture Committee to any plans or specifications for any work done or proposed or in connection with any other matter requiring the approval or consent of the Architecture Committee shall not be deemed to constitute a waiver of any right to withhold approval or consent as to any plans or specifications or other matter whatsoever subsequently or additionally submitted for approval or consent by the same or a different Person.

**7.08   Compensation of Members**. The members of the Architecture Committee shall be entitled to reasonable compensation from the Association for services rendered, together with reimbursement for expenses incurred by them in the performance of their duties hereunder. Such compensation shall be determined by Declarant while it has the right to appoint or remove the members of the Architecture Committee pursuant to Section 7.02 hereof, and thereafter, such compensation shall be determined by the Board.

**7.09   Inspection of Work.**

      (a)   Completed Work. Inspection of completed work and correction of defects therein shall proceed as follows:

            (i)   Upon the completion of any Improvement for which approved plans or specifications are required under this Declaration, the Owner shall give written notice of completion to the Architecture Committee within fifteen (15) days of completion.

            (ii)   Within such reasonable time as the Architecture Committee may set, but not to exceed thirty (30) days thereafter, the Committee or its duly authorized

38

2002.05.10
.01313

representative may inspect such improvement. If the Committee finds that such work was not done in strict compliance with all approved plans and specifications submitted or required to be submitted for its prior approval, it shall notify the Owner in writing of such noncompliance within such period, specifying in reasonable detail the particulars of noncompliance, and shall require the Owner to remedy the same.

(iii)     If, upon the expiration of thirty (30) days from the date of such notification, the Owner shall have failed to remedy such noncompliance, the Architecture Committee shall notify the Board in writing of such failure. Upon notice and hearing before the Board, the Board shall issue a ruling determining whether there is a noncompliance, and if such noncompliance is found to exist, the Board shall determine the estimated cost of correcting or removing the same. The Owner shall remedy or remove the same within a period of not more than forty-five (45) days from the date of announcement of the Board ruling. If the Owner does not comply with the Board's ruling within such period, the Board, at its option, may either remove the noncomplying Improvement or remedy the noncompliance, and the Owner shall reimburse the Association upon demand for all expenses incurred in connection therewith. If such expenses are not promptly repaid by the Owner to the Association, the Board shall levy a special Assessment against such Owner and the Improvement in question and the Lot upon which the Improvement is situated for reimbursement, and the special Assessment shall constitute a lien upon such Lot and Improvement.

(iv)     If for any reason after receipt of said written notice of completion from the Owner, the Architecture Committee fails to notify the Owner of any noncompliance within the period provided in subsection 7.09(a)(ii) hereof, the Improvement shall be deemed to be in accordance with said approved plans and specifications.

(b)     Work in Progress. The Architecture Committee may inspect all work in progress and give notice of noncompliance as provided above in subsection 7.09(a)(ii). If the Owner denies that such noncompliance exists, the procedures set out in subsection 7.09(a)(iii) shall be followed, except that, pending resolution of the dispute, no further work shall be done that would hamper correction of the noncompliance if the Board should find that such noncompliance exists.

7.10   Nonliability of Committee Members. Neither the Architecture Committee nor any member thereof nor the Board nor any member thereof shall be liable to the Association or to any Owner or to any other Person for any loss, damage, or injury arising out of or in any way connected with the performance of the Architecture Committee's or the Board's respective duties under this Declaration, except for the willful misconduct or bad faith of the Architecture Committee or its members or the Board or its members, as the case may be. Except insofar as its duties may be extended with respect to a particular area by a supplemental declaration filed by Declarant, the Architecture Committee shall review and approve or disapprove all plans and specifications submitted to it for any proposed Improvement, including the construction, alteration, or addition thereof or thereto, solely on the basis of aesthetic considerations and the overall benefit or detriment that would result to the surrounding area and the Property generally. In granting its approval or disapproval

39

```
20020510
.01313
```

to plans and specifications for a proposed Improvement, the Architecture Committee shall take into consideration the aesthetic aspects of the architectural designs, landscaping, color schemes, exterior finishes, and materials and similar features. The approval of the Architecture Committee shall not be construed to be, nor shall the Architecture Committee be responsible for, approval of the structural safety, engineering soundness, or conformance with zoning, building, or other codes that may be applicable.

**7.11   Variances.** The Architecture Committee may authorize variances from compliance with any of the architectural provisions of this Declaration or any supplemental declaration, including restrictions upon height, bulk, size, shape, land area, placement of structures, setbacks, building envelopes, colors, materials, or similar restrictions when circumstances such as topography, natural obstructions, hardship, or aesthetic or environmental considerations may, in its sole and absolute discretion, warrant. Such variances must be consistent with any and all applicable laws. Such variances must be evidenced in writing and must be signed by at least a majority of all of the members of the Architecture Committee. If such a variance is granted, no violation of the covenants, conditions, or restrictions contained in this Declaration or any supplemental declaration shall be deemed to have occurred with respect to the matter for which the variance was granted. The granting of such a variance shall not operate to waive any provisions of this Declaration, the Design Guidelines, or any supplemental declaration for any purpose except as to the particular property and particular provision and in the particular instance covered by the variance.

**7.12   Obligations with Respect to Zoning and Subdivisions.** The Architecture Committee shall require all Persons to comply fully with the zoning and master plan designations and any special use permits and with all applicable federal, state, and local laws, regulations, and ordinances insofar as the same are applicable and as the same may hereafter be amended from time to time.

**7.13   Indemnification of Architecture Committee.** The members of the Architecture Committee shall be deemed the appointed agents of the Board, and the Architecture Committee is hereby authorized to carry out and adhere to the provisions of this Article VII. The Owners hereby collectively agree that the members of the Architecture Committee shall be indemnified and held harmless for any liability, damages, or other obligation (including reasonable attorneys' fees) resulting from the reasonable and prudent exercise of their duties as members of the Architecture Committee as specified in this Article VII.

### ARTICLE VIII.

### Mortgagee Provisions

The following provisions are for the benefit of holders, insurers, and guarantors of first Mortgages on Lots. The provisions of this Article apply to both this Declaration and to the Bylaws notwithstanding any other provisions contained therein.

40

2002051 0
.01313

**8.01    Notices of Action.** An institutional holder, insurer, or guarantor of a first Mortgage who provides written request to the Association (such request to state the name and address of such requestor and the street address of the Lot to which its interest relates, thereby becoming an "Eligible Holder") will be entitled to timely written notice of:

(a)    Any condemnation loss or any casualty loss that affects a material portion of the Property or that affects any Lot on which there is a first Mortgage held, insured, or guaranteed by such Eligible Holder;

(b)    Any delinquency in the payment of Assessments or charges owed by an Owner of a Lot subject to the Mortgage of such Eligible Holder when such delinquency has continued for a period of sixty (60) days, or any other violation of this Declaration or the Bylaws relating to such Lot or the Owner that is not cured within sixty (60) days. Notwithstanding this provision, any holder of a first Mortgage is entitled to written notice upon request from the Association of any default in the performance by an Owner of a Lot of any obligation under this Declaration or the Bylaws that is not cured within sixty (60) days;

(c)    Any lapse, cancellation, or material modification of any insurance policy maintained by the Association; or

(d)    Any proposed action that would require the consent of a specified percentage of Eligible Holders.

**8.02    Special Provision.** Unless at least sixty-seven percent (67%) of the Eligible Holders and voting Members representing at least sixty-seven percent (67%) of the total Association consent, the Association shall not:

(a)    By act or omission seek to abandon, partition, subdivide, encumber, sell, or transfer all or any portion of the real property comprising the Common Area that the Association owns directly or indirectly. The granting of easements for public utilities or other similar purposes consistent with the intended uses of the Common Area shall not be deemed a transfer within the meaning of this subsection;

(b)    Change the method of determining the obligations, Assessments, dues, or other charges that may be levied against an Owner of a Lot;

(c)    By act or omission change, waive, or abandon the Subdivision Map or this Declaration or change, waive, or abandon any scheme of regulations or enforcement relating to architectural design, exterior appearance, or maintenance of the Lots and the Common Area. The issuance and amendment of architectural standards, procedures, rules and regulations, or use restrictions shall not constitute a change, waiver, or abandonment within the meaning of this provision;

(d)    Fail to maintain insurance as required by this Declaration; or

41

Case 2:21-cv-02120-JCM-BNW    Document 1-1    Filed 11/29/21    Page 570 of 807

20020510
.01313

(e)    Use hazard insurance proceeds for any Common Area losses for other than the repair, replacement, or reconstruction of such property.

First Mortgagees may, jointly or singly, pay taxes or other charges that are in default and that may or have become a charge against the Common Area and may pay overdue premiums of property insurance policies, or secure new property insurance coverage upon the lapse of an Association policy, and first Mortgagees making such payments shall be entitled to immediate reimbursement from the Association.

**8.03    Other Provisions for First Mortgages.** To the extent possible under Nevada law:

(a)    Any restoration or repair of the Property after a partial condemnation or damage due to an insurable hazard shall be performed substantially in accordance with this Declaration and the original plans and specifications unless the approval is obtained of the Eligible Holders on Lots to which at least fifty-one percent (51%) of the votes of Lots subject to Mortgages held by such Eligible Holders are allocated.

(b)    Any election to terminate the Association after substantial destruction or a substantial taking in condemnation shall require the approval of the Eligible Holders on Lots to which at least fifty-one percent (51%) of the votes of Lots subject to Mortgages held by such Eligible Holders are allocated.

(c)    Any election to terminate the Association other than for the causes described in subsection 8.03(b) shall require the approval of the Eligible Holders on Lots to which at least sixty-seven percent (67%) of the votes of the Lots subject to the mortgages held by such Eligible Holders are allocated.

**8.04    No Priority.** No provision of the Declaration or the Bylaws gives or should be construed as giving any Owner or another party priority over any rights of the first Mortgagee of any Lot in the case of distribution to such Owner of insurance proceeds or condemnation awards for losses to or a taking of the Common Area.

**8.05    Notice to Association.** Upon request, each Owner shall be obligated to furnish to the Association the name and address of the holder of any Mortgage encumbering such Owner's Lot.

**8.06    Amendment by Board.** Should the Federal National Mortgage Association or the Federal Home Loan Mortgage Corporation subsequently delete any of its respective requirements that necessitate the provisions of this Article or make any such requirements less stringent, the Board, without the approval of the Owners, may Record an amendment to this Article to reflect such changes.

42

Case 2:21-cv-02120-JCM-BNW   Document 1-1   Filed 11/29/21   Page 571 of 807



**8.07   Applicability**. Nothing contained in this Article shall be construed to reduce the percentage vote that must otherwise be obtained under this Declaration, the Bylaws, or Nevada law for any of the acts set out in this Article.

**8.08   Failure of Mortgagee to Respond**. Any Mortgagee who receives a written request from the Board to respond to or consent to any action shall be deemed to have approved such action if the Association does not receive a written response from the Mortgagee within thirty (30) days of the date of such Mortgagee's receipt of the Association's request, provided such request is delivered to the Mortgagee by certified or registered mail, return receipt requested.

**ARTICLE IX.**

**Annexation**

**9.01   Annexation of Additional Property by Association**. Upon the approval of two-thirds (2/3) or more of the Members of the Association, the owner of any real property who desires to subject that property to the covenants, conditions, and restrictions of this Declaration and subject that property to the jurisdiction of the Association may Record a Declaration of Annexation, which shall extend the covenants, conditions, and restrictions of this Declaration to such property.

**9.02   Annexation by Declarant**. Subject to Section 2.11 hereof, if within seven (7) years of the date of the Recording of this Declaration in the Official Records of the Clark County Recorder Declarant desires to develop additional phases in the Annexable Area in its sole and absolute descretion, such additional phases or any portion thereof may be added to the Property, be subjected to this Declaration, and be included within the jurisdiction of the Association by action of Declarant without the consent of the Members or Eligible Holders. All Common Area Improvements in each phase of the Annexable Area will be substantially completed prior to annexation. Improvements constructed or located in the Annexable Area shall be consistent in terms of quality of construction and architectural design with the Improvements located elsewhere on the Property.

**9.03   Procedure for Annexation**. Any annexation may be accomplished by the Recording of a Declaration of Annexation, which shall state that Owners of Lots in the Annexable Area shall also be Members. At the time of Recording of the Declaration of Annexation, Declarant shall also by deed or assignment, as the case may be, transfer to the Association the Association Property in the area being annexed. The obligation of an Owner to pay Assessments or fees to the Association and the right of an Owner to exercise voting rights in the Association in any Annexable Area shall not commence until both of the following occur: (a) such portion of the Annexable Area containing the Lot owned by the Owner is actually annexed to and becomes a part of the Property; and (b) the first day of the month following the close of the first sale of a Lot by Declarant to an Owner other than Declarant in that particular portion of the Annexable Area.

43



**9.04  Deannexation**.  Declarant may delete all or any portion of the phase of development from coverage of this Declaration and the jurisdiction of the Association so long as Declarant is the owner of all of that phase and provided that:

(a)  the Notice of Deannexation is Recorded in the same manner as the applicable Declaration of Annexation was Recorded;

(b)  Declarant has not exercised any rights to vote with respect to any portion of such phase;

(c)  Assessments have not yet commenced with respect to any portion of such phase;

(d)  no Lot has been sold in such phase to a member of the general public; and

(e)  the Association has not made any expenditures or incurred any obligation respecting any portion of such phase.

**ARTICLE X.**

**General Provisions**

**10.01  Term**.  This Declaration, including all of the covenants, conditions, and restrictions hereof, shall run until the date fifty (50) years hereafter, unless amended as herein provided. After the date fifty (50) years hereafter, this Declaration, including all such covenants, conditions, and restrictions, shall be automatically extended for successive periods of ten (10) years each, unless amended or extinguished by a written instrument executed by at least two thirds (2/3) of the Owners and recorded in the Official Records of the County Recorder of Clark County, Nevada.

**10.02  Resale of Lots**.  The seller of any Lot shall furnish to the purchaser before execution of any contract for the sale of the Lot or otherwise before conveyance:

(a)  a copy of this Declaration, the Articles, Bylaws, and Rules and Regulations;

(b)  a statement setting forth the amount of the annual Assessments for common expenses and any unpaid Assessment of any kind currently due from the selling Owner; and

(c)  a copy of the current operating budget of the Association.

The selling Lot Owner shall also at such time notify the Association of the proposed sale and provide the Association with the name and address of the new Owner and the

44

20020510
.01313

proposed date of sale. Nothing in this Section 10.02 shall be construed to require any approval by the Association of the sale of any Lot.

### 10.03 Lease of Property.

(a)     In the event an Owner rents or leases any Lot, the Owner shall provide the Lessee with a copy of this Declaration, the Articles, Bylaws, Rules and Regulations, any rules and regulations adopted by the Architecture Committee, and a list of the members of the Board.  The lease or other agreement with the Lessee shall provide that the Lessee shall abide by the provisions of this Declaration, the Articles, Bylaws, Rules and Regulations, and any rules and regulations adopted by the Architecture Committee and that the lease is subject to such provisions. The Association may, after notice to the Owner of the Lot and in addition to any other rights or remedies it may have at law or equity, enforce against the Lessee those remedies set forth in this Declaration and may evict the Lessee if within a twelve (12) month period the Lessee commits three or more material violations of this Declaration, the Articles, Bylaws, Rules and Regulations, or any rules and regulations adopted by the Architecture Committee regardless of whether such violations are cured.

(b)     Any Owner renting or leasing its Lot shall notify the Association of such arrangement and provide the Association with the name of the Lessee and the term of the Lease for occupancy.

(c)     In the event the Association engages an attorney or takes any legal action against a Lessee for violation of this Declaration, the Owner as well as the Lessee shall be subject to the costs and expenses set forth in subsection 10.05(f) hereof.

### 10.04 Amendment.

(a)     Majority Vote. Except as provided in subsection 10.04(c), no amendment of this Declaration shall be effective unless adopted by a majority of the Members. Notwithstanding the foregoing, the consent of sixty-seven percent (67%) of the Members entitled to vote and of Declarant, so long as the Declarant owns any land subject to this Declaration, and the approval of Eligible Holders on Lots to which at least fifty-one percent (51%) of the votes of Lots subject to a Mortgage shall be required to materially amend any provisions of this Declaration, the Bylaws, Articles, or to add any material provisions thereto that establish, provide for, govern, or regulate any of the following:

(i)     voting;

(ii)    Assessments, Assessment liens, or subordination of such liens;

(iii)   reserves for maintenance, repair, and replacement of the Common Area;

[ Perm Fund Dbl Covers Space Range C LLC v Segal ]

45



(iv)     insurance or fidelity bonds;

(v)      rights to use the Common Area;

(vi)     responsibility for maintenance and repair of the Property;

(vii)    expansion or contraction of the Property or the annexation or withdrawal of real property to or from the jurisdiction of the Association;

(viii)   boundaries of any Lot;

(ix)     leasing of Lots;

(x)      imposition of any restrictions on an Owner's right to sell or transfer its Lot;

(xi)     establishment of self-management by the Association after professional management has been required by an Eligible Holder;

(xii)    any provisions in this Declaration, the Bylaws, or Articles that are for the express benefit of Eligible Holders, guarantors, or insurers of first Mortgages on Lots;

(xiii)   reallocation of interests in the Common Area; or

(xiv)    convertibility of Lots into Common Area or vice versa.

(b)     <u>Recording of Amendment</u>. Every amendment of this Declaration must be Recorded in the Official Records of the Clark County Recorder, and no amendment of this Declaration shall be effective until executed and so Recorded. Every amendment must be indexed in the grantee's index in the name of the Association and in the grantor's index in the name of the party executing the amendment. Every amendment of this Declaration must be prepared, executed, Recorded, and certified on behalf of the Association by the officer of the Association designated in the Bylaws for that purpose, or in the absence of such designation, by the President of the Association.

(c)     <u>Persons Entitled to Amend</u>.  This Declaration may be amended in accordance with NRS §§ 116.2109, 116.2110 by Declarant for the purpose of exercising any developmental rights as set forth in this Declaration.

(d)     <u>Restrictions on Amendment</u>. Except to the extent expressly permitted or required by the provisions of the Act, no amendment may change the boundaries of any particular Lot, the allocated interests of a particular Lot, or the uses to which a particular Lot is restricted in the absence of the consent of the Owner of the Lot affected and the consent of a majority of the Owners of the remaining Lots. No action to challenge the validity of an

```
2002051 0
.01313
```

amendment adopted by the Association pursuant to NRS § 116.2117 may be brought more than one (1) year after the amendment is recorded.

    (e)    <u>Declarant Amendment</u>. Notwithstanding any provision of this Declaration to the contrary, for so long as Declarant owns any portion of the Property, but no later than five (5) years from Recordation of this Declaration, Declarant may unilaterally amend this Declaration by Recording a written instrument signed by Declarant in order to correct technical errors, for clarification, and to conform this Declaration to the requirements of the City of North Las Vegas, the Veterans Administration, the Department of Housing and Urban Development, the Federal Housing Administration, the Federal Home Loan Mortgage Corporation, FNMA, or GNMA.

    (f)    <u>Delivery of Amendments to Owners</u>. If any change is made to this Declaration or any of the other governing documents of the Association, the Secretary of the Association shall, within thirty (30) days after the change is made, prepare and cause to be hand-delivered or sent prepaid by United States mail to the mailing address of each Lot or to any other mailing address designated in writing by the Lot Owner, a copy of the change that was made.

**10.05 Enforcement and Nonwaiver.**

    (a)    <u>Right of Enforcement</u>. Subject to NRS Chapter 38 and except as otherwise provided herein, any Owner (at its own expense), Declarant, and the Board shall have the right to enforce, by any proceeding at law or in equity and including arbitration proceedings and other forms of mediation, all of the restrictions, conditions, covenants, reservations, liens, and charges now or hereafter imposed by the provisions of this Declaration against any property within the Property and the Owners thereof. Such right of enforcement shall include both damages for and injunctive relief against the breach of any such provision. The right of any Owner to so enforce such provisions shall be equally applicable without regard to whether the property (or other interest) of the Owner seeking such enforcement or the property (or other interest) whereon or with respect to which a violation of such provision is alleged is initially set forth on Exhibit "A" or is hereafter subjected to this Declaration pursuant to Article IX hereof.

    (b)    <u>Violation as a Nuisance</u>. Every act or omission by which any provision of this Declaration is violated in whole or in part is hereby declared to be a nuisance and may be enjoined or abated by any Owner (at its own expense), by Declarant, or by the Board, whether or not the relief sought is for negative or affirmative action. However, only Declarant, the Board, and the duly authorized agents of either of them may enforce by self-help any of the provisions of this Declaration and then only if such self-help is preceded by reasonable notice to the Owner in question.

    (c)    <u>Violation of Law</u>. Any violation of any federal, state, or local law, ordinance, or regulation pertaining to the ownership, occupancy, or use of any property within the Property

47

20020510
.01313

is hereby declared to be a violation of this Declaration and subject to all of the enforcement procedures set forth herein.

(d)    Remedies Cumulative. Each remedy provided by this Declaration is cumulative and not exclusive.

(e)    Nonwaiver. The failure to enforce any provision of this Declaration at any time shall not constitute a waiver of the right thereafter to enforce any such provision or any other provision herein.

(f)    Attorneys' Fees. In the event the Board engages legal counsel or takes any legal action, including, but not limited to, arbitration proceedings pursuant to NRS Chapter 38, to enforce the provisions of this Declaration, it shall be entitled to its costs, including reasonable attorneys' fees, incurred in connection therewith.

**10.06 Notices.** Any notice or communication to be given under the terms of this Declaration shall be in writing and shall be personally delivered or sent by facsimile, overnight delivery, or registered or certified mail, return receipt requested. Notice shall be effective: (a) if personally delivered, when delivered; (b) if by facsimile, on the day of transmission thereof on a proper facsimile machine with confirmed answerback; (c) if by overnight delivery, on the day after delivery thereof to a reputable overnight courier service; and (d) if mailed, at midnight on the third (3rd) business day after deposit in the mail, postage prepaid. Notices shall be addressed to the Person at the address given by such Person to the Association for the purpose of service of notices or to the residence of such Person if no address has been given to the Association. Such address may be changed from time to time by notice in writing given by such Person to the Association.

**10.07 Construction.**

(a)    Restrictions Severable. Each of the provisions of this Declaration shall be deemed independent and severable, and the invalidity or partial invalidity of any provision or portion thereof shall not affect the validity or enforceability of any other provision.

(b)    Singular Includes Plural. Unless the context requires a contrary construction, the singular shall include the plural and the plural the singular, and the masculine, feminine, or neuter shall each include the masculine, feminine, and neuter.

(c)    Captions. All captions and titles used in this Declaration are intended solely for convenience of reference and shall not enlarge, limit, or otherwise affect that which is set forth in any of the Sections or Articles hereof.

(d)    Liberal Construction. It is the intention of Declarant that this Declaration be liberally construed to promote the purpose of a well-planned community, reserving to

48

```
20020510
.01313
```

Declarant the rights necessary to develop the Property and to insure the integrity of the interrelated land uses.

**10.08  State Law.** The provisions of this Declaration shall be governed and interpreted according to the laws of the State of Nevada.

**10.09  Priorities, Inconsistencies**. If there are conflicts or inconsistencies between this Declaration and either the Articles or the Bylaws, the terms and provisions of this Declaration shall prevail.

Declarant has executed this Declaration this ___ day of May, 2002.

**DECLARANT**

Centex Homes of Nevada,
a Nevada general partnership

By: _____
(Signature)

Name: _____
(Print Name)

Title: _____
(Print Title)

STATE OF NEVADA)
)  ss:
COUNTY OF CLARK)

On the ___ day of May, 2002, before me, a Notary Public in and for said County and State, personally appeared _____, known (or proved) to me to be the _____ of Centex Homes of Nevada, a Nevada general partnership, and who acknowledged to me that he/she executed the within instrument.



_____
Notary

49

Case 2:21-cv-02120-JCM-BNW   Document 1-1   Filed 11/29/21   Page 578 of 807



200205 10
.01313

EXHIBIT "A"


LOTS 41-44 INCLUSIVE IN BLOCK 12 AND LOTS 26-33 INCLUSIVE IN BLOCK 9
OF RANCHO MIRAGE UNIT II – PHASE 2, AS SHOWN BY MAP THEREOF ON
FILE IN BOOK 102 OF PLATS, PAGE 96, IN THE OFFICE OF THE COUNTY
RECORDER OF CLARK COUNTY, NEVADA.



Exhibit "B"

Legal Description of the Annexable Area,
including Contingent Annexable Area

RANCHO MIRAGE UNIT II-PHASE 2.  BEING A SUBDIVISION OF A PORTION OF LOT 1 OF PARCEL MAP: FILE 96, PAGE 59, LOCATED WITHIN THE SOUTHEAST QUARTER (SE ¼) OF THE SOUTHWEST QUARTER (SW ¼) OF SECTION 27, TOWNSHIP 19 SOUTH, RANGE 61 EAST, M.D.M., CITY OF NORTH LAS VEGAS, CLARK COUNTY, NEVADA.

COMMENCING AT THE SOUTH CENTER SIXTEENTH CORNER OF SAID SECTION 27; THENCE NORTH 88°47'34" WEST, ALONG THE NORTH LINE OF THE SOUTHEAST QUARTER (SE1/4) OF THE SOUTHWEST QUARTER (SW1/4) OF SAID SECTION 27, A DISTANCE OF 331.08 FEET TO THE POINT OF BEGINNING.

LOTS 21-25, BLOCK 9
LOTS 66-91, BLOCK 10
LOTS 45-56, BLOCK 12

RANCHO MIRAGE UNIT II-PHASE 1, BEING A SUBDIVISION OF A PORTION OF LOT 1 OF AMENDED PARCEL MAP: FILE 96, PAGE 59, LOCATED WITHIN THE SOUTHEAST QUARTER (SE 1/4) OF THE SOUTHWEST QUARTER (SW 1/4) OF SECTION 27, TOWNSHIP 19 SOUTH, RANGE 61 EAST, M.D.M., CITY OF NORTH LAS VEGAS, CLARK COUNTY NEVADA

LOTS 34-40, BLOCK 9
LOTS 57-65, BLOCK 10

PARCEL ONE: THAT PORTION OF THE SOUTH HALF (S 1/2) OF THE SOUTHWEST QUARTER (SW 1/4) OF SECTION 27, TOWNSHIP 19 SOUTH, RANGE 16 EAST, M.D.B.M. MORE PARTICULARLY AS FOLLOWS:

PARCEL ONE AS SHOWN BY MAP THEREOF ON FILE 96 OF PARCEL MAPS, PAGE 59 IN THE OFFICE OF THE COUNTY RECORDER, CLARK COUNTY, NEVADA. EXCEPTING THEREFROM PARCELS "A" & "B" SET FORTH BELOW:

PARCEL "A": LOTS 34 THRU 40, INCLUSIVE, IN BLOCK 9 AND 57 THRU 65, INCLUSIVE, IN BLOCK 10 OF RANCHO MIRAGE UNIT II - PHASE I AS SHOWN BY MAP THEREOF ON FILE IN BOOK 102 OF PLATS, PAGE 95 IN THE OFFICE OF THE COUNTY RECORDER, CLARK COUNTY, NEVADA.

Case 2:21-cv-02120-JCM-BNW   Document 1-1   Filed 11/29/21   Page 580 of 807

200205 10
.01313

PARCEL "B": LOTS 21 THRU 33, INCLUSIVE, IN BLOCK 9, LOTS 66 THRU 91,
INCLUSIVE, IN BLAOCK 10 AND LOTS 41 THRU 56, INCLUSIVE, IN BLOCK 12
OF RANCHO MIRAGE UNIT II - PHASE 2, AS SHOWN BY THE MAP THREROF
ON FILE IN BOOK 102 OF PLATS, PAGE 96 IN THE OFFICE OF THE COUNTY
RECORDER, CLARK COUNTY, NEVADA.



Exhibit "C"

Legal Description of the Contingent Annexable Area

PARCEL ONE: THAT PORTION OF THE SOUTH HALF (S 1/2) OF THE SOUTHWEST QUARTER (SW 1/4) OF SECTION 27, TOWNSHIP 19 SOUTH, RANGE 16 EAST, M.D.B.M, MORE PARTICULARLY AS FOLLOWS:

PARCEL ONE AS SHOWN BY MAP THEREOF ON FILE 96 OF PARCEL MAPS, PAGE 59 IN THE OFFICE OF THE COUNTY RECORDER, CLARK COUNTY, NEVADA, EXCEPTING THEREFROM PARCELS "A" & "B" SET FORTH BELOW:

PARCEL "A": LOTS 34 THRU 40, INCLUSIVE, IN BLOCK 9 AND 57 THRU 65, INCLUSIVE, IN BLOCK 10 OF RANCHO MIRAGE UNIT II - PHASE 1 AS SHOWN BY MAP THEREOF ON FILE IN BOOK 102 OF PLATS, PAGE 95 IN THE OFFICE OF THE COUNTY RECORDER, CLARK COUNTY, NEVADA.

PARCEL "B": LOTS 21 THRU 33, INCLUSIVE, IN BLOCK 9, LOTS 66 THRU 91, INCLUSIVE, IN BLAOCK 10 AND LOTS 41 THRU 56, INCLUSIVE, IN BLOCK 12 OF RANCHO MIRAGE UNIT II - PHASE 2, AS SHOWN BY THE MAP THREROF ON FILE IN BOOK 102 OF PLATS, PAGE 96 IN THE OFFICE OF THE COUNTY RECORDER, CLARK COUNTY, NEVADA.

Case 2:21-cv-02120-JCM-BNW   Document 1-1   Filed 11/29/21   Page 582 of 807

```
200205 10
.01313
```

**Exhibit "D"**

**Site Development Plan**

1  Form Date DGF Copers Santa Rosa d'C'd Re 5 wpd

APPROVED BY THE CLARK COUNTY DISTRICT BOARD OF HEALTH.
CONCERNS SEWAGE DISPOSAL, WATER POLLUTION, WATER QUALITY 20020510
SUPPLY FACILITIES AND IS PREDICATED UPON PLANS FOR A PUBLIC .01313
_Y AND A COMMUNITY SYSTEM FOR DISPOSAL OF SEWAGE.

_____    08/22/01
OARD OF HEALTH - WALTER B. ROSS    DATE

## NG COMMISSION APPROVAL

ERTIFY THAT THIS MAP IS APPROVED AND ACCEPTED, ON BEHALF OF
. ANY PARCELS OF LAND OFFERED FOR DEDICATION FOR PUBLIC USE IN
WITH THE TERMS OF THE OFFER OF DEDICATION. FURTHERMORE, I
IS MAP IS IN SUBSTANTIAL COMPLIANCE WITH THE TENTATIVE MAP AND
IONS HAVE BEEN MET THIS _fourth_ DAY OF _December_ , 2001 .

_____
CLER
T DIRECTOR

## OF BEARINGS

40' 41" WEST, BEING THE BEARING OF ANN ROAD, SAME BEING THE
SOUTH LINE OF THE SOUTHWEST QUARTER (SW 1/4) OF SECTION 27,
19 SOUTH, RANGE 61 EAST, M.D.M., CLARK COUNTY, NEVADA, AS
THAT CERTAIN PARCEL MAP ON FILE IN THE OFFICE OF THE COUNTY
CLARK COUNTY, NEVADA, IN FILE 81 OF PARCEL MAPS, AT PAGE 06.

## ( RECORDER'S NOTE

QUENT CHANGES TO THIS MAP SHOULD BE
ND MAY BE DETERMINED BY REFERENCE
ITY RECORDER'S CUMULATIVE MAP INDEX.
5

W. O. 5503-1
SHEET 1 OF 2
VCL

| | |
|---|---|
| NO. _0103l_ | |
| FILED AT THE REQUEST OF : | |
| VTN nevada | |
| DATED _12-13-2001_ AT _10:38_ AM | |
| BOOK _102_ PAGE _0096_ | |
| OF PLATS | |
| OFFICIAL RECORDS BOOK, NO. _20021213_ | |
| CLARK COUNTY, NEVADA RECORDS | |
| JUDITH A. VANDEVER, RECORDER | |
| FEE $ _104.00_ DEPUTY _94x_ | |

VIN PLS 12409

| 17 | LOT NUMBER / RESIDENTIAL LOTS = 16 |
| | COMMON ELEMENT LOTS =   2 |
| | TOTAL LOTS = 18 |

20020510
.01311

3          BLOCK NUMBER

◉          FOUND MONUMENT AS INDICATED

C25        CURVE NUMBER
L22        COURSE NUMBER
R19        RADIAL LINE NUMBER
(R)        RADIAL
S.F.       SQUARE FEET
(PROD)     PRODUCED LINE
(PRC)      POINT OF REVERSE CURVE
(PCC)      POINT OF COMPOUND CURVE
C.E.       COMMON ELEMENT

           SIGHT VISIBILITY RESTRICTION AREA
           NO VIEW OBSTRUCTIONS OVER
           30" ABOVE TOP OF CURB

## NOTES:

1. ALL  LOT CORNERS MUST BE SET WITH A TYPE III MONUMENT. IN THOSE
   INSTANCES WHERE OFFSITE  IMPROVEMENTS EXIST  (I.E., REAR PROPRTY
   WALL AND FRONT CURB), A NAIL AND TAG SHALL BEE SET IN THE WALL
   AT THE BACK PROPERTY  CORNER AND A SAWCUT SHALL BE  MADE IN
   THE TOP OF THE FRONT  CURB  AT  THE  PROLONGATION OF THE SIDE
   PROPERTY LINE.

★ 2. DIRECT VEHICULAR AND/OR PEDESTRIAN ACCESS TO COMMERCE STREET
   THROUGH COMMON ELEMENTS FROM ABUTTING LOTS IS PROHIBITED.

3. ALL CORNER LOT SETBACKS ARE CHAMFERED EQUAL TO 1/2 OF THE
   PROPERTY LINE / RIGHT-OF-WAY CORNER LOT RADIUS.

C.N.L.V.
CAP

W.O. 5503-1
SHEET 2 OF 2
VCL/KAK

200205 10
.01313

T QUARTER (SE 1/4)
   CLARK COUNTY, NEVADA.

'OR'S CERTIFICATE

?. RIEKKI, A PROFESSIONAL LAND SURVEYOR LICENSED IN THE
EVADA, AS AN AGENT FOR VTN NEVADA, CERTIFY THAT:

PLAT REPRESENTS THE RESULTS OF A SURVEY CONDUCTED UNDER MY
SUPERVISION AT THE INSTANCE OF RANCHO MIRAGE I, L.L.C., A
LIMITED LIABILITY COMPANY.

ANDS SURVEYED LIE WITHIN A PORTION OF THE SE 1/4, OF THE SW
OF SECTION 27, T. 19 S., R. 61 E., M.D.M., CITY OF NORTH LAS
    CLARK COUNTY, NEVADA, AND THE SURVEY WAS COMPLETED ON
/99.

PLAT COMPLIES WITH THE APPLICABLE STATE STATUTES AND ANY
ORDINANCES IN EFFECT ON THE DATE THAT THE GOVERNING BODY
ITS FINAL APPROVAL.

ONUMENTS DEPICTED ON THE PLAT WILL BE OF THE CHARACTER SHOWN
OCCUPY THE POSITIONS INDICATED BY: __/2/06/02__ .
N APPROPRIATE FINANCIAL GUARANTEE WILL BE POSTED WITH THE
NING BODY BEFORE RECORDATION TO ASSURE THE INSTALLATION OF
ENTS.



EKKI, P.L.S.
ENSE NO. 12469

N OF WATER RESOURCES CERTIFICATE

_ MAP IS APPROVED BY THE DIVISION OF WATER RESOURCES OF THE
OF CONSERVATION AND NATURAL RESOURCES CONCERNING WATER
JBJECT TO THE REVIEW OF APPROVAL ON FILE IN THIS OFFICE.

2002051 10
.01313



# T QUARTER (SE 1/4)
# CLARK COUNTY, NEVADA.

2" C.N.L.V. BRASS CAP IN
CONCRETE LOCATED UNDER AC
TO BE RESTORED AS TYPE II
MONUMENT AL. CAP "VTN PLS 12469"
UPON COMPLETION OF CONSTRUCTION
OR SET WELL MONUMENT OVER EXISTING
IF STILL IN PLACE

## GRAPHIC SCALE

( IN FEET )
1 inch = 40 ft.

## LEGEND

**P.O.B.**          POINT OF BEGINNING

BOUNDARY LINE

LOT LINE

RIGHT—OF—WAY LINE

STREET CENTERLINE

BUILDING SETBACK LINE
FRONT = 18' / REAR = 15'
SIDE = 5' / CORNER = 10'

SET TYPE III MONUMENT
AL. CAP "VTN PLS 12469"

20020510
.01313

# UNIT II — PHASE 1

TEREST COMMUNITY)

1AP: FILE **96**, PAGE **52**, LOCATED WITHIN THE SOUTHE

TH, RANGE 61 EAST, M.D.M., CITY OF NORTH LAS VEG.

## R'S CERTIFICATE

VEGAS, COUNTY OF CLARK, STATE OF NEVADA, DOES
HAVE EXAMINED THE FINAL MAP OF RANCHO MIRAGE
. THAT THE SUBDIVISION AS SHOWN HEREON IS
1E AS IT APPEARS ON THE TENTATIVE MAP, AND ANY
THEREOF. THAT ALL PROVISIONS OF THE PLANNING AND
1TE OF NEVADA AND ANY LOCAL ORDINANCES APPLICABLE
OVAL OF THE TENTATIVE MAP HAVE BEEN COMPLIED WITH.
1TISFIED THIS MAP IS TECHNICALLY CORRECT AND THAT,
/E NOT BEEN SET, A PROPER FINANCIAL GUARANTEE HAS
1NTEEING THEIR SETTING ON OR BEFORE

1AY OF _December_ , _2001_

LAURNAL H. GUBLER
(CITY ENGINEER, R.P.E. NO. **3131**

1A15 DIRECTOR
UBLIC WORKS

## 1PTION

HO MIRAGE UNIT II — PHASE 1

OF A PORTION OF LOT 1 OF THAT CERTAIN AMENDED PLAT
ARCEL MAP (FILE 81, PAGE 06), ON FILE IN THE OFFICE
ORDER, CLARK COUNTY, NEVADA, IN FILE **96** OF PARCEL
CCATED WITHIN THE SOUTHEAST QUARTER (SE 1/4) OF THE
SW 1/4) OF SECTION 27, TOWNSHIP 19 SOUTH, RANGE 61
Y OF NORTH LAS VEGAS, CLARK COUNTY, NEVADA, MORE
BED AS FOLLOWS:

RTHEAST CORNER OF SAID LOT 1, BEING A POINT ON THE
AY OF COMMERCE STREET; THENCE SOUTH 00°36'28" EAST,
Y BOUNDARY OF SAID LOT 1, COINCIDENT WITH SAID

SUR

I. AL
STATE

1. T
C
N

2. T
1
V
C

3. T
L
C

4. T
A
C
N

ALAN F
NEVAD/

## DIVI

THIS
DEPAR
QUANT:

20020510
.01313

# UNIT II – PHASE 1

TEREST COMMUNITY)

MAP: FILE 94, PAGE 59, LOCATED WITHIN THE SOUTH

TH, RANGE 61 EAST, M.D.M., CITY OF NORTH LAS VEG

RCEL 2 PARCEL MAP FILE 94, PAGE 81
APN 124-27-301-008



"; THENCE NORTH 25° 47' 23" WEST, 48.00 FEET; THENCE
ST, 4.75 FEET; THENCE NORTH 00° 36' 29" WEST, 159.20
H 08° 03' 34" WEST, 153.61 FEET TO THE NORTHERLY
LOT 1; THENCE SOUTH 88° 47' 34" EAST, ALONG SAID
281.06 FEET TO THE POINT OF BEGINNING.

CRES, MORE OR LESS, AS DETERMINED BY COMPUTER

2002 05 10
.01313

THIS F
THIS
AND WA
WATER

DISTRI

## SURVEY ANALYSIS

NOT TO SCALE



FOUND 2" C.N.L.V.
BRASS CAP
IN CONCRETE

S 1/16
S27

2701.90'
949.28'

LOT 1
PM FILE 96, PAGE 59

RANCHO MIRAGE
PHASE II — UNIT 1

1355.78'

STREET

50.00'

LOT 2
PM FILE 96, PAGE 59

N00°36'29"W

COMMERCE

RANCHO MIRAGE UNIT 1
OOK 65 OF PLATS, PAGE 09

50.00'

41"W          2708.96'

ROAD

FOUND 4" C.N.L.V.
ALUMINUM CAP

1/4
S27
S34

SIS   OF   BEARINGS"

PLA
I HERE
THE PU
CONFOR
CERTIF
ALL C

JIM
ACTING DEVEL

BAS
NORTH
BEARI
TOWNS
SHOWN
RECOR

COU
ANY S
EXAMIN
TO THE
NRS 2

E ME ON *AUGUST 19*

SPECIALTY HOLDINGS, INC., A

: OF RANCHO MIRAGE I, L.L.C.,

*8-19-99*

ND STATE
000

## T RECIPIENTS

, AND AGENCIES, APPROVE THE

FRIE RIZZO          *8-21-99*
                    DATE

ETT                 *9/2/99*
                    DATE

TODD                *9/30/99*
                    DATE     DAVID ANGELLO

O. HAZARD           *8-20-99*
                    DATE  STEPHEN L. JONES

ION –               *12/04/01*
                    DATE



THENCE    NORTHEA
200205 ANGLE    OF    02°
.01313 NORTH    64° 12' 37
       FEET;    THENCE
       BOUNDARY    OF    S
       NORTHERLY· BOUND

CONTAINING    3.
METHODS.

LOT 3
PM FILE 81, PAGE

LOT 2
PM FILE 79, PAGE 11

FOUND 1-1/2"
ALUMINUM CAP
STAMPED "VTN PI

S 1/16
S33 - S34

STREET

REVERE

1350.15'

N00°18'57"W

50.02'

1371.51'

SE

FOUND 3"
BRASS CAP
ILLEGIBLE

ANN

S28  S27
S33  S34



DETAIL "B"
NOT TO SCALE

CACTUS SANDS AVENUE

COMMERCE STREET

40

9

CE LOT A

TYPICAL LOT SETBACKS
NOT TO SCALE

| RADIUS | CHAMFER |
|--------|---------|
| 15' | 7.5' |
| 20' | 10' |
| 25' | 12.5' |
| 30' | 15' |

NOTE:
CHAMFER DIMENSION AT ALL
CORNER LOT SETBACKS EQUALS
1/2 OF THE PROPERTY LINE/
RIGHT-OF-WAY CORNER LOT RADIUS.

N.A.P. PORTIO.

RECORDER'S MEMO
POSSIBLE POOR RECORD DUE TO
QUALITY OF ORIGINAL DOCUMENT

200920510
.01313

# RANCHO MIRAG

(A COMMON

IVISION OF A PORTION OF LOT 1 OF AMENDED PARCE

ST QUARTER (SW 1/4) OF SECTION 27, TOWNSHIP 19 :

## ) DEDICATION

NEVADA LIMITED LIABILITY COMPANY,
OWNER OF THE PARCEL OF LAND WHICH
RAGE UNIT II – PHASE 1, AND DESCRIBED
AND DOES HEREBY CONSENT TO THE
PLAT, AND DOES HEREBY OFFER AND
EASEMENTS AND PUBLIC PLACES AS
E REQUIREMENTS OF N.R.S. 278.010 TO
O TO THE CITY OF NORTH LAS VEGAS FOR
E UNDERSIGNED OWNER OF THE WITHIN
CONVEY TO THE CITY OF NORTH LAS
PORATION, NEVADA POWER COMPANY,
COX COMMUNICATIONS LAS VEGAS,
A PERMANENT EASEMENT AND RIGHT–OF–
JTILITY EASEMENTS (P.U.E.), PRIVATE
EE FOOT (3') WIDE EASEMENT ON ALL
RVICES TO METER PANELS; A FIVE FOOT
LINES ABUTTING PUBLIC AND PRIVATE
ANSFORMER PADS AND ABOVE GROUND
ITH AND ADDITIONAL TWO FEET (2')
THE PLATTED LANDS FOR THE
AND FINAL REMOVAL OF UNDERGROUND
AND GAS LINES AND APPURTENANCES
HERETO: FURTHERMORE, THE UNDERSIGNED
DS DOES HEREBY WAIVE DIRECT ACCESS
THIS SUBDIVISION INCLUDING BUT NOT
THE FOLLOWING STREETS: COMMERCE
ITS SHALL BE A COVENANT ATTACHED TO
EVERY PORTION OF THE SUBDIVISION AND
OVENANT RUNNING WITH THE LAND.

$\tau$ _____ 1999

TED LIABILITY COMPANY, BY:
PORATION, BY:

## CITY ENGI

THE CITY OF NORT
HEREBY CERTIFY T
UNIT II – PHAS
SUBSTANTIALLY TH
APPROVED ALTERAT
ZONING ACT OF TH
AT THE TIME OF
FURTHERMORE, I
IF THE MONUMENT
BEEN POSTED

12/06/0

DATED THIS

## LEGAL DE:

BEING A SUBDIV
OF A PORTION
OF THE COUNT
MAPS, AT PAGE :
SOUTHWEST QUAR
EAST, M.D.M.,
PARTICULARLY DI

BEGINNING AT TI
WESTERLY RIGHT·
ALONG THE EA:



# RANCHO MIRAG

(A COMMON

DIVISION OF A PORTION OF LOT 1 OF AMENDED PARCE

ST QUARTER (SW 1/4) OF SECTION 27, TOWNSHIP 19 S



20020510
.01313

BEING A S
OF THE SOUTH

## OWNER'S CERTIFICATE

RANCHO      MIRAGE     I,   L.L.C.,
DOES  HEREBY  CERTIFY  THAT  IT  IS
IS  SHOWN  UPON  THIS  PLAT  OF  RAN(
IN    THE  SURVEYOR'S  CERTIFICATE  F
PREPARATION  AND  RECORDATION  OF
DEDICATE  ALL   THE   STREETS,  AL
INDICATED  AND  OUTLINED  HEREON,  F
278.630,  INCLUSIVE,  AND  TITLE  16.
THE  USE  OF  THE  PUBLIC;  FURTHERMOF
PLATTED  LANDS  DOES  HEREBY  GRAN
VEGAS,  NEVADA,  SOUTHWEST  GAS
CENTRAL   TELEPHONE   COMPANY,    /
INC.,    THEIR  SUCCESSORS  AND  ASS
WAY    AS    SHOWN  HEREON  AS  PUBL
STREETS,    AND  COMMON  ELEMENTS;
SIDE  PROPERTY  LINES  AND  UNDERGROU
(5')    WIDE  EASEMENT  ON  ALL  PR(
STREETS    AND    ABOVE    GROUND
TELEPHONE  EQUIPMENT  PADS  TOGETF
AROUND    TRANSFORMER  PADS  WIT
CONSTRUCTION,    MAINTENANCE,  OPEF
POWER,  TELEPHONE,   WATER,  CABLE
TOGETHER  WITH  THE  RIGHT  OF  ACCES
OWNER   OF   THE   WITHIN  PLATTE
RIGHTS   FROM   ABUTTING  LOTS   \
LIMITED   TO,   VEHICULAR   ACCESS
STREET.   THIS   WAIVER  OF  ACCESS
THE   LAND   AND  PASS   WITH  EACH
SHALL HAVE  THE  FORCE  AND  EFFECT (

DATED THIS  ___19th___ DAY OF ___A·

RANCHO  MIRAGE  I,  L.L.C.,  A  NEVAD,
SPECIALTY  HOLDINGS,  INC.,  A  NEVA!

2002051 10
.01313

THE PURPOSE OF THIS CERTIFICATE OF AMENDMENT IS TO (1) CORRECT A STREET NAME AND (2) PROVIDE RECORDING INFORMATION, WHICH WAS OMITTED, FROM SAID PLAT.

(1) THE STREET NAME CACTUS AVENUE IS HEREBY AMENDED TO READ AS CACTUS SANDS AVENUE ON SHEET 2 OF 2.

(2) THE MISSING RECORDING INFORMATION FOR THE AMENDED PARCEL MAP SHOWN WITHIN COMMERCE STREET AND THE SOUTHERLY ADIOINER IS AS FOLLOWS: FILE 96, PAGE 99 ON SHEET 2 OF 2.

BEING A
OF THE SOUT

## CURVE TABLE

| CURVE | RADIUS | LENGTH | TA |
|-------|--------|--------|-----|
| C1 | 498.50' | 23.15' | 1 |
| C2 | 44.00' | 23.91' | 1 |
| C3 | 44.00' | 76.56' | 5 |
| C4 | 44.00' | 61.63' | 3 |
| C5 | 44.00' | 47.27' | 2 |
| C6 | 20.00' | 14.38' | |
| C7 | 20.00' | 3.70' | |
| C8 | 20.00' | 14.26' | |
| C9 | 20.00' | 18.08' | |
| C10 | 44.00' | 209.37' | 4 |
| C11 | 25.00' | 17.69' | |
| C12 | 25.00' | 39.27' | 2 |
| C13 | 25.00' | 21.58' | 1 |
| C14 | 274.00' | 29.70' | 1 |
| C15 | 250.00' | 109.88' | 5 |
| C16 | 20.00' | 33.58' | 2 |
| C17 | 20.00' | 23.02' | 1 |
| C18 | 274.00' | 5.42' | |
| C19 | 20.00' | 40.21' | 3 |
| C20 | 20.00' | 28.32' | 1 |
| C21 | 226.00' | 35.04' | 1 |
| C22 | 250.00' | 77.02' | 3 |
| C23 | 250.00' | 32.85' | 1 |
| C24 | 25.00' | 39.27' | 2 |

2002 05 10
.01313

## ACKNOWLEDGEMENT

STATE OF NEVADA )
                ) SS
COUNTY OF CLARK )

THIS INSTRUMENT WAS ACKNOWLEDGED
*1999* BY JERRY GOEDEN AS PRESIDENT
NEVADA CORPORATION, AS MANAGING
A NEVADA LIMITED LIABILITY COMPAN

*KATHLEEN GALL*
NOTARY PUBLIC IN AND FOR SAID COU
MY COMMISSION EXPIRES: *AUGUST*

## CERTIFICATE OF EASE

WE, THE HEREIN NAMED UTILITY COMP
GRANT OF THE DESIGNATED EASEMENTS

COX COMMUNICATIONS LAS VEGAS, INC

NEVADA POWER COMPANY   *LISA C. C*

SPRINT   *RICHARD*

SOUTHWEST GAS CORPORATION   *JO*

CITY OF NORTH LAS VEGAS, UTILITY
*LAURNAL H— GUBLER*

| | | | |
|---|---|---|---|
| C32 | 43.00' | 61.62' | 37 |
| C33 | 44.00'05'10 63.98' | | 39 |
| C34 | 44.00'13 34.55' | | 18. |
| C35 | 20.00' | 12.69' | 6. |

## RADIAL LINE TABLE

| LINE | BEARING | LENGTH |
|---|---|---|
| R1 | N78°48'05"E | 13.00' |
| R2 | N37°35'48"E | 12.00' |
| R3 | N80°51'18"W | 13.00' |
| R4 | S80°54'29"E | 13.00' |
| R5 | S49°46'02"E | 12.00' |
| R6 | S50°03'23"E | 13.00' |
| R7 | N18°15'38"W | 13.00' |
| R8 | N09°29'28"W | 11.00' |
| R9 | N06°49'10"W | 12.00' |
| R10 | N24°39'25"W | 12.00' |
| R11 | N48°51'23"E | 13.00' |
| R12 | S35°20'28"E | 12.00' |
| R13 | S81°33'32"W | 13.00' |
| R14 | S81°59'11"E | 13.00' |
| R15 | S53°01'33"W | 12.00' |
| R16 | S80°15'25"E | 13.00' |
| R17 | S23°07'43"E | 13.00' |

## COURSE TABLE

| LINE | BEARING | LENGTH |
|---|---|---|
| L1 | N64°12'37"E | 4.75' |
| L2 | N25°47'23"W | 48.00' |
| L3 | N89°23'31"E | 7.54' |
| L4 | N89°23'31"E | 4.42' |
| L5 | N00°36'29"W | 11.49' |
| L6 | S01°19'19"W | 16.47' |

| ACT | DATE | BY | REV |
|---|---|---|---|
| | | | |
| | | | |
| 2 | 12/06/01 | VCL | REVISED LOT LINE BETWEEN LOT 34 & |
| 1 | 8/23/99 | KAK | ADD SVRE'S AND DETAIL, REV. MONU |



: MAP IS APPROVED BY THE CLARK COUNTY DISTRICT BOARD OF HEALTH. 20020510
JVAL CONCERNS SEWAGE DISPOSAL, WATER POLLUTION, WATER QUALITY. 01313
SUPPLY FACILITIES AND IS PREDICATED UPON PLANS FOR A PUBLIC
.Y AND A COMMUNITY SYSTEM FOR DISPOSAL OF SEWAGE.

_____          08/28/01
JARD OF HEALTH - *WALTER B. ROSS*                DATE

## NG COMMISSION APPROVAL

ERTIFY THAT THIS MAP IS APPROVED AND ACCEPTED, ON BEHALF OF
ANY PARCELS OF LAND OFFERED FOR DEDICATION FOR PUBLIC USE IN
WITH THE TERMS OF THE OFFER OF DEDICATION.  FURTHERMORE, I
IS MAP IS IN SUBSTANTIAL COMPLIANCE WITH THE TENTATIVE MAP AND
IONS HAVE BEEN MET THIS *tenth* DAY OF *December*, *2001*.

_____
UBLER
T DIRECTOR

## OF BEARINGS

:0' 41" WEST, BEING THE BEARING OF ANN ROAD, SAME BEING THE
SOUTH LINE OF THE SOUTHWEST QUARTER (SW 1/4) OF SECTION 27,
9 SOUTH, RANGE 61 EAST, M.D.M., CLARK COUNTY, NEVADA, AS
HAT CERTAIN PARCEL MAP ON FILE IN THE OFFICE OF THE COUNTY
:LARK COUNTY, NEVADA, IN FILE 81 OF PARCEL MAPS, AT PAGE 06.

## RECORDER'S NOTE

UENT CHANGES TO THIS MAP SHOULD BE
JD MAY BE DETERMINED BY REFERENCE
TY RECORDER'S CUMULATIVE MAP INDEX.

W. O. 5503 (2)
SHEET 1 OF 3

NO. *01039*
_____

FILED AT THE REQUEST OF :

VTN nevada

DATED *12-13-2001* AT *10:38* A M
BOOK *102*        PAGE *0096*
OF PLATS
OFFICIAL RECORDS BOOK, NO. *20011213*

CLARK COUNTY, NEVADA RECORDS
JUDITH A. VANDEVER, RECORDER

FEE $ *74.00* DEPUTY *SHC*



| | |
|---|---|
| ✳ | NAIL AND BRASS TAG "VTN PLS 12469" SET PER "RANCHO MIRAGE UNIT II – PHASE BOOK 102 OF PLATS, PAGE 95 |
| **17** | LOT NUMBER / TOTAL LOTS = 55 |
| ⬡3 | BLOCK NUMBER |
| ◉ | FOUND MONUMENT AS INDICATED |
| C25 | CURVE NUMBER |
| L22 | COURSE NUMBER |
| R19 | RADIAL LINE NUMBER |
| (R) | RADIAL |
| S.F. | SQUARE FEET |
| (PRC) | POINT OF REVERSE CURVE |
| (PCC) | POINT OF COMPOUND CURVE |

## TYPICAL LOT SETBACKS
NOT TO SCALE



| RADIUS | CHAMFER |
|---|---|
| 15' | 7.5' |
| 20' | 10' |
| 25' | 12.5' |
| 30' | 15' |

**NOTE:**
CHAMFER DIMENSION AT ALL
CORNER LOT SETBACKS EQUALS
1/2 OF THE PROPERTY LINE/
RIGHT-OF-WAY CORNER LOT RADIUS.

W.O. 5503 (2)
SHEET 2 OF 3

VCL

```
200205 10
.01313
```

`ARTER (SE 1/4)`
`· CLARK COUNTY, NEVADA.`

`YOR'S CERTIFICATE`

R.   RIEKKI, A PROFESSIONAL LAND SURVEYOR LICENSED   IN   THE
EVADA, AS AN AGENT FOR VTN NEVADA, CERTIFY THAT:

   PLAT REPRESENTS THE RESULTS OF A SURVEY CONDUCTED UNDER   MY
T SUPERVISION AT THE INSTANCE OF RANCHO MIRAGE I, L.L.C.,   A
A LIMITED LIABILITY COMPANY.

ANDS SURVEYED LIE WITHIN A PORTION OF THE SE 1/4, OF THE   SW
OF SECTION 27, T. 19 S., R. 61 E., M.D.M., CITY OF NORTH LAS
, CLARK  COUNTY, NEVADA, AND THE SURVEY  WAS  COMPLETED  ON
/99.

 ·PLAT  COMPLIES WITH THE APPLICABLE STATE STATUTES  AND   ANY
   ORDINANCES IN EFFECT ON THE DATE THAT THE  GOVERNING  BODY
ITS FINAL APPROVAL.

ONUMENTS DEPICTED ON THE PLAT WILL BE OF THE CHARACTER SHOWN
OCCUPY  THE POSITIONS INDICATED BY: _12/12/02_
AN  APPROPRIATE FINANCIAL GUARANTEE WILL BE POSTED WITH  THE
NING  BODY BEFORE RECORDATION TO ASSURE THE INSTALLATION  OF
ENTS.

EKKI, P.L.S.
ENSE NO. 12469

7/27/99

# N OF WATER RESOURCES CERTIFICATE

L  MAP IS APPROVED BY THE DIVISION OF WATER RESOURCES OF THE
 OF CONSERVATION AND NATURAL RESOURCES CONCERNING  WATER
UBJECT TO THE REVIEW OF APPROVAL ON FILE IN THIS OFFICE.

Case 2:21-cv-02120-JCM-BNW   Document 1-1   Filed 11/29/21   Page 602 of 807

20020510
.01313

W.O. 5503 (2)
SHEET 3 OF 3
VCL

200205 10
.01313



ARTER (SE 1/4)

CLARK COUNTY, NEVADA.

P.O.C.

C
S 1/16
S27
C

2" C.N.L.V. BRASS CAP IN
CONCRETE LOCATED UNDER AC
TO BE RESTORED AS TYPE II
MONUMENT AL. CAP "VTN PLS 12469"
UPON COMPLETION OF CONSTRUCTION
OR SET WELL MONUMENT OVER EXISTING
IF STILL IN PLACE

COMMERCE STREET

## GRAPHIC SCALE

( IN FEET )
1 inch = 40 ft.

## LEGEND

| | |
|---|---|
| P.O.C. | POINT OF COMMENCEMENT |
| P.O.B. | POINT OF BEGINNING |
| | BOUNDARY LINE |
| | LOT LINE |
| | RIGHT-OF-WAY LINE |
| | STREET CENTERLINE |
| | BUILDING SETBACK LINE |
| | FRONT = 20' / REAR = 15' |
| | SIDE = 5' / CORNER = 10' |
| ● | SET TYPE III MONUMENT |
| | AL. CAP "VTN PLS 12469" |

200205 10
.01313

ARTER (SE 1/4)
CLARK COUNTY, NEVADA.

## DIAL LINE TABLE

| NE | BEARING | LENGTH |
|---|---|---|
| 1 | S23°07'43"E | 13.00' |
| 2 | S16°57'17"E | 13.00' |
| 3 | S10°59'39"E | 13.00' |
| 4 | S05°10'00"E | 13.00' |
| 5 | S00°35'39"W | 13.00' |
| 6 | S09°05'21"E | 13.00' |
| 7 | S04°04'05"E | 11.00' |
| 8 | S15°57'40"E | 11.00' |
| 9 | S58°09'56"E | 12.00' |
| 10 | S84°15'18"E | 13.00' |
| 11 | N62°46'39"E | 13.00' |
| 12 | N30°37'19"E | 13.00' |
| 13 | N02°15'20"W | 13.00' |
| 14 | N31°14'07"W | 12.00' |
| 15 | N33°38'59"E | 12.00' |
| 16 | N19°24'50"E | 13.00' |
| 18 | N56°56'58"E | 12.00' |
| 19 | N72°04'29"E | 13.00' |

2002 05 10
.01313

# UNIT II – PHASE 2

(NTEREST COMMUNITY)

FILE **96**, PAGE **59**, LOCATED WITHIN THE SOUTHEAST

JTH, RANGE 61 EAST, M.D.M., CITY OF NORTH LAS VE(

## ER'S CERTIFICATE                                           SUI

|S VEGAS, COUNTY OF CLARK, STATE OF NEVADA, DOES                I, /
I HAVE EXAMINED THE FINAL MAP OF RANCHO MIRAGE              STATE
. THAT THE SUBDIVISION AS SHOWN HEREON IS
ME AS IT APPEARS ON THE TENTATIVE MAP, AND ANY            1.
THEREOF. THAT ALL PROVISIONS OF THE PLANNING AND
ATE OF NEVADA AND ANY LOCAL ORDINANCES APPLICABLE
OVAL OF THE TENTATIVE MAP HAVE BEEN COMPLIED WITH.         2.
ATISFIED THIS MAP IS TECHNICALLY CORRECT AND THAT,
VE NOT BEEN SET. A PROPER FINANCIAL GUARANTEE HAS
JANTEEING THEIR SETTING ON OR BEFORE

DAY OF _December_ , _2001_                                    3.

                                                             4.

                                                 CITY ENGINEER
                               ~~ARNAD H. GUBLER, R.P.E. NO. 3131~~

HATE DIRECTOR / CITY ENGINEER
USLIC WORKS

## RIPTION                                                      [logo]
                                                            ALAN
CHO MIRAGE UNIT II – PHASE 2                                 NEVA

ION OF A PORTION OF LOT 1 OF THAT CERTAIN "AMENDED
OF PARCEL MAP (FILE 81, PAGE 06)", ON FILE IN THE
JNTY RECORDER, CLARK COUNTY, NEVADA, IN FILE **96** OF       DI\
GE **59**, LOCATED WITHIN THE SOUTHEAST QUARTER (SE 1/4)
QUARTER (SW 1/4) OF SECTION 27, TOWNSHIP 19 SOUTH,         THIS
).M., CITY OF NORTH LAS VEGAS, CLARK COUNTY, NEVADA,       DEPA
DESCRIBED AS FOLLOWS:                                       QUAN

SOUTH CENTER SIXTEENTH CORNER OF SAID SECTION 27;
47' 34" WEST, ALONG THE NORTH LINE OF THE SOUTHEAST

2002.0510
.01313

# UNIT II – PHASE 2

(TEREST COMMUNITY)

FILE 96, PAGE 59, LOCATED WITHIN THE SOUTHEAST

JTH, RANGE 61 EAST, M.D.M., CITY OF NORTH LAS VEG

E 94, PAGE 81
J8



Case 2:21-cv-02120-JCM-BNW   Document 1-1   Filed 11/29/21   Page 607 of 807



2002.05.10
.01313

# UNIT II — PHASE 2

NTEREST COMMUNITY)

FILE 96, PAGE 59, LOCATED WITHIN THE SOUTHEAST

JTH, RANGE 61 EAST, M.D.M., CITY OF NORTH LAS VEG

### COURSE TABLE

| LINE | BEARING | LENGTH |
|------|---------|--------|
| L1 | S64°12'37"W | 4.75' |
| L2 | S25°47'23"E | 48.00' |

ANGLE OF 02°39'40"; THENCE SOUTH 01°19'19" WEST,
NORTHERLY BOUNDARY OF LOT 2 OF SAID "AMENDED PLAT
CEL MAP (FILE 81, PAGE C6)"; THENCE NORTH 88°40'41"
NORTHERLY BOUNDARY, 450.00 FEET; THENCE ALONG THE
COURSES: (1) SOUTH 00°36'24" EAST, 91.44 FEET; (2)
EST, 160.72 FEET; (3) NORTH 00°36'29" WEST, 20.61
23'31" WEST, 100.00 FEET; (5) NORTH 00°36'29" WEST,
NORTH LINE OF THE SOUTHEAST QUARTER (SE 1/4) OF THE
(SW 1/4) OF SAID SECTION 27; THENCE SOUTH 88°47'34"
RTH LINE, 701.16 FEET TO THE POINT OF BEGINNING.

CRES, MORE OR LESS, AS DETERMINED BY COMPUTER

20020510
.01313

THIS

THIS

AND W.

WATER

DISTR

**PLA**

I HER
THE P
CONFO
CERTI
ALL C

ACTING  DEVEL

**BA**

NORTH
BEARI
TOWNS
SHOWN
RECOR

**COU**

ANY
EXAMIN
TO THI
NRS 2



LOT 2 OF AMENDED PLAT OF PARCEL MAP
FILE 96, PAGE 59.

T BE SET WITH A TYPE III MONUMENT. IN THOSE
TE IMPROVEMENTS EXIST (I.E., REAR PROPERTY
A NAIL AND TAG SHALL BEE SET IN THE WALL
    CORNER AND A SAW CUT SHALL BE MADE IN
    CURB AT THE PROLONGATION OF THE SIDE

RS ARE CHAMFERED EQUAL TO 1/2 OF THE
-OF-WAY CORNER LOT RADIUS.

E, COURSE, AND RADIAL LINE TABLES.

RECORDER'S MEMO
POSSIBLE POOR RECORD DUE TO
QUALITY OF ORIGINAL DOCUMENT



## SURVEY ANALYSIS

NOT TO SCALE





# RANCHO MIRAC

## (A COMMON

. SUBDIVISION OF A PORTION OF LOT 1 OF PARCEL M,
:ST QUARTER (SW 1/4) OF SECTION 27, TOWNSHIP 19

### D DEDICATION

.IMITED LIABILITY COMPANY, DOES
OF THE PARCEL OF LAND THAT IS
UNIT II — PHASE 2, AND DESCRIBED
. AND DOES HEREBY CONSENT TO THE
'LAT, AND DOES HEREBY OFFER AND
EASEMENTS AND PUBLIC PLACES AS
E REQUIREMENTS OF N.R.S. 278.010
16.050 TO THE CITY OF NORTH LAS

': THE WITHIN PLATTED LANDS DOES
:Y OF NORTH LAS VEGAS, NEVADA,
'WER COMPANY, CENTRAL TELEPHONE
:GAS, INC., THEIR SUCCESSORS AND
:GHT-OF-WAY AS SHOWN HEREON AS
, PRIVATE STREETS, AND COMMON
:MENT ON ALL SIDE PROPERTY LINES
NELS: A FIVE FOOT (5') WIDE
JG PUBLIC AND PRIVATE STREETS AND
3OVE GROUND TELEPHONE EQUIPMENT
:EET (2') AROUND TRANSFORMER PADS
'RUCTION, MAINTENANCE, OPERATION,
:R, TELEPHONE, WATER, CABLE T.V.,
3ETHER WITH THE RIGHT OF ACCESS

': THE WITHIN PLATTED LANDS DOES
:FROM ABUTTING LOTS WITHIN THIS
) TO, VEHICULAR ACCESS. TO THE

: A COVENANT ATTACHED TO THE LAND
)F THE SUBDIVISION AND SHALL HAVE
NNING WITH THE LAND.

:'T _____ _1999_

ITED LIABILITY COMPANY, BY:

### CITY ENG

THE CITY OF NOR
HEREBY CERTIFY
UNIT II — PHA
SUBSTANTIALLY 1
APPROVED ALTER/
ZONING ACT OF 1
AT THE TIME OF
FURTHERMORE, )
IF THE MONUMEN
BEEN POSTED

_12/12/0l_

DATED THIS _/2_

### LEGAL DE

BEING A SUB
PLAT OF A PO
OFFICE OF T
PARCEL MAPS,
OF THE SOUT
RANGE 61 EAS
MORE PARTICUL

COMMENCING A
THENCE NORTH

RECORDER'S MEMO
POSSIBLE POOR RECORD DUE TO
QUALITY OF ORIGINAL DOCUMENT


20020510
.01313

# RANCHO MIRAC

(A COMMON

A SUBDIVISION OF A PORTION OF LOT 1 OF PARCEL M
ST QUARTER (SW 1/4) OF SECTION 27, TOWNSHIP 19

N.A.P. PARCEL 2 PARCEL MA
APN 124-27-3

N88°47'34"W
S88°47'34"E

| 68.30' | 50.00' | 50.00' | 50.00' | 50.00' | 50.00' |
| 80 5,036 S.F. | 79 5,230 S.F. | 78 5,350 S.F. | 77 5,350 S.F. | 76 5,350 S.F. | 75 5,350 S.F. |

N16°75'4"W (R) 101.03'
96.55'  107.00'  107.00'  107.00'  107.00'
N01°19'19"E

C29  C28  C27  C17
C26
R/6  R/5

22.79'  50.00'  50.00'  50.00'  50.00'

DUNE        RIDGE  330.13'

(71.18')  S88°47'34"E  24.00'
(60.90')

"OFFERED        FOR
352.90'
24.00'

C25  27.48'  50.00'  50.00'  50.00'  50.00'

| 49 5,030 S.F. | 50 5,100 S.F. | 51 5,100 S.F. | 52 5,100 S.F. | 53 5,100 S.F. |

102.00'  102.00'  102.00'  102.00'  102.00'
S01°19'19"W

85.92'

N88°47'34"W

STREET

"DEDICATION"

60.17'  50.00'  50.00'  50.00'  50.00'
62.56'  50.00'  50.00'

Branch :FLV,User :EDI_E    Comment:    Station Id :X7QR



200205 10
.01313

# RANCHO MIRA(

(A COMMO

A SUBDIVISION OF A PORTION OF LOT 1 OF PARCEL M

ST QUARTER (SW 1/4) OF SECTION 27, TOWNSHIP 19

## CURVE TABLE

| CURVE | RADIUS | LENGTH | TANGENT | DELTA |
|-------|--------|--------|---------|-------|
| C1 | 498.50' | 23.15' | 11.58' | 02°39'40" |
| C2 | 474.50' | 138.31' | 69.65' | 16°42'01" |
| C3 | 474.50' | 224.53' | 114.41' | 27°06'42" |
| C4 | 474.50' | 86.22' | 43.23' | 10°24'40" |
| C5 | 450.50' | 42.38' | 21.21' | 05°23'24" |
| C6 | 20.00' | 30.21' | 18.83' | 86°32'24" |
| C7 | 20.00' | 36.78' | 26.23' | 105°21'11" |
| C8 | 450.50' | 77.28' | 38.73' | 09°49'43" |
| C9 | 498.50' | 235.88' | 120.19' | 27°06'42" |
| C10 | 498.50' | 6.33' | 3.17' | 00°43'40" |
| C11 | 498.50' | 53.72' | 26.88' | 06°10'26" |
| C12 | 498.50' | 51.86' | 25.95' | 05°57'38" |
| C13 | 498.50' | 50.70' | 25.37' | 05°49'39" |
| C14 | 498.50' | 50.12' | 25.08' | 05°45'38" |
| C15 | 20.00' | 32.09' | 20.69' | 91°55'48" |
| C16 | 20.00' | 30.74' | 19.34' | 88°04'12" |
| C17 | 25.00' | 14.16' | 7.27' | 32°26'33" |
| C18 | 35.00' | 53.87' | 33.91' | 88°11'05" |
| C19 | 61.50' | 164.30' | 256.85' | 153°04'11" |
| C20 | 61.50' | 28.00' | 14.25' | 26°05'22" |
| C21 | 61.50' | 35.39' | 18.20' | 32°56'03" |
| C22 | 61.50' | 34.51' | 17.73' | 32°09'20" |
| C23 | 61.50' | 35.29' | 18.15' | 32°52'39" |
| C24 | 61.50' | 31.11' | 15.89' | 28°58'47" |
| C25 | 35.00' | 56.09' | 36.13' | 91°48'55" |
| C26 | 61.50' | 168.20' | 298.28' | 156°42'00" |
| C27 | 61.50' | 15.28' | 7.68' | 14°14'09" |
| C28 | 61.50' | 38.33' | 19.81' | 35°42'43" |
| C29 | 61.50' | 35.60' | 18.32' | 33°10'05" |
| C30 | 61.50' | 34.26' | 17.59' | 31°54'58" |

ᴈᵁᴅᴅᴇᴎ        ᴅᴀᴵᴸ

200205 ᴎᴑF   498.50  FI
.01313      THROUGH  A  CI
            154.71  FEET
            OF A PORTION
            WEST, ALONG
            FOLLOWING FIVI
            SOUTH  89° 23'
            FEET;  (4)  SOU
            598.83 FEET T
            SOUTHWEST  QU
            EAST, ALONG S.

            CONTAINING  9.
            METHODS.

ᴏRE ME ON  *AUGUST 19*

SPECIALTY HOLDINGS, INC., A NEVADA
RANCHO MIRAGE I, L.L.C., A NEVADA

AND STATE
O

## ᴎT RECIPIENTS

ᴈS AND AGENCIES, APPROVE THE



TARIE RIZZO        9-7-99    DATE      N.I.T. 07/11/01
                                       MARCIA L. TAPIA

BENITO            9-13-99    DATE      Jim Daily
                                       7/31/01
                                       JIM A. REILLY

                   9-8-99    DATE      D/m  7.11.01
                                       DAVID MORENO

J. McCARRE, JR.    9-7-99    DATE      RS 7/12/01
                                       STEPHEN A. JONES

ᴈSION –           12/12/01   DATE



RECORDER'S MEMO
POSSIBLE POOR RECORD DUE TO
QUALITY OF ORIGINAL DOCUMENT



2002051 10
.01313

BEIN

OF THE SOUT

## OWNER'S CERTIFICATI

RANCHO MIRAGE I, L.L.C., A N
HEREBY CERTIFY THAT IT IS THE
SHOWN UPON THIS PLAT OF RANCHO
IN THE SURVEYOR'S CERTIFICATE
PREPARATION AND RECORDATION OF
DEDICATE ALL THE STREETS, AL
INDICATED AND OUTLINED HEREON,
TO 278.630, INCLUSIVE, AND T
VEGAS FOR THE USE OF THE PUBLIC;

FURTHERMORE, THE UNDERSIGNED O
HEREBY GRANT AND CONVEY TO
SOUTHWEST GAS CORPORATION, NE
COMPANY, AND COX COMMUNICATIONS
ASSIGNS: A PERMANENT EASEMENT
"PUBLIC UTILITY EASEMENT", (
ELEMENTS; A THREE FOOT (3') WI
AND UNDERGROUND SERVICES TO M
EASEMENT ON ALL PROPERTY LINES
ABOVE GROUND TRANSFORMER PADS
PADS TOGETHER WITH AN ADDITIONAL
WITHIN THE PLATTED LANDS FOR THE
AND FINAL REMOVAL OF UNDERGROU
AND GAS LINES AND APPURTENANC
THERETO;

FURTHERMORE, THE UNDERSIGNED O
HEREBY WAVE DIRECT ACCESS R
SUBDIVISION, INCLUDING BUT NOT
FOLLOWING STREETS: (NONE).

THIS WAIVER OF ACCESS RIGHTS S
AND PASS WITH EACH AND EVERY PO
THE FORCE AND EFFECT OF A COVEN.

DATED THIS _19d__ DAY OF _A

RANCHO MIRAGE I, L.L.C., A NEVA
SPECIALTY HOLDINGS, INC., A NEV.



20020510
.01313

S 1/16
S28 — S27

FOUND 1-1/2"
ALUMINUM CAP
STAMPED "VTN PLS 9105"

1669.66'

BEI
OF THE SOUT

104.10'

30.47'

N49°27'59"W (R)

135.C

**81**
9,228 S

105.26'

**82**
6,736 S.F.

N81°22'57"W (R)   88.

63.00'

**83**
5,013 S.F.

S89°23'31"W 95.87

598.83'

50.10'

**84**
5,007 S.F.

S89°23'31"W 100.0

50.00'

**85**
5,000 S.F.

S89°23'31"W 100.C

THE PURPOSE OF THIS CERTIFICATE OF AMENDMENT IS TO (1)
PROVIDE RECORDING INFORMATION, WHICH WAS OMITTED, FROM
SAID PLAT AND (2) CORRECT INFORMATION IN THE LEGEND
REGARDING THE FRONT SETBACK.

(1) THE MISSING RECORDING INFORMATION FOR "RANCHO MIRAGE
UNIT II – PHASE 1" ALONG THE EASTERLY BOUNDARY AS SHOWN
ON SHEET 2 OF 3 IS AS FOLLOWS: BOOK 101, PAGE 95.

(2) THE FRONT SETBACK IN THE LEGEND IS HEREBY CORRECTED TO
READ AS FOLLOWS: BUILDING SETBACK LINE FRONT = 18' AS
SHOWN ON SHEET 2 OF 3.

Copies:

MENDED PLAT OF PARCEL MAP"
GE 59.

Case 2:21-cv-02120-JCM-BNW    Document 1-1    Filed 11/29/21    Page 619 of 807

20020510
.01313

BEI
OF THE SOU

Case 2:21-cv-02120-JCM-BNW   Document 1-1   Filed 11/29/21   Page 620 of 807



## ACKNOWLEDGEMENT

STATE OF NEVADA )
                        ss
COUNTY OF CLARK )

THIS INSTRUMENT WAS ACKNOWLEDGED
*1999* BY JERRY GOEDEN AS PRESIDEN
COPORATION,   AS MANAGING   MEMBER
LIMITED LIABILITY COMPANY.

*Kathleen Gall*

KATHLEEN GALL

NOTARY PUBLIC IN AND FOR SAID CO
MY COMMISSION EXPIRES: *AUGUST 1*

## CERTIFICATE OF EASE

WE, THE HEREIN NAMED UTILITY COM
GRANT OF THE DESIGNATED EASEMENT

*Marie Cizzy*

COX COMMUNICATIONS LAS VEGAS, IN

*Yolanda M. Saint*

NEVADA POWER COMPANY. *YOLANDA*

*Jane F. Stokes*

SPRINT             *JANE F. STOK*

*Del McClure*

SOUTHWEST GAS CORPORATION *CLA*

*Ladrnal M. Gubler*

CITY OF NORTH LAS VEGAS, UTILIT
*LADRNAL M. GUBLER*



N.A.P. "AMENDE

20.6'
N00°36'29"

RECORDER'S MEMO
POSSIBLE POOR RECORD DUE TO
QUALITY OF ORIGINAL DOCUMENT

CLARK COUNTY, NEVADA
JUDITH A. VANDEVER, RECORDER
RECORDED AT REQUEST OF:

NEVADA TITLE COMPANY
05-10-2002  14:08  KGC          97
OFFICIAL RECORDS
BOOK: 20020510  INST:    01313
FEE:    110.00  RPTT:          .00

# EXHIBIT 8

# EXHIBIT 8

20090608-0006547

Fee: $24.00      RPTT: $0.00
N/C Fee: $0.00
06/08/2009                    15:47:47
T20090199988
Requestor:
    STEWART TITLE LAS VEGAS WARM
Debbie Conway              RMS
Clark County Recorder      Pgs: 11

PIN #: 124-27-412-049

When Recorded Return To:
MOUNTAIN VIEW MORTGAGE COMPANY
7311 W CHARLESTON BLVD, SUITE 110
LAS VEGAS, NV 89117
(702) 228-7105

Grantee:
MOUNTAIN VIEW MORTGAGE COMPANY
7311 W CHARLESTON BLVD, SUITE 110, LAS
VEGAS, NV 89117

Mail Tax Statement To:
MOUNTAIN VIEW MORTGAGE COMPANY
7311 W CHARLESTON BLVD, SUITE 110
LAS VEGAS, NV 89117

*1017264*

[Space Above This Line For Recording Data]

## DEED OF TRUST

**RECORDING REQUESTED BY:**
**STEWART TITLE OF NEVADA**

GREGORY
Loan #: 09051511
MIN: 100096000090515118
PIN: 124-27-412-049
Case #: 332-4899944-703

THIS DEED OF TRUST ("Security Instrument") is made on **MAY 26, 2009**. The grantor is **KEN E. GREGORY, AN UNMARRIED MAN** ("Borrower"). The trustee is **STEWART TITLE OF NEVADA** ("Trustee"). The beneficiary is Mortgage Electronic Registration Systems, Inc. ("MERS") (solely as nominee for Lender, as hereinafter defined, and Lender's successors and assigns), as beneficiary. MERS is organized and existing under the laws of Delaware, and has an address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS. **MOUNTAIN VIEW MORTGAGE COMPANY** ("Lender") is organized and existing under the laws of **COLORADO**, and has an address of **7311 W CHARLESTON BLVD, SUITE 110, LAS VEGAS, NV 89117**. Borrower owes Lender the principal sum of **ONE HUNDRED EIGHT THOUSAND SEVEN** Dollars (U.S. **$108,007.00**). This debt is evidenced by Borrower's note dated the same date as this Security Instrument ("Note"), which provides for monthly payments, with the full debt, if not paid earlier, due and payable on **JUNE 1, 2039**. This Security Instrument secures to Lender: (a) the repayment of the debt evidenced by the Note, with interest, and all renewals, extensions and modifications of the Note; (b) the payment of all other sums, with interest, advanced under paragraph 7 to protect the security of this Security Instrument; and (c) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower irrevocably grants and conveys to Trustee, in trust, with power of sale, the following described property located in **CLARK** County, Nevada:
**LEGAL DESCRIPTION ATTACHED HERETO AND MADE A PART HEREOF.**
which has the address of **5733 OASIS RIDGE STREET, NORTH LAS VEGAS**, Nevada **89031** ("Property Address");

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the

**FHA Nevada Deed of Trust - 07/08**
👁 395.4                      Page 1 of 8

09051511

interests granted by Borrower in this Security Instrument; but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing or canceling this Security Instrument.

BORROWER COVENANTS that Borrower is lawfully seized of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

**1. Payment of Principal, Interest and Late Charge.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and late charges due under the Note.

**2. Monthly Payment of Taxes, Insurance and Other Charges.** Borrower shall include in each monthly payment, together with the principal and interest as set forth in the Note and any late charges, a sum for (a) taxes and special assessments levied or to be levied against the Property, (b) leasehold payments or ground rents on the Property, and (c) premiums for insurance required under paragraph 4. In any year in which the Lender must pay a mortgage insurance premium to the Secretary of Housing and Urban Development ("Secretary"), or in any year in which such premium would have been required if Lender still held the Security Instrument, each monthly payment shall also include either; (i) a sum for the annual mortgage insurance premium to be paid by Lender to the Secretary, or (ii) a monthly charge instead of a mortgage insurance premium if this Security Instrument is held by the Secretary, in a reasonable amount to be determined by the Secretary. Except for the monthly charge by the Secretary, these items are called "Escrow Items" and the sums paid to Lender are called "Escrow Funds."

Lender may, at any time collect and hold amounts for Escrow Items in an aggregate amount not to exceed the maximum amount that may be required for Borrower's escrow account under the Real Estate Settlement Procedures Act of 1974, 12 U.S.C. Section 2601 et seq. and implementing regulations, 24 CFR Part 3500, as they may be amended from time to time ("RESPA"), except that the cushion or reserve permitted by RESPA for unanticipated disbursements or disbursements before the Borrower's payments are available in the account may not be based on amounts due for the mortgage insurance premium.

If the amounts held by Lender for Escrow Items exceed the amounts permitted to be held by RESPA, Lender shall account to borrower for the excess funds as required by RESPA. If the amounts of funds held by Lender at any time are not sufficient to pay the Escrow Items when due, Lender may notify the Borrower and require Borrower to make up the shortage or deficiency as permitted by RESPA.

The Escrow Funds are pledged as additional security for all sums secured by this Security Instrument. If Borrower tenders to Lender the full payment of all such sums, Borrower's account shall be credited with the balance remaining for all installment items, (a), (b) and (c) and any mortgage insurance premium installment that Lender has not become obligated to pay to the Secretary, and Lender shall promptly refund any excess funds to Borrower. Immediately prior to a foreclosure sale of the Property or its acquisition by Lender, Borrower's account shall be credited with any balance remaining for all installment for items (a), (b) and (c).

**3. Application of Payments.** All payments under paragraphs 1 and 2 shall be applied by Lender as follows:

**FHA Nevada Deed of Trust - 07/08**
👁 395.4                          Page  2  of  8

09051511

_First_, to the mortgage insurance premium to be paid by Lender to the Secretary or to the monthly charge by the Secretary instead of the monthly mortgage insurance premium;

_Second_, to any taxes, special assessments, leasehold payments or ground rents, and fire, flood and other hazard insurance premiums, as required;

_Third_, to interest due under the Note;

_Fourth_, to amortization of the principal of the Note;

_Fifth_, to late charges due under the Note.

**4. Fire, Flood and Other Hazard Insurance.** Borrower shall insure all improvements on the Property, whether now in existence or subsequently erected, against any hazards, casualties, and contingencies, including fire, for which Lender requires insurance. This insurance shall be maintained in the amounts and for the periods that Lender requires. Borrower shall also insure all improvements on the Property, whether now in existence or subsequently erected, against loss by floods to the extent required by the Secretary. All insurance shall be carried with companies approved by Lender. The insurance policies and any renewals shall be held by Lender and shall include loss payable clauses in favor of, and in a form acceptable to, Lender.

In the event of loss, Borrower shall give Lender immediate notice by mail. Lender may make proof of loss if not made promptly by Borrower. Each insurance company concerned is hereby authorized and directed to make payment for such loss directly to Lender, instead of to Borrower and to Lender jointly. All or any part of the insurance proceeds may be applied by Lender, at its option, either (a) to the reduction of the indebtedness under the Note and this Security Instrument, first to any delinquent amounts applied in the order in Paragraph 3, and then to prepayment of principal, or (b) to the restoration or repair of the damaged Property. Any application of the proceeds to the principal shall not extend or postpone the due date of the monthly payments which are referred to in Paragraph 2, or change the amount of such payments. Any excess insurance proceeds over an amount required to pay all outstanding indebtedness under the Note and this Security Instrument shall be paid to the entity legally entitled thereto.

In the event of foreclosure of this Security Instrument or other transfer of title to the Property that extinguishes the indebtedness, all right, title and interest of Borrower in and to insurance policies in force shall pass to the purchaser.

**5. Occupancy, Preservation, Maintenance and Protection of the Property; Borrower's Loan Application; Leaseholds.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within sixty days after the execution of this Security Instrument (or within sixty days of a later sale or transfer of the property) and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender determines that requirement will cause undue hardship for Borrower, or unless extenuating circumstances exist which are beyond Borrower's control. Borrower shall notify Lender of any extenuating circumstances. Borrower shall not commit waste or destroy, damage or substantially change the Property or allow the Property to deteriorate, reasonable wear and tear excepted. Lender may inspect the Property if the Property is vacant or abandoned or the loan is in default. Lender may take reasonable action to protect and preserve such vacant or abandoned Property. Borrower shall also be in default if Borrower, during the loan application process, gave materially false or inaccurate information or statements to Lender (or failed to provide Lender with any material information) in connection with the loan evidenced by the Note, including, but not limited to, representations concerning Borrower's occupancy of the Property as a principal residence. If this Security Instrument is on a leasehold, Borrower shall comply with the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and fee title shall not be merged unless Lender agrees to the merger in writing.

**6. Condemnation.** The proceeds of any award or claim for damages, direct or consequential, in connection with any condemnation or other taking of any part of the Property, or for conveyance in place of

**FHA Nevada Deed of Trust - 07/08**
👁 395.4                          Page  3  of  8

09051511

condemnation, are hereby assigned and shall be paid to Lender to the extent of the full amount of the indebtedness that remains unpaid under the Note and this Security Instrument. Lender shall apply such proceeds to the reduction of the indebtedness under the Note and this Security Instrument, first to any delinquent amounts applied in the order provided in Paragraph 3, and then to prepayment of principal. Any application of the proceeds to the principal shall not extend or postpone the due date of the monthly payments, which are referred to in Paragraph 2, or change the amount of such payments. Any excess proceeds over an amount required to pay all outstanding indebtedness under the Note and this Security Instrument shall be paid to the entity legally entitled thereto.

**7. Charges to Borrower and Protection of Lender's Rights in the Property.** Borrower shall pay all governmental or municipal charges, fines and impositions that are not included in Paragraph 2. Borrower shall pay these obligations on time directly to the entity which is owed the payment. If failure to pay would adversely affect Lender's interest in the Property, upon Lender's request Borrower shall promptly furnish to Lender receipts evidencing these payments.

If Borrower fails to make these payments or the payments required by Paragraph 2, or fails to perform any other covenants and agreements contained in this Security Instrument, or there is a legal proceeding that may significantly affect Lender's rights in the Property (such as a proceeding in bankruptcy, for condemnation or to enforce laws or regulations), then Lender may do and pay whatever is necessary to protect the value of the Property and Lender's rights in the Property, including payment of taxes, hazard insurance and other items mentioned in Paragraph 2.

Any amounts disbursed by Lender under this Paragraph shall become an additional debt of Borrower and be secured by this Security Instrument. These amounts shall bear interest from the date of disbursement, at the Note rate, and at the option of Lender, shall be immediately due and payable.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender; (b) contests in good faith the lien by, or defends against enforcement of the lien in, legal proceedings which in the Lender's opinion operate to prevent the enforcement of the lien; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which may attain priority over this Security Instrument. Lender may give Borrower a notice identifying the lien. Borrower shall satisfy the lien or take one or more of the actions set forth above within 10 days of the giving of notice.

**8. Fees.** Lender may collect fees and charges authorized by the Secretary.

**9. Grounds for Acceleration of Debt.**

**(a) Default.** Lender may, except as limited by regulations issued by the Secretary in the case of payment defaults, require immediate payment in full of all sums secured by this Security Instrument if:

(i) Borrower defaults by failing to pay in full any monthly payment required by this Security Instrument prior to or on the due date of the next monthly payment, or

(ii) Borrower defaults by failing, for a period of thirty days, to perform any other obligations contained in this Security Instrument.

**(b) Sale Without Credit Approval.** Lender shall, if permitted by applicable law (including section 341(d) of the Garn-St Germain Depository Institutions Act of 1982, 12 U.S.C. 1701j-3(d)) and with the prior approval of the Secretary, require immediate payment in full of all sums secured by this Security Instrument if:

(i) All or part of the Property, or a beneficial interest in a trust owning all or part of the Property, is sold or otherwise transferred (other than by devise or descent) and

**FHA Nevada Deed of Trust - 07/08**
👁 395.4                    Page  4  of  8

09051511

(ii) The Property is not occupied by the purchaser or grantee as his or her principal residence, or the purchaser or grantee does so occupy the Property but his or her credit has not been approved in accordance with the requirements of the Secretary.

**(c) No Waiver.** If circumstances occur that would permit Lender to require immediate payment in full, but Lender does not require such payments, Lender does not waive its rights with respect to subsequent events.

**(d) Regulations of HUD Secretary.** In many circumstances regulations issued by the Secretary will limit Lender's rights in the case of payment defaults, to require immediate payment in full and foreclose if not paid. This Security Instrument does not authorize acceleration or foreclosure if not permitted by regulations of the Secretary.

**(e) Mortgage Not Insured.** Borrower agrees that should this Security Instrument and the Note are not to be eligible for insurance under the National Housing Act within **60 days** from the date hereof, Lender may, at its option, require immediate payment in full of all sums secured by this Security Instrument. A written statement of any authorized agent of the Secretary dated subsequent to **60 days** from the date hereof, declining to insure this Security Instrument and the Note shall be deemed conclusive proof of such ineligibility. Notwithstanding the foregoing, this option may not be exercised by Lender when the unavailability of insurance is solely due to Lender's failure to remit a mortgage insurance premium to the Secretary.

**10. Reinstatement.** Borrower has a right to be reinstated if Lender has required immediate payment in full because of Borrower's failure to pay an amount due under the Note or this Security Instrument. This right applies even after foreclosure proceedings are instituted. To reinstate the Security Instrument, Borrower shall tender in a lump sum all amounts required to bring Borrower's account current including, to the extent they are obligations of Borrower under this Security Instrument, foreclosure costs and reasonable and customary attorneys' fees and expenses properly associated with the foreclosure proceeding. Upon reinstatement by Borrower, this Security Instrument and the obligations that it secures shall remain in effect as if Lender had not required immediate payment in full. However, Lender is not required to permit reinstatement if: (i) Lender has accepted reinstatement after the commencement of foreclosure proceedings within two years immediately preceding the commencement of a current foreclosure proceeding, (ii) reinstatement will preclude foreclosure on different grounds in the future, or (iii) reinstatement will adversely affect the priority of the lien created by this Security Instrument.

**11. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time of payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to any successor in interest of Borrower shall not operate to release the liability of the original Borrower or Borrower's successor in interest. Lender shall not be required to commence proceedings against any successor in interest or refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or Borrower's successors in interest. Any forbearance by Lender in exercising any right or remedy shall not be a waiver of or preclude the exercise of any right or remedy.

**12. Successors and Assigns Bound; Joint and Several Liability; Co-Signers.** The covenants and agreements of this Security Instrument shall bind and benefit the successors and assigns of Lender and Borrower, subject to the provisions of Paragraph 9(b). Borrower's covenants and agreements shall be joint and several. Any Borrower who co-signs this Security Instrument but does not execute the Note: (a) is co-signing this Security Instrument only to mortgage, grant and convey that Borrower's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower may agree to extend, modify, forebear or make any accommodations with regard to the terms of this Security Instrument or the Note without that Borrower's consent.

**FHA Nevada Deed of Trust - 07/08**
👁 395.4                    Page 5 of 8

09051511

**13. Notices.** Any notice to Borrower provided for in this Security Instrument shall be given by delivering it or by mailing it by first class mail unless applicable law requires use of another method. The notice shall be directed to the Property Address or any other address Borrower designates by notice to Lender. Any notice to Lender shall be given by first class mail to Lender's address stated herein or any address Lender designates by notice to Borrower. Any notice provided for in this Security Instrument shall be deemed to have been given to Borrower or Lender when given as provided in this paragraph.

**14. Governing Law; Severability.** This Security Instrument shall be governed by Federal law and the law of the jurisdiction in which the Property is located. In the event that any provision or clause of this Security Instrument or the Note conflicts with applicable law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision. To this end the provisions of this Security Instrument and the Note are declared to be severable.

**15. Borrower's Copy.** Borrower shall be given one conformed copy of the Note and of this Security Instrument.

**16. Hazardous Substances.** Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property that is in violation of any Environment Law. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property.

Borrower shall promptly give Lender written notice of any investigation, claim, demand, lawsuit or other action by any removal or other regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge. If Borrower learns, or is notified by any governmental or regulatory authority, that any removal or other remediation of any Hazardous Substances affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law.

As used in this paragraph 16, "Hazardous Substances" are those substances defined as toxic or hazardous substances by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials. As used in this paragraph 16, "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection.

**NON-UNIFORM COVENANTS.** Borrower and Lender further covenant and agree as follows:

**17. Assignment of Rents.** Borrower unconditionally assigns and transfers to Lender all the rents and revenues of the Property. Borrower authorizes Lender or Lender's agents to collect the rents and revenues and hereby directs each tenant of the Property to pay the rents to Lender or Lender's agents. However, prior to Lender's notice to Borrower of Borrower's breach of any covenant or agreement in the Security Instrument, Borrower shall collect and receive all rents and revenues of the Property as trustee for the benefit of Lender and Borrower. This assignment of rents constitutes an absolute assignment and not an assignment for additional security only.

If Lender gives notice of breach to Borrower: (a) all rents received by Borrower shall be held by Borrower as trustee for benefit of Lender only, to be applied to the sums secured by the Security Instrument; (b) Lender shall be entitled to collect and receive all of the rents of the Property; and (c) each tenant of the Property shall pay all rents due and unpaid to Lender or Lender's agent on Lender's written demand to the tenant.

Borrower has not executed any prior assignment of the rents and has not and will not perform any

**FHA Nevada Deed of Trust - 07/08**
👁 395.4                                   Page  6  of  8

Case 2:21-cv-02120-JCM-BNW   Document 1-1   Filed 11/29/21   Page 629 of 807

09051511

act that would prevent Lender from exercising its rights under this Paragraph 17.

    Lender shall not be required to enter upon, take control of or maintain the Property before or after giving notice of breach to Borrower. However, Lender or a judicially appointed receiver may do so at any time there is a breach. Any application of rents shall not cure or waive any default or invalidate any other right or remedy of Lender. This assignment of rents of the Property shall terminate when the debt secured by the Security Instrument is paid in full.

    **18. Foreclosure Procedure.** If Lender requires immediate payment in full under paragraph 9, Lender may invoke the power of sale and any other remedies permitted by applicable law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this paragraph 18, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

    If Lender invokes the power of sale, Lender shall execute or cause Trustee to execute written notice of the occurrence of an event of default and of Lender's election to cause the Property to be sold, and shall cause such notice to be recorded in each county in which any part of the Property is located, Lender or Trustee shall mail copies of the notice as prescribed by applicable law to Borrower and to the persons prescribed by applicable law. Trustee shall give public notice of sale to the persons and in the manner prescribed by applicable law. After the time required by applicable law, Trustee, without demand on Borrower, shall sell the Property at public auction to the highest bidder at the time and place and under the terms designated in the notice of sale in one or more parcels and in any order Trustee determines. Trustee may postpone sale of all or any parcel of the Property by public announcement at the time and place of any previously scheduled sale. Lender or its designee may purchase the Property at any sale.

    Trustee shall deliver to the purchaser Trustee's deed conveying the Property without any covenant or warranty, expressed or implied. The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein. Trustee shall apply the proceeds of the sale in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable Trustee's and attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it.

    If the Lender's interest in this Security Instrument is held by the Secretary and the Secretary requires immediate payment in full under Paragraph 9, the Secretary may invoke the nonjudicial power of sale provided in the Single Family Mortgage Foreclosure Act of 1994 ("Act") (12 U.S.C. 3751 *et seq.*) by requesting a foreclosure commissioner designated under the Act to commence foreclosure and to sell the Property as provided in the Act. Nothing in the preceding sentence shall deprive the Secretary of any rights otherwise available to a Lender under this Paragraph 18 or applicable law.

    **19. Reconveyance.** Upon payment of all sums secured by this Security Instrument, Lender shall request Trustee to reconvey the Property and shall surrender this Security Instrument and all notes evidencing debt secured by this Security Instrument to Trustee. Trustee shall reconvey the Property without warranty and without charge to the person or persons legally entitled to it. Such person or persons shall pay any recondition costs.

    **20. Substitute Trustee.** Lender, at its own option, may from time to time remove Trustee and appoint a successor trustee to any Trustee appointed hereunder. Without conveyance of the Property, the successor trustee shall succeed to all the title, power and duties conferred upon Trustee herein and by applicable law.

    **21. Assumption Fee.** Lender may charge the maximum assumption fee allowable by the Department of Housing and Urban Development.

    **22. Riders to this Security Instrument.** If one or more riders are executed by Borrower and recorded together with this Security Instrument, the covenants and agreements of each such rider shall be incorporated into and shall amend and supplement the covenants and agreements of this Security Instrument as if the rider(s) were a part of this Security Instrument.

**FHA Nevada Deed of Trust - 07/08**

395.4                    Page  7  of  8

09051511

The Following Rider(s) are to be executed by Borrower and are attached hereto and made a part thereof [check box as applicable]:

☐ Condominium Rider            ☐ Growing Equity Rider          ☐ Adjustable Rate Rider
☒ Planned Unit Development Rider   ☐ Graduated Payment Rider
☐ Other(s) [specify]

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

**SIGNATURE CLARIFICATION:**

5-27-09

- BORROWER -  KEN E. GREGORY  - DATE -        **KEN E. GREGORY**

_____
[Space Below This Line For Acknowledgment]

STATE OF *Nevada*

COUNTY OF *Clark*

This instrument was acknowledged before me on *May 27, 2009* by

*Ken E. Gregory*

_____

Notary Public

KRISTEN LANGE
Notary Public State of Nevada
No. 06-104795-1
My appt. exp. Mar. 23, 2010

My Commission Expires: 3-23-10

FHA Nevada Deed of Trust - 07/08
395.4                              Page  8  of  8

**EXHIBIT "A"**

The land referred to herein situate in the State of Nevada, County of Clark, described as follows:

Lot Eighty-Five (85) in Block Ten (10) of Rancho Mirage Unit II, Phase 2, as shown by map thereof on file in Book 102 of Plats, Page 96 and amended by the Certificate of Amendment recorded January 18, 2002 in Book 20020118 as Document No. 00615, in the Office of the County Recorder of Clark County, Nevada.

# PLANNED UNIT DEVELOPMENT RIDER

**GREGORY**
Loan #: 09051511
MIN: 100096000090515118
Case #: 332-4899944-703

    THIS PLANNED UNIT DEVELOPMENT RIDER is made this **26TH** day of **MAY, 2009**, and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust or Security Deed ("Security Instrument") of the same date given by the undersigned ("Borrower") to secure Borrower's Note ("Note") to **MOUNTAIN VIEW MORTGAGE COMPANY** ("Lender") of the same date and covering the Property described in the Security Instrument and located at: **5733 OASIS RIDGE STREET, NORTH LAS VEGAS, NV 89031** [Property Address]. The Property Address is a part of a planned unit development ("PUD") known as **RANCHO MIRAGE UNIT 2 PHASE 2** [Name of Planned Unit Development].

    **PUD COVENANTS.** In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

    **A.** So long as the Owners Association (or equivalent entity holding title to common areas and facilities), acting as trustee for the homeowners, maintains, with a generally accepted insurance carrier, a "master" or "blanket" policy insuring the property located in the PUD, including all improvements now existing or hereafter erected on the mortgaged premises, and such policy is satisfactory to Lender and provides insurance coverage in the amounts, for the periods, and against the hazards Lender requires, including fire and other hazards included within the term "extended coverage," and loss by flood, to the extent required by the Secretary, then: (i) Lender waives the provision in Paragraph 2 of this Security Instrument for the monthly payment to Lender of one-twelfth of the yearly premium installments for hazard insurance on the Property, and (ii) Borrower's obligation under Paragraph 4 of this Security Instrument to maintain hazard insurance coverage on the Property is deemed satisfied to the extent that the required coverage is provided by the Owners Association policy. Borrower shall give Lender prompt notice of any lapse in required hazard insurance coverage and of any loss occurring from a hazard. In the event of a distribution of hazard insurance proceeds in lieu of restoration or repair following a loss

    50.1                                Page 1 of 2                        **FHA Multistate PUD Rider
6/96**

Case 2:21-cv-02120-JCM-BNW   Document 1-1   Filed 11/29/21   Page 633 of 807

09051511

to the Property or to common areas and facilities of the PUD, any proceeds payable to Borrower are hereby assigned and shall be paid to Lender for application to the sums secured by this Security Instrument, with any excess paid to the entity legally entitled thereto.

**B.** Borrower promises to pay all dues and assessments imposed pursuant to the legal instruments creating and governing the PUD.

**C.** If Borrower does not pay PUD dues and assessments when due, then Lender may pay them. Any amounts disbursed by Lender under this paragraph C shall become additional debt of Borrower secured by the Security Instrument. Unless Borrower and Lender agree to other terms of payment, these amounts shall bear interest from the date of disbursement at the Note rate and shall be payable, with interest, upon notice from Lender to Borrower requesting payment.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and provisions contained in this PUD Rider.

5-27-09

- BORROWER - KEN E. GREGORY - DATE -

**SIGNATURE CLARIFICATION:**

**KEN E. GREGORY**

50.1                    Page 2 of 2                    **FHA Multistate PUD Rider**
**6/96**

# EXHIBIT 9

# EXHIBIT 9

Inst #: 20181106-0001809
Fees: $40.00
11/06/2018 11:52:44 AM
Receipt #: 3557021
Requestor:
NATIONWIDE LEGAL
Recorded By: ANI  Pgs: 4
DEBBIE CONWAY
CLARK COUNTY RECORDER
Src: FRONT COUNTER
Ofc: MAIN OFFICE

## RECORDING COVER PAGE
(Must be typed or printed clearly in BLACK ink only
and avoid printing in the 1" margins of document)

**APN#**  124-27-412-049

(11 digit Assessor's Parcel Number may be obtained at:
http://redrock.co.clark.nv.us/assrrealprop/ownr.aspx)

## TITLE OF DOCUMENT
(DO NOT Abbreviate)

Assignment of Deed of Trust

_____

_____

_____

**Document Title on cover page must appear EXACTLY as the first page of the document
to be recorded.**

**RECORDING REQUESTED BY:**

Wright, Finlay & Zak, LLP

**RETURN TO: Name** Wright, Finlay & Zak, LLP

**Address** 7785 W. Sahara Ave., Suite 200

**City/State/Zip** Las Vegas, NV 89117

**MAIL TAX STATEMENT TO:** (Applicable to documents transferring real property)

**Name** N/A

**Address** N/A

**City/State/Zip** N/A

This page provides additional information required by NRS 111.312 Sections 1-2.
An additional recording fee of $1.00 will apply.
To print this document properly, do not use page scaling.
Using this cover page does not exclude the document from assessing a noncompliance fee.
P:\Common\Forms & Notices\Cover Page Template Feb2014

Recording requested by:
When recorded mail to:
MARINERS COMPANIES
1303 AVOCADO AVE SUITE 200
NEWPORT BEACH, CA 92660
-SEND TAX STATEMENTS TO ABOVE-

SPACE ABOVE THIS LINE FOR RECORDER'S USE

Property commonly known as: 5733 OASIS RIDGE ST, N. LAS VEGAS, NV, 89031
APN: 124-27-412-049

## ASSIGNMENT OF DEED OF TRUST

For value received, **MARINERS ATLANTIC PORTFOLIO, LLC** , (herein "Assignor"), whose
address 1303 AVOCADO AVE SUITE 200, NEWPORT BEACH, CA 92660 does hereby grant,
sell, assign, transfer and convey unto **MARINERS PAC VENTURES, LLC** (Assignee) whose
address is 1303 AVOCADO AVE SUITE 200, NEWPORT BEACH, CA 92660, all beneficial
interest under that certain   described below together with the Note(s) and obligations therein
described and the money due and to become due thereon with interest and all rights accrued or to
accrue under said Note.

**SEE LEGAL DESCRIPTION ATTACHED HERETO AND MADE A PART OF.**

ORIGINAL LENDER: **MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC.**
**FOR MOUNTAIN VIEW MORTGAGE COMPANY**

TRUSTEE:    **STEWART TITLE OF NEVADA**

ORIGINAL LOAN AMOUNT: **108,007.00**

BORROWER(S): **KEN E. GREGORY**

DATED: **05/26/2009**          RECORDED: **06/08/2009**

INSTRUMENT:     **200906080006547**    BOOK: **N/A**        PAGE: N/A

RECORDED IN: **CLARK COUNTY, NV**

I, the undersigned hereby affirm that this document submitted for recording does not contain the
social security number of any person or persons.

IN WITNESS, WHEREOF, the undersigned corporation has caused this instrument to be executed
as a sealed instrument by its proper officer.

Made Effective: 02/06/2018            **MARINERS ATLANTIC PORTFOLIO, LLC**

WITNESS: Matt Curtin

WITNESS: Ron Millar

By: APRIL SMITH
Its:  VICE PRESIDENT

«NOTARY ACKNOWLEDGEMENT TO FOLLOW»

## ACKNOWLEDGEMENT

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document, to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of _CALIFORNIA_
County of _ORANGE_

On _10-10-18_ before me, _M. Gwen Melanson_ ,
Notary                    Public,            · personally                    appeared
_APRIL SMITH_ ,
who proved to me on the basis of satisfactory evidence to be the person(s) who's name is subscribed to the within instrument and acknowledged to me that he /she /they executed the same in his /her /their authorized capacity, and that his /her / their signature on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of _California_ that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

_M. Gwen Melanson_

Signature of Notary Public
My commission expires on

M. GWEN MELANSON
Commission No.   2246948
NOTARY PUBLIC-CALIFORNIA
ORANGE COUNTY
My Comm. Expires     JUNE 21, 2022

#

**EXHIBIT "A"**


LOT EIGHTY-FIVE (85) IN BLOCK TEN (10) OF RANCH MIRAGE UNIT II, PHASE 2, AS SHOWN BY MAP THEREOF ON FILE IN BOOK 102 OF PLATS, PAGE 96, AND AMENDED BY THE CERTIFICATE OF AMENDMENT RECORDED JANUARY 18, 2002 IN BOOK 20020118 AS DOCUMENT NO. 00615, IN THE OFFICE OF THE COUNTY RECORDER OF CLARK COUNTY, NEVADA.

PROPERTY COMMONLY KNOWN AS: 5733 OASIS RIDGE ST, N. LAS VEGAS, NV, 89031

# EXHIBIT 10

# EXHIBIT 10

Case 2:21-cv-02120-JCM-BNW   Document 1-1   Filed 11/29/21   Page 640 of 807

Inst #: 201212180002236
Fees: $17.00
N/C Fee: $0.00
12/18/2012 09:45:44 AM
Receipt #: 1425498
Requestor:
NORTH AMERICAN TITLE COMPAN
Recorded By: DGI   Pgs: 1
**DEBBIE CONWAY**
**CLARK COUNTY RECORDER**

APN # 124-27-412-049
# N72906

## Accommodation

### NOTICE OF DELINQUENT ASSESSMENT LIEN

In accordance with Nevada Revised Statutes and the Association's declaration of Covenants Conditions and Restrictions (CC&Rs), recorded on August 7, 2002, as instrument number 00080 Book 20020807, of the official records of Clark County, Nevada, the Santa Rosa has a lien on the following legally described property.

The property against which the lien is imposed is commonly referred to as 5733 Oasis Ridge Street North Las Vegas, NV 89031 particularly legally described as:  RANCHO MIRAGE UNIT 2 PHASE 2, PLAT BOOK 102, PAGE 96, LOT 85, BLOCK 10 in the County of Clark.

The owner(s) of record as reflected on the public record as of today's date is (are):
Ken E Gregory

Mailing address(es):
5733 Oasis Ridge Street North Las Vegas, NV 89031

*Total amount due as of today's date is $3,016.50.

This amount includes late fees, collection fees and interest in the amount of $818.50
      * Additional monies will accrue under this claim at the rate of the claimant's regular assessments or special assessments, plus permissible late charges, costs of collection and interest, accruing after the date of the notice.
      Nevada Association Services, Inc. is a debt collector.  Nevada Association Services, Inc. is attempting to collect a debt.  Any information obtained will be used for that purpose.

Dated:   December 14, 2012

By Megan Moling, of Nevada Association Services, Inc., as agent for Santa Rosa

When Recorded Mail To:
Nevada Association Services
TS # N72906
6224 W. Desert Inn Rd, Suite A
Las Vegas, NV 89146
Phone:  (702) 804-8885        Toll Free: (888) 627-5544

# EXHIBIT 11

# EXHIBIT 11

Inst #: 201306210002082
Fees: $18.00
N/C Fee: $0.00
06/21/2013 12:15:30 PM
Receipt #: 1664904
Requestor:
TITLE SOLUTIONS, INC.
Recorded By: GILKS   Pgs: 2
**DEBBIE CONWAY**
CLARK COUNTY RECORDER

APN # 124-27-412-049
NAS # N72906
Title Solutions, Inc. # **731946**
Property Address:  5733 Oasis Ridge Street

## NOTICE OF DEFAULT AND ELECTION TO SELL UNDER
## HOMEOWNERS ASSOCIATION LIEN

### IMPORTANT NOTICE

# WARNING! IF YOU FAIL TO PAY THE AMOUNT SPECIFIED IN THIS NOTICE, YOU COULD LOSE YOUR HOME, EVEN IF THE AMOUNT IS IN DISPUTE!

IF YOUR PROPERTY IS IN FORECLOSURE BECAUSE YOU ARE BEHIND IN YOUR PAYMENTS IT MAY BE SOLD WITHOUT ANY COURT ACTION and you may have the legal right to bring your account in good standing by paying all your past due payments plus permitted costs and expenses within the time permitted by law for reinstatement of your account.  No sale date may be set until ninety (90) days from the date this notice of default was mailed to you. The date this document was mailed to you appears on this notice.

   This amount is $2,316.38 as of June 7, 2013 and will increase until your account becomes current.
   While your property is in foreclosure, you still must pay other obligations (such as insurance and taxes) required by your note and deed of trust or mortgage, or as required under your Covenants Conditions and Restrictions.  If you fail to make future payments on the loan, pay taxes on the property, provide insurance on the property or pay other obligations as required by your note and deed of trust or mortgage, or as required under your Covenants Conditions and Restrictions, Santa Rosa (the Association) may insist that you do so in order to reinstate your account in good standing.  In addition, the Association may require as a condition to reinstatement that you provide reliable written evidence that you paid all senior liens, property taxes and hazard insurance premiums.
   Upon your request, this office will mail you a written itemization of the entire amount you must pay.  You may not have to pay the entire unpaid portion of your account, even though full payment was demanded, but you must pay all amounts in default at the time payment is made.  However, you and your Association may mutually agree in writing prior to the foreclosure sale to, among other things, 1) provide additional time in which to cure the default by transfer of the property or otherwise; 2) establish a schedule of payments in order to cure your default; or both (1) and (2).
   Following the expiration of the time period referred to in the first paragraph of this notice, unless the obligation being foreclosed upon or a separate written agreement between you and your Association permits a longer period, you have only the legal right to stop the sale of your property by paying the entire amount demanded by your Association.
   To find out about the amount you must pay, or arrange for payment to stop the foreclosure, or if your property is in foreclosure for any other reason, contact: Nevada Association Services, Inc. on behalf of Santa Rosa, 6224 W. Desert Inn Road, Suite A, Las Vegas, NV 89146.  The phone number is (702) 804-8885 or toll free at (888) 627-5544.
   If you have any questions, you should contact a lawyer or the Association which maintains the right of assessment on your property.

NAS # N72906

Notwithstanding the fact that your property is in foreclosure, you may offer your property for sale, provided the sale is concluded prior to the conclusion of the foreclosure.

## REMEMBER, YOU MAY LOSE LEGAL RIGHTS IF YOU DO NOT TAKE PROMPT ACTION.
## NOTICE IS HEREBY GIVEN THAT NEVADA ASSOCIATION SERVICES, INC.

is the duly appointed agent under the previously mentioned Notice of Delinquent Assessment Lien, with the owner(s) as reflected on said lien being Ken E Gregory, dated December 14, 2012, and recorded on December 18, 2012 as instrument number 0002236 Book 20121218 in the official records of Clark County, Nevada, executed by Santa Rosa, hereby declares that a breach of the obligation for which the Covenants Conditions and Restrictions, recorded on May 10, 2002, as instrument number 01313 Book 20020510, as security has occurred in that the payments have not been made of homeowner's assessments due from 1/1/2012 and all subsequent  · homeowner's assessments, monthly or otherwise, less credits and offsets, plus late charges, interest, trustee's fees and costs, attorney's fees and costs and Association fees and costs.

That by reason thereof, the Association has deposited with said agent such documents as the Covenants Conditions and Restrictions and documents evidencing the obligations secured thereby, and declares all sums secured thereby due and payable and elects to cause the property to be sold to satisfy the obligations.

Nevada Association Services, Inc. is a debt collector.  Nevada Association Services, Inc. is attempting to collect a debt.  Any information obtained will be used for that purpose.

Nevada Associations Services, Inc., whose address is 6224 W. Desert Inn Road, Suite A, Las Vegas, NV 89146 is authorized by the association to enforce the lien by sale.

Legal_Description:  RANCHO MIRAGE UNIT 2 PHASE 2, PLAT BOOK 102, PAGE 96, LOT 85, BLOCK 10 in the County of  Clark

Dated:  June 7, 2013

By:  Autumn Fesel, of Nevada Association Services, Inc.
on behalf of Santa Rosa

When Recorded Mail To:
Nevada Association Services, Inc.
6224 W. Desert Inn Road, Suite A
Las Vegas, NV 89146
(702) 804-8885
(888) 627-5544

# EXHIBIT 12

# EXHIBIT 12

Inst #: 201310280001599
Fees: $18.00
N/C Fee: $0.00
10/28/2013 08:15:06 AM
Receipt #: 1822799
Requestor:
TITLE SOLUTIONS, INC.
Recorded By: BGN  Pgs: 2
**DEBBIE CONWAY**
**CLARK COUNTY RECORDER**

**RECORDING COVER PAGE**
(Must be typed or printed clearly in BLACK ink only
and avoid printing in the 1" margins of document)

APN# 124-27-412-049

(11 digit Assessor's Parcel Number may be obtained at:
http://redrock.co.clark.nv.us/assrrealprop/ownr.aspx)

**TITLE OF DOCUMENT**
**(DO NOT Abbreviate)**

Notice of Foreclosure Sale

Document Title on cover page must appear EXACTLY as the first page of the
document to be recorded.

**RECORDING REQUESTED BY:**

Nevada Association Services

RETURN TO: Name  Nevada Association Services

            Address  6224 W. Desert Inn Road

            City/State/Zip  Las Vegas, NV 89146

**MAIL TAX STATEMENT TO:  (Applicable to documents transferring real property)**

        Name

        Address

        City/State/Zip

This page provides additional information required by NRS 111.312 Sections 1-2.
An additional recording fee of $1.00 will apply.
To print this document properly—do not use page scaling.

APN # 124-27-412-049                              NAS # N72906
Santa Rosa

### NOTICE OF FORECLOSURE SALE

**WARNING! A SALE OF YOUR PROPERTY IS IMMINENT! UNLESS
YOU PAY THE AMOUNT SPECIFIED IN THIS NOTICE BEFORE
THE SALE DATE, YOU COULD LOSE YOUR HOME, EVEN IF THE
AMOUNT IS IN DISPUTE. YOU MUST ACT BEFORE THE SALE
DATE. IF YOU HAVE ANY QUESTIONS, PLEASE CALL NEVADA
ASSOCIATION SERVICES, INC. AT (702) 804-8885. IF YOU NEED
ASSISTANCE, PLEASE CALL THE FORECLOSURE SECTION OF
THE OMBUDSMAN'S OFFICE, NEVADA REAL ESTATE DIVISION,
AT 1-877-829-9907 IMMEDIATELY.**

YOU ARE IN DEFAULT UNDER A DELINQUENT ASSESSMENT LIEN, December 14, 2012. UNLESS
YOU TAKE ACTION TO PROTECT YOUR PROPERTY, IT MAY BE SOLD AT A PUBLIC SALE. IF
YOU NEED AN EXPLANATION OF THE NATURE OF THE PROCEEDINGS AGAINST YOU, YOU
SHOULD CONTACT A LAWYER.

   NOTICE IS HEREBY GIVEN THAT on 11/22/2013 at 10:00 am at the front entrance to the Nevada
Association Services, Inc. 6224 West Desert Inn Road, Las Vegas, Nevada, under the power of sale pursuant to
the terms of those certain covenants conditions and restrictions recorded on May 10, 2002 as instrument
number 01313 Book 20020510 of official records of Clark County, Nevada Association Services, Inc., as duly
appointed agent under that certain Delinquent Assessment Lien, recorded on December 18, 2012 as document
number 0002236 Book 20121218 of the official records of said county, will sell at public auction to the highest
bidder, for lawful money of the United States, all right, title, and interest in the following commonly known
property known as: 5733 Oasis Ridge Street, North Las Vegas, NV 89031. Said property is legally described
as: RANCHO MIRAGE UNIT 2 PHASE 2, PLAT BOOK 102, PAGE 96, LOT 85, BLOCK 10, official
records of Clark County, Nevada.

The owner(s) of said property as of the date of the recording of said lien is purported to be: Ken E Gregory
   The undersigned agent disclaims any liability for incorrectness of the street address and other common
designations, if any, shown herein. The sale will be made without covenant or warranty, expressed or implied
regarding, but not limited to, title or possession, or encumbrances, or obligations to satisfy any secured or
unsecured liens. The total amount of the unpaid balance of the obligation secured by the property to be sold
and reasonable estimated costs, expenses and advances at the time of the initial publication of the Notice of
Sale is $3,030.81. Payment must be in cash or a cashier's check drawn on a state or national bank, check drawn
on a state or federal savings and loan association, savings association or savings bank and authorized to do
business in the State of Nevada. The Notice of Default and Election to Sell the described property was
recorded on 6/21/2013 as instrument number 0002082 Book 20130621 in the official records of Clark County.
   Nevada Association Services, Inc. is a debt collector. Nevada Association Services, Inc. is attempting to
collect a debt. Any information obtained will be used for that purpose.

October 23, 2013                        Nevada Association Services, Inc.
                                        6224 W. Desert Inn Road, Suite A
                                        Las Vegas, NV 89146  (702) 804-8885, (888) 627-5544

When Recorded Mail To:
Nevada Association Services, Inc.
6224 W. Desert Inn Road, Suite A       By: Elissa Hollander, Agent for Association and employee of
Las Vegas, NV 89146                     Nevada Association Services, Inc.

# EXHIBIT 13

# EXHIBIT 13

Inst #: 201311260001412
Fees: $18.00 N/C Fee: $0.00
RPTT: $627.30 Ex: #
11/26/2013 10:09:04 AM
Receipt #: 1854993
Requestor:
**RESOURCES GROUP**
Recorded By: MSH   Pgs: 3
**DEBBIE CONWAY**
**CLARK COUNTY RECORDER**

Please mail tax statement and
when recorded mail to:
**Saticoy Bay LLC Series 5733 Oasis Ridge**
**P.O. Box 36208**
**Las Vegas, NV 89133**

## FORECLOSURE DEED

APN # 124-27-412-049
Title Solutions, Inc. #731946                                    NAS # N72906

The undersigned declares:

Nevada Association Services, Inc., herein called agent (for the Santa Rosa), was the duly
appointed agent under that certain Notice of Delinquent Assessment Lien, recorded December
18, 2012 as instrument number 0002236  Book 20121218, in Clark County. The previous owner
as reflected on said lien is Ken E Gregory. Nevada Association Services, Inc. as agent for Santa
Rosa does hereby grant and convey, but without warranty expressed or implied to: Saticoy Bay
LLC Series 5733 Oasis Ridge (herein called grantee), pursuant to NRS 116.31162, 116.31163
and 116.31164, all its right, title and interest in and to that certain property legally described as:
RANCHO MIRAGE UNIT 2 PHASE 2, PLAT BOOK 102, PAGE 96, LOT 85, BLOCK 10
Clark County

AGENT STATES THAT:
This conveyance is made pursuant to the powers conferred upon agent by Nevada Revised
Statutes, the Santa Rosa governing documents (CC&R's) and that certain Notice of Delinquent
Assessment Lien, described herein.  Default occurred as set forth in a Notice of Default and
Election to Sell, recorded on 6/21/2013 as instrument # 0002082 Book 20130621 which was
recorded in the office of the recorder of said county.  Nevada Association Services, Inc. has
complied with all requirements of law including, but not limited to, the elapsing of 90 days,
mailing of copies of Notice of Delinquent Assessment and Notice of Default and the posting and
publication of the Notice of Sale.  Said property was sold by said agent, on behalf of Santa Rosa
at public auction on 11/22/2013, at the place indicated on the Notice of Sale.  Grantee being the
highest bidder at such sale, became the purchaser of said property and paid therefore to said agent
the amount bid $25,000.00 in lawful money of the United States, or by satisfaction, pro tanto, of
the obligations then secured by the Delinquent Assessment Lien.

Dated: November 25, 2013

*Misty Blanchard*

By Misty Blanchard, Agent for Association and Employee of Nevada Association Services

STATE OF NEVADA                    )
COUNTY OF CLARK                    )
On November 25, 2013, before me, Susana E. Puckett, personally appeared Misty Blanchard personally
known to me (or proved to me on the basis of satisfactory evidence) to be the person whose name is
subscribed to the within instrument and acknowledged that he/she executed the same in his/her
authorized capacity, and that by signing his/her signature on the instrument, the person, or the entity
upon behalf of which the person acted, executed the instrument.
WITNESS my hand and seal.

(Seal)                                                          (Signature)

> SUSANA E. PUCKETT
> Notary Public, State of Nevada
> Appointment No. 11-4965-1
> My Appt. Expires April 21, 2015

*Susana E. Puckett*

**STATE OF NEVADA**
**DECLARATION OF VALUE**

1. Assessor Parcel Number(s)
   a. 124-27-412-049
   b. _____
   c. _____
   d. _____

2. Type of Property:
   a. ☐ Vacant Land　　b. ☑ Single Fam. Res.
   c. ☐ Condo/Twnhse　d. ☐ 2-4 Plex
   e. ☐ Apt. Bldg　　　f. ☐ Comm'l/Ind'l
   g. ☐ Agricultural　　h. ☐ Mobile Home
   ☐ Other

| FOR RECORDERS OPTIONAL USE ONLY |
|---|
| Book_____　Page:_____ |
| Date of Recording:_____ |
| Notes: |

3.a. Total Value/Sales Price of Property　　　　$ 25,000.00
   b. Deed in Lieu of Foreclosure Only (value of property ( _____ )
   c. Transfer Tax Value:　　　　　　　　　　　$ 122,940.00
   d. Real Property Transfer Tax Due　　　　　　$ 627.50

4. **If Exemption Claimed:**
   a. Transfer Tax Exemption per NRS 375.090, Section _____
   b. Explain Reason for Exemption: _____

5. Partial Interest: Percentage being transferred: 100 %
The undersigned declares and acknowledges, under penalty of perjury, pursuant to NRS 375.060
and NRS 375.110, that the information provided is correct to the best of their information and belief,
and can be supported by documentation if called upon to substantiate the information provided herein.
Furthermore, the parties agree that disallowance of any claimed exemption, or other determination of
additional tax due, may result in a penalty of 10% of the tax due plus interest at 1% per month. Pursuant
to NRS 375.030, the Buyer and Seller shall be jointly and severally liable for any additional amount owed.

Signature _Misty Blanchard_　　　　　Capacity: Agent for HOA/NAS Employee

Signature _____　Capacity: _____

| **SELLER (GRANTOR) INFORMATION** (REQUIRED) | **BUYER (GRANTEE) INFORMATION** (REQUIRED) |
|---|---|
| Print Name: Nevada Association Services | Print Name: Saticoy Bay LLC Series 5733 Oasis Ridge |
| Address: 6224 W. Desert Inn Road | Address: P.O. Box 36208 |
| City: Las Vegas | City: Las Vegas |
| State: Nevada　　Zip: 89146 | State: Nevada　　Zip: 89133 |

**COMPANY/PERSON REQUESTING RECORDING (Required if not seller or buyer)**

Print Name: Saticoy Bay LLC Series 5733 Oasis Ridge　　Escrow # _____
Address: P.O. Box 36208　　5733 Oasis Ridge
City: LV　　　　　　　State: NV　　Zip: 89133

AS A PUBLIC RECORD THIS FORM MAY BE RECORDED/MICROFILMED

# EXHIBIT 14

# EXHIBIT 14

# CIVIL COVER SHEET

Clark County, Nevada

A-13-693884-C
XXIX

Case No. _____
*(Assigned by Clerk's Office)*

## I. Party Information

Plaintiff SATICOY BAY LLC SERIES 5733 OASIS RIDGE

Attorney Michael F. Bohn, Esq.

376 E. Warm Springs Road, Ste. 125

Las Vegas NV 89119 (702) 642-3113

Defendants GMAC MORTGAGE LLC; CLEAR RECON CORP; AND KEN E. GREGORY

Attorney  N/A

## II. Nature of Controversy EXEMPTION FROM ARBITRATION Title to Real Property

### Civil Cases

| Real Property | Torts | |
|---|---|---|
| ☐ **Landlord/Tenant**<br> ☐ Unlawful Detainer<br> ☐ **Title to Property**<br> ☐ Foreclosure<br> ☐ Liens<br> **X Quiet Title**<br> ☐ Specific Performance<br> ☐ **Condemnation/Eminent Domain**<br> ☐ **Other Real Property**<br> ☐ Partition<br> ☐ Planning/Zoning | **Negligence**<br> ☐ **Negligence – Auto**<br> ☐ **Negligence – Medical/Dental**<br> ☐ **Negligence – Premises Liability**<br> (Slip/Fall)<br> ☐ **Negligence – Other** | ☐ **Product Liability**<br> ☐ Product Liability/Motor Vehicle<br> ☐ Other Torts/Product Liability<br> ☐ **Intentional Misconduct**<br> ☐ Torts/Defamation (Libel/Slander)<br> ☐ Interfere with Contract Rights<br> ☐ **Employment Torts** (Wrongful termination)<br> ☐ **Other Torts**<br> ☐ Anti-trust<br> ☐ Fraud/Misrepresentation<br> ☐ Insurance<br> ☐ Legal Tort<br> ☐ Unfair Competition |

| Probate | Other Civil Filing Types | |
|---|---|---|
| **Estimated Estate Value:** _____<br><br> ☐ **Summary Administration**<br> ☐ **General Administration**<br> ☐ **Special Administration**<br> ☐ **Set Aside Estates**<br> ☐ **Trust/Conservatorships**<br> ☐ Individual Trustee<br> ☐ Corporate Trustee<br> ☐ **Other Probate** | ☐ **Construction Defect**<br> ☐ Chapter 40<br> ☐ General<br> ☐ **Breach of Contract**<br> ☐ Building & Construction<br> ☐ Insurance Carrier<br> ☐ Commercial Instrument<br> ☐ Other Contracts/Acct/Judgment<br> ☐ Collection of Actions<br> ☐ Employment Contract<br> ☐ Guarantee<br> ☐ Sale Contract<br> ☐ Uniform Commercial Code<br> ☐ **Civil Petition for Judicial Review**<br> ☐ Foreclosure Mediation<br> ☐ Other Administrative Law<br> ☐ Department of Motor Vehicles<br> ☐ Worker's Compensation Appeal | ☐ **Appeal from Lower Court** (*also check applicable civil case box*)<br> ☐ Transfer from Justice Court<br> ☐ Justice Court Civil Appeal<br> ☐ **Civil Writ**<br> ☐ Other Special Proceeding<br> ☐ **Other Civil Filing**<br> ☐ Compromise of Minor's Claim<br> ☐ Conversion of Property<br> ☐ Damage to Property<br> ☐ Employment Security<br> ☐ Enforcement of Judgment<br> ☐ Foreign Judgment – Civil<br> ☐ Other Personal Property<br> ☐ Recovery of Property<br> ☐ Stockholder Suit<br> ☐ Other Civil Matters |

## III. Business Court Requested (Please check applicable category; *for Clark or Washoe Counties only.*)

| | | |
|---|---|---|
| ☐ NRS Chapters 78-88<br> ☐ Commodities (NRS 90)<br> ☐ Securities (NRS 90) | ☐ Investments (NRS 104 Art. 8)<br> ☐ Deceptive Trade Practices (NRS 598)<br> ☐ Trademarks (NRS 600A) | ☐ Enhanced Case Mgmt/Business<br> ☐ Other Business Court Matters |

January 2nd , 2014
_____
Date

/ S / Michael F. Bohn, Esq. /
_____
Signature of initiating party or representative

Electronically Filed
01/02/2014 10:41:54 AM

**CLERK OF THE COURT**

1   **COMP**
    MICHAEL F. BOHN, ESQ.
2   Nevada Bar No.: 1641
    mbohn@bohnlawfirm.com
3   LAW OFFICES OF
    MICHAEL F. BOHN, ESQ., LTD.
4   376 East Warm Springs Road, Ste. 125
    Las Vegas, Nevada  89119
5   (702) 642-3113/ (702) 642-9766 FAX

6   Attorney for plaintiff

7

8                           DISTRICT  COURT

9                        CLARK COUNTY, NEVADA

10

11  SATICOY BAY LLC SERIES 5733 OASIS     CASE NO.: A-14-693884-C
    RIDGE,                                DEPT NO.:
12                                                     XXIX
13              Plaintiff,               **EXEMPTION FROM ARBITRATION:**
                                         **Title to real property**
14  vs.

15  GMAC MORTGAGE, LLC; CLEAR
    RECON CORP; AND KEN E. GREGORY,
16
                Defendants.
17

18                          **COMPLAINT**

19          Plaintiff, Saticoy Bay LLC Series 5733 Oasis Ridge, by and through it's attorney, Michael F.

20  Bohn, Esq.  alleges as follows:

21          1.  Plaintiff  is the owner of the real property commonly known as 5733 Oasis Ridge Street,

22  North Las Vegas, Nevada.

23          2.  Plaintiff obtained title by foreclosure deed recorded November 26, 2013.

24          3.  The plaintiff's title stems from a foreclosure deed arising from a delinquency in

25  assessments due from the former owner to the Santa Rosa, pursuant to NRS Chapter 116.

26          4.  GMAC Mortgage, LLC is the beneficiary  of a deed of trust which was recorded as an

27  encumbrance to the subject property on June 8, 2009.

28                                        1

1    5.  Clear Recon Corp is the trustee on the deed of trust.

2    6.  Defendant Ken E. Gregory was the former owner of the subject real property.

3    7.  The interest of each of the defendants has been extinguished by reason of the foreclosure

4  sale resulting from a delinquency in assessments due from the former owner, Ken E. Gregory to the

5  Santa Rosa, pursuant to NRS Chapter 116.

6    8.  The plaintiff is entitled to an award of attorneys fees and costs.

7                              **SECOND CLAIM FOR RELIEF**

8    9.  Plaintiff repeats the allegations contained in paragraphs 1 through 8.

9    10.  Plaintiff  is entitled to a determination from this court, pursuant to NRS  40.010 that the

10  plaintiff is the rightful owner of the property and that the defendants have no right, title, interest or

11  claim to the subject property.

12    11.  The plaintiff is entitled to an award of attorneys fees and costs.

13                              **THIRD CLAIM FOR RELIEF**

14    12.  Plaintiff repeats the allegations contained in paragraphs 1 through 11.

15    13.  Plaintiff  seeks a declaration from this court, pursuant to NRS 40.010, that title in the

16  property is vested in plaintiff free and clear of all liens and encumbrances, that the defendants herein

17  have no estate, right, title or interest in the property, and that defendants are forever enjoined from

18  asserting any estate, title, right, interest, or claim to the subject property adverse to the plaintiff.

19    14.  The plaintiff is entitled to an award of attorneys fees and costs.

20    WHEREFORE, plaintiff prays for Judgment as follows:

21    1.  For injunctive relief;

22    2.  For a determination and declaration that plaintiff is the rightful holder of title to the

23  property, free and clear of all liens, encumbrances, and claims of the defendants.

24    3.  For a determination and declaration that the defendants have no estate, right, title, interest

25  or claim in the property.

26    4.  For a judgment forever enjoining the defendants from asserting any estate, right, title,

27  interest or claim in the property; and

28                                              2

5.  For such other and further relief as the Court may deem just and proper.

DATED this 2nd day of January 2014.

LAW OFFICES OF
MICHAEL F. BOHN, ESQ., LTD.


By:   / s / Michael F. Bohn, Esq. /
  Michael F. Bohn, Esq.
  376 East Warm Springs Road, Ste. 125
  Las Vegas, Nevada 89119
  Attorney for plaintiff

3

## VERIFICATION

STATE OF NEVADA       )
                             ) ss:
COUNTY OF CLARK       )

Iyad Haddad, being first duly sworn, deposes and says;

That he is the authorized representative of the plaintiff Limited Liability Company in the above entitled action; that he has read the foregoing complaint and knows the contents thereof; that the same is true of his own knowledge, except as to those matters therein alleged on information and belief, and as to those matters, he believes them to be true.

IYAD HADDAD

SUBSCRIBED and SWORN to before me
this 2ND day of January, 2014

NOTARY PUBLIC in and for said
County and State

MAURIZIO MAZZA
Notary Public State of Nevada
No. 05-94588-1
My Appt. Exp. Feb. 1, 2017

1  **IAFD**
MICHAEL F. BOHN, ESQ.
2  Nevada Bar No.: 1641
mbohn@bohnlawfirm.com
3  LAW OFFICES OF
MICHAEL F. BOHN, ESQ., LTD.
4  376 East Warm Springs Road, Ste. 125
Las Vegas, Nevada  89119
5  (702) 642-3113/ (702) 642-9766 FAX

6  Attorney for plaintiff

                            DISTRICT  COURT
7
                        CLARK COUNTY, NEVADA
8

9  SATICOY BAY LLC SERIES 5733 OASIS          CASE NO.:
   RIDGE,                                     DEPT NO.:
10
              Plaintiff,
11
   vs.
12
   GMAC MORTGAGE , LLC; CLEAR RECON
13 CORP; AND KEN E. GREGORY,

14            Defendants.

15              **INITIAL APPEARANCE FEE DISCLOSURE**

16        Pursuant to NRS Chapter 19, filing fees are submitted for the party appearing in the above-

17 entitled action as indicated below:

18        SATICOY BAY LLC SERIES 5733 OASIS RIDGE        $270.00

19        TOTAL REMITTED:                                $270.00

20        DATED this 2nd day of January 2014.

21                                      LAW OFFICES OF
                                        MICHAEL F. BOHN, ESQ., LTD.
22

23

24                                      By:  / s / Michael F. Bohn, Esq. /
                                          Michael F. Bohn, Esq.
25                                        376 East Warm Springs Road, Ste. 125
                                          Las Vegas, Nevada 89119
26                                        Attorney for plaintiff

27

28                                          1

# EXHIBIT 15

# EXHIBIT 15

Electronically Filed
3/30/2018 3:31 PM
Steven D. Grierson
CLERK OF THE COURT

1  **AANS**
   WRIGHT, FINLAY & ZAK, LLP
2  Edgar C. Smith, Esq.
   Nevada Bar No. 5506
3  Krista J. Nielson, Esq.
   Nevada Bar No. 10698
4  7785 W. Sahara Ave., Suite 200
5  Las Vegas, NV 89117
   (702) 475-7964; Fax: (702) 946-1345
6  knielson@wrightlegal.net
7  *Attorneys for Defendant, Ocwen Loan Servicing, LLC*

8                          **DISTRICT COURT**

9                      **CLARK COUNTY, NEVADA**

10

11  SATICOY BAY LLC SERIES 5733 OASIS          Case No.:  A-14-693884-C
    RIDGE,                                     Dept. No.:  XXIX
12
                         Plaintiff,            **OCWEN LOAN SERVICING, LLC'S**
13                                             **AMENDED ANSWER TO FIRST**
    vs.                                        **AMENDED COMPLAINT AND**
14                                             **COUNTERCLAIM**
    OCWEN LOAN SERVICING, LLC; CLEAR
15  RECON CORP; and KEN E. GREGORY;
    DOES 1-10; and ROES 1-10 inclusive,
16
17                       Defendants.
18
    OCWEN LOAN SERVICING, LLC,
19
                    Counter-Claimant,
20
21  vs.
22  SATICOY BAY LLC SERIES 5733 OASIS
    RIDGE; SANTA ROSA HOMEOWNERS
23  ASSOCIATION; NEVADA ASSOCIATION
    SERVICES, INC.; DOES 1 through 10,
24  inclusive; ROE CORPORATIONS 1 through 10
25  inclusive,
26                       Defendants.
27
28

**AMENDED ANSWER**

Ocwen filed an Answers to Plaintiff's SAmended Complaint on December 3, 2014. Those responses are still valid as to Plaintiff's Amended Complaint. Out of an abundance of caution, Ocwen hereby incorporate by reference as set forth fully herein those Answers, Affirmative Defenses, and Prayer against Plaintiff

**OCWEN'S COUNTERCLAIM**

COMES NOW Defendant/Counter-Claimant, Ocwen Loan Servicing, LLC ("Ocwen" or "Defendant/Counter-Claimant"), by and through its attorneys of record, Edgar C. Smith, Esq., and Krista J. Nielson, Esq., of the law firm of Wright, Finlay & Zak, LLP, and hereby submits its Amended Answer and Counterclaim against Saticoy Bay LLC Series 5733 Oasis Ridge ("Saticoy Bay", "HOA Buyer", or "Plaintiff/Counter-Defendant"); Santa Rosa Homeowners Association ("Santa Rosa" or "HOA"); Nevada Association Services, Inc. ("NAS" or "HOA Trustee"); DOES 1 through 10, inclusive; and ROE CORPORATIONS 1 through 10, inclusive (collectively, "Counter-Defendants"). Nothing in this Amended Answer and Counterclaim is intended to disturb Ocwen's previously filed Answer or Affirmative Defenses to Saticoy Bay's Complaint.

**INTRODUCTION**

1. Ocwen is authorized to bring this action in the State of Nevada by NRS 40.430.

2. The real property at issue is known as 5733 Oasis Ridge Street, North Las Vegas, Nevada 89031; APN: 124-27-412-049 (the "Property").

3. At all relevant times herein, HOA Trustee was acting as agent for the HOA.

**JURISDICTION AND VENUE**

4. Venue and jurisdiction are proper in this judicial district because Counter-Defendants conduct business in this district; a substantial part of the events or omissions giving rise to Ocwen's claims occurred in this district; and the property that is the subject of this action is situated in this district, in Las Vegas, Clark County, Nevada.

**PARTIES**

5. Ocwen Loan Servicing, LLC is a Foreign Limited Liability Company registered

1    in Delaware authorized to conduct business in the State of Nevada.

2        **6.**      Ocwen is now and at all times relevant herein the assigned Beneficiary under the

3    Deed of Trust signed by Ken E. Gregory ("Borrower"), recorded on June 8, 2009 ("Deed of

4    Trust"), which encumbers the Property and secures a promissory note.

5        **7.**      Upon information and belief, Counter-Defendant Saticoy Bay LLC Series 5733

6    Oasis Ridge ("Saticoy Bay", "HOA Buyer", or "Plaintiff/Counter-Defendant") is a Domestic

7    Limited Liability Company.  Public records show Saticoy Bay is the current owner of record for

8    the Property.[1]

9        **8.**      Upon information and belief, Santa Rosa Homeowners Association ("Santa Rosa"

10   or "HOA") is a Domestic Non-Profit Corporation, licensed to do business in the State of Nevada.

11       **9.**      Upon information and belief, Nevada Association Services, Inc. ("NAS" or

12   "HOA Trustee") is a Domestic Corporation, licensed to do business in the State of Nevada.

13       **10.**     Ocwen does not know the true names, capacities or bases of liability of fictitious

14   defendants sued as DOE INDIVIDUALS 1 through 10, inclusive; and ROE CORPORATIONS 1

15   through 10, inclusive (collectively "fictitious Defendants").  Each fictitious defendant is in some

16   way liable to Ocwen or claims some rights, title, or interest in the Subject Property that is

17   subsequent to or subject to the interests of Ocwen, or both.  Ocwen will amend this counterclaim

18   to reflect the true names of said defendants when the same have been ascertained.

19                                   **FACTUAL BACKGROUND**

20       **11.**     On or about May 27, 2009, the Borrower purchased the Property.[2]

21       **12.**     The Borrower financed the purchase price of the Property.  The Deed of Trust

22   ("Deed of Trust") executed by the Borrower identified Mountain View Mortgage Company as

23   the Lender, Stewart Title of Nevada as the Trustee, and Mortgage Electronic Registration

24   Systems, Inc. ("MERS") as nominee for Lender and securing a loan in the amount of

---

[1] Saticoy Bay notes that the real property records maintained by the Clark County Assessor identify the Property as being owned by Saticoy Bay LLC Series 5733 Oasis Ridge.

[2] A true and correct copy of the Grant, Bargain, Sale Deed recorded in the official records of the Clark County Recorder's Office as Book and Instrument Number 20090608-0006546 is attached hereto as **Exhibit 1**.  All other recordings stated hereafter are recorded in the same manner.

1   $108,007.00 ("Loan").[3]

2   ///

3   ///

4      13.   Public records show that on November 6, 2012, an Assignment of Deed of Trust

5   was recorded, evidencing the assignment of all beneficial interest in the Deed of Trust to GMAC

6   Mortgage, LLC.[4]

7      14.   Public records show that on February 13, 2014, an Assignment of Deed of Trust

8   was recorded, evidencing the assignment of all beneficial interest in the Deed of Trust to Ocwen

9   Loan Servicing, LLC.[5]

10      15.   Public records show that on December 18, 2012, a Notice of Delinquent

11   Assessment Lien was recorded against the Property by the HOA Trustee as agent for the HOA.[6]

12      16.   Public records show that on June 21, 2013, a Notice of Default and Election to

13   Sell Under Homeowners Association Lien was recorded against the Property by the HOA

14   Trustee on behalf of the HOA.[7]

15      17.   Public records show that on October 28, 2013, a Notice of Foreclosure Sale was

16   recorded against the Property by the HOA Trustee as agent for the HOA.[8]

17      18.   Upon information and belief, a non-judicial foreclosure sale occurred on or about

18   November 22, 2013 (the "HOA Sale"), whereby the HOA conveyed its interest in the Property, if

19   any, to Saticoy Bay LLC Series 5733 Oasis Ridge ("Saticoy Bay", "HOA Buyer", or

20

21   ─────────────────

22   [3]  A true and correct copy of the Deed of Trust recorded as Book and Instrument Number
     20090608-0006547 is attached hereto as **Exhibit 2**.

23   [4] A true and correct copy of the Assignment of Deed of Trust recorded as Book and Instrument
     Number 20121106-0000035 is attached hereto as **Exhibit 3**.

24   [5] A true and correct copy of the Assignment of Deed of Trust recorded as Book and Instrument
     Number 20140213-0000401 is attached hereto as **Exhibit 4**.

25   [6] A true and correct copy of the Notice of Delinquent Assessment Lien recorded as Book and

26   Instrument Number 20121218-0002236 is attached hereto as **Exhibit 6**.
     [7] A true and correct copy of the Notice of Default and Election to Sell Under Homeowners

27   Association Lien recorded as Book and Instrument Number 20130621-0002082 is attached
     hereto as **Exhibit 7**.

28   [8] A true and correct copy of the Notice of Foreclosure Sale recorded as Book and Instrument
     Number 20131028-0001599 is attached hereto as **Exhibit 8**.

"Plaintiff/Counter-Defendant") for $25,000.00.

19.     Public records show that on November 26, 2013, a Foreclosure Deed was recorded by which Saticoy Bay claims its interest.[9]

## GENERAL ALLEGATIONS

20.     The HOA Sale was an invalid sale and could not have extinguished Ocwen's secured interest.

21.     The HOA Sale is unlawful and void because the statutory scheme set forth in NRS 116.3116, et seq. constitutes a regulatory taking of private property without adequate compensation so the statute is unconstitutional on its face.

22.     The HOA Sale deprived Ocwen of its right to due process because the foreclosure notices failed to identify the super-priority amount, or to adequately describe the deficiency in payment, to provide Ocwen notice of the correct super-priority amount, or to provide a reasonable opportunity for Ocwen to protect its priority by payment to satisfy that amount.

23.     The failure to disclose whether the lien included a super-priority piece, and the amount, precluded adequate notice to Ocwen that its lien may be threatened, and deprived it of its right to cure.

24.     The HOA lien and notices included collection costs in violation of NRS Chapter 116, and thus were invalid, making the sale void as a matter of law.

25.     The circumstances of the HOA Sale of the Property breached the HOA's and the HOA Trustee's obligations of good faith under NRS 116.1113 and their duty to act in a commercially reasonable manner.

26.     The HOA's CC&Rs under Section 5.06 state that "...no lien created under this Article V or under any other Article of this Declaration, nor any lien arising by reason of any breach of this Declaration, nor the enforcement of any provision of this Declaration, shall defeat or render invalid the rights of the beneficiary under any Recorded Mortgage of first and senior priority now or hereafter upon a Lot, made in good faith and for value, perfected before the date

---

[9] A true and correct copy of the Foreclosure Deed recorded as Book and Instrument Number 20131126-0001412 is attached hereto as **Exhibit 9**.

1    on which the Assessment sought to be enforced became delinquent."[10]

2         **27.**    Because the CC&Rs contain a Mortgagee Protection Clause in Section 5.06, and

3    because Ocwen, or its predecessors, were not given proper notice that the HOA intended to

4    foreclose on the super-priority portion of the dues owing, Ocwen, or its predecessors, did not

5    know that it had to attend the HOA Sale to protect its security interest.

6         **28.**    The CC&Rs and the Mortgagee Protection Clause therefore prohibit the HOA

7    from foreclosing on a unit where the mortgage or deed of trust would be eliminated.

8         **29.**    Ocwen is informed and believes that the HOA Buyer is a professional property

9    purchaser.

10        **30.**    The circumstances of the HOA Sale of the Property, and the HOA Buyer's status

11   as a professional property purchaser, prevent the HOA Buyer from being deemed a bona fide

12   purchaser for value.

13        **31.**    Upon information and belief, the HOA Buyer had actual, constructive, or inquiry

14   notice of Ocwen's or its predecessor's first Deed of Trust which prevents the HOA Buyer from

15   being deemed a bona fide purchaser for value.

16        **32.**    Upon information and belief, the HOA and the HOA Trustee refused to provide

17   Ocwen or its predecessors-in-interest or their respective servicers, agents, attorneys, and trustees

18   a payoff amount for the super-priority portion of the lien in violation of their duties under NRS

19   116.3116 *et seq.* and the CC&Rs.

20        **33.**    Upon information and belief, the HOA and the HOA Trustee refused to accept a

21   tender of the super-priority portion of the lien in violation of their duties under NRS 116.3116 *et*

22   *seq.* and the CC&Rs.

23        **34.**    As an actual and proximate result of the HOA's and the HOA Trustee's breaches

24   of their statutory and contractual duties, Ocwen was unable to cure by tendering a payoff of the

25   super-priority lien threatening its security interest.

26        **35.**    Upon information and belief, Ocwen or its predecessors-in-interest or their

27   _____

28   [10] A true and correct copy of the Declarations of Covenants, Conditions & Restrictions and
     Reservation of Easements for Santa Rosa is attached hereto as **Exhibit 10**.

1  respective servicers, agents, attorneys, and trustees or others paid – or offered to pay with the
2  immediate intention and ability to tender – the super-priority portion of the lien.

3      **36.**   In the event Ocwen's interest in the Property is not reaffirmed or restored, Ocwen
4  suffered damages in the amount of the fair market value of the Property or the unpaid balance of
5  the Loan and Deed of Trust, at the time of the HOA Sale, whichever is greater, as a proximate
6  result of the HOA's and the HOA Trustee's acts and omissions.

7  **FIRST CAUSE OF ACTION**

8  **(Quiet Title/Declaratory Relief Pursuant to NRS 30.010 et seq. and NRS 40.010 et seq.**

9  **versus HOA Buyer, HOA, HOA Trustee, and all fictitious Defendants)**

10      **37.**   Ocwen incorporates and re-alleges all previous paragraphs, as if fully set forth
11  herein.

12      **38.**   Pursuant to NRS 30.010 et seq. and NRS 40.010, this Court has the power and
13  authority to declare Ocwen's rights and interests in the Property and to resolve Counter-
14  Defendants' adverse claims in the Property.

15      **39.**   Further, pursuant to NRS 30.010 et seq., this Court has the power and authority to
16  declare the rights and interest of the parties following the acts and omissions of the HOA and the
17  HOA Trustee in foreclosing the Property.

18      **40.**   Ocwen's Deed of Trust is a first secured interest on the Property.

19      **41.**   As the current beneficiary under the Deed of Trust and the Loan, Ocwen's interest
20  still encumbers the Property and retains its first position status in the chain of title for the
21  Property after the HOA Sale and is superior to the interest, if any, acquired by the HOA Buyer,
22  or held or claimed by any other party.

23      **42.**   The HOA Buyer claims an interest in the Property through a Foreclosure Deed
24  recorded in the official records of the Clark County Recorder's Office that is adverse to Ocwen's
25  interest.

26      **43.**   Based on the adverse claims being asserted, and conduct by the parties, Ocwen is
27  entitled to a judicial determination regarding the rights and interests of the respective parties to
28  the case.

44.     For all the reasons set forth above, Ocwen is entitled to a determination from this Court, pursuant to NRS 30.010 and NRS 40.010, that Ocwen is the beneficiary of a first position Deed of Trust which still encumbers the Property and is superior to the interest, if any, acquired by the HOA Buyer.

45.     In the alternative, if it is found under state law that Ocwen's interest could have been extinguished by the HOA Sale, for all the reasons set forth above, Ocwen is entitled to a determination from this Court, pursuant to NRS 30.010 and NRS 40.010, that the HOA Sale is unlawful and void and conveyed no legitimate interest to the HOA Buyer.

46.     Ocwen has been required to retain counsel and is entitled to recover reasonable attorney's fees and costs to prosecute this action.

## SECOND CAUSE OF ACTION

### (Permanent and Preliminary Injunction versus HOA Buyer)

47.     Ocwen incorporates by reference the allegations of all previous paragraphs, as if fully set forth herein.

48.     As set forth above, the HOA Buyer may claim an ownership interest in the Property that is adverse to Ocwen.

49.     Any sale or transfer of the Property, prior to a judicial determination concerning the respective rights and interests of the parties to the case, may be rendered invalid if Ocwen's Deed of Trust still encumbered the Property in first position and was not extinguished by the HOA Sale.

50.     Ocwen has a reasonable probability of success on the merits of the complaint, for which compensatory damages will not compensate Ocwen for the irreparable harm of the loss of the first position priority status secured by the Property.

51.     Ocwen has no adequate remedy at law due to the uniqueness of the Property involved in the case.

52.     Ocwen is entitled to a preliminary and permanent injunction prohibiting the HOA Buyer, their creditors, their successors, assigns, and agents from conducting a sale, transfer or encumbrance of the Property, as the sale which purported to convey an interest to Buyer should

1    be declared void.

2        **53.**    Ocwen is entitled to a preliminary injunction requiring the Buyer to pay all taxes,

3    insurance and homeowner's association dues during the pendency of this action.

4        **54.**    Ocwen is entitled to a preliminary injunction requiring the HOA Buyer to

5    segregate and deposit all rents received from its claimed interest in the Property with the Court or

6    a Court-approved trust account over which the HOA Buyer has no control during the pendency

7    of this action.

8        **55.**    Ocwen has been required to retain counsel to prosecute this action and is entitled

9    to recover reasonable attorney's fees to prosecute this action.

10    

**THIRD CAUSE OF ACTION**

11    

**(Defective Foreclosure versus HOA, HOA Trustee, and fictitious Defendants)**

12        **56.**    Ocwen incorporates by reference the allegations of all previous paragraphs, as if

13    fully set forth herein.

14        **57.**    Upon information and belief, the HOA, the HOA Trustee, and all fictitious

15    Counter-Defendants did not comply with all mailing and noticing requirements stated in NRS

16    116.31162 through NRS 116.31168.

17        **58.**    Because the HOA Sale was wrongfully conducted and violated applicable law, the

18    Court should set it aside to the extent that it purports to have extinguished Ocwen's first Deed of

19    Trust and delivered free and clear title to the HOA Buyer.

20        **59.**    Because HOA, the HOA Trustee, and fictitious Counter-Defendants did not give

21    Ocwen, or its predecessors, agents, servicers or trustees the proper, adequate notice and the

22    opportunity to cure the deficiency or default in the payment of the HOA's assessments and

23    super-priority lien (if any) required by Nevada statutes and due process, the HOA Sale was

24    wrongfully conducted and should be set aside.

25        **60.**    Because, upon information and belief, the HOA Foreclosure Notices included

26    improper fees and costs in the amount demanded, the HOA Sale was wrongfully conducted and

27    should be set aside.

28        **61.**    As a proximate result of HOA's, and the fictitious Counter-Defendants' wrongful

1  foreclosure of the Property by the HOA Sale, as more particularly set forth above, Ocwen has

2  suffered general and special damages in an amount in excess of $10,000.00.  Ocwen will seek

3  leave of court to assert said amounts when they are determined.

4       62.     If it is determined that Ocwen's Deed of Trust has been extinguished by the HOA

5  Sale, as a proximate result of the HOA's, the HOA Trustee's, and fictitious Counter-Defendants'

6  wrongful foreclosure of the Property by the HOA Sale, Ocwen has suffered special damages in

7  the amount equal to the fair market value of the Property or the unpaid balance of the Loan, plus

8  interest, at the time of the HOA Sale, whichever is greater, in an amount not presently known.

9  Ocwen will seek leave of court to assert said amounts when they are determined.

10      63.     Ocwen has been required to retain counsel to prosecute this action and is entitled

11  to recover reasonable attorney's fees to prosecute this action.

**FOURTH CAUSE OF ACTION**

**(Unjust Enrichment versus HOA Buyer, HOA, HOA Trustee, and fictitious Defendants)**

14      64.     Ocwen incorporates and re-alleges all previous paragraphs, as if fully set forth

15  herein.

16      65.     Ocwen has been deprived of the benefit of the Deed of Trust and of its right

17  foreclose thereunder by the actions of the HOA Buyer, the HOA, the HOA Trustee, and fictitious

18  Counter-Defendants.

19      66.     The HOA Buyer, the HOA, the HOA Trustee, and fictitious Counter-Defendants

20  have benefitted from the unlawful HOA Sale and from use and possession of the real property.

21      67.     Upon information and belief, the HOA Buyer, the HOA, the HOA Trustee, and

22  fictitious Counter-Defendants have benefitted from Ocwen's payment of taxes, insurance or

23  homeowner's association assessments since the time of the HOA Sale.

24      68.     Should Ocwen's Complaint be successful in quieting title against the HOA Buyer,

25  the HOA, the HOA Trustee, and fictitious Counter-Defendants, and setting aside the HOA Sale,

26  the HOA Buyer, the HOA, the HOA Trustee, and fictitious Counter-Defendants will have been

27  unjustly enriched by the HOA Sale and usage of the Property.

28      69.     Ocwen will have suffered damages if the HOA Buyer, the HOA, the HOA

1    Trustee, and fictitious Counter-Defendants are allowed to retain their interests in the Property

2    and the funds received from the HOA Sale and use of the Property.

3        **70.**    Ocwen will have suffered damages if the HOA Buyer, the HOA, the HOA

4    Trustee, and fictitious Counter-Defendants are allowed to retain their interests in the Property

5    and Ocwen's payment of taxes, insurance or homeowner's association assessments since the

6    time of the HOA Sale.

7        **71.**    Ocwen is entitled to general and special damages in excess of $10,000.00.

8        **72.**    Ocwen has furthermore been required to retain counsel and is entitled to recover

9    reasonable attorney's fees for having brought the underlying action.

10    **PRAYER**

11        Wherefore, Ocwen prays for judgment against the Counter-Defendants, jointly and

12    severally, as follows:

13        1.    For a declaration and determination that Ocwen's interest is secured against the

14        Property, and that Ocwen's first Deed of Trust was not extinguished by the HOA

15        Sale;

16        2.    For a declaration and determination that Ocwen's interest is superior to the

17        interest of the HOA Buyer, the HOA, and fictitious Counter-Defendants;

18        3.    For a declaration and determination that the HOA Sale was wrongful, invalid and

19        is set aside;

20        4.    For a declaration and determination that the HOA Sale was invalid and conveyed

21        no legitimate interest to Buyer;

22        5.    For a preliminary injunction that the HOA Buyer, its successors, assigns, and

23        agents are prohibited from conducting a sale, transfer, or encumbrance of the

24        Property during the pendency of this action;

25        6.    For a preliminary injunction ordering the HOA Buyer, its successors, assigns, and

26        agents pay all taxes, insurance and homeowner's association dues during the

27        pendency of this action;

28        7.    For a preliminary injunction that the Buyer, its successors, assigns, and agents be

1    required to account for, segregate, and deposit and all rents derived from the

2    Property with the Court or a Court-approved trust account over which the HOA

3    Buyer has no control during the pendency of this action;

4    8.    If it is determined that Ocwen's Deed of Trust has been extinguished by the HOA

5          Sale, for special damages in the amount equal to the fair market value of the

6          Property or the unpaid balance of the Loan and Deed of Trust, at the time of the

7          HOA Sale, whichever is greater;

8    9.    For general and special damages in an amount in excess of $15,000.00;

9    10.   For attorney's fees;

10   11.   For costs incurred herein, including post-judgment costs;

11   12.   For any and all further relief deemed appropriate by this Court.

12

13   DATED this 30 day of March, 2018.

14

15                          WRIGHT, FINLAY & ZAK, LLP

16

17                          Edgar C. Smith, Esq.
18                          Nevada Bar No. 5506
                            Krista J. Nielson, Esq.
19                          Nevada Bar No. 10698
                            *Attorneys for Defendant, Ocwen Loan Servicing,*
20                          *LLC*

21

22

23

24

25

26

27

28

**CERTIFICATE OF SERVICE**

Pursuant to NRCP 5(b), I certify that I am an employee of WRIGHT, FINLAY & ZAK, LLP, and that on this 30ᵗʰ day of March, 2018, I did cause a true copy of **OCWEN LOAN SERVICING, LLC'S FIRST AMENDED ANSWER TO PLAINTIFF'S FIRST AMENDED COMPLAINT AND COUNTERCLAIM** to be e-filed and e-served through the Eighth Judicial District EFP system pursuant to NEFCR 9.

Richard J Vilkin  richard@gvattorneys.com
Kristin Schuler-Hintz .  dcnv@mccarthyholthus.com
Thomas N. Beckom .  tbeckom@mccarthyholthus.com
Victoria Campbell .  vcampbell@houser-law.com
Alexandria Raleigh  araleigh@lawhjc.com
Ashlie L. Surur  asurur@lawhjc.com

_____
An Employee of WRIGHT, FINLAY & ZAK, LLP

Exhibit 1

Exhibit 1

Exhibit 1

20090608-0006546
Fee: $16.00      RPTT: $561.00
N/C Fee: $0.00
06/08/2009        15:47:47
T20090199988
Requestor:
STEWART TITLE LAS VEGAS WARM
Debbie Conway            RMS
Clark County Recorder    Pgs: 5

| A.P.N. # | 124-27-412-049 |
| R.P.T.T. | $561.00 |
| Escrow No. | 1017264-FNMA |
| **Recording Requested By:** | |

# stewart
title of nevada

| Mail Tax Statements To: | Same as below |
| **When Recorded Mail To:** | |

Ken Gregory
5733 Oasis Ridge St.
Las Vegas, NV 89031

## GRANT, BARGAIN, SALE DEED

THIS INDENTURE WITNESSETH: That **Fannie Mae A/K/A Federal National Mortgage Association Organized and Existing under the laws of the United States of America** for valuable consideration, the receipt of which is hereby acknowledged, does hereby Grant, Bargain Sell and Convey to

Ken E. Gregory, an unmarried man

, all that real property situated in the County of Clark, State of Nevada, bounded and described as follows:

See Exhibit "A" attached hereto and by reference made a part hereof for complete legal description.
SUBJECT TO:
1. Taxes for fiscal year;
2. Reservations, restrictions, conditions, rights, rights of way and easements, if any of record on said premises.

Together with all and singular the tenements, hereditaments and appurtenances thereunto belonging or in anywise appertaining, and any reversions, remainders, rents, issues or profits thereof.

Dated:  5-27-09

(One inch Margin on all sides of Document for Recorder's Use Only)          Page 1 of 3

Fannie Mae A/K/A Federal National Mortgage Association Organized and Existing under
the laws of the United Sates of America

BY:  Stewart Title Company-Authorized Agent                **Signature Clarification:**

BY:                                                         **Barbara Siensa, Assistant Secretary**
      Barbara Siensa, Assistant Secretary

State of Nevada                        }
                                       } ss.
County of Clark                        }

This instrument was acknowledged before me          05|27|09
on
By:  Barbara Siensa

Signature:
                    Notary Public          JOHN G. INGRAM

```
┌─────────────────────────────────┐
│        JOHN G INGRAM            │
│        NOTARY PUBLIC           │
│        STATE OF NEVADA         │
│        APPT. No. 02-78583-1    │
│   MY APPT. EXPIRES AUG. 22, 2010 │
└─────────────────────────────────┘
```

(One inch Margin on all sides of Document for Recorder's Use Only)          Page 2 of 3

**Exhibit A**
**LEGAL DESCRIPTION**

File Number: 1017264

Lot Eighty-Five (85) in Block Ten (10) of Rancho Mirage Unit II, Phase 2, as shown by map thereof on file in Book 102 of Plats, Page 96 and amended by the Certificate of Amendment recorded January 18, 2002 in Book 20020118 as Document No. 00615, in the Office of the County Recorder of Clark County, Nevada.

(One inch Margin on all sides of Document for Recorder's Use Only          Page 3 of 3

**STATE OF NEVADA**
**DECLARATION OF VALUE**

1. Assessor Parcel Number(s)

| FOR RECORDER'S OPTIONAL USE ONLY |
|---|

a)  124-27-412-049

Document/Instrument No.

b)  _____

Book _____ Page _____

c)  _____

Date of Recording: _____

d)  _____

Notes:

2. Type of Property

a) [ ] Vacant Land        b) [X] Single Family Residence
c) [ ] Condo/Twnhse       d) [ ] 2-4 Plex
e) [ ] Apartment Bldg.    f) [ ] Commercial/Industrial
g) [ ] Agricultural       h) [ ] Mobile Home
i) [ ] Other _____

3.  a. Total Value/Sales Price of Property          $110,000.00
    b. Deed in Lieu of Foreclosure Only (Value of
       Property)                                   ( _____ )
    c. Transfer Tax Value                            $110,000.00
    d. REAL PROPERTY TRANSFER TAX DUE:                  $561.00

**4. If Exemption Claimed:**
    a. Transfer Tax Exemption, per NRS 375.090,
       Section:                                    _____
    b. Explain Reason for Exemption:  _____

5. Partial Interest: Percentage being
   transferred:                          100      %

The undersigned declares and acknowledges, under penalty of perjury, pursuant to NRS 375.060 and NRS 375.110 that the information provided is correct to the best of their information and belief, and can be supported by documentation if called upon to substantiate the information provided herein. Furthermore, the parties agree that disallowance of any claimed exemption, or other determination of additional tax due, may result in a penalty of 10% of the tax due plus interest at 1% per month.
Pursuant to NRS 375.030, the Buyer and Seller shall be jointly and severally liable for any additional amount owed.

Signature: _____       Capacity:  Seller
           Fannie Mae A/K/A Federal National Mortgage Association Organized and
           Existing under the laws of the United State of America

Signature: _____       Capacity:  Buyer
           Ken Gregory

| **SELLER (GRANTOR) INFORMATION (REQUIRED)** | **BUYER (GRANTEE) INFORMATION (REQUIRED)** |
|---|---|
| Print Name: Fannie Mae A/K/A Federal National Mortgage Association Organized and Existing under the laws of the United State of America | Print Name: Ken Gregory |
| Address: 14221 Dallas Pkwy, #1000 | Print Name: Ken Gregory |
| | Address: 5733 Oasis Ridge St. Las Vegas, NV 89031 |

City/State/Zip  Dallas, TX 75254 _____    City/State/Zip  _____

**COMPANY/PERSON REQUESTING RECORDING (required if not the Seller or Buyer)**

Company Name:       Stewart Title of Nevada – Las Vegas
                    Division                          Escrow No   1017264-FNMA _____

Address:       376 E. Warm Springs Road, Suite 190 _____

City       Las Vegas _____    State:    NV          Zip    89119 _____

(AS A PUBLIC RECORD THIS FORM MAY BE RCORDED/MICROFILMED)

Exhibit 2

Exhibit 2

Exhibit 2

20090608-0006547

Fee: $24.00    RPTT: $0.00
N/C Fee: $0.00
06/08/2009    15:47:47
T20090199988
Requestor:
    STEWART TITLE LAS VEGAS WARM
Debbie Conway    RMS
Clark County Recorder    Pgs: 11

. PIN #: 124-27-412-049

When Recorded Return To:
MOUNTAIN VIEW MORTGAGE COMPANY
7311 W CHARLESTON BLVD, SUITE 110
LAS VEGAS, NV 89117
(702) 228-7105

Grantee:
MOUNTAIN VIEW MORTGAGE COMPANY
7311 W CHARLESTON BLVD, SUITE 110, LAS
VEGAS, NV 89117

Mail Tax Statement To:
MOUNTAIN VIEW MORTGAGE COMPANY
7311 W CHARLESTON BLVD, SUITE 110
LAS VEGAS, NV 89117

*1017264*

[Space Above This Line For Recording Data]

## DEED OF TRUST

**RECORDING REQUESTED BY:**
**STEWART TITLE OF NEVADA**

GREGORY
Loan #: 09051511
MIN: 100096000090515118
PIN: 124-27-412-049
Case #: 332-4899944-703

    THIS DEED OF TRUST ("Security Instrument") is made on MAY 26, 2009. The grantor is KEN
E. GREGORY, AN UNMARRIED MAN ("Borrower"). The trustee is STEWART TITLE OF NEVADA
("Trustee"). The beneficiary is Mortgage Electronic Registration Systems, Inc. ("MERS") (solely as nominee
for Lender, as hereinafter defined, and Lender's successors and assigns), as beneficiary. MERS is organized
and existing under the laws of Delaware, and has an address and telephone number of P.O. Box 2026, Flint,
MI 48501-2026, tel. (888) 679-MERS. MOUNTAIN VIEW MORTGAGE COMPANY ("Lender") is organized
and existing under the laws of COLORADO, and has an address of 7311 W CHARLESTON BLVD, SUITE
110, LAS VEGAS, NV 89117. Borrower owes Lender the principal sum of ONE HUNDRED EIGHT
THOUSAND SEVEN Dollars (U.S. $108,007.00). This debt is evidenced by Borrower's note dated the
same date as this Security Instrument ("Note"), which provides for monthly payments, with the full debt, if
not paid earlier, due and payable on JUNE 1, 2039. This Security Instrument secures to Lender: (a) the
repayment of the debt evidenced by the Note, with interest, and all renewals, extensions and modifications of
the Note; (b) the payment of all other sums, with interest, advanced under paragraph 7 to protect the security
of this Security Instrument; and (c) the performance of Borrower's covenants and agreements under this
Security Instrument and the Note. For this purpose, Borrower irrevocably grants and conveys to Trustee, in
trust, with power of sale, the following described property located in CLARK County, Nevada:
LEGAL DESCRIPTION ATTACHED HERETO AND MADE A PART HEREOF.
which has the address of 5733 OASIS RIDGE STREET, NORTH LAS VEGAS, Nevada 89031
("Property Address");

    TOGETHER WITH all the improvements now or hereafter erected on the property, and all
easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and
additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security
Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the

**FHA Nevada Deed of Trust - 07/08**
  395.4             Page 1 of 8

09051511

interests granted by Borrower in this Security Instrument; but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing or canceling this Security Instrument.

BORROWER COVENANTS that Borrower is lawfully seized of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

**1. Payment of Principal, Interest and Late Charge.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and late charges due under the Note.

**2. Monthly Payment of Taxes, Insurance and Other Charges.** Borrower shall include in each monthly payment, together with the principal and interest as set forth in the Note and any late charges, a sum for (a) taxes and special assessments levied or to be levied against the Property, (b) leasehold payments or ground rents on the Property, and (c) premiums for insurance required under paragraph 4. In any year in which the Lender must pay a mortgage insurance premium to the Secretary of Housing and Urban Development ("Secretary"), or in any year in which such premium would have been required if Lender still held the Security Instrument, each monthly payment shall also include either; (i) a sum for the annual mortgage insurance premium to be paid by Lender to the Secretary, or (ii) a monthly charge instead of a mortgage insurance premium if this Security Instrument is held by the Secretary, in a reasonable amount to be determined by the Secretary. Except for the monthly charge by the Secretary, these items are called "Escrow Items" and the sums paid to Lender are called "Escrow Funds."

Lender may, at any time collect and hold amounts for Escrow Items in an aggregate amount not to exceed the maximum amount that may be required for Borrower's escrow account under the Real Estate Settlement Procedures Act of 1974, 12 U.S.C. Section 2601 et seq. and implementing regulations, 24 CFR Part 3500, as they may be amended from time to time ("RESPA"), except that the cushion or reserve permitted by RESPA for unanticipated disbursements or disbursements before the Borrower's payments are available in the account may not be based on amounts due for the mortgage insurance premium.

If the amounts held by Lender for Escrow Items exceed the amounts permitted to be held by RESPA, Lender shall account to borrower for the excess funds as required by RESPA. If the amounts of funds held by Lender at any time are not sufficient to pay the Escrow Items when due, Lender may notify the Borrower and require Borrower to make up the shortage or deficiency as permitted by RESPA.

The Escrow Funds are pledged as additional security for all sums secured by this Security Instrument. If Borrower tenders to Lender the full payment of all such sums, Borrower's account shall be credited with the balance remaining for all installment items, (a), (b) and (c) and any mortgage insurance premium installment that Lender has not become obligated to pay to the Secretary, and Lender shall promptly refund any excess funds to Borrower. Immediately prior to a foreclosure sale of the Property or its acquisition by Lender, Borrower's account shall be credited with any balance remaining for all installment for items (a), (b) and (c).

**3. Application of Payments.** All payments under paragraphs 1 and 2 shall be applied by Lender as follows:

**FHA Nevada Deed of Trust - 07/08**
☞ 395.4                                    Page  2  of  8

09051511

First, to the mortgage insurance premium to be paid by Lender to the Secretary or to the monthly charge by the Secretary instead of the monthly mortgage insurance premium;

Second, to any taxes, special assessments, leasehold payments or ground rents, and fire, flood and other hazard insurance premiums, as required;

Third, to interest due under the Note;

Fourth, to amortization of the principal of the Note;

Fifth, to late charges due under the Note.

**4. Fire, Flood and Other Hazard Insurance.** Borrower shall insure all improvements on the Property, whether now in existence or subsequently erected, against any hazards, casualties, and contingencies, including fire, for which Lender requires insurance. This insurance shall be maintained in the amounts and for the periods that Lender requires. Borrower shall also insure all improvements on the Property, whether now in existence or subsequently erected, against loss by floods to the extent required by the Secretary. All insurance shall be carried with companies approved by Lender. The insurance policies and any renewals shall be held by Lender and shall include loss payable clauses in favor of, and in a form acceptable to, Lender.

In the event of loss, Borrower shall give Lender immediate notice by mail. Lender may make proof of loss if not made promptly by Borrower. Each insurance company concerned is hereby authorized and directed to make payment for such loss directly to Lender, instead of to Borrower and to Lender jointly. All or any part of the insurance proceeds may be applied by Lender, at its option, either (a) to the reduction of the indebtedness under the Note and this Security Instrument, first to any delinquent amounts applied in the order in Paragraph 3, and then to prepayment of principal, or (b) to the restoration or repair of the damaged Property. Any application of the proceeds to the principal shall not extend or postpone the due date of the monthly payments which are referred to in Paragraph 2, or change the amount of such payments. Any excess insurance proceeds over an amount required to pay all outstanding indebtedness under the Note and this Security Instrument shall be paid to the entity legally entitled thereto.

In the event of foreclosure of this Security Instrument or other transfer of title to the Property that extinguishes the indebtedness, all right, title and interest of Borrower in and to insurance policies in force shall pass to the purchaser.

**5. Occupancy, Preservation, Maintenance and Protection of the Property; Borrower's Loan Application; Leaseholds.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within sixty days after the execution of this Security Instrument (or within sixty days of a later sale or transfer of the property) and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender determines that requirement will cause undue hardship for Borrower, or unless extenuating circumstances exist which are beyond Borrower's control. Borrower shall notify Lender of any extenuating circumstances. Borrower shall not commit waste or destroy, damage or substantially change the Property or allow the Property to deteriorate, reasonable wear and tear excepted. Lender may inspect the Property if the Property is vacant or abandoned or the loan is in default. Lender may take reasonable action to protect and preserve such vacant or abandoned Property. Borrower shall also be in default if Borrower, during the loan application process, gave materially false or inaccurate information or statements to Lender (or failed to provide Lender with any material information) in connection with the loan evidenced by the Note, including, but not limited to, representations concerning Borrower's occupancy of the Property as a principal residence. If this Security Instrument is on a leasehold, Borrower shall comply with the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and fee title shall not be merged unless Lender agrees to the merger in writing.

**6. Condemnation.** The proceeds of any award or claim for damages, direct or consequential, in connection with any condemnation or other taking of any part of the Property, or for conveyance in place of

**FHA Nevada Deed of Trust – 07/08**

395.4                                    Page 3 of 8

09051511

condemnation, are hereby assigned and shall be paid to Lender to the extent of the full amount of the indebtedness that remains unpaid under the Note and this Security Instrument. Lender shall apply such proceeds to the reduction of the indebtedness under the Note and this Security Instrument, first to any delinquent amounts applied in the order provided in Paragraph 3, and then to prepayment of principal. Any application of the proceeds to the principal shall not extend or postpone the due date of the monthly payments, which are referred to in Paragraph 2, or change the amount of such payments. Any excess proceeds over an amount required to pay all outstanding indebtedness under the Note and this Security Instrument shall be paid to the entity legally entitled thereto.

**7. Charges to Borrower and Protection of Lender's Rights in the Property.** Borrower shall pay all governmental or municipal charges, fines and impositions that are not included in Paragraph 2. Borrower shall pay these obligations on time directly to the entity which is owed the payment. If failure to pay would adversely affect Lender's interest in the Property, upon Lender's request Borrower shall promptly furnish to Lender receipts evidencing these payments.

If Borrower fails to make these payments or the payments required by Paragraph 2, or fails to perform any other covenants and agreements contained in this Security Instrument, or there is a legal proceeding that may significantly affect Lender's rights in the Property (such as a proceeding in bankruptcy, for condemnation or to enforce laws or regulations), then Lender may do and pay whatever is necessary to protect the value of the Property and Lender's rights in the Property, including payment of taxes, hazard insurance and other items mentioned in Paragraph 2.

Any amounts disbursed by Lender under this Paragraph shall become an additional debt of Borrower and be secured by this Security Instrument. These amounts shall bear interest from the date of disbursement, at the Note rate, and at the option of Lender, shall be immediately due and payable.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender; (b) contests in good faith the lien by, or defends against enforcement of the lien in, legal proceedings which in the Lender's opinion operate to prevent the enforcement of the lien; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which may attain priority over this Security Instrument. Lender may give Borrower a notice identifying the lien. Borrower shall satisfy the lien or take one or more of the actions set forth above within 10 days of the giving of notice.

**8. Fees.** Lender may collect fees and charges authorized by the Secretary.

**9. Grounds for Acceleration of Debt.**

(a) **Default.** Lender may, except as limited by regulations issued by the Secretary in the case of payment defaults, require immediate payment in full of all sums secured by this Security Instrument if:

(i) Borrower defaults by failing to pay in full any monthly payment required by this Security Instrument prior to or on the due date of the next monthly payment, or

(ii) Borrower defaults by failing, for a period of thirty days, to perform any other obligations contained in this Security Instrument.

(b) **Sale Without Credit Approval.** Lender shall, if permitted by applicable law (including section 341(d) of the Garn-St Germain Depository Institutions Act of 1982, 12 U.S.C. 1701j-3(d)) and with the prior approval of the Secretary, require immediate payment in full of all sums secured by this Security Instrument if:

(i) All or part of the Property, or a beneficial interest in a trust owning all or part of the Property, is sold or otherwise transferred (other than by devise or descent) and

**FHA Nevada Deed of Trust - 07/08**
☜ 395.4                              Page  4 of 8

09051511

(ii) The Property is not occupied by the purchaser or grantee as his or her principal residence, or the purchaser or grantee does so occupy the Property but his or her credit has not been approved in accordance with the requirements of the Secretary.

**(c) No Waiver.** If circumstances occur that would permit Lender to require immediate payment in full, but Lender does not require such payments, Lender does not waive its rights with respect to subsequent events.

**(d) Regulations of HUD Secretary.** In many circumstances regulations issued by the Secretary will limit Lender's rights in the case of payment defaults, to require immediate payment in full and foreclose if not paid. This Security Instrument does not authorize acceleration or foreclosure if not permitted by regulations of the Secretary.

**(e) Mortgage Not Insured.** Borrower agrees that should this Security Instrument and the Note are not to be eligible for insurance under the National Housing Act within 60 days from the date hereof, Lender may, at its option, require immediate payment in full of all sums secured by this Security Instrument. A written statement of any authorized agent of the Secretary dated subsequent to 60 days from the date hereof, declining to insure this Security Instrument and the Note shall be deemed conclusive proof of such ineligibility. Notwithstanding the foregoing, this option may not be exercised by Lender when the unavailability of insurance is solely due to Lender's failure to remit a mortgage insurance premium to the Secretary.

**10. Reinstatement.** Borrower has a right to be reinstated if Lender has required immediate payment in full because of Borrower's failure to pay an amount due under the Note or this Security Instrument. This right applies even after foreclosure proceedings are instituted. To reinstate the Security Instrument, Borrower shall tender in a lump sum all amounts required to bring Borrower's account current including, to the extent they are obligations of Borrower under this Security Instrument, foreclosure costs and reasonable and customary attorneys' fees and expenses properly associated with the foreclosure proceeding. Upon reinstatement by Borrower, this Security Instrument and the obligations that it secures shall remain in effect as if Lender had not required immediate payment in full. However, Lender is not required to permit reinstatement if: (i) Lender has accepted reinstatement after the commencement of foreclosure proceedings within two years immediately preceding the commencement of a current foreclosure proceeding, (ii) reinstatement will preclude foreclosure on different grounds in the future, or (iii) reinstatement will adversely affect the priority of the lien created by this Security Instrument.

**11. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time of payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to any successor in interest of Borrower shall not operate to release the liability of the original Borrower or Borrower's successor in interest. Lender shall not be required to commence proceedings against any successor in interest or refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or Borrower's successors in interest. Any forbearance by Lender in exercising any right or remedy shall not be a waiver of or preclude the exercise of any right or remedy.

**12. Successors and Assigns Bound; Joint and Several Liability; Co-Signers.** The covenants and agreements of this Security Instrument shall bind and benefit the successors and assigns of Lender and Borrower, subject to the provisions of Paragraph 9(b). Borrower's covenants and agreements shall be joint and several. Any Borrower who co-signs this Security Instrument but does not execute the Note: (a) is co-signing this Security Instrument only to mortgage, grant and convey that Borrower's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower may agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without that Borrower's consent.

**FHA Nevada Deed of Trust - 07/08**
👁 395.4            Page 5 of 8

Branch :FLV,User :CON2                              Comment:                                                        Station Id :XJUY

09051511

**13. Notices.** Any notice to Borrower provided for in this Security Instrument shall be given by delivering it or by mailing it by first class mail unless applicable law requires use of another method. The notice shall be directed to the Property Address or any other address Borrower designates by notice to Lender. Any notice to Lender shall be given by first class mail to Lender's address stated herein or any address Lender designates by notice to Borrower. Any notice provided for in this Security Instrument shall be deemed to have been given to Borrower or Lender when given as provided in this paragraph.

**14. Governing Law; Severability.** This Security Instrument shall be governed by Federal law and the law of the jurisdiction in which the Property is located. In the event that any provision or clause of this Security Instrument or the Note conflicts with applicable law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision. To this end the provisions of this Security Instrument and the Note are declared to be severable.

**15. Borrower's Copy.** Borrower shall be given one conformed copy of the Note and of this Security Instrument.

**16. Hazardous Substances.** Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property that is in violation of any Environment Law. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property.

Borrower shall promptly give Lender written notice of any investigation, claim, demand, lawsuit or other action by any removal or other regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge. If Borrower learns, or is notified by any governmental or regulatory authority, that any removal or other remediation of any Hazardous Substances affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law.

As used in this paragraph 16, "Hazardous Substances" are those substances defined as toxic or hazardous substances by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials. As used in this paragraph 16, "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection.

**NON-UNIFORM COVENANTS.** Borrower and Lender further covenant and agree as follows:

**17. Assignment of Rents.** Borrower unconditionally assigns and transfers to Lender all the rents and revenues of the Property. Borrower authorizes Lender or Lender's agents to collect the rents and revenues and hereby directs each tenant of the Property to pay the rents to Lender or Lender's agents. However, prior to Lender's notice to Borrower of Borrower's breach of any covenant or agreement in the Security Instrument, Borrower shall collect and receive all rents and revenues of the Property as trustee for the benefit of Lender and Borrower. This assignment of rents constitutes an absolute assignment and not an assignment for additional security only.

If Lender gives notice of breach to Borrower: (a) all rents received by Borrower shall be held by Borrower as trustee for benefit of Lender only, to be applied to the sums secured by the Security Instrument; (b) Lender shall be entitled to collect and receive all of the rents of the Property; and (c) each tenant of the Property shall pay all rents due and unpaid to Lender or Lender's agent on Lender's written demand to the tenant.

Borrower has not executed any prior assignment of the rents and has not and will not perform any

**FHA Nevada Deed of Trust - 07/08**
   395.4                                      Page  6  of  8

09051511

act that would prevent Lender from exercising its rights under this Paragraph 17.

Lender shall not be required to enter upon, take control of or maintain the Property before or after giving notice of breach to Borrower. However, Lender or a judicially appointed receiver may do so at any time there is a breach. Any application of rents shall not cure or waive any default or invalidate any other right or remedy of Lender. This assignment of rents of the Property shall terminate when the debt secured by the Security Instrument is paid in full.

**18. Foreclosure Procedure.** If Lender requires immediate payment in full under paragraph 9, Lender may invoke the power of sale and any other remedies permitted by applicable law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this paragraph 18, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

If Lender invokes the power of sale, Lender shall execute or cause Trustee to execute written notice of the occurrence of an event of default and of Lender's election to cause the Property to be sold, and shall cause such notice to be recorded in each county in which any part of the Property is located, Lender or Trustee shall mail copies of the notice as prescribed by applicable law to Borrower and to the persons prescribed by applicable law. Trustee shall give public notice of sale to the persons and in the manner prescribed by applicable law. After the time required by applicable law, Trustee, without demand on Borrower, shall sell the Property at public auction to the highest bidder at the time and place and under the terms designated in the notice of sale in one or more parcels and in any order Trustee determines. Trustee may postpone sale of all or any parcel of the Property by public announcement at the time and place of any previously scheduled sale. Lender or its designee may purchase the Property at any sale.

Trustee shall deliver to the purchaser Trustee's deed conveying the Property without any covenant or warranty, expressed or implied. The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein. Trustee shall apply the proceeds of the sale in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable Trustee's and attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it.

If the Lender's interest in this Security Instrument is held by the Secretary and the Secretary requires immediate payment in full under Paragraph 9, the Secretary may invoke the nonjudicial power of sale provided in the Single Family Mortgage Foreclosure Act of 1994 ("Act") (12 U.S.C. 3751 et seq.) by requesting a foreclosure commissioner designated under the Act to commence foreclosure and to sell the Property as provided in the Act. Nothing in the preceding sentence shall deprive the Secretary of any rights otherwise available to a Lender under this Paragraph 18 or applicable law.

**19. Reconveyance.** Upon payment of all sums secured by this Security Instrument, Lender shall request Trustee to reconvey the Property and shall surrender this Security Instrument and all notes evidencing debt secured by this Security Instrument to Trustee. Trustee shall reconvey the Property without warranty and without charge to the person or persons legally entitled to it. Such person or persons shall pay any recondition costs.

**20. Substitute Trustee.** Lender, at its own option, may from time to time remove Trustee and appoint a successor trustee to any Trustee appointed hereunder. Without conveyance of the Property, the successor trustee shall succeed to all the title, power and duties conferred upon Trustee herein and by applicable law.

**21. Assumption Fee.** Lender may charge the maximum assumption fee allowable by the Department of Housing and Urban Development.

**22. Riders to this Security Instrument.** If one or more riders are executed by Borrower and recorded together with this Security Instrument, the covenants and agreements of each such rider shall be incorporated into and shall amend and supplement the covenants and agreements of this Security Instrument as if the rider(s) were a part of this Security Instrument.

**FHA Nevada Deed of Trust - 07/08**
☜ 395.4                    Page  7  of  8

Branch :FLV,User :CON2          Comment:                                      Station Id :XJUY

09051511

The Following Rider(s) are to be executed by Borrower and are attached hereto and made a part thereof
[check box as applicable]:

☐ Condominium Rider                    ☐ Growing Equity Rider          ☐ Adjustable Rate Rider
☒ Planned Unit Development Rider       ☐ Graduated Payment Rider
☐ Other(s) [specify]

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this
Security Instrument and in any Rider executed by Borrower and recorded with it.

**SIGNATURE CLARIFICATION:**

5·27-09

**KEN E. GREGORY**

- BORROWER - KEN E. GREGORY -   DATE -

[Space Below This Line For Acknowledgment]

STATE OF Nevada

COUNTY OF Clark

This instrument was acknowledged before me on May 27, 2009 by

Ken E. Gregory

Notary Public

KRISTEN LANGE
Notary Public State of Nevada
No. 06-104795-1
My appt. exp. Mar. 23, 2010

My Commission Expires: 3-23-10

FHA Nevada Deed of Trust - 07/08
395.4                    Page 8 of 8

Branch :FLV,User :CON2                                    Comment:                                                    Station Id :XJUY

**EXHIBIT "A"**

The land referred to herein situate in the State of Nevada, County of Clark, described as follows:

Lot Eighty-Five (85) in Block Ten (10) of Rancho Mirage Unit II, Phase 2, as shown by map thereof on file in Book 102 of Plats, Page 96 and amended by the Certificate of Amendment recorded January 18, 2002 in Book 20020118 as Document No. 00615, in the Office of the County Recorder of Clark County, Nevada.

# PLANNED UNIT DEVELOPMENT RIDER

**GREGORY**
Loan #: 09051511
MIN: 10009600009051118
Case #: 332-4899944-703

THIS PLANNED UNIT DEVELOPMENT RIDER is made this **26TH** day of **MAY, 2009**, and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust or Security Deed ("Security Instrument") of the same date given by the undersigned ("Borrower") to secure Borrower's Note ("Note") to **MOUNTAIN VIEW MORTGAGE COMPANY** ("Lender") of the same date and covering the Property described in the Security Instrument and located at: **5733 OASIS RIDGE STREET, NORTH LAS VEGAS, NV 89031** [Property Address]. The Property Address is a part of a planned unit development ("PUD") known as **RANCHO MIRAGE UNIT 2 PHASE 2** [Name of Planned Unit Development].

**PUD COVENANTS.** In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

A. So long as the Owners Association (or equivalent entity holding title to common areas and facilities), acting as trustee for the homeowners, maintains, with a generally accepted insurance carrier, a "master" or "blanket" policy insuring the property located in the PUD, including all improvements now existing or hereafter erected on the mortgaged premises, and such policy is satisfactory to Lender and provides insurance coverage in the amounts, for the periods, and against the hazards Lender requires, including fire and other hazards included within the term "extended coverage," and loss by flood, to the extent required by the Secretary, then: (i) Lender waives the provision in Paragraph 2 of this Security Instrument for the monthly payment to Lender of one-twelfth of the yearly premium installments for hazard insurance on the Property, and (ii) Borrower's obligation under Paragraph 4 of this Security Instrument to maintain hazard insurance coverage on the Property is deemed satisfied to the extent that the required coverage is provided by the Owners Association policy. Borrower shall give Lender prompt notice of any lapse in required hazard insurance coverage and of any loss occurring from a hazard. In the event of a distribution of hazard insurance proceeds in lieu of restoration or repair following a loss

09051511

to the Property or to common areas and facilities of the PUD, any proceeds payable to Borrower are hereby assigned and shall be paid to Lender for application to the sums secured by this Security Instrument, with any excess paid to the entity legally entitled thereto.

**B.** Borrower promises to pay all dues and assessments imposed pursuant to the legal instruments creating and governing the PUD.

**C.** If Borrower does not pay PUD dues and assessments when due, then Lender may pay them. Any amounts disbursed by Lender under this paragraph C shall become additional debt of Borrower secured by the Security Instrument. Unless Borrower and Lender agree to other terms of payment, these amounts shall bear interest from the date of disbursement at the Note rate and shall be payable, with interest, upon notice from Lender to Borrower requesting payment.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and provisions contained in this PUD Rider.

5-27-09

- BORROWER -   KEN E. GREGORY   - DATE -

**SIGNATURE CLARIFICATION:**

**KEN E. GREGORY**

50.1                          Page 2 of 2                    **FHA Multistate PUD Rider**
                                                                              6/96

Exhibit 3

Exhibit 3

Exhibit 3

Branch :FLV,User :CON2                    Comment:                                    Station Id :XJUY

Inst #: **201211060000035**
Fees: $17.00
N/C Fee: $25.00
11/06/2012 08:00:12 AM
Receipt #: 1370992
Requestor:
**INDECOMM GLOBAL SERVICES**
Recorded By: BGN   Pgs: 1
**DEBBIE CONWAY**
**CLARK COUNTY RECORDER**

APN: 124-27-412-049

When Recorded **Return To:**
Indecomm Global Services
2925 Country Drive
St. Paul, MN 55117

Prepared by:
Cal-Western Reconveyance Corporation
525 East Main Street
El Cajon, CA 92020

T.S. NO.; 1368218-38   MERS ID: 100096000090515118 MERS P# 1-888-679-6377
_____SPACE ABOVE THIS LINE FOR RECORDER S USE_____

78102729   **ASSIGNMENT OF DEED OF TRUST**

FOR VALUE RECEIVED, the undersigned hereby grants, assigns and transfers to
GMAC MORTGAGE, LLC
C/O   1100 VIRGINIA DRIVE
      FORT WASHINGTON PA 19034

all beneficial interest under that certain deed of trust dated May 26, 2009, executed by KEN E. GREGORY, AN
UNMARRIED MAN, trustor, to STEWART TITLE OF NEVADA, trustee, and recorded as Instrument No.
20090608-0006547 on June 08, 2009 in book N/A page N/A, of Official Records in the County Recorder's
office of CLARK County, NEVADA describing land therein as
COMPLETELY DESCRIBED IN SAID DEED OF TRUST

and all rights accrued or to accrue under said Deed of Trust.

Dated:   *10-19-12*          MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC.,
                             AS NOMINEE FOR MOUNTAIN VIEW MORTGAGE
                             COMPANY, ITS SUCCESSORS AND ASSIGNS

                             Jeanette Piccone  Assistant Secretary

State of   Pennsylvania
County of _____Montgomery_____

On   *10-19-12*   before me, _____Patricia Nolan Hoffman_____
a Notary Public, personally appeared
_____Jeanette Piccone_____
who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to
the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized
capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of
which the person(s) acted, executed the instrument. I certify under PENALTY OF PERJURY under the laws of
the State of ____Pennsylvania____ that the foregoing paragraph is true and correct.
WITNESS my hand and official seal                        (Seal)
Signature *Patricia Nolan Hoffman*
          Patricia Nolan Hoffman

COMMONWEALTH OF PENNSYLVANIA
NOTARIAL SEAL
PATRICIA NOLAN HOFFMAN, Notary Public
City of Philadelphia, Phila. County
My Commission Expires November 15, 2015

*U03134661*
10301  10/23/2012  78102729/1

CLARK,NV                          Page 1 of 1                    Printed on 10/26/2016 8:33:42 AM
Document: DOT ASN 2012.1106.35

Exhibit 4

Exhibit 4

Exhibit 4

Branch :FLV,User :CON2                    Comment:                                    Station Id :XJUY

APN: 124-27-412-049
RECORDING REQUESTED BY:

When Recorded Mail To:
Ocwen Loan Servicing, LLC
1100 VIRGINIA DRIVE Suite 175
FORT WASHINGTON, PA 19034

6953673 (32)

Inst #: 201402130000401
Fees: $17.00
N/C Fee: $0.00
02/13/2014 09:23:14 AM
Receipt #: 1931730
Requestor:
DOCUMENT PROCESSING SOLUTIO
Recorded By: RYUD   Pgs: 1
DEBBIE CONWAY
CLARK COUNTY RECORDER

SPACE ABOVE THIS LINE FOR RECORDER'S USE

TS No: 1368218-1
The undersigned hereby affirms that there is no Social Security number contained in this document.

## ASSIGNMENT OF DEED OF TRUST

For Value Received, the undersigned corporation hereby grants, assigns, and transfers to:

Ocwen Loan Servicing, LLC

all beneficial interest under that certain Deed of Trust dated: **5/26/2009** executed by **KEN E. GREGORY, AN UNMARRIED MAN**, as Trustor(s), to **STEWART TITLE OF NEVADA**, as Trustee, and recorded 6/8/2009, as Instrument No. 20090608-0006547, of Official Records, in the office of the County Recorder of **Clark** County, **Nevada** and all rights accrued or to accrue under said Deed of Trust.

Date:      **January 17, 2014**

GMAC MORTGAGE, LLC

**Ann-Marie A. Owens, Authorized Signer**
**Ocwen Loan Serivicing, LLC**
**Attorney-In-Fact**

State of      **Pennsylvania**     } SS
County of   **Montgomery**      }

On   January 17, 2014   before me,   **Lisa Howlin Thomas**
Notary Public, personally appeared
                        **Ann-Marie A. Owens**

personally known to me (or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and official seal.

Signature   _Lisa Howlin Thomas_   (Seal)
                **Lisa Howlin Thomas**

| NOTARIAL SEAL |
| --- |
| LISA HOWLIN THOMAS, NOTARY PUBLIC |
| CHELTENHAM TWP. MONTGOMERY COUNTY |
| MY COMMISSION EXPIRES MAY 8, 2016 |

Page 1 of 1

Exhibit 5

Exhibit 5

Exhibit 5

Branch :FLV,User :CON2                              Comment:                                          Station Id :XJUY

Inst #: 201212180002236
Fees: $17.00
N/C Fee: $0.00
12/18/2012 09:45:44 AM
Receipt #: 1425496
Requestor:
NORTH AMERICAN TITLE COMPAN
Recorded By: DGI   Pgs: 1
**DEBBIE CONWAY**
**CLARK COUNTY RECORDER**

APN # 124-27-412-049
# N72906                     **Accommodation**

### NOTICE OF DELINQUENT ASSESSMENT LIEN

In accordance with Nevada Revised Statutes and the Association's declaration of Covenants Conditions and Restrictions (CC&Rs), recorded on August 7, 2002, as instrument number 00080 Book 20020807, of the official records of Clark County, Nevada, the Santa Rosa has a lien on the following legally described property.

The property against which the lien is imposed is commonly referred to as 5733 Oasis Ridge Street North Las Vegas, NV 89031 particularly legally described as: RANCHO MIRAGE UNIT 2 PHASE 2, PLAT BOOK 102, PAGE 96, LOT 85, BLOCK 10 in the County of Clark.

The owner(s) of record as reflected on the public record as of today's date is (are):
Ken E Gregory

Mailing address(es):
5733 Oasis Ridge Street North Las Vegas, NV 89031

*Total amount due as of today's date is $3,016.50.

This amount includes late fees, collection fees and interest in the amount of $818.50
        * Additional monies will accrue under this claim at the rate of the claimant's regular assessments or special assessments, plus permissible late charges, costs of collection and interest, accruing after the date of the notice.
        Nevada Association Services, Inc. is a debt collector. Nevada Association Services, Inc. is attempting to collect a debt. Any information obtained will be used for that purpose.

Dated:   December 14, 2012

By Megan Molina, of Nevada Association Services, Inc., as agent for Santa Rosa

When Recorded Mail To:
Nevada Association Services
TS # N72906
6224 W. Desert Inn Rd, Suite A
Las Vegas, NV 89146
Phone: (702) 804-8885        Toll Free: (888) 627-5544

<u>Exhibit 6</u>

<u>Exhibit 6</u>

<u>Exhibit 6</u>

Inst #: 201306210002082
Fees: $18.00
N/C Fee: $0.00
06/21/2013 12:15:30 PM
Receipt #: 1664904
Requestor:
TITLE SOLUTIONS, INC.
Recorded By: GILKS  Pgs: 2
**DEBBIE CONWAY**
**CLARK COUNTY RECORDER**

APN # 124-27-412-049
NAS # N72906
Title Solutions, Inc. # 731946
Property Address: 5733 Oasis Ridge Street

## NOTICE OF DEFAULT AND ELECTION TO SELL UNDER
## HOMEOWNERS ASSOCIATION LIEN

### IMPORTANT NOTICE

## WARNING! IF YOU FAIL TO PAY THE AMOUNT SPECIFIED IN THIS NOTICE, YOU COULD LOSE YOUR HOME, EVEN IF THE AMOUNT IS IN DISPUTE!

IF YOUR PROPERTY IS IN FORECLOSURE BECAUSE YOU ARE BEHIND IN YOUR PAYMENTS IT MAY BE SOLD WITHOUT ANY COURT ACTION and you may have the legal right to bring your account in good standing by paying all your past due payments plus permitted costs and expenses within the time permitted by law for reinstatement of your account.  No sale date may be set until ninety (90) days from the date this notice of default was mailed to you. The date this document was mailed to you appears on this notice.

This amount is $2,316.38 as of June 7, 2013 and will increase until your account becomes current.

While your property is in foreclosure, you still must pay other obligations (such as insurance and taxes) required by your note and deed of trust or mortgage, or as required under your Covenants Conditions and Restrictions.  If you fail to make future payments on the loan, pay taxes on the property, provide insurance on the property or pay other obligations as required by your note and deed of trust or mortgage, or as required under your Covenants Conditions and Restrictions, Santa Rosa (the Association) may insist that you do so in order to reinstate your account in good standing.  In addition, the Association may require as a condition to reinstatement that you provide reliable written evidence that you paid all senior liens, property taxes and hazard insurance premiums.

Upon your request, this office will mail you a written itemization of the entire amount you must pay.  You may not have to pay the entire unpaid portion of your account, even though full payment was demanded, but you must pay all amounts in default at the time payment is made.  However, you and your Association may mutually agree in writing prior to the foreclosure sale to, among other things, 1) provide additional time in which to cure the default by transfer of the property or otherwise; 2) establish a schedule of payments in order to cure your default; or both (1) and (2).

Following the expiration of the time period referred to in the first paragraph of this notice, unless the obligation being foreclosed upon or a separate written agreement between you and your Association permits a longer period, you have only the legal right to stop the sale of your property by paying the entire amount demanded by your Association.

To find out about the amount you must pay, or arrange for payment to stop the foreclosure, or if your property is in foreclosure for any other reason, contact: Nevada Association Services, Inc. on behalf of Santa Rosa, 6224 W. Desert Inn Road, Suite A, Las Vegas, NV 89146.  The phone number is (702) 804-8885 or toll free at (888) 627-5544.

If you have any questions, you should contact a lawyer or the Association which maintains the right of assessment on your property.

NAS # N72906

Notwithstanding the fact that your property is in foreclosure, you may offer your property for sale, provided the sale is concluded prior to the conclusion of the foreclosure.

## REMEMBER, YOU MAY LOSE LEGAL RIGHTS IF YOU DO NOT TAKE PROMPT ACTION.
## NOTICE IS HEREBY GIVEN THAT NEVADA ASSOCIATION SERVICES, INC.

is the duly appointed agent under the previously mentioned Notice of Delinquent Assessment Lien, with the owner(s) as reflected on said lien being Ken E Gregory, dated December 14, 2012, and recorded on December 18, 2012 as instrument number 0002236 Book 20121218 in the official records of Clark County, Nevada, executed by Santa Rosa, hereby declares that a breach of the obligation for which the Covenants Conditions and Restrictions, recorded on May 10, 2002, as instrument number 01313 Book 20020510, as security has occurred in that the payments have not been made of homeowner's assessments due from 1/1/2012 and all subsequent homeowner's assessments, monthly or otherwise, less credits and offsets, plus late charges, interest, trustee's fees and costs, attorney's fees and costs and Association fees and costs.

That by reason thereof, the Association has deposited with said agent such documents as the Covenants Conditions and Restrictions and documents evidencing the obligations secured thereby, and declares all sums secured thereby due and payable and elects to cause the property to be sold to satisfy the obligations.

Nevada Association Services, Inc. is a debt collector.  Nevada Association Services, Inc. is attempting to collect a debt.  Any information obtained will be used for that purpose.

Nevada Associations Services, Inc., whose address is 6224 W. Desert Inn Road, Suite A, Las Vegas, NV 89146 is authorized by the association to enforce the lien by sale.

Legal_Description:  RANCHO MIRAGE UNIT 2 PHASE 2, PLAT BOOK 102, PAGE 96, LOT 85, BLOCK 10 in the County of Clark

Dated:  June 7, 2013

By:  Autumn Fesel, of Nevada Association Services, Inc.
on behalf of Santa Rosa

When Recorded Mail To:
Nevada Association Services, Inc.
6224 W. Desert Inn Road, Suite A
Las Vegas, NV 89146
(702) 804-8885
(888) 627-5544

Exhibit 7

Exhibit 7

Exhibit 7

Inst #: 201310280001599
Fees: $18.00
N/C Fee: $0.00
10/28/2013 08:15:06 AM
Receipt #: 1822799
Requestor:
TITLE SOLUTIONS, INC.
Recorded By: BGN   Pgs: 2
**DEBBIE CONWAY**
**CLARK COUNTY RECORDER**

**RECORDING COVER PAGE**
(Must be typed or printed clearly in BLACK ink only
and avoid printing in the 1" margins of document)

APN# 124-27-412-049

(11 digit Assessor's Parcel Number may be obtained at:
http://redrock.co.clark.nv.us/assrrealprop/ownr.aspx)

**TITLE OF DOCUMENT**
**(DO NOT Abbreviate)**

Notice of Foreclosure Sale

Document Title on cover page must appear EXACTLY as the first page of the
document to be recorded.

**RECORDING REQUESTED BY:**

Nevada Association Services

RETURN TO: Name   Nevada Association Services

Address   6224 W. Desert Inn Road

City/State/Zip   Las Vegas, NV 89146

**MAIL TAX STATEMENT TO:  (Applicable to documents transferring real property)**

Name

Address

City/State/Zip

This page provides additional information required by NRS 111.312 Sections 1-2.
An additional recording fee of $1.00 will apply.
To print this document properly—do not use page scaling.

APN # 124-27-412-049                          NAS # N72906
Santa Rosa

## NOTICE OF FORECLOSURE SALE

**WARNING! A SALE OF YOUR PROPERTY IS IMMINENT! UNLESS YOU PAY THE AMOUNT SPECIFIED IN THIS NOTICE BEFORE THE SALE DATE, YOU COULD LOSE YOUR HOME, EVEN IF THE AMOUNT IS IN DISPUTE. YOU MUST ACT BEFORE THE SALE DATE. IF YOU HAVE ANY QUESTIONS, PLEASE CALL NEVADA ASSOCIATION SERVICES, INC. AT (702) 804-8885. IF YOU NEED ASSISTANCE, PLEASE CALL THE FORECLOSURE SECTION OF THE OMBUDSMAN'S OFFICE, NEVADA REAL ESTATE DIVISION, AT 1-877-829-9907 IMMEDIATELY.**

YOU ARE IN DEFAULT UNDER A DELINQUENT ASSESSMENT LIEN, December 14, 2012.  UNLESS YOU TAKE ACTION TO PROTECT YOUR PROPERTY, IT MAY BE SOLD AT A PUBLIC SALE. IF YOU NEED AN EXPLANATION OF THE NATURE OF THE PROCEEDINGS AGAINST YOU, YOU SHOULD CONTACT A LAWYER.

NOTICE IS HEREBY GIVEN THAT on 11/22/2013 at 10:00 am at the front entrance to the Nevada Association Services, Inc. 6224 West Desert Inn Road, Las Vegas, Nevada, under the power of sale pursuant to the terms of those certain covenants conditions and restrictions recorded on May 10, 2002 as instrument number 01313 Book 20020510 of official records of Clark County, Nevada Association Services, Inc., as duly appointed agent under that certain Delinquent Assessment Lien, recorded on December 18, 2012 as document number 0002236  Book 20121218 of the official records of said county, will sell at public auction to the highest bidder, for lawful money of the United States, all right, title, and interest in the following commonly known property known as: 5733 Oasis Ridge Street, North Las Vegas, NV 89031. Said property is legally described as: RANCHO MIRAGE UNIT 2 PHASE 2, PLAT BOOK 102, PAGE 96, LOT 85, BLOCK 10, official records of Clark County, Nevada.

The owner(s) of said property as of the date of the recording of said lien is purported to be: Ken E Gregory

The undersigned agent disclaims any liability for incorrectness of the street address and other common designations, if any, shown herein.  The sale will be made without covenant or warranty, expressed or implied regarding, but not limited to, title or possession, or encumbrances, or obligations to satisfy any secured or unsecured liens.  The total amount of the unpaid balance of the obligation secured by the property to be sold and reasonable estimated costs, expenses and advances at the time of the initial publication of the Notice of Sale is $3,030.81.  Payment must be in cash or a cashier's check drawn on a state or national bank, check drawn on a state or federal savings and loan association, savings association or savings bank and authorized to do business in the State of Nevada.  The Notice of Default and Election to Sell the described property was recorded on 6/21/2013 as instrument number 0002082 Book 20130621 in the official records of Clark County.

Nevada Association Services, Inc. is a debt collector.  Nevada Association Services, Inc. is attempting to collect a debt.  Any information obtained will be used for that purpose.

October 23, 2013                          Nevada Association Services, Inc.
                                         6224 W. Desert Inn Road, Suite A
                                         Las Vegas, NV 89146   (702) 804-8885, (888) 627-5544

When Recorded Mail To:                   By: Elissa Hollander, Agent for Association and employee of
Nevada Association Services, Inc.        Nevada Association Services, Inc.
6224 W. Desert Inn Road, Suite A
Las Vegas, NV 89146

Exhibit 8

Exhibit 8

Exhibit 8

Inst #: 201311260001412
Fees: $18.00 N/C Fee: $0.00
RPTT: $627.30 Ex: #
11/26/2013 10:09:04 AM
Receipt #: 1854993
Requestor:
RESOURCES GROUP
Recorded By: MSH   Pgs: 3
DEBBIE CONWAY
CLARK COUNTY RECORDER

Please mail tax statement and
when recorded mail to:
Saticoy Bay LLC Series 5733 Oasis Ridge
P.O. Box 36208
Las Vegas, NV 89133

## FORECLOSURE DEED

APN # 124-27-412-049
Title Solutions, Inc. #731946                                    NAS # N72906

The undersigned declares:

Nevada Association Services, Inc., herein called agent (for the Santa Rosa), was the duly
appointed agent under that certain Notice of Delinquent Assessment Lien, recorded December
18, 2012 as instrument number 0002236 Book 20121218, in Clark County. The previous owner
as reflected on said lien is Ken E Gregory. Nevada Association Services, Inc. as agent for Santa
Rosa does hereby grant and convey, but without warranty expressed or implied to: Saticoy Bay
LLC Series 5733 Oasis Ridge (herein called grantee), pursuant to NRS 116.31162, 116.31163
and 116.31164, all its right, title and interest in and to that certain property legally described as:
RANCHO MIRAGE UNIT 2 PHASE 2, PLAT BOOK 102, PAGE 96, LOT 85, BLOCK 10
Clark County

AGENT STATES THAT:
This conveyance is made pursuant to the powers conferred upon agent by Nevada Revised
Statutes, the Santa Rosa governing documents (CC&R's) and that certain Notice of Delinquent
Assessment Lien, described herein.  Default occurred as set forth in a Notice of Default and
Election to Sell, recorded on 6/21/2013 as instrument # 0002082 Book 20130621 which was
recorded in the office of the recorder of said county.  Nevada Association Services, Inc. has
complied with all requirements of law including, but not limited to, the elapsing of 90 days,
mailing of copies of Notice of Delinquent Assessment and Notice of Default and the posting and
publication of the Notice of Sale.  Said property was sold by said agent, on behalf of Santa Rosa
at public auction on 11/22/2013, at the place indicated on the Notice of Sale.  Grantee being the
highest bidder at such sale, became the purchaser of said property and paid therefore to said agent
the amount bid $25,000.00 in lawful money of the United States, or by satisfaction, pro tanto, of
the obligations then secured by the Delinquent Assessment Lien.

Dated: November 25, 2013

*Misty Blanchard*

By Misty Blanchard, Agent for Association and Employee of Nevada Association Services

STATE OF NEVADA            )
COUNTY OF CLARK            )
On November 25, 2013, before me, Susana E. Puckett, personally appeared Misty Blanchard personally
known to me (or proved to me on the basis of satisfactory evidence) to be the person whose name is
subscribed to the within instrument and acknowledged that he/she executed the same in his/her
authorized capacity, and that by signing his/her signature on the instrument, the person, or the entity
upon behalf of which the person acted, executed the instrument.
WITNESS my hand and seal.

(Seal)                                          (Signature)

SUSANA E. PUCKETT
Notary Public, State of Nevada
Appointment No. 11-4965-1
My Appt. Expires April 21, 2015

STATE OF NEVADA
DECLARATION OF VALUE

1. Assessor Parcel Number(s)
   a. 124-27-412-049
   b. _____
   c. _____
   d. _____

2. Type of Property:
   a. ☐ Vacant Land      b. ☑ Single Fam. Res.
   c. ☐ Condo/Twnhse    d. ☐ 2-4 Plex
   e. ☐ Apt. Bldg        f. ☐ Comm'l/Ind'l
   g. ☐ Agricultural     h. ☐ Mobile Home
      ☐ Other

   | FOR RECORDERS OPTIONAL USE ONLY |
   | Book_____ Page:_____ |
   | Date of Recording: _____ |
   | Notes: |

3.a. Total Value/Sales Price of Property      $  25,000.00
   b. Deed in Lieu of Foreclosure Only (value of property (                    )
   c. Transfer Tax Value:                      $  122,940.00
   d. Real Property Transfer Tax Due           $  627.50

4. **If Exemption Claimed:**
   a. Transfer Tax Exemption per NRS 375.090, Section_____
   b. Explain Reason for Exemption: _____

5. Partial Interest: Percentage being transferred: 100 %
The undersigned declares and acknowledges, under penalty of perjury, pursuant to NRS 375.060
and NRS 375.110, that the information provided is correct to the best of their information and belief,
and can be supported by documentation if called upon to substantiate the information provided herein.
Furthermore, the parties agree that disallowance of any claimed exemption, or other determination of
additional tax due, may result in a penalty of 10% of the tax due plus interest at 1% per month. Pursuant
to NRS 375.030, the Buyer and Seller shall be jointly and severally liable for any additional amount owed.

Signature _Misty Blanchard_    Capacity: Agent for HOA/NAS Employee

Signature _____    Capacity: _____

**SELLER (GRANTOR) INFORMATION**
**(REQUIRED)**
Print Name: Nevada Association Services
Address: 6224 W. Desert Inn Road
City: Las Vegas
State: Nevada      Zip: 89146

**BUYER (GRANTEE) INFORMATION**
**(REQUIRED)**
Print Name: Saticoy Bay LLC Series 5733 Oasis Ridge
Address: P.O. Box 36208
City: Las Vegas
State: Nevada      Zip: 89133

**COMPANY/PERSON REQUESTING RECORDING (Required if not seller or buyer)**
Print Name: Saticoy Bay LLC Series    Escrow # 
Address: P.O. Box 36208      5733 Oasis Ridge
City: LV      State: N.V   Zip: 89133

AS A PUBLIC RECORD THIS FORM MAY BE RECORDED/MICROFILMED

<u>Exhibit 9</u>

<u>Exhibit 9</u>

<u>Exhibit 9</u>

Branch :FLV,User :EDLE                          Comment:                                                    Station Id :X7QR



20020510
.01313



APN:

WHEN RECORDED RETURN TO:

SANTORO, DRIGGS, WALCH,
KEARNEY, JOHNSON & THOMPSON
3773 Howard Hughes Parkway, Suite 290N
Las Vegas, Nevada 89109
Attention: Rodney S. Woodbury, Esq.
124-27-4/3-006 to 013 + 014 to 017

### DECLARATION
### OF COVENANTS, CONDITIONS, AND RESTRICTIONS FOR
### SANTA ROSA

This instrument is delivered to the Recorder's
office as an accommodation, by Nevada Title Company,
for physical convenience only. It has not been
examined as to its validity, execution or it's
effect upon title, if any.

20020510
.01313

# TABLE OF CONTENTS

## ARTICLE I.

Recitals . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
1.01   Real Property . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
1.02   Planned Community . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
1.03   Owners Association . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
1.04   The Development . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
1.05   Covenants Running With Land . . . . . . . . . . . . . . . . . . . . 1
1.06   Declaration . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

## ARTICLE II.

Definitions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
2.01   "Act" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
2.02   "Annexable Area" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
2.03   "Architecture Committee" . . . . . . . . . . . . . . . . . . . . . . . . 2
2.04   "Articles" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
2.05   "Assessment" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
2.06   "Association" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
2.07   "Association Property" . . . . . . . . . . . . . . . . . . . . . . . . . . 2
2.08   "Board" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
2.09   "Bylaws" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
2.10   "Common Area" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
2.11   "Contingent Annexabe Area" . . . . . . . . . . . . . . . . . . . . . 3
2.12   "Declarant" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
2.13   "Design Guidelines" . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
2.14   "Development" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
2.15   "Eligible Holder" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
2.16   "Improvement" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
2.17   "Lessee" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
2.18   "Lot" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
2.19   "Member" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
2.20   "Mortgage" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
2.21   "NRS" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
2.22   "Owner" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
2.23   "Party Walls" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
2.24   "Perimeter Walls" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
2.25   "Person" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
2.26   "Property" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
2.27   "Record, "Recording," or "Recorded" . . . . . . . . . . . . . . . 4
2.28   "Residence" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
2.29   "Rules and Regulations" . . . . . . . . . . . . . . . . . . . . . . . . 4

ii

J. Jones Date DGJ/Capron Santa Rosa (CCR 2 3 wpd)

```
2002051 0
.01313
```

2.30    "Site Development Plan" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    4
2.31    "Subdivision Map" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    4

ARTICLE III.

Property and Property Rights . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    5
3.01    Description of the Property . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    5
3.02    No Representations or Warranties. . . . . . . . . . . . . . . . . . . . . . . . . . .    5
3.03    Lots . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    5
3.04    Association Property . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    6
3.05    Special Declarant's Rights . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    11

ARTICLE IV.

Owners' Association; Membership and Voting Rights . . . . . . . . . . . . . . . . . .    11
4.01    Association . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    11
4.02    Membership Rights . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    12
4.03    Control of Association . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    12
4.04    Meetings of Members . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    14
4.05    Duties of the Association . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    15
4.06    Powers and Authority of the Association . . . . . . . . . . . . . . . . . . . . . .    18
4.07    Indemnification . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    22
4.08    Diseased Trees . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    24
4.09    Perimeter Walls . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    24
4.10    Rules . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    24
4.11    Breach of Rules, Regulations, or Restrictions . . . . . . . . . . . . . . . . . .    25
4.12    Fines . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    25
4.13    Liability of Members of Board . . . . . . . . . . . . . . . . . . . . . . . . . . . .    26
4.14    Amendment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    26

ARTICLE V.

Covenant for Maintenance Assessments . . . . . . . . . . . . . . . . . . . . . . . . .    26
5.01    Assessments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    26
5.02    Purpose of Assessments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    26
5.03    Regular Assessments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    27
5.04    Special Assessments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    29
5.05    Notice of Special Assessments; Time for Payment . . . . . . . . . . . . . . .    29
5.06    Collection of Assessments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    29
5.07    Unpaid Assessments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    29
5.08    Mortgage Protection . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    30
5.09    Effect of Amendments on Mortgages . . . . . . . . . . . . . . . . . . . . . . . .    30
5.10    Annual Assessments Paid By Declarant . . . . . . . . . . . . . . . . . . . . . .    30

I :Free Disc DLof Conv's Spites Reart/CCR's 1 wpd

iii

2002051 10
.01313

### ARTICLE VI.

Permitted Uses and Restrictions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31
6.01   Improvements and Use . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31
6.02   Animals . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31
6.03   Commercial or Other Non-Residential Uses . . . . . . . . . . . . . . . . . . 31
6.04   Utility Service . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32
6.05   Nuisances . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32
6.06   Garbage . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32
6.07   Antennae, Satellite Dishes and Solar Collectors . . . . . . . . . . . . . . . 32
6.08   Signs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32
6.09   Equipment and Machinery . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32
6.10   Laundry . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33
6.11   Propane Tanks . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33
6.12   Maintenance of Lawn and Plants . . . . . . . . . . . . . . . . . . . . . . . . 33
6.13   Vehicle Parking . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33
6.14   Leases . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34
6.15   Resubdivision . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35
6.16   Improvements . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35
6.17   Taxes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35
6.18   Rules and Regulations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35
6.19   Hazardous Substances . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35
6.20   Party Walls . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35
6.21   Exterior Holiday Decorations. . . . . . . . . . . . . . . . . . . . . . . . . . . 35

### ARTICLE VII.

Architecture Committee . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36
7.01   Establishment of Committee . . . . . . . . . . . . . . . . . . . . . . . . . . . 36
7.02   Members of Committee . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36
7.03   Architectural Design Guidelines . . . . . . . . . . . . . . . . . . . . . . . . . 36
7.04   Landscape Standards . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37
7.05   Review of Proposed Improvements . . . . . . . . . . . . . . . . . . . . . . . 37
7.06   Meetings of the Committee . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38
7.07   No Waiver of Future Approvals . . . . . . . . . . . . . . . . . . . . . . . . . 38
7.08   Compensation of Members . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38
7.09   Inspection of Work . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38
7.10   Nonliability of Committee Members . . . . . . . . . . . . . . . . . . . . . . . 39
7.11   Variances . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40
7.12   Obligations with Respect to Zoning and Subdivisions . . . . . . . . . . . . 40
7.13   Indemnification of Architecture Committee . . . . . . . . . . . . . . . . . . . 40

### ARTICLE VIII.

Mortgagee Provisions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

I Form Dako DLR Commu Sunta Nova CLARB 1 tupê

iv

2002051 0
.01313

| | | |
|---|---|---|
| 8.01 | Notices of Action | 41 |
| 8.02 | Special Provision | 41 |
| 8.03 | Other Provisions for First Mortgages | 42 |
| 8.04 | No Priority | 42 |
| 8.05 | Notice to Association | 42 |
| 8.06 | Amendment by Board | 42 |
| 8.07 | Applicability | 43 |
| 8.08 | Failure of Mortgagee to Respond | 43 |

ARTICLE IX.

| | | |
|---|---|---|
| | Annexation | 43 |
| 9.01 | Annexation of Additional Property by Association | 43 |
| 9.02 | Annexation by Declarant | 43 |
| 9.03 | Procedure for Annexation | 43 |
| 9.04 | Deannexation | 44 |

ARTICLE X.

| | | |
|---|---|---|
| | General Provisions | 44 |
| 10.01 | Term | 44 |
| 10.02 | Resale of Lots | 44 |
| 10.03 | Lease of Property | 45 |
| 10.04 | Amendment | 45 |
| 10.05 | Enforcement and Nonwaiver | 47 |
| 10.06 | Notices | 48 |
| 10.07 | Construction | 48 |
| 10.08 | State Law | 49 |
| 10.09 | Priorities, Inconsistencies | 49 |

I Pma Data DGHEman Jama Kaya CC.810 I mpP

v

20020510
.01313

# DECLARATION
# OF COVENANTS, CONDITIONS, AND RESTRICTIONS FOR
# SANTA ROSA

THIS DECLARATION (the "Declaration") is made this _____ day of May, 2002, by Centex Homes of Nevada, a Nevada general partnership (the "Declarant").

## ARTICLE I.

### Recitals

**1.01   Real Property.** Declarant is the owner of certain real property located entirely in Clark County, Nevada, more particularly described in Exhibit "A" attached hereto (the "Property"). The Property shall include any additional real property that may from time to time be annexed thereto.

**1.02   Planned Community.** Declarant desires to develop the Property and, if Declarant so elects, the adjacent land described in Section 2.02 (the "Annexable Area") as a residential community and to establish covenants, conditions, and restrictions relating to the use, enjoyment, maintenance, improvement, and occupancy of the Property. The residential community shall be developed as a planned community under a general plan of development pursuant to the Act (as hereinafter defined) and shall be named Santa Rosa (the "Development"). If the entire Annexable Area is annexed as provided herein, the planned community will consist of up to a maximum of one hundred twenty-five (125) Lots (as hereinafter defined).

**1.03   Owners Association.** Declarant desires to establish Santa Rosa Homeowners Association, a Nevada nonprofit corporation (the "Association"), for the purpose of maintaining and administering the Common Areas (as hereinafter defined) of the Property, administering and enforcing these covenants, conditions, and restrictions, and collecting and disbursing funds pursuant to Assessments and charges established by these covenants, conditions, and restrictions. Each Lot shall have appurtenant to it a membership in the Association.

**1.04   The Development.** Declarant contemplates developing the Property, constructing the Development, and conveying the Association Property (as hereinafter defined) to the Association in a planned multi-phase development. Although Declarant contemplates completing all phases of the Development and subjecting the Annexable Area to this Declaration, there is no guarantee that any or all of the phases of the Development or that any or all of the Annexable Area will be developed by Declarant.

**1.05   Covenants Running With Land.** This Declaration shall run with the Property and all parts and parcels thereof and shall be binding on all parties having any right, title, or interest in the Property and their heirs, successors, successors-in-title, and assigns and on the Association and all of its successors in interest and shall inure to the benefit of each owner or member thereof. Each of the limitations, easements, uses, obligations, covenants,

1 Form Data [H:] Centex Santa Rosa CC&Rs 1.wpd



conditions, and restrictions imposed hereby shall be deemed to be and construed as equitable servitudes enforceable by any of the owners of any portion of the Property subject to this Declaration against any other owner, tenant, or occupant of the Property or portion thereof similarly restricted by this Declaration.

**1.06   Declaration.** Declarant hereby declares that all of the Property shall be held, sold, conveyed, hypothecated, encumbered, leased, rented, used, occupied, and improved subject to the following easements, restrictions, covenants, and conditions, which are for the purpose of protecting the value and desirability of the Property.

## ARTICLE II.

### Definitions

In addition to the terms elsewhere defined herein, the following terms shall have the following meanings whenever used in this Declaration.

**2.01   "Act"** shall mean the Nevada Common Interest Ownership Act, NRS 116.1101 et seq.

**2.02   "Annexable Area"** shall mean the real property described in Exhibit "B" hereto, including the Contingent Annexable Area described in Exhibit "C" hereto.

**2.03   "Architecture Committee"** shall mean the committee created by Article VII of this Declaration.

**2.04   "Articles"** shall mean the articles of incorporation of the Association as may be amended from time to time.

**2.05   "Assessment"** shall mean those Assessments set forth in Article V of this Declaration.

**2.06   "Association"** shall mean Santa Rosa Homeowners Association, a Nevada nonprofit corporation, and its successors and assigns.

**2.07   "Association Property"** shall mean all property, real and personal, owned or leased by the Association, including, without limitation, the Common Area.

**2.08   "Board"** shall mean the Board of Directors of the Association.

**2.09   "Bylaws"** shall mean the Bylaws of the Association as may be amended from time to time.

2



2.10   **"Common Area"** shall mean all real property (including the improvements thereto) designated as common elements on the Site Development Plan (as hereinafter defined) or any subsequent subdivision or parcel map of the Property, that is now or hereafter conveyed by Declarant to the Association, including private streets, if any, sewer and water lines, easements, park areas, and other such property.

2.11   **"Contingent Annexabe Area"** shall mean the real property described in Exhibit "C" hereto. The Contingent Annexable Area has been subjected to that certain Declaration of Covenants, Conditions, and Restrictions for Rancho Mirage recorded on April 5, 1995, in Book 950405 as Instrument 00740 in the Office of the Recorder of Clark County, Nevada (as amended, the "Rancho Mirage Declaration").   Anything herein to the contrary notwithstanding, in no event shall the Contingent Annexable Area or any portion thereof be added to the Property, subjected to this Declaration, or included within the jurisdiction of the Association pursuant to Article IX hereof unless and until such property has been duly deannexed from coverage of the Rancho Mirage Declaration.   Declarant makes no representation or warranty of any kind, express or implied, that the Contingent Annexable Area or any portion thereof will ever be deannexed from coverage of the Rancho Mirage Declaration or that it will be added to the Property, subjected to this Declaration, or included within the jurisdiction of the Association.

2.12   **"Declarant"** shall mean Centex Homes of Nevada, a Nevada general partnership, and its successors and assigns.

2.13   **"Design Guidelines"** shall mean the guidelines adopted by the Architecture Committee as set forth in Article VII.

2.14   **"Development"** shall mean the residential community referred to as Santa Rosa being developed by Declarant as a planned community pursuant to the Act.

2.15   **"Eligible Holder"** shall mean the Persons (as hereinafter defined) described in Article VIII of this Declaration.

2.16   **"Improvement"** shall mean the buildings, structures, improvements, roadways, parking areas, lighting fixtures, fences, walls, hedges, plantings, planted trees and shrubs, swimming pools, patios, decks, outbuildings, athletic facilities, and all other structures or landscaping of every type and kind upon the Property.

2.17   **"Lessee"** shall mean any Person who rents, leases, or subleases any Lot from an Owner (as hereinafter defined) or a Person in privity with an Owner.

2.18   **"Lot"** shall mean each of the lots, with the exception of the Common Area, shown on the Site Development Plan or any subsequent subdivision or parcel map of the Property, and all Improvements erected, constructed, or located thereon.

I Sant Rosa Draft Coven, Second Revised I ARa 1 wpd

3



20020510
.01513

2.19    **"Member"** shall mean each of those Owners who are members of the Association.

2.20    **"Mortgage"** shall mean a mortgage or deed of trust that encumbers any Lot.

2.21    **"NRS"** shall mean the Nevada Revised Statutes.

2.22    **"Owner"** shall mean the record owner, whether one or more persons or entities, of a fee simple title to any Lot, including contract sellers but excluding those having such interest merely as security for the performance of an obligation.

2.23    **"Party Walls"** shall mean those walls, other than Perimeter Walls (as hereinafter defined), located anywhere on the Development that form Lot boundaries.

2.24    **"Perimeter Walls"** shall mean those walls all or a part of which are located on Association Property or separate a Lot from Association Property.

2.25    **"Person"** shall mean a person, partnership, corporation, trustee, or other legal entity.

2.26    **"Property"** shall mean that real property located entirely in Clark County, Nevada, more particularly described in Exhibit "A" attached hereto. The Property shall include any additional real property that may from time to time be annexed thereto.

2.27    **"Record, "Recording," or "Recorded"** shall mean to file, the filing, or filed of record a legal instrument in the Office of the Recorder of Clark County, Nevada, or such other place as may be designated as the official location for recording deeds, plats, and similar documents affecting title to real property in Clark.

2.28    **"Residence"** shall mean and refer to any dwelling constructed on a Lot in accordance with all local, state, and federal laws and this Declaration.

2.29    **"Rules and Regulations"** shall mean the rules and regulations adopted by the Board pursuant to Section 4.10 of this Declaration.

2.30    **"Site Development Plan"** shall mean the general plot plan of the Development attached hereto as Exhibit "D."

2.31    **"Subdivision Map"** shall mean the map(s) or plat(s) of the Development Recorded or to be Recorded in the Office of the Recorder of Clark County, Nevada.

4



2002 05 10
.01313

## ARTICLE III.

### Property and Property Rights

**3.01   Description of the Property.** The Property shall consist of the Lots and the Common Area.

**3.02   No Representations or Warranties.** No representations or warranties of any kind, express or implied, other than the standard warranty required by VA and FHA, have been given or made by Declarant or its agents or employees in connection with the Property or any portion thereof, or any Improvement thereon, its physical condition, zoning, compliance with applicable laws, or fitness for intended use, or in connection with the subdivision, sale, operation, maintenance, cost of maintenance, taxes, or regulation thereof as a common-interest community, except as specifically and expressly set forth in this Declaration and except as may be filed by Declarant from time to time with any governmental authority. To the extent permitted by law, the Association, each and every Owner, and their successors and assigns hereby waive, and Declarant hereby expressly disclaims and excludes, any and all express and implied warranties created by NRS 116.4113, NRS 116.4114, and other applicable laws, including, without limitation, any implied warranty of quality, merchantability, fitness for a particular purpose, habitability, and workmanship. By virtue of obtaining its ownership interest in the Property or any portion thereof, the Association and each and every Owner hereby covenant and agree that the period for commencing any action against Declarant for breach of any obligations or warranties arising under NRS 116.4113 or 116.4114 shall be two (2) years after the cause of action accrues.

**3.03   Lots.**

(a)   Reciprocal Easements. Each Lot and its Owner shall have an easement and the same is hereby granted by the Declarant over all adjoining parcels for the purpose of accommodating any encroachment due to engineering errors, errors in original construction, settlement or shifting of the land, or any other cause; provided, however, that in no event shall an easement for encroachment be created in favor of an Owner or Owners if the encroachment occurred due to construction or alteration by the Owner (except Declarant) or the negligence or willful misconduct of the Owner. In the event a structure on any Lot is partially or totally destroyed and then repaired or rebuilt, the Owners of each Lot agree that minor unintentional encroachments over adjoining Lots not to exceed one (1) foot shall be permitted and that there shall be easements for the maintenance of the encroachments so long as they shall exist.

(b)   Association Easements. There are hereby reserved to the Association such easements across the Property as are necessary to perform the duties and obligations of the Association.

5

2002.0510
.01313

(c)   Utilities Easement.  There is hereby granted in favor of Declarant, the Association, and their respective licensees an easement across each Lot for purposes of installing, facilitating, maintaining, repairing, replacing, or inspecting sewer, drainage, underground power lines, cable television systems, or other utilities over, under, and across the Property.  All utility hook-ups and fixtures and improvements relating thereto shall be the property of the Association.

(d)   Emergency Repairs Easement.  In addition to all other easements reserved or granted herein, there is hereby reserved to the Association an easement across each Lot as is necessary to permit a reasonable right of entry onto each Lot for the purpose of performing emergency repairs or to do other work reasonably necessary for the proper maintenance of the Development.

(e)   Maintenance Obligation of Owners.  It shall be the duty of each Owner at its sole cost and expense, subject to the provisions of this Declaration requiring approval of the Architecture Committee, to maintain, repair, replace, and restore (including any mainte-nance, repairs, replacement, or restoration required as a result of any damage or destruction of the Property by casualty or otherwise) any Residence, Improvements, and landscaping located on its Lot and the Lot itself in a neat, sanitary, and attractive condition and in accordance with the Rules and Regulations of the Association, all as determined by the Board in its sole and absolute discretion.  If any Owner shall permit any Residence, Improvements, or the Lot to fall into disrepair or to become unsafe, unsightly, or unattractive or otherwise violate this Declaration, the Association shall have the right to seek any remedies at law or in equity it may have.  In addition, the Board shall have the right, but not the duty, if such unacceptable maintenance is not corrected within thirty (30) days of written notice from the Association (or such longer period if reasonably necessary under the circumstances, provided the owner is diligently performing such maintenance or repairs), to enter upon such Owner's Lot and make such repairs and perform such maintenance and charge the costs thereof to Owner.  Such costs shall be enforced, including penalty fees and costs, as an Assessment on the Lot pursuant to Article V hereof.

(f)   Insurance Obligations of Owners.  Each Owner shall insure the Residence and Improvements on its Lot against loss or damage by fire or by any other casualty in an amount as near as practical to the full replacement value of the Residence and pertinent Improvements, without deduction for depreciation or coinsurance.

### 3.04   Association Property.

(a)   Conveyance of Association Property.  The Declarant hereby covenants for itself, its successors, and assigns, at the time of the conveyance of the twelfth (12th) Lot in the Property to an Owner not the Declarant, that it will convey title to the Association Property on the Property to the Association free and clear of all encumbrances and liens, except utility easements, covenants, conditions, and reservations then of record, including, without limitation, those set forth in this Declaration.  Similar conveyances shall be made

6

2002 05 10
.01313

to the Association at the time of the conveyance to an Owner not the Declarant of the first Lot in each subsequent phase of the Development.

(b)     Declarant's Right to Inspect Prior to Conveyance.   At any time prior to conveyance by Declarant to the Association of the Association Property with respect to any given phase of the Development, Declarant shall have the right, but not the obligation, after providing reasonable notice to the Association, to cause, from time to time, an independent third party approved by Declarant and the Association to conduct inspections and tests of all or any parts of the Common Area in order to ascertain the physical condition of the Improvements thereon and determine whether maintenance, repairs, or replacements of any such Improvements are indicated.  If the Declarant causes any such tests or inspections to be conducted, it shall pay all costs thereof, restore the affected portion of the Property to its condition immediately prior to the inspections and tests, and indemnify the Association and Owner(s) of any affected unit(s) from any damage resulting therefrom.  The Declarant may have a representative accompany the inspector if it so elects.  The Declarant shall provide the Association with copies of any written reports describing the results of any such inspections or tests.   The third party inspector, the Declarant, and its respective representatives shall have such rights of entry on, over, under, across, and through the Property as may be reasonably necessary to exercise the rights described in this subsection 3.04(b).

(c)     Common Area Ownership.  The Common Area shall be owned by the Association in fee simple for the use, enjoyment, and convenience of the Owners and shall contain the roadways, walkways, landscaped areas, recreational areas, parking areas, storage and trash areas, utility easements, all Perimeter Walls, and all other areas of the Property not a part of the Lots.  Each Lot and its Owner shall have an easement over all of the Common Area, and such easement is hereby granted, transferred, and conveyed to all Owners by the Declarant for the benefit of the Lots, the Owners, and each of them, and for their respective families, guests, and invitees for all of the foregoing purposes.  In furtherance of the establishment of this easement, the individual deeds to the Lots may, but shall not be required to, set forth the foregoing easements.

(d)     Use.  Each Member or Lessee who resides on the Property and their respective families, guests, and invitees who reside with them shall be entitled to use the Common Area subject to the following:

(i)      the right of the Association to charge reasonable dues, use fees, and other fees for those facilities or amenities for which fees are normally charged or assessed;

(ii)     the right of the Association to suspend the rights to the use of any Association Property by any Member or Lessee and their families, guests, and invitees for any period during which any Assessment against the Member's property remains past due and unpaid, and after notice and hearing by the Board, the right of the Association to invoke any remedy set forth in Article V of this Declaration;

7



(iii)    the right of the Association to require that security deposits be made and deposited with the Association to secure all sums payable to the Association and to guarantee performance of all duties due and owing or to become due and owing to the Association;

(iv)    the right of the Association to allow the general public, or certain segments thereof, to use any Association Property, and in the discretion of the Board, to charge use or other fees therefor subject to subsection (i) above provided that the Association may not charge fees for access to public parks and sport fields;

(v)    such rights to use the Association Property as may have been granted by the Association to others;

(vi)    such covenants, conditions, and restrictions as may have been imposed by the Association or prior owners on the Association Property;

(vii)    such rules and regulations for the use of the Association Property as may be imposed by the Association from time to time; and

(viii)    the right of Declarant to use the Common Area for sales, development, and related activities pertaining to the Development.

(e)    <u>Maintenance of Association Property</u>. The Association shall be responsible for all of the costs and maintenance of the Association Property.  The Association may at any time and without any approval of the Owners being required:

(i)    reconstruct, repair, replace or refinish any Improvement, structure, fixture, or facility located on the Common Area or any portion thereof in accordance with: (A) the last plans thereof approved by the Board; (B) the original plans for development of the Property; or (C) if neither (A) nor (B) is applicable and if such Improvement was previously in existence, then in accordance with the original designs, plans, finishing, or standards of construction of such Improvement as it was originally constructed;

(ii)    construct, reconstruct, repair, replace, or refinish any road improvement or surface upon any portion of the Common Area used as a road, street, walk, or parking area;

(iii)    replace injured and diseased trees or other vegetation on the Common Area and plant trees, shrubs, and ground cover to the extent that the Board deems necessary for the conservation of water and soil and for aesthetic purposes;

(iv)    place and maintain upon any such area such signs, markers, and lights as the Board may deem appropriate for the proper identification, use, and regulation thereof;

8

200205 10
.01313

        (v)     remove all papers, debris, and refuse from the Common Area, wash or sweep paved areas as required, and clean and relamp lighting fixtures as needed;

        (vi)    repaint striping, markers, directional signs, and similar devices as necessary;

        (vii)   maintain, repair, and replace, as necessary, the Perimeter Walls; notwithstanding the foregoing, Owners of Lots bounded by Perimeter Walls shall be responsible for all aesthetic maintenance and repair of that side of the Perimeter Walls bounding the Owners' respective Lots;

        (viii)  pay all real estate and personal property taxes and Assessments on the Common Area;

        (ix)    pay all electrical, water, gas sewer, trash collection, telephone, and other utility charges or fees for services furnished to the Common Area and all water charges or fees for services furnished to the Lots;

        (x)     pay for and keep in force at the Association's expense public liability, casualty, and fire insurance with companies acceptable to the Association in amounts and with limits of liability desired by the Owners or required of the Owners pursuant to any other recorded document affecting the Property, such insurance to name the Association, the Owners, or both as named insureds; and

        (xi)    do all such other and further acts that the Board deems necessary to preserve and protect the Common Area and the beauty thereof in accordance with the general purposes for use and enjoyment of the Property described in this Declaration;

The Board shall be the sole judge as to the appropriate maintenance of all portions of the Common Area. Nothing herein shall be construed so as to preclude the Association from delegating its powers set forth above to a manager.

    (f)    <u>Improvements on Common Area</u>. Any other provision of this Declaration to the contrary notwithstanding, until Declarant has sold ninety percent (90%) of the Lots, no land within the Common Area may be improved by any Improvement, used, or occupied except in such manner as shall have been approved by Declarant in its sole and absolute discretion. Declarant may delegate its right to grant such approvals to the Board. No approval shall be granted that would be in contravention of the zoning or other local regulation then in effect for the area in question.

    (g)    <u>Damages</u>. Each Owner or Lessee shall be liable to the Association for any damage to the Association Property that may be sustained by reason of the negligent or intentional misconduct of such Owner or Lessee or of its family, guests, or invitees. If the Lot, the ownership or leasing of which entitles the Owner or Lessee thereof to use the Association Property, is owned or leased jointly or in common, the liability of all such joint

I Form Data 71x7 Casino-Lanai Rose CC&Rs Yupd

9



or common Owners or Lessees shall be joint and several. The amount of such damage may, in addition to any other rights or remedies, be assessed against such Person's real and personal property on or within the Property, including the leasehold estate of any Lessee, and may be collected as provided in Article V below for the collection of Assessments.

(h)  Damage and Destruction.  In the case of destruction of or damage to the Association Property by fire or other casualty, the Board shall have the following rights and privileges.

(i)  Liberty to Reconstruct.  If the cost to repair or replace the Association Property, over and above all insurance proceeds, is less than twenty thousand dollars ($20,000), the Board may, without the consent of the Members, determine to repair or replace the damaged property with property substantially the same as those that were destroyed or damaged.

(ii)  Decision to Reconstruct.  If the cost to repair or replace the Association Property, over and above all insurance proceeds, is equal to or greater than twenty thousand dollars ($20,000) and the Board determines to rebuild any Association Property destroyed or damaged in the form substantially the same as those that were destroyed or damaged, it shall prepare plans and obtain bids following the notice proceeding for a special Assessment as set forth in Article V hereof.  The Board shall submit the plans and bids to the Members for approval, which approval shall require the affirmative vote of sixty-seven percent (67%) of the Members entitled to vote.  The Board will modify the plans until the required vote is obtained or the restoration becomes subject to subsection 3.03(h)(i) or (iii) hereof.  If approved, the Board shall cause the repairs or replacements to be done and assess the Members for the costs as a special Assessment.

(iii)  Decision Not to Reconstruct.  If the Board determines not to rebuild any Association Property so destroyed or damaged or to build facilities substantially different from those that were destroyed or damaged, it shall submit its decision to the Members for their approval or disapproval, which approval shall require the consent of eighty percent (80%) of the Members entitled to vote.  If the Members elect to approve the decision, the Board shall act accordingly; but if the Members do not approve the decision, the Board shall proceed to repair or rebuild the damaged or destroyed facility pursuant to subsection 3.03(h)(i) or (ii) hereof.

(iv)  Damage During Declarant Control Period.  Should any Association Property become destroyed or damaged before Declarant has sold all of the Lots, the Association shall rebuild or repair such Association Property in a manner consistent with its original condition as constructed by Declarant.

(v)  Damage or Destruction by Owner.  In the event any portion of the Common Area is damaged or destroyed by an Owner, a Lessee, or any of their respective guests, tenants, licensees, or agents, the Board may repair said damaged area.  In the event the Board determines to repair said damage, the amount necessary for such repairs shall

10

2002 05 10
.01313

be paid by the Owner or Lessee, upon demand, to the Board. If said amounts are not immediately paid, they shall be deemed to be Assessments, and the Board may enforce collection of same in the same manner as provided in Article V hereof for collection and enforcement of Assessments.

**3.05    Special Declarant's Rights.** Declarant and its agents shall have the following rights and privileges, all of which shall terminate immediately upon the sale by Declarant of the last Lot within the Property:

(a)    Easement for Repairs. A nonexclusive easement over the Association Property for the purpose of making repairs to the Association Property and the Lots if access thereto is not reasonably available;

(b)    Easement for Sales. A nonexclusive easement over the Association Property (which easement shall extend to the sales agents, customers, prospective customers, guests, and representatives of Declarant) for sales, display, access, ingress, egress, exhibits, and other purposes deemed useful by Declarant and its agents in advertising and promoting the sale of Lots (including the erection of signs, flags, and banners) until all Lots are sold by Declarant. In exercising the easement, Declarant shall not unreasonably interfere with the rights and enjoyment of the Owners;

(c)    Easement for Development. A nonexclusive easement over the Association Property (which easement shall be in favor of Declarant and its agents, contractors, and licensees) for access, ingress, and egress over, in, upon, under, and across the Association Property, including, but not limited to, the right to store materials thereon and to make such other use thereof as may be reasonable, necessary, or incidental to Declarant's development of the Property; provided, however, that no such rights or easements shall be exercised in such a manner as to reasonably interfere with the occupancy, use, enjoyment, or access by any Owner;

(d)    Right to Lease. The right to lease any unsold Lot; and

(e)    Other Rights. Each of the developmental rights and special declarant's rights set forth in NRS 116.11034 and 116.110385.

## ARTICLE IV.

## Owners' Association; Membership and Voting Rights

**4.01    Association.**

(a)    Organization. The Association is a nonprofit Nevada corporation created for the purposes, charged with the duties, and vested with the powers prescribed by law or set forth in its Articles and Bylaws or in this Declaration. Neither the Articles nor Bylaws

11

2002C510
.01313

shall for any reason be amended or otherwise changed or interpreted so as to be inconsistent with this Declaration.

(b)    Successor Associations. In the event the Association is dissolved at any time this Declaration is in force or effect, a nonprofit unincorporated association shall automatically and without further action or notice be formed to succeed to all the rights and duties of the Association. The successor unincorporated association shall be governed by the laws of the State of Nevada and, to the extent not inconsistent therewith, by the Articles and Bylaws of the Association as if they were created for the purpose of governing the affairs of an unincorporated association. In the event an unincorporated association is formed pursuant to this subsection 4.01(b), the appropriate officers of the Association or the successor association shall take all reasonable efforts to restore or reincorporate the Association as a nonprofit Nevada corporation.

4.02    Membership Rights. Only Owners, including Declarant, shall be Members of the Association. Each Owner shall automatically be a Member of the Association without the necessity of any further action on its part, and membership in the Association shall be appurtenant to and shall run with the property interest ownership that qualifies the Owner to membership in the Association. Membership in the Association may not be severed from or in any way transferred, pledged, mortgaged, or alienated except with the title to the property ownership interest that qualifies the Owner thereof to membership and then only to the transferee of title to the property interest. Any attempt to make a prohibited severance, transfer, pledge, mortgage, or alienation shall be void. Subject to subsection 4.03(d) and Section 5.07 hereof and as set forth in the Articles, each Member shall be entitled to one (1) vote for each Lot owned by that Member.

4.03    Control of Association.

(a)    Period of Declarant Control of Association. Notwithstanding any other provision of this Declaration or of the Bylaws, and subject to subsection (b) below, there shall be a period during which Declarant shall control the Association, and Declarant or a Person designated by Declarant may appoint and remove all or some of the officers and directors of the Association. The period of Declarant control of the Association terminates no later than the earlier of:

(i)    sixty (60) days after the conveyance by Declarant of seventy-five percent (75%) of the Lots that may be created within the Property to Owners other than the Declarant;

(ii)    five (5) years after the Declarant has ceased to offer Lots for sale in the ordinary course of its business; or

(iii)    five (5) years after any right to annex new Lots was last exercised by Declarant.

12

20020510
.01313

Provided, however, that Declarant may, but is not obligated to, voluntarily surrender the right to appoint and remove officers and Board members as provided herein before the termination period set forth above, provided that Declarant may require that specified actions of the Association or the Board may require Declarant approval prior to becoming effective. Such surrender of rights shall only be by a recorded instrument.

(b)  Composition of the Board.  Not later than sixty (60) days after conveyance by Declarant of twenty-five percent (25%) of the Lots that may be created within the Property to Owners other than Declarant, at least one (1) member of the Board and not less than twenty-five percent (25%) of the members of the Board must be elected by Owners other than Declarant. Not later than sixty (60) days after conveyance by Declarant of fifty percent (50%) of the Lots that may be created within the Property to Owners other than Declarant, not less than thirty-three and one-third percent (33-1/3%) of the members of the Board must be elected by Owners other than Declarant. Upon expiration of the Declarant control period set forth in subsection (a) above, one hundred percent (100%) of the Board shall be elected by Owners other than Declarant.

(c)  Removal of Board Members.  Notwithstanding any provision of this Declaration or the Bylaws to the contrary, the Owners, by a two-thirds (2/3) vote of all Persons present and entitled to vote at any meeting of the Owners at which a quorum is present, may remove any member of the Board with or without cause, other than a member appointed by the Declarant.

(d)  Joint or Common Ownership.  If any property interest, ownership of which entitles the Owner thereof to vote, is held jointly or in common by more than one (1) Person, the vote or votes to which such property interest is entitled shall also be held jointly or in common in the same manner. However, the vote or votes for such property interest shall be cast, if at all, as a unit, and neither fractional votes nor split votes shall be allowed. In the event joint or common Owners are unable to agree among themselves as to how their vote or votes shall be cast as a unit, they shall lose the right to cast their vote or votes on the matter in question. In the event more than one vote is cast for a particular membership, none of the votes shall be counted, and all such votes shall be deemed void. Any joint or common Owner shall be entitled to cast the vote or votes belonging to the joint or common Owners unless another joint or common Owner shall have delivered to the Secretary of the Association prior to the time for casting such vote a written statement to the effect that the Owner wishing to cast the vote or votes has not been authorized to do so by the other joint or common Owner or Owners.

(e)  Proxy Voting.  Except as otherwise provided in this Section, votes allocated to a Lot may be cast pursuant to a revocable written proxy executed by the Owner thereof, authorizing the holder to cast the Owner's votes on any matter. An Owner may give a proxy only to a member of his immediate family, his tenant who resides in the Development, another Owner who resides in the Development, or any other Person permitted by the Act. If a Lot is owned by more than one Person, each Owner of the Lot may vote or register protest to the casting of votes by the other Owners of the Lot through a proxy. A vote may not be cast

13

200235 10
.01313

pursuant to a proxy for the election of a member of the Board.  A proxy shall be void if (i) it is not dated, (ii) it purports to be revocable without notice, (iii) it does not designate the votes that must be cast on behalf of the Owner who executed it, or (iv) the holder of the proxy does not disclose at the beginning of the meeting for which the proxy is executed, the number of proxies pursuant to which he will be casting votes and the voting instructions received for each proxy. Every proxy shall terminate immediately after the conclusion of the meeting for which it was executed. An Owner may revoke a proxy only by actual notice of revocation to the person presiding over a meeting of the Association.

    (f)    Cumulative Voting. Voting shall not be cumulative.

  4.04    Meetings of Members. The Association shall hold an annual meeting of the Members. The annual meeting of the Members shall be held on or about one (1) year after the date of the last annual meeting.  If the Members have not held a meeting for one (1) year, a meeting of the Members must be held in accordance with the Act.  The Association shall also hold at least one (1) regular meeting other than the annual meeting each year. Special meetings of the Members may be called at any reasonable time and place by notice by the President of the Association, the Board, or Members having ten percent (10%) or more of the total votes.

    (a)    Notice.  Not less than ten (10) days (twenty-one (21) days in the event of a meeting at which an Assessment for a capital improvement or commencement of a civil action is to be considered or action is to be taken on such an Assessment) nor more than sixty (60) days in advance of each meeting of the Members, the Secretary shall cause notice of the meeting to be hand-delivered or sent prepaid by United States mail to the mailing address of each Lot or to any other mailing address designated in writing by the Lot Owner. The notice of the meeting must state the time and place of the meeting and include a copy of the agenda for the meeting. The notice must also include  notification of the right of an Owner (i) to have a copy of the minutes or a summary of the minutes of the meeting distributed to the Owner upon request and, if required by the Board, upon payment to the Association of the cost of making the distribution, and (ii) to speak to the Association.

    (b)    Agenda.  The agenda for each meeting of the Owners must consist of (i) a clear and complete statement of the topics scheduled to be considered during the meeting, including, without limitation, any proposed amendment to the Declaration or Bylaws, any fees or Assessments to be imposed or increased by the Association, any budgetary changes, and any proposal to remove an officer or member of the Board, (ii) a list describing the items on which action may be taken and clearly denoting that action may be taken on those items, and (iii) a period devoted to comments by Owners and discussion of those comments.  In an Emergency (as hereinafter defined), the Owners may take action on an item which is not listed on the agenda. The notice, agenda, and Owner comment requirements of subsection 4.04(a) and this subsection 4.04(b) apply to both regular and special meetings of the Members.

I Form Data Doc't Prep xxxx Ready EAPk 3.wpd

14

2002 05 10
.01313

(c)     Emergency.  As used in this Section 4.04, "Emergency" means any occurrence or combination of occurrences that (i) could not have been reasonably foreseen, (ii) affects the health, welfare, and safety of the Owners, (iii) requires the immediate attention of, and possible action by, the Board, and (iv) makes it impracticable to comply with the notice provisions of this Section.

(d)     Quorum.  The presence at any meeting, in person or by proxy, of Members entitled to vote at least twenty percent (20%) of the total votes outstanding shall constitute a quorum.  If any meeting cannot be held because a quorum is not present, the Members present, either in person or by proxy, may adjourn the meeting to a time not less than forty-eight (48) hours nor more than thirty (30) days from the time set for the original meeting, at which adjourned meeting the quorum requirement shall be the Members entitled to vote fifteen percent (15%) of the total votes outstanding.

(e)     Organization.  The Chairman of the Board, or in his or her absence the Vice-Chairman, shall call meetings of Members to order and act as chairman of such meetings. In the absence of both of said officers, any Member entitled to vote thereat or any proxy of any such Member may call the meeting to order, and a chairman of the meeting shall be elected. The Secretary of the Association, or in his or her absence the Assistant Secretary, shall act as secretary of the meeting. In the absence of both the Secretary and the Assistant Secretary, a secretary shall be selected in the same manner as that provided above for selecting a chairman of the meeting.

(f)     Action by Members.  Except as provided otherwise in this Declaration or the Bylaws, any action (including any approvals required under this Declaration) may be taken at any legally convened meeting of the Members at which a quorum is present upon the affirmative vote of the Members having a majority (or such greater percentage as may be required elsewhere in this Declaration for approval of the Members of any matter) of the total votes present at such meeting in person or by proxy.  Only votes cast in person, by secret ballot, or by proxy may be counted.

(g)     Minutes.  Not more than thirty (30) days after any meeting of the Members, the Secretary shall cause the minutes or a summary of the minutes of the meeting to be made available to the Members.  A copy of the minutes or a summary of the minutes must be provided to any Member who pays the Association the cost of providing the copy.

**4.05   Duties of the Association.**  Subject to and in accordance with this Declaration, the Association shall have and perform each of the following duties for the benefit of the Members of the Association:

(a)     Members.  The Association shall accept all Owners as Members.

(b)     Recreation and Open Space Areas and Common Area.  The Association shall accept, own, operate, and maintain all recreation and open space and Common Area that may be conveyed, leased, licensed, or otherwise enjoyed by it, together with all

i5



Improvements of whatever kind and for whatever purpose that may be located in said areas. The Association shall accept, own, operate, and maintain all other property easements or rights of use, whether real or personal, for which the Association, the Members, or the Property receive any benefits, whether aesthetic or tangible.

     (c)    Title to Property Upon Dissolution. The Association shall pay over or convey, upon dissolution of the Association, the assets of the Association to one or more exempt organizations of the kind described in Section 501(c) of the Internal Revenue Code of 1986, as amended from time to time.

     (d)    Repair and Maintenance of Association Property. Subject to the provisions of this Declaration pertaining to damage and destruction of Association Property and condemnation, the Association shall paint, maintain, repair, and replace the Common Area, including any Improvements thereon, and other Association Property enjoyed by, owned by, licensed to, or leased to the Association, or shall contract for such maintenance, repair, and replacement to assure maintenance thereof, in a clean, sanitary and attractive condition reasonably consistent with prudent property management practices, the Association's budget, and any manuals governing such maintenance, repair, and replacement as may from time to time be adopted by the Board. The Board shall determine, in its sole discretion, the level and frequency of such maintenance.

     (e)    Payment of Taxes. The Association shall pay all real and personal property taxes and other taxes and assessments levied upon or with respect to any Association Property to the extent that such taxes and assessments are not levied directly upon the Members. The Association shall have all rights granted by law to contest the legality and the amount of such taxes and assessments.

     (f)    Insurance. The Association shall, at its sole cost and expense, obtain and maintain in effect policies of insurance of such kind and in such amounts as the Board, in its opinion, deems adequate or desirable, but in no event less than that required by law, including the requirements of NRS § 116.3113 and, so long as the Federal National Mortgage Association ("FNMA") or the Government National Mortgage Association ("GNMA") holds a security interest in a Lot, the requirements of FNMA or GNMA. Without limiting the generality of the preceding sentence, during any time Declarant is the owner of more than five (5) Lots such policies of insurance shall include:

     (i)    Fire and extended coverage insurance on all Improvements owned by or leased to the Association in an amount not less than one hundred percent (100%) of the aggregate full insurable value, meaning actual replacement cost exclusive of the costs of excavations, foundations, and footings. Such insurance shall insure the Association and any mortgagees, as their interests may appear. As to each such policy that will not be thereby voided or impaired, the Association hereby waives and releases all claims against the Board and Declarant, and the officers, agents, and employees of each thereof, with respect to any loss covered by such insurance, whether or not caused by negligence or breach of any duty or agreement by said Persons, but only to the extent that insurance proceeds are received

16

2002051 10
.01313

in compensation for the loss. If the foregoing exculpatory clause is held to be invalid, then the liability of the insurance company shall be primary, and the liability of the Board, Declarant, and the officers, agents, and employees of the Board and of Declarant shall be secondary;

(ii)     Liability insurance, with limits in amounts reasonably determined by the Board, insuring against liability for bodily injury or property damage arising from activities of the Association or with respect to the Association Property, including, if obtainable, a cross-liability endorsement insuring each insured against liability to each other insured. The liability insurance policies referred to above shall name as separately protected insureds Declarant, the Association, the Board and each of its members, the Architecture Committee and each of its members, and the manager of the Property, if any, and such policies may also name some or all of the respective officers, employees, and agents of the foregoing;

(iii)     Workers' compensation insurance to the extent necessary to comply with all applicable laws;

(iv)     A fidelity bond in an amount determined by the Board naming the members of the Board and such other Persons as may be designated by the Board as principals and the Association as obligee; and

(v)     Such other insurance, including indemnity and other bonds, as the Board shall deem necessary or desirable to carrying out the Association's functions.

The Association shall be deemed trustee of the interests of all Members in all insurance proceeds and shall, subject to the requirements of law, including NRS §§ 116.31133, 116.31135 and any successor statutes, have full power to receive, hold, and disburse such proceeds.

(g)     Architecture Committee. The Board shall appoint and remove members of the Architecture Committee as provided in Article VII hereof and ensure that at all reasonable times there is available a duly constituted and appointed Architecture Committee.

(h)     Enforcement. The Association shall enforce, in its own behalf and on behalf of all Owners, all of the covenants, conditions, and restrictions set forth in this Declaration under an irrevocable agency (which is hereby granted) coupled with an interest as beneficiary of said covenants, conditions, and restrictions and as assignee of Declarant. The Association shall perform all other acts, whether or not anywhere expressly authorized, as may be reasonably necessary to enforce any of the provisions of the Rules and Regulations or the Design Guidelines.

(i)     Long-Term Financing. The Association may, subject to compliance with NRS § 116.3112, execute mortgages and deeds of trust, both construction and permanent, for construction of facilities, including Improvements, on property owned by or leased to the Association. Such financing may be effected through conventional mortgages or deeds of trust, the issuance and sale of development or other bonds, or in any other form or manner as may be deemed appropriate by the borrower, whether that be Declarant or the Association.

17

2002051 0
.01313

The mortgage, deed of trust, or other security interest given to secure repayment of such debt may consist of a first lien or a second or other junior lien, as shall be deemed appropriate by such borrower, whether that be Declarant or the Association, on the Improvement or other facility to be constructed, together with such underlying and surrounding lands as Declarant or the Association, as the case may be, deems appropriate. The debt secured by such mortgage, deed of trust, or other security instrument may be retired from revenues generated by dues, use fees, Assessments of the Members of the Association, or otherwise or any combination thereof as may be deemed appropriate by Declarant or the Association, as the case may be, but subject to the limitations imposed by this Declaration and the Act.

(j)     Audit. Within one hundred twenty (120) days of the end of the Association's fiscal year, the Association shall, at its own cost, conduct an annual audit by an independent certified public accountant of the accounts of the Association and make a copy of such audit available to each Member during normal business hours at the principal office of the Association. Upon written request, the Association shall provide to any Eligible Holder, insurer, or guarantor of any Mortgage a copy of the annual audit. Any Member may at any time and at its own expense cause an audit or inspection to be made of the books and records of the Association by a certified public accountant provided that such audit or inspection is made during normal business hours and without unnecessary interference with the operations of the Association. The Association shall maintain copies of the then current Declaration, Articles, Bylaws, and Rules and Regulations, as amended, at the principal office of the Association, and the same shall be available during normal business hours for inspection by Declarant, any Owner, prospective purchasers of Lots, Eligible Holders, insurers, and any guarantors of a Mortgage.

(k)     Books and Records. The Board shall, upon the request of a Member, make available for review at the business office of the Association or other suitable location during the regular working hours of the Association, the books, records and other papers of the Association, including, without limitation, (i) the financial statement of the Association, (ii) the budgets of the Association, and (iii) the study of the reserves of the Association required to be conducted pursuant to subsection 5.03(b) of this Declaration. The Board shall provide a copy of any of the records to a Member within fourteen (14) days after receiving a written request therefor. The Board may charge a fee to cover the actual costs of preparing a copy, but not to exceed twenty-five cents ($.25) per page. The provisions of this subsection 4.05(k) do not apply to the personnel records of the employees of the Association and the records of the Association relating to another Owner.

(l)     Other. The Association shall carry out all duties of the Association set forth in the Rules and Regulations, the Articles, or the Bylaws.

**4.06   Powers and Authority of the Association**. The Association shall have all of the powers of a nonstock, nonprofit corporation organized under the laws of the State of Nevada in operating for the benefit of its members, subject only to such limitations upon the exercise of such powers as are expressly set forth in the Articles, the Bylaws, or this Declaration. It shall have the power to do any and all lawful things which may be authorized, required, or permitted to be done under and by virtue of this Declaration and to do and perform

18



any and all acts that may be necessary or proper for or incidental to the exercise of any of the express powers of the Association for the peace, health, comfort, safety, or general welfare of the Owners. Without in any way limiting the generality of the foregoing, the Association and the Board shall have the following powers and authority to exercise in their discretion:

(a) <u>Right of Entry and Enforcement</u>. Subject to any limitations or restrictions imposed by FNMA, which are incorporated herein by this reference, the Board and its agents and representatives shall have the power and right to enter upon any Lot and the Improvements thereon without liability to any Owner for the purpose of enforcing any of the provisions of this Declaration or for the purpose of maintaining and repairing the Improvements located on said Lot as provided in this Declaration or if the Owner thereof fails to maintain and repair any portion of a Lot as required by this Declaration. The Association shall also have the power and authority from time to time in its own name, on its own behalf, or on the behalf of any Owner or Owners who consent thereto to commence and maintain actions and suits to restrain and enjoin any breach or threatened breach of this Declaration and to enforce, by mandatory injunction or otherwise, all of the provisions of this Declaration. The costs of any such action or suit, including reasonable attorneys' fees, shall be paid to the prevailing party as part of its judgment.

(b) <u>Civil Actions</u>. Except as otherwise provided in this subsection 4.06(b), the Association may commence a civil action only upon a vote or written agreement of the Members holding at least a majority of the voting power of the Association. The Association shall provide written notice to each Owner of a meeting at which commencement of a civil action is to be considered at least twenty-one (21) days before the meeting. The provisions of this subsection do not apply to a civil action that is commenced: (i) to enforce the payment of an Assessment; (ii) to enforce the provisions of the Declaration, Bylaws, or Rules and Regulations; (iii) to proceed with a counterclaim; or (iv) to protect the health, safety and welfare of the Members. If a civil action is commenced pursuant to this subsection without the required vote or agreement, the action must be ratified in accordance with the Act.

(c) <u>Construction Defect Actions</u>. Notwithstanding anything in this Declaration to the contrary, at least sixty (60) days before initiating any action against Declarant for construction defects, as defined in NRS 40.615, as may be amended, the Association and any Owner(s) pursuing or bringing such action must give written notice by certified mail, return receipt requested, to the Declarant, at the Declarant's last known address, specifying in reasonable detail the defects and any damages or injuries that are the subject of the complaint. During the thirty-five (35) day period after the Declarant receives the notice, the Declarant shall be entitled, upon written request, to inspect the Lots, Residences, and Common Area that are the subject of the complaint to determine the nature and cause of the defect, damage, or injury and the nature and extent of repairs necessary to remedy the defect. The Declarant may take reasonable steps to establish the existence of the defect. If the Residence, Lot, or Common Area is covered by a warranty or contract of insurance issued by an insurer authorized by the State of Nevada to issue such a warranty or contract, the claimant(s) must diligently pursue a claim under the warranty or contract. Within forty-five (45) days after the Declarant receives the notice, the Declarant may make a written offer

19

Branch :FLV,User :EDLE                                    Comment:                                                                Station Id :X7QR

20020510
.01313

of settlement to the claimant. The offer (i) must be served to the claimant by certified mail, return receipt requested, at the claimant's last known address, (ii) must respond to each constructional defect set forth in the claimant's notice, and describe in reasonable detail the cause of the defect, if known, the nature and extent of the damage or injury resulting from the defect, and, unless the offer is limited to a proposal for monetary compensation, the method, adequacy, and estimated cost of the proposed repair; and (iii) may include (A) a proposal for monetary compensation, (B) if the Declarant is licensed to make the repairs, an agreement by the Declarant to make the repairs, or (C) an agreement by the Declarant to cause the repairs to be made, at the Declarant's expense, by another contractor who is licensed to make the repairs, bonded, and insured. The repairs must be made within forty-five (45) days after the Declarant receives written notice of acceptance of the offer, unless completion is delayed by the claimant or by other events beyond the control of the Declarant. The claimant and the Declarant may agree in writing to extend the periods prescribed by this subsection 4.06(c).

(d)     Easements and Rights-of-Way.  The Board shall have the power to grant and convey to any third party easements, licenses, and rights-of-way, in, on, over, or under any Common Area conveyed or otherwise transferred to the Association or under its jurisdiction, subject to the conditions contained in NRS § 116.3112.

(e)     Employment of Manager.  The Board shall have the power to employ, by written agreement and at its sole cost and expense, the services of a manager or management company, subject to the direction and control of the Board, to manage and carry out the affairs of the Association and, to the extent consistent with the laws of the State of Nevada and upon such conditions as are otherwise deemed advisable by the Board, to delegate to the manager any of the powers of the Board or the officers of the Association. In no event shall any management agreement be for a term greater than one (1) year, except with the approval of a majority of the Members, and any such agreement shall provide for termination without penalty on a minimum of thirty (30) days written notice. Except as otherwise provided in the Act, any manager so appointed must hold either a permit to engage in property management pursuant to NRS Chapter 645 or a certificate issued by the Nevada Real Estate Commission.

(f)     Services.  The Board shall have the power, by written agreement and at its sole cost and expense, to provide for and engage the services of others for the maintenance, protection, and preservation of the Association Property, including the Common Area, such as grounds keepers, painters, plumbers, and such other maintenance personnel, as the nature and character of the Common Area may require and including any such necessary personnel as the nature and character of any recreational facilities within the Common Area may require; provided, however, that no contract for such services shall be for a duration of more than one (1) year, except with the approval of a majority of the Members, and any such agreement shall provide for termination without penalty on a minimum of ninety (90) days written notice.

20

2002 05 10
.01313

(g)    Utilities. The Board shall have the power to contract, use, and pay for utility services to the Association Property.

(h)    Other Property. The Board shall have the power to acquire and hold, as trustee for the benefit of the Members, tangible and intangible personal property and to dispose of the same by sale or otherwise.

(i)    Mergers. The Association shall have the power, to the extent permitted by NRS § 116.2121, to participate in mergers and consolidations with other nonprofit corporations organized for the same purposes as the Association.

(j)    Dedication. The Board shall have the power to dedicate any of the Association Property to an appropriate public authority for public use, provided that any such dedication shall comply with NRS § 116.3112, and that such dedication is subject to the existing easements and rights of use of all of the Members.

(k)    Delegation. The Board may delegate any of its powers to any committees, officers, or employees as it deems necessary and proper.

(l)    Construction on Association Property. The Board shall have the power to construct new Improvements or additions to the Association Property or demolish existing Association Property or Improvements subject to the approval of the Architecture Committee as is required in this Declaration.

(m)    Maintenance of Entry and Exit Measures. The Board shall have the power to implement measures regulating entrance and exit at all points of entry and exit to or from the Property, which may or may not be guarded.

(n)    Conveyances. The Board shall have the power to grant and convey to any Person real property and interests therein, including fee title, leasehold estates, easements, rights of way, mortgages, and deeds of trust, out of, in, on, over, or under any Association Property for the purpose of constructing, erecting operating, maintaining, or repairing thereon, therein or thereunder:

(i)    parks, parkways, or other recreational facilities;

(ii)    roads, streets, ways, driveways, trails, and paths;

(iii)    lines, cables, wires, conduits, pipelines, or other devices for utility purposes;

(iv)    sewers, water systems, storm water drainage systems, sprinkler systems, and pipelines; and

(v)    any similar public, quasi-public, or private improvements or facilities.

21

Branch :FLV,User :EDLE                    Comment:                           Station Id :X7QR



Nothing above contained, however, shall be construed to permit use or occupancy of any land, Improvement, or other facility in a way that would violate applicable zoning or use and occupancy restrictions imposed thereon by other provisions of this Declaration or by city, county, or other applicable public agency.

(o)     Legal and Accounting Services. The Board shall have the power, by written agreement and at its sole cost and expense, to retain and pay for legal and accounting services necessary or proper in the operation of the Association, the operation and management of the Association Property, the enforcement of the Rules and Regulations, or in the performance of any other duty, right, power, or authority of the Association.

(p)     Association Property Services. The Board shall have the power to pay for water, sewer, garbage removal, electricity, telephone, gas, snow removal, landscaping, gardening, and all other utilities, services, and maintenance for the Association Property.

(q)     Other Areas. The Board shall have the power to maintain and repair easements, roads, roadways, rights of way, parks, parkways, median strips, sidewalks, paths, trails, ponds, lakes, entry details, entry houses, Perimeter Walls, or other Common Area whether owned by or leased to the Association and to contribute toward the cost of operation and maintenance of private roads, if any, and any other Improvements or other facilities owned by or leased to the Association.

(r)     Recreational Facilities. The Board shall have the power to operate and maintain any and all types of facilities owned by or leased to the Association for both active and passive recreation within the Common Area including, but not limited to: swimming pools; community clubs; picnic areas; parks and playgrounds; trails for hiking and bicycles; lakes and ponds for swimming, fishing, and other water sports; and other similar and dissimilar recreational facilities.

(s)     Other Services and Properties. The Board shall have the power to obtain and pay for any other property and services and to pay any other taxes or assessments that the Association or the Board is required to secure or to pay for pursuant to applicable law, the Rules and Regulations, the Articles, or the Bylaws.

(t)     Contracts. The Board shall have the power, at its sole cost and expense, to enter into contracts with Declarant and other Persons, on such terms and provisions as the Board shall determine, to operate and maintain any Common Area and Improvements thereon or to provide any service to the Property (including, but not limited to, cable television and laundry facilities).

**4.07   Indemnification.**

(a)     Indemnification. The Association shall indemnify any Person who was or is a party or is threatened to be made a party to any threatened, pending, or completed



200205 10
.01313

action, suit, or proceeding, whether civil, criminal, administrative, or investigative, by reason of the fact that it is or was a director, officer, employee, servant, or agent of the Association against expenses (including attorneys' fees), judgments, fines, and amounts paid in settlement actually and reasonably incurred by it in connection with such action, suit, or proceeding until and unless it is proved that it acted with willful or wanton misfeasance or with gross negligence and provided it acted in good faith and in a manner it reasonably believed to be in or not opposed to the best interests of the Association, and with respect to any criminal action or proceeding, had no reasonable cause to believe its conduct was unlawful. The termination of any action, suit, or proceeding by judgment, order, settlement, conviction, or upon a plea of nolo contendere or its equivalent shall not of itself create a presumption that the Person did not act in good faith or in a manner it reasonably believed to be in or not opposed to the best interests of the Association, or with respect to any criminal action or proceeding, had reasonable cause to believe that its conduct was unlawful.

Board members are not liable to the victims of crimes that may occur on the Property. Punitive damages may not be recovered against the Association but may be recovered only from Persons whose intentional activities are proved to have resulted in damages.

(b)   Determination. Any indemnification that the Association has elected to provide under this Section 4.07 (unless ordered by a court) shall be made by the Association only as authorized in the specific case by a determination that indemnification of the officer, director, employee, servant, or agent is proper in the circumstances because it has met the applicable standard of conduct set forth in subsection 4.07(a). Such determination shall be made: (i) by the Board by a majority vote of a quorum consisting of directors who were not parties to such action, suit, or proceeding; or (ii) if such a quorum is not obtainable, or even if obtainable and a quorum of disinterested directors so directs, by independent legal counsel in a written opinion; provided, however, that if a director, officer, employee, servant, or agent of the Association has been successful on the merits or otherwise in the defense of any action, suit, or proceeding referred to in subsection 4.07(a), or in defense of any claim, issue, or matter therein, then to the extent that the Association has elected to provide indemnification, it shall automatically be indemnified against expenses (including attorneys' fees) actually and reasonably incurred by it in connection therewith without the necessity of any such determination that it has met the applicable standard of conduct set forth in subsection 4.07(a).

(c)   Payment in Advance. Expenses incurred in defending a civil or criminal action, suit, or proceeding may, upon action by the Board in accordance with subsection 4.07(b), be paid by the Association in advance of the final disposition of such action, suit, or proceeding upon receipt of an undertaking by or on behalf of the director, officer, employee, servant, or agent to repay such amount unless it shall ultimately be determined that it is entitled to be indemnified by the Association as authorized in this Section 4.07.

(d)   Insurance. The Board shall purchase and maintain, at its sole cost and expense, insurance on behalf of any Person who is or was a director, officer, employee,

23

200205 10
.01313

servant, or agent of the Association against any liability asserted against it or incurred by it in any such capacity or arising out of its status as such, whether or not the Association would have the power to indemnify it against such liability hereunder or otherwise.

(e)   Other Coverage.  The indemnification provided by this Section 4.07 shall not be deemed exclusive of any other rights to which anyone seeking indemnification may be entitled under this Declaration, any agreement, vote of the Members, vote of disinterested directors, Nevada law, or otherwise, both as to action in its official capacity and as to action in another capacity while holding such office, and may continue as to a Person who has ceased to be a director, officer, employee, servant, or agent and may inure to the benefit of the heirs and personal representatives of such a Person.

**4.08   Diseased Trees.**  The Association may enter upon any part of the Property at any time to inspect for, prevent, and control diseased and insect infested trees and other plant life. If any diseased or insect infested trees or other plant life are found, the Association may spray, remove diseased trees and other plant life, or take such other remedial measures as it deems expedient. The cost thereof applicable to privately owned property may be levied by the Association as a special Assessment against such privately owned property pursuant to Section 5.04 hereof.

**4.09   Perimeter Walls.**  The Association may enter upon any part of the Property at any time to inspect for, prevent, or control damage to any Perimeter Walls and to maintain, repair, or replace, as necessary, the Perimeter Walls. Owners of Lots bounded by a Perimeter Wall shall be responsible for the cost of maintenance to Perimeter Walls as set forth in subsection 3.04(e)(vii) hereof. Notwithstanding the foregoing, an Owner causing any damage to any Perimeter Walls by its acts shall be solely responsible and liable for any maintenance, repair, or replacement, as required, and for any cost or liability necessary to repair such damaged Perimeter Walls.

**4.10   Rules.**

(a)   Rulemaking Power.  The Board may, from time to time and subject to the provisions of this Declaration, propose, enact, and amend rules and regulations to be known as the "Rules and Regulations" that relate to the management, operation, and control of the Association or the Common Area. The Rules and Regulations shall become effective and binding on all Owners only after adoption by the Board.  Such Rules and Regulations may concern, but need not be limited to, matters pertaining to use of the Common Area; signs; collection and disposal of refuse; minimum standards of maintenance of property; parking and traffic restrictions; limitations on maintenance of landscaping or other Improvements on any property; standards for Residences; limitations on the type of furniture, fixtures, equipment, and other objects maintained on Lots in view of other Owners; limitations on the number and type of animals that may be allowed on the Property; and any other subject or matter within the jurisdiction of the Association as provided in this Declaration. The Rules and Regulations may restrict and govern the use of the Common Area by any Member or

24

20020510
.01313

Lessee, by the family of such Member or Lessee, or by any invitee, licensee, or guest of such Member or Lessee. Declarant retains the right to establish rules relating to the use of any portion of the Common Area owned by it until annexation and conveyance to the Association, and the Association may incorporate such rules in its Rules and Regulations. The right of an Owner or the Board to enforce Rules and Regulations is limited to those Owners that are subject to this Declaration.

(b)     Notification of Rules and Regulations.  A copy of the Rules and Regulations, as they may be from time to time adopted, amended, or repealed, shall be mailed or otherwise delivered to each Member and may, but are not required to, be recorded.  The adoption of the Rules and Regulations shall have the same force and effect as if they were set forth in and were a part of this Declaration. No Rules and Regulations may be adopted that materially impair the rights, preferences, or privileges of any Owner as specifically set forth herein.

**4.11     Breach of Rules, Regulations, or Restrictions.**  In the event of a breach of any provision of the Rules and Regulations or of any of the restrictions contained in this Declaration by an Owner its family, guests, employees, invitees, licensees, or tenants, the Board, for and on behalf of itself and all other Owners, shall have the right to enforce the obligations of each Owner to obey the Rules and Regulations or the restrictions of this Declaration in any manner provided by law or in equity, including, but not limited to, appropriate hiring of legal counsel, the pursuing of legal action, suspension of the Owner's right to use the facilities of the Common Area, or suspension of the Owner's voting rights; provided, however, such suspension for a nonrecurring violation of the Rules and Regulations may not be for a period in excess of thirty (30) days, after notice and hearing as herein provided. Subject to Section 4.12 below and in addition to the other remedies herein set forth, including, without limitation, assessing the cost of repair of any damage resulting from a violation of the Rules and Regulations, the Board, by majority vote, may levy a fine against such Owner, after appropriate notice and hearing as herein provided. Prior to imposing any penalty provided herein for breach of the Rules and Regulations or of the restrictions contained in this Declaration, the Board shall provide the Owner with reasonable notice and a hearing before the Board, which notice must specify the nature of the violation.  In the event that the Board determines that a violation has occurred and that a penalty shall be imposed, the determination of the Board shall be final, provided that a reasonable opportunity for a hearing before the Board has been provided to the Owner.  In the event legal counsel is retained or legal action is instituted by the Board pursuant to this Section, any settlement prior to judgment or any judgment rendered in any such action shall include costs of collection, court costs, and reasonable attorneys' fees.

**4.12     Fines.**  Every fine must be commensurate with the severity of the violation. Additionally, if the violation does not threaten the health and welfare of the Development, the fine must not exceed one hundred dollars ($100) for each violation or a total amount of five hundred dollars ($500), whichever is less. The Rules and Regulations may be enforced by the Assessment of a fine only if (a) the Person alleged to have violated the Rules and Regulations has received notice of the alleged violation that informs him of his opportunity to request a hearing on the alleged violation, and, (b) at least thirty (30) days before the alleged

I\Forms\Dec\Dec\Common Sands\Proc CC &Rs.1.wpd

25

20020510
.01313

violation, said Person was given written notice of the rule or regulation (or any amendment to the rule or regulation) that the Person allegedly violated. If a fine is imposed pursuant to this Section and the violation is not cured within fourteen (14) days or such longer cure period as the Board establishes, the violation shall be deemed a continuing violation and the Board may thereafter impose additional fines for the violation not to exceed one hundred dollars ($100) per each seven (7) day period or portion thereof that the violation remains uncured. Any additional fine may be imposed without notice and an opportunity to be heard. The Secretary of the Association shall prepare and cause to be hand-delivered or sent prepaid by United States mail to the mailing address of each Lot or to any other mailing address designated in writing by the Lot Owner, a schedule of the fines that may be imposed for particular violations of the Declaration, Rules and Regulations, and other governing documents of the Association. The Association may not foreclose a lien for the Assessment of a fine for a violation of the Declaration, Bylaws, or Rules and Regulations, unless the violation is of a type that threatens the health, safety, or welfare of the residents of the Development.

4.13    Liability of Members of Board. No member of the Board shall be personally liable to any of the other Board members, to the Members, or to any other Person, including Declarant, for any error or omission of the Association, its representatives and employees, or the Architecture Committee, provided that such Board member has, upon the basis of such information as may be possessed by him or her, acted in good faith.

4.14    Amendment. Notwithstanding anything to the contrary in Section 10.04, the provisions of Sections 4.01, 4.02, 4.03, and 4.04 shall not be amended without the vote or written consent of two-thirds (2/3rds) of the Owners.

## ARTICLE V.

### Covenant for Maintenance Assessments

5.01    Assessments. The Owner of any Lot, by acceptance of a deed therefor, covenants and agrees to pay to the Association annual Assessments and special Assessments for capital improvements, such Assessments to be established and collected as hereinafter provided. The annual Assessment, special Assessment, interest, costs, and reasonable attorneys' fees shall be a charge on the Lot and shall be a continuing lien upon the Lot against which each such Assessment is made until paid. Each Assessment, together with interest, costs, and reasonable attorneys' fees, shall also be the personal obligation of the Owner of the Lot at the time when the Assessment became due. The personal obligation for delinquent Assessments shall not be extinguished upon the sale or the conveyance of a Lot, but any purchaser of a Lot shall not be liable for any unpaid Assessments or fee greater than the amounts set forth in the statement of unpaid Assessments described in Section 5.07.

5.02    Purpose of Assessments. The Assessments levied by the Association shall be used exclusively to promote the recreation, health, safety, and welfare of the residents

26



of the Property, for the improvement and maintenance of the Common Area, and for the daily operating expenses of the Association.

### 5.03    Regular Assessments.

(a)    Annual Assessment.    The Board shall fix the annual Assessment at an amount sufficient to cover the estimated budget of the Association prior to the beginning of each fiscal year. The Board may increase the annual Assessment by up to fifteen percent (15%) of the previous year's annual Assessment without the consent of the Owners. The Board shall, not less than thirty (30) days or more than sixty (60) days before the beginning of each fiscal year of the Association, prepare and distribute to each Owner a copy of the budget for the daily operation of the Association. The budget must include, without limitation, the estimated revenue and expenditures of the Association for the coming year and any contributions to be made to the reserve funds established by subsection 5.03(b) hereof. In lieu of distributing copies of the budget, the Board may distribute summaries of the budget, accompanied by a written notice that the budget is available for review at the business office of the Association or other suitable location and that copies of the budget will be provided upon request.

(b)    Reserve. The annual Assessment of the Association shall, in addition to being sufficient to cover anticipated expenses, include adequate reserves for the repair, replacement, and restoration of the major components of the Common Area. The reserve funds may be used only for those purposes and not for daily maintenance. Money in the reserve accounts may not be withdrawn without the signatures of at least two (2) members of the Board or the signatures of at least one (1) member of the Board and one (1) officer of the Association who is not a member of the Board.

The Board shall, not less than thirty (30) days or more than sixty (60) days before the beginning of the fiscal year of the Association prepare and distribute to each Owner a copy of the reserve budget. In lieu of distributing copies of the reserve budget, the Board may distribute summaries of the budget, accompanied by a written notice that the budget is available for review at the business office of the Association or other suitable location and that copies of the budget will be provided upon request.

The reserve budget must include, without limitation: (i) the current estimated replacement cost, estimated remaining life, and estimated useful life of each major component of the Common Area; (ii) as of the end of the fiscal year for which the budget is prepared, the current estimate of the amount of cash reserves that are necessary, and the current amount of accumulated cash reserves that are set aside, to repair, replace, or restore the major components of the Common Area; (iii) a general statement describing the procedures used for said estimation and accumulation of cash reserves, including, without limitation, the qualifications of the Person responsible for the preparation of the reserve studies required under this subsection; and (iv) a statement as to whether the Board has determined or anticipates that the levy of one or more Special Assessments will be required to repair, replace,

27

2002051G
.01313

or restore any major component of the Common Area or to provide adequate reserves for that purpose.

The Board shall cause to be conducted at least once every five (5) years, a study of the reserves required to be maintained by this subsection, review the results of that study at least annually to determine if those reserves are sufficient, and make any adjustments it deems necessary to maintain the required reserves.  The study must be conducted by a person qualified by training and experience to conduct such a study, including a member of the Board, an Owner, or the manager of the Association who is so qualified.  The study must include, without limitation: (i) a summary of an inspection of the major components of the Common Area that the Association is obligated to repair, replace, or restore; (ii) an identification of the major components of the Common Area that the Association is obligated to repair, replace, or restore which have a remaining useful life of less than thirty (30) years; (iii) an estimate of the remaining useful life of each major component so identified; (iv) an estimate of the cost of repair, replacement, or restoration of each major component so identified; and (v) an estimate of the total annual Assessments that may be required to cover the cost of repair, replacement, or restoration of the major components so identified after subtracting the reserves of the Association as of the date of the study.

(c)    Increases of Annual Assessment.  The annual Assessment may not be increased by more than fifteen percent (15%) of the annual Assessment for the previous year without a vote or written consent of fifty-one percent (51%) of the Members; provided, however, that following the termination of the Declarant control period described in subsection 4.03(a) hereof, any such increase shall have the vote or written consent of: (i) fifty-one percent (51%) of the Members, and (ii) fifty-one percent (51%) of the Members other than Declarant.

(d)    Budget Ratification.  The Board shall, within thirty (30) days after the adoption of any proposed budget, provide a summary of the budget to all Owners and shall set a date for a meeting of Owners to consider and ratify the budget not less than fourteen (14) nor more than thirty (30) days after the mailing of the summary.  Unless a majority of all Owners at the meeting reject the budget (whether or not a quorum is present), the budget is ratified.  If the budget is rejected, the budget last ratified shall continue to be the budget for the Association.

(e)    Inadequacy of Annual Assessment.  In the Board's sole and absolute discretion, should the annual Assessment be inadequate for any reason, including, without limitation, nonpayment of any Member's annual Assessment, to provide for the Association's costs and expenses, the Board may at any time and from time to time levy further Assessments in the same manner as described in subsection (a) of this Section 5.03.

(f)    Financial Statement.  A financial statement for the Association shall be prepared each fiscal year, which shall include a balance sheet showing the profit and loss of the Association and the funds held in reserve by the Association.

28



(g)    Initial Contribution.  In addition to the allocable portion of the monthly installment of the regular Assessment for the month escrow closes on the sale of a Lot by Declarant to an Owner other than Declarant, each Owner shall be required to make at close of escrow an initial capital contribution to the reserve fund described in subsection (b) above. The initial reserve contribution shall be equal to twice the monthly installment of annual Assessments allocable to the Owner's Lot. This initial capital contribution is not an advance payment on the Owner's annual Assessments and is not refundable to the Owner or its successors or assigns.

5.04    Special Assessments.  In addition to the annual Assessments authorized above, the Board may levy special Assessments for the purpose of construction, reconstruction, repair, or replacement of a capital Improvement upon the Common Area, including fixtures and personal property related thereto.  Any such Assessment must be approved by a majority of the Members.  The Association shall provide written notice to Owners of any meeting at which an Assessment for capital Improvements is to be considered at least twenty-one (21) calendar days before the meeting.

5.05    Notice of Special Assessments; Time for Payment.  The Association may, in its discretion, give written notice of special Assessments to each Owner, which notice shall specify the amount of the special Assessment and the date or dates of payment of the same. No payment shall be due fewer than fifteen (15) days after the written notice has been given.  Failure of the Association to give notice of the special Assessment shall not affect the liability of the Owner of any Lot, but the date when payment shall become due in such a case shall be deferred to a date fifteen (15) days after the notice shall have been given.

5.06    Collection of Assessments.  Annual Assessments shall commence with respect to each Lot in the original Property on the first (1st) day of the month immediately following the first (1st) close of escrow for the sale by Declarant to an Owner other than Declarant of a Lot in the original Property.  Annual Assessments shall so commence with respect to each Lot in any Annexable Area annexed to the Property in accordance with Article IX hereof on the first (1st) day of the month immediately following the first close of escrow for the sale by Declarant to an Owner other than Declarant of a Lot in that portion of the Annexable Area so annexed.

5.07    Unpaid Assessments.  The amount of any delinquent Assessment, whether regular or special, assessed against any Lot, a late payment charge of five percent (5%) of the delinquent Assessment, plus interest on such Assessment and late payment charge at a rate not to exceed eighteen percent (18%) per annum simple interest, and the costs of collecting such Assessment, late payment charge, and interest, including reasonable attorneys' fees, shall be a lien upon the Lot assessed until paid.  Such lien shall be prior to any declaration of homestead, and except as provided in Section 5.08 hereof, such lien shall survive and not be affected by the conveyance of the Lot subject to the delinquent Assessment to a third-party purchaser.  Such lien shall be created in accordance with NRS

29

Branch :FLV,User :EDLE                    Comment:                                    Station Id :X7QR

20020510
.01313

§ 116.3116 and shall be foreclosed in the manner provided for in NRS § 116.31162-116.31168 as is now or hereafter may be in effect. A certificate executed and acknowledged by any two (2) members of the Board stating the indebtedness secured by such lien shall be conclusive upon the Association as to the amount of such indebtedness as of the date of the certificate in favor of all Persons who rely thereon in good faith, and such certificate shall be furnished to any Owner upon request at a reasonable fee not to exceed Ten Dollars ($10.00). In addition to foreclosure of the Assessment lien, the Association may, but is not obligated to, bring an action to recover judgment against the Member personally obligated to pay the delinquent regular or special Assessment after having provided to that Member thirty (30) days' written notice of the delinquency. The Board may suspend the voting rights in the Association and right to use any of the recreational facilities of the Common Area of any Owner during any period any Assessment due from such Owner is unpaid. In the event an Assessment is past due more than fifteen (15) days, the Board may declare immediately due and payable the total amount assessed against the Owner and the Lot for that fiscal year. The Association may not foreclose a lien for the Assessment of a fine for a violation of this Declaration, the Bylaws, or the Rules and Regulations, unless the violation is of a type that threatens the health, safety, or welfare of the residents of the Development.

     **5.08   Mortgage Protection.** Notwithstanding any other provision of this Declaration, no lien created under this Article V or under any other Article of this Declaration, nor any lien arising by reason of any breach of this Declaration, nor the enforcement of any provision of this Declaration, shall defeat or render invalid the rights of the beneficiary under any Recorded Mortgage of first and senior priority now or hereafter upon a Lot, made in good faith and for value, perfected before the date on which the Assessment sought to be enforced became delinquent. However, after the foreclosure of any such first Mortgage, such Lot shall remain subject to this Declaration and shall be liable for all regular Assessments and all special Assessments levied subsequent to the date six (6) months prior to the institution of an action to foreclose on any such first Mortgage.

     **5.09   Effect of Amendments on Mortgages.** Notwithstanding the provisions of Section 10.04 hereof, no amendment of Section 5.08 of this Declaration shall affect the rights of any beneficiary whose Mortgage has senior priority as provided in Section 5.08 and who does not join in the execution thereof, provided that its Mortgage is Recorded in the real property records of Clark County, Nevada, prior to the Recordation of such amendment; provided, however, that after foreclosure or conveyance in lieu of foreclosure, the property that was subject to such Mortgage shall be subject to such amendment.

     **5.10   Annual Assessments Paid By Declarant.** Declarant shall pay all Assessments on all Lots owned by Declarant (but not on any Lots in any Annexable Area until both of the following shall occur: (a) such Annexable Area is actually annexed to and becomes a part of the Property; and (b) the first day of the month following the close of the first sale by Developer to an Owner other than Developer of a Lot within that particular portion of the Annexable Area); including those Lots owned by Declarant that have not been sold to Owners

30



other than Declarant; provided, however, that Declarant may receive as a credit the costs or value of any maintenance or repair performed by Declarant on the Association Property.

## ARTICLE VI.

## Permitted Uses and Restrictions

In addition to all of the covenants contained herein, the use of the Property and each Lot therein is subject to the following:

**6.01   Improvements and Use.** Except as expressly provided herein, the Lots shall be used exclusively for single-family residential purposes. Timesharing is prohibited. No mobile home may be placed or located on any Lot.

**6.02   Animals.** No animals of any kind shall be raised, bred, or kept on any Lot, except that a reasonable number of dogs, cats, or other household pets may be kept on a Lot provided that they are not kept, bred, or maintained for any commercial purpose nor in violation of any applicable local ordinance or any other provision of this Declaration. A "reasonable number" shall ordinarily mean three (3) or fewer pets per Lot. All pets within the Property shall be leashed or otherwise under the direct control of the pet owner when not within an enclosed area of a Lot. It shall be the absolute duty and responsibility of each Owner or Lessee to remove any solid animal waste after such animals have used any portion of the Property or any public property in the vicinity of the Property. No pet shall be permitted to be kept within any portion of the Property if it makes excessive noise or is otherwise determined by the Board to be a nuisance. If a pet is determined to be a nuisance, the Board may give notice to the Owner or Lessee to resolve the offending problem within seventy-two (72) hours, and if the problem is not resolved during that period of time, order the removal of the pet.

**6.03   Commercial or Other Non-Residential Uses.** No commercial, professional, industrial, institutional, or other non-residential use (including residential day care facilities) shall be conducted on any Lot without the written approval of the Board, except such temporary uses as shall be permitted by Declarant while the Development is being constructed and Lots are being sold by Declarant. Any owner wishing to conduct any commercial, institutional, or other non-residential uses on any Lot shall first apply to the Board for approval of such use and shall provide to the Board any information deemed necessary by the Board to evaluate the impacts of such use on the neighborhood. The Board shall determine if such use diminishes the residential character of the Lot or neighborhood or imposes a nuisance on the neighborhood. The decision of the Board shall be final and conclusive. The Board may review, and repeal, any such approval from time to time at the discretion of the Board if, in the opinion of the Board, the use has changed or increased to a level not consistent with the original approval. This provision may not be amended or deleted without the approval of all of the Members.

31



**6.04   Utility Service.** No lines, wires, or other devices for the communication or transmission of electric current or power, including telephone, television, and radio signals, shall be erected, placed, or maintained anywhere in or on any Lot unless the same shall be contained in conduits or cables installed and maintained underground or concealed in, under, or on buildings or other structures approved in writing by the Board. All temporary utility outlets shall be installed and maintained in accordance with applicable provisions of the Rules and Regulations. No provision hereof shall be deemed to forbid the erection of the temporary power or telephone installations incident to the construction of approved buildings or structures.

**6.05   Nuisances.** No noxious, illegal, or offensive activity shall be carried out on or upon any Lot or any part of the Property, nor shall anything be done thereon that may be or may become an annoyance or nuisance, public or private, to the neighborhood, that shall in any way interfere with the quiet enjoyment of each of the Owners of their respective Lots, or that shall in any way increase the rate of insurance for the Association or for the Owners.

**6.06   Garbage.** No rubbish, trash, garbage, or other waste shall be kept except in sanitary containers. All equipment for the storage or disposal of such materials shall be kept in a clean and sanitary condition and shall be enclosed so as not to be visible from any public street or from any other Lot or the Common Area.

**6.07   Antennae, Satellite Dishes and Solar Collectors.** No Owner may erect or maintain a television or radio receiving or transmitting antenna, satellite dish or similar implement or apparatus, or solar collector panels or equipment upon any Lot unless such apparatus is erected and maintained in such a way that it is screened from public view along the public street right-of-way directly in front (and to the side, in the case of a corner Lot) of the house erected on such Lot; and no such apparatus shall be erected without the prior written consent of the Architecture Committee. The Architecture Committee, as designated in this Declaration, shall have the absolute authority to determine whether an accessory is adequately screened from public view. The provisions of this Section 6.07 and the authority of the Architecture Committee in this matter shall be subject to any regulations issued by the Federal Communications Commission and any other applicable governmental authority.

**6.08   Signs.** No signs other than one (1) sign of customary and reasonable dimensions advertising a Lot for sale or rent shall be displayed on any Lot so that it is visible from any other Lot, public street, or the Common Area without prior written consent of the Board. No signs shall be displayed on the Common Area except signs approved by the Board.

**6.09   Equipment and Machinery.** No power equipment or hobby shops shall be permitted on the Property except with prior written approval of the Board. No equipment, machinery, junk, debris, building materials, or similar matter shall be placed, stored, or kept in or on any Lot, parking area, or street within or adjoining the Property.

32

2002051 0
.01313

**6.10   Laundry.** Outside clotheslines or other outside facilities for drying or airing clothes shall not be erected, placed, or maintained on any Lot. No washing machine or dryer shall be kept on any Lot, except within a Residence, without the prior written approval of the Board.

**6.11   Propane Tanks.** Only propane tanks used in connection with barbecue grills shall be permitted on any Lot; provided, however, that such tanks are in compliance with all applicable codes and laws.

**6.12   Maintenance of Lawn and Plants.** All Lots, landscaping, driveways, and exteriors must be kept neat and tidy at all times. No landscape trimmings shall be placed for removal on or near any public road within the Property or in a place upon the Lot where they are visible from any other Lot or the Common Area.

**6.13   Vehicle Parking.**

(a)     Owner and Occupant Parking; Priorities. It is the intent of this Subsection to limit on-street parking within the Property. Accordingly, each Owner and the occupants of his Residence shall park all of their vehicles first within the garage and then on the driveway of the Owner's Lot; provided, however, that the number of vehicles parked on any Lot shall not exceed the maximum number of vehicles that the garage and driveway were designed to accommodate (e.g., if a Residence has a three (3) car garage and a driveway designed to accommodate three (3) additional cars, then no more than six (6) cars may be parked on the Lot). Garage doors must be kept closed at all times, except as reasonably required for ingress and egress to and from the garage. Only after all parking areas first within the garage and then on the driveway are full shall an Owner be allowed to park a vehicle on the streets within the Project. In addition, no Owner shall park, store, or keep anywhere within the Property any vehicle or vehicular equipment, mobile or otherwise, deemed to be a nuisance by the Board, in its sole and absolute discretion.

(b)     Guest Parking. Notwithstanding the provisions of Subsection 6.13(a). Persons other than Owners and occupants of the Property, including, without limitation, their guests, invitees, and licensees, may park their vehicles on the streets of the Property between the hours of 7:00 a.m. and 10:00 p.m. Pacific Standard Time. During times other than these hours, including overnight stays, vehicles of such other persons must be parked in accordance with the provisions of Subsection 6.13(a).

(c)   Campers, Boats, RVs, Trailers and Non-Passenger Vehicles. No campers, boats, trailers, trailer coaches, camp trailers, recreational vehicles, camper units, house/cars, motor homes, mobile homes, aircraft, jet skis, wave runners, four-wheelers, off-road vehicles, buses, recreational trailers, non-passenger vehicles, or any other similar vehicles, rolling stock, equipment, implements, or accessories shall be stored or kept on any Lot unless the same are fully enclosed within the garage located on such Lot or are in operable condition,



located behind the side yard block wall and gate, and otherwise adequately screened from view, all as determined by the Board in its sole and absolute discretion.

(d)   Commercial Vehicles.  No large commercial vehicles, including, but not limited to, any dump truck, cement mixer truck, oil or gas truck, or delivery truck, shall be kept or stored on any Lot unless approval of the Board is granted.  For purposes of this Subsection 6.13(d), "large commercial vehicle" shall mean any vehicle larger than a nineteen (19) foot van or three-quarter (3/4) ton pickup truck that bears commercial insignia, names, or other common indicia indicating that the vehicle is used for commercial purposes, all as determined by the Board in its sole and absolute discretion.  Large commercial vehicles that are temporarily parked on any Lot for the sole purpose of serving such Lot are exempt from this restriction. The Board shall have the absolute authority to grant approval for storing or keeping a large commercial vehicle on a Lot.  Any Owner wishing to keep a large commercial vehicle on any Lot shall apply for approval to the Board, and shall provide such information as the Board, in its sole authority, may require.  The Board may from time to time in its sole discretion review the approval to keep a large commercial vehicle on any Lot to determine if the vehicle complies with the intent of the original approval. Upon an adverse determination by the Board, any vehicle shall be removed or otherwise brought into compliance with the requirements of this Section 6.13.

(e)   Disabled, Inoperable and Unregistered Vehicles.  No disabled, inoperable or unregistered vehicles, campers, boats, trailers, recreational vehicles, or other types of non-passenger vehicles, equipment, implements, or accessories may be kept or stored on any street within the Property for any period in excess of forty-eight (48) hours, nor placed on any Lot unless fully screened from view.

(f)   Vehicle Maintenance.  No dismantling, assembling or maintenance (other than emergency maintenance) of motor vehicles, boats, trailers, recreational vehicles, or other machinery, implements, accessories or equipment shall be permitted in the streets within the Property, or in any parking area, driveway or yard adjacent to a street, or that is not screened from view.

(g)   Authority to Review.  The Board shall have the absolute authority to determine from time to time whether a vehicle or accessory is operable, adequately screened from public view, and otherwise in compliance with the provisions of this Section 6.13. Upon an adverse determination by the Board, the vehicle or accessory shall be removed or otherwise brought into compliance with this Section 6.13.

(h)   Parking Rules and Regulations.  The Board may adopt rules and regulations consistent with this Section 6.13 to further regulate vehicle parking in the Property.

**6.14   Leases.**  Any lease of a Lot shall be in writing and be of a term of at least six (6) months, shall expressly provide that such lease is subject in all respects to this Declaration, and that any failure of the Lessee to comply with any provisions of this Declaration shall constitute a default under such lease. The Owner of a leased Lot shall be responsible for

34

20020510
.01313

all Assessments, penalties, and costs imposed on said Lot.  No Lot may be leased for hotel or transient purposes.  No portion of a Lot (less than the entire Lot) may be leased for any period.

**6.15   Resubdivision.**  No Lot shall be resubdivided nor shall less than an entire Lot be sold.

**6.16   Improvements.**  All Lot Improvements, including any species of plant material and placement of plants, shall be subject to the control and approval of the Architecture Committee as set forth in Article VII of this Declaration.

**6.17   Taxes.**  Each Owner shall pay when due and before delinquency all taxes, Assessments, levies, fees, and all other public charges and utility fees and charges of every kind and nature imposed upon or assessed against its Lot.

**6.18   Rules and Regulations.**  The Board is hereby expressly authorized to establish all rules and regulations as it shall deem necessary for the purpose of implementing, enforcing, and administering the purposes of this Declaration.

**6.19   Hazardous Substances.**  No activity shall be permitted on any Lot or the Common Area that, in the sole opinion of the Board, will create or emit offensive, hazardous, or excessive quantities of dust, dirt, ash, smoke, noise, fumes, odors, or vibrations or create risk of fire, explosion, or other hazards or is not in harmony and consistent with the Property.  Activities prohibited hereunder include, but are not limited to, activities that result in the disposal of hazardous substances in any form upon the Property.  For the purposes of this Declaration, the term "Hazardous Substance" shall mean any product, substance, chemical, material, or waste whose presence, nature, quantity, or intensity of existence, use, manufacture, disposal transportation, spill, release, or effect, either by itself or in connection with other materials expected to be found upon any Lot, is either: (i) potentially injurious to the public health, safety, or welfare or the environment or the Property; (ii) regulated or monitored by any governmental authority; or (iii) a basis for liability of Declarant or any Owner to any governmental agency or third party under any applicable state or common law principle.

**6.20   Party Walls.**  Owners of Party Walls shall share equally the responsibility and cost of all maintenance, repair, or replacement, as necessary, of their respective Party Walls.  Notwithstanding the foregoing, an Owner causing any damage to any Party Walls by its acts shall be solely responsible and liable for any maintenance, repair, or replacement, as required, and for any cost or liability necessary to repair such damaged Party Walls.

**6.21   Exterior Holiday Decorations.**  Lights or decorations may be erected on a Lot in commemoration or celebration of publicly observed holidays provided that such lights or decorations do not unreasonably disturb the peaceful enjoyment of Owners of adjacent Lots by illuminating bedrooms, creating noise or attracting sight-seers. Holiday decorations or lights for any publicly observed holiday between December 1 and December 31 of any

35

2002 05 10
.01313

year, may not be displayed before November 15 of any year. For other holidays, decorations or lights may not be displayed more than two (2) weeks in advance of the holiday. All lights and decorations that are not permanent fixtures of a Lot which are part of the original construction or have been properly approved as permanent improvements by the Architecture Committee shall be removed within thirty (30) days after the holiday has ended. The Board shall have the right, upon thirty (30) days prior written notice to designate a party to enter upon any Lot and summarily remove exterior lights or decorations displayed in violation of this provision. The Board, and the individuals removing the lights and decorations, shall not be liable to the Owner for trespass, conversion, or damages of any kind except intentional misdeeds and gross negligence.

## ARTICLE VII.

### Architecture Committee

**7.01    Establishment of Committee.** There shall be an architecture and landscape control committee (the "Architecture Committee"), established for the purpose of enforcing the architectural standards of the community and approving or disapproving plans for Improvements proposed for the Lots.   No Improvement shall be erected, altered, added on or repaired on a Lot until plans and specifications showing the nature, kind, shape, colors, materials, and location of the Improvement have been submitted to and approved in writing by the Architecture Committee, provided, however, that Improvements erected, altered, added onto or repaired on the Property by Declarant shall be exempt from the provisions of this Article VII.

**7.02    Members of Committee.** The Architecture Committee shall consist of three (3) members, all of whom shall first be appointed by Declarant.  There shall also be two (2) alternate members of the Architecture Committee, who shall be designated by the Architecture Committee, to act as substitutes on the Architecture Committee in the event of absence or disability of any member. Each member of the Architecture Committee shall hold office until such time as he or she has resigned or has been removed or his or her successor has been appointed, as provided herein. Members of the Architecture Committee may be removed at any time with or without cause. Until ninety percent (90%) of all Lots have been sold, Declarant shall have the sole power to appoint and remove the members of the Architecture Committee.  Thereafter, the Board shall have the power to appoint and remove all members of the Architecture Committee and to determine the number of members of the Architecture Committee; provided, however, that the Architecture Committee shall at no time consist of less than three (3) members. Members of the Architecture Committee need not be Members of the Association.

**7.03    Architectural Design Guidelines.** Prior to conveyance of the first Lot to an Owner other than the Declarant, the Declarant may, in its sole discretion and without the consent of anyone, adopt, amend or repeal rules and regulations to be known as "Design Guidelines," which shall interpret and implement the provisions of this Declaration, set forth

36



fees to be charged, and promulgate procedures and design and construction criteria to be followed in submitting proposals to the Architecture Committee. Thereafter, the Architecture Committee shall have the right to and may in its discretion, subject only to approval of the Board, adopt, amend or repeal the Design Guidelines. No such actions shall affect any prior Architecture Committee approval. A copy of the Design Guidelines as they may from time to time be adopted, amended, or repealed, certified by any member of the Architecture Committee, shall be maintained at the office of the Association and shall be available for inspection and copying by any Member at any reasonable time during the business hours of the Association. The following minimum standards and restrictions shall apply to all Improvements made on the Property:

(a)     all Improvements shall be constructed in full compliance with all applicable zoning laws, building codes, and other laws, ordinances, and regulations applicable to the construction, use, and occupancy of Improvements; and

(b)     all Improvements shall be constructed in accordance with the Design Guidelines.

**7.04     Landscape Standards.** Upon adoption of the Design Guidelines, the Architecture Committee shall, as part of the Design Guidelines, establish guidelines for plant and landscaping material that shall reflect desert landscaping to the extent practicable. Such guidelines may restrict the species and placement of any tree, plant, bush, ground cover, or other growing thing planted or placed on the Property. The Architecture Committee shall adopt a list of approved plant species that may be altered or augmented from time to time.

**7.05     Review of Proposed Improvements.** Whenever in this Declaration or in any supplemental declaration the approval of the Architecture Committee is required, it shall have the right to consider all of the plans and specifications for the Improvement or proposal in question and all other facts that in its sole discretion are relevant. Except as provided in Section 7.01, prior to commencement of construction of any Improvement upon the Property, the plans and specifications therefor shall be submitted to the Architecture Committee, and construction or placement thereof may not commence unless and until the Architecture Committee has approved such plans and specifications in writing. The Architecture Committee shall consider and act upon any and all plans and specifications submitted for its approval pursuant to this Declaration and perform such other duties assigned to it by this Declaration or as from time to time shall be assigned to it by the Board, including the inspection of construction or placement in progress to assure its conformance with plans and specifications approved by the Architecture Committee. The Architecture Committee shall approve plans and specifications submitted for its approval only if it deems that the construction, alterations, or additions contemplated thereby in the locations indicated will not be detrimental to the surrounding area or to the Property as a whole, that the appearance of any structure affected thereby will be in harmony with the surrounding structures, and that the upkeep and maintenance therefor will not become a burden on the Association. The Architecture Committee may condition its approval of plans and specifications on such changes therein as it deems appropriate and may require submission of additional plans and specifications or other

37

2002 05 10
.01313

information prior to approving or disapproving the material submitted.  The Architecture Committee may also issue rules or guidelines regarding anything relevant to its functions, including, but not limited to, minimum standards and procedures for the submission of plans and specifications for approval. The Architecture Committee, in its sole discretion, may require a reasonable fee to accompany each application for approval, which shall be used to cover the Architecture Committee and its members' reasonable costs. The Architecture Committee may require such detail in plans and specifications submitted for its review and such other information as it deems proper.

7.06   **Meetings of the Committee.**  The Architecture Committee shall meet from time to time as necessary to perform its duties hereunder, but such meetings shall be held at least annually. The vote of a majority of all of the members of the Architecture Committee or the written consent of a majority of all of the members of the Architecture Committee taken without a meeting shall constitute an act of the Architecture Committee.  The Architecture Committee may from time to time by resolution adopted in writing, delegate its duties, except for the granting of variances pursuant to Section 7.11, or retain the services of a professional engineer, architect, designer, inspector or other Person to assist in the performance of its duties.

7.07   **No Waiver of Future Approvals.**  The approval or consent of the Architecture Committee to any plans or specifications for any work done or proposed or in connection with any other matter requiring the approval or consent of the Architecture Committee shall not be deemed to constitute a waiver of any right to withhold approval or consent as to any plans or specifications or other matter whatsoever subsequently or additionally submitted for approval or consent by the same or a different Person.

7.08   **Compensation of Members.**  The members of the Architecture Committee shall be entitled to reasonable compensation from the Association for services rendered, together with reimbursement for expenses incurred by them in the performance of their duties hereunder.  Such compensation shall be determined by Declarant while it has the right to appoint or remove the members of the Architecture Committee pursuant to Section 7.02 hereof, and thereafter, such compensation shall be determined by the Board.

7.09   **Inspection of Work.**

(a)   <u>Completed Work</u>.  Inspection of completed work and correction of defects therein shall proceed as follows:

(i)   Upon the completion of any Improvement for which approved plans or specifications are required under this Declaration, the Owner shall give written notice of completion to the Architecture Committee within fifteen (15) days of completion.

(ii)   Within such reasonable time as the Architecture Committee may set, but not to exceed thirty (30) days thereafter, the Committee or its duly authorized

38

20029510
.01313

representative may inspect such Improvement. If the Committee finds that such work was not done in strict compliance with all approved plans and specifications submitted or required to be submitted for its prior approval, it shall notify the Owner in writing of such noncompliance within such period, specifying in reasonable detail the particulars of noncompliance, and shall require the Owner to remedy the same.

(iii)     If, upon the expiration of thirty (30) days from the date of such notification, the Owner shall have failed to remedy such noncompliance, the Architecture Committee shall notify the Board in writing of such failure. Upon notice and hearing before the Board, the Board shall issue a ruling determining whether there is a noncompliance, and if such noncompliance is found to exist, the Board shall determine the estimated cost of correcting or removing the same. The Owner shall remedy or remove the same within a period of not more than forty-five (45) days from the date of announcement of the Board ruling. If the Owner does not comply with the Board's ruling within such period, the Board, at its option, may either remove the noncomplying Improvement or remedy the noncompliance, and the Owner shall reimburse the Association upon demand for all expenses incurred in connection therewith. If such expenses are not promptly repaid by the Owner to the Association, the Board shall levy a special Assessment against such Owner and the Improvement in question and the Lot upon which the Improvement is situated for reimbursement, and the special Assessment shall constitute a lien upon such Lot and Improvement.

(iv)     If for any reason after receipt of said written notice of completion from the Owner, the Architecture Committee fails to notify the Owner of any noncompliance within the period provided in subsection 7.09(a)(ii) hereof, the Improvement shall be deemed to be in accordance with said approved plans and specifications.

(b)     Work in Progress. The Architecture Committee may inspect all work in progress and give notice of noncompliance as provided above in subsection 7.09(a)(ii). If the Owner denies that such noncompliance exists, the procedures set out in subsection 7.09(a)(iii) shall be followed, except that, pending resolution of the dispute, no further work shall be done that would hamper correction of the noncompliance if the Board should find that such noncompliance exists.

7.10     Nonliability of Committee Members. Neither the Architecture Committee nor any member thereof nor the Board nor any member thereof shall be liable to the Association or to any Owner or to any other Person for any loss, damage, or injury arising out of or in any way connected with the performance of the Architecture Committee's or the Board's respective duties under this Declaration, except for the willful misconduct or bad faith of the Architecture Committee or its members or the Board or its members, as the case may be. Except insofar as its duties may be extended with respect to a particular area by a supplemental declaration filed by Declarant, the Architecture Committee shall review and approve or disapprove all plans and specifications submitted to it for any proposed Improvement, including the construction, alteration, or addition thereof or thereto, solely on the basis of aesthetic considerations and the overall benefit or detriment that would result to the surrounding area and the Property generally. In granting its approval or disapproval

39



to plans and specifications for a proposed Improvement, the Architecture Committee shall take into consideration the aesthetic aspects of the architectural designs, landscaping, color schemes, exterior finishes, and materials and similar features. The approval of the Architecture Committee shall not be construed to be, nor shall the Architecture Committee be responsible for, approval of the structural safety, engineering soundness, or conformance with zoning, building, or other codes that may be applicable.

   **7.11   Variances.** The Architecture Committee may authorize variances from compliance with any of the architectural provisions of this Declaration or any supplemental declaration, including restrictions upon height, bulk, size, shape, land area, placement of structures, setbacks, building envelopes, colors, materials, or similar restrictions when circumstances such as topography, natural obstructions, hardship, or aesthetic or environmental considerations may, in its sole and absolute discretion, warrant. Such variances must be consistent with any and all applicable laws. Such variances must be evidenced in writing and must be signed by at least a majority of all of the members of the Architecture Committee. If such a variance is granted, no violation of the covenants, conditions, or restrictions contained in this Declaration or any supplemental declaration shall be deemed to have occurred with respect to the matter for which the variance was granted. The granting of such a variance shall not operate to waive any provisions of this Declaration, the Design Guidelines, or any supplemental declaration for any purpose except as to the particular property and particular provision and in the particular instance covered by the variance.

   **7.12   Obligations with Respect to Zoning and Subdivisions.** The Architecture Committee shall require all Persons to comply fully with the zoning and master plan designations and any special use permits and with all applicable federal, state, and local laws, regulations, and ordinances insofar as the same are applicable and as the same may hereafter be amended from time to time.

   **7.13   Indemnification of Architecture Committee.** The members of the Architecture Committee shall be deemed the appointed agents of the Board, and the Architecture Committee is hereby authorized to carry out and adhere to the provisions of this Article VII. The Owners hereby collectively agree that the members of the Architecture Committee shall be indemnified and held harmless for any liability, damages, or other obligation (including reasonable attorneys' fees) resulting from the reasonable and prudent exercise of their duties as members of the Architecture Committee as specified in this Article VII.

## ARTICLE VIII.

### Mortgagee Provisions

   The following provisions are for the benefit of holders, insurers, and guarantors of first Mortgages on Lots. The provisions of this Article apply to both this Declaration and to the Bylaws notwithstanding any other provisions contained therein.

40

20029510
.01313

**8.01    Notices of Action.** An institutional holder, insurer, or guarantor of a first Mortgage who provides written request to the Association (such request to state the name and address of such requestor and the street address of the Lot to which its interest relates, thereby becoming an "Eligible Holder") will be entitled to timely written notice of:

(a)    Any condemnation loss or any casualty loss that affects a material portion of the Property or that affects any Lot on which there is a first Mortgage held, insured, or guaranteed by such Eligible Holder;

(b)    Any delinquency in the payment of Assessments or charges owed by an Owner of a Lot subject to the Mortgage of such Eligible Holder when such delinquency has continued for a period of sixty (60) days, or any other violation of this Declaration or the Bylaws relating to such Lot or the Owner that is not cured within sixty (60) days. Notwithstanding this provision, any holder of a first Mortgage is entitled to written notice upon request from the Association of any default in the performance by an Owner of a Lot of any obligation under this Declaration or the Bylaws that is not cured within sixty (60) days;

(c)    Any lapse, cancellation, or material modification of any insurance policy maintained by the Association; or

(d)    Any proposed action that would require the consent of a specified percentage of Eligible Holders.

**8.02    Special Provision.** Unless at least sixty-seven percent (67%) of the Eligible Holders and voting Members representing at least sixty-seven percent (67%) of the total Association consent, the Association shall not:

(a)    By act or omission seek to abandon, partition, subdivide, encumber, sell, or transfer all or any portion of the real property comprising the Common Area that the Association owns directly or indirectly. The granting of easements for public utilities or other similar purposes consistent with the intended uses of the Common Area shall not be deemed a transfer within the meaning of this subsection;

(b)    Change the method of determining the obligations, Assessments, dues, or other charges that may be levied against an Owner of a Lot;

(c)    By act or omission change, waive, or abandon the Subdivision Map or this Declaration or change, waive, or abandon any scheme of regulations or enforcement relating to architectural design, exterior appearance, or maintenance of the Lots and the Common Area. The issuance and amendment of architectural standards, procedures, rules and regulations, or use restrictions shall not constitute a change, waiver, or abandonment within the meaning of this provision;

(d)    Fail to maintain insurance as required by this Declaration; or

41



(e)    Use hazard insurance proceeds for any Common Area losses for other than the repair, replacement, or reconstruction of such property.

First Mortgagees may, jointly or singly, pay taxes or other charges that are in default and that may or have become a charge against the Common Area and may pay overdue premiums of property insurance policies, or secure new property insurance coverage upon the lapse of an Association policy, and first Mortgagees making such payments shall be entitled to immediate reimbursement from the Association.

**8.03   Other Provisions for First Mortgages.** To the extent possible under Nevada law:

(a)    Any restoration or repair of the Property after a partial condemnation or damage due to an insurable hazard shall be performed substantially in accordance with this Declaration and the original plans and specifications unless the approval is obtained of the Eligible Holders on Lots to which at least fifty-one percent (51%) of the votes of Lots subject to Mortgages held by such Eligible Holders are allocated.

(b)    Any election to terminate the Association after substantial destruction or a substantial taking in condemnation shall require the approval of the Eligible Holders on Lots to which at least fifty-one percent (51%) of the votes of Lots subject to Mortgages held by such Eligible Holders are allocated.

(c)    Any election to terminate the Association other than for the causes described in subsection 8.03(b) shall require the approval of the Eligible Holders on Lots to which at least sixty-seven percent (67%) of the votes of the Lots subject to the mortgages held by such Eligible Holders are allocated.

**8.04   No Priority.** No provision of the Declaration or the Bylaws gives or should be construed as giving any Owner or another party priority over any rights of the first Mortgagee of any Lot in the case of distribution to such Owner of insurance proceeds or condemnation awards for losses to or a taking of the Common Area.

**8.05   Notice to Association.** Upon request, each Owner shall be obligated to furnish to the Association the name and address of the holder of any Mortgage encumbering such Owner's Lot.

**8.06   Amendment by Board.** Should the Federal National Mortgage Association or the Federal Home Loan Mortgage Corporation subsequently delete any of its respective requirements that necessitate the provisions of this Article or make any such requirements less stringent, the Board, without the approval of the Owners, may Record an amendment to this Article to reflect such changes.

42

2002051O
.01313

**8.07   Applicability.**  Nothing contained in this Article shall be construed to reduce the percentage vote that must otherwise be obtained under this Declaration, the Bylaws, or Nevada law for any of the acts set out in this Article.

**8.08   Failure of Mortgagee to Respond.**  Any Mortgagee who receives a written request from the Board to respond to or consent to any action shall be deemed to have approved such action if the Association does not receive a written response from the Mortgagee within thirty (30) days of the date of such Mortgagee's receipt of the Association's request, provided such request is delivered to the Mortgagee by certified or registered mail, return receipt requested.

**ARTICLE IX.**

Annexation

**9.01   Annexation of Additional Property by Association.**  Upon the approval of two-thirds (2/3) or more of the Members of the Association, the owner of any real property who desires to subject that property to the covenants, conditions, and restrictions of this Declaration and subject that property to the jurisdiction of the Association may Record a Declaration of Annexation, which shall extend the covenants, conditions, and restrictions of this Declaration to such property.

**9.02   Annexation by Declarant.**  Subject to Section 2.11 hereof, if within seven (7) years of the date of the Recording of this Declaration in the Official Records of the Clark County Recorder Declarant desires to develop additional phases in the Annexable Area in its sole and absolute descretion, such additional phases or any portion thereof may be added to the Property, be subjected to this Declaration, and be included within the jurisdiction of the Association by action of Declarant without the consent of the Members or Eligible Holders.  All Common Area Improvements in each phase of the Annexable Area will be substantially completed prior to annexation.  Improvements constructed or located in the Annexable Area shall be consistent in terms of quality of construction and architectural design with the Improvements located elsewhere on the Property.

**9.03   Procedure for Annexation.**  Any annexation may be accomplished by the Recording of a Declaration of Annexation, which shall state that Owners of Lots in the Annexable Area shall also be Members.  At the time of Recording of the Declaration of Annexation, Declarant shall also by deed or assignment, as the case may be, transfer to the Association the Association Property in the area being annexed.  The obligation of an Owner to pay Assessments or fees to the Association and the right of an Owner to exercise voting rights in the Association in any Annexable Area shall not commence until both of the following occur:  (a) such portion of the Annexable Area containing the Lot owned by the Owner is actually annexed to and becomes a part of the Property; and (b) the first day of the month following the close of the first sale of a Lot by Declarant to an Owner other than Declarant in that particular portion of the Annexable Area.

43

200205 10
.01313

**9.04  Deannexation**.  Declarant may delete all or any portion of the phase of development from coverage of this Declaration and the jurisdiction of the Association so long as Declarant is the owner of all of that phase and provided that:

(a)  the Notice of Deannexation is Recorded in the same manner as the applicable Declaration of Annexation was Recorded;

(b)  Declarant has not exercised any rights to vote with respect to any portion of such phase;

(c)  Assessments have not yet commenced with respect to any portion of such phase;

(d)  no Lot has been sold in such phase to a member of the general public; and

(e)  the Association has not made any expenditures or incurred any obligation respecting any portion of such phase.

## ARTICLE X.

### General Provisions

**10.01  Term**.  This Declaration, including all of the covenants, conditions, and restrictions hereof, shall run until the date fifty (50) years hereafter, unless amended as herein provided. After the date fifty (50) years hereafter, this Declaration, including all such covenants, conditions, and restrictions, shall be automatically extended for successive periods of ten (10) years each, unless amended or extinguished by a written instrument executed by at least two thirds (2/3) of the Owners and recorded in the Official Records of the County Recorder of Clark County, Nevada.

**10.02  Resale of Lots**.  The seller of any Lot shall furnish to the purchaser before execution of any contract for the sale of the Lot or otherwise before conveyance:

(a)  a copy of this Declaration, the Articles, Bylaws, and Rules and Regulations;

(b)  a statement setting forth the amount of the annual Assessments for common expenses and any unpaid Assessment of any kind currently due from the selling Owner; and

(c)  a copy of the current operating budget of the Association.

The selling Lot Owner shall also at such time notify the Association of the proposed sale and provide the Association with the name and address of the new Owner and the

t.\Prm Data\Da7\Comm\Assts\Rstrs\CA45-3.wpd                          44

2002.0510
.01313

proposed date of sale. Nothing in this Section 10.02 shall be construed to require any approval by the Association of the sale of any Lot.

**10.03  Lease of Property.**

(a)    In the event an Owner rents or leases any Lot, the Owner shall provide the Lessee with a copy of this Declaration, the Articles, Bylaws, Rules and Regulations, any rules and regulations adopted by the Architecture Committee, and a list of the members of the Board. The lease or other agreement with the Lessee shall provide that the Lessee shall abide by the provisions of this Declaration, the Articles, Bylaws, Rules and Regulations, and any rules and regulations adopted by the Architecture Committee and that the lease is subject to such provisions. The Association may, after notice to the Owner of the Lot and in addition to any other rights or remedies it may have at law or equity, enforce against the Lessee those remedies set forth in this Declaration and may evict the Lessee if within a twelve (12) month period the Lessee commits three or more material violations of this Declaration, the Articles, Bylaws, Rules and Regulations, or any rules and regulations adopted by the Architecture Committee regardless of whether such violations are cured.

(b)    Any Owner renting or leasing its Lot shall notify the Association of such arrangement and provide the Association with the name of the Lessee and the term of the Lease for occupancy.

(c)    In the event the Association engages an attorney or takes any legal action against a Lessee for violation of this Declaration, the Owner as well as the Lessee shall be subject to the costs and expenses set forth in subsection 10.05(f) hereof.

**10.04  Amendment.**

(a)    Majority Vote. Except as provided in subsection 10.04(c), no amendment of this Declaration shall be effective unless adopted by a majority of the Members. Notwithstanding the foregoing, the consent of sixty-seven percent (67%) of the Members entitled to vote and of Declarant, so long as the Declarant owns any land subject to this Declaration, and the approval of Eligible Holders on Lots to which at least fifty-one percent (51%) of the votes of Lots subject to a Mortgage shall be required to materially amend any provisions of this Declaration, the Bylaws, Articles, or to add any material provisions thereto that establish, provide for, govern, or regulate any of the following:

(i)    voting;

(ii)    Assessments, Assessment liens, or subordination of such liens;

(iii)    reserves for maintenance, repair, and replacement of the Common Area;

45

200020510
.01313

(iv)   insurance or fidelity bonds;

(v)   rights to use the Common Area;

(vi)   responsibility for maintenance and repair of the Property;

(vii)   expansion or contraction of the Property or the annexation or withdrawal of real property to or from the jurisdiction of the Association;

(viii)   boundaries of any Lot;

(ix)   leasing of Lots;

(x)   imposition of any restrictions on an Owner's right to sell or transfer its Lot;

(xi)   establishment of self-management by the Association after professional management has been required by an Eligible Holder;

(xii)   any provisions in this Declaration, the Bylaws, or Articles that are for the express benefit of Eligible Holders, guarantors, or insurers of first Mortgages on Lots;

(xiii)   reallocation of interests in the Common Area; or

(xiv)   convertibility of Lots into Common Area or vice versa.

(b)   Recording of Amendment. Every amendment of this Declaration must be Recorded in the Official Records of the Clark County Recorder, and no amendment of this Declaration shall be effective until executed and so Recorded. Every amendment must be indexed in the grantee's index in the name of the Association and in the grantor's index in the name of the party executing the amendment. Every amendment of this Declaration must be prepared, executed, Recorded, and certified on behalf of the Association by the officer of the Association designated in the Bylaws for that purpose, or in the absence of such designation, by the President of the Association.

(c)   Persons Entitled to Amend. This Declaration may be amended in accordance with NRS §§ 116.2109, 116.2110 by Declarant for the purpose of exercising any developmental rights as set forth in this Declaration.

(d)   Restrictions on Amendment. Except to the extent expressly permitted or required by the provisions of the Act, no amendment may change the boundaries of any particular Lot, the allocated interests of a particular Lot, or the uses to which a particular Lot is restricted in the absence of the consent of the Owner of the Lot affected and the consent of a majority of the Owners of the remaining Lots. No action to challenge the validity of an

J:\Form Data DGP Camp's Sunset Road C&R's 1.wpd

46



amendment adopted by the Association pursuant to NRS § 116.2117 may be brought more than one (1) year after the amendment is recorded.

(e)  Declarant Amendment. Notwithstanding any provision of this Declaration to the contrary, for so long as Declarant owns any portion of the Property, but no later than five (5) years from Recordation of this Declaration, Declarant may unilaterally amend this Declaration by Recording a written instrument signed by Declarant in order to correct technical errors, for clarification, and to conform this Declaration to the requirements of the City of North Las Vegas, the Veterans Administration, the Department of Housing and Urban Development, the Federal Housing Administration, the Federal Home Loan Mortgage Corporation, FNMA, or GNMA.

(f)  Delivery of Amendments to Owners. If any change is made to this Declaration or any of the other governing documents of the Association, the Secretary of the Association shall, within thirty (30) days after the change is made, prepare and cause to be hand-delivered or sent prepaid by United States mail to the mailing address of each Lot or to any other mailing address designated in writing by the Lot Owner, a copy of the change that was made.

**10.05 Enforcement and Nonwaiver.**

(a)  Right of Enforcement. Subject to NRS Chapter 38 and except as otherwise provided herein, any Owner (at its own expense), Declarant, and the Board shall have the right to enforce, by any proceeding at law or in equity and including arbitration proceedings and other forms of mediation, all of the restrictions, conditions, covenants, reservations, liens, and charges now or hereafter imposed by the provisions of this Declaration against any property within the Property and the Owners thereof. Such right of enforcement shall include both damages for and injunctive relief against the breach of any such provision. The right of any Owner to so enforce such provisions shall be equally applicable without regard to whether the property (or other interest) of the Owner seeking such enforcement or the property (or other interest) whereon or with respect to which a violation of such provision is alleged is initially set forth on Exhibit "A" or is hereafter subjected to this Declaration pursuant to Article IX hereof.

(b)  Violation as a Nuisance. Every act or omission by which any provision of this Declaration is violated in whole or in part is hereby declared to be a nuisance and may be enjoined or abated by any Owner (at its own expense), by Declarant, or by the Board, whether or not the relief sought is for negative or affirmative action. However, only Declarant, the Board, and the duly authorized agents of either of them may enforce by self-help any of the provisions of this Declaration and then only if such self-help is preceded by reasonable notice to the Owner in question.

(c)  Violation of Law. Any violation of any federal, state, or local law, ordinance, or regulation pertaining to the ownership, occupancy, or use of any property within the Property

47



is hereby declared to be a violation of this Declaration and subject to all of the enforcement procedures set forth herein.

(d)    Remedies Cumulative. Each remedy provided by this Declaration is cumulative and not exclusive.

(e)    Nonwaiver. The failure to enforce any provision of this Declaration at any time shall not constitute a waiver of the right thereafter to enforce any such provision or any other provision herein.

(f)    Attorneys' Fees. In the event the Board engages legal counsel or takes any legal action, including, but not limited to, arbitration proceedings pursuant to NRS Chapter 38, to enforce the provisions of this Declaration, it shall be entitled to its costs, including reasonable attorneys' fees, incurred in connection therewith.

10.06 Notices. Any notice or communication to be given under the terms of this Declaration shall be in writing and shall be personally delivered or sent by facsimile, overnight delivery, or registered or certified mail, return receipt requested. Notice shall be effective: (a) if personally delivered, when delivered; (b) if by facsimile, on the day of transmission thereof on a proper facsimile machine with confirmed answerback; (c) if by overnight delivery, on the day after delivery thereof to a reputable overnight courier service; and (d) if mailed, at midnight on the third (3rd) business day after deposit in the mail, postage prepaid. Notices shall be addressed to the Person at the address given by such Person to the Association for the purpose of service of notices or to the residence of such Person if no address has been given to the Association. Such address may be changed from time to time by notice in writing given by such Person to the Association.

10.07 Construction.

(a)    Restrictions Severable. Each of the provisions of this Declaration shall be deemed independent and severable, and the invalidity or partial invalidity of any provision or portion thereof shall not affect the validity or enforceability of any other provision.

(b)    Singular Includes Plural. Unless the context requires a contrary construction, the singular shall include the plural and the plural the singular; and the masculine, feminine, or neuter shall each include the masculine, feminine, and neuter.

(c)    Captions. All captions and titles used in this Declaration are intended solely for convenience of reference and shall not enlarge, limit, or otherwise affect that which is set forth in any of the Sections or Articles hereof.

(d)    Liberal Construction. It is the intention of Declarant that this Declaration be liberally construed to promote the purpose of a well-planned community, reserving to

48

20020510
.01313

Declarant the rights necessary to develop the Property and to insure the integrity of the interrelated land uses.

**10.08  State Law.** The provisions of this Declaration shall be governed and interpreted according to the laws of the State of Nevada.

**10.09  Priorities, Inconsistencies.** If there are conflicts or inconsistencies between this Declaration and either the Articles or the Bylaws, the terms and provisions of this Declaration shall prevail.

Declarant has executed this Declaration this _____ day of May, 2002.

**DECLARANT**

Centex Homes of Nevada,
a Nevada general partnership

By: _____
(Signature)

Name: _____
(Print Name)

Title: _____
(Print Title)

STATE OF NEVADA)
                           ) SS:
COUNTY OF CLARK)

On the 15th day of May, 2002, before me, a Notary Public in and for said County and State, personally appeared _____, known (or proved) to me to be the _____ of Centex Homes of Nevada, a Nevada general partnership, and who acknowledged to me that he/she executed the within instrument.



_____
Notary

49

2002 05 10
.01313

EXHIBIT "A"

LOTS 41-44 INCLUSIVE IN BLOCK 12 AND LOTS 26-33 INCLUSIVE IN BLOCK 9
OF RANCHO MIRAGE UNIT II – PHASE 2, AS SHOWN BY MAP THEREOF ON
FILE IN BOOK 102 OF PLATS, PAGE 96, IN THE OFFICE OF THE COUNTY
RECORDER OF CLARK COUNTY, NEVADA.



Exhibit "B"

Legal Description of the Annexable Area,
including Contingent Annexable Area

RANCHO MIRAGE UNIT II-PHASE 2. BEING A SUBDIVISION OF A PORTION
OF LOT 1 OF PARCEL MAP: FILE 96, PAGE 59, LOCATED WITHIN THE
SOUTHEAST QUARTER (SE ¼) OF THE SOUTHWEST QUARTER (SW ¼) OF
SECTION 27, TOWNSHIP 19 SOUTH, RANGE 61 EAST, M.D.M., CITY OF NORTH
LAS VEGAS, CLARK COUNTY, NEVADA.

COMMENCING AT THE SOUTH CENTER SIXTEENTH CORNER OF SAID
SECTION 27; THENCE NORTH 88°47'34" WEST, ALONG THE NORTH LINE OF
THE SOUTHEAST QUARTER (SE1/4) OF THE SOUTHWEST QUARTER (SW1/4)
OF SAID SECTION 27, A DISTANCE OF 331.08 FEET TO THE POINT OF
BEGINNING.

LOTS 21-25, BLOCK 9
LOTS 66-91, BLOCK 10
LOTS 45-56, BLOCK 12

RANCHO MIRAGE UNIT II-PHASE 1. BEING A SUBDIVISION OF A PORTION
OF LOT 1 OF AMENDED PARCEL MAP: FILE 96, PAGE 59, LOCATED WITHIN
THE SOUTHEAST QUARTER (SE 1/4) OF THE SOUTHWEST QUARTER (SW 1/4)
OF SECTION 27, TOWNSHIP 19 SOUTH, RANGE 61 EAST, M.D.M., CITY OF
NORTH LAS VEGAS, CLARK COUNTY NEVADA

LOTS 34-40, BLOCK 9
LOTS 57-65, BLOCK 10

PARCEL ONE: THAT PORTION OF THE SOUTH HALF (S 1/2) OF THE
SOUTHWEST QUARTER (SW 1/4) OF SECTION 27, TOWNSHIP 19 SOUTH,
RANGE 16 EAST, M.D.B.M. MORE PARTICULARLY AS FOLLOWS:

PARCEL ONE AS SHOWN BY MAP THEREOF ON FILE 96 OF PARCEL MAPS,
PAGE 59 IN THE OFFICE OF THE COUNTY RECORDER, CLARK COUNTY,
NEVADA. EXCEPTING THEREFROM PARCELS "A" & "B" SET FORTH BELOW:

PARCEL "A": LOTS 34 THRU 40, INCLUSIVE, IN BLOCK 9 AND 57 THRU 65,
INCLUSIVE, IN BLOCK 10 OF RANCHO MIRAGE UNIT II - PHASE I AS SHOWN
BY MAP THEREOF ON FILE IN BOOK 102 OF PLATS, PAGE 95 IN THE OFFICE
OF THE COUNTY RECORDER, CLARK COUNTY, NEVADA.



PARCEL "B": LOTS 21 THRU 33, INCLUSIVE, IN BLOCK 9, LOTS 66 THRU 91,
INCLUSIVE, IN BLAOCK 10 AND LOTS 41 THRU 56, INCLUSIVE, IN BLOCK 12
OF RANCHO MIRAGE UNIT II - PHASE 2, AS SHOWN BY THE MAP THREROF
ON FILE IN BOOK 102 OF PLATS, PAGE 96 IN THE OFFICE OF THE COUNTY
RECORDER, CLARK COUNTY, NEVADA.

Branch :FLV,User :EDLE                    Comment:                                    Station Id :X7QR

20020510
.01313

Exhibit "C"

Legal Description of the Contingent Annexable Area

PARCEL ONE: THAT PORTION OF THE SOUTH HALF (S 1/2) OF THE SOUTHWEST QUARTER (SW 1/4) OF SECTION 27, TOWNSHIP 19 SOUTH, RANGE 16 EAST, M.D.B.M. MORE PARTICULARLY AS FOLLOWS:

PARCEL ONE AS SHOWN BY MAP THEREOF ON FILE 96 OF PARCEL MAPS, PAGE 59 IN THE OFFICE OF THE COUNTY RECORDER, CLARK COUNTY, NEVADA, EXCEPTING THEREFROM PARCELS "A" & "B" SET FORTH BELOW:

PARCEL "A": LOTS 34 THRU 40, INCLUSIVE, IN BLOCK 9 AND 57 THRU 65, INCLUSIVE, IN BLOCK 10 OF RANCHO MIRAGE UNIT II - PHASE 1 AS SHOWN BY MAP THEREOF ON FILE IN BOOK 102 OF PLATS, PAGE 95 IN THE OFFICE OF THE COUNTY RECORDER, CLARK COUNTY, NEVADA.

PARCEL "B": LOTS 21 THRU 33, INCLUSIVE, IN BLOCK 9, LOTS 66 THRU 91, INCLUSIVE, IN BLAOCK 10 AND LOTS 41 THRU 56, INCLUSIVE, IN BLOCK 12 OF RANCHO MIRAGE UNIT II - PHASE 2, AS SHOWN BY THE MAP THREROF ON FILE IN BOOK 102 OF PLATS, PAGE 96 IN THE OFFICE OF THE COUNTY RECORDER, CLARK COUNTY, NEVADA.

2002 05 10
.01313

**Exhibit "D"**

**Site Development Plan**

1 Form Date DGF Copers' Senior Direct FC.d.Rz 2 mgrd

˙ APPROVED BY THE CLARK COUNTY DISTRICT BOARD OF HEALTH.
_ CONCERNS SEWAGE DISPOSAL, WATER POLLUTION, WATER QUALITY 20020510
SUPPLY FACILITIES AND IS PREDICATED UPON PLANS FOR A PUBLIC .01313
_Y AND A COMMUNITY SYSTEM FOR DISPOSAL OF SEWAGE.

*(signature)*                                    08/22/01

OARD OF HEALTH - WALTER B. ROSS                  DATE

## NG COMMISSION APPROVAL

ERTIFY THAT THIS MAP IS APPROVED AND ACCEPTED, ON BEHALF OF
. ANY PARCELS OF LAND OFFERED FOR DEDICATION FOR PUBLIC USE IN
WITH THE TERMS OF THE OFFER OF DEDICATION.  FURTHERMORE, I
IS MAP IS IN SUBSTANTIAL COMPLIANCE WITH THE TENTATIVE MAP AND
IONS HAVE BEEN MET THIS *fourth* DAY OF *December* , 2001 .

*(signature)*

GIER
T DIRECTOR

## OF BEARINGS

40' 41" WEST, BEING THE BEARING OF ANN ROAD, SAME BEING THE
SOUTH LINE OF THE SOUTHWEST QUARTER (SW 1/4) OF SECTION 27,
19 SOUTH, RANGE 61 EAST, M.D.M., CLARK COUNTY, NEVADA, AS
THAT CERTAIN PARCEL MAP ON FILE IN THE OFFICE OF THE COUNTY
CLARK COUNTY, NEVADA, IN FILE 81 OF PARCEL MAPS, AT PAGE 06.

## RECORDER'S NOTE

QUENT CHANGES TO THIS MAP SHOULD BE
ND MAY BE DETERMINED BY REFERENCE
ITY RECORDER'S CUMULATIVE MAP INDEX.
5

W. O. 5503-1
SHEET 1 OF 2
VCL

| NO. | 01031 |
|---|---|

FILED AT THE REQUEST OF :

VTN nevada

DATED 12-13-2001 AT 10:38 AM
BOOK 102 PAGE 0096
OF PLATS
OFFICIAL RECORDS BOOK. NO. 20011213

CLARK COUNTY, NEVADA RECORDS
JUDITH A. VANDEVER, RECORDER

FEE $ 64.00 DEPUTY SAX



VIN PLS 12483

| 17 | LOT NUMBER / RESIDENTIAL LOTS = 16 |
| | COMMON ELEMENT LOTS =  2 |
| | TOTAL LOTS = 18 |

20020910
.01313

⬡ 3        BLOCK NUMBER

◉          FOUND MONUMENT AS INDICATED

C25        CURVE NUMBER
L22        COURSE NUMBER
R19        RADIAL LINE NUMBER
(R)        RADIAL
S.F.       SQUARE FEET
(PROD)     PRODUCED LINE
(PRC)      POINT OF REVERSE CURVE
(PCC)      POINT OF COMPOUND CURVE
C.E.       COMMON ELEMENT

           SIGHT VISIBILITY RESTRICTION AREA
           NO VIEW OBSTRUCTIONS OVER
           30" ABOVE TOP OF CURB

## NOTES:

1. ALL LOT CORNERS MUST BE SET WITH A TYPE III MONUMENT. IN THOSE INSTANCES WHERE OFFSITE IMPROVEMENTS EXIST (I.E., REAR PROPRTY WALL AND FRONT CURB), A NAIL AND TAG SHALL BEE SET IN THE WALL AT THE BACK PROPERTY CORNER AND A SAWCUT SHALL BE MADE IN THE TOP OF THE FRONT CURB AT THE PROLONGATION OF THE SIDE PROPERTY LINE.

✱ 2. DIRECT VEHICULAR AND/OR PEDESTRIAN ACCESS TO COMMERCE STREET THROUGH COMMON ELEMENTS FROM ABUTTING LOTS IS PROHIBITED.

3. ALL CORNER LOT SETBACKS ARE CHAMFERED EQUAL TO 1/2 OF THE PROPERTY LINE / RIGHT-OF-WAY CORNER LOT RADIUS.

C.N.L.V.
CAP

W.O. 5503-1
SHEET 2 OF 2
VCL/KAK

20020510
.01313

## T QUARTER (SE 1/4)
## CLARK COUNTY, NEVADA.

### 'OR'S CERTIFICATE

R. RIEKKI, A PROFESSIONAL LAND SURVEYOR LICENSED IN THE EVADA, AS AN AGENT FOR VTN NEVADA, CERTIFY THAT:

PLAT REPRESENTS THE RESULTS OF A SURVEY CONDUCTED UNDER MY T SUPERVISION AT THE INSTANCE OF RANCHO MIRAGE I, L.L.C., A A LIMITED LIABILITY COMPANY.

ANDS SURVEYED LIE WITHIN A PORTION OF THE SE 1/4, OF THE SW OF SECTION 27, T. 19 S., R. 61 E., M.D.M., CITY OF NORTH LAS CLARK COUNTY, NEVADA, AND THE SURVEY WAS COMPLETED ON /99.

PLAT COMPLIES WITH THE APPLICABLE STATE STATUTES AND ANY ORDINANCES IN EFFECT ON THE DATE THAT THE GOVERNING BODY ITS FINAL APPROVAL.

ONUMENTS DEPICTED ON THE PLAT WILL BE OF THE CHARACTER SHOWN OCCUPY THE POSITIONS INDICATED BY: ___12/06/02___ . AN APPROPRIATE FINANCIAL GUARANTEE WILL BE POSTED WITH THE NING BODY BEFORE RECORDATION TO ASSURE THE INSTALLATION OF ENTS.



EKKI, P.L.S.
ENSE NO. 12469

7/08/99

### N OF WATER RESOURCES CERTIFICATE

_ MAP IS APPROVED BY THE DIVISION OF WATER RESOURCES OF THE OF CONSERVATION AND NATURAL RESOURCES CONCERNING WATER JBJECT TO THE REVIEW OF APPROVAL ON FILE IN THIS OFFICE.



200205 10
.91313

T QUARTER (SE 1/4)
CLARK COUNTY, NEVADA.

2" C.N.L.V. BRASS CAP IN
CONCRETE LOCATED UNDER AC
TO BE RESTORED AS TYPE II
MONUMENT AL. CAP "VTN PLS 12469"
UPON COMPLETION OF CONSTRUCTION
OR SET WELL MONUMENT OVER EXISTING
IF STILL IN PLACE

GRAPHIC SCALE

( IN FEET )
1 inch = 40 ft.

LEGEND

P.O.B.          POINT OF BEGINNING
                BOUNDARY LINE
                LOT LINE
                RIGHT—OF—WAY LINE
                STREET CENTERLINE
                BUILDING SETBACK LINE
                FRONT = 18' / REAR = 15'
                SIDE = 5' / CORNER = 10'
●               SET TYPE III MONUMENT
                AL. CAP "VTN PLS 12469"

2002051O
.01313

# UNIT  II — PHASE  1

TEREST COMMUNITY)

[AP: FILE __96__, PAGE __59__, LOCATED WITHIN THE SOUTHE

TH, RANGE 61 EAST, M.D.M., CITY OF NORTH LAS VEG.

## R'S CERTIFICATE

S VEGAS, COUNTY OF CLARK, STATE OF NEVADA, DOES
HAVE EXAMINED THE FINAL MAP OF RANCHO MIRAGE
, THAT THE SUBDIVISION AS SHOWN HEREON IS
1E AS IT APPEARS ON THE TENTATIVE MAP, AND ANY
THEREOF. THAT ALL PROVISIONS OF THE PLANNING AND
TE OF NEVADA AND ANY LOCAL ORDINANCES APPLICABLE
)VAL OF THE TENTATIVE MAP HAVE BEEN COMPLIED WITH.
\TISFIED THIS MAP IS TECHNICALLY CORRECT AND THAT,
/E NOT BEEN SET, A PROPER FINANCIAL GUARANTEE HAS
\NTEEING THEIR SETTING ON OR BEFORE

)AY OF _December_ , _2001_ .

LAURNAL H. GUBLET
(CITY ENGINEER, R.P.E. NO. 3131

)ATE DIRECTOR
UBLIC WORKS

## IPTION

HO MIRAGE UNIT II — PHASE 1

OF A PORTION OF LOT 1 OF THAT CERTAIN AMENDED PLAT
ARCEL MAP (FILE 81, PAGE 06), ON FILE IN THE OFFICE
ORDER, CLARK COUNTY, NEVADA, IN FILE __96__ OF PARCEL
OCATED WITHIN THE SOUTHEAST QUARTER (SE 1/4) OF THE
SW 1/4) OF SECTION 27, TOWNSHIP 19 SOUTH, RANGE 61
Y OF NORTH LAS VEGAS, CLARK COUNTY, NEVADA, MORE
BED AS FOLLOWS:

RTHEAST CORNER OF SAID LOT 1, BEING A POINT ON THE
AY OF COMMERCE STREET; THENCE SOUTH 00°36'28" EAST,
Y BOUNDARY OF SAID LOT 1, COINCIDENT WITH SAID

SUR

I. AL
STATE

1. T
C
N

2. T
1
V
C

3. T
L
G

4. T
F
F
C
k

ALAN F
NEVAD/

DIVI

THIS
DEPAR
QUANT:

20020510
.01313

# UNIT II — PHASE 1

TEREST COMMUNITY)
MAP: FILE 94, PAGE 59, LOCATED WITHIN THE SOUTHI
TH, RANGE 61 EAST, M.D.M., CITY OF NORTH LAS VEG

RCEL 2 PARCEL MAP FILE 94, PAGE 81
APN 124-27-301-008



CT, 2019 FEET ALONG SAID CURVE THROUGH A CENTRAL
."; THENCE NORTH 25° 47' 23" WEST, 48.00 FEET; THENCE
ST, 4.75 FEET; THENCE NORTH 00° 36' 29" WEST, 159.20
H 08° 03' 34" WEST, 153.61 FEET TO THE NORTHERLY
LOT 1; THENCE SOUTH 88° 47' 34" EAST, ALONG SAID
281.06 FEET TO THE POINT OF BEGINNING.

CRES, MORE OR LESS, AS DETERMINED BY COMPUTER

2002 05 10
.01313

THIS F
THIS
AND WA
WATER

DISTRI

## SURVEY ANALYSIS
### NOT TO SCALE



FOUND 2" C.N.L.V.
BRASS CAP
IN CONCRETE

S 1/16
S27

2701.90'          949.28'

LOT 1
PM FILE 26, PAGE 59

Rancho Mirage Phase II – Unit 1

1355.78'

COMMERCE STREET

50.00'

RANCHO MIRAGE UNIT 1
OOK 65 OF PLATS, PAGE 09

LOT 2
PM FILE 26, PAGE 59

N00°36'29"W

50.00'

41"W          2708.96'

ROAD

FOUND 4" C.N.L.V.
ALUMINUM CAP

1/4
S27
S34

PLA
I HERE
THE PU
CONFOR
CERTI
ALL CO

ACTING DEVEL

BAS
NORTH
BEARIN
TOWNS
SHOWN
RECORI

COU
ANY S
EXAMIN
TO THE
NRS 2







DETAIL "B"
NOT TO SCALE

**TYPICAL LOT SETBACKS**
NOT TO SCALE

| RADIUS | CHAMFER |
|--------|---------|
| 15'    | 7.5'    |
| 20'    | 10'     |
| 25'    | 12.5'   |
| 30'    | 15'     |

**NOTE:**
CHAMFER DIMENSION AT ALL
CORNER LOT SETBACKS EQUALS
1/2 OF THE PROPERTY LINE/
RIGHT-OF-WAY CORNER LOT RADIUS.

RECORDER'S MEMO
POSSIBLE POOR RECORD DUE TO
QUALITY OF ORIGINAL DOCUMENT

200205 10
.01313

# RANCHO MIRAG

(A COMMON

DIVISION OF A PORTION OF LOT 1 OF AMENDED PARCE

ST QUARTER (SW 1/4) OF SECTION 27, TOWNSHIP 19 S

## DEDICATION

NEVADA LIMITED LIABILITY COMPANY,
OWNER OF THE PARCEL OF LAND WHICH
RAGE UNIT II — PHASE 1, AND DESCRIBED
AND DOES HEREBY CONSENT TO THE
PLAT, AND DOES HEREBY OFFER AND
EASEMENTS AND PUBLIC PLACES AS
E REQUIREMENTS OF N.R.S. 278.010 TO
D TO THE CITY OF NORTH LAS VEGAS FOR
E UNDERSIGNED OWNER OF THE WITHIN
D CONVEY TO THE CITY OF NORTH LAS
PORATION, NEVADA POWER COMPANY,
COX COMMUNICATIONS LAS VEGAS,
A PERMANENT EASEMENT AND RIGHT-OF-
JTILITY EASEMENTS (P.U.E.), PRIVATE
EE FOOT (3') WIDE EASEMENT ON ALL
RVICES TO METER PANELS; A FIVE FOOT
LINES ABUTTING PUBLIC AND PRIVATE
ANSFORMER PADS AND ABOVE GROUND
ITH AND ADDITIONAL TWO FEET (2')
THE PLATTED LANDS FOR THE
AND FINAL REMOVAL OF UNDERGROUND
AND GAS LINES AND APPURTENANCES
HERETO; FURTHERMORE, THE UNDERSIGNED
DS DOES HEREBY WAIVE DIRECT ACCESS
THIS SUBDIVISION INCLUDING BUT NOT
THE FOLLOWING STREETS: COMMERCE
HTS SHALL BE A COVENANT ATTACHED TO
EVERY PORTION OF THE SUBDIVISION AND
OVENANT RUNNING WITH THE LAND.

_____  _1999_

TED LIABILITY COMPANY, BY:
PORATION, BY:

## CITY ENGIN

THE CITY OF NORT
HEREBY CERTIFY T
UNIT II — PHAS
SUBSTANTIALLY TH
APPROVED ALTERAT
ZONING ACT OF TH
AT THE TIME OF
FURTHERMORE, I
IF THE MONUMENT
BEEN POSTED
_12/06/0L_

DATED THIS _6 7º_

## LEGAL DE:

BEING A SUBDIV
OF A PORTION
OF THE COUNT'
MAPS, AT PAGE :
SOUTHWEST QUAR'
EAST, M.D.M.,
PARTICULARLY DI

BEGINNING AT TI
WESTERLY RIGHT
ALONG THE EA:



# RANCHO MIRAG

## (A COMMON

DIVISION OF A PORTION OF LOT 1 OF AMENDED PARCE

ST QUARTER (SW 1/4) OF SECTION 27, TOWNSHIP 19

Branch :FLV,User :EDLE                Comment:                                Station Id :X7QR

2002051 0
.01313

BEING A S
OF THE SOUTH

## OWNER'S CERTIFICATE

RANCHO    MIRAGE    I,   L.L.C.,
DOES  HEREBY  CERTIFY  THAT  IT  IS
IS  SHOWN  UPON  THIS PLAT OF RANC
IN    THE  SURVEYOR'S  CERTIFICATE  I-
PREPARATION  AND  RECORDATION  OF
DEDICATE   ALL    THE    STREETS,  AL
INDICATED  AND  OUTLINED  HEREON,  F
278.630,  INCLUSIVE,  AND  TITLE  16.
THE  USE  OF  THE  PUBLIC;  FURTHERMOF
PLATTED  LANDS  DOES  HEREBY  GRAN
VEGAS,  NEVADA,  SOUTHWEST   GAS
CENTRAL   TELEPHONE   COMPANY,   /
INC.,     THEIR  SUCCESSORS  AND  AS!
WAY   AS   SHOWN  HEREON  AS  PUBL
STREETS,    AND  COMMON  ELEMENTS;
SIDE PROPERTY LINES AND UNDERGROL
(5')   WIDE  EASEMENT  ON  ALL  PRC
STREETS    AND   ABOVE   GROUND
TELEPHONE  EQUIPMENT  PADS  TOGETH
AROUND     TRANSFORMER  PADS  WI
CONSTRUCTION,   MAINTENANCE,  OPEF
POWER,  TELEPHONE,   WATER, CABLE
TOGETHER  WITH  THE  RIGHT OF ACCES
OWNER   OF   THE   WITHIN  PLATTE
RIGHTS   FROM   ABUTTING LOTS   \
LIMITED   TO,   VEHICULAR   ACCES!
STREET.   THIS   WAIVER  OF  ACCESS
THE   LAND   AND PASS   WITH  EACI-
SHALL HAVE THE FORCE AND EFFECT (

DATED THIS  __19th__ DAY OF  __A__

RANCHO MIRAGE I, L.L.C., A NEVAD.
SPECIALTY HOLDINGS, INC., A NEVA!

20020510
.01313

THE PURPOSE OF THIS CERTIFICATE OF AMENDMENT IS TO (1) CORRECT A STREET NAME AND (2) PROVIDE RECORDING INFORMATION, WHICH WAS OMITTED, FROM SAID PLAT.

(1) THE STREET NAME CACTUS AVENUE IS HEREBY AMENDED TO READ AS CACTUS SANDS AVENUE ON SHEET 2 OF 2.

(2) THE MISSING RECORDING INFORMATION FOR THE AMENDED PARCEL MAP SHOWN WITHIN COMMERCE STREET AND THE SOUTHERLY ADJOINER IS AS FOLLOWS: FILE 94, PAGE 39 ON SHEET 2 OF 2.

BEING A
OF THE SOUT

## CURVE TABLE

| CURVE | RADIUS | LENGTH | TA |
|-------|--------|--------|-----|
| C1 | 498.50' | 23.15' | 1 |
| C2 | 44.00' | 23.91' | 1 |
| C3 | 44.00' | 76.56' | 5 |
| C4 | 44.00' | 61.63' | 3 |
| C5 | 44.00' | 47.27' | 2 |
| C6 | 20.00' | 14.38' | |
| C7 | 20.00' | 3.70' | |
| C8 | 20.00' | 14.26' | |
| C9 | 20.00' | 18.08' | |
| C10 | 44.00' | 209.37' | 4 |
| C11 | 25.00' | 17.69' | |
| C12 | 25.00' | 39.27' | 2 |
| C13 | 25.00' | 21.58' | 1 |
| C14 | 274.00' | 29.70' | 1 |
| C15 | 250.00' | 109.88' | 5 |
| C16 | 20.00' | 33.58' | 2 |
| C17 | 20.00' | 23.92' | 1 |
| C18 | 274.00' | 5.42' | |
| C19 | 20.00' | 40.21' | |
| C20 | 20.00' | 28.32' | 1 |
| C21 | 226.00' | 35.04' | 1 |
| C22 | 250.00' | 77.02' | |
| C23 | 250.00' | 32.85' | 1 |
| C24 | 25.00' | 39.27' | 2 |

20020510
.01313

## ACKNOWLEDGEMENT

STATE OF NEVADA )
                 ) SS
COUNTY OF CLARK )

THIS INSTRUMENT WAS ACKNOWLEDGED
*1999* BY JERRY GOEDEN AS PRESIDENT
NEVADA CORPORATION, AS MANAGING M
A NEVADA LIMITED LIABILITY COMPAN

*Kathleen Gall*
KATHLEEN GALL
NOTARY PUBLIC IN AND FOR SAID COU
MY COMMISSION EXPIRES: *AUGUST*

## CERTIFICATE OF EASE

WE, THE HEREIN NAMED UTILITY COMP
GRANT OF THE DESIGNATED EASEMENTS

*Marie Rippo*
COX COMMUNICATIONS LAS VEGAS, INC

*Lisa C. Corbett*  LISA C. C
NEVADA POWER COMPANY

*Richard m Hood*  RICHARD
SPRINT

*John P. Glymark*  Jo
SOUTHWEST GAS CORPORATION

*Laurnal H. Gubler*
CITY OF NORTH LAS VEGAS, UTILITY
LAURNAL H— GUBLER

| C32 | 44.00' | 61.62 | 57 |
| C33 | 48000510 63.98' | | 39 |
| C34 | 440013  34.55' | | 18. |
| C35 | 20.00' | 12.69' | 6. |

## RADIAL LINE TABLE

| LINE | BEARING | LENGTH |
|------|---------|--------|
| R1 | N78°48'05"E | 13.00' |
| R2 | N37°35'48"E | 12.00' |
| R3 | N80°51'18"W | 13.00' |
| R4 | S80°54'29"E | 13.00' |
| R5 | S49°46'02"E | 12.00' |
| R6 | S50°03'23"E | 13.00' |
| R7 | N18°15'38"W | 13.00' |
| R8 | N09°29'28"W | 11.00' |
| R9 | N06°49'10"W | 12.00' |
| R10 | N24°39'25"W | 12.00' |
| R11 | N48°51'23"E | 13.00' |
| R12 | S35°20'28"E | 12.00' |
| R13 | S81°33'32"W | 13.00' |
| R14 | S81°59'11"E | 13.00' |
| R15 | S53°01'33"W | 12.00' |
| R16 | S80°15'25"E | 13.00' |
| R17 | S23°07'43"E | 13.00' |

## COURSE TABLE

| LINE | BEARING | LENGTH |
|------|---------|--------|
| L1 | N64°12'37"E | 4.75' |
| L2 | N25°47'23"W | 48.00' |
| L3 | N89°23'31"E | 7.54' |
| L4 | N89°23'31"E | 4.42' |
| L5 | N00°36'29"W | 11.49' |
| L6 | S01°19'19"W | 16.47' |

| ACT | DATE | BY | REV |
|-----|------|----|-----|
| 2 | 12/06/01 | VCL | REVISED LOT LINE BETWEEN LOT 34 & |
| 1 | 8/23/99 | KAK | ADD SVRE'S AND DETAIL. REV. MONUM |



; MAP IS APPROVED BY THE CLARK COUNTY DISTRICT BOARD OF HEALTH. 20020510
IVAL CONCERNS SEWAGE DISPOSAL, WATER POLLUTION, WATER QUALITY. 01313
SUPPLY FACILITIES AND IS PREDICATED UPON PLANS FOR A PUBLIC
.Y AND A COMMUNITY SYSTEM FOR DISPOSAL OF SEWAGE.

IARD OF HEALTH – WALTER B. ROSS                    08/28/01
                                                   DATE

## NG COMMISSION APPROVAL

:RTIFY THAT THIS MAP IS APPROVED AND ACCEPTED, ON BEHALF OF
ANY PARCELS OF LAND OFFERED FOR DEDICATION FOR PUBLIC USE IN
WITH THE TERMS OF THE OFFER OF DEDICATION. FURTHERMORE, I
IS MAP IS IN SUBSTANTIAL COMPLIANCE WITH THE TENTATIVE MAP AND
IONS HAVE BEEN MET THIS _tenth_ DAY OF _December_ , 2001 .

IBLER
T DIRECTOR

## OF BEARINGS

;0' 41" WEST, BEING THE BEARING OF ANN ROAD, SAME BEING THE
SOUTH LINE OF THE SOUTHWEST QUARTER (SW 1/4) OF SECTION 27,
9 SOUTH, RANGE 61 EAST, M.D.M., CLARK COUNTY, NEVADA, AS
HAT CERTAIN PARCEL MAP ON FILE IN THE OFFICE OF THE COUNTY
:LARK COUNTY, NEVADA, IN FILE 81 OF PARCEL MAPS, AT PAGE 06.

## RECORDER'S NOTE

UENT CHANGES TO THIS MAP SHOULD BE
JD MAY BE DETERMINED BY REFERENCE
TY RECORDER'S CUMULATIVE MAP INDEX.

W. O. 5503 (2)
SHEET 1 OF 3

NO. _01039_

FILED AT THE REQUEST OF :

VTN nevada

DATED _12-13-2001_ AT _10:38_ A M
BOOK _102_          PAGE _0096_
          OF PLATS
OFFICIAL RECORDS BOOK, NO. _2001213_

CLARK COUNTY, NEVADA RECORDS
JUDITH A. VANDEVER, RECORDER
FEE $ _74.00_ DEPUTY _SHC_

20020510
04313

| | |
|---|---|
| ✳ | NAIL AND BRASS TAG "VTN PLS 12469" SET PER "RANCHO MIRAGE UNIT 11 — PHASE BOOK 102 OF PLATS, PAGE 95 |
| **17** | LOT NUMBER / TOTAL LOTS = 55 |
| ⬡3 | BLOCK NUMBER |
| ◉ | FOUND MONUMENT AS INDICATED |
| C25 | CURVE NUMBER |
| L22 | COURSE NUMBER |
| R19 | RADIAL LINE NUMBER |
| (R) | RADIAL |
| S.F. | SQUARE FEET |
| (PRC) | POINT OF REVERSE CURVE |
| (PCC) | POINT OF COMPOUND CURVE |

## TYPICAL LOT SETBACKS

NOT TO SCALE



| RADIUS | CHAMFER |
|---|---|
| 15' | 7.5' |
| 20' | 10' |
| 25' | 12.5' |
| 30' | 15' |

15.00' REAR

5.00' SIDE

18.00' FRONT

10.00' CORNER

**NOTE:**
CHAMFER DIMENSION AT ALL
CORNER LOT SETBACKS EQUALS
1/2 OF THE PROPERTY LINE/
RIGHT-OF-WAY CORNER LOT RADIUS.

W.O. 5503 (2)
SHEET 2 OF 3

VCL

20020510
.01313

## ARTER (SE 1/4)
### CLARK COUNTY, NEVADA.

### YOR'S CERTIFICATE

R. RIEKKI, A PROFESSIONAL LAND SURVEYOR LICENSED IN THE
EVADA, AS AN AGENT FOR VTN NEVADA, CERTIFY THAT:

PLAT REPRESENTS THE RESULTS OF A SURVEY CONDUCTED UNDER MY
T SUPERVISION AT THE INSTANCE OF RANCHO MIRAGE I, L.L.C., A
A LIMITED LIABILITY COMPANY.

ANDS SURVEYED LIE WITHIN A PORTION OF THE SE 1/4, OF THE SW
OF SECTION 27, T. 19 S., R. 61 E., M.D.M., CITY OF NORTH LAS
, CLARK COUNTY, NEVADA, AND THE SURVEY WAS COMPLETED ON
/99.

PLAT COMPLIES WITH THE APPLICABLE STATE STATUTES AND ANY
ORDINANCES IN EFFECT ON THE DATE THAT THE GOVERNING BODY
ITS FINAL APPROVAL.

ONUMENTS DEPICTED ON THE PLAT WILL BE OF THE CHARACTER SHOWN
OCCUPY THE POSITIONS INDICATED BY: _12/12/02_
AN APPROPRIATE FINANCIAL GUARANTEE WILL BE POSTED WITH THE
NING BODY BEFORE RECORDATION TO ASSURE THE INSTALLATION OF
ENTS.



EKKI, P.L.S.
ENSE NO. 12469

7/27/99

### N OF WATER RESOURCES CERTIFICATE

L MAP IS APPROVED BY THE DIVISION OF WATER RESOURCES OF THE
OF CONSERVATION AND NATURAL RESOURCES CONCERNING WATER
UBJECT TO THE REVIEW OF APPROVAL ON FILE IN THIS OFFICE.

20020510
.01313

W.O. 5503 (2)
SHEET 3 OF 3
VCL



20020510
.01313

RTER (SE 1/4)
CLARK COUNTY, NEVADA.

-P.O.C.

C
S 1/16
S27
C

2" C.N.L.V. BRASS CAP IN
CONCRETE LOCATED UNDER AC
TO BE RESTORED AS TYPE II
MONUMENT AL. CAP "VTN PLS 12469"
UPON COMPLETION OF CONSTRUCTION
OR SET WELL MONUMENT OVER EXISTING
IF STILL IN PLACE

COMMERCE STREET

GRAPHIC SCALE

( IN FEET )
1 inch = 40 ft.

LEGEND

P.O.C.   POINT OF COMMENCEMENT
P.O.B.   POINT OF BEGINNING

———————   BOUNDARY LINE
———————   LOT LINE
———————   RIGHT-OF-WAY LINE
— — — —   STREET CENTERLINE
— · — · —   BUILDING SETBACK LINE
          FRONT = 20'/7' REAR = 15'
          SIDE = 5' / CORNER = 10'
   ●       SET TYPE III MONUMENT
          AL CAP "VTN PLS 12469"

200205 10
.01313

...RTER (SE 1/4)

CLARK COUNTY, NEVADA.

**...DIAL LINE TABLE**

| ...NE | BEARING | LENGTH |
|---|---|---|
| ...1 | S23°07'43"E | 13.00' |
| ...2 | S16°57'17"E | 13.00' |
| ...3 | S10°59'39"E | 13.00' |
| ...4 | S05°10'00"E | 13.00' |
| ...5 | S00°35'39"W | 13.00' |
| ...6 | S09°05'21"E | 13.00' |
| ...7 | S04°04'05"E | 11.00' |
| ...8 | S15°57'40"E | 11.00' |
| ...9 | S58°09'56"E | 12.00' |
| ...10 | S84°15'18"E | 13.00' |
| ...11 | N62°46'39"E | 13.00' |
| ...12 | N30°37'19"E | 13.00' |
| ...13 | N02°15'20"W | 13.00' |
| ...14 | N31°14'07"W | 12.00' |
| ...15 | N33°38'59"E | 12.00' |
| ...16 | N19°24'50"E | 13.00' |
| ...18 | N56°56'58"E | 12.00' |
| ...19 | N72°04'29"E | 13.00' |

20020510
.01313

# UNIT II – PHASE 2

ITEREST COMMUNITY)

FILE **96**, PAGE **59**, LOCATED WITHIN THE SOUTHEAST

JTH, RANGE 61 EAST, M.D.M., CITY OF NORTH LAS VEC

ER'S CERTIFICATE                                                          SU

S VEGAS, COUNTY OF CLARK, STATE OF NEVADA, DOES          I, /
I HAVE EXAMINED THE FINAL MAP OF RANCHO MIRAGE           STATE
, THAT THE SUBDIVISION AS SHOWN HEREON IS
ME AS IT APPEARS ON THE TENTATIVE MAP, AND ANY           1.
THEREOF. THAT ALL PROVISIONS OF THE PLANNING AND
ATE OF NEVADA AND ANY LOCAL ORDINANCES APPLICABLE
OVAL OF THE TENTATIVE MAP HAVE BEEN COMPLIED WITH.       2.
ATISFIED THIS MAP IS TECHNICALLY CORRECT AND THAT,
VE NOT BEEN SET. A PROPER FINANCIAL GUARANTEE HAS
ANTEEING THEIR SETTING ON OR BEFORE

DAY OF _December_ , _2001_                                3.

4.

CONRAD L GUGLER, R.P.E.  NO. 7131

ATE DIRECTOR  CITY ENGINEER
BLIC WORKS

RIPTION                                                  ALAN
                                                         NEVA
CHO MIRAGE UNIT II – PHASE 2

ION OF A PORTION OF LOT 1 OF THAT CERTAIN "AMENDED
OF PARCEL MAP (FILE 81, PAGE 06)", ON FILE IN THE        DI
JNTY RECORDER, CLARK COUNTY, NEVADA, IN FILE **96** OF   THIS
3E **59** LOCATED WITHIN THE SOUTHEAST QUARTER (SE 1/4)  DEPA
QUARTER (SW 1/4) OF SECTION 27, TOWNSHIP 19 SOUTH,       QUAN
O.M., CITY OF NORTH LAS VEGAS, CLARK COUNTY, NEVADA,
DESCRIBED AS FOLLOWS:

SOUTH CENTER SIXTEENTH CORNER OF SAID SECTION 27;
47' 34" WEST, ALONG THE NORTH LINE OF THE SOUTHEAST

200205.10
.01313

# UNIT II – PHASE 2

## (TEREST COMMUNITY)
## FILE 96, PAGE 59, LOCATED WITHIN THE SOUTHEAST
## JTH, RANGE 61 EAST, M.D.M., CITY OF NORTH LAS VEG

E 94, PAGE 81
08





# UNIT II – PHASE 2

NTEREST COMMUNITY)

FILE 96, PAGE 59, LOCATED WITHIN THE SOUTHEAST

UTH, RANGE 61 EAST, M.D.M., CITY OF NORTH LAS VE(

### COURSE TABLE

| LINE | BEARING | LENGTH |
|------|---------|--------|
| L1 | S64°12'37"W | 4.75' |
| L2 | S25°47'23"E | 48.00' |

20020510
.01313

THIS
THIS
AND W.
WATER

. ANGLE OF 02° 39' 40"; THENCE SOUTH 01° 19' 19" WEST,
. NORTHERLY BOUNDARY OF LOT 2 OF SAID "AMENDED PLAT
CEL MAP (FILE 81, PAGE C6)": THENCE NORTH 88° 40' 41"
NORTHERLY BOUNDARY, 450.00 FEET; THENCE ALONG THE
COURSES: (1) SOUTH 00°36'24" EAST, 91.44 FEET; (2)
EST, 160.72 FEET; (3) NORTH 00° 36' 29" WEST, 20.61
23' 31" WEST, 100.00 FEET; (5) NORTH 00° 36' 29" WEST,
NORTH LINE OF THE SOUTHEAST QUARTER (SE 1/4) OF THE
(SW 1/4) OF SAID SECTION 27; THENCE SOUTH 88° 47' 34"
RTH LINE, 701.16 FEET TO THE POINT OF BEGINNING.

DISTR

CRES, MORE OR LESS, AS DETERMINED BY COMPUTER

PLA

I HER
THE P
CONFO
CERTI
ALL C

ACTING  DEVEL

BA:
NORTH
BEARI
TOWNS
SHOWN
RECOR

COU

ANY
EXAMIN
TO THI
NRS 2



LOT 2 OF AMENDED PLAT OF PARCEL MAP
FILE 96, PAGE 59.

T BE SET WITH A TYPE III MONUMENT. IN THOSE
TE IMPROVEMENTS EXIST (I.E. REAR PROPERTY
. A NAIL AND TAG SHALL BEE SET IN THE WALL
   CORNER AND A SAW CUT SHALL BE MADE IN
CURB AT THE PROLONGATION OF THE SIDE

RKS ARE CHAMFERED EQUAL TO 1/2 OF THE
-OF-WAY CORNER LOT RADIUS.

E. COURSE. AND RADIAL LINE TABLES.

RECORDER'S MEMO
POSSIBLE POOR RECORD DUE TO
QUALITY OF ORIGINAL DOCUMENT



20020510
.01313

# RANCHO MIRAC

## (A COMMON

## SUBDIVISION OF A PORTION OF LOT 1 OF PARCEL M/
## ST QUARTER (SW 1/4) OF SECTION 27, TOWNSHIP 19

### D DEDICATION

_IMITED LIABILITY COMPANY, DOES
OF THE PARCEL OF LAND THAT IS
UNIT II — PHASE 2, AND DESCRIBED
AND DOES HEREBY CONSENT TO THE
'LAT, AND DOES HEREBY OFFER AND
EASEMENTS AND PUBLIC PLACES AS
E REQUIREMENTS OF N.R.S.  278.010
6.050 TO THE CITY OF  NORTH LAS

THE WITHIN PLATTED  LANDS DOES
Y OF NORTH LAS VEGAS,  NEVADA,
WER COMPANY, CENTRAL TELEPHONE
GAS, INC., THEIR SUCCESSORS AND
GHT—OF—WAY·AS SHOWN ·HEREON AS
., PRIVATE STREETS, AND COMMON
MENT ON ALL SIDE PROPERTY LINES
NELS: A  FIVE ˙FOOT ˙(5') WIDE
G PUBLIC AND PRIVATE STREETS AND
BOVE GROUND · TELEPHONE  EQUIPMENT
FEET (2') AROUND TRANSFORMER PADS
RUCTION, MAINTENANCE, OPERATION,
R, TELEPHONE, WATER, CABLE T.V.,
GETHER WITH THE RIGHT  OF· ACCESS

THE WITHIN PLATTED  LANDS  DOES
FROM ABUTTING LOTS  WITHIN  THIS
TO .  VEHICULAR ACCESS.  TO THE

E A COVENANT ATTACHED TO THE LAND
OF THE SUBDIVISION AND SHALL HAVE
NNING WITH THE LAND.

T           1999

ITED LIABILITY COMPANY. BY:

### CITY ENG

THE CITY OF NOR
HEREBY CERTIFY
UNIT II — PHA
SUBSTANTIALLY 1
APPROVED ALTER/
ZONING ACT OF 1
AT  THE TIME OF
FURTHERMORE,  }
IF THE MONUMEN
BEEN  POSTED

_12/12/0_

DATED THIS  _12_

### LEGAL DE

BEING A SUB
PLAT OF A PO
OFFICE OF  T
PARCEL MAPS,
OF THE SOUT
RANGE  61 EAS
MORE PARTICUL

·COMMENCING A
THENCE NORTH

RECORDER'S MEMO
POSSIBLE POOR RECORD DUE TO
QUALITY OF ORIGINAL DOCUMENT



# RANCHO MIRA

(A COMMO

SUBDIVISION OF A PORTION OF LOT 1 OF PARCEL M
ST QUARTER (SW 1/4) OF SECTION 27, TOWNSHIP 19

N.A.P. PARCEL 2 PARCEL MA
APN 124-27-3(





# RANCHO MIRAC

(A COMMO

A SUBDIVISION OF A PORTION OF LOT 1 OF PARCEL M

ST QUARTER (SW 1/4) OF SECTION 27, TOWNSHIP 19

## CURVE TABLE

| CURVE | RADIUS | LENGTH | TANGENT | DELTA |
|-------|--------|--------|---------|-------|
| C1 | 498.50' | 23.15' | 11.58' | 02°39'40" |
| C2 | 474.50' | 138.31' | 69.65' | 16°42'01" |
| C3 | 474.50' | 224.53' | 114.41' | 27°06'42" |
| C4 | 474.50' | 88.22' | 43.23' | 10°24'40" |
| C5 | 450.50' | 42.38' | 21.21' | 05°23'24" |
| C6 | 20.00' | 30.21' | 18.83' | 86°32'24" |
| C7 | 20.00' | 36.78' | 26.23' | 105°21'11" |
| C8 | 450.50' | 77.28' | 38.73' | 09°49'43" |
| C9 | 498.50' | 235.88' | 120.19' | 27°06'42" |
| C10 | 498.50' | 6.33' | 3.17' | 00°43'40" |
| C11 | 498.50' | 53.72' | 26.88' | 06°10'26" |
| C12 | 498.50' | 51.86' | 25.95' | 05°57'38" |
| C13 | 498.50' | 50.70' | 25.37' | 05°49'39" |
| C14 | 498.50' | 50.12' | 25.08' | 05°45'38" |
| C15 | 20.00' | 32.09' | 20.69' | 91°55'48" |
| C16 | 20.00' | 30.74' | 19.34' | 88°04'12" |
| C17 | 25.00' | 14.16' | 7.27' | 32°26'33" |
| C18 | 35.00' | 53.87' | 33.91' | 88°11'05" |
| C19 | 61.50' | 164.30' | 256.85' | 153°04'11" |
| C20 | 61.50' | 28.00' | 14.25' | 26°05'22" |
| C21 | 61.50' | 35.39' | 18.20' | 32°58'03" |
| C22 | 61.50' | 34.51' | 17.73' | 32°09'20" |
| C23 | 61.50' | 35.29' | 18.15' | 32°52'39" |
| C24 | 61.50' | 31.11' | 15.89' | 28°58'47" |
| C25 | 35.00' | 56.09' | 36.13' | 91°48'55" |
| C26 | 61.50' | 168.20' | 298.28' | 156°42'00" |
| C27 | 61.50' | 15.28' | 7.68' | 14°14'09" |
| C28 | 61.50' | 38.33' | 19.81' | 35°42'43" |
| C29 | 61.50' | 35.60' | 18.32' | 33°10'05" |
| C30 | 61.50' | 34.26' | 17.59' | 31°54'58" |

⊐⊔⊏∟∈Ν        ⊔⊓⊐∟

200205 ⊔F  498.50  FI
.01313   THROUGH  A  CI
          154.71  FEET
          OF A PORTION
          WEST,  ALONG
          FOLLOWING·FIVI
          SOUTH  89°23'
          FEET;  (4)  SOU
          598.83  FEET  T
          SOUTHWEST  QU
          EAST,  ALONG  S.

          CONTAINING  9.
          METHODS.

ORE ME ON  AUGUST 19.
SPECIALTY HOLDINGS, INC., A NEVADA
RANCHO MIRAGE I, L.L.C., A NEVADA

AND STATE
O

## NT RECIPIENTS

IS AND AGENCIES, APPROVE THE



TARIE RIZZO        9-7-99      DATE      M.I.T. 07/11/01
                                          MARIA L. TREJIA

BENITO             9-13-99     DATE      Jim Reilly
                                          7/31/01
                                          JIM A. REILLY

                   9-8-99      DATE      Dm 7.11.01
                                          DAVID MORENO

B. McCARREL, JR.   9-7-99      DATE      BES 7/2/01
                                          STEPHEN A. JONES

ISION -            12/12/01    DATE



RECORDER'S MEMO
POSSIBLE POOR RECORD DUE TO
QUALITY OF ORIGINAL DOCUMENT

Branch :FLV,User :EDLE                    Comment:                                    Station Id :X7QR



200205.10
.01313

BEIN
OF THE SOUT

## OWNER'S CERTIFICATI

RANCHO MIRAGE I, L.L.C., A N
HEREBY CERTIFY THAT IT IS THE
SHOWN UPON THIS PLAT OF RANCHO
IN THE SURVEYOR'S CERTIFICATE
PREPARATION AND RECORDATION OF
DEDICATE ALL THE STREETS, AL
INDICATED AND OUTLINED HEREON, I
TO 278.630, INCLUSIVE, AND TI
VEGAS FOR THE USE OF THE PUBLIC:

FURTHERMORE, THE UNDERSIGNED O
HEREBY GRANT AND CONVEY TO
SOUTHWEST GAS CORPORATION, NE
COMPANY, AND COX COMMUNICATIONS
ASSIGNS: A PERMANENT EASEMENT
"PUBLIC UTILITY EASEMENT", (!
ELEMENTS; A THREE FOOT (3') WI
AND UNDERGROUND SERVICES TO ME
EASEMENT ON ALL PROPERTY LINES
ABOVE GROUND TRANSFORMER PADS
PADS TOGETHER WITH AN ADDITIONAL
WITHIN THE PLATTED LANDS FOR THE
AND FINAL REMOVAL OF UNDERGROUI
AND GAS LINES AND APPURTENAN(
THERETO;

FURTHERMORE, THE UNDERSIGNED O'
HEREBY WAVE DIRECT ACCESS R
SUBDIVISION, INCLUDING BUT NOT I
FOLLOWING STREETS: (NONE).

THIS WAIVER OF ACCESS RIGHTS SI
AND PASS WITH EACH AND EVERY PO!
THE FORCE AND EFFECT OF A COVEN.

DATED THIS _190l_ DAY OF _A_

RANCHO MIRAGE I, L.L.C., A NEVA
SPECIALTY HOLDINGS, INC., A NEV.



200205 10
.01313

BEI
OF THE SOU

20020510
.01313

## ACKNOWLEDGEMENT

STATE OF NEVADA )
                ) SS
COUNTY OF CLARK )

THIS INSTRUMENT WAS ACKNOWLEDGED
_1999_ BY JERRY GOEDEN AS PRESIDEN
COPORATION,  AS MANAGING MEMBER
LIMITED LIABILITY COMPANY.

_Kathleen Gall_
KATHLEEN GALL
NOTARY PUBLIC IN AND FOR SAID CO
MY COMMISSION EXPIRES: AUGUST

## CERTIFICATE OF EASE

WE, THE HEREIN NAMED UTILITY COM
GRANT OF THE DESIGNATED EASEMENT

_Marie Cinzzi_
COX COMMUNICATIONS LAS VEGAS,  IN

_Yolanda M. Reinstra_
NEVADA POWER COMPANY · YOLANDA

_Jane F. Stokes_
SPRINT                    JANE F. STOK

_Ted McClure_
SOUTHWEST GAS CORPORATION  CLA

_Ladenal U. Cubler_
CITY OF NORTH LAS VEGAS, UTILIT
LADENAL U. CUBLER



200205 10
.01313

RECORDER'S MEMO
POSSIBLE POOR RECORD DUE TO
QUALITY OF ORIGINAL DOCUMENT

CLARK COUNTY, NEVADA
JUDITH A. VANDEVER, RECORDER
RECORDED AT REQUEST OF:

NEVADA TITLE COMPANY
05-10-2002 14:08  KGO        97
OFFICIAL RECORDS
BOOK: 20020510  INST:   01313
FEE:   110.00  RPTT:            .00

# EXHIBIT 16

# EXHIBIT 16

 

Tiki Velazquez
Claims Representative
Stewart Title Guaranty Company
2055 West Army Trail Road
Suite 110
Addison, IL 60101
(630)889-4050
(630)629-7565 FAX
tiki.velazquez@stewart.com

WrightFinlay & Zak
Attn: J. Stephen Dolembo
4665 MacArthur Court
Suite 200
Newport Beach, CA 92660

Re: STGC Claim Number:   S023-0279191-16
    Policy Number:       M-9302-1363434
    Insured:             Mountain View Mortgage Company
    Borrower:           Ken Gregory

Dear Mr. Doelembo:

Stewart Title Guaranty Company ("Stewart") has completed its review of your title claim and
has reached a coverage determination. You filed a claim with Stewart regarding an HOA lien in
the amount of $3,030.81 that was subsequently foreclosed, resulting in an extinguishment of the
insured lien. In your claim letter you are requesting Stewart to "take necessary steps to cure the
title issues."

Coverage under the Policy is subject to the stated conditions, exclusions and exceptions
contained therein. Your attention is directed to the Policy, specifically the Exclusions
from Coverage section that provides in pertinent part as follows:

      EXCLUSIONS FROM COVERAGE
      The following matters are expressly excluded from the coverage of this policy and the Company
      will not pay loss or damage, costs, attorneys' fees or expenses, which arise by reason of:

      3.     Defects, liens, encumbrances, adverse claims or other matters:

           (a)      created, suffered, assumed or agreed to by the Insured claimant;

           . . .

Additionally, I refer your attention to the following Conditions and Stipulations:

3.    NOTICE OF CLAIM TO BE GIVEN BY INSURED CLAIMANT.
The insured shall notify the Company promptly in writing (i) in case of any litigation as
set forth in Section 4 (a) below, (ii) in case knowledge shall come to an insured hereunder
of any claim of title or interest which is adverse to the title to the estate or the interest or
the lien of the insured mortgage, as insured, and which might cause loss or damage for
which the Company may be liable by virtue of this policy; or (iii) if title to the estate or
interest of the lien of the insured mortgage, as insured, is rejected as unmarketable. If
prompt notice shall not be given to the Company, then as to the insured all liability of the
Company shall terminate with regard to the matter or matters for which prompt notice is
required; provided, however, that failure to notify the Company shall in no case prejudice
the rights of any insured under this policy unless the Company shall be prejudiced by the
failure and then only to the extent of the prejudice.

Under Condition and Stipulation 3 of the Policy, it is not for the Insured to decide when it
will provide notice to the Company. If the Insured wants policy benefits, the Insured *shall* give
prompt notice to Stewart. If prompt notice is not provided, liability under the policy may be
limited to the extent that it prejudices the insurer. Here, the Insured's failure to provide notice
completely deprived Stewart of the ability to cure the lien on behalf of the Insured. The Insured
did not provide prompt notice of the HOA lien, foreclosure action or subsequent litigation filed
by Nevada Association Services. By the time the Insured did tender this claim, the matter had
been sold and the lien extinguished.

The Insured's late notice prevented Stewart from exercising its rights under Condition
4(b) of the Policy to "institute and prosecute any action or proceeding or to do any other act
which in its opinion may be necessary or desirable to establish the title to the estate or interest or
the lien of the insured mortgage, as insured, or to prevent or reduce loss or damage to the
insured." The prejudice exists in the fact that had notice been timely; Stewart's liability under
the Policy could have been limited to a nominal payment to obtain a lien release. Instead, the
Insured now seeks indemnity despite the fact that the Insured did not give Stewart notice of this
matter, did not pay the outstanding lien balance and did not afford Stewart any opportunity to
review and/or defend any litigation adverse to the Insured. The Insured's actions have
prejudiced Stewart to the extent that it cannot defend or otherwise resolve the claim and your
claim for indemnity is respectfully denied.

For the foregoing reasons, your claim is respectfully denied. However, since pursuant to
the 9-06 to the Policy, this claim may have been a covered matter in 2013 had the Insured
tendered a claim at that time. Assuming that a claim had been tendered, Stewart would have
paid a loss in the amount of $3,030.81. A check in the amount of $3,030.81 will be forthcoming
within ten (10) business days.

Very truly yours;

Tiki Velazquez
Claims Representative

Cc: Kelly Rickenbach